UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------X

ORAN ALMOG, et al.,                              :

                Plaintiffs,             :          CV 04-5564 (NG)(VVP)

          -against-                          :

ARAB BANK, PLC,                                  :

                Defendant.            :

-----------------------------------------------------X
-----------------------------------------------------X

GILA AFRIAT-KURTZER, et al.,                     :

                Plaintiffs,             :          CV 05-388 (NG)(VVP)

          -against-                          :

ARAB BANK, PLC,                                  :

                Defendant.            :

-----------------------------------------------------X


## MEMORANDUM OF LAW OF ARAB BANK PLC IN SUPPORT OF ITS MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINTS IN *ALMOG ET AL. V. ARAB BANK, PLC* AND *AFRIAT-KURTZER ET AL. V. ARAB BANK, PLC*


**WINSTON & STRAWN LLP**
200 Park Avenue
New York, New York 10166
Tel.:  (212) 294-6700

Attorneys for Defendant Arab Bank plc

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ iv

PRELIMINARY STATEMENT ....................................................................................... 2

THE FACTS ................................................................................................................... 8

I.     THE PLAINTIFFS ............................................................................................... 8

II.    THE COMPLAINTS ............................................................................................ 9

    A.     The Complaints Improperly Assert Claims
        Under The Alien Tort Statute ................................................................ 9

    B.     The Complaints Improperly Assert Claims
        Under The Anti-Terrorism Act .............................................................. 9

ARGUMENT ................................................................................................................... 9

I.     *SOSA* REQUIRES THE DISMISSAL OF ALL CLAIMS
    UNDER THE ALIEN TORT STATUTE ............................................................... 9

    A.     Sosa Requires That This Court Exercise Extreme
        Caution In Identifying New "Norms of International Law" ..................... 10

    B.     No International Norm Exists With Respect To
        The "Financing Of Terrorism" ............................................................... 13

        1.     The Sources of International Law Upon Which Plaintiffs
            Rely Do Not Reflect "Norms of Customary International Law" ..... 16

        2.     United Nations Resolutions Do Not Constitute
            Sources Of International Law ...................................................... 17

    C.     Plaintiffs Have Failed To Allege That Customary
        International Law Prohibits The Banking Transactions At Issue ............. 18

    D.     Customary International Law Does Not Recognize
        Civil Liability For The Aiding And Abetting Of Terrorism ..................... 20

    E.     The Provision Of Banking Services Does Not
        Constitute An Act Of Genocide ............................................................. 22

    F.     Counts Four And Five Must Be Dismissed
        With Respect To Forty-Four *Almog* Plaintiffs, And All
        *Afriat-Kurtzer* Plaintiffs, Whose Injuries Pre-Date The Tort Alleged ..... 23

II.    PLAINTIFFS HAVE FAILED ADEQUATELY TO ALLEGE THE ELEMENTS OF A
    CIVIL CLAIM FOR AIDING AND ABETTING ACTS OF TERRORISM. ............. 24

    A.     Fifty-One Plaintiffs Allege Harm From Unattributed Acts Of Violence ...... 25

    B.     Forty-Two Plaintiffs Improperly Assert That
        Arab Bank Is Liable For The Acts Of "Palestinians" .............................. 27

# TABLE OF CONTENTS
## (cont'd)

Page

C.  No Plaintiff Alleges That The Particular Assailant Responsible For His or Her Harm Held An Account At, Or Received Monies Through, Arab Bank .......................................................................................29

D.  The Allegations Of The Complaints Regarding Charitable Organizations Are Insufficient To State A Claim Against Arab Bank .............................................31

E.  Plaintiffs Have Failed To Allege That The Violent Acts At Issue Were Motivated by Benefit Payments..........................................................34

III.  PLAINTIFFS HAVE IMPROPERLY ALLEGED VIOLATIONS OF "FEDERAL COMMON LAW" .......................................................................37

    A.  The Allegation That Arab Bank Assisted In The International Injury Of Others Does Not Constitute A Federal Common Law Tort .....................38

    B.  "Reckless Disregard" Is Not A Recognized Federal Common Law Tort ...............39

    C.  Allegations Of "Wrongful Death" Must Be Dismissed As A Matter Of Law ...............................................................................40

        1.  Plaintiffs Fail To Allege A Cause Of Action For Wrongful Death Under New York Statutory Law ...........................................41

            a.  No Plaintiff Claims To Be The Personal Representative Of The Estate Of A Deceased Plaintiff ..........................................41

            b.  Many Plaintiffs Are Not Distributees Of Decedents' Estates As Defined In New York Law ........................................................42

            c.  Plaintiffs' Claims For Non-Pecuniary Damage Must Be Dismissed ..................................................................................42

        2.  Many Plaintiffs' Claims Are Time-Barred ......................................................43

    D.  Count Nine Fails To State A Cause Of Action For The Tort of Survival ...............43

    E.  Count Ten, For Negligent And Intentional Infliction Of Emotional Distress, Must Be Dismissed ...............................................................44

        1.  Plaintiffs' Claims For Negligent Infliction of Emotional Distress Are Legally Insufficient.....................................................................45

        2.  Under New York Law, The Negligent Infliction Of Emotional Distress Claims Of Many Plaintiffs Are Time-Barred..................46

        3.  Plaintiffs' Claims For Intentional Infliction Of Emotional Distress Are Legally Insufficient .....................................................47

**TABLE OF CONTENTS**
**(cont'd)**

Page

      4.    Under New York Law, The Intentional Infliction Of
           Emotional Distress Claims Of Many Plaintiffs Are Time-Barred..................47

IV.  THIS COURT LACKS SUBJECT MATTER JURISDICTION
     OVER THE PLAINTIFFS' CLAIMS ...............................................................................47

V.   COUNTS ONE AND TWO MUST BE DISMISSED
     AS A MATTER OF LAW. ................................................................................................48

     A.    Seventeen Of Thirty-Six Plaintiffs Lack Standing To
           Assert Claims Under The Anti-Terrorism Act .........................................................48

     B.    Six Plaintiffs Fail To Allege That They Have Been Injured
           By Acts Meeting The Definition Of "International Terrorism" ...............................49

     C.    Three Plaintiffs' Claims Are Time-Barred ................................................................50

VI.  ADOPTION OF LINDE, LITLE AND COULTER BRIEFS .............................................51

CONCLUSION.............................................................................................................................52

## TABLE OF AUTHORITIES

Page

### FEDERAL CASES

*In re: Air Crash Off Long Island, N.Y., on July 17, 1996,*
   209 F.3d 200 (2d Cir. 2000)................................................................40

*Bano v. Union Carbide Corp.,*
   No. 99 Civ. 11329, 2000 WL 1225789 (S.D.N.Y. Aug. 28, 2000) ............17

*Bailey v. Grand Trunk Lines New England,*
   805 F.2d 1097 (2d Cir. 1975)...........................................................48

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,*
   403 U.S. 388 (1970)........................................................................37

*Boim v. Quranic Literacy Institute,*
   291 F.3d 1000 (7th Cir. 2002) .........................................................25

*Boim v. Quranic Literacy Institute,*
   340 F. Supp. 2d 885 (N.D. Ill. 2004) ...............................................25

*City of Milwaukee v. Illinois,*
   451 U.S. 304 (1981)........................................................................37

*Clearfield Trust Co. v. United States,*
   318 U.S. 363 (1943)........................................................................37

*Corporacion Venezolana de Fomento v. Vintero Sales Corp.,*
   629 F.2d 786 (2d Cir. 1980).............................................................48

*Erie R.R. Co. v. Tompkins,*
   304 U.S. 64 (1938)......................................................................37, 38

*In re Estate of Ferdinand Marcos,*
   25 F.3d 1467 (9th Cir. 1994) ...........................................................11

*Filartiga v. Pena-Irala,*
   630 F.2d 876 (2d Cir. 1980).............................................................11

*First Nationwide Bank v. Gelt Funding Corp.,*
   27 F.3d 763 (2d Cir. 1994)...............................................................36

*Flatow v. Islamic Republic of Iran,*
   999 F. Supp. 1 (D.D.C. 1998)..........................................................40

*Flores v. S. Peru Copper Corp.,*
   343 F.3d 140 (2d Cir. 2003)...........................................11, 17, 18, 19

## TABLE OF AUTHORITIES
### (cont'd)

Page

*Carrick v. Central Gen. Hosp.*,
   414 N.E. 2d 632 (N.Y. 1980).............................................................................42

*Ganguly v. Charles Schwab & Co., Inc.*,
   No. 03 Civ. 6454, 2004 WL 213016 (S.D.N.Y. Feb. 4, 2004) ......................................10

*Garland v. Herrin*,
   724 F.2d 16 (2d Cir. 1983).............................................................................43

*Grey v. American Airlines, Inc.*,
   227 F.2d 282 (2d Cir. 1995)............................................................................39

*Haver v. Yaker*,
   76 U.S. (9 Wall.) 32 (1869) ...........................................................................16

*Hinderlider v. La Plata River & Cherry Creek Ditch Co.*,
   304 U.S. 92 (1938)........................................................................................37

*IIT v. Vencap Ltd.*,
   519 F.2d 1001 (2d Cir. 1975).....................................................................10, 48

*Kadic v. Karadzic*,
   70 F.3d 232 (2d Cir. 1995)..............................................................................11

*Koehler v. Bank of Bermuda, Ltd.*,
   No. 96 Civ. 7885, 1998 WL 67652 (S.D.N.Y. Feb. 19, 1998) ....................................50

*Kossick v. United Fruit Co.*,
   365 U.S. 731 (1961)........................................................................................37

*Leider v. Ralfe*,
   No. 01 Civ. 3137, 2005 WL 152025 (S.D.N.Y. Jan. 25, 2005)............................37, 39

*Mortise v. U.S.*,
   102 F.3d 693 (2d Cir. 1996).............................................................................45

*In re Pfohl Brothers Landfill Litigation*,
   26 F. Supp. 2d 512 (W.D.N.Y. 1998 ..............................................................42, 44

*Schwarder v. U.S.*,
   974 F.2d 1118 (9th Cir. 1992) .........................................................................40

*Sosa v. Alvarez-Machain*,
   __ U.S. __, 124 S. Ct. 2739 (2004).............................................................. *passim*

*In re South African Apartheid Litigation*,
   346 F. Supp. 2d 538 (S.D.N.Y. 2004)........................................................16, 17, 18

## TABLE OF AUTHORITIES
### (cont'd)

Page

*Tel-Oren v. Libyan Arab Republic,*
    726 F.2d 774 (D.C. Cir. 1984)..................................................................11

*In re Terrorist Attacks on September 11, 2001,*
    349 F. Supp. 2d 765 (S.D.N.Y. 2005), ...............................................*passsim*

*U.S. v. Yousef,*
    327 F.3d 5 (2d Cir. 2003)........................................................................14

*Wiwa v. Royal Dutch Petroleum Co.,*
    226 F.3d 88 (2d Cir. 2000)......................................................................11

*Xuncax v. Gramajo,*
    886 F. Supp. 162 (D. Mass. 1995) ..........................................................11

*Yamaha Motor Corp., USA v. Calhoun,*
    516 U.S. 199 (1996)................................................................................40

### STATE CASES

*Bovsun v. Sanperi,*
    461 N.E.2d 843 (N.Y. 1984)............................................................45, 46

*Chong v. New York City Trans. Authority,*
    441 N.Y.S.2d 24 (2d Dep't 1981).............................................................41

*James v. Middletown Cmty. Health Ctr., Inc.,*
    718 N.Y.S2d 358 (2d Dep't 2000) ..........................................................41

*Kennedy v. McKesson Co.,*
    448 N.E.2d 1332 (N.Y.1983)...................................................................45

*Martin v. Reedy,*
    606 N.Y.S.2d 455 (3d Dep't 1994)...........................................................43

*Meroni v. Holy Spirit Assoc. for Unification of World Christianity,*
    506 N.Y.S.2d 174 (2d Dep't 1986)...........................................................42

*Mingone v. State,*
    474 N.Y.2d 557 (2d Dep't 1984).  ...........................................................44

*Trombetta v. Con Kling,*
    626 N.E.2d 653 (N.Y. 1993)....................................................................46

### FEDERAL STATUTES

18 U.S.C. § 2333................................................................................................49

## TABLE OF AUTHORITIES
### (cont'd)

**Page**

18 U.S.C. § 2332 (f)..........................................................................................21

18 U.S.C. § 2335..............................................................................................50

18 U.S.C. § 2339 (c) ........................................................................................21

28 U.S.C. § 1330..............................................................................................47

28 U.S.C. § 1331..............................................................................................48

28 U.S.C. § 1332..............................................................................................47

28 U.S.C. § 1350..............................................................................................10

## STATE STATUTES

N.Y. C.P.L.R. § 214(5) ..............................................................................44, 46

N.Y. C.P.L.R. § 215................................................................................38, 40

N.Y. C.P.L.R. § 215(3) ...................................................................................47

N.Y. E.P.T.L. § 4-1.1(a) .................................................................................42

N.Y. E.P.T.L. § 5-1.2.......................................................................................51

N.Y. E.P.T.L. § 5-4.1.........................................................................41, 42, 43

N.Y. E.P.T.L. § 11-3.1 *et seq*.........................................................................44

## OTHER AUTHORITIES

21A Carmody-Wait 2d § 130:5.......................................................................43

Restatement (Second) of Torts § 500..............................................................39

Ronald H. Rosenberg, *The Ultimate Independence of the Federal Courts: Defying the Supreme Court in the Exercise of Federal Common Law Powers*, ..................... 37

G.A. Res. 54/109, U.N. GAOR, 54th Sess., 76th mtg., Supp. No. 49, U.N. Doc. A/Res/53/108 (1999)......................................................................................20

Defendant Arab Bank plc ("Arab Bank") respectfully submits this memorandum of law in support of its motions to dismiss the First Amended Complaint in *Almog, et al.* v. *Arab Bank, PLC* (the "*Almog* Complaint") and the First Amended Complaint in *Afriat-Kurtzer, et al.* v. *Arab Bank, PLC* (the "*Afriat-Kurtzer* Complaint") (collectively, the "Complaints") for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1), for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6), and on *forum non conveniens* grounds.

