UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------X

ORAN ALMOG, et al.,                          :

                Plaintiffs,        :        CV 04-5564 (NG)

        -against-                          :

ARAB BANK, PLC,                              :

               Defendant.        :

-----------------------------------------------------X

-----------------------------------------------------X

GILA AFRIAT-KURTZER, et al.,                 :

                Plaintiffs,        :        CV 05-388 (NG)

        -against-                          :

ARAB BANK, PLC,                              :

               Defendant.        :

-----------------------------------------------------X

## DECLARATION OF ERIC A. POSNER

    I, Eric A. Posner, declare as follows:

### Introduction

    1.    I have been asked to provide my opinion on the questions referred to in paragraph 4 below, in the form of a Declaration, to Winston and Strawn LLP, Attorneys at Law acting on behalf of Arab Bank plc. Arab Bank is a defendant in proceedings brought against it by Oran Almog, *et al.*, and Gila Afriat-Kurtzer, *et al.* Allegations with respect to Arab Bank are identical in the two proceedings.

### Qualifications and Experience

    2.    I am Kirkland and Ellis Professor of Law at the University of Chicago. I graduated from Harvard Law School in 1991, and began teaching in 1993. I specialize in international law. I teach courses in this field (public international law, foreign relations law, theories of international law, international law workshop), and I have written one book (*The*

*Limits of International Law*, with Jack Goldsmith, Oxford University Press, 2005) and numerous articles on various aspects of international law, which have appeared in the Stanford Law Review, University of Chicago Law Review, Virginia Journal of International Law, and other journals.  My c.v. is annexed.

<u>Background</u>

3.      My understanding on the basis of information in the Complaints is as follows. Plaintiffs are citizens of Israel and other countries who allege that they or their family members were victims of terrorist attacks carried out by various militant organizations or individuals on Israeli or Israeli-controlled territory, which resulted in tragic loss of life and horrific injuries. Arab Bank is based in Amman, Jordan.  The plaintiffs allege that Arab Bank maintained accounts for, or transferred money for the benefit of accounts belonging to, front organizations of terrorist groups, and that Arab Bank knew, or should have known, that its banking services were benefiting the terrorist groups.  The plaintiffs also allege that Arab Bank acted in concert with other institutions and groups, to create an incentive scheme that induced individuals to become suicide bombers by providing funds to their families after their deaths.

<u>The Questions</u>

4.      I have been asked to answer the following questions.  (i) Is a bank's provision of banking services of the type alleged in the Complaints a violation of customary international law?  (ii) Is a bank's alleged provision of banking services to various militant groups that have committed violent acts in the state of Israel an act of genocide or complicity in genocide?  (iii) Does a bank, by allegedly transferring funds after the fact to the families of suicide bombers with the purported intent to provide an incentive for such activity, violate customary international law by aiding or abetting crimes against humanity, including genocide?

<u>Summary of Opinion</u>

5.      I am of the opinion that none of the acts described in paragraph 4 is a violation of customary international law.

<u>Legal Background</u>

6.      International law comes from two main sources:  (i) treaties and (ii) customary international law.[1]   Treaties are explicit, written contracts between nations.  Customary international law "results from a general and consistent practice of states followed by them from a sense of legal obligation."  Restatement (Third) of Foreign Relations § 102(2) (1987).  Customary international law thus has two elements: "state practice" and what is usually called "opinio juris," that is, the sense of legal obligation.

7.      State practice refers to the actual practices of states.  A norm of customary international law can exist only if states comply with it.  Perfect compliance is not necessary.  A

---

[1]   The Alien Tort Statute refers to the "law of nations;" courts and commentators now refer to "customary international law" instead of "law of nations," but the meaning is roughly the same.

state can, on occasion, violate a norm of customary international law without at the same time undermining the existence of the norm. But noncompliance must be sporadic. If states frequently fail to comply with an asserted norm of customary international law, that norm cannot be said to exist.

8.      Opinio juris refers to the attitude of the states. A state may comply with an asserted norm of customary international law for political reasons, or for reasons of comity, but if not out of a sense of legal obligation, then the norm does not exist. Diplomatic, judicial, and other official statements may establish whether a state acts out of a sense of legal obligation or for some other reason. States that persistently object to a norm of customary international law are not bound by it.

9.      To determine whether the elements of state practice and opinio juris exist, courts traditionally consult international conventions and treaties; international custom; general principles of law; the declarations of governments; and (as a subsidiary means) the writings of scholars. *See* ICJ Statute, June 26, 1945, Art. 38, 59 Stat. 1055, 1060, U.S.T.S. 993. Treaties may reflect a norm of customary international law to the extent that they show that state parties recognize a norm of international law and comply with it. "However, a treaty will only constitute *sufficient proof* of a norm of customary international law if an overwhelming majority of States have ratified the treaty, *and* those States uniformly and consistently act in accordance with its principles." *Flores v. Southern Peru Copper Corp.*, 343 F.3d 140, 162-63 (2d Cir. 2003).

10.     Customary international law, like treaty-based international law, mainly applies to states and not to individuals or private entities. There are a few exceptions to this general rule, however. Prior to World War II, the main exception was piracy. Individuals who committed piracy violated international law. As a matter of customary international law, any state could try and punish people for committing piracy, regardless of the nationality of the defendants or the victims, or the location of the piratical acts. A common explanation for this rule was that no state had sovereignty over the high seas, and thus states implicitly agreed that any state could prosecute any other state's national for committing piracy on the high seas. Piracy was deemed a violation of customary international law because all civilized states condemned piracy and prosecuted pirates without regard to the nationality of defendants or victims, or the location of the offense. The norms against piracy and related acts were detailed and elaborate, and interpreted consistently by the nations of the civilized world. *See United States v. Smith*, 18 U.S. 153 (1820).

11.     After World War II, the number of international crimes recognized by customary international law increased. This development began with the Nuremberg Trials of Major War Criminals. The German defendants were prosecuted for war crimes and crimes against humanity, and held individually liable for these acts. The next step was the Universal Declaration of Human Rights, which, although not legally binding, showed that states believed that the protection of human rights was a matter of international concern. Over the next several decades, most states signed and ratified a series of legally binding human rights treaties, including the Genocide Convention, the International Convention on the Elimination of All Forms of Racial Discrimination, the International Covenant on Civil and Political Rights, and the

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. However, these treaties generally applied against states, not against individuals, and to the extent that they applied to individuals, they applied to individuals who were acting under state law. The treaties themselves did not create private rights of action. For this reason, plaintiffs bringing cases under the Alien Tort Statute have generally not argued that their cause of action is based on a treaty, but on a norm of customary international law. Treaties and other international agreements are relied on mainly as "evidence of an emerging norm of customary international law…." *Filártiga v. Peña-Irala*, 630 F.2d 876, 880 n.7 (2d Cir. 1980); *see also Kadic v. Karadžić*, 70 F.3d 232, 238 n.1 (2d Cir. 1995); *Sosa v. Alvaraz-Machain*, 124 S. Ct. 2739, 2767 (2004).

12.     In principle, identification of customary international law norms that create individual criminal liability continues to require satisfaction of both elements of the definition of customary international law: state practice and opinio juris. Thus, under traditional international legal reasoning, customary international law prohibits individuals from engaging in certain behavior only if states both prohibit this behavior and express a sense of legal obligation to prohibit this behavior. This does not mean that the norm is never violated. The court in Filártiga found a customary international law norm against official torture, for example, even though it acknowledged that in many states official torture occurred. *Filártiga*, 603 F.2d, at 884 & n.15. In *Sosa*, the Supreme Court agreed "that violations of a rule [do not] logically foreclose the existence of that rule as international law…. Nevertheless, that a rule is as far from full realization as the one [asserted in the *Sosa* case] is evidence against its status as binding law…." *Sosa*, 124 S. Ct., at 2769 n.29. Other courts have emphasized that the state practice requirement remains valid. *See, e.g., Flores*, 343 F.3d at 162-63, 167.