The *Almog* and *Afriat-Kurtzer* Complaints differ only with respect to those allegations pertaining to the identification of plaintiffs and the circumstances allegedly giving rise to their injury. Each Complaint copies in substantial part the allegations of the First Amended Complaint in *Linde, et al. v. Arab Bank, PLC,* CV 04-2799 (the "*Linde*" action), the First Amended Complaint in *Litle, et al. v. Arab Bank, PLC,* CV 04-5449 (the "*Litle*" action) and the Complaint in *Coulter, et al. v. Arab Bank, PLC,* CV 05-465 (the "*Coulter*" action). Arab Bank accordingly adopts herein the arguments set forth in its previously served motions to dismiss the *Linde*, *Litle* and *Coulter* Complaints.

Arab Bank wishes to emphasize, as an initial matter, that while it must accept all well pleaded allegations as true for the purposes of a Rule 12(b)(6) motion, it rejects absolutely any assertion that it has had involvement with terrorism. Arab Bank abhors terrorism, which has been a tragic obstacle to peace and prosperity in the region that it serves. As the largest financial institution in the Middle East, Arab Bank has for 75 years played a crucial and constructive role in the development of reliable, transparent and honest financial infrastructure in the region and views itself as a crucial catalyst for peaceful change and development.

## PRELIMINARY STATEMENT

In initiating these proceedings -- proceedings that one of their attorneys has described as a "targeted assassination" of Arab Bank -- plaintiffs are seeking to adjudicate in a federal court in Brooklyn long festering political grievances between Israelis and Palestinians.[1] These overwhelmingly foreign plaintiffs -- all but 36 of 1,636 of them are aliens -- seek to hold Arab Bank, the largest financial institution in the Middle East, liable for virtually every violent act that has taken place in Israel and the Palestinian territories in the last decade, under a theory of liability utterly unknown to American tort law and a theory of causation which Judge Robertson has described in a similar case against Arab Bank as "stretching proximate causation to terra incognita." These are political claims masquerading as causes of action. They do not belong in this Court and should be dismissed.

Plaintiffs seek in this unprecedented action to open the doors of the federal courthouses to the airing of remote, intractable political conflicts that have no connection to the United States. This Court should reject plaintiffs' invitation to make the federal courts a crucible in which political antagonists seek to extend the field of conflict to attempts to bankrupt one another through litigation.

Simply stated, plaintiffs allege that in processing electronic fund transfers, Arab Bank violated recognized "norms of international law" -- in particular, the widely recognized prohibition against "genocide." Genocide is, of course, one of the most heinous crimes imaginable, and few would consider the completion of a wire transfer to be an exemplar of a genocidal act. If this Court allows the grave charge of genocide to stand against a prominent financial institution that is alleged to have done nothing other than process routine banking

---

[1]    *Yediot Ahronot*, "Cost of Terrorism" (Israel, Dec. 17, 2004). *See infra* n.4.

transactions, it will legitimize such outlandish claims against all entities that find themselves the subject of political controversy.

Indeed, it is a simple matter for this Court to envision the allegations that will soon follow if the flawed Complaints now before it survive challenge. The next class of defendants will include not only the many other banks that participated in the processing of the electronic transfers at issue, but also the many humanitarian organizations that have raised funds to alleviate grievous economic hardship in the Middle East. Plaintiffs have hinted that they are in the process of entertaining such claims:

> Palestinian terrorist groups . . . have served to benefit from the financial support that has been fed into the Palestinian territories since the outbreak of the Al-Quds Intifada.

(Compls. ¶ 159.) Indeed, one of the attorneys for plaintiffs has already declared, in a profile of him appearing in Israel in *Yediot Ahronot*, that "[l]ater on, he and his partners plan to sue corporations and individuals, and it does not end in America. This front will continue in Chechnya, the Philippines, Bosnia, Europe. . . . This is the American way of thinking, which grants a great deal of power to civil claims."[2]

In fact, the Saudi Committee, which figures prominently in the allegations of the Complaints as the "backbone of the donor base" for the funds that have flowed in recent years to the Palestinian territories, has acted in partnership with the United Nations, as have the Kingdom of Saudi Arabia and the Holy See, in funding the charitable activities of its Relief and Works

---

[2]     *Yediot Ahronot,* "Cost of Terrorism" (Israel, Dec. 17, 2004). Mr. Mairone also notes: "We searched from the start for entities who were both helping to finance terrorism and who would be able to pay. Apart from that, you cannot compare the amounts that could be awarded in America in torts cases to anything we know here. In the U.S., contrary to Israel, in addition to the torts compensation, there are also enormous penal awards, and I am talking millions." Mr. Mairone also expressly acknowledged his political objectives: "There are a number of goals here, all important: . . . to expose large and respectable corporations before the American courts, as well as to assist Israeli propaganda efforts. That is a type of propaganda that is much more effective than what we have today." *Id.* For the reference of the Court, an English language version of the full article, as well as an original, is annexed to this memorandum of law.

Agency.     Plainly, in the tortured logic that underlies the theory of liability asserted here, the United Nations, the European Union, the World Bank, and even the United States government, having "fed into the Palestinian territories" considerable "financial support," thereby benefited "Palestinian terror groups."[3]  (Compls. ¶ 159.)  In effect, plaintiffs seek to conflate all donor and economic activity in the Palestinian territories with terrorism and to hold all institutions involved in such donor activity liable -- because an infinitesimal fraction of the funds used in such humanitarian and development activities may have unwittingly found its way into the hands of the wrong people.

The tragic cycle of recrimination and violence is an intractable fact of life in the Middle East today.   Indeed, it is far from impossible to imagine, should this Court allow plaintiffs' unprecedented claims to proceed, the filing of the political mirror image of the case now before this Court:  an action by a Palestinian family against the Israeli government, or Israeli civilians or institutions, for engaging in "genocide," including the killing of civilians and the razing of homes, against the Palestinian people.  (It is, after all, an unhappy characteristic of the troubles in the Middle East that such inflammatory claims are routinely made by both parties

---

[3]     Since the start of the Second Intifada, the European Commission Humanitarian Organisation has provided over EU$155 million "in assistance to Palestinian people throughout the region."  During this same period of time, the World Bank has contributed more than $185 million, which has been distributed by the Palestinian Authority.  *Assisting     the     most     vulnerable     Palestinians*,     Feb.     16,     2005,     *available     at* http://europa.eu.int/comm.echo/field/gaza/index_en.htm; West Bank & Gaza: A World Free of Poverty, available at http://Inweb18.worldbank.org/mna/mena.nsf/0/81299aflbl220c528525680e008ld721 ("World Bank Web site").

The United Nations Relief and Works Agency has contributed more than $400 million to the Palestinian community during the period from October 4, 2000 to December 31, 2004.  The United States has contributed more than $150 million to this community:  it is the single largest financial donor to the Palestinian relief effort and is directly responsible for over 35% of all aid given.  *See United Nations Relief and Works Agency for Palestine Refugees in the Near East, Pledges to UNRWA's Emergency Appeals, from 4 October 2000 up to 31 December 2004, available at* http://www.un.org/unrwa/finances/pdf/ea_rank.pdf ("UN Web site") (providing chart of nations' and relief organizations' contributions to Palestinian causes).  *See also USAID West Bank and Gaza Program Budget, available at* http://www.usaid.gov/wbg/budget.htm ("USAID Web site") (quoting the Palestinian Authority Ministry of Planning as stating: "the U.S. is the largest bilateral donor in the West Bank and Gaza.").  *Id.*  In fact, the United States has donated a total of $1.5 billion in aid to the West Bank and Gaza from 1993 through 2004.  *See* USAID Web site.

4

to the conflict.)   What possible role can the United States courts play as the referee of such claims?

Ascertaining and applying the "law of nations" to such stalemated disputes is the business of the political branches of government, rather than the federal courts.  Indeed, the Supreme Court has recognized that such a task is fraught with peril:

> [T]he general practice has been to look for legislative guidance before exercising innovative authority over substantive law [in the area of foreign relations].  It would be remarkable to take a more aggressive role in exercising a jurisdiction that remained largely in shadow for much of the prior two centuries. . . .
>
> [T]he possible collateral consequences of making international rules privately actionable argue for judicial caution. . . .
>
> It is one thing for American courts to enforce constitutional limits on our own State and Federal Government's power, but quite another to consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens, and to hold that a foreign government or its agents has transgressed those limits. . . .
>
> [M]any attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences. . . .
>
> Several times, indeed, the Senate has expressly declined to give the federal courts the task of interpreting and applying international human rights laws.

*Sosa v. Alvarez-Machain*, __ U.S. __, 124 S. Ct. 2739, 2762-63 (2004) ("*Sosa*").

While the Supreme Court in *Sosa* recognized that there may be certain specific, universal norms of international law that may be justiciable -- for example, the prohibition against torture or piracy -- the federal courts cannot engage in the exercise of finding international law where norms are difficult to define or are in conflict.  In a similar context, the Supreme Court found the implications of declaring a universal justiciable norm against arbitrary detention to be "breathtaking."  Here, however, plaintiffs seek to go further, notwithstanding the fact that no federal court has ever held that the provision of routine banking services contravenes

the "law of nations" or the norms of customary international law. Plaintiffs' attempt to create such a norm is directly contrary to the Supreme Court's recent direction in *Sosa*.

In effect, plaintiffs are asking this Court to endorse causes of action that can be asserted in connection with any funds transfer, anywhere in the world, which arguably was employed, in the most attenuated of fashions, to support acts of violence. Plainly, international banking, which relies upon sophisticated, automated systems, cannot exist in a world where a teller is required to look into the soul of every customer at the counter to discern if he harbors political sentiments that may tend towards violence.

When confronted with the virtually identical claims of alien plaintiffs, the court in *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005) ("*In re Terrorist Attacks*"), dismissed them summarily. It is notable that the plaintiffs in those actions, represented by the same lead counsel as now appears before this Court, also alleged that the banking transactions processed by Arab Bank and a dozen other banks and financial institutions violated norms of international law. *E.g.*, Third Am. Compl., *Burnett* (¶ 654, "These terrorist acts constitute a clear violation of the law of nations, otherwise referred to as customary international law, which includes international legal norms prohibiting mass murder, genocide, torture, air piracy, and terrorism"; ¶ 656 "Defendants' sponsorship of terrorism in violation of the law of nations . . ."). The Court rejected these allegations without leave to replead. "Providing routine banking services, without having knowledge of the terrorist activities, cannot subject Arab Bank to liability. . . . A complaint alleging conclusions without supporting facts will not survive a Rule 12(b)(6) motion." *In re Terrorist Attacks*, 349 F. Supp. 2d at 835.

Nor are the claims of the 36 plaintiffs who allege United States citizenship viable. These plaintiffs assert claims under the Anti-Terrorism Act. Like those plaintiffs who have

asserted claims under the Alien Tort Statute, none are able to identify the assailants who caused their injury. They have similarly failed to allege facts that support an inference that Arab Bank had actual knowledge of the planned activities of these assailants and intended to provide material support to them. Nor have plaintiffs alleged that these assailants were incentivized by the promise of prospective payment from the Saudi Committee. These deficiencies are fatal, since under familiar principles of tort law applicable here, each plaintiff must allege not only that he or she suffered injury, but also that this injury was caused by a specific act, committed by an identified assailant, and that Arab Bank provided material assistance to such assailant with actual knowledge of the harmful act that resulted in the plaintiff's specific injury.

Instead, the 36 plaintiffs who assert claims under the Anti-Terrorism Act, like those who have improperly invoked the jurisdiction of this Court under the Alien Tort Statute, allege that Arab Bank is responsible for aiding and abetting all acts of terror -- and indeed, all acts of random violence -- in Israel and Israeli-occupied territories since 2000. Arab Bank is alleged to be liable for these acts not because it knew of them and sought to support them, but because it acted as a banking intermediary in the processing of payments to Palestinians, some of which may have been made to family members of terrorists.

Such a theory of liability is, as courts have recognized, utterly at odds with concepts of legal causation in American tort law. This Court must instead measure the plaintiffs' claims against the cautionary language of the Supreme Court in *Sosa*: "such a rule would suggest a cause of action . . . anywhere in the world" for any charitable payment that was alleged to be illegitimate. *Sosa*, 124 S. Ct. at 2768. All claims asserted in these Complaints should be dismissed.

7

## THE FACTS

### I.   THE PLAINTIFFS

Neither the *Almog* nor the *Afriat-Kurtzer* action asserts class-based claims. To the contrary, each of the more than 1,600 plaintiffs in these two actions has asserted individual claims arising from particular, and disparate, acts of violence occurring over a ten year period.[4]

Notwithstanding the many glaring deficiencies in their pleadings, it is plain that only a handful of these plaintiffs are able to allege any connection whatsoever to this jurisdiction. Only 36 plaintiffs, for instance, allege United States citizenship. Indeed, of the 34 *Almog* plaintiffs who allege United States citizenship, 26 claim to hold dual citizenship and do not appear to be residents of the United States. The remaining plaintiffs are citizens of no fewer than

---

[4]   In fact, it is impossible accurately to discern the number of plaintiffs who purport to bring suit against Arab Bank. In the *Almog* Complaint, the caption lists 1,517 names, yet 1,760 names are set forth in ¶¶ 30(1)-(153). Of those, only 1,450 persons are identified as a "plaintiff." Similarly, the *Afriat-Kurtzer* Complaint sets forth 119 names in the caption, yet identifies only 117 persons in ¶¶ 30(1)-(2); of those, 99 are referred to as a "plaintiff" and 18 are not. Two plaintiffs named in the *Afriat-Kurtzer* caption, "Vered Ben Zino" and "[Estate of] Ziva Benor," moreover, appear nowhere in the Complaint.