13.     Last year the Supreme Court further clarified the means by which norms of customary international law are to be identified for the purpose of the Alien Tort Statute. The Court said that "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 [the Alien Tort Statute] was enacted." *Sosa*, 124 S. Ct. at 2765. The Court offered the example of piracy, discussed above, and found that the asserted norm in the *Sosa* case – against arbitrary arrest – was not in fact a norm of customary international law of sufficient definiteness. The Court did not repudiate the *Filártiga* court's finding that official torture violates customary international law, nor the finding of another American court that there are international law norms against genocide (whether an official or private act), certain war crimes, and summary execution (if an official act). *Kadic*, 70 F.3d, at 241-44.

## Financing of Terrorist Operations

14.     The first question is whether the alleged provision of banking services to militant groups, allegedly with knowledge of their violent activities, is an offense under customary international law, in the same way that piracy and genocide are. The problem with the claim that a norm against terrorist financing exists, and exists with sufficient definiteness, is that "terrorism" has never been a well-defined offense in international law. As recently noted by the Second Circuit Court of Appeals, "there continues to be strenuous disagreement among States

about what actions do or do not constitute terrorism, nor have we shaken ourselves free of the cliché that 'one man's terrorist is another man's freedom fighter.'" *U.S. v. Yousef*, 327 F.3d 56, 107 (2d Cir. 2003); *see also Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984).

15.    The Complaints cite several international documents that, they argue, show that customary international law norms against terrorism and terrorist financing have evolved. However, these documents establish no such thing.

16.    In 2002, The International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, U.N. GAOR, 54th Sess., 76th mtg., Supp. No. 49, U.N. Doc. A/Res/53/108 (1999), entered into force.  The Convention makes it an offense to "provide[] or collect[] funds with the intention that they should be used or in the knowledge that they are to be used ... in order to carry out: (a) An act which constitutes an offense within the scope of and as defined in one of the treaties listed in the annex; or (b) Any other act intended to cause death or seriously bodily injury to a civilian ... when the purpose of such act ... is to intimidate a population, or to compel a Government or an international organization to do or to abstain from doing any act." *Id.*, Art. 2(1).  The treaties listed in the annex create various offenses: for example, the International Convention for the Suppression of Terrorist Bombings prohibits certain types of terrorist bombings.  Thus, the Convention for the Suppression of the Financing of Terrorism prohibits the financing of these types of terrorist bombings.

17.    Like most treaties, the Convention created new treaty-based legal obligations on the part of states.  Under the Convention, states "shall adopt such measures as may be necessary ... to establish as criminal offences under its domestic law the offences set forth in article 2 ...." *Id.*, Art. 4(a).  Compliance with the treaty mainly takes the form of governments enacting new domestic criminal law that incorporates the treaty's provisions.

18.    The Convention did not purport to recognize existing customary international law.  Some treaties do, or purport to, recognize existing customary international law.  For example, the Genocide Convention, Art. 1, says that "The Contracting Parties *confirm* that genocide ... is a crime under international law..." (emphasis added).  The Convention for the Suppression of the Financing of Terrorism, by contrast, creates a new offense, and stipulates that it will be enforced by states, which are to include that offense in their criminal codes.

19.    In addition, the fact that parties are permitted to enter reservations limiting their obligations under the Convention shows that the states did not recognize these obligations as norms of customary international law whose legal force predated the Convention's entry into force, as states are not permitted to unilaterally exclude themselves from existing norms of customary international law.  *See* North Sea Continental Shelf Cases, 1969 ICJ Reports 4, 38-39.  The language in the treaty thus shows that prior to 2002 states recognized no norm of customary international law that prohibited terrorist financing.  Indeed, just a few years earlier, the drafters of the Rome Statute refused to give the International Criminal Court jurisdiction over terrorism on the ground that terrorism is less serious than the crimes against humanity that would be the focus of the court's work.  *See* Geoffrey Robertson, Crimes Against Humanity 358 (2d ed. 2002).

20.     Thus, for there to be a customary international law norm against terrorist financing today, it would have to be the case that the Convention helped establish a *new* norm of customary international law – that, in effect, the drafting of the Convention provoked or encouraged states to recognize a new norm.  Proof of such a new norm would exist only if "an overwhelming majority of States have ratified the treaty, *and* those States uniformly and consistently act in accordance with its principles." *Flores*, 343 F.3d, at 162-63 (emphasis in original).  It would have to be shown that the norms incorporated in the treaty are sufficiently definite to be customary international law.  And it would have to be shown that state practice has converged with extraordinary rapidity, as it has been only a few years since the Convention entered into force.  None of these showings have been made.

21.     More than 130 states are parties to the Convention, but there are 191 states in existence.  The majority is large but not overwhelming.  But even more troublesome is the fact that not even the ratifying states agree on a definition of terrorist financing.  The Convention makes it an offense to finance an offense defined in one of the nine treaties listed in the Convention's annex, but also allows states, by declaration, to avoid being legally obligated to recognize offences in treaties they have not ratified.  Numerous states have done just this.  For example, France has not ratified the Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, Including Diplomatic Agents, and accordingly has declared that it is not bound to recognize the offences defined in this treaty in the application of the Convention for the Suppression of the Financing of Terrorism.[2]  Thus, there remains great controversy over what forms of terrorist financing are, and ought to be, banned by international law.

22.     Although many states have been able to agree on a treaty that prohibits terrorist financing, and on various treaties that prohibit specific terrorist-related acts like hijacking, they have not been able to agree on a general treaty that prohibits all forms of terrorism because of fundamental disagreements about the nature of terrorism.  Negotiations have dragged on for years, but have not been able to overcome several stumbling blocks.  States have not been able to agree on whether "terrorism" includes (i) violent acts committed in the course of armed struggle against a foreign occupation; (ii) violent acts performed by established armed forces, but in violation of international law; and (iii) violent acts against soldiers (as opposed to civilians), such as those committed by the Irish Republican Army against British soldiers.  The Arab Convention for the Suppression of Terrorism, for example, exempts from its definition of terrorism "[a]ll cases of struggle by whatever means, including armed struggle, against foreign occupation and aggression for liberation and self-determination, in accordance with the principles of international law."  Art. 2(a).  A similar exception can be found in the Organization of African Unity's Convention on the Prevention and Combating of Terrorism, Art. 3(1), and the Convention of the Organization of The Islamic Conference on Combating International Terrorism, Art. 2(a).  *See generally* Alexandra V. Orlova and James W. Moore, "Umbrellas" or "Building Blocks"?: Defining International Terrorism and Transnational Organized Crime in International Law, 27 Houston J. Inter'l L. 167 (2005).  These controversies about the definition of terrorism are ongoing, and show that even though many states have ratified the Convention on the Suppression of Terrorist Financing, albeit with significant reservations, there is not yet

---

[2]  Available at: http://untreaty.un.org/ENGLISH/bible/englishinternetbible/partI/chapterXVIII/treaty11.asp.

universal agreement on the meaning of terrorism, which is necessary for a norm establishing individual criminal liability for terrorism to become a part of customary international law.

23.     In sum, the Convention for the Suppression of Financing of Terrorism created a new international obligation on the part of many but not all states to, among other things, pass domestic laws that criminalize the financing of certain acts of terrorism, but it did not create or reflect an international consensus concerning what terrorism is or the specific types of conduct, including the provision of banking services, that are prohibited.

24.     The Security Council of the United Nations has issued numerous resolutions related to the financing of terrorism.  The technical legal effect of these resolutions was to encourage or oblige states to take certain actions, for example, against certain terrorist organizations and their state sponsors.  The resolutions did not purport to create an international crime of financing terrorism.  The resolutions do not show that states already recognized the existence of such a crime in customary international law.  Most of the resolutions refer to the terrorist activities of two specific groups – the Taliban and al Qaeda (Resolutions 1267, 1333, 1363, 1390, 1455, 1456, 1526) – and thus did no more than establish a moral and political judgment of the international community that these two groups posed a threat to international security.  These two groups are not involved in the current proceedings, and thus the relevance of these resolutions is highly questionable.  That the members of the Security Council could agree that al Qaeda's activities constituted terrorism and a threat to member states, and therefore that financing of al Qaeda's activities should be stopped, does not show that they could, or did, agree on a common definition of a crime of financing of terrorism.  States that agreed that al Qaeda's activities constituted terrorism, for example, would not necessarily agree that the activities of Palestinian militants constitute terrorism.  Indeed, the absence of Security Council resolutions condemning militant Palestinian groups for engaging in terrorism shows, by contrast, that there is no international consensus about the nature of their acts.