Other instances of sloppiness pervade the *Almog* Complaint. More than 30 plaintiffs, for instance, appear multiple times in the caption of the *Almog* Complaint. *See, e.g., Almog* Compl., Caption at pp. 51, 59 (listing Ofra Adani, whose allegation appears only at ¶ 30(141), twice as one of "The 'ALMOG Plaintiffs' Represented by Ronald Motley and Allen Gerson"; *similarly, id.*, at pp. 64, 92, 93 (listing Hadas Hadad, whose allegation appears only at ¶ 30(4), three times as one of "The 'FRANCO Plaintiffs' Represented by Ronald Motley and Gavriel Mairone." Indeed, a number of plaintiffs are listed more than once, as clients of different counsel. *See, e.g., id.*, at pp. 49, 71 (listing Yehuda Yungriss, whose allegation appears only at ¶ 30(51), twice -- once as an "ALMOG Plaintiff Represented by Ronald Motley and Allen Gerson" and separately as a "FRANCO Plaintiff Represented by Ronald Motley and Gavriel Mairone"). Equally confusing is the fact that the names of 55 decedents appear in the *Almog* caption, under the title "Estate of __," yet the remainder of the 212 decedents do not appear in the caption at all. *Compare, e.g., Almog* Compl. ¶ 30(35) & Caption, p. 76 (Ehud Avitan) *with* ¶ 30(12) (Zvi Bahat); *similarly, compare* ¶ 30(52) & Caption, p. 73 (Boaz Aluf) *with* ¶ 30(90) (Asan Avitan); *similarly*, ¶ 30(13) & Caption, p. 73 (Felix Nicholaichuk) *with* ¶ 30(143) (Hanan Levy).

Although it is entirely unclear why certain decedents are listed in the caption and others are not, the confusion in such pleading is compounded by the fact that some of those decedents whose names are listed in the caption are referred to in the Complaint as "plaintiffs," while others who are listed in the caption are not. (*Compare, e.g., Almog* Compl. ¶ 30(44) & Caption, p. 74 ("plaintiff Yossi Mamiststlov" *with* ¶ 30(52) & Caption, p. 73 ("Boaz Aluf").) It contravenes all rules of proper pleading that Arab Bank has been forced to guess which of the 212 decedents have claims purportedly brought on their behalf and which do not. Here, however, a more serious deficiency is apparent in that even among the 55 decedents listed in the caption as "Estate of __," not one is represented by a named administrator or other proper representative and thus cannot, as explained further below, state a claim in any event. Indeed, some of the persons in the caption, apparently suing under their own names rather than under the name of an "estate," are alleged to be deceased. (*See, e.g., Almog* Compl. ¶ 30(88) & Caption, p. 85 (Michael Zarayski); *similarly, Almog* Compl. ¶ 30(66) & Caption, p. 79 (Rachel Levy).)

27 countries, including Afghanistan, Kazakhstan, Morocco, Peru, South Africa, and Israel. (*Almog* Compl. ¶¶ 30(1)-(153).)

## II.    THE COMPLAINTS

### A.    The Complaints Improperly Assert Claims Under The Alien Tort Statute.

The 1,600 alien plaintiffs purport to assert claims under "norms of international law." (*Almog* Compl., pp. 224-44; *Afriat-Kurtzer* Compl., pp. 84-104.)   The sources of this "international law" are alleged to be an assemblage of international conventions and United Nations resolutions. The alien plaintiffs also assert claims of "reckless disregard" and "wrongful death," among other causes of action, that appear to allege violations of "general federal common law." (Compls. ¶ 4.)   Because of the vague and imprecise manner in which the Complaints have been drafted, it is impossible to discern those counts that are asserted by each plaintiff.

### B.    The Complaints Improperly Assert Claims Under The Anti-Terrorism Act.

Only those 36 plaintiffs who allege United States citizenship may seek to allege claims under the Anti-Terrorism Act. The *Almog* and *Afriat-Kurtzer* actions purport to assert such claims, in a form that is essentially identical to the claims asserted by the *Linde, Litle* and *Coulter* plaintiffs. Arab Bank respectfully refers the Court to its previous arguments in support of the dismissal of those actions. (*See generally Linde* Br. at 10-50; *Litle* Br. at 1-23; *Coulter* Br. at 3-20.)

## ARGUMENT

### I.    *SOSA* REQUIRES THE DISMISSAL OF ALL CLAIMS UNDER THE ALIEN TORT STATUTE.

As noted above, substantially all of the plaintiffs are aliens. The conduct which allegedly has given rise to their injuries -- the processing of humanitarian aid payments to

Palestinian beneficiaries in Gaza and the West Bank -- is similarly remote.  Plaintiffs nonetheless

seek to assert their political claims in this forum pursuant to the "norms of international law" --

in particular, the universal prohibition against genocide.  Their attempt to do so is entirely

meritless and plainly contravenes the recent holding of the United States Supreme Court in *Sosa*.

The assertion that the processing of routine banking transactions, at the instruction

of other banks, is tantamount to a campaign of genocide is, on its face, incoherent and baseless.

The very same outlandish claims against Arab Bank and a dozen other financial institutions --

irresponsibly made by the very same counsel -- were summarily dismissed in *In re Terrorist*

*Attacks*, and they must be dismissed here.

A.  **Sosa Requires That This Court Exercise Extreme Caution In Identifying New "Norms of International Law."**

All of the alien plaintiffs assert their claims pursuant to the Alien Tort Claims

Act, 28 U.S.C. § 1350 (the "Alien Tort Statute").  (Compls. ¶ 5.)  This Statute does not confer

substantive rights, but rather affords subject matter jurisdiction over a very narrow class of

claims that allege the violation of clearly established "international norms."  *Ganguly v. Charles*

*Schwab & Co., Inc.*, No. 03 Civ. 6454, 2004 WL 213016, at *6 (S.D.N.Y. Feb. 4, 2004).  The

Alien Tort Statute provides in its entirety:

> The district courts shall have original jurisdiction of any civil action by an alien
> for a tort only, committed in violation of the law of nations or a treaty of the
> United States.

28 U.S.C. § 1350.

The Alien Tort Statute was passed by the first Congress as part of the Judiciary

Act of 1789, and remained moribund for two centuries.  *Sosa*, 124 S. Ct. at 2755.  Very little is

known about its origins; "it is a kind of legal Lohengrin . . . no one seems to know whence it

came."  *IIT v. Vencap Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975).  The Alien Tort Statute similarly

"lacks a legislative history that could provide courts with guidance as to its intended meaning." *Flores v. S. Peru Copper Corp.*, 343 F.3d 140, 148, 156, 159 (2d Cir. 2003) ("*Flores*"). Under the circumstances, it is not surprising that in the 170 years following its enactment, there is only one occasion on which the Alien Tort Statute was found to confer jurisdiction over a plaintiff's claims. *Sosa*, 124 S. Ct. at 2755.

This long period of dormancy ended in 1980, when the Second Circuit decided *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980). The events giving rise to the claims in *Filartiga* occurred in Paraguay; plaintiffs alleged that the decedent had been kidnapped, tortured, and killed by the Asuncion Inspector General of Police "in retaliation for his father's political activities and beliefs." *Id.*, 630 F.2d at 878. The court concluded that the Alien Tort Statute afforded a private right of action to aliens who alleged violations of the customary international prohibition against torture.

Predictably, *Filartiga*'s holding "attracted both celebrants and critics," *Flores*, 343 F.3d at 151 n.19, and, in its wake, claims under the Alien Tort Statute, typically alleging horrific acts of torture by repressive regimes, began to appear in the federal courts.[5] These decisions collectively gave rise to substantial uncertainty as to whether the Alien Tort Statute created not only subject matter jurisdiction, but also substantive causes of action upon which aliens might sue for torts in violation of the law of nations.

In June 2004, the United States Supreme Court definitively resolved this uncertainty, holding that the Alien Tort Statute authorized a tort claim by an alien only in the event that a separate and independent cause of action existed pursuant to a treaty of the United

---

[5]       *See, e.g., Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 92 (2d Cir. 2000) ("*Wiwa*") (torture by the Nigerian government); *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) (torture, rape, and other abuses by Serbian military leader); *In re Estate of Ferdinand Marcos*, 25 F.3d 1467 (9th Cir. 1994) (torture and other abuses by former Philippine President); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984) (claims against Libya for attack on civilians); *Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995) (abuses by Guatemalan military forces).

11

States, or the "law of nations." *Sosa v. Alvarez-Machain*, __ U.S. __, 124 S. Ct. 2739 (2004).   In

*Sosa,* the Court underscored, on multiple occasions, its concern that judicial efforts to discern

and enforce "the law of nations" "should be undertaken if at all with great caution," in light of

the fact that "many attempts by federal courts to craft remedies for the violations of new norms

of international law would raise risks of adverse foreign policy consequences." *Id.* at 2763.

      Humberto Alvarez-Machian, the respondent in *Sosa*, was a Mexican national who

had been indicted in the United States for the torture and murder in Mexico of an agent of the

United States Drug Enforcement Agency ("DEA").   The DEA ultimately authorized his seizure

by Mexican nationals so that he could be brought to the United States for trial.   Alvarez was

acquitted and thereafter commenced a civil action against his Mexican abductors, and others.   He

alleged that his seizure and detention were arbitrary and forbidden by customary international

law.

      The Supreme Court summarily rejected Alvarez's contention that there was a

binding, customary international norm against arbitrary detention.   Of greater significance, the

Court concluded that courts should not be engaged in the activity of identifying new, broadly

defined norms of international law.   Congress had never contemplated opening the doors of the

federal courts to such a torrent of claims, but rather had envisaged a very narrow universe of torts

that aliens had standing to assert:

> [W]e have found no basis to suspect Congress had any examples in mind beyond
> those torts corresponding to Blackstone's three primary offenses:   violation of
> safe conducts, infringement of the rights of ambassadors, and piracy.

*Id.* at 2761.   The Court cautioned, moreover, that any judicial efforts to discern the existence of

international norms "under the ambient law of the [modern] era" must be "restrained":

> there are good reasons for a restrained conception of the discretion a federal court
> should exercise in considering a new cause of action of this kind.   Accordingly,
> we think courts should require any claim based on the present-day law of nations

12

to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized.

*Id.*, at 2761-62. So as to underscore the need for caution, the Court warned:  there must be "a high bar to new private causes of action for violating international law." *Id.* at 2763.

In plain contravention of this holding, the plaintiffs have invited this Court to embrace an "international norm" far more tenuous than the prohibition against arbitrary detention at issue in *Sosa*. They assert that there is a specific and universal international norm against the financing of terrorism that prohibits the types of banking transactions at issue in these proceedings. In fact, there is nothing of the sort:  the international community has yet to agree upon a specific, enforceable definition of "terrorism," to say nothing of the "financing of terrorism." Nor have the federal courts, at any time since the enactment of the Alien Tort Statute more than 200 years ago, ever permitted claims for violations of customary international law to proceed against a bank for engaging in the type of financial activities alleged here.

The fact that plaintiffs consider this Court to be their "most powerful weapon" in the "targeted assassination" that they intend for Arab Bank casts the political nature of their claims in bold relief.  Such claims can only be resolved, of course, in the political realm. Otherwise, this Court and its sister courts will become global referees, called upon to perform the impossible task of assessing whether humanitarian initiatives supported by some and opposed by others violate norms of accepted international conduct.

**B.   No International Norm Exists With Respect To The "Financing Of Terrorism."**

Contrary to the plaintiffs' allegations, no international norm exists with respect to the "financing of terrorism." It is an unfortunate but irrefutable truth that the international community cannot reach agreement upon the "financing of terrorism" because it cannot agree

13

upon a definition of terrorism. "[T]here continues to be strenuous disagreement among states about what actions do or do not constitute terrorism, nor have we shaken ourselves free of the cliché that 'one man's terrorist is another man's freedom fighter.'" *U.S. v. Yousef*, 327 F.3d 56, 107 (2d Cir.), *cert. denied,* 540 U.S. 933 (2003) ("*Yousef*").

The defendant in *Yousef* was convicted "for placing a bomb on a civil aircraft registered in another country." *Id.* at 88. The district court had held that "customary international law permit[ted] the United States to prosecute him under the so-called universality principle for the bombing of [an] airline flight." *Id.*, 327 F.3d at 91. On appeal, the defendant argued that "absent a universally agreed-upon definition of 'terrorism' and an international consensus that terrorism is a subject matter over which universal jurisdiction may be exercised, the United States could not rest jurisdiction over him for a 'terrorist' act under a principle of universality." *Id.* He further argued that "because customary international law does not provide for the punishment of terrorist acts under the universality principle, such failure precludes or invalidates United States laws that provide for the prosecution of such acts that occur extraterritorially." *Id.* at 97.

The Second Circuit agreed. In a holding that is fatal to plaintiffs' assertion that an international consensus exists concerning the financing of terrorism, the court concluded that

> [u]nlike those offenses supporting universal jurisdiction under customary international law -- that is, piracy, war crimes, and crimes against humanity -- that now have fairly precise definitions and that have achieved universal condemnation, "terrorism" is a term as loosely deployed as it is powerfully charged. . . .
>
> [w]e regrettably are no closer now than eighteen years ago to an international consensus on the definition of terrorism or even its proscription . . . .

*Id.* at 106. Indeed, the Second Circuit concluded that even within the United States, there was no clear consensus as to what constituted "terrorism": "United States legislation has adopted

several approaches to defining terrorism, demonstrating that, even within nations, no single definition of 'terrorism' or 'terrorist act' prevails.    There are numerous statutes defining 'terrorism' or 'acts of terrorism.'" *Id.* at 107, n.42.

This conclusion has been regularly echoed in the international community.    Less than one month ago, the Secretary General of the United Nations observed that no universally accepted definition of terrorism exists.    Secretary General of the United Nations, *In Larger Freedom: Towards Development, Security and Human Rights for All*, Mar. 21, 2005 ("Report").[6] The Report's acknowledgement that there is no universally understood definition of terrorism is hardly surprising:

> Although many states have been able to agree on a treaty that prohibits terrorist financing, and on various treaties that prohibit specific terrorist-related acts like hijacking, they have not been able to agree on a general treaty that prohibits all forms of terrorism because of fundamental disagreements about the nature of terrorism.    Negotiations have dragged on for years, but have not been able to overcome several stumbling blocks.    States have not been able to agree on whether "terrorism" includes (i) violent acts committed in the course of armed struggle against a foreign occupation; (ii) violent acts performed by established armed forces, but in violation of international law; and (iii) violent acts against soldiers (as opposed to civilians), such as those committed by the Irish Republican Army against British soldiers.    The Arab Convention for the Suppression of Terrorism, for example, exempts from its definition of terrorism "[a]ll cases of struggle by whatever means, including armed struggle, against foreign occupation and aggression for liberation and self-determination, in accordance with the principles of international law."    Art. 2(a).    A similar exception can be found in the Organization of African Unity's Convention on the Prevention and Combating of Terrorism, Art. 3(1), . . . .