25.     The other UN Security Council resolutions cited in the Complaints also provide no evidence of a customary international law norm that recognizes criminal responsibility for terrorist financing.  Resolutions 1269, 1373, and 1377 condemn "terrorism," and its financing, without saying what terrorism is.  Resolution 1373, like the Convention for the Suppression of the Financing of Terrorism, calls upon states to criminalize terrorist activity.  Resolution 1456 calls upon states to become parties to the Convention and other treaties.  Resolution 1535 reorganizes a counter-terrorism committee created by earlier resolutions.  These resolutions show collectively that a number of states were concerned about various acts of terrorism and terrorism financing, but not that they agreed about the definitions or contours of the acts in question, nor that they recognized any existing crime of terrorism financing in customary international law. Far from providing a clear definition of terrorism, the resolutions are vague and often hortatory.

26.     Resolution 1373, which is typical of the resolutions cited in the Complaints, declares in ¶ 5 that "acts, methods, and practices of terrorism are contrary to the principles of the United Nations and that knowingly financing, planning, and inciting terrorist acts are also contrary to the purposes and principles of the United Nations."  But the declaration does not purport to establish individual civil or criminal liability.  It says nothing about civil or criminal liability, and does not define terrorism with the specificity required for customary international

law. Instead, it calls upon states to take action against terrorism and terrorist financing. Such a declaration cannot establish civil or criminal liability for individuals under international law. Nondefensive wars without Security Council authorization also violate the purposes, principles, and rules of the United Nations, but there is no international consensus that Bill Clinton, George W. Bush, and numerous leaders of European nations are criminally liable under international law because they authorized such wars (the intervention in Kosovo and, more arguably, the recent invasion of Iraq).

27.   The absence of a universally recognized definition of terrorism was recognized yet again just last month by the Secretary-General of the United Nations, who cited continuing disagreement on this issue as a threat to global security, and urged states to establish such a definition by treaty.   Report of the Secretary-General, In Larger Freedom: Towards Development, Security and Human Rights for All ¶ 91 (2005).[3]

28.   In conclusion, treaties and Security Council resolutions show that states are slowly working toward a treaty regime that obliges states to enact domestic laws restricting certain kinds of terrorism and terrorist financing, and to cooperate with each other in pursuing certain kinds of terrorist suspects. Many issues have been worked out, but many more remain unresolved, including the issue whether the use of force in wars of national liberation amounts to terrorism. With so much continuing disagreement about the nature of terrorism, and, a fortiori, the nature of terrorist financing, there can be no customary international law norm, and certainly not a definite and widely accepted norm, recognizing individual criminal responsibility for providing banking services of the type alleged in the Complaints.

<u>Aiding and Abetting Genocide</u>

29.   The second question is whether a bank's alleged provision of banking services to various militant groups that have committed violent acts in the state of Israel is an act of genocide or complicity in genocide.

30.   Genocide is an international crime, recognized as such by customary international law. *See* Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide (Advisory Opinion), 1951 ICJ Reports 16. A large majority of states have ratified the Convention on Genocide, and virtually all states condemn genocide.[4] As genocides are rare and isolated events, state practice is consistent with the claim that there is a norm against genocide.

31.   The Convention on Genocide, Art. 2, defines genocide as "any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical [sic], racial or religious group, as such: (a) Killing members of the group; (b) Causing serious bodily or mental harm to members of the group; (c) Deliberately inflicting on the group conditions of life

---

[3]  I also do not think that, given the lack of universal consent to the Bombing Convention, the accomplice liability provision of the Bombing Convention can be said to establish a customary international law norm that prohibits individuals from aiding and abetting terrorist bombings.

[4]  Other international instruments provide evidence that states condemn genocide, including the statutes that created the international tribunals charged with adjudicating international crimes committed in Rwanda and the former Yugoslavia.

calculated to bring about its physical destruction in whole or in part; (d) Imposing measures intended to prevent births within the group; (e) Forcibly transferring children of the group to another group."   Although commentators have argued from time to time that genocide encompasses nearly any mass killing undertaken for political purposes, such a view is not supported by state practice or opinio juris. The core meaning of genocide remains the systematic destruction of a national minority. *See* William A. Schabas, Genocide in International Law ch. 3 (2000).

32.   The Convention on Genocide, Art. 3, prohibits complicity in genocide. However, the Convention does not define "complicity," nor does any authoritative source, as far as I know. It might be that ordinary criminal law notions of complicity were supposed to be incorporated, but, if so, substantial evidence of subsequent opinio juris and state practice does not exist. Thus, there is no international consensus that acts like providing banking services of the type alleged in the Complaints, to people who are purported to be engaging in genocidal acts, should be considered complicity in genocide.

33.   For a genocide to exist, the perpetrators must have the proper intent. They must intend to destroy a national, ethnic, racial, or religious group.  What is the purpose of the Palestinian militants (or what are their purposes)? There are several possibilities.

34.   One possibility is that the militants seek to expel Israel from the occupied territories.  However, the use of violence by occupants of a territory against civilians in order to expel foreign occupiers cannot be considered an act of genocide.  The purpose of the violence, however regrettable, is independence, not the destruction of a national, ethnic, racial, or religious group.  A broad definition of genocide that encompassed the use of violence for purposes of national liberation would sweep in numerous national resistance movements, including Jewish resistance to British occupation of Palestine, local resistance to French colonial rule in Algeria and Vietnam, the struggle against Apartheid in South Africa, and the Irish Republican Army's resistance to British control of Northern Ireland.  The activities of these groups have often involved a horrific level of violence, but states have not regarded these activities as genocidal.

35.   Another possible purpose of the Palestinian militants is to overthrow the Israeli government and establish a Palestinian state where Israel currently exists.  However, the use of violence even in order to overthrow a state cannot, without more, be considered genocide.  As the International Court of Justice noted, when it rejected Serbia and Montenegro's argument that the NATO intervention in the Balkan wars was genocide against the Serbs: "the threat or use of force against a State cannot in itself constitute an act of genocide."  Legality of Use of Force (Serbia and Montenegro v. United Kingdom), 1999 ICJ 11, ¶ 35.  Otherwise, the various attempts by Arab states to destroy the state of Israel since its founding would have to be considered attempted genocides.  However, as far as I know, the international community has not accused (say) Egypt during the Yom Kippur War of attempting a genocide.  There have been, throughout history, countless wars in which the aim of one state or group was to defeat and eliminate the political independence of another state.  Only in a very few instances has the international community determined that the conflict was an act of genocide.

36.     Even if the militants have genocidal intent, a genocide can exist only if certain acts are performed.  It is clear that systematic and widespread murder of the kind that occurred during the Holocaust and in Rwanda can be genocidal, but aside from these and a few other extreme cases, there is no international consensus that genocide has occurred in other situations. One can only say that genocide may be implicated when a significant fraction of the protected group has been systematically killed.  *See* Steven R. Ratner and Jason S. Abrams, Accountability for Human Rights Atrocities in International Law: Beyond the Nuremberg Legacy 38-39 (2d ed. 2001).  As a recent illustration of the ambiguity of genocide, the United States government and a United Nations commission disagree about whether genocide has occurred, or is occurring, in Darfur, where tens of thousands of people have died.

37.     In sum, a genocide exists under international law when the perpetrators intend the destruction of a group rather than independence or the overthrow of a government or political regime, and they engage in systematic and widespread killing of a protected group.   The international community has been able to agree in rare and extreme instances that a genocide has occurred, but the norm against genocide is highly ambiguous outside these core cases.   In addition, because the elements of complicity in genocide remain obscure, one cannot conclude that there is a definite norm of customary international law that specific acts such as the provision of banking services constitute aiding and abetting genocide.