(Declaration of Eric A. Posner ("Posner Decl.") ¶ 22.).    The fact that there is no enforceable international law norm against terrorism may explain why plaintiffs have sought here to allege "crimes against humanity" or "genocide."    Affixing such incendiary labels to the conduct commonly referred to as terrorism does not, however, create a cause of action from thin air.

---

[6]    *Available at* http://www.cfr.org/pdf/report-largerfreedom.pdf.

1.    **The Sources Of International Law Upon Which Plaintiffs Rely Do Not
Reflect "Norms of Customary International Law."**

In many cases, the sources of international law cited by plaintiffs, ostensibly to

establish the existence of "norms of customary international law," fail to evidence enforceable

international law norms.    Plaintiffs concede, for instance, that the Rome Statute of the

International Criminal Court ("The Rome Statute"), cited at Compls. ¶ 289, has not been ratified

by the United States. (Posner Decl. ¶ 401 ("this treaty did not receive universal consent.  Indeed,

it did not even receive the consent of the United States.  Nor did it receive the consent of other

major nations such as China, Russia, Japan, and India.").)   Under the circumstances, the Rome

Statute obviously cannot be cited as binding international law, because "the United States is

bound by a treaty only once 'the Senate, in whom rests the authority to ratify it, . . . agree[s] to

it.'" *Haver v. Yaker*, 76 U.S. (9 Wall.) 32, 35 (1869).

Plaintiffs' reliance upon the Convention on the Prevention and Punishment of the

Crime of Genocide ("Genocide Convention") as evidence of customary international law is

similarly misplaced.   (Compls. ¶ 288.)   The Genocide Convention is not self-executing and

therefore cannot support private liability in United States courts. *In re South African Apartheid

Litig.*, 346 F. Supp. 2d 538, 552 (S.D.N.Y. 2004) ("[N]o liability based upon any alleged

violation of the[] norms [alleged in the Genocide Convention] can form an adequate predicate for

jurisdiction under the [Alien Tort Statute].").

Plaintiffs also cite two international criminal statutes, the Statute of the

International Criminal Tribunal for the former Yugoslavia and the International Criminal

Tribunal for Rwanda in support of the proposition that "[c]ases emanating from the ICTY and

the ICTR have confirmed that aiding and abetting is a concept duly ingrained in international law

to provide a colorable claim pursuant to the jurisdiction conferred by the [Alien Tort Statute]."

16

(Compls. ¶ 306.)  Neither of these statutes confirms anything of the sort.  Rather, these statutes apply only to the atrocities committed in Rwanda and the former Yugoslavia, and they cannot be interpreted to reflect novel customary international law norms that apply more broadly.  The failure of the International Criminal Court -- which seeks to establish a more general jurisdiction over such acts -- to obtain universal consent reinforces such a conclusion.  (Posner Decl. ¶ 46.)

Each statute, moreover, speaks only of criminal liability, not civil liability, and thus provides no evidence that customary international law recognizes private, civil claims of aiding and abetting acts of terrorism of the type asserted here.  *In re South African Apartheid Litigation*, 346 F. Supp. 2d 538 at 552 ("Plaintiffs here point to little that would lead this Court to conclude that aiding and abetting international law violations is itself an international law violation that is universally accepted as a legal obligation."); *Flores*, 343 F.3d at 169-70 (holding that international tribunals are not primary sources of customary international law where the tribunals are not authorized to create binding norms of international law); *Bano v. Union Carbide Corp.*, No. 99 Civ. 11329, 2000 WL 1225789,  at *13 (S.D.N.Y. Aug. 28, 2000), *aff'd in part, vacated in part on other grounds*, 273 F.3d 120 (2d Cir. 2001) (expressly rejecting plaintiffs' argument that the Alien Tort Statute provides a remedy for offenses that are essentially criminal violations and holding that Alien Tort Statute provides "jurisdiction only for civil claims").  In any event, plaintiffs cannot begin to make out a claim of genocide on the facts alleged here.

2.    **United Nations Resolutions Do Not Constitute Sources Of International Law.**

Plaintiffs have also cited one General Assembly Resolution and eleven Security Council Resolutions as evidence of customary international norms that prohibit the financing of terrorism. (*Almog* Compl. ¶¶ 250, 270, *Afriat-Kurtzer* Compl. ¶¶ 249, 270.)  These resolutions are not, however, valid sources of international law.

17

Resolution 53/108 of The General Assembly, for instance, imposes no duty upon private parties. To the contrary, the General Assembly Resolution 53/108 is purely prospective in scope.[7] Indeed, as a general matter, General Assembly resolutions "are . . . not valid sources of international law," *In re South African Apartheid Litig.*, 346 F. Supp. 2d at 553, nor do resolutions legally bind member States. *Id.*; *Flores*, 343 F.3d at 165 ("General Assembly resolutions and declarations do not have the power to bind member states because the member states specifically denied the General Assembly that power after extensively considering the issue . . . .").

Nor do any of the Security Council resolutions upon which plaintiffs rely evidence norms of customary international law. Each of those that pertain to terrorism is a general resolution that broadly condemns "all acts of terrorism, irrespective of motive, wherever and by whomever committed," and "call[s] upon" States to take measures to prevent terrorism. Security Council Resolutions 1269, 1373, 1377, 1456 and 1535. These resolutions obviously fall far short of articulating norms of international law. To the contrary, they do nothing other than recommend that nations pass measures to combat terrorism. Notably, they impose no binding legal obligation on private entities, and thus they cannot serve as evidence of customary international law. Moreover, as noted above, a universally accepted definition of terrorism does not exist; under the circumstances, the language of these resolutions is precatory at best and does not establish a specific, enforceable universal norm.

**C.    Plaintiffs Have Failed To Allege That Customary International Law Prohibits The Banking Transactions At Issue.**

Plaintiffs have misrepresented to this Court the "norms of international law" that allegedly support their claims. In fact, no such "norms" exist.

---

[7]    The resolution urges "States that have not yet done so to consider, as a matter of priority, becoming parties to relevant conventions and protocols . . . and call[ing] upon all States to enact, as appropriate, domestic legislation necessary to implement the provisions of those conventions and protocols . . . ."

In order for a principle to become part of customary international law, States must universally abide by it. *Flores*, 343 F.3d at 154. The principle must, moreover, be more than merely professed or aspirational. *Id.* A "principle is only incorporated into customary international law if states accede to it out of a sense of legal obligation." *Id.* Practices adopted "for moral or political reasons, but not out of a sense of legal obligation, cannot give rise to rules of customary international law." *Id.* Customary international law addresses only those wrongs that are of mutual, and not merely several, concern to States. *Id.* at 155; (Posner Decl. ¶¶ 6-13.).

"In determining what offenses violate customary international law, courts must proceed with extraordinary care and restraint." *Flores*, 343 F.3d at 154. The fact that certain conduct is universally proscribed by States in their domestic law does not give rise to customary international law. The crime of murder, for instance, of one private party by another is not actionable under the Alien Tort Statue as a violation of customary international law, since murder is not a wrong of mutual concern. *Id.* at 155.

Conventions -- sometimes referred to as treaties -- provide evidence of customary international law only to the extent they create legal obligations analogous to contractual obligations on the States that are parties to them. *Id.* at 162-63 ("[A] treaty will only constitute sufficient proof of a norm of customary international law if an overwhelming majority of States have ratified the treaty, and those States uniformly and consistently act in accordance with its principles.").

"The evidentiary weight to be afforded to a given treaty varies greatly depending on (i) how many, and which, States have ratified the treaty, and (ii) the degree to which those States actually implement and abide by the principles set forth in the treaty." *Id.* at 163. Whether a treaty is self-executing is of particular import, since "[n]on-self-executing treaties

require implementing action by the political branches of government or . . . are otherwise unsuitable for judicial application." *Id.* at 163 (citations and quotations omitted). As set forth below, there is no self-executing international convention that creates an enforceable norm here.

**D.    Customary International Law Does Not Recognize Civil Liability For The Aiding and Abetting of Terrorism.**

Plaintiffs have not cited, and cannot cite, any developed body of international law that imposes civil liability upon financial institutions for allegedly aiding and abetting the commission of acts of terrorism by others. Nor have any treaties or international tribunals ever enacted a rule of international law to proscribe the civil offense of aiding and abetting as alleged by plaintiffs here.

In Count Three, for example, plaintiffs purport to rely upon the International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, U.N. GAOR, 54th Sess., 76th mtg., Supp. No. 49, U.N. Doc. A/Res/53/108 (1999) (In force Apr. 2002) (the "Financing Convention") in support of their allegations that "[t]he crime of terrorist financing rests on a clear and definite norm of international law which is universally accepted by the civilized world." (Compls. ¶ 270.) In fact, however, the Financing Convention provides no such "clear and definite norm."

The Financing Convention seeks to establish the criminal liability of individuals; it is not concerned, as plaintiffs falsely suggest, with the imposition or civil liability upon legal entities. To this end, the Financing Convention urges States to establish criminal penalties against individuals for enumerated offenses, including accomplice liability. Financing Convention, Arts. 2, 4. Nowhere in the Financing Convention is secondary civil liability against a legal entity specified as a penalty to be established by States.

In addition, the Financing Convention is prospective in nature and not self-executing; it specifies that State parties to the convention "shall adopt such measures as may be necessary" to establish a criminal and penal scheme applicable to the financing of terrorism. Notably, no penalties are specifically listed. The fact that the Financing Convention is subject to exceptions, including a State's decision not to ratify particular treaties, plainly demonstrates that there is no international consensus as to what conduct is prohibited under the convention.[8]

Nor can plaintiffs find support in the Bombing Convention for their contention that international norms prohibit the activity alleged in Count Three of the Complaints. (Compls. ¶¶ 268-84.) The Bombing Convention makes absolutely no mention of the imposition of liability upon legal entities. To the contrary, the Bombing Convention, like the Financing Convention, is focused solely upon criminal accountability, and, in particular, the criminal accountability of individuals.

Nor is it of any moment, as plaintiffs claim, that the United States has enacted legislation implementing the Financing and Bombing Conventions. Both conventions encourage the States to "take such measures as may be necessary to establish . . . jurisdiction" over offenses enumerated therein. Financing Convention, Art. 7; Bombing Convention, Art. 6. Public Law 107-197, signed in June 2002, implemented the Financing Convention and Bombing Convention within the United States. The implementing legislation plainly affords no protection to aliens whose allegations, as here, are founded upon offenses that took place outside of the United States. 18 U.S.C. §§ 2332(f); 2339C.

---

[8]    Financing Convention, Art. 4 ("Each State Party shall adopt such measures as may be necessary:  (a) To establish as criminal offences under its domestic law the offences set forth in article 2; (b) To make those offences punishable by appropriate penalties which take into account the grave nature of the offences.").

21

**E.**     **The Provision Of Banking Services Does Not Constitute An Act Of Genocide.**

The Complaints assert that Arab Bank has aided and abetted "crimes against humanity" and "genocide." These allegations, although contrived to achieve incendiary effect, are entirely unsustainable. Although the personal tragedy that has been visited upon individuals is considerable, it is nonetheless undeniable that there is no universal consensus that the acts of violence that have occurred in Israel, Gaza and the West Bank in recent years qualify either as crimes against humanity or genocide -- any more than does the long and intractable history of violence in Northern Ireland. At least one of the attorneys for plaintiffs has publicly stated his desire to derive from this unhappy situation "a type of propaganda that is much more effective than we have today." *Supra* n.2. Plaintiffs have thus invited this Court to declare a moral victor. The Supreme Court has rightly decided, however, that such a declaration belongs in the realm of politics, and not in the realm of law.

The Convention of the Prevention and Punishment of the Crime of Genocide, Article 2, defines genocide to consist of "acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group." "It is clear that systematic and widespread murder of the kind that occurred during the Holocaust and Rwanda can be genocidal, but aside from these and a few other extreme cases, there is no international consensus that genocide has occurred in other situations." (Posner Decl. ¶ 36.)

Nor is there universal international consensus with respect to the purpose of Palestinian militants. It is indisputable, for example, that there is a significant strand of opinion in the Middle East and elsewhere, that the use of violence by civilians against occupants of a territory in order to expel foreigners cannot be an act of genocide. (Posner Decl. ¶ 34.) This line of argument asserts that "the purpose of the violence, however regrettable, is independence, not the destruction of a national, ethnic, racial or religious group." (*Id.*) Plaintiffs allege that the

22

purpose of Palestinian militants is to overthrow the Israeli government and establish a Palestinian state, where Israel currently exists or in the Occupied Territories. (Compls. at ¶ 319.) Opinions of the subject obviously differ -- evidencing that that this is not a situation characterized by a universal moral consensus.

In fact, the allegations of the Complaints contain nothing to suggest that any plaintiff has been victimized by an orchestrated campaign of "genocide." Plaintiff Gavriel Ben Yitschak, for instance, alleges that he was shot and wounded in Tel Romeda, Hebron by unknown assailants. Plainly, few, if any, would consider such street crime to be an act of genocide. (*Almog* Compl. ¶¶ 30(11).) Nor is the claim that that "[a] drive-by shooter injures 4," (*Almog* Compl. ¶ 30(118)), evocative, in even the most tangential respect, of a systematic effort to eliminate a national, racial or religious group. To the contrary, the event described has all the attributes of a random act of urban violence -- one, moreover, for which no perpetrator has been found. This is an unfortunate occurrence, to be sure, but hardly a genocidal one. When the rhetorical din generated by competing claims of genocide is muted, it appears that the one certain truth is that a political dispute over land exists, and that a small minority of people have resorted to violence in attempts to pursue their own resolution of this dispute.

### F.   Counts Four And Five Must Be Dismissed With Respect To Forty-Four *Almog* Plaintiffs, And All *Afriat-Kurtzer* Plaintiffs, Whose Injuries Pre-Date The Tort Alleged.