## Facilitating Payments to Families of Suicide Bombers

38.     The question is whether a bank, by allegedly transferring funds after the fact to the families of suicide bombers with the purported intent to provide an incentive for such activity, violates customary international law by aiding or abetting crimes against humanity, including genocide.[5]

39.     The modern concept of the crime against humanity originated in the Charter of the International Military Tribunal at Nuremberg.[6]  The Charter defined crimes against humanity as: "murder, extermination, enslavement, deportation, and other inhumane acts committed against any civilian population, before or during the war; or persecutions on political, racial or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of the domestic law of the country where perpetrated." Art. 6(c).  The definition suggests that the authors of the Charter had in mind the uniquely heinous acts of the Nazis, as the International Military Tribunal had jurisdiction only over crimes committed by the governments of Germany and the other Axis powers.  The Charter did not apply to any other governments or countries, and it was signed only by the United States, the Soviet Union, France, and Britain.  Although the Charter may have signaled an emerging sense among some nations that crimes against humanity ought to be condemned, it did not by itself establish new norms of customary international law.

40.     Indeed, although specific types of crimes against humanity – including genocide and torture – were subsequently prohibited by treaty, and thus *did* enter international law, crimes

---

[5]  I will confine my discussion to crimes against humanity other than genocide, as I discuss genocide in the prior section.
[6]  Some earlier precedents have not had much influence.

against humanity as a general category of international criminal liability were not subsequently established by a multilateral treaty that received universal consent.  The closest thing to such a treaty was the Rome Statute of 1998, which gave the International Criminal Court jurisdiction over crimes against humanity.  But this treaty did not receive universal consent.  Indeed, it did not even receive the consent of the United States.  Nor did it receive the consent of other major nations such as China, Russia, Japan, and India.

41.     Before the Rome Statute was drafted, the United Nations Security Council established two tribunals with jurisdiction over crimes against humanity – the tribunal for the former Yugoslavia and the tribunal for Rwanda.  Like the Nuremberg tribunal, these tribunals were established for the purpose of trying individuals who had participated in specific conflicts whose brutality shocked the international community.  The tribunals did not have jurisdiction over the acts of people who were not involved in these conflicts; thus, the statutes of the tribunals could not, by themselves, establish general norms of international law.  Like the Nuremberg tribunal, the Yugoslavia and Rwanda tribunals showed that nations could agree on criminal liability for crimes against humanity in specific conflicts, but not on a general definition that could be applied in different settings.

42.     Despite the weakness of the authorities, the scholarly community agrees that crimes against humanity have entered customary international law, and American courts apparently have accepted this view.  Nonetheless, there is no scholarly or international agreement concerning the contours of these crimes.  In particular, there remains controversy over the difference between an "ordinary" crime like murder and even mass murder, and a murder that counts as a "crime against humanity."

43.     The legal authorities suggest several grounds for distinction.  First, some authorities suggest that there must be a nexus with an armed conflict – that is, an interstate war (as opposed to an insurgency within a state) or at least a massive breakdown of civil order.  The Nuremberg Charter, for all practical purposes, required such a nexus, as it was limited to crimes committed during World War II.  The statute for the Yugoslavia Tribunal requires a "conflict," albeit of an "internal" as well as "international" character (Art. 5) – clearly a reference to the collapse of civil order in the Balkans.  The statute for the Rwanda Tribunal does not require an armed conflict, but its jurisdiction extended only to the Rwanda conflict, which was a massive civil war of a different character from that of the insurgency in Israel.  The statute for the International Criminal Court does not require a nexus with an armed conflict but, as noted earlier, the ICC remains a controversial institution.  Thus, it is not clear whether the nexus requirement still exists or has lapsed, and if it still exists, whether it can be satisfied with an internal conflict less violent than those that occurred in Yugoslavia and Rwanda.  To the extent that the nexus requirement still exists, the acts described in the Complaints would not qualify as crimes against humanity because they arise in the context of a domestic insurgency.

44.     Second, most authorities suggest that the activities that constitute crimes against humanity must be "committed as part of a widespread or systematic attack directed against any civilian population," in the words of The Rome Statute of the International Criminal Court, Art. 7(1).  These terms have not been adequately clarified by international legal authorities.  We know that the Nazis, the warring factions in the former Yugoslavia, and the Hutus in Rwanda

committed crimes against humanity, and we know that the atrocities in these cases were systematic in the sense that they were meticulously planned and supervised by hierarchical authorities, carried out by numerous subordinates or citizens responding to orders or exhortation, and directed at large groups of people. But we do not know the dividing line between "systematic" and "unsystematic."

45.     Third, early authorities suggested a state action requirement. At Nuremberg, it was assumed that perpetrators of crimes against humanity acted under the authority of one of the Axis governments. The Yugoslavia and Rwanda statutes do not require state action, but the statutes applied to civil wars, where atrocities were committed at the behest of governments or political organizations seeking independence. The statute of the International Criminal Court, Art. 7(2)(a), requires a "state or organizational policy." The militant groups described in the Complaints are not states, nor do they seem akin to the highly organized political and military forces in Yugoslavia and Rwanda. And there is not an international consensus concerning the meaning of "organizational policy."

46.     Although the broad language of the Yugoslavia and Rwanda statutes may seem at first sight to encompass the activities of the militant Palestinian groups, it must be remembered that those statutes apply only to the atrocities committed in those two places, and it is unclear that they should be interpreted as reflecting novel customary international law norms that apply more broadly. The failure of the International Criminal Court to obtain universal consent reinforces this doubt. So does the absence of any clear examples of members of conventional militant organizations being convicted of crimes against humanity outside of a civil war of the type that prevailed in Yugoslavia and Rwanda.

47.     The opposite conclusion would imply that a radical change in customary international law norms has occurred in the last few years, and that in just a few years these norms have become definite and widely accepted. Historically, many insurgent groups have resorted to mass violence against civilians in order to achieve political ends. The historical record includes the African National Congress in South Africa during the Apartheid era, the Irish Republican Army in Great Britain, the Chechen separatists in Russia, the Shining Path guerillas in Peru, and so forth. Although most nations have condemned the acts of these groups, there has not developed a consensus that these groups committed crimes against humanity in violation of international law. Indeed, no major nation state or international body, as far as I know, has asserted that the violent acts of the Palestinian militants are crimes against humanity. With such ambiguity about the contours of the crime against humanity as applied to mass killings (aside from genocide), one must conclude that, even if the core of the crime against humanity is relatively clear, the extent to which this crime can be applied to violent attacks launched by an insurgency outside the context of interstate conflict or civil war is far from definite.

48.     Finally, it must be borne in mind that international law regulates matters that are of "mutual concern" to states. *Flores*, 343 F.3d at 155 n.23 (quoting Judge Friendly). It is clear that states do not regard all domestic crimes as matters of mutual concern, and care must be used in distinguishing those domestic crimes that properly remain within the domain of municipal law and those that rise to the level of international concern. Until the International Criminal Court's jurisdiction has been tested, we must recognize the possibility that although states have been able

to agree that some extreme forms of official or quasi-official ethnic cleansing in certain settings – Nazi Germany, Yugoslavia, Rwanda, and now Darfur – may count as crimes against humanity, these rough judgments about extreme cases have not hardened into a norm of customary international law of sufficient definiteness to allow one to determine the extent of its application to less extreme settings involving chronic criminal activity, violent civil disorder, and insurgencies, but without the genocidal element or the breakdown of civil order. The International Criminal Court has not decided its first case; it may be necessary to wait until it has built up a jurisprudence before we can make this determination.

49.    To declare that the acts described in the Complaints are crimes against humanity would be to take the risk that the *Sosa* court warned against. The court noted with concern that Alvarez's proposed norm against arbitrary detention "would support a cause of action in federal court for any arrest, anywhere in the world, unauthorized by the law of the jurisdiction in which it took place...." *Sosa*, 124 S. Ct., at 2768. Similarly, a finding that the acts alleged in the Complaints are crimes against humanity would support a cause of action in federal court for any chronic violent activity, and perhaps even large-scale organized crime, anywhere in the world – including the crimes of Chechen separatists in Russia, of the Tamil Tigers in Sri Lanka, of narco-terrorists in Colombia and Bolivia, of the ETA in Spain, of Muslim insurgents in the Philippines, of Islamic terrorists in Afghanistan, Pakistan, Iraq, Algeria, Saudi Arabia, and Thailand, of Kashmiri separatists in India, of the Aum Shinrikyo cult in Japan, and of the various insurgent groups that plague many of the countries in Sub-Saharan Africa.