Plaintiffs allege that the "systematic and widespread" attacks forming the basis of their claims under Counts Four and Five did not begin until "on or about October 2000." (*Almog* Compl. ¶ 319.) Thus, as a matter of law, the claims of all plaintiffs who allege injuries resulting from incidents prior to October 2000 must be dismissed. By plaintiffs' own allegations, therefore, the claims of 44 alien plaintiffs, *Almog* Compl. ¶¶ 30(146)-(153), cannot be sustained under Counts Four and Five.

23

All of the *Afriat-Kurtzer* plaintiffs seek damages in relation to an incident alleged to have occurred on January 22, 1995. (*Afriat-Kurtzer* Compl. ¶ 30(1).) Because they also allege, like the *Almog* plaintiffs, that the "systematic and widespread" attacks forming the basis of their claims under Counts Four and Five did not begin until "on or about October 2000," (*Afriat-Kurtzer* Compl. ¶ 319), Counts Four and Five must be dismissed as to all plaintiffs as a matter of law.

## II. PLAINTIFFS HAVE FAILED ADEQUATELY TO ALLEGE THE ELEMENTS OF A CIVIL CLAIM FOR AIDING AND ABETTING ACTS OF TERRORISM.

Only 36 plaintiffs purport to assert claims under the Anti-Terrorism Act. To state a claim against Arab Bank, each of the *Almog* and *Afriat-Kurtzer* plaintiffs, must nonetheless allege facts that implicate the bank in the events that gave rise to his or her alleged injuries. In particular, each plaintiff must allege that Arab Bank had knowledge of the specific terrorist act that allegedly injured him or her and that Arab Bank knowingly and intentionally provided support to the specific perpetrator to further that act.

No plaintiff has alleged, or can allege, such facts. To the contrary, each plaintiff has been unable to identify those perpetrators allegedly aided and abetted by Arab Bank. It is doubtless for this reason that plaintiffs have instead alleged that Arab Bank is liable for all acts of terror in Israel, Gaza and the West Bank since 1995 -- without regard to whether Arab Bank had any knowledge whatsoever of such acts or the perpetrators of them. Plainly, in the absence of any knowledge of specific acts or actors -- and no such knowledge is alleged in many hundreds of pages of pleadings -- Arab Bank did not provide knowing assistance to terrorists. The conclusory and unsubstantiated claims that it did so cannot stand. *See In re Terrorist Attacks,* 349 F. Supp. 2d at 835 (seeking liability against Arab Bank, among others, for purportedly aiding and abetting the attacks of September 11, 2001). Here, as in *In re Terrorist*

24

*Attacks*, the theories of liability articulated by plaintiffs threaten to "stretch causation to terra incognita." *Id.* at 789.

Nor is *In re Terrorist Attacks* the only decision to require such specificity of allegation. In *Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d 885, 890, 898-99 (N.D. Ill. 2004), the court found the allegations at issue legally sufficient because the plaintiff had alleged that he suffered injury proximately caused by specific acts, and further alleged that these acts had been committed by identified individuals and that the defendant had provided knowing assistance to such individuals. (*Litle* Br. at 5-6.) The *Boim* Court expressly noted, by way of contrast, that mere allegations of "some random drive-by shooting" would be fatally deficient. *Boim*, 340 F. Supp. 2d at 898. Notably, the *Almog* and *Afriat-Kurtzer* plaintiffs allege no fewer than nine such "drive by" incidents, and scores of other allegations concern what are tragic but indisputably random acts of urban violence, for which no attribution has been claimed.

A.    **Fifty-One Plaintiffs Allege Harm From Unattributed Acts Of Violence.**

In order to state a claim against Arab Bank for aiding and abetting acts of terrorism, each plaintiff must allege -- and ultimately prove -- that he or she suffered injury that was proximately caused by the acts of Arab Bank. Each plaintiff must also allege and prove that Arab Bank knowingly and intentionally provided assistance to the specific terrorist or terrorists who caused his injury. *E.g.*, *Boim*, 340 F. Supp. 2d at 890, 898-99; *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1011 (7th Cir. 2002) (affirming dismissal); *In re Terrorist Attacks,* 349 F. Supp. 2d at 835; (*Linde* Br. at 12-15; *Litle* Br. at 5-7.).

Plaintiffs have failed entirely to satisfy these standards of pleading. The Azziz plaintiffs provide an illustrative case in point. The *Almog* Complaint alleges the following facts -- repeated here in their entirety -- regarding the injury for which plaintiff Yair Azziz seeks to hold Arab Bank liable:

> A firebomb is thrown at a vehicle traveling on Road 443 near Bet Shoron, injuring Plaintiff Yair Azziz, a citizen of Israel.

(*Almog* Compl. ¶ 30(145).)  Mr Azziz does not allege who committed the attack, nor does he specify factual particularity concerning its circumstances.  If he is incapable of alleging even the most cursory detail regarding the circumstances of a regrettable, but random, act of violence, how can this Court permit him conclusorily to allege that Arab Bank has aided and abetted such conduct?

The allegations of the Langer plaintiffs are similarly illustrative.  Plaintiffs allege that Rotem Langer was "shot and severely wounded in an IDF [Israeli Defense Force] operation."  (*Almog* Compl. ¶ 30(28).)  Once again, the assailant is unidentified, nor is any detail provided with respect to the circumstances of the shooting.  Whether Mr. Langer is himself a member of the IDF is not alleged.  The allegation suggests that Arab Bank should be held liable for every injury suffered by every member of the Israeli Defense Forces.  Such a claim distorts beyond recognition the theory of liability urged by the plaintiffs in *In re Terrorist Attacks* and rejected by Judge Casey -- that those banks that played any role in transactions that financed the September 11 attacks should be held liable.

In fact, the allegations of the Complaints are an unhappy catalog of unfortunate violence with no connecting thread: "December 17, 2001: Gunmen open fire on a car traveling on Road 60 near Ramallah" (*Almog* Compl. ¶ 30(86); "September 12, 2001: Ruth Shuay, a citizen of Israel, is killed in a drive-by shooting," (*Almog* Compl. ¶ 30(103)); "July 2, 2001: Aharon Avadian, a citizen of Israel, husband of plaintiff Irit Avadian, a citizen of Israel, is shot at close range and killed while shopping at the market near Baqa Sharqia." (*Almog* Compl. ¶ 30(113)).

How, this Court may fairly inquire, are any of these tragic allegations sufficient to state a claim against Arab Bank?  What allegations place Arab Bank at the shopping market near Barqa Sharqia, or on "Road 60 near Ramallah"?  By what possible logic can this Court permit charges of aiding and abetting acts of violence to stand when those who were allegedly aided and abetted will be forever unknown, and when the circumstances and intentions surrounding their acts will never be ascertained?

**B.      Forty-Two Plaintiffs Improperly Assert That Arab Bank Is Liable For The Acts Of "Palestinians."**

The fact that the plaintiffs have presented a set of grievances that are political, rather than legal, is best illustrated by the frequency of disparaging references to "Palestinians" in the Complaints.  Plaintiffs seek to conflate "Palestinians" with "terrorists" so as to allege that any act committed by a Palestinian is a terrorist act and that any support for the Palestinian cause is, of necessity, support for terrorism.  This Court should refuse plaintiffs' invitation to involve itself in what is plainly a political imbroglio.  Plaintiffs' allegations are, in any event, entirely insufficient to establish that Arab Bank knew of the alleged acts of violence attributed to "Palestinians" and that it sought to aid those acts.

The Dolinger plaintiffs allege, for instance, that on "May 12, 2002:  "Nisun Starkman Dolinger, a citizen of Israel, husband of plaintiff Eva Starkman Dolinger, a citizen of Israel, is shot and killed *by his Palestinian employee* in Gush Katif."  (*Almog* Compl. ¶ 30(59) (emphasis supplied).)  The name of the assailant is not alleged, notwithstanding the fact that it seems implausible that his identity is not known to Mrs. Dollinger.  Surely, had this employee been known to have had terrorist affiliations, such a connection would have been pled.  In any event, it is impossible to connect this shooting to Arab Bank.  Indeed, the plain, if absurd,

implication of this allegation is that Arab Bank is liable to the survivor of every employer killed or injured by an employee -- provided the employee was Palestinian.

Other plaintiffs unable to identify their assailants appear to attempt to conceal such a deficiency by pointing the finger of accusation at Palestinians generally. The Sasson plaintiffs allege, for instance, that on "February 11, 2001: Palestinian gunmen open fire on a car near Gush Etzion and kill Tzachi Sasson, a citizen of Israel, brother of plaintiff Gabriel Sasson, a citizen of Israel." (*Almog* Compl. ¶ 30(132) (emphasis supplied).)[9]

A sad fact of recent history is that the social fabric of the Middle East continues to be torn by acts of violence, some of which are politically motivated. Each of these acts of violence is regrettable. To suggest, however -- as do the plaintiffs -- that Arab Bank is liable for every violent act committed by a Palestinian since 1995 is entirely untenable (*Linde* Br. at 14-16; *Litle* Br. at 8.)

---

[9]     Similar mention of "Palestinians" and "Palestinian gunmen" are found on many other occasions in the Complaints. *E.g.*, "December 28, 2000: *A Palestinian gunman* stages an ambush at the West Bank settlement of Eilon Moreh, shooting and wounding plaintiff Semuel Hilario, a citizen of Israel and Peru, husband of plaintiff Yehudit Hilario, a citizen of Israel and Peru, and father of plaintiffs Izak Hilario, a citizen of Israel and Peru, Pnina Michal Sikcce, a citizen of Israel, and Ariela Hilario, a citizen of Israel," *Almog* Compl. ¶ 30(136) (emphasis supplied); "December 12, 2000: *Palestinians* attack a car in the Gaza settlement of Morag with automatic weapons, injuring 2, among them plaintiff Raichel Yom-Tov, a citizen of Israel, wife of plaintiff Menashe Yom-Tov, a citizen of Israel, and mother of plaintiffs Hodaia Yom-Tov, Shira Yom-Tov, Aviosaf Yom-Tov, Yigal Yom-Tov, Ruth Yom-Tov, Yinon Yom-Tov, Moshe Yom-Tov, and Hadar Yom-Tov, all citizens of Israel," *Almog* Compl. ¶ 30(137) (emphasis supplied); "December 8, 2000: *Palestinian gunmen* open fire on a bus traveling along the Jericho bypass road, killing Tal Gordon, a citizen of Israel, son of plaintiff Orna Gordon, a citizen of Israel, stepson of plaintiff Aleksandr Gorodetsky, a citizen of Israel, and brother of plaintiff Maor Gordon, a citizen of Israel," *Almog* Compl. ¶ 30(139) (emphasis supplied); "January 4, 1999: *Palestinian gunmen* open fire on a vehicle in Kiryat Arba, wounding two women, one of whom is plaintiff Fanny El Ezra, a citizen of Israel, wife of plaintiff Meir El Ezra, a citizen of Israel, and mother of plaintiff Kinneret Day, a citizen of Israel," *Almog* Compl. ¶ 30(148) (emphasis supplied); "May 13, 1996: *Palestinian gunmen* open fire on Jewish settlers at the Ayosh Junction in the West Bank, killing one and injuring others, including plaintiff Ravit Rivka David, a citizen of Israel, wife of plaintiff Uzi David, a citizen of Israel, daughter of plaintiffs Ahuva Salman and Adiv Salman, both citizens of Israel, and mother of plaintiffs Omri David, Noa David, and Yair David, all citizens of Israel," *Almog* Compl. ¶ 30(152) (emphasis supplied).

C.     **No Plaintiff Alleges That The Particular Assailant Responsible For His Or Her Harm Held An Account At, Or Received Monies Through, Arab Bank.**

Neither the *Almog nor Afriat-Kurtzer* Complaints, which together exceed 350 pages in length, contains a single allegation that any of the terrorists identified therein held an account at Arab Bank or, indeed, received monies through Arab Bank. The mere fact that a customer of Arab Bank, or a recipient of funds at Arab Bank, committed terrorist acts would not, of course, in itself provide a predicate for the liability of the Bank. It is nonetheless notable that plaintiffs are unable to allege even a prima facie causal connection between the injury causing acts and Arab Bank. Plaintiffs' inability to do so is obviously fatal to their assertion that Arab Bank sought to aid and abet the acts of violence that are alleged to have injured them.

Instead, plaintiffs have invented an insurance "scheme" allegedly involving various Saudi entities, many Saudi and U.S. banks, and the Tulkarem Charitable Committee, among other entities. *See* II, D, *infra.* The allegations regarding this "scheme" seek to conflate -- and confuse -- the activities of the international humanitarian aid community, the acute economic hardship in Gaza and the West Bank that has given rise to these humanitarian efforts, the pervasive social unrest that continues to destabilize these communities, and the acts of terror that have on occasion disfigured them. When these allegations are parsed individually and considered objectively, it is clear that plaintiffs have not alleged that any of the banking transactions processed by Arab Bank paid for or incentivized any of the individuals who are alleged to have committed any of the acts of violence that caused any of the injuries at issue. *See* II, E, *infra.* Nor have plaintiffs identified who, if anyone, received "incentive payments from Arab Bank."

In essence, the Complaints' allegations of a "terror finance scheme" seek to impose civil liability upon Arab Bank -- and Arab Bank alone -- for all acts of violence since the

beginning of the Second Intifada. Arab Bank has presumably been chosen as the target for such claims because it is by far the largest banking presence in Gaza and the West Bank, where it operates 22 branches, and because it is the bank of choice for the international aid community.

In fact, as plaintiffs themselves acknowledge, multiple financial institutions have been involved in the dissemination of funds to the Palestinian territories. These funds are alleged to have been gathered by two Saudi committees, the Popular Committee for Assisting the Palestinian Mujahideen and the Saudi Committee for Aid to the Al-Quds Intifada (the "Saudi Committees"), from various governments and private entities, to support the "Intifada." (Compls. ¶¶ 20, 167.)  They are alleged to have passed to ultimate beneficiaries through Citibank, Chase Manhattan Bank, "certain [unnamed] commercial banks located in the [Saudi] Kingdom," and the Islamic Development Bank, "among other institutions," in addition to Arab Bank.  (Compls. ¶¶ 167-70.)