50.    Despite the tragic ubiquity of violent insurgencies, the international community has been able to agree to create tribunals with the authority to find crimes against humanity in only a small number of cases – Nazi Germany, Japan, Rwanda, Yugoslavia, Sierra Leone, and a few others. There are, of course, practical and political reasons why more tribunals have not been created, but their paucity nonetheless indicates the extraordinary difficulty of obtaining consensus about what constitutes a crime against humanity, and perhaps that the norm is exceedingly narrow, encompassing only the most heinous acts committed only for the worst of motives, and not (for example) out of opposition to foreign or colonial rule. Beyond such core crimes, the contours of the norm are highly indefinite. The creation of the International Criminal Courts suggests that states envision or hope that the norm may be developed in the future, but it is too soon to tell whether this will happen.

51.    Even if the violent acts described in the Complaints were deemed to be crimes against humanity, the international community has not reached a consensus that acts like the alleged transferring of money to the families of the suicide bombers would constitute aiding and abetting such crimes. Given the lack of cases testing the definition of aiding and abetting crimes against humanity, I am unable to conclude that the conduct of Arab Bank alleged in the compliant would violate a widely accepted norm of sufficient definiteness prohibiting the aiding and abetting of crimes against humanity.

I declare under penalty of perjury under the laws of the United States of America that the above statements are true and correct.

Executed on April 12, 2005, in Chicago, Illinois.

Eric A. Posner

# CURRICULUM VITAE

**Eric A. Posner**                                                          **April 2005**

**Address:**      University of Chicago Law School
                 1111 E. 60th St.
                 Chicago, IL 60637
                 (773)702-0425
                 eposner@uchicago.edu

## Professional Experience:

Kirkland & Ellis Professor of Law, University of Chicago (since 2003)
Member, Committee on International Relations, University of Chicago (since 2003)
Editor, The Journal of Legal Studies (since 1998)

| | |
|---|---|
| 1998-2002 | Professor of Law, University of Chicago |
| Fall 1997 | Visiting Assistant Professor of Law, University of Chicago |
| 1993-1998 | Assistant Professor of Law, University of Pennsylvania |
| 1992-1993 | Attorney Adviser, Office of Legal Counsel, U.S. Department of Justice |
| 1991-1992 | Law Clerk, Judge Stephen F. Williams, U.S. Court of Appeals, D.C. Circuit |

## Books:

Law and Social Norms: Harvard University Press (2000)
 Japanese edition (Bokutakusha, 2002)
 Chinese edition (China University of Political Science and Law Publishing House, forthcoming)
 Taiwanese edition (Angle Publishing Company, forthcoming)

Chicago Lectures in Law and Economics (editor): Foundation Press (2000)

Cost-Benefit Analysis: Legal, Philosophical, and Economic Perspectives (editor, with Matthew Adler): University of Chicago Press (2001)

The Limits of International Law (with Jack Goldsmith): Oxford University Press (2005)

## Articles and Book Chapters:

Contract Law in the Welfare State: A Defense of Usury Laws, the Unconscionability Doctrine, and Related Limitations on the Freedom to Contract, 24 J. Legal Stud. 283 (1995)

The Regulation of Groups: The Influence of Legal and Nonlegal Sanctions on Collective Action, 63 U. Chi. L. Rev. 133 (1996)

Law, Economics, and Inefficient Norms, 144 U. Pa. L. Rev. 1697 (1996)

The Legal Regulation of Religious Groups, 2 Legal Theory 33 (1996)

Altruism, Status, and Trust in the Law of Gifts and Gratuitous Promises, 1997 Wisc. L. Rev. 567 (1997)

The Political Economy of the Bankruptcy Reform Act of 1978, 96 Mich. L. Rev. 47 (1997) (reprinted in part in Bankruptcy Anthology (Charles J. Tabb ed. 2001)

The Parol Evidence Rule, the Plain Meaning Rule, and the Principles of Contractual Interpretation, 146 U. Pa. L. Rev. 533 (1998)

Symbols, Signals, and Social Norms in Politics and the Law, 27 J. Legal Stud. 765 (1998)

The Strategic Basis of Principled Behavior: A Critique of the Incommensurability Thesis, 146 U. Pa. L. Rev. 1185 (1998)

The Demand for Human Cloning, in Clones and Clones: Facts and Fantasies About Human Cloning (Martha C. Nussbaum and Cass R. Sunstein, eds.): W.W. Norton (1998)  (with Richard A. Posner) (Reprinted, with a postscript, in 27 Hofstra L. Rev. 579 (1999))

A Positive Theory of Chapter 11, 74 NYU Law Rev. 161 (1999)  (with Kevin A. Kordana)

The Decline of Formality in Contract Law, in The Fall and Rise of Freedom of Contract (Frank Buckley, ed.): Duke University Press (1999)

Family Law and Social Norms, in The Fall and Rise of Freedom of Contract (Frank Buckley, ed.): Duke University Press (1999)

Shaming White Collar Criminals under the Federal Sentencing Guidelines, 42 J. Law & Econ. 365 (1999) (With Dan M. Kahan)

Arbitration and the Harmonization of International Commercial Law: A Defense of *Mitsubishi*, 39 Va. J. Intern'l Law 647 (1999)

Should Debtors Be Forced into Chapter 13?, 32 Loyola of Los Angeles L. Rev. 965 (1999)

A Theory of Customary International Law, 66 U. Chi. L. Rev. 1113 (1999)  (with Jack L. Goldsmith)

Rethinking Cost-Benefit Analysis, 109 Yale L.J. 165 (1999)  (With Matthew Adler) (Reprinted in part in Jurisprudence: Contemporary Readings, Narratives, and Problems (Robert Hayman et al., ed., 2d ed. forthcoming 2002))

Contract Remedies: Foreseeability, Precaution, Causation, and Mitigation, in The Encyclopedia of Law and Economics (Boudewijn Bouckaert and Gerrit De Geest, eds.): Edward Elgar (2000)

A Theory of Contract Law Under Conditions of Radical Judicial Error, 94 Nw. U. L. Rev. 749 (2000)

Understanding the Resemblance Between Modern and Traditional Customary International Law, 40 Va. J. Int'l Law 639 (2000)  (with Jack L. Goldsmith)

Implementing Cost-Benefit Analysis When Preferences Are Distorted, 29 J. Legal Stud. 1105 (2000)  (with Matthew Adler)

Introduction to the Conference on Cost-Benefit Analysis, 29 J. Legal Stud. 837 (2000)  (with Matthew Adler)

Agency Models in Law and Economics, in *Chicago Lectures in Law and Economic* (Eric A. Posner ed., 2000)

The Design and Interpretation of Contracts: Why Complexity Matters, 95 Nw. U.L. Rev. 91 (2000)  (with Karen Eggleston and Richard Zeckhauser)

Law and Social Norms: The Case of Tax Compliance, 86 Va. L. Rev. 1781 (2000)

Cost-Benefit Analysis as a Solution to a Principal-Agent Problem, 53 Admin. L. Rev. 289 (2001)

Law and the Emotions, 89 Georgetown L.J. 1977 (2001)

Controlling Agencies with Cost-Benefit Analysis: A Positive Political Theory Perspective, 68 U. Chi. L. Rev. 1137 (2001)

The Law and Economics of Consumer Finance, 4 Amer. Law & Econ. Rev. 162 (2002) (with Richard Hynes)

Social Norms and Economic Analysis of the Law, in *Economic Analysis of Law: A European Perspective* (Aristides N. Hatzis ed., forthcoming)