Plaintiffs also allege that the Saudi committees have collected funds in various "Accounts 98 and 90," and that these funds have been routed to the Palestinian territories through numerous banks, including "the Saudi-American Bank, the Saudi-British Bank, the Saudi-Dutch Bank, Saudi French Bank, National Commercial Bank, and Arab National Bank." (*Almog* Compl. ¶ 198; *Afriat-Kurtzer* Compl. ¶ 197.)  Plaintiffs have *not* alleged that Arab Bank has collected any such Account 98 or 90 funds.

Essentially, what plaintiffs allege is that Arab Bank, as the largest financial institution in the West Bank and Gaza, processes transactions and distributes funds for numerous organizations, that these funds are intended for humanitarian relief in the Palestinian territories, and that some of these funds find their way into the hands of the families of individuals involved in terrorism.  Plaintiffs do not, however, specifically allege that Arab Bank particpated in any

transfers that were received by those who committed any of the terrorist acts at issue here. Such an allegation itself, would not, of course, be sufficient to state a viable claim against Arab Bank; the inability of plaintiffs to allege even such essential elements, nonetheless illustrates just how beyond "terra incognita" plaintiffs' theory of aiding and abetting liability extends.

### D.   The Allegations Of The Complaints Regarding Charitable Organizations Are Insufficient To State A Claim Against Arab Bank.

The *Almog* and *Afriat-Kurtzer* Complaints are replete with conclusory allegations concerning "charitable front organizations."[10]   In particular, the Complaints allege that Arab Bank maintained accounts for charitable organizations in Gaza and the West Bank that were, in fact, fronts for HAMAS and other terrorist organizations. Claims that Arab Bank aided and abetted terrorist activity by virtue of its alleged maintenance of these accounts must fail as a matter of law.

Plaintiffs in *In re Terrorist Attacks* made strikingly similar allegations. *Compare*, *e.g.*, *In re Terrorist Attacks*, 349 F. Supp. 2d at 831 ("Plaintiffs claim that Al Rajhi Bank is 'the primary bank for a number of charities that serve as al Qaeda front groups, including Al Haramain, MWL, *WAMY*, SJRC, and IIRO") (emphasis supplied), *with Almog* Compl. ¶ 233, *Afriat-Kurtzer* Compl. ¶ 232 ("the Tulkarem Charitable Society is supported by . . . the following well known Hamas front organizations: the Holy Land Foundation for Relief and Development . . ., World Assembly of Muslim Youth ('WAMY') . . ., the Palestinian Relief and Development Fund in Britain ('Interpal'), Committee for Palestinian Charity and Aid ('CPSP') in France, and the International Relief Fund for the Afflicted and Needy in Canada ('IRFAN')") (emphasis supplied).   The court explicitly rejected these conclusory allegations regarding charitable "fronts" in its dismissal of the *Burnett* and *Federal* cases:   "[c]onclusory allegations that

---

[10]      *See, e.g.*, Compls. ¶¶ 18, 32, 38, 53, 56, 70, 72, 74, 75, 77, 78; *Almog* Compl. ¶¶ 187, 206, 210, 233, 243; *Afriat-Kurtzer* Compl. ¶¶ 186, 205, 209, 232, 242.

31

[defendant] donated money to charities, without specific factual allegations that he knew they were funneling money to terrorists, do not suffice." *Id.* at 813-14 (emphasis supplied) (citations omitted). Here, of course, such "specific factual allegations" with respect to Arab Bank are entirely absent. (*Linde* Br. at 12-17; *Litle* Br. at 5-8, 18-23.)

The sole allegation set forth in the *Almog* and *Afriat-Kurtzer* Complaints that purports to connect Arab Bank to any of these "charitable front organizations" pertains to an account that Arab Bank is alleged to maintain for the "Tulkarem Charitable Committee," sometimes referred to as the "Tulkarem Charity Society". (*Almog* Compl. ¶¶ 170, 204, 234; *Afriat-Kurtzer* Compl. ¶¶ 170, 203, 233.) None of the plaintiffs allege, however, that the Tulkarem Charitable Committee had any connection to the acts that allegedly injured them, or that Arab Bank knew of such a connection. Notably, this entity has never been listed by OFAC, nor has it even appeared on any of the Bank of Israel's circulars listing prohibiting terrorist organizations. (*Linde* Br. at 26 (citing OFAC list, *available at* www.treas.gov/offices/enforcement.ofac/sdn/t11sdn.pdf); *Litle* Br. at 15 (citing Shenhar Affidavit at ¶¶ 2-9 & exhibits).) In fact, plaintiffs themselves allege that this organization sought to deceive the public by holding itself out as a "charitable organization with a purely humanitarian and benign purpose." (Compls. ¶ 76.)

Despite their concession that the Tulkarem Charitable Society was perceived to be "purely humanitarian" in its objectives, plaintiffs nonetheless allege that the Society harbors a sinister purpose. They refer to a "spreadsheet" allegedly obtained by the Israeli Defense Forces during a raid conducted by them on the Tulkarem Charitable Society. (*Almog* Compl. ¶¶ 230, 237(1-9); *Afriat-Kurtzer* Compl. ¶¶ 229, 236(1-9).) Plaintiffs do not allege that Arab Bank was in any way involved in the preparation of this spreadsheet, or, in fact, that its management has

32

even seen such a spreadsheet -- nor do they allege that the spreadsheet contains facts that are relevant to the particular injuries alleged by the plaintiffs here. Instead, plaintiffs allege that this spreadsheet lists individuals who are "suicide bombers" and that the "families" of these suicide bombers "received payments" from the "Intifada Committee," as reflected in the spreadsheet and "in records contained on the Intifada Committee's archived website." (*Almog* Compl. ¶ 237(1-9); *Afriat-Kurtzer* Compl. ¶ 236(1-9).)

Nowhere, however, does either Complaint allege any connection between the facts allegedly reflected in the spreadsheet and the acts of Arab Bank. Nor do the Complaints allege when payments to the families of suicide bombers were received, who received such payments, the amount of such alleged payments, or whether these payments motivated any attacks. In light of the fact that plaintiffs have alleged payment details irrelevant to their claims elsewhere (*e.g., Almog* Compl. ¶¶ 238-39; *Afriat-Kurtzer* Compl. ¶¶ 237-38), it is reasonable for this Court to infer that plaintiffs would have alleged the particular detail required by both *Boim* and *In re Terrorist Attacks* if the information contained in the "spreadsheet" revealed any connection between Arab Bank and the families of suicide bombers.

The claims regarding the "spreadsheet" are consistent, moreover, with the pseudo-specific welter of irrelevant detail that is found throughout the Complaints. In essence, plaintiffs contend that Arab Bank should have known the undeclared purposes of charitable organizations, even when those purposes had not been discerned by governmental enforcement agencies that have been charged with responsibility for investigating and prosecuting terrorism. Plaintiffs also appear to suggest that all Islamic charities are presumptively suspect. Neither claim, of course, should be accepted as adequate pleading by this Court.

Moreover, the Complaints allege payments to the families of suicide bombers who in turn are not alleged to have caused any injury to the plaintiffs in these actions. Each Complaint, for example, alleges that monies were transferred "through Arab Bank" to the family of a suicide bomber responsible for an attack "on September 9, 2001 . . . at the Beit Lid intersection." (*Almog* Compl. ¶ 238; *Afriat-Kurtzer* Compl. ¶ 237.) Notably, none of the more than 1,600 plaintiffs has claimed to be injured by that attack. (Compls. ¶ 30, *et seq.*) Similarly, each Complaint identifies an alleged suicide bomber whose "family received the exceptional sum of around $5,000-$7,000 for his action and approximately $14,000 to compensate for the razing of the family's house, in addition to their increased monthly allowance." (*Almog* Compl. ¶ 239; *Afriat-Kurtzer* Compl. ¶ 238.) Plaintiffs do not allege, however, that Arab Bank was involved in any transfer of money to this individual or his family, nor do they allege that he was aware that payments would be made to his family after his death and incentivized in any way by such payments. Nor do they allege facts to support an inference that Arab Bank was aware of the purposes for any such payment. The juxtaposition of unrelated incidents to suggest a pattern of activity is characteristic of plaintiffs' pleading in these cases.

E.    **Plaintiffs Have Failed To Allege That The Violent Acts At Issue Were Motivated By Benefit Payments.**

Because they have not, and cannot, identify any terrorists who received money through Arab Bank, or who were incentivized to commit acts of terror by the payment of benefits to others through Arab Bank, plaintiffs have cast a far wider net. They allege that Arab Bank's provision of routine banking services to other banks in transferring monies raised by the Saudi Committee incentivized every act of terrorism in Israel since October 2000. (*Almog* Compl. ¶¶ 188, 195; *Afriat-Kurtzer* Compl. ¶¶ 187, 195.)[11] The assertion of such a claim belies a flagrant

---

[11]    In fact, plaintiffs purport to allege injury attributable to acts of violence occurring as early as 1995. (Compls. ¶ 30.)

34

disregard for accepted standards of pleading. It is also contradicted by the very allegations of the Complaint.

Notably, plaintiffs' own allegations do not support the inference that the injuries alleged by them were proximately caused by Saudi Committee payments. This Court must consider as true, for instance, plaintiffs' allegations that young children are routinely exploited by terrorist organizations such as Hamas and exposed to programs of ideological indoctrination that encourage them to become terrorists. (*E.g.*, Compls. ¶¶ 120-122 (stating that the "ideological affect on young children" of terrorist-indoctrination "*cannot be overstated*") (emphasis supplied).) Indeed, plaintiffs harbor the apparent conviction that it is far more difficult, if not impossible, to convince an adult to commit such crimes: "You start at kindergarten so by the time he's 22, he's looking for an opportunity to sacrifice his life." (Compls. ¶ 121 (citation omitted).)

In fact, one of the plaintiffs in the *Almog* action, Jacob Schlesinger, (*Almog* Compl. ¶ 30(64)), has broadly disseminated his strong political conviction that terrorists are motivated not by financial reward, but by early indoctrination. Mr. Schlesinger is the registered operator of a public Web site, http://www.cat2002.org, devoted to the subjects of terrorism.[12] (The Web site also provides a copy of the *Almog* complaint in its unamended form and contains prominent mention -- in what appears to be "pop-up" advertising -- of at least one attorney for the plaintiffs.)

The Schlesinger Web site purports to explain the causes and consequences of terrorism. One video presentation contends that the indoctrination of Palestinian youth by the Palestinian Authority and certain religious leaders is responsible for creating terrorists, including

---

[12]    *See* InterNic, *available at* http://reports.internic.net/cgi/whois?whois_nic=cat2002.0rg&type=domain.

suicide bombers. [13]   Another video presentation features the findings of a Palestinian psychologist, who has conducted a study that concludes that more than 50% of Palestinian children aged 6-11 "dream of becoming suicide bombers who wear explosive belts." [14] Elsewhere, on a page entitled "Incitements & Propaganda," Mr. Schlesinger provides numerous examples of advertisements, posters, selected passages from textbooks, and newspaper articles that he considers to be responsible for inciting Palestinians to engage in terrorist activity. [15]  Yet, neither financial incentivization, nor the banking activities of Arab Bank, are anywhere mentioned on that page.

Under the circumstances, plaintiffs' conclusory allegations that Arab Bank has incentivized their assailants, by participating with other financial institutions in the processing of fund transfers, are both plainly inconsistent with their own theories of causation and insufficient as a matter of law. (*Linde* Br. at 17-22.)  As the Court held in *In re Terrorist Attacks*, 349 F. Supp. 2d at 826, "[c]entral to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, *but only to those with respect to whom his acts were a substantial factor in the sequence of responsible causation*, and whose injury was reasonably foreseeable or anticipated as a natural consequence." (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)) (emphasis supplied).  The plain inconsistencies in plaintiffs' pleading underscore the danger of attempting to resolve in a court of law the apparently irresolvable debate about the complex psychological, political and material causes of Middle East violence.  As the Supreme Court has made clear, not every political

---

[13]    *See More Hatred, available at* http://www.cat2002.org/site/palestine.php.

[14]    *See Seeds of Hate, available at* http://www.cat2002.org/site/presentations.php.

[15]    *See Incitements & Propaganda, available at* http://www.cat2002.org/site/incitement.php.

dispute -- and certainly not this one -- is capable of the specific, principled decision-making that the legal process demands.

## III.   PLAINTIFFS HAVE IMPROPERLY ALLEGED VIOLATIONS OF "FEDERAL COMMON LAW".

Counts Six through Ten of the Complaints improperly assert violations of "general federal common law."[16] The Supreme Court of the United States, as well as courts within the Second Circuit, do not generally recognize the existence of such federal common law torts, and these allegations must therefore be dismissed as a matter of law.

It is, of course, well established that "[t]here is no general federal common law." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) at 78; *Sosa*, 124 S. Ct. at 2764 ("federal courts have no authority to derive 'general' common law"). Although the Supreme Court has recognized certain narrow exceptions to this principle, typically involving admiralty or interstate disputes, none of those exceptions are applicable here.[17]

Notwithstanding these narrow exceptions, moreover, "[t]he clear trend in Supreme Court pronouncements over the last quarter century has been to confine, not expand, the common law powers of federal judges." Ronald H. Rosenberg, *The Ultimate Independence of the Federal Courts: Defying the Supreme Court in the Exercise of Federal Common Law Powers*, 36 Conn. L. Rev. 425, 427 (Winter 2004). Indeed, *Erie R.R. Co.* and its progeny require that a federal court look to state law in the absence of express federal law or a unique countervailing federal interest. *E.g., Leider v. Ralfe,* No. 01 Civ. 3137, 2005 WL 152025, at *4

---

[16]     In particular, plaintiffs assert claims for: "Assisting in the Intentional Injury of Others by a Third Party," Compls. ¶¶ 329-34 (Count Six); "Reckless Disregard," Compls. ¶¶ 335-38 (Count Seven); "Wrongful Death," Compls. ¶¶ 339-45 (Count Eight); "Survival," Compls. ¶¶ 346-48 (Count Nine); and "Negligent and/or Intentional Infliction of Emotional Distress," *Almog* Compl. ¶¶ 349-54 (Count Ten); *Afriat-Kurtzer* Compl. ¶¶ 349-55 (Count Ten).