Legislative Entrenchment: A Reappraisal, 111 Yale L.J. 1665 (2002) (with Adrian Vermeule)

Fear and the Regulatory Model of Counterterrorism, 25 Harv. J.L. & Pub. Pol. 681 (2002)

Controlling Agencies with Net Benefit Accounts: A Thought Experiment, 150 U. Pa. L. Rev. 1473 (2002)

Moral and Legal Rhetoric in International Relations: A Rational Choice Perspective , 31 J. Legal Stud. S115 (2002) (with Jack Goldsmith)

Interring the Nondelegation Doctrine, 69 U. Chi. L. Rev. 1721 (2002) (with Adrian Vermeule)

Economic Analysis of Contract Law After Three Decades: Success or Failure?, 112 Yale L.J. 829 (2003)

Four Economic Perspectives on American Labor Law and the Problem of Social Conflict, 159 J. Inst'l & Theoretical Econ. 101 (2003)

The Jurisprudence of Greed, 151 U. Pa. L. Rev. 1097 (2003)

Reparations for Slavery and Other Historical Injustices, 103 Colum. L. Rev. 689 (2003) (with Adrian Vermeule)

A Theory of the Laws of War, 70 U. Chi. L. Rev. 297 (2003)

Do States Have a Moral Obligation to Comply with International Law?, 55 Stan. L. Rev. 1901 (2003)

Accommodating Emergencies, 56 Stan. L. Rev. 605 (2003) (with Adrian Vermeule), reprinted in The Constitution in Wartime 55 (Mark Tushnet, editor, 2005)

Transfer Regulations and Cost-Effectiveness Analysis, 53 Duke L.J. 1067 (2003)

Probability Errors: Implications for Tort and Contract Law, 11 Sup. Ct. Econ. Rev.  125 (2004), reprinted in The Law and Economics of Irrational Behavior 456 (Francesco Parisi and Vernon Smith, editors, 2005)

Transitional Justice as Ordinary Justice, 117 Harv. L. Rev. 761 (2004) (with Adrian Vermeule)

The Political Economy of State Bankruptcy Exemptions, 47 J. Law & Econ. 19 (2004) (with Richard Hynes and Anup Malani)

A Theory of International Adjudication, Calif. L. Rev. (forthcoming 2005) (with John Yoo)

Optimal War and *Jus ad Bellum*, Georgetown L.J. (forthcoming 2005) (with Alan Sykes)

Holding Internet Service Providers Accountable, Sup. Ct. Econ. Rev. (forthcoming 2005) (with Douglas Lichtman)

International Law and the Disaggregated State, U. Fla. L. Rev. (forthcoming 2005)

Dollars and Death, U. Chi. L. Rev. (forthcoming 2005) (with Cass Sunstein)

Is the International Court of Justice Biased?, J. Legal Stud. (forthcoming 2005) (with Miguel de Figueiredo)

**Book Reviews, Comments, and Other Short Pieces:**

Norms, Formalities, and the Statute of Frauds: A Comment, 144 U. Pa. L. Rev. 1971 (1996)

Standards, Rules, and Social Norms, 21 Harv. J.L. & Pub. Policy 101 (1997)

Efficient Norms, in The New Palgrave Dictionary of Economics and the Law (Peter Newman, ed.): Macmillan (1998)

Notes Toward a Theory of Customary International Law, 92 ASIL Proceedings 53 (1998)  (With Jack L. Goldsmith)

Law and Regret (Review of *Changing Your Mind* by E. Allan Farnsworth), 98 Mich. L. Rev. 1468 (2000)

Review of *The New Palgrave Dictionary of Economics and the Law*, edited by Peter Newman, 110 Econ J. 824 (2000)

Law and Economics for the Masses (Review of *Law's Order* by David Friedman), Jurist (2000)

Strategies of Constitutional Scholarship (Review of *The Strategic Constitution* by Robert D. Cooter), 26 Law & Social Inquiry 529 (2001)

Review of *The Jurisprudential Foundations of Corporate and Commercial Law*, edited by Jody S. Kraus and Steven D. Walt, 112 Ethics 626 (2002)

Review of *Law and Market Economy*, by Robin Paul Malloy, 18 Economics and Philosophy 183 (2002)

The Signaling Model of Social Norms: Further Thoughts, 36 U. Rich. L. Rev. 465 (2002)

Further Thoughts on Customary International Law, 23 Mich. J. Inter'l L. 191 (2002) (With Jack Goldsmith)

Introduction to a Conference on Rational Choice and International Law, 31 J. Legal Stud. S1 (2002).

Comment on Jean Braucher's Means Testing Consumer Bankruptcy, 7 Fordham J. Corp & Fin. L. 457 (2002)

When Reforming Accounting, Don't Forget Regulation.  Policy Matters 02-35, AEI-Brookings Joint Center (August 2002)

Contract Theory, in Blackwell Guide to the Philosophy of Law and Legal Theory (William A. Edmundson, ed.): Blackwell (forthcoming)

Forward to the Japanese Edition of Law and Social Norms (Ota Shozo et al. trans. 2002)

Crimes and Punishment, Wall Street Journal, April 11, 2003, p. A10 (with Adrian Vermeule)

Tobacco Regulation or Litigation? (Review of *Smoke-Filled Rooms* by W. Kip Viscusi), 70 U. Chi. L. Rev. 1141 (2003)

International Agreement: A Rational Choice Approach, 44 Va. J. Int'l L. 113 (2003) (with Jack Goldsmith)

The Nondelegation Doctrine: A Postmortem, 70 U. Chi. L. Rev. 1331 (2003) (with Adrian Vermeule)

The Patriot Act Under Fire, Wall Street Journal, December 9, 2003, p. A10 (with John Yoo)

Bankuptcy Act of 1978, in Major Acts of Congress (Brian K. Landsberg ed., 2003), vol. 1, p. 59

Reign of Terror, Chicago Tribune, January 18, 2004 (with John Yoo)

Evaluating Transfer Regulations, 26 Regulation 42 (2004)

International Court of Hubris, Wall Street Journal, April 7, 2004, p. A18 (with John Yoo)

Bring Back the Baathists, The New York Times, April 28, 2004, p. A23

The Alien Tort Statute and Transitional Justice, ASIL Proceedings (forthcoming)

Law, Examples of Social Science Methods Used in, in the Encyclopedia of Social Measurement (Kimberly Kempf-Leonard ed., forthcoming)

Emergencies and Political Change: A Reply to Tushnet, 56 Stan. L. Rev. 1593 (with Adrian Vermeule)

A "Torture" Memo and Its Tortuous Critics, The Wall Street Journal, July 6, 2004, p. A22 (with Adrian Vermeule)

Remarks on the Alien Tort Claims Act and Transitional Justice, ASIL Proc. 56 (2004)

Terrorism and the Laws of War, 5 Chi. J. Int'l L. 423 (2005)

Contract Theory, in The Blackwell Guide to the Philosophy of Law and Legal Theory 138 (Martin P. Golding and William A. Edmundson eds. 2005)

Law, in The Encyclopedia of Social Measurement 463 (Kimberly Kempf-Leonard ed. 2005)

All Justice, Too, Is Local, The New York Times, December 30, 2004, p. A23

Reply to Helfer and Slaughter, Cal. L. Rev. (forthcoming 2005) (with John Yoo)

All Hail...King George?, Foreign Policy Online, http://www.foreignpolicy.com/story/files/story2814.php (March 2005)

5

**Work in Progress:**

    The Evolution of Constitutions

    Covenants Not to Compete from an Incomplete Contract Perspective (with Alexander Triantis and George Triantis)

    Courts Should Not Enforce Government Contracts

    Social Norms in Tort and Contract Law

    The Design of Political Trials

    There Are No Penalty Default Rules in Contract Law

**Presentations:**

    10/21/93:  Wharton Public Policy and Management Seminar: Contract Law in the Welfare State

    3/8/94:  Harvard Law and Economics Seminar: Contract Law in the Welfare State

    9/23/94:  Penn Legal Studies Workshop: The Regulation of Groups

    1/11/95:  Georgetown Law and Economics Seminar: The Regulation of Groups

    1/17/95:  University of Chicago Law and Economics Seminar: The Regulation of Groups