[17]     *E.g., Clearfield Trust Co. v. United States*, 318 U.S. 363, 366 (1943); *Kossick v. United Fruit Co.*, 365 U.S. 731, 742 (1961); *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110-11 (1938); *City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981); *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 392 (1971).

(S.D.N.Y. Jan. 25, 2005) ("'[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state'") (quoting *Erie R.R. Co.*, 304 U.S. at 78).

The claims presented by Counts Six through Ten, which include claims of reckless disregard, wrongful death, survival and negligent or intentional infliction of emotional distress, all fall within the category of claims routinely litigated under controlling state statutory and common law, rather than federal common law. Claims under state law cannot, in any event, be asserted by the vast majority of the plaintiffs in these actions. All of these Counts should therefore be dismissed as a matter of law.

A.    **The Allegation That Arab Bank Assisted In The International Injury Of Others Does Not Constitute A Federal Common Law Tort.**

Federal courts have not generally recognized the existence of a common law tort for "assisting in the intentional injury of others by a third party," as pled in Count Six. (Compls. ¶¶ 329-34.) While courts may, on rare occasion, look to the Restatements for guidance in the absence of a developed body of federal common law, here there is no relevant Restatement upon which this Court may rely with any assurance.

Should the Court choose not to dismiss Count Six, it must nonetheless dismiss the claims of most plaintiffs as time-barred under potentially applicable statutes of limitation. Here, of course, there is no reason to apply the law of a specific state. Assuming, for the sake of argument, that state law does apply, however, and choosing the law of New York by way of example, the only arguably analogous statute of limitations under New York law is the one year statute of limitations applicable to all intentional torts, pursuant to N.Y. C.P.L.R. § 215 (McKinney 2003). This Court must therefore dismiss as time-barred the claims of all plaintiffs

38

whose injuries are alleged to have occurred more than one year prior to the date of commencement of their respective actions.

**B.**    **"Reckless Disregard" Is Not A Recognized Federal Common Law Tort.**

Count Seven of the Complaint, bearing the caption "Reckless Disregard," alleges that Arab Bank "knew, or should have known, that the funds deposited in the specific accounts established and maintained by it . . . were used to support, encourage, entice and make possible the suicide bombings and other murderous attacks described herein." (Compls. ¶¶ 335-38.) This is not a viable federal law claim, and it must be dismissed.

Because no federal precedent supports the assertion of such a claim, to the extent United States law applies under any circumstances, this Court may look to both the Restatement and New York State law for guidance. *E.g., Leider v. Ralfe,* No. 01 Civ. 3137, 2005 WL 152025, at *4 (S.D.N.Y. Jan. 25, 2005). Under the Restatement, "reckless disregard" is a category of intentional tort, which requires that an actor: "know[ ] or have[ ] reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." Restatement (Second) of Torts § 500 (1965) ("Reckless Disregard Of Safety"). *Accord Grey v. Am. Airlines, Inc.,* 227 F. 2d 282, 285 (2d Cir. 1955).

Here, plaintiffs allege that "[d]efendant knew, or should have known, that the funds deposited in the specific accounts established and maintained by it . . . were used to support suicide bombings . . . ." (Compls. ¶ 336 (emphasis supplied).) What Arab Bank "should have known" is obviously irrelevant to establish either "a conscious intent to do or omit doing an act" or an "intentional omission of a manifest duty." *Grey,* 227 F. 2d at 285. Nor have plaintiffs alleged that Arab Bank owed a special duty to them. Plaintiffs are obviously not customers of

39

the Bank, and none alleges that he or she ever had any professional dealings with the Bank.  In

any event, plaintiffs must allege, and then ultimately prove, that the Bank had actual knowledge

of terrorist activities; here, in the face of such requirement, they have failed to allege facts that

support even the faintest inference of such knowledge.

The claims of many plaintiffs under Count Seven are, in any event, time-barred

under New York's one-year statute of limitations applicable to intentional torts.  N.Y. C.P.L.R. §

215(3) (McKinney's 2003).  Application of this statute requires the dismissal of the claims of all

*Almog* plaintiffs whose injuries are alleged to have occurred prior to December 21, 2003, and of

all *Afriat-Kurtzer* plaintiffs whose injuries are alleged to have occurred prior to January 21, 2004.

(*Almog* Compl. ¶¶ 30(10)-30(153); *Afriat-Kurtzer* Compl. ¶¶ 30(1)-30(2).)

C.     **Allegations Of "Wrongful Death" Must Be Dismissed As A Matter Of Law.**

Count Eight, alleging "Wrongful Death," purports to be based on the "laws of

nations," "federal statutes," or "general federal common law."  (Compls. ¶ 4.)  This cause of

action is insufficient as a matter of law and must be dismissed.

Absent an express federal statute -- and none is cited here -- this Court may look

to state law by way of example.[18]  To the extent New York law applies, it plainly does not

support these claims.

---

[18]     *E.g., Yamaha Motor Corp., USA v. Calhoun*, 516 U.S. 199, 215 (1996) (holding that that federal courts look to state remedies in wrongful death and survival actions under maritime tort actions for non-seamen uniformly applied).  *Accord In re: Air Crash Off Long Island, N.Y., on July 17, 1996*, 209 F.3d 200, 210 (2d Cir. 2000) (applying New York State's wrongful death standard in determining applicability of Death on the High Seas Act jurisdiction in civil federal action); *Schwarder v. U.S.*, 974 F.2d 1118, 1121-22 (9th Cir. 1992) (noting that in Federal Tort Claims Act actions for wrongful death, federal courts must look to state law to determine extent to which federal government is liable for wrongful death); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998) (court takes notice of state/district law even where Congress established cause of action for wrongful death under Foreign Sovereign Immunities Act, because Act does not itself define "scope of [wrongful death] action").

1.    **Plaintiffs Fail To Allege A Cause Of Action For Wrongful Death Under New York Statutory Law.**

The *prima facie* elements which must be pled in order to state a claim for wrongful death under New York law are "(1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent." McKinney's N.Y. E.P.T.L. § 5-4.1; *Chong v. New York City Trans. Auth.*, 441 N.Y.S.2d 24, 25 (2d Dep't 1981). For all of the many reasons set forth above, plaintiffs have failed to adequately allege that Arab Bank is liable for the death of any of the 254 decedents named in the complaint.[19]

a.    **No Plaintiff Claims To Be The Personal Representative Of The Estate Of A Deceased Plaintiff.**

Under New York law, only the "personal representative" of a decedent who is "duly appointed" may bring a cause of action for wrongful death. McKinney's N.Y. E.P.T.L. § 5-4.1. None of the plaintiffs has alleged an appointment as the personal representative of any decedent's estate. Under the circumstances, no estate has standing to pursue a claim of wrongful death. New York law is unambiguous in its imposition of such a requirement: only "[t]he personal representative, duly appointed in this state or any other jurisdiction, of a decedent who is survived by distributees may maintain an action to recover damages for a wrongful act . . . which caused the decedent's death." *Id.* "Since the plaintiffs' Complaint does not allege that a personal representative of the decedents has been appointed . . ., it does not state a cause of action to recover damages." *James v. Middletown Cmty. Health Ctr., Inc.*, 718 N.Y.S.2d 358,

---

[19]    These decedents are identified in the allegations of the Complaints as follows: *Almog* Compl. ¶¶ 30(1), (4)-(10), (12)-(18), (20)-(26), (31)-(33), (35)-(36), (38), (40), (42)-(49), (51)-(53), (55)-(56), (58)-(64), (66)-(71), (73)-(75), (77)-(79), (81), (83)-(85), (87)-(93), (95)-(103), (105)-(110), (113)-(117), (120)-(126), (128), (131)-(134), (138)-(143), (147), (153); *Afriat-Kurtzer* Compl. ¶ 30(1).

359 (2d Dep't 2000) (citing *Meroni v. Holy Spirit Ass'n for Unification of World Christianity*, 506 N.Y.S.2d 174 (2d Dep't 1986)).  A failure to plead a duly appointed representative is considered, moreover, to be a "fatal flaw" or "deadly defect" as to any wrongful death (or survival) claim, necessitating dismissal.[20]

> **b.      Many Plaintiffs Are Not Distributees Of Decedents' Estates As Defined By New York Law.**

Even if plaintiffs had alleged the appointment of a necessary representative for each decedent's estate -- as they have not -- most of the plaintiffs do not, in any event, qualify as distributees of the estates at issue.  The New York wrongful death statute provides that only distributees, as represented by a duly appointed representative, of an estate are entitled to damages for wrongful death.  McKinney's N.Y. E.P.T.L. § 5-4.1(1).  New York law expressly specifies those who may qualify as distributees of a decedent's estate.  McKinney's N.Y. E.P.T.L. § 4-1.1(a)(1-7(e)).  Those plaintiffs who do not meet these criteria may not seek a distribution in a wrongful death action under New York law.  Here, although plaintiffs allege a variety of family relationships, none have alleged the particular rights of distribution established by the N.Y. E.P.T.L.  Count Eight should therefore be dismissed as to all plaintiffs.

> **c.      Plaintiffs' Claims For Non-Pecuniary Damage Must Be Dismissed.**

Plaintiffs also allege entitlement to recovery for "physical and emotional distress, severe trauma, and lasting physical, emotional and psychological injuries" suffered by the "heirs and families" of the decedents.  (Compls. ¶ 344.)  Such allegations have no place in a cause of action for wrongful death.

---

[20]      *E.g.*, *In re Pfohl Bros. Landfill Litig.*, 26 F. Supp. 2d 512, 546 (W.D.N.Y. 1998), *judgment vacated on other grounds by Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, (2d Cir. 2002), *cert. denied*, 538 U.S. 998 (2003) (*citing Carrick v. Cent. Gen. Hosp.*, 414 N.E. 2d 632, 636 n.2 (N.Y. 1980)) ("It is well established that the existence of a qualified administrator is essential to the maintenance of the action and that the statutory right to recover for wrongful death does not even arise until an administrator has been named through the issuance of letters of administration.").

The New York wrongful death statute provides only for pecuniary damages accruing to distributees as a result of a decedent's death. Damages attributable to a distributee's physical and emotional distress are not recoverable in a wrongful death action. *Martin v. Reedy*, 606 N.Y.S.2d 455, 457 (3d Dep't 1994); *Garland v. Herrin*, 724 F.2d 16, 21 (2d Cir. 1983). *Accord* 21A Carmody-Wait 2d § 130:5 ("Causes of action for wrongful death and for a decedent's personal injuries are materially separate and distinct; . . . in a wrongful death action the recovery is for the pecuniary loss sustained by the person for whose benefit the action is brought."). Accordingly, to the extent such damages are sought by plaintiffs, as alleged in Count Eight, such demand for relief must be dismissed as a matter of law.

### 2.   Many Plaintiffs' Claims Are Time-Barred.

Even if the plaintiffs had adequately pled a cause of action for wrongful death -- as, of course, they have not -- many of the plaintiffs' claims are in any event time-barred and must therefore be dismissed. Under New York law, the statute of limitations for an action for wrongful death is two years from the occurrence of the injury. McKinney's N.Y. E.P.T.L. § 5-4.1(1). Under a two-year statute of limitations, the claims of all *Almog* plaintiffs whose injuries are alleged to have occurred prior to December 21, 2002, and of all *Afriat-Kurtzer* plaintiffs whose injuries are alleged to have occurred prior to January 21, 2003, are untimely. (*Almog* Compl. ¶¶ 30(34)-30(153); *Afriat-Kurtzer* Compl. ¶¶ 30(1)-30(2).)

### D.   Count Nine Fails To State A Cause Of Action For The Tort Of Survival.

Count Nine alleges a claim for survival. As is the case with respect to a claim for wrongful death, there is no general federal common law creating a cause of action for survival. Federal courts therefore look to state statutes to determine the sufficiency of survival claims that have been stated under general federal law. Once again, in the absence of any specification of those plaintiffs who assert claims of survival, and the law upon which they rely, this Court must

43

necessarily make certain assumptions to test the legal adequacy of allegations that are factually deficient on their face. To do so, this Court may again consider New York law by way of example.

Here, as is true of their wrongful death count, plaintiffs' claims for survival must be dismissed because they have failed to allege that any individual has been appointed a personal representative of the estate of any decedent, as required by New York law. McKinney's N.Y. E.P.T.L. § 11-3.1 *et seq.; accord, id.* § 11-3.2(b); *In re Pfohl Bros. Landfill Litig.*, 26 F. Supp. 2d 512, 546 (W.D.N.Y. 1998), *judgment vacated on other grounds by Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, (2d Cir. 2002), *cert. denied*, 538 U.S. 998 (2003) (*citing Mingone v. State*, 474 N.Y.2d 557, 560 (2d Dep't 1984)).

Even if plaintiffs here had adequately pled a cause of action for survival -- as they have not -- many plaintiffs' claims are nonetheless time-barred pursuant to New York's three-year statute of limitations for an action for personal injury. N.Y. C.P.L.R. § 214(5) (McKinney's 2003). Under a three-year statute of limitations, the claims of all *Almog* plaintiffs whose injuries are alleged to have occurred prior to December 21, 2001, and of all *Afriat-Kurtzer* plaintiffs whose injuries are alleged to have occurred prior to January 21, 2002, are untimely. (*Almog* Compl. ¶¶ 30(10)-30(153); *Afriat-Kurtzer* Compl. ¶¶ 30(1)-30(2).)

### E.   Count Ten, For Negligent And Intentional Infliction Of Emotional Distress, Must Be Dismissed.

Count Ten alleges that Arab Bank is liable for "negligent and/or intentional infliction of emotional distress." This claim, purportedly asserted under general federal common law, is improperly pled and must be dismissed.

1.    **Plaintiffs' Claims For Negligent Infliction Of Emotional Distress Are Legally Insufficient.**

Under New York law, a plaintiff may state a claim for the negligent infliction of emotional distress under a "direct duty" theory of liability if he or she suffers an emotional injury from a defendant's breach of a duty which unreasonably endangered the plaintiff's physical safety. *E.g.*, *Mortise v. U.S.*, 102 F.3d 693, 696 (2d Cir. 1996) (citing *Kennedy v. McKesson Co.*, 448 N.E.2d 1332, 1334 (N.Y. 1983)). Plaintiffs here have not alleged, and cannot allege, any "direct duty" specifically owed to the plaintiffs, and thus cannot proceed under a "direct duty" theory. Such an omission is not surprising; it is well established that banks have no duty to protect non-customers from the intentional torts of customers. *E.g.*, *In re Terrorist Attacks*, 349 F. Supp. 2d at 830 (citing *Renner v. Chase Manhattan Bank*, No. 98 Civ. 926 (CSH), 1999 WL 47239, at *13 (S.D.N.Y. Feb. 3, 1999)).