    2/10/95:  Penn Topics in Legal Theory Seminar: The Legal Regulation of Religious Groups

    2/13/95:  Penn Legal Studies Workshop: Comment on Bernstein, Project Summary

    3/9/95:  University of Southern California Law and Economics Seminar: The Regulation of Groups

    3/16/95:  Boston University School of Law: The Legal Regulation of Religious Groups

    5/12/95:  American Law and Economics Association Annual Meeting, Berkeley: The Regulation of Groups

    2/9/96:  University of Pennsylvania Law Review Symposium on Law, Economics, and Norms: (1) Law, Economics, and Inefficient Norms; (2) Norms, Formalities, and Codes in Contract Law: A Comment

    2/28/96:  University of Toronto Law School: Law, Economics, and Inefficient Norms

    5/11/96:  American Law and Economics Association Annual Meeting, Chicago: Law, Economics, and Inefficient Norms

    7/13/96:  Law and Society Conference, Glasgow, Scotland: Altruism, Trust, and Status in the Law of Gifts and Gratuitous Promises

    9/17/96:  George Mason Law School: The Parol Evidence Rule, the Plain Meaning Rule, and Related Rules of Contract Interpretation

    9/24/96:  Harvard Law and Economics Seminar: Altruism, Status, and Trust in the Law of Gifts and Gratuitous Promises

11/15/96:  University of Virginia Law School: The Political Economy of the Bankruptcy Reform Act of 1978

2/15/97:  University of Wisconsin Law Review Symposium on Law and Economics and Law and Society: Altruism, Status, and Trust in the Law of Gifts and Gratuitous Promises

3/1/97:  Federalist Society Conference on Law and Economics and the Rule of Law, Duke University: The Legal Economist as Social Engineer: A Critique

4/18/97:  Conference on Social Norms, Social Meaning, and the Economic Analysis of Law, University of Chicago Law School: Symbols, Signals, and Social Norms in Politics and the Law

4/25/97:  Bankruptcy Roundtable, sponsored by the Institute for Law and Economics, University of Pennsylvania: The Political Economy of the Bankruptcy Reform Act of 1978

5/9/97:  American Law and Economics Association Annual Meeting, Toronto: Symbols, Signals, and Social Norms in Politics and the Law

6/20/97:  Central European University, Budapest, Hungary: Conference on Financing Constitutional Identity: Autonomy and Welfare in the Regulatory State

9/12/97:  University of Illinois at Urbana-Champaign College of Law: A Defense of Cost-Benefit Analysis

10/4/97:  Donner Conference on Family Law, Alexandria, Virginia: Family Law and Social Norms

10/23/97:  University of Chicago Law School: Shaming Penalties in the Criminal Law

10/28/97:  University of Chicago, Workshop on Rational Models in the Social Sciences: The Demand for Human Cloning (with Richard A. Posner)

11/4/97:  University of Chicago Law and Economics Seminar: Law Without Design

12/13/97:  University of Chicago Law School and John M. Olin Program in Law and Economics, Conference on Penalties: Shaming White Collar Criminals: A Proposal for Reform of the Federal Sentencing Guidelines (with Dan M. Kahan)

1/29/98:  Stanford Law and Economics Seminar: Law and Cooperation

2/7/98:  University of Pennsylvania Conference on Incommensurability and the Law: The Strategic Basis of Principled Behavior: A Critique of the Incommensurability Thesis

3/2/98:  University of California at Berkeley Law and Economics Seminar: Law, Cooperation, and Rational Choice

4/2/98:  American Society of International Law Annual Meeting, Washington, D.C.: Notes Toward a Theory of International Law (with Jack L. Goldsmith)

4/17/98:  NYU Law School: Law, Cooperation, and Rational Choice

4/30/98:  University of Michigan Law and Economics Seminar: Law, Cooperation, and Rational Choice

7

5/8/98:  American Law and Economics Association Annual Meeting, Berkeley: Voting Rules in Chapter 11 (with Kevin Kordana)

9/8/98:  University of Chicago Law School: A Theory of Customary International Law (with Jack Goldsmith)

9/11/98:  University of Virginia Law School, Sokol Colloquium on Private International Law: Arbitration and the Harmonization of International Commercial Law: A Defense of *Mitsubishi*

9/14/98:  Georgetown University Law Center: Law, Cooperation, and Rational Choice

9/23/98:  Yale Law and Economics Seminar: Law, Cooperation, and Rational Choice

10/22/98:  Vanderbilt Law School: Law, Cooperation, and Rational Choice

11/20/98:  Loyola University New Orleans School of Law: A Theory of Customary International Law

1/7/99:  Association of American Law Schools Annual Meeting, New Orleans: The Political Economy of State Property Exemptions

1/29/99:  Northwestern University School of Law: Symposium on Relational Contract Theory: Unanswered Questions: Relational Contracts and Incompetent Courts

3/2/99:  University of Chicago Law and Economics Seminar: Rethinking Cost-Benefit Analysis (with Matthew Adler)

4/1/99:  University of Minnesota Law School: Law, Cooperation, and Rational Choice

4/16/99:  John M. Olin Conference on Law and Evolution, Georgetown Law School: The Evolution of Constitutions

4/26/99:  UCLA Conference on the Political Economy of Contractual Obligations: The Case of Bankruptcy Law: The Political Economy of State Property Exemptions

5/8/99:  American Law and Economics Association Annual Meeting, New Haven, CT: The Political Economy of State Property Exemptions

7/15/99:  University of Chicago Law School: Simplicity and Complexity in Contracts

8/30/99:  University of Southern California Law and Economics Workshop: Implementing Cost-Benefit Analysis When Preferences Are Distorted

9/7/99:  Harvard Law and Economics Seminar: Simplicity and Complexity in Contracts

9/17/99:  University of Chicago Law School Conference on Cost-Benefit Analysis: Implementing Cost-Benefit Analysis When Preferences Are Distorted

10/20/99:  University of Toronto Law and Economics Seminar: Implementing Cost-Benefit Analysis When Preferences Are Distorted

1/28/00:  University of San Diego Conference on Genes and the Just Society: Liberal Eugenics

2/10/00:  University of Chicago Law School: The Evolution of Constitutions

2/25/00:  University of Virginia Law School Conference on the Legal Construction of Norms: Law and Social Norms: The Case of Tax Compliance

3/14/00:  Harvard Law and Economics Seminar: The Evolution of Constitutions

4/6/00:  American Society of International Law Annual Meeting, Washington, D.C.: Should International Arbitration Awards Be Reviewable?

4/25/00:  Rational Models Workshop, University of Chicago: Law and Social Norms

5/6/00:  American Law and Economics Association Annual Meeting, New York: The Evolution of Constitutions

5/29/00:  University of Chicago Law School: Moral and Legal Rhetoric in International Relations: A Rational Choice Perspective

9/29/00:  Cornell Law School: Law and the Emotions

10/19/00:  University of Chicago Program on International Politics, Economics, and Security: Moral and Legal Rhetoric in International Relations: A Rational Choice Perspective (with Jack Goldsmith)

11/4/00:  Georgetown Law School Conference on Contracts with Highly Skilled Workers: Covenants Not to Compete from an Incomplete Contracts Perspective (with George Triantis)

12/9/00:  University of Pennsylvania Law School Conference on Corporate Law and Social Norms: Comment on Eric Talley, Disclosure Norms

2/20/01:  University of Chicago Law and Economics Seminar: Covenants Not to Compete from an Incomplete Contracts Perspective (with George Triantis)

4/28/01:  University of Chicago Conference on Rational Choice and International Law: Moral and Legal Rhetoric in International Relations: A Rational Choice Perspective (with Jack Goldsmith)

5/11/01:  American Law and Economics Association Annual Meeting, Washington, D.C.: Moral and Legal Rhetoric in International Relations: A Rational Choice Perspective

7/19/01:  University of Chicago Summer Workshop: Courts Should Not Enforce Government Contracts

8/3/01:  American Bar Association Annual Meeting, Section on Administrative Law: Why Liberals Should Favor Cost-Benefit Analysis and Conservatives Should Oppose It

11/8/01:  University of Chicago Work in Progress Seminar: Legislative Entrenchment: A Reappraisal (with Adrian Vermeule)

2/1/02:  Washington University, St. Louis: The Political Economy of Property Exemption Law (with Richard Hynes)

2/15/02:  Kennedy School of Government, Harvard University: Controlling Agencies with Net Benefit Accounts: A Thought Experiment

3/1/02:  University of Pennsylvania Law School Conference on Rationality and Preferences: The Jurisprudence of Greed

9

3/8/02:  University of Colorado Law School: Should Courts Enforce Government Contracts?