New York law also permits the assertion of a negligent infliction of emotional distress claim under a "bystander" theory of liability. In such a case, plaintiff must allege that "a defendant's conduct is negligent as creating an unreasonable risk of bodily harm to a plaintiff and such conduct is a substantial factor in bringing about injuries to the plaintiff in consequence of a shock or fright resulting from his or her *contemporaneous observation* of serious physical injury or death inflicted by the defendant's conduct on a member of the *plaintiff's immediate family*." *In re Terrorist Attacks,* 349 F. Supp. 2d at 830, *quoting Bovsun v. Sanperi*, 461 N.E.2d 843, 849 (N.Y. 1984) (internal quotation marks omitted) (emphasis added).

The overwhelming majority of plaintiffs do not allege that they were physically attacked in any of the 154 incidents of violence described in the Complaints alleged. Rather, substantially all allege that they are relatives of those who were attacked. The mere allegation of a familiar relationship is insufficient to state a claim for the intentional infliction of emotional

distress, however. Accordingly, under New York law, the claims of all such plaintiffs must be dismissed.[21]

The claims of some of these plaintiff relatives additionally fail because they have not alleged that they are "immediate family members." *Trombetta v. Conkling,* 626 N.E.2d 653, 655 (N.Y. 1993) ("[o]n firm public policy grounds, we are persuaded that we should not expand the cause of action for emotional injuries to all bystanders who may be able to demonstrate a blood relationship coupled with significant emotional attachment or the equivalent of an intimate, immediate familial bond."); *accord Bovsun,* 61 N.Y.2d at 234, n.13. The negligent infliction claims of the many plaintiffs must therefore be dismissed on this ground as well.[22]

### 2.    Under New York Law, The Negligent Infliction Of Emotional Distress Claims Of Many Plaintiffs Are Time-Barred.

New York applies a three-year statute of limitations to claims of negligence. *See* N.Y. C.P.L.R. § 214(5) (McKinney's 2003). Under such a statute, the claims of all *Almog* plaintiffs whose injuries are alleged to have occurred prior to December 21, 2001, and of all *Afriat-Kurtzer* plaintiffs whose injuries are alleged to have occurred prior to January 21, 2002, are untimely and must be dismissed. (*Almog* Compl. ¶¶ 30(10)-30(153); *Afriat-Kurtzer* Compl. ¶¶ 30(1)-30(2).)

---

[21]    These plaintiffs are identified in the following allegations: *Almog* Compl. ¶¶ 30(1)-(26), 30(28-33), 30(35-38), 30(40-81), 30(83-85), 30(87-103), 30(105-17), 30(119-29), 30(131-34), 30(136-48), 30(151-53); *Afriat-Kurtzer* Compl. ¶¶ 30(1-2).

[22]    *Almog* Compl. ¶¶ 30(12) (plaintiffs Shiron and Margulite Almakies, grandparents of plaintiff Liran and Noya Zer Aviv), 30(38) (Collette Kessous, as grandmother of Noam and Matan Ohayon), 30(64) (plaintiff Jacob Schlesinger, as uncle of Adi Shiran); 30(139) (plaintiff Aleksandr Gorodetsky, as stepfather of Tal Gordon); 30(143) (plaintiff Zeev Wiesner, as the "ex-husband" of Ayelet Hashahar Levy); *Afriat-Kurtzer* Compl. ¶ 30(1) (Anat Kadour, as the "fiancée" of Anan Kadour).

3.      **Plaintiffs' Claims For Intentional Infliction Of Emotional Distress Are Legally Insufficient.**

Arab Bank respectfully refers the Court to its motion to dismiss the *Linde* Complaint with regard to plaintiffs' failure to plead the necessary elements to establish a claim for intentional infliction of emotional distress under New York law, as well as plaintiffs' failure to plead the requisite intent and causation against Arab Bank. (*Linde* Br. at 37-39).

4.      **Under New York Law, The Intentional Infliction Of Emotional Distress Claims Of Many Plaintiffs Are Time-Barred.**

New York's one year statute of limitations applies to plaintiffs' claims for intentional infliction of emotional distress. *E.g.*, *In re Terrorist Attacks*, 349 F. Supp. 2d at 830; N.Y. C.P.L.R. § 215(3) (McKinney's 2003). Under a one-year statute of limitations, the claims of all *Almog* plaintiffs whose injuries are alleged to have occurred prior to December 21, 2003, and of all *Afriat-Kurtzer* plaintiffs whose injuries are alleged to have occurred prior to January 21, 2004, are untimely. (*Almog* Compl. ¶¶ 30(10)-30(153); *Afriat-Kurtzer* Compl. ¶¶ 30(1)-30(2).)

IV.    **THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER THE PLAINTIFFS' CLAIMS.**

Plaintiffs' allegations of jurisdiction are seriously flawed. Plaintiffs have alleged, for instance, that 28 U.S.C. § 1330 affords jurisdiction here; this section expressly pertains, however, solely to a "nonjury civil action against a foreign state," and is clearly inapplicable here. Plaintiffs' citation to 28 U.S.C. § 1332(a)(2), the statute conferring diversity jurisdiction, is equally misplaced.

None of the plaintiffs may claim jurisdiction under § 1332(a)(2) because in neither the *Almog* action nor the *Afriat-Kurtzer* action is there complete diversity between all plaintiffs and defendant. The majority of plaintiffs allege alien citizenship, (Compls. ¶ 30), and

have sued a banking corporation that is "[h]eadquartered in Jordan." (Compls. ¶ 34.) Under the circumstances, this Court may not exercise subject matter jurisdiction pursuant to 28 U.S.C. § 1332. *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 790 (2d Cir. 1980) ("the presence of aliens on two sides of a case destroys diversity jurisdiction"); *accord IIT v. Vencap Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975). That Arab Bank is also alleged to have "a branch office" in New York is legally irrelevant for purposes of diversity jurisdiction. *Bailey v. Grand Trunk Lines New England*, 805 F.2d 1097, 1101 (2d Cir. 1986) (finding lack of diversity jurisdiction over Canadian corporation with branch office in the United States, because "alien corporation's worldwide principal place of business, and not its principal place of business within the United States, is controlling").

Here, subject matter jurisdiction, if it exists at all, must be found solely under the Anti-Terrorism Act and 28 U.S.C. § 1331 ("federal question jurisdiction") with respect to the claims of the few United States nationals, and pursuant to 28 U.S.C. § 1350, the Alien Tort Statute, with respect to the claims of the alien plaintiffs. Because those claims are otherwise subject to dismissal as a matter of law, for the reasons discussed above, this Court lacks subject matter jurisdiction over these actions.

## V.     COUNTS ONE AND TWO MUST BE DISMISSED AS A MATTER OF LAW.

### A.     Seventeen Of Thirty-Six Plaintiffs Lack Standing To Assert Claims Under The Anti-Terrorism Act.

The *Almog* and *Afriat-Kurtzer* Complaints have recently been amended and now plead, for the first time, the nationalities of the plaintiffs. The Amended Complaints still fail, however, to identify those plaintiffs who purport to assert claims under Counts One and Two. In light of the small number of plaintiffs who allege United States citizenship, such identification could have been accomplished easily. The failure of plaintiffs to do so leaves unclear whether

48

Counts One and Two are asserted by only these United States nationals who allege physical injury in terrorist attacks and their relatives alleging related emotional distress, or rather, in addition to these individuals, by the United States relatives of aliens who allege physical injury in terrorist attacks.

Any attempt by plaintiffs to assert claims under the Anti-Terrorism Act in the absence of injury to a United States national, among other necessary allegations, must fail. (*Linde-Litle* Reply Br. at 18-20.) Each plaintiff asserting a claim under the Anti-Terrorism Act must allege that his or her claim arises from injuries sustained by a United States national in a terrorist attack abroad.

Seventeen plaintiffs have failed to do so. They have alleged only that they are United States nationals, or dual citizens of the United States and another country, and that a relative -- who is an alien -- was injured in a terrorist attack. These allegations are insufficient and must be dismissed.[23]

### B.    Six Plaintiffs Fail To Allege That They Have Been Injured By Acts Meeting The Definition Of "International Terrorism."

A claim brought pursuant to the Anti-Terrorism Act is not viable unless it alleges that a United States national was inured by reason of an act of international terrorism. 18 U.S.C. § 2333(a). (*Coulter* Br. at 10-12.)

To satisfy this requirement, a private litigant must allege that the act upon which his or her claims are based appears to be intended either to "intimidate or coerce a civilian population," "influence the policy of a government by intimidation or coercion," or "affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. §

---

[23]    The 17 plaintiffs are: *Almog* Compl. ¶¶ 30(5) (Suzan Ben Abraham); 30(12) (Oran Almog); 30(49) (Avraham Eichental); 30(55) (Joseph Carlin, Adam Carlin, Dina Carlin); 30(64) (Jacob Schlesinger); 30(68) (Akiva Anachovich); 30(88) (Ravil Safiullin, Ali Safiullin); 30(89) (Oded Zinger, Ya'ara Zinger, Neta Zinger, Ela Zinger); 30(128) (Ronen Cohen, Daniel Cohen); and 30(143) (Zeev Wiesner).

2333(a); *Koehler v. Bank of Bermuda, Ltd.*, No. 96 Civ. 7885, 1998 WL 67652, at *5 (S.D.N.Y. Feb. 19, 1998) *aff'd*, 209 F.3d 130 (2d Cir. 2000). It is also clear that simply alleging in conclusory fashion -- as the Complaints do -- that a plaintiff has been injured by attacks of "international terrorism" is insufficient to state a claim under the Anti-Terrorism Act. *In re Terrorist Attacks*, 349 F. Supp. 2d at 827 ("Bare and conclusory allegations are insufficient to withstand a motion to dismiss . . . ."); *id.* at 835 (dismissing the *Burnett* and *Federal* plaintiffs' complaints for failing to provide allegations to support their conclusory charge that Arab Bank knowingly aided and abetted the September 11, 2001 attacks).

Claims alleging random acts of violence, without attribution, necessarily fail to allege an attempt to "influence a government" or to "coerce a population." Thus, for example, the claim that "Judith Cohen is shot and killed on the main road between Matzuba and Shlom," (*Almog* Compl. ¶ 30(128)), while tragic, is plainly insufficient to state a claim for "international terrorism" and the claim of this plaintiff and the related claims of two relatives, *id.* (Ronen and Daniel Cohen) must be dismissed. *See similarly,* (*Almog* Compl. ¶ 30(86) ("Gunmen open fire on a car traveling on Road 60 . . . wounding plaintiff David Rubin")); (*id.* ¶ 30(63) ("Matanya Robinson…is killed by Palestinian gunfire . . . .").

**C.    Three Plaintiffs' Claims Are Time-Barred.**

Under the Anti-Terrorism Act, "a suit for recovery of damages under section 2333 . . . shall not be maintained unless commenced within 4 years after the date the cause of action accrues." 18 U.S.C. § 2335(a). The original *Almog* Complaint was filed on December 21, 2004 and the original *Afriat-Kurtzer* Complaint was filed on January 21, 2005. One *Almog* plaintiff, Zeev Wiesner, nonetheless purports to assert an Anti-Terrorism Act claim for an attack which occurred prior to December 21, 2000. (*Almog* Compl. ¶ 30(143) (alleging injury November 2,

2000).)[24]    Similarly, two *Afriat-Kurtzer* plaintiffs, Gila Afriat-Kurtzer and Ronen Ben Haim,

purport to bring Anti-Terrorism Act claims in relation to an incident alleged to have occurred

many years prior to January 21, 2001.  (*Afriat-Kurtzer* Compl. ¶ 30(2) (alleging injury January

22, 1995).)  These claims must be dismissed as time-barred.

## VI.    ADOPTION OF *LINDE*, *LITLE* AND *COULTER* BRIEFS.

In accordance with the directive of this Court, Arab Bank has focused in this

submission upon those allegations of the *Almog* and *Afriat-Kurtzer* Complaints not contained in

the *Linde*, *Litle* and *Coulter* Complaints.  Because the Complaints are also subject to challenge

for each of the reasons stated in Arab Bank's submission in *Linde*, *Litle* and *Coulter*, Arab Bank

respectfully adopts all of the legal arguments set forth in its preceding briefs in support of its

motions to dismiss the plaintiffs' claims against it for failure to state a claim or, in the

alternative, on *forum non conveniens* grounds.

---

[24]    Additionally, this plaintiff purports to bring an Anti-Terrorism Act claim arising out of injury to his ex-wife Ayelet Hashahar, a citizen of Israel.  For the reasons stated above, *supra* at III, E, 1, he lacks standing.  Moreover, his claim is further subject to dismissal because an "ex-wife" is not an eligible "heir" or "survivor" as those terms are defined by law.  *See, e.g.*, McKinney' N.Y. E.P.T.L. § 5-1.2.

## CONCLUSION

For the reasons set forth herein and in Arab Bank's memorandum of law and declarations filed in support of its motions to dismiss the *Linde, Litle and Coulter* Complaints and adopted by reference herein, Arab Bank respectfully requests the dismissal with prejudice of all claims asserted against it in the *Almog* and *Afriat-Kurtzer* Complaints. Alternatively, Arab Bank respectfully requests dismissal of plaintiffs' claims on *forum non conveniens* grounds, for the reasons set forth in the memorandum of law and declarations filed by Arab Bank in support of its motion to dismiss the *Linde* Complaint.

Dated: New York, New York
April 15, 2005

Respectfully submitted,

Kevin Walsh (KW-6256)
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700
Attorneys for Defendant Arab Bank plc

OF COUNSEL:

J. David Reich
Steven J. Young
Leah Campbell
Gassan A. Baloul
Douglas W. Mateyaschuk II

52