3/23/02:  University of Pennsylvania Law School Sparer Conference on Suing the Government: Should Courts Enforce Government Contracts?

3/28/02:  University of Chicago Law School Work in Progress Seminar: Interring the Nondelegation Doctrine (with Adrian Vermeule)

4/19/02:  University of Illinois at Chicago Department of Economics: The Economic Analysis of Contract Law After Three Decades: Success or Failure?

4/25/02:  Villanova Law School: Should Courts Enforce Government Contracts?

6/20/02:  Conference on Causes and Management of Conflicts, Wörlitz, Germany: Conflict Management in American Labor Law.

6/24/02:  Max Planck Project Group on Common Goods, Bonn, Germany: Should Courts Enforce Government Contracts?

7/25/02:  University of Chicago Law School Work in Progress Seminar: Reparations for Slavery and Other Historical Injustices (with Adrian Vermeule)

9/6/02:  William and Mary College of Law: Reparations for Slavery and Other Historical Injustices

9/9/02:  University of Virginia Law and Economics Seminar: Probability Errors

9/27/02:  University of Michigan Law and Economics Seminar: A Theory of the Laws of War

10/11/02:  Midwestern Law and Economics Association, Champaign, Illinois: A Theory of the Laws of War

10/31/02:  George Mason Law School: Understanding Treaties

11/2/02:  Conference on the Law and Economics of Irrational Behavior, George Mason Law School: Probability Errors: Some Positive and Normative Implications for Tort and Contract Law

11/15/02:  Conference on the Limits of International Law, NYU Law School: Understanding Treaties: A Rational Choice Perspective (with Jack Goldsmith)

1/13/03:  University of Chicago Law and Philosophy Workshop: A Theory of the Laws of War

1/16/03:  University of Chicago Program on International Politics, Economics, and Security: Understanding Treaties: A Rational Choice Perspective (with Jack Goldsmith)

2/20/03:  University of Chicago Law School: Transitional Justice as Ordinary Justice (with Adrian Vermeule)

2/22/03:  Stanford Law Review Conference on Treaties, Enforcement, and U.S. Sovereignty: Do States Have a Moral Obligation to Comply with International Law?

3/14/03:  McGill Law School: Transitional Justice as Ordinary Justice

3/19/03:  University of California at San Diego and University of San Diego Law School: Social Norms in Tort and Contract Law

3/27/03:  University of Lexington Law School: Transitional Justice as Ordinary Justice

6/9/03:  Law and Society Annual Meeting, Pittsburgh: Social Norms in Tort and Contract Law

6/24/03:  Fundación Ortega y Gasset, Madrid: A Theory of International Law

6/25/03:  University Pompeu Fabra, Barcelona: The Law, Economics, and Social Norms of Contract Law

6/27/03:  Workshop on Institutional Analysis, University Pompeu Fabra, Barcelona: A Theory of International Law

7/24/03:  University of Chicago Law School: A Theory of International Law

9/5/03:  University of Indiana at Bloomington: Accommodating Emergencies

9/20/03:  American Law and Economics Association Annual Meeting, Toronto: International Tribunals.

10/30/03:  University of Chicago Law School: Accommodating Emergencies

11/7/03:  Yale Law, Economics, and Organization Seminar: A Theory of International Law

12/1/03:  University of Southern California Law School: A Theory of International Law

1/13/04:  University of Chicago Law School International Law Workshop: A Theory of International Law

2/6/04:  University of Virginia Law School: A Theory of International Adjudication

3/18/04:  Florida State University College of Law: A Theory of International Adjudication

4/1/04:  American Society of International Law, Annual Meeting, Washington, D.C.: The Alien Tort Statute and Transitional Justice

4/30/04:  Conference on Compliance in International Law, University of Southern California: A Theory of International Adjudication

5/13/04:  University of Chicago Law School: Optimal War and *Jus ad Bellum*

6/11/04:  George Mason University Conference on Cybersecurity: Holding Internet Service Providers Accountable (with Doug Lichtman)

6/17/04:  U.S. Naval Academy, Annapolis, Maryland: Optimal War and *Jus ad Bellum*

7/22/04:  University of Chicago Law School: Voting Behavior in the International Court of Justice

9/13/04:  Washington University in St. Louis Law and Politics Seminar: Is the International Court of Justice Politically Biased?

9/16/04:  Berkeley International Law Seminar: Is the International Court of Justice Politically Biased?

10/15/04:  Conference on Analyzing International Conflict Resolution, Saarbrücken, Germany: The Politics of the International Court of Justice

10/29/04:  Conference on International Law and The Supreme Court's 2003-2004 Term, Tulsa, Oklahoma: The Supreme Court and International Law

12/2/04:  University of Chicago Law School: Should Coercive Interrogation Be Legal?

12/3/04:  Baker Institute Conference on the War on Terrorism After Iraq: Remarks on Domestic Law Enforcement and Civil Liberties.

1/24/05:  Columbia Law and Economics Seminar: Is the International Court of Justice Biased?

2/8/05:  Northwestern Law School: Should Coercive Interrogation Be Legal?

3/3/05:  University of Minnesota Law School: Should Coercive Interrogation Be Legal?

3/10/05:  University of Chicago Law School: The Design of Political Trials

3/25/05:  Florida State University College of Law, Conference on Default Rules, Tallahassee, Florida: There Are No Penalty Default Rules in Contract Law

3/30/05:  American Enterprise Institute, Washington, D.C.: The Limits of International Law

3/31/05:  American Social for International Law, Annual Meeting, Washington, D.C.: Is the International Court of Justice Biased?

3/31/05:  Federal Trade Commission, Washington, D.C.: Holding Internet Service Providers Accountable

**Testimony:**

3/16/99:  Subcommittee on Commercial and Administrative Law, Committee on the Judiciary, House of Representatives, U.S. Congress: H.R. 833, The Bankruptcy Reform Act of 1999

**Education:**

Harvard Law School.  J.D., magna cum laude, 1991
Yale University.  B.A., M.A. in philosophy, summa cum laude, 1988

**Professional Organizations:**

Maryland Bar Association
American Law and Economics Association

**Grants and Fellowships:**

3/95:  John M. Olin fellowship, University of Southern California

6/96:  University Research Foundation grant, University of Pennsylvania

9/02:  Olin Fellow, University of Virginia Law School

3/18/04:  Simon Visiting Scholar, Florida State University College of Law

12

**Teaching:**

Contracts; Secured Transactions; Bankruptcy; Corporate Reorganization; Contract Theory; Game Theory and the Law; Employment and Labor Law; Public International Law; Foreign Relations Law

**Other Professional Service:**

Adviser, Restatement (Third) of Restitution, American Law Institute

Referee for Journal of Law and Economics, Journal of Economic Literature, Oxford University Press, Harvard University Press, Edward Elgar, Quarterly Journal of Economics, National Science Foundation, Law and Social Inquiry, American Economic Review, Journal of Law, Economics, & Organization, American Law and Economic Review, International Review of Law and Economics, American Journal of Political Science, Law and Society Review, Journal of Policy Analysis and Management, Journal of the European Economic Association, Health Affairs, University of Chicago Press

Member, Editorial Board, Law & Social Inquiry (2000-2001)

Member, Board of Directors, American Law and Economics Association (2000-2003)

Member, Board of University Publications, University of Chicago (2001-2004)

Member, Editorial Board, Review of Law and Economics (2004-)

13