**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

_____

ORAN ALMOG, et. al.                )          CV 04-5564 (NG) (VVP)
                                   )
                  Plaintiffs,      )
                                   )
v.                                 )
                                   )
ARAB BANK, PLC,                    )
                                   )
                  Defendants.      )
_____)


_____

GILA AFRIAT-KURTZER, et. al.        )          CV 05-388 (NG) (VVP)
                                   )
                  Plaintiffs,      )
                                   )
v.                                 )
                                   )
ARAB BANK, PLC,                    )
                                   )
                  Defendants.      )
_____)


# DECLARATION OF STEFAN TALMON


I, Stefan Talmon, declare as follows:

1.  I have been asked by counsel for the defendant in the above-titled civil actions to provide my opinion on several specialized questions of public international law. This opinion is to assist the Court in considering the defendant's reply to the plaintiffs' Memorandum in Opposition to the Defendant's Motion to Dismiss the First Amended Complaints.

2.  I have read both the First Amended Complaints, dated January 25, 2005 ("the Complaints") and the Memorandum in Opposition to the Defendant's Motion to Dismiss the First Amended Complaints, dated June 14, 2005 ("the Memorandum"), including the Declarations of Professors Ruth Wedgwood ("Wedgwood Declaration"), Yoram Dinstein ("Dinstein

Declaration") and Mark A. Drumbl ("Drumbl Declaration"). My Opinion is provided on the basis of the Complaints and the Memorandum and is submitted in response to the three declarations.

### QUALIFICATIONS AND EXPERIENCE

3.   I offer this opinion in my personal capacity. I hold a permanent appointment as University Lecturer in Public International Law at the University of Oxford, United Kingdom (US equivalent: tenured Professor). I also serve as Course Director in Public International Law at the Oxford Foreign Service Program and as Adjunct Professor at the Universities of Georgia and Ohio. I specialize in research and teaching of public international law, including the law of international organizations, international criminal law, international environmental law, international humanitarian law, the law of the sea, international human rights law, and the foreign relations law of the European Union.

4.   I was previously Assistant and Associate Professor at the University of Tübingen (Germany). I held visiting professorships at the Jaroslaw-Mudryi Academy in Charkow (Ukraine) (2001), the University Aix-Marseille III (France) (2002, 2003) and at Yeditepe University, Istanbul (Turkey) (2003, 2005). I have been elected visiting professor at the University Panthéon-Assas, Paris (France) and at the University of Canterbury (New Zealand). I serve on the editorial board of the Chinese Journal of International Law and as academic adviser to Oxford University Press, Cambridge University Press and Hart Publishing. I have authored and edited five books and some 25 articles on topics of international law.

5.   I am a practicing member of the German bar and regularly advise governments and private clients on questions of public international law and European law. My Resume is attached to this declaration.

### INTRODUCTION

6.   The purpose of this affidavit is to make available to the Court pertinent State practice, including United Nations documents and other material, that might otherwise not be familiar or readily available, and that is conspicuously absent from the declarations submitted in support of the plaintiffs' Memorandum.

7.   I am instructed to assume for the purposes of this Declaration that the facts are as set out in the Complaints and the Memorandum. My understanding is that the question before the Court

concerns whether Arab Bank could be held civilly liable under the Alien Tort Statute for the financing of terrorism by maintaining accounts for front organizations of Palestinian terrorist groups and for transferring money to the families of individuals conducting suicide bombings against soldiers and civilians in Israel and in Israeli-occupied territory. In such circumstances, I have been asked to address the question whether the financing of terrorism is a crime under customary international law (comparable to the crimes of torture and genocide).

8.   In this declaration, I will deal with the following questions:

I.      The Requirements of Crimes under Customary International Law [paras. 9-11]

II.     The Elements of Customary International Law [12-14]

III.    Evidence of a Rule of Customary International Law [15-16]

IV.    Definition of Terrorism [17-63]

1.     Declarations of States with Regard to Terrorism [17-31]

2.     Exclusion of Certain Violent Acts from Terrorism in Regional Conventions on Combating Terrorism [32]

3.     United Nations Security Council Resolutions on International Terrorism [33-48]

a.     Resolutions Condemning International Terrorism [33-34]

b.     Resolution 1373 (2001) [35-43]

c.     Resolution 1566 (2004) [44-48]

4.     The Report of the High-Level Panel on Threats, Challenges and Change [49-55]

5.     Drafting History of the Statute of the International Criminal Court [56-57]

6.     Writings of Scholars [58-63]

V.     The Financing of Terrorism [64-85]

1.     Measures Taken by States against the Financing of Terrorism [64-66]

2.     The Question of Financing Terrorism in the Regional Conventions on Combating Terrorism [67-68]

3.     International Terrorist Financing Convention [69-85]

a.     Status of the Convention in International Law [69-81]

b.     Content of the Convention [82-85]

## I. THE REQUIREMENTS OF CRIMES UNDER CUSTOMARY INTERNATIONAL LAW

9.   I have been asked to advise on whether financing of terrorism is a crime under customary international law. Crimes under customary or general international law have been defined by

the International Law Commission of the United Nations as crimes "under a norm of international law accepted and recognized by the international community of States as a whole as being of such a fundamental character that its violation attracts the criminal responsibility of individuals."[1]

10.  Crimes under customary international law must fulfil three conditions: (1) a violation of a rule of customary international law which is intended to protect values considered important by the international community of States; (2) the rule violated must entail the criminal responsibility of the person breaching the rule; and (3) the responsibility must emanate directly from customary international law without intermediate provisions of municipal law. As a consequence, the breach of such a rule may be punished by any State. The fact that a certain action has been condemned by the international community consequently does not suffice to establish the action as a crime under international law.

11.  The proponent of a rule of customary international law has the burden of proof.[2] It is thus for the plaintiffs in the present action to prove that the financing of terrorism is prohibited under customary international law and that a violation of this rule entails, again under customary international law, the individual criminal responsibility of the person violating the rule.

## II. THE ELEMENTS OF CUSTOMARY INTERNATIONAL LAW

12.  International law sees customary international law rules as resulting from the combination of two elements: a "settled", i.e. an established, widespread and consistent practice on the part of States; and a psychological element known as *opinio juris sive necessitatis*, the perception on the part of States that the practice is required by a rule of law. The *Restatement of the Foreign Relations Law of the United States* provides in § 102 (2):

> Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation.[3]

13.  A practice can be general even if it is not universally followed. There is no precise formula how widespread a practice must be. Much depends on the circumstances of the case. Provided the

---

[1] Report of the International Law Commission on the work of its forty-sixth session, 2 May-22 July 1994: UN Doc. A/49/10, 1994, 66-67.

[2] See Ian Brownlie, *Principles of Public International Law* (6th edn., 2003), 12.

[3] American Law Institute, *Restatement of the Law (Third) Foreign Relations Law of the United States*, vol. 1 (1987), 24.

consistency and generality of a practice are proved, no particular duration is required but the passage of time is of course part of the evidence of generality and consistency.

14. It may be concluded that while complete uniformity and consistency of State practice is not required, substantial uniformity is; especially in cases such as international terrorism, which is of concern to all States. It seems striking that the State practice of a large segment of the international community which contradicts the plaintiffs' claims is practically ignored in the Declarations of Professors Wedgwood, Dinstein and Drumbl which reflect a rather narrow, western-centric view of international law.

### III. EVIDENCE OF A RULE OF CUSTOMARY INTERNATIONAL LAW

15. The *Restatement of the Foreign Relations Law of the United States* provides in § 103 (1):

> Whether a rule has become international law is determined by evidence appropriate to the particular source from which the rule is alleged to derive [...].[4]

The Commentary in the *Restatement* provides that "for customary law the 'best evidence' is proof of state practice."[5] This must be read in conjunction with the comment that "explicit evidence of a sense of legal obligation (e.g. by official statements) is not necessary; *opinio juris* may be inferred from acts or omissions", i.e. from State practice.[6] The sources of State practice are numerous and include the following: diplomatic correspondence, policy statements, press releases, the opinions of the legal advisers, official manuals on legal questions, executive decisions and practices, comments by governments on drafts produced by the International Law Commission, State legislation, international and national judicial decisions, recitals in treaties and other international instruments, a pattern of treaties in the same form, the practice of international organs, and resolutions relating to legal questions in the United Nations General Assembly. Obviously the value of these sources varies and much depends on the circumstances.[7]

16. Any rule that the financing of terrorism is a crime under customary international law which entails the individual criminal responsibility of the perpetrator must be proved by reference to the practice of States. Plaintiffs' experts fail to take sufficiently into account the practice of

---

[4] Ibid., 35.

[5] Ibid., 36 (§ 103, Com a).

[6] Ibid., 25 (§ 102, Com c).

[7] See Ian Brownlie, *Principles of Public International Law* (6th edn., 2003), 6.

States in drawing their conclusion that the law of nations knows of a generally accepted definition of terrorism. In fact, only Professor Wedgwood engages in any meaningful, albeit limited, way with the declarations of Arab and Islamic States on the question of terrorism (Wedgwood Declaration, paras. 70-72 and 78-81). Professor Dinstein relies solely on a number of United Nations General Assembly and Security Council resolutions and the 1999 International Convention for the Suppression of the Financing of Terrorism (Dinstein Declaration, pp. 1-3) and Professor Drumbl touches only briefly on the position of two Arab States (Drumbl Declaration, para. 25).

## IV. Definition of terrorism

### 1. Declarations of States with Regard to Terrorism

17. Plaintiffs' experts have maintained that there is a clear definition of terrorism in customary international law which meets the standard set out by the Supreme Court in *Sosa* v. *Alvarez-Machain*.[8] I respectfully beg to disagree with this conclusion. Contrary to what is claimed in the plaintiffs' Memorandum (at p. 62), the disagreement on the definition of international terrorism is not just "peripheral" or limited to "the margins" or merely concerns the "fringe" of a customary international law norm but goes right to the heart of the definition of terrorism.

18. Although the need or usefulness of a definition of "terrorism" has long been recognized, it has thus far proved impossible to adopt one. As Eric Rosand, the Deputy Legal Counselor at the United States Mission to the United Nations in New York, recently pointed out: "disputes over the definition of terrorism have left the negotiations on a draft comprehensive convention against international terrorism at a standstill for the past thirty-two years."[9] The lack of an agreed definition is generally acknowledged.[10] On December 5, 2001, the Parliamentary Under-Secretary of State at the British Foreign and Commonwealth Office wrote in reply to a parliamentary question:

---

[8] See *Sosa* v. *Alvarez-Machain*, 124 S.Ct. 2739 at 2765-2766 (2004).

[9] Eric Rosand, 'The Security Council as "Global Legislator": Ultra Vires or Ultra Innovative?', *Fordham International Law Review* 28 (2005), 542-590 at 549. See also ibid., 576: "negotiations on a comprehensive terrorism convention have been stalled for four years over two paragraphs in the text related to the definition of terrorism."

[10] For example, on Sept. 13, 2004, Malaysia expressed concerns that "there is yet to be an internationally agreed definition of terrorism." (UN Doc. S/PV.5031, 13 September 2004, 30). In the Report on "Patterns of Global Terrorism – 2002", released by the U.S. Secretary of State and the Coordinator of Counterterrorism on Apr. 30, 2003, it says: "No one definition of terrorism has gained universal acceptance"; available at <http://www.state.gov/ s/ct/rls/pgtrpt/2002/> (Last visited July 18, 2005).

Setting up a new international criminal court or tribunal to try terrorism would cause great delay, not least since there is no internationally-agreed definition of terrorism.[11]

19.  This position was confirmed more recently. On November 10, 2003, the British Minister for Europe stated in reply to a written parliamentary question put to the Secretary of State for Foreign and Commonwealth Affairs:

An internationally agreed definition of terrorism would be beneficial and we are working in the UN [United Nations] to achieve one. But so deep is *the controversy surrounding certain groups*, an internationally agreed definition does not seem possible in the short term.[12]

This statement is of particular interest as it shows that the disagreement of States is about who to label as a "terrorist." A substantial number of Arab, Islamic and African States excludes groups fighting foreign occupation or alien domination from the definition of terrorists; and especially Palestinian groups fighting "for self-determination and national liberation." These States cling to the political doctrine whereby so-called "freedom fighters" are entitled to avoid the stigma of terrorism on account of the political ends they pursue. The following statements and declarations may illustrate the position of theses States.

20.  On October 3, 2001, the representative of Qatar declared in the United Nations General Assembly:

In the absence of a specific definition of terrorism, we stress once again the need to differentiate between terrorism, which we strongly condemn, and acts of legitimate resistance and national struggle against foreign occupation. International law and the Charter of the United Nations have guaranteed the legitimate right of all peoples under foreign occupation and control to liberate their land. The absence of such a definition has also seriously undermined international efforts to tackle this grave threat to human society. A comprehensive legal definition of terrorism must make a clear distinction between terrorism, on one hand, and the legitimate struggle of peoples, on the other hand.[13]

21.  Similarly, Lebanon in a letter to the United Nations Secretary-General, dated May 25, 2004, stated:

_____

[11] United Kingdom, House of Commons, Debates, vol. 376, col. 313W: 5 December 2001.

[12] United Kingdom, House of Commons, Debates, vol. 414, col. 42W-43W: 10 November 2003 (emphasis added).

[13] UN Doc. A/56/PV.17, 3 October 2001, 19.

Lebanon believes that the exercise of the right of peoples to resist occupation with a view to self-determination in accordance with the four Geneva Conventions does not constitute terrorism.[14]

22. At the meeting of the Sixth Committee (Legal) of the United Nations General Assembly on October 17, 2003, the representative of Morocco stated:

[H]e regretted the lack of political will hindering the completion of work on a comprehensive convention against terrorism based on a text originally presented by India. Any attempt to define terrorism – one of the problems delaying agreement on the convention – must necessarily take account of the struggle of the Palestinian people and distinguish it from wanton terrorist acts such as those against the United States, Saudi Arabia and his own country.[15]

Saudi Arabia also stated that "the Palestinian struggle for self-determination should not be equated to acts of terrorism"[16] and several other States emphasized the difference between terrorism and the legitimate struggle of people against foreign occupation.[17]

23. At the 61st session of the Commission of Human Rights on March 18, 2005, the delegate of Pakistan declared that

the right of peoples to self-determination was an inalienable right enshrined in the Charter of the United Nations, the Universal Declaration of Human Rights and the International Covenants on Human Rights. It shielded the vulnerable against aggression, occupation and domination, and its denial caused suffering and instability. [...] To dismiss the Kashmiri freedom struggle as "cross-border terrorism" was an oversimplification. Characterizing the issue as part of the global problem of terrorism was at best disingenuous and at worst dangerous.[18]

---

[14] UN Doc. A/59/130, 6 July 2004, 3, para. 9.

[15] The official verbatim record of the 7th meeting is not yet available on the Official Document System of the United Nations. Summaries of the statements made at the meeting of the Sixth Committee on Oct. 17, 2003 are available at <http://www.scienceblog.com/community/older/archives/L/2003/A/un030730.html> (last visited July 18, 2005).

[16] Ibid.

[17] Algeria, Libya, Malaysia, Oman, Qatar.

[18] Commission on Human Rights, Sixty-first Session, Summary Record of the 13th Meeting, UN Doc. E/CN.4/2005/SR.13, 1 April 2005, 2. See also the Pakistani statement that a "legal and internationally agreed definition of terrorism still needs to be developed, and we hope that will be done by the General Assembly. As the United Nations has decided in the past that a distinction should be maintained between terrorism and the right of peoples to self-determination, the United Nations should not and cannot reverse its historical support for peoples and nations struggling

24. Besides individual States, several Arab, Islamic, and African international governmental organizations have also expressed their views on the definition of terrorism. At a special session on international terrorism in Malaysia on April 3, 2002, the Islamic Conference of Foreign Ministers, which represents the 56 Member States of the Organization of Islamic Conference (OIC) adopted the Kuala Lumpur Declaration on International Terrorism. The declaration provides in the relevant part:

> 7. We unequivocally condemn acts of international terrorism in all its forms and manifestations [...];
>
> 8. We reiterate the principled position under international law and the Charter of the United Nations of the legitimacy of resistance to foreign aggression and the struggle of peoples under colonial or alien domination and foreign occupation for national liberation and self-determination. In this context, we underline the urgency for an internationally agreed definition of terrorism, which differentiates such legitimate struggles from acts of terrorism;
>
> 10. We reject any attempt to link terrorism to the struggle of the Palestinian people in the exercise of their inalienable right to establish their independent state with Al-Quds Al-Sharif as its capital;
>
> 11. We reject any attempt to associate Islamic States or Palestinian and Lebanese resistance with terrorism which constitutes an impediment to the global struggle against terrorism; [...].[19]

25. More recently, on July 15, 2004, the Permanent Representative of Turkey to the United Nations, in his capacity as chairman of the Organization of Islamic Conference Group to the United Nations, transmitted the text of a resolution on combating international terrorism adopted by the Islamic Conference of Foreign Ministers at its thirty-first session, held in Istanbul, Turkey, in June 2004. In that resolution, the Islamic Conference of Foreign Ministers:

---

for liberation from foreign occupation and alien domination." (UN Doc. S/PV.5059, 19 October 2004, 13).

[19] See Letter dated April 4, 2002 from the permanent representative of Mali to the United Nations addressed to the Secretary-General, UN Doc. A/56/911-S/2002/362, 8 April 2002, Annex II, 5-6. See also the statement of the permanent representative of Malaysia to the United Nations at the annual coordination meeting of the Ministers of Foreign Affairs of the Organization of the Islamic Conference, 17 September 2002: "The definition [of terrorism] should distinctly distinguish acts of terrorism, from the legitimate struggles of peoples under colonial or alien domination and foreign occupation for self-determination and national liberation – a right acknowledged under international law and resolutions of the United Nations. [...] We must not allow the legitimate struggle of the Palestinian people to be relegated to "terrorism" when the root cause is Israeli occupation and its practice of State terrorism"; available at <http://www.un.int/malaysia/GA/GA/GA17Sept02.html> (last visited June 29, 2005).

1. Affirms that the phenomenon of terrorism is antithetical to all the teaching of Islam which advocates tolerance and non-violence and enjoins against all forms of aggression, and above all the killing of human life, regardless of color, religion or race.

2. Calls again for the convening of an international conference under the aegis of the United Nations to set a definition for the concept of terrorism and distinguish it from the peoples' national liberation struggle.

3. Reiterates, in this connection, that the struggle of peoples plying under the yoke of foreign occupation and colonialism, to accede to national freedom and establish their right to self-determination, does not in any way constitute an act of terrorism.[20]

26. The League of Arab States in a report to the Counter-Terrorism Committee, dated April 26, 2004, also reaffirmed its support for a "definition of terrorism reflecting the distinction between terrorism and the right of peoples to resist foreign occupation."[21]

27. In the final communiqué adopted by the Supreme Council of the Gulf Cooperation Council (GCC)[22] at its twenty-fifth session, held in the Kingdom of Bahrain in December 2004, the Council declared:

> The Council reviewed the dangerous acts of terrorism that had been witnessed both in the region and elsewhere. In that context, the Council reiterated its condemnation and repudiation of terrorism in all its forms, wherever it might occur and whatever its sources, motives or stated justifications might be. At the same time, the Council reaffirmed the clear and firm positions of the GCC countries on combating terrorism, cutting off its sources of financing by every available means and treating its causes and underlying motives, locally as well as regionally and internationally, and also

---

[20] OIC Resolution No. 51/31-P on Combating International Terrorism, adopted on June 16, 2004; reproduced in UN Doc. A/58/856-S/2004/582, 21 July 2004, 138-139. For similar OIC statement see UN Doc. S/2004/345, 30 April 2004, 11; UN Doc. A/C.6/59/SR.7, 10 November 2004, 6, para. 24. See also the document "The Roots and Causes of Terrorism. An intervention prepared by the OIC as a contribution to the deliberations of the international conference on combating terrorism, Riyadh, 5-8 Feb 2005": "The new situation imposed on the Islamic world [after September 11, 2001] has also worsened the situations of Muslim peoples living under foreign occupation, such as the Palestinian people [...]. This is what has brought about the Islamic insistence and the demand by the Organization of the Islamic Conference for the need to hold an international conference under the auspices of the United Nations. Such a conference would be concerned with setting for terrorism a definition agreed upon by the international community and which would distinguish between terrorism and peoples' struggle for national liberation and for ending foreign occupation"; available at <http://www.oic-oci.org/index.asp> (last visited June 29, 2005).

[21] UN Doc. S/2004/345, 30 April 2004, 9 and 11.

[22] Members of the GCC are Saudi Arabia, Bahrain, Kuwait, Oman, Qatar and the United Arab Emirates.

drew attention to the need to distinguish between terrorism and the legitimate right of peoples to resist occupation, in accordance with the resolutions constituting international legitimacy.[23]

28.  On April 6, 2005, Malawi speaking on behalf of the 53 Member States of the Group of African States at the United Nations said:

In line with the Algiers Convention on the Prevention and Combating of Terrorism, terrorism cannot be justified under any circumstances. Political, philosophical, ideological, racial, ethnic, religious or other motives cannot be a justifiable defence for a terrorist act. However, there is a difference between terrorism and legitimate struggle waged by people for their liberation or self- determination in accordance with the principles of international law.[24]

29.  Numerous other statements both of individual States and international organizations could be added.[25] These statements show that some 80 Arab, Islamic and African States exclude the struggle of peoples for self-determination and against foreign or alien occupation, in general, and "the struggle of the Palestinian people in the exercise of their inalienable right to establish their independent state", in particular, from what they consider to be "terrorism." The financing of violent acts in the pursuit of these causes, in the understanding of these States, thus does not constitute financing of terrorism. The voting of these States on United Nations resolutions condemning terrorism or their ratification of treaties on combating and suppressing terrorism must be interpreted in the light of their understanding of "terrorism."

30.  Professor Dinstein is, of course, correct in pointing out "that there is no such thing as 'good' terrorists in contradistinction to 'bad' terrorists" (Dinstein Declaration, p. 2). However, this misses the point. As shown by the statements above, a substantial number of States does not distinguish between good terrorists and bad terrorists but between "terrorists" and "non-terrorists." Irrespective of whether one agrees with this position, the fact is that some 80 States

---

[23] Letter dated Jan. 3, 2005 from the Permanent Representative of Bahrain to the United Nations addressed to the Secretary-General, UN Doc. A/59/663–S/2005/5, 6 January 2005, Annex, 5. See also the statement of Bahrain at UN Doc. S/PV.4710, 20 February 2003, 14.

[24] UN Doc. A/59/PV.85, 6 April 2005, 22. See also the African Union Declaration of the Second High-Level Intergovernmental Meeting on the Prevention and Combating of Terrorism in Africa, held in Algiers, 13-14 October 2004: "We underscore the need to differentiate between terrorism and the legitimate struggles of peoples for liberation, self-determination, freedom and independence, as recognized under international law." (AU Doc. Mtg/HLIG/Conv.Terror/Decl. (II) Rev. 2).

[25] See, e.g. UN Doc. A/C.3/58/SR.48, 25 March 2004, 4, para. 15; UN Doc. A/59/PV.22, 7 October 2004, 2 (Syria); UN Doc. S/PV.5059, 19 October 2004, 27 (Cuba).

do not regard as terrorists people involved in acts of national armed struggle and fighting foreign occupation.

31. The statement that sheds most light on the question of whether the financing of terrorism constitutes a crime under customary international law has been made, however, by a country that does not distinguish between terrorism and struggles of peoples for self-determination. Peru stated in its Report to the Counter-Terrorism Committee:

> Part of the problem of typifying the offence of international terrorism is that there is no international definition of terrorism, meaning that there is no common definition that might be acceptable to the international community when punishing citizens of countries other than Peru.[26]

If there were a clearly defined crime of international terrorism in customary international law, as Professors Wedgwood, Dinstein and Drumbl claim, Peru would not have had any difficulty in prescribing this crime in its domestic law and applying that law to foreign citizens.

## 2. EXCLUSION OF CERTAIN VIOLENT ACTS FROM TERRORISM IN THE REGIONAL CONVENTIONS ON COMBATING TERRORISM

32. In view of the Israeli-Palestinian conflict the 1998 Arab Convention on Combating Terrorism ("Arab Convention"), the 1999 Convention of the Organization of the Islamic Conference on Combating International Terrorism ("OIC Convention"), and 1999 Convention of the Organization of African Unity on the Prevention and Combating of Terrorism ("OAU Convention") expressly exclude certain acts of violence from the scope of these conventions.[27] For example, Article 3 (1) of the OAU Convention provides:

> the struggle waged by peoples in accordance with the principles of international law for their liberation or self-determination, including armed struggle against colonialism, occupation, aggression and domination by foreign forces shall not be considered as terrorist acts.

Similar provision are found in Article 2(a) of the Arab Convention and Article 2(a) of the OIC

---

[26] UN Doc. S/2002/1085, 27 September 2002, 11.

[27] The text of these conventions may be found in Sherif Bassiouni, *International Terrorism: Multilateral Conventions (1937-2001)* (2001).

Convention. The Arab League represents 10, the OIC 56[28] and the OAU (now: African Union) 52 member States.[29] The organizations under whose auspices these Conventions were drawn up have a membership of 80 States in total.[30]

## 3. UNITED NATIONS SECURITY COUNCIL RESOLUTIONS
## ON INTERNATIONAL TERRORISM
### A. RESOLUTIONS CONDEMNING INTERNATIONAL TERRORISM

33.   The UN Security Council has adopted numerous resolutions condemning international terrorism. These resolutions, however, do not contribute to the question of whether financing of terrorism is a crime under international law as they deal with different matters.

34.   Several of these resolutions provide that "States shall freeze without delay the funds and other financial assets or economic resources" of particular persons or terrorist organizations or of persons who commit terrorist acts in general,[31] or "cut the flow of funds or other financial assets and economic resources" to these persons or organizations.[32] Other resolutions call on States to take appropriate steps "to prevent and suppress in their territories through all lawful means the preparation and financing of any acts of terrorism"; "to deny those who plan, finance or commit terrorist acts safe havens by ensuring their apprehension and prosecution or

---

[28] This number excludes the "State of Palestine" that is listed as a member of the Organization but does not fulfil the criteria of statehood in international law.

[29] This number does not include the 'Saharawi Arab Democratic Republic' which is listed as a member of the Organization but does not fulfil the criteria of statehood in international law. For a list of member States, see http://www.africa-union.org/home/Welcome.htm.

[30] The States are: Afghanistan, Albania, Algeria, Angola, Azerbaijan, Bahrain, Bangladesh, Benin, Botswana, Brunei-Darussalam, Burkina Faso, Burundi, Cameroon, Cape Verde, Central African Republic, Chad, Comoros, Congo, Democratic Republic of Congo, Côte d'Ivoire, Djibouti, Egypt, Equatorial Guinea, Eritrea, Ethiopia, Gabon, Gambia, Ghana, Guinea, Guinea-Bissau, Guyana, Indonesia, Iran, Iraq, Jordan, Kazakhstan, Kenya, Kuwait, Kyrghyzstan, Lesotho, Liberia, Libya, Madagascar, Malawi, Malaysia, Maldives, Mali, Mauritania, Mauritius, Morocco, Mozambique, Namibia, Niger, Nigeria, Oman, Pakistan, Qatar, Rwanda, Sao Tome and Principe, Saudi Arabia, Senegal Seychelles, Sierra Leone, Somalia, South Africa, Sudan, Suriname, Swaziland, Tajikistan, Tanzania, Togo, Tunisia, Turkey, Turkmenistan, Uganda, United Arab Emirates, Uzbekistan, Yemen, Zambia, Zimbabwe.

[31] See e.g. S/RES/1267 (1999) of 15 October 1999, para. 4 (b); S/RES/1333 (2000) of 19 December 2000, para. 8 (c); S/RES/1390 (2002) of 16 January 2002, para. 2 (a); S/RES/1373 (2001) of 28 September 2001, para. 1 (c). See also S/RES/1455 (2003) of 17 January 2003, paras. 1, 5; S/RES/1456 (2003) of 29 January 2003, Annex, para. 2 (c); S/RES/1526 (2004) of 30 January 2004, para. 1 (a).

[32] S/RES/1526 (2004) of 30 January 2004, para. 4.

extradition";[33] and "to cooperate fully in the fight against terrorism, especially with those States where or against whose citizens terrorist acts are committed, in accordance with their obligations under international law, in order to find, deny safe haven and bring to justice [...] any person who supports, facilitates, participates or attempts to participate in the financing, planning, preparation or commission of terrorist acts or provides safe havens."[34] In some resolutions the Council also "stresses that [...] the financing, planning and preparation of as well as any other form of support for acts of international terrorism are similarly contrary to the purposes and principles of the Charter of the United Nations",[35] and "underlines the obligation on States to deny financial and all other forms of support and safe haven to terrorists and those supporting terrorism"[36] or reaffirms that "measures to detect and stem the flow of finance and funds for terrorist purposes must be urgently strengthened."[37] The resolutions impose obligations on States and not on individuals;[38] especially they do not establish any criminal liability of individuals directly under customary international law. Saying that an action is "contrary to the purposes and principles of the Charter of the United Nations" does not mean that it is a crime under customary international law.

## B. Resolution 1373 (2001)

35.  The resolution most heavily relied on in the Declarations of Professors Wedgwood and Dinstein (Wedgwood declaration, paras. 63-72; Dinstein Declaration, pp. 1-2) is resolution 1373 (2001), adopted unanimously by the Security Council on September 28, 2001. The resolution which is binding upon all Member States of the United Nations under Chapter VII of the UN Charter provides in the relevant parts:

> *The Security Council*, [...]
> *Recognizing* the need for States to complement international cooperation by taking additional measures to prevent and suppress, in their territories through all lawful means, the financing and preparation of any acts of terrorism, [...]

---

[33] See e.g. S/RES/1269 (1999) of 19 October 1999, para. 4; S/RES/1373 (2001) of 28 September 2001, para. 2 (c).

[34] S/RES/1566 (2004) of 8 October 2004, para. 2.

[35] See e.g. S/RES/1377 (2001) of 12 November 2001, Annex, para. 6.

[36] See e.g. S/RES/1377 (2001) of 12 November 2001, Annex, para. 11.

[37] S/RES/1456 (2003) of 29 January 2003, Annex, preambular para. 5.

[38] See also *supra* para. 36, with regard to Professor Wedgwood's misleading statement that resolution 1373 (2001) "implies correlative legal duties for private parties" (Wedgwood Declaration, paras. 67, 68).

*Decides* that all States shall:

(a) Prevent and suppress the financing of *terrorist acts*;

(b) Criminalize the wilful provision or collection, by any means, directly or indirectly, of funds by their nationals or in their territories with the intention that the funds should be used, or in the knowledge that they are to be used, in order to carry out *terrorist acts*; [...]

(d) Prohibit their nationals or any persons and entities within their territories from making any funds, financial assets or economic resources or financial or other related services available, directly or indirectly, for the benefit of persons who commit or attempt to commit or facilitate or participate in the commission of *terrorist acts*, of entities owned or controlled, directly or indirectly, by such persons and of persons and entities acting on behalf of or at the direction of such persons; [...].[39]

This resolution was reaffirmed in several subsequent resolutions, and in resolution 1456 (2003) the Council restated that "States must bring to justice those who finance, plan, support or commit terrorist acts."[40]

36. Resolution 1373 (2001) undoubtedly creates legal obligations for the Member States of the United Nations. The statement of Professor Wedgwood (Declaration, paras. 67, 68) that the resolution "implies correlative legal duties for private parties" is, however, not in conformity with present-day international law. The addressees of the obligations contained in Security Council resolutions are States not private parties. This is shown by the language of resolution 1373 (2001) where the Security Council decides that "all States" shall take certain actions. Nowhere in the resolution is there an obligation imposed on private parties (be it individuals or legal entities). It is generally accepted that binding resolutions of the Security Council are not self-executing and do not confer rights or impose duties on the individual citizens of the Member States.[41]

37. Resolution 1373 (2001) which was hailed as a "groundbreaking resolution",[42] a "landmark

---

[39] S/RES/1373 (2001) of 28 September 2001 (emphasis added).

[40] S/RES/1456 (2003) of 29 January 2003, Annex, para. 3.

[41] See *Diggs* v. *Dent* (C.A.D.C. 1975), reported in *International Legal Materials* 14 (1975), 797, 803; *Diggs* v. *Richardson*, 555 F.2d 848, 850 (D.C. Cir. 1976); *Smith* v. *Socialist People's Libyan Arab Jamahiriya*, 886 F. Supp. 306, 311 (E.D.N.Y.1995). See also the statement of the U.S. Government in *Kangai* v. *Vance* (D.C. Cir. 1978), reported in *American Journal of International Law* 73 (1979), 297, 298.

[42] Turkey: UN Doc. A/56/PV.48, 12 November 2001, 9. See also the statement by Guatemala: UN Doc. A/56/PV.34, 31 October 2001, 13.

decision",[43] a "historic event"[44] was widely welcomed by States including the Arab States and the Observer for Palestine. States voting for the resolution included Tunisia, Bangladesh, Mali and Mauritius which were non-permanent members of the Security Council at the time. All four States had previously made it clear that they did not consider the struggle of peoples for self-determination and against foreign or alien occupation, in general, and the struggle of the Palestinian people in the exercise of their inalienable right to establish their independent state, in particular, to be terrorism. The representative of Morocco, speaking on behalf of the Arab States declared in a Security council debate on January 18, 2002:

> [...] the Arab Group is animated by the wish to make a positive, concrete contribution to international efforts against terrorism, in compliance with resolution 1373 (2001) of 28 September. As soon as this resolution was adopted, the Arab countries established all the national and regional mechanisms necessary to ensure the implementation of the provisions of the resolution in the best possible conditions. [...] They have adopted preventive and deterrent measures, including controls on suspicious sources of financing.[45]

There was, however, an important qualification to this statement. The Moroccan delegate continued:

> The Arab countries also believe that we must avoid any misuse of the term "terrorism" to serve particular interests in political disputes. [...] the international legal system grants the Palestinian people, whose most basic human rights are being flouted, the right to self-defence in the current difficult and sensitive conditions in the Middle East.[46]

38.    The statement of the Moroccan delegate highlights the basic flaw of the resolution which allowed Arab, Islamic and other States to support the resolution and, at the same time, to maintain their position on the question of what constitutes terrorism. Although the language of the resolution can be and is read broadly by some States and scholars, the resolution only refers to the financing of "acts of terrorism" or "terrorist acts" without defining these terms. As the resolution does not give a definition of "terrorist acts" each member State can define terrorist acts under its domestic legislation. This enabled, for example, Syria and other Arab States to adopt the definition of terrorism contained in the Arab Convention on Combating

---

[43] Singapore: UN Doc. A/56/PV.25, 15 October 2001, 10.

[44] United Kingdom: UN Doc. S/PV. 4413, 12 November 2001, 15.

[45] UN Docs. S/PV.4453, 18 January 2002, 22.

[46] Ibid., 23.

-16-

Terrorism,[47] "which clearly distinguishe[s] between terrorism and legitimate struggle against foreign occupation" thereby excluding violent acts by groups such as Hamas, the Al-Aqsa Martyrs Brigades, or Islamic Jihad (which are seen as fighting the Israeli occupation of Arab territories in Palestine) from the application of resolution 1373 (2001).[48]

39.   The ambiguity of resolution 1373 (2001) was apparently intentional. Eric Rosand, the Deputy Legal Counselor at the U.S. Mission to the United Nations in New York, wrote in 2005:

> In drafting Resolution 1373, the Council [...] avoided addressing those issues on which there was no consensus among the wider U.N. Membership. For example, it took care not to interfere with the ongoing General Assembly efforts to define terrorism, and thus Resolution 1373 allows each State to apply its own definition.[49]

Similarly, Professor Jane E. Stromseth remarked:

> Resolution 1373 requires states to take strong action against those who finance or engage in terrorist acts, but it does not define terrorist acts or terrorism. [...] But by not defining terrorism or terrorist acts, Resolution 1373 effectively allows member states to define terrorism in their domestic legislation. [...] the CTC's [Counter-Terrorism Committee's] ability to go beyond capacity building and to monitor whether states are in fact complying with their obligations to bring "to justice" and "deny safe haven" to those who commit "terrorist acts" will eventually confront the CTC with some of the same difficulties that the General Assembly's Sixth (Legal) Committee has confronted in its struggle to reach agreement on a comprehensive convention on international terrorism.[50]

Professor Shibley Telhami has gone so far as to say that resolution 1373 "was possible only because member states did not have to tackle the issue of defining terrorism. [...] Many states among those voting for the resolution did not see eye to eye with the United States on such a

---

[47] See Arts. 1 and 2 of the Arab Convention on Combating Terrorism, 22 April 1998. The text is printed in Sherif Bassiouni, *International Terrorism: Multilateral Conventions, 1937-2001* (2001), 393-406.

[48] UN Doc. S/PV.4453, 18 January 2002, 9 and 8: "foreign occupation is the most brutal form of terrorism; therefore, resistance to foreign occupation – especially Israeli occupation of Arab territories in Palestine, the Syrian Golan and southern Lebanon – constitutes legitimate struggle."

[49] Eric Rosand, 'The Security Council as "Global Legislator": Ultra Vires or Ultra Innovative?', *Fordham International Law Review* 28 (2005), 542-590 at 581-582.

[50] Jane E. Stromseth, 'An Imperial Security Council? Implementing Security Council Resolutions 1373 and 1390', *ASIL Proceedings* 97 (2003), 41-45 at 44-45.

definition."[51]

40.   The fact that each State could apply its own definition of "terrorism" also explains why Arab, Islamic and African States can report without difficulty to the Counter-Terrorism Committee established under resolution 1373 that the financing of "terrorism" now constitutes a crime in their country (see Wedgwood Declaration, paras. 70-72). In its report to the Counter-Terrorism Committee, Syria stated:

> Inasmuch as Security Council resolution 1373 (2001) lacks any clear definition of the concept of terrorism or of the terrorist acts or entities to be combated, the Syrian Arab Republic has based itself, in the present reply, on its commitments under the 1998 Arab Convention for the Suppression of Terrorism, which distinguishes between terrorism and the legitimate struggle against foreign occupation, on its commitments under the international conventions against terrorism to which Syria is a party and on the provisions of Security Council resolution 1333 (2000) [...].[52]

41.   Algeria, in its fourth report to the Counter-Terrorism Committee, reported on a "bill on combating money-laundering and the financing of terrorism" and other legislative acts. The report reads as follows:

> Following its ratification, the International Convention for the Suppression of the Financing of Terrorism applies to Algeria in its entirety. Article 18 of the Convention and paragraph 1 (a) of Security Council resolution 1373 (2001) apply to financial intermediaries and other agents authorized to conduct transactions in Algeria. [...]
>
> Algeria supports the definition of terrorism set forth in the Conventions of the Organization of African Unity (OAU) and League of Arab States, both of which it has ratified. *It is on these legal foundations*, and on the basis of investigations by the security services and the judicial authorities, that a terrorist organization is designated as such. [...]
>
> The legal provisions which are in place in Algeria are consistent with the country's commitment to combat terrorism and accord with ratified international instruments such as the Conventions of OAU and the League of Arab States.[53]

---

[51] Shilbey Telhami, 'Conflicting Views on Terrorism', *Cornell International Law Journal* 35 (2002), 581-598 at 584. See also Javaid Rehman, *Islamic State Practices, International Law and the Threat from Terrorism* (2005), 190 ("The resolution has, however, deliberately avoided the thorny issue of defining 'terrorism'").

[52] UN Doc. S/2002/1046, 19 September 2002, 3.

[53] UN Doc. S/2004/324, 23 April 2004, 12-13 (emphasis added).

The Arab and the OAU Conventions, of course, expressly excludes armed struggle against colonialism, occupation, aggression and domination by foreign forces from the definition of "terrorist acts." Similar provisos were made by other States.[54]

42.   An initial review of the reports of States (not just Arab, Islamic and African States) submitted under resolution 1373 (2001) also points to another problem. Many States equate the "financing of terrorist acts" in para. 1 (a) of the resolution with money laundering, and deal with it only in that context. Money used to finance terrorism is not necessarily generated by illegal business transactions; on the contrary, assets and profits acquired by legitimate means and even declared to tax authorities can be used to finance terrorist attacks. Similarly, many States claimed that the crime of financing terrorism was covered by the criminal provisions on "aiding and abetting" or conspiracy. The Group of Experts examining the reports, however, has doubts whether these auxiliary offenses cover all acts of the financing of terrorism as set out in para. 1 (b) of the resolution.[55] Thus, while many States have declared that they implemented the resolution, they have in fact not done so.[56]

43.   Apart from these deficiencies, resolution 1373 (2001) does not proscribe the financing of (undefined) "terrorist acts" as a crime under international law but imposes obligations on States to criminalize the financing of such acts in their domestic laws.


## C. RESOLUTION 1566 (2004)

44.   Professor Wedgwood also relies on resolution 1566 (2004) adopted unanimously by the Security Council on October 8, 2004 (Wedgwood Declaration, paras. 93-100). Whereas the initial draft attempted to define terrorism,[57] the final text of the resolution (paragraph 3) only

---

[54] See e.g. the statement of Lebanon: "In the preparation of the present report Lebanon has based itself on the distinction, as made in United Nations General Assembly resolution 46/51 of 19 January 1991 and in the 1998 Arab Convention for the Suppression of Terrorism, between terrorism on the one hand and the legitimate right of peoples to resist foreign occupation on the other [...]. On the basis of the foregoing and in accordance with the concepts mentioned, Lebanon addresses to the Committee its answers to [the questions corresponding to the relevant] operative paragraphs [of resolution 1373 (2001)]." (UN Doc. S/2001/1201, 13 December 2001, 2).

[55] Cf. Walter Gehr, Recurrent Issues (Briefing for Member States on 4 April 2002), at <http://www.un.org/Docs/sc/committees/1373/rc>.

[56] See Stefan Talmon, The Security Council as World Legislature, *American Journal of International Law* 99 (2005), 175-193 at 189-190.

[57] See John R. Crook, 'Contemporary Practice of the United States Relating to International Law', *American Journal of International Law* 99 (2005), 253-273 at 268.

recalls that the following acts are under no circumstances justifiable:

> *criminal acts*, including against civilians, committed with the intent to cause death or serious bodily injury, or taking of hostages, with the purpose to provoke a state of terror in the general public or in a group of persons or particular persons, intimidate a population or compel a government or an international organization to do or to abstain from doing any act, *which constitute offences within the scope of and as defined in the international conventions and protocols relating to terrorism.*[58]

As not all international conventions and protocols relating to terrorism are universally accepted, it is difficult to see how a definition which relies on sectoral *treaty-based* offenses can establish a generally accepted definition of terrorism under customary international law.

45.   States made it quite clear that they did not consider paragraph 3 of resolution 1566 (2004) as prescribing a definition of terrorism. On January 18, 2005 the representative of Brazil declared:

> We believe that resolution 1566 (2004) reflects compromise language that contains a clear and important *political message*. Properly speaking, however, it should not be construed as a conceptual definition of terrorism. Furthermore, as foreseen in the Charter, we believe that reaching an agreed definition of terrorism falls under the functions and powers of the General Assembly.[59]

Another declaration of Brazil makes it clear that there is no generally agreed crime of terrorism under international law. On April 25, 2005, the Brazilian delegate on the Security Council stated:

> Without a consensus definition of terrorism, it is not appropriate to consider – as envisaged in resolution 1566 (2004) – possible practical measures regarding individuals, groups or entities involved in terrorist activities not covered by resolution 1267 (1999). Resolution 1566 (2004) reflects negotiated language that contains a clear and important political message, but it does not constitute a conceptual definition of terrorism and cannot be interpreted as such.[60]

Resolution 1267 (1999), of course, is specifically directed at Al-Qaeda and the Taliban in Afghanistan,[61] and does not deal with terrorism or terrorists in general.

---

[58] S/RES/1566 (2004) of 8 October 2004, para. 3.

[59] UN Doc. S/PV.5113, 18 January 2005, 13 (emphasis added). See also S/PV.5053, 8 October 2004, 7.

[60] UN Doc. S/PV.5168, 25 April 2005, 9.

[61] See S/RES/1267 (1999) of 15 October 1999. See also UN Doc. S/PV.5059, 19 October 2004, 11.

46.   Resolution 1566 (2004) was also criticized by Switzerland whose representative declared:

> Switzerland regrets that resolution 1566 (2004) contains formulations of a legislative nature that do not correspond to the definitions used in the draft comprehensive convention on international terrorism and in the 12 international conventions against terrorism; nor do they comply with the principle of legality in criminal law, which requires the clear and precise formulation of laws.[62]

47.   As in the case of resolution 1373 (2001), the resolution was approved unanimously. States voting for the resolution included Algeria, Angola, Benin and Pakistan which were non-permanent Members of the Security Council at the time. All four States had previously made it clear that they did not consider the struggle of peoples for self-determination and against foreign or alien occupation to be terrorism. As these States had no problem in voting for the resolution it must be concluded that they considered the resolution not to cover acts in the struggle of peoples for self-determination and against foreign or alien occupation. This becomes clear from statements of the Algerian delegate in the Security Council. Algeria believes that the "resolution's main objective was to reaffirm the mobilization of the international community in fighting against that scourge and not to provide a definition of terrorism."[63] Speaking on October 19, 2004, the head of the Algerian delegation to the United Nations said:

> My delegation would like to reiterate its call for a definition of the phenomenon of terrorism. We also reiterate the need to distinguish between terrorist acts, which are condemnable and unjustifiable in all their forms and manifestations, and the legitimate struggle of peoples for liberation, self-determination, freedom and independence including through armed struggle, in accordance with international law. My delegation therefore believes that the criminal acts set out in paragraph 3 of resolution 1566 (2004) should not be interpreted as a definition of terrorism. It is not up to the Security Council to legislate in that regard. That prerogative falls under the competence of the General Assembly, which already has before it two draft conventions on terrorism, which we very much hope will soon be finalized.[64]

48.   Irrespective of whether or not resolution 1566 (2004) contains a definition of terrorism, it should be pointed out that the language used by the Security Council in paragraph 3 of the

---

[62] UN Doc. S/PV.5059, 19 October 2004, 24-25. See also A/C.6/59/SR.7, 10 November 2004, 10, para. 52.

[63] UN Doc. S/PV.5113, 18 January 2005, 16.

[64] UN Doc. S/PV.5059, 19 October 2004, 17. See also A/C.6/59/SR.8, 24 January 2005, 12.

resolution, employing the word "*recalls*" and "*calls upon*" instead of "*decides*", shows that the Council did not intend to impose any legal obligation upon Member States to punish all the acts mentioned in the various conventions.

### 4. THE REPORT OF THE HIGH-LEVEL PANEL ON THREATS, CHALLENGES AND CHANGE

49.  Both Professor Wedgwood (Declaration, paras. 82-92) and Professor Drumbl (Declaration, para. 26) rely extensively on the Report of the High-Level Panel, which was appointed by UN Secretary-General Kofi Annan in 2002, in their effort to show that there is a generally accepted definition of terrorism in customary international law.

50.  The passages which Professor Wedgwood quotes from the Report of the High-Level Panel present, however, a highly selective picture. It should be noted that the Panel also had the following to say on the question of a definition of terrorism:

> The United Nations ability to develop a comprehensive strategy [against terrorism] has been constrained by the inability of Member-States to agree an anti-terrorism convention including a definition of terrorism. This prevents the United Nations from exerting its moral authority and from sending an unequivocal message that terrorism is never an acceptable tactic, even for the most defensible of causes. [...]
>     Lack of agreement on a clear an well-known definition undermines the normative [...] stance against terrorism [...].
>     The search for an agreed definition usually stumbles on two issues. [...] The second objection is that peoples under foreign occupation have a right to resistance and a definition of terrorism should not override this right.[65]

This view was subsequently endorsed by the United Nations Secretary-General.[66]

51.  As pointed out by the High-level Panel the lack of agreement on a definition of terrorism undermines the "normative stance" against terrorism. Without a definition of terrorism there cannot be a clear and definite norm prohibiting the financing of terrorism as it is unclear what acts may not be financed.

---

[65] A more secure world: our shared responsibility. Report of the High-Level Panel on Threats, Challenges and Change, UN Doc. A/59/565, 2 December 2004, 48, paras. 157, 159, 160.

[66] In larger freedom: towards development, security and human rights for all. Report of the Secretary-General, UN Doc. A/59/2000, 21 March 2005, 26, paras. 90, 91. See also the Secretary-General's address to the Summit of the League of Arab States, 23 March 2005.

52. The High-Level Panel stated that "attacks that specifically target innocent civilians and non-combatants must be condemned clearly and unequivocally by all."[67] The need for such a call shows that this is presently not the case. On the contrary, the Panel notes elsewhere that "far too many States remain outside the [counter-terrorism] conventions and not all countries ratifying the conventions proceed to adopt internal enforcement measures",[68] and that States in the regions from which terrorists originate are lacking the "will to fight terror."[69]

53. Referring to the work of the High-Level panel, Professor Wedgewood states that "the effort to craft a "comprehensive" convention on terrorism is thus not an attempt to change the law, but rather, to publicize what the law already is." (Declaration, para. 91). If it was only a question of *publicizing* the law, one wonders why it has not been possible to do so for the last thirty-two years.[70] It is rather, as the High-Level Panel rightly pointed out, the content of the definition which States are unable to agree upon.

54. Professor Drumbl states that the High-Level Panel "was able to *consolidate consensus* on a definition of terrorism" (Drumbl Declaration, para. 26 [emphasis added]). This is again misleading. All the High-Level Panel did, was to suggest elements a "definition of terrorism *should* include." That there did not yet exist any consensus on the definition of terrorism becomes clear from the following statement of the Panel: "[w]e believe there is particular value in *achieving* a consensus definition within the General Assembly, given its unique legitimacy in normative terms."[71]

55. With regard to the question of whether terrorism is a crime under customary international law, the following passage from the Report of the High-Level Panel is instructive:

> The definition of terrorism should include the following elements: [...]
> (b) *Restatement* that acts under the 12 preceding anti-terrorism conventions are terrorism, and a *declaration* that they are a crime under international law; and *restatement* that terrorism in time of armed conflict is prohibited by the Geneva Conventions and Protocols.[72]

The High-Level Panel distinguishes in its recommendations between the "restatement" that

---

[67] Report of the High-Level Panel, para. 161.

[68] Ibid., para. 149.

[69] Ibid., para. 147.

[70] See Eric Rosand, 'The Security Council as "Global Legislator": Ultra Vires or Ultra Innovative?', *Fordham International Law Review* 28 (2005), 542-590 at 549.

[71] Report of the High-Level Panel, para. 162 (emphasis added).

[72] Ibid., para. 164 (emphasis added).

certain acts are terrorism and a "declaration" that they are a crime under international law. This shows that the latter is not yet established in customary international law.

## 5. DRAFTING HISTORY OF THE STATUTE OF THE INTERNATIONAL CRIMINAL COURT

56.   The drafting history of the Statute of the International Criminal Court also sheds some light on the question whether terrorism or the financing of terrorism qualifies as a crime under customary international law. In 1993, the International Law Commission proposed that a future international criminal court should be given jurisdiction over crimes under general international law in general. This proposal met with considerable criticism from States on the grounds that a mere reference to "crimes under general international" law was highly uncertain. The Commission therefore limited the Court's jurisdiction over crimes under general international law to a number of specified crimes that were generally accepted. As crimes under general international law the Commission identified the following: genocide, aggression, violations of the laws and customs applicable in armed conflict and crimes against humanity. In addition, the Court was to have jurisdiction over so-called "treaty crimes", crimes under treaties which provide for the suppression of undesirable conduct of international concern constituting *crimes under national law*. Six of the fourteen treaty crimes concerned terrorist offenses (e.g. hijacking, hostage-taking). The importance of the systematic factor of distinguishing the two types of crimes was stressed by a number of members of the Commission, in particular in the context of crimes associated with terrorist activity. It was pointed out that "as yet the international community has not yet developed a single definition of terrorism."

57.   The Bureau of the Rome Conference on the International Criminal Court also distinguished between genocide, crimes against humanity, war crimes and aggression on the one hand and treaty crimes such as terrorism on the other.[73] The "crime of terrorism" was included in brackets, without prejudice to a final decision on its inclusion in the Statute, in the draft Statute of the International Criminal Court that was the basis of the work of the Rome Conference.[74] At the plenary meetings of the Conference and those of its Committee of the Whole the majority of representatives (including those belonging to the Western European and others Group) opposed the inclusion of the crime of terrorism in the Statute. The reason for its final exclusion was again the failure of the Conference to reach a generally acceptable definition of terrorism. Thus, in the Final Act of the United Nations Diplomatic Conference of

---

[73] UN Doc. A/CONF.183/C.1/L.59, 10 July 1998, 1; UN Doc. A/CONF.183/C.1/L.53, 6 July 1998, 1.

[74] Report of the Preparatory Committee on the Establishment of an International Criminal Court, UN Doc. A/CONF.183/2/Add.1, 14 April 1998, 27-28.

Plenipotentiaries on the Establishment of an International Criminal Court, done at Rome on July 17, 1998, the Conference regrets that "no generally acceptable definition of the crimes of terrorism and drug crimes could be agreed upon for the inclusion, within the jurisdiction of the Court."[75]

## 6. WRITINGS OF SCHOLARS

58.   The writings of scholars has been identified in the *Restatement of the Foreign Relations Law of the United States* as one of the secondary means of proving that a rule has become customary international law.[76] Professor Ian Brownlie, the leading British authority on public international law wrote in the 6th edition of his textbook in 2003 with regard to international crimes:

> There is, at this stage in the historical development of the concept of international crimes, sufficient material to provide a reliable assessment of those offences which are recognized as part of general or customary international law. In this context the provisions of the Statute of the International Criminal Court constitute good evidence of the offences forming part of general international law.[77]

He then lists genocide, crimes against humanity, war crimes and aggression as crimes forming part of general international law. To this list he adds torture in time of peace as a separate international crime.[78] An admittedly limited survey or textbooks published in the last two years shows that Professor Brownlie's view is shared by other leading authorities who also mention only genocide, war crimes, crimes against humanity, aggression and piracy as offenses established under customary international law.[79]

59.   A recent doctoral dissertation on *Defining "Terrorism" in International Law* presented by Dr. Ben Saul concludes: "Arguments that terrorism is a customary international law crime are

---

[75] See Resolution E of the United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, UN Doc. A/CONF.183/10, 17 July 1998, 8.

[76] American Law Institute, *Restatement of the Law (Third) Foreign Relations Law of the United States*, vol. 1 (1987), 36 (§ 103 (2) (c) Com a).

[77] Ian Brownlie, *Principles of Public International Law* (6th edn., 2003), 561.

[78] Ibid., 561-564.

[79] See Martin Dixon, *Textbook on International Law* (2005), 114-115; Hanspeter Neuhold, Waldemar Hummer, Christoph Schreuer (eds.), *Österreichisches Handbuch des Völkerrechts [Austrian Handbook on International Law]* (2004), 533; Stephan Hobe, Otto Kimminich, *Einführung in das Völkerrecht [Introduction to International Law]* (2004), 251-255.

premature."[80]

60. Dr. Saul's conclusion is shared by Douglas R. Burgess Jr. who writes:

> International law lacks a definition for terrorism as a crime. [...] This gives an out to countries that harbor terrorists and declare them "freedom fighters." [...] The overall situation is, in a word, anarchic. This chaotic state is reflected in, and caused by, the tortuous machinations of the U.N. in defining terrorism. Over 40 years of debate have produced a plethora of conventions proscribing acts ranging from hijacking to financing terrorist organizations. But the U.N. remains deadlocked on what a terrorist is. [...] What is needed now is a framework for an international crime of terrorism. The framework should be incorporated into the U.N. Convention on Terrorism and should call for including the crime in domestic criminal law and perhaps the jurisdiction of the International Criminal Court.[81]

61. Professor Javaid Rehman, in his book on *Islamic State Practices, International Law and the Threat from Terrorism* (2005), concludes the chapter on "Financing of International Terrorism" with the following statement:

> Financing of terrorism unfortunately remains a major concern for the international community. [...] It is also the case that sometimes, differing perceptions of the cause lead States to take diametrically opposed views. The issue of the struggle of the Palestinians is a pertinent example. Israel and its allies may regard any form of financial support for the Palestinian cause as promoting terrorism; in their view any organization and institution working to finance the Palestinians' struggle for their lawful rights is promoting terrorism. The Islamic community, however, firmly believes in the integrity of the right of self-determination of the people of Palestine.[82]

---

[80] Ben Saul, *Defining "Terrorism" in International Law* (doctoral thesis, Oxford University, 2005), 210. See also Ben Saul, 'Definition of "Terrorism" in the UN Security Council: 1985-2004', *Chinese Journal of International Law* 4 (2005), 141-166 at 166 ("It is still premature to claim universal jurisdiction over terrorism, given the absence of an agreed definition [...]").

[81] Douglas R. Burgess Jr., 'The Dread Pirate Bin Laden: How thinking of terrorists as pirates can help win the war on terror', *Legal Affairs* Jul-Aug. 2005, 32-36 at 32.

[82] Javaid Rehman, *Islamic State Practices, International Law and the Threat from Terrorism* (2005), 190. See also ibid., 184 ("The definition of terrorism and the identification of terrorists have clearly been problematic for Islamic States. There remains a major debate on the position of such organizations as *Anasar-al-Islam*, *Hizbollah*, and the *Palestinian Islamic Jihad*. The US has recently placed these organizations on its list of proscribed groups, and has required their financial assets be frozen. On the other hand, many Arab and Islamic States regard *Hizbollah* and the *Palestinian Islamic Jihad* as genuine liberation movements.").

62.   In an examination why international terrorism is missing from the Statute of the International Criminal Court, Patrick Robinson, a Judge on the International Criminal Tribunal for the Former Yugoslavia, writes about "The Place of the Crime of International Terrorism in International law":

> The absence of a generally acceptable definition of international terrorism complicates the assessment of its place in international law. [...] The international legal regime on terrorism has, however, in the absence of a global treaty on the subject been developed mainly through the adoption of treaties devoted to the suppression of specific terrorist acts; at that level there is, therefore, a strong conventional regime on terrorist acts. The question is whether anything in that regime reflects customary international law, or indeed, whether, quite apart from that regime, there is any other basis for concluding that there is a customary rule proscribing terrorism.

> After a careful analysis of various United Nations General Assembly resolutions dealing with terrorism, he concludes that these resolutions may be viewed as establishing a customary rule which not only criminalizes as terrorist, acts intended or calculated to provoke a state of terror, but also requires States to take certain action to prevent and punish these acts. This finding is, however, subject to the important qualification that

> international law excludes from the concept of terrorism the struggle for self-determination and independence, although some acts perpetrated in that struggle may themselves be terrorist and unlawful.[83]

63.   There seems to be only one leading authority, Antonio Cassese, who, subject to certain conditions, has advocated terrorism as a crime under customary international law. For terrorist acts to amount to international crimes, according to Cassese, the acts must, "transcend national boundaries" and must be "carried out with the support, the toleration, or the acquiescence of the State where the terrorist organization is located or of a foreign State." The author does not give any evidence for his view or for the conditions he specifies.[84] Even Cassese, however, does not mention the financing of terrorism as a crime under customary international law.

---

[83] Patrick Robinson, The Missing Crimes, in: Antonio Cassese et al. (eds.), *The Rome Statute of the International Criminal Court: A Commentary*, vol. 1 (2002), 497-525 at 518-521.

[84] Antonio Cassese, *International Criminal Law* (2003), 128-130. See also Antonio Cassese, *International Law* (2nd edn., 2005), 449-450.

## V. THE FINANCING OF TERRORISM

### 1. MEASURES TAKEN BY STATES AGAINST THE FINANCING OF TERRORISM

64.   There is no constant and uniform practice of States with regard to the financing of terrorism that allows international lawyers to establish a clear rule of customary international law. Measures taken by States against the financing of terrorism vary widely,[85] and often no measures are taken at all. Whether measures are taken depends on what States regard as "terrorism" and what is considered as "financing" of terrorism. Considering their view on terrorism, it comes as no surprise that countries like Saudi Arabia have reported to the Counter-Terrorism Committee of the United Nations Security Council that "there have been no successful prosecutions involving the provision of financial assistance for the carrying out of terrorist acts, whether within or outside the territory of Saudi Arabia."[86] In reply to the question whether there are any generally applicable procedures for the freezing and provisional seizure of assets for offenses relating to terrorism and its financing, Saudi Arabia replied:

> In the absence of a precise and unequivocal definition of terrorism endorsed by the international community, in Saudi Arabia measures for the freezing and seizure of funds can only be taken in accordance with specific statutory procedures and on the basis of a request from the Minister of the Interior addressed to the Minister of Finance and National Economy.[87]

The question who is a terrorist is thus effectively decided by the Saudi Minister of the Interior on an *ad hoc* basis.

65.   There are also many States which distinguish between funding political, religious, charitable and educational activities and the financing of terrorism. For example, the spokesman for the European Commission explained on June 23, 2003 why fund-raising activities by Hamas were not prohibited: "You can't say that the whole of Hamas is a terrorist organization and certainly that is not our position."[88]

66.   The United Nations High-Level Panel on Threats, Challenges and Change summarized in its Report published in December 2004 the situation with regard to the measures taken against the financing of terrorism as follows:

---

[85] See United Nations, *National Laws and Regulations on the Prevention and Suppression of International Terrorism*, Part I (2002).

[86] UN Doc. S/2002/869, 1 August 2002, 4.

[87] UN Doc. S/2002/869, 1 August 2002, 5.

[88] EU rejects full Hamas ban, BBC News, at <http://news.bbc.co.uk/1/hi/world/europe/3026992.stm>.

[...] attempts to address the problem of terrorist financing have been inadequate. While in the three months after 11 September 2001 $112 million in alleged terrorist funds were frozen, only $24 million were frozen in the two years that followed.

[...] a number of States are lagging behind in their compliance with the directives of the Counter-Terrorism Committee.[89]

## 2. THE QUESTION OF FINANCING TERRORISM

### IN THE REGIONAL CONVENTIONS ON COMBATING TERRORISM

67.   Since the 1970s, several regional conventions on the prevention and combating of terrorism have been concluded. These conventions include:

(1)   Convention of the Organization of American States to Prevent and Punish the Acts of Terrorism Taking the Form of Crimes against Persons and Related Extortion that Are of International Significance, February 2, 1971; entry into force October 16, 1973 ("OAS Convention")

(2)   European Convention on the Suppression of Terrorism, January 27, 1977; entry into force August 4, 1978 ("European Convention")[90]

(3)   Regional Convention on Suppression of Terrorism of the South Asian Association for Regional Cooperation, November 4, 1987; entry into force August 22, 1988 ("SAARC Convention")[91]

(4)   Arab Convention on Combating Terrorism, April 22, 1998; entry into force May 7, 1999 ("Arab Convention")

(5)   Treaty on Cooperation among States Members of the Commonwealth of Independent States in Combating Terrorism, June 4, 1999; entry into force by country, first entry into force October 3, 2000 ("CIS Treaty")

(6)   Convention of the Organization of the Islamic Conference on Combating

---

[89] A more secure world: our shared responsibility. Report of the High-level Panel on Threats, Challenges and Change, UN Doc. A/59/565, 2 December 2004, 46, para. 149 and 48, para. 153.

[90] The Protocol amending the European Convention on the Suppression of Terrorism, done on May 15, 2003, has not yet entered into force. For the text, see <http://conventions.coe.int/Treaty/en/Treaties/Html/190.htm> (last visited July 18, 2005). Parties are obliged to establish their jurisdiction, inter alia, over offenses within the meaning of the 1999 Terrorist Financing Convention.

[91] The Additional Protocol to the SAARC Regional Convention on Suppression of Terrorism, done on January 6, 2004, has not yet entered into force. For the text, see <http://www.saarc-sec.org/main.php?id=11&t=7.1> (last visited July 18, 2005). Terrorist financing is an offense under the Protocol; see Article 4.

International Terrorism, July 1, 1999; entry into force November 7, 2002 ("OIC Convention")

(7)    Convention of the Organization of African Unity on the Prevention and Combating of Terrorism, July 14, 1999; entry into force December 6, 2002 ("OAU Convention")[92]

(8)    Agreement on Cooperation among the Governments of GUUAM[93] Member States in the Field of Combat Against Terrorism, Organized Crime and Other Dangerous Types of Crime, July 20, 2002 ("GUUAM Agreement")[94]

(9)    Inter-American Convention against Terrorism, June 3, 2002; entry into force July 10, 2003 ("Inter-American Convention")[95]

68.   Several of these regional treaties on terrorism do not mention the financing of terrorism at all (OAS Convention, European Convention, SAARC Convention, CIS Convention, GUUAM Agreement). The treaties that do mention the financing of terrorism do so in the context of establishing an obligation of the *contracting States* to "refrain from any acts aimed at [...] financing [...] terrorist acts"[96], "not to [...] finance [...] terrorist acts"[97], "not to [...] participate in any form in [...] financing [...] terrorist acts."[98] The OIC Convention, in addition, provides that "money laundering aimed at financing terrorist objectives shall be considered terrorist crimes."[99] The Inter-American Convention obligates each State party to "ensure that its domestic penal money laundering legislation also includes as predicate offenses those offenses established in the international [anti-terrorism] instruments."[100] Only the 2004 Additional Protocol to the SAARC Convention[101] and the 2005 Council of Europe Convention on the Financing of Terrorism,[102] neither of which has yet entered into force, expressly require the

---

[92] The text of all these conventions may be found in Sherif Bassiouni, *International Terrorism: Multilateral Conventions (1937-2001)* (2001).

[93] GUUAM is a regional organization of five States: Georgia, Ukraine, Uzbekistan, Azerbaijan and Moldova.

[94] For the text of the Agreement, see <http://www.guuam.org.ua/cgi-bin/valmenu_guuam.sh?1p030103.html> (last visited July 18, 2005).

[95] As of July 18, 2005 only 12 of the 36 OAS Member States are parties to the Convention. The Text of the convention may be found at <http://www.oas.org/xxxiiga/english/docs_en/docs_items/AGres1840_02.htm> (last visited July 18, 2005).

[96] Article 4 (1) OAU Convention.

[97] Article 3 Arab Convention.

[98] Article 3 (1) OIC Convention.

[99] Article 2 (d) OIC Convention.

[100] Article 6(1) Inter-American Convention.

[101] See Articles 7-9 SAARC Additional Protocol.

[102] See Articles 2, 9 Council of Europe Convention on Laundering, Search, Seizure and Confiscation of the

parties to adopt domestic legislation with regard to the "financing of terrorism." However, none of the regional anti-terrorism conventions prescribes terrorist financing as an international crime. Upon signing the Inter-American Convention, Ecuador expressly "deplore[d] that the member states have not been able to reach a consensus on the definition of terrorism and its classification as an international crime against humanity."[103]

### 3. INTERNATIONAL TERRORIST FINANCING CONVENTION

#### A. STATUS OF THE CONVENTION IN INTERNATIONAL LAW

69.   The Declarations submitted on behalf of the plaintiffs deal at length with the International Convention for the Suppression of the Financing of Terrorism ("Financing Convention") (Wedgwood Declaration, paras. 73-81; Dinstein Declaration, pp. 2-3; Drumbl Declaration, paras. 19-25). The Convention was adopted by UN General Assembly Resolution 54/109 of December 9, 1999.[104] Article 2(1) of the Convention provides:

> Any person commits an offence within the meaning of this Convention if that person by any means, directly or indirectly, unlawfully and wilfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out:
>> (a) An act which constitutes an offence within the scope of and as defined in one of the treaties listed in the annex; or
>> (b) Any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act.

70.   One of the conventions listed in the annex mentioned in Article 2(1)(a) is the International Convention for the Suppression of Terrorist Bombings ("Bombings Convention"), adopted by the General Assembly of the United Nations on December 15, 1997. According to Article 2(1)

---

Proceeds from Crime and on the Financing of Terrorism, done at Warsaw, May 16, 2005; CETS 198. For the text, see <http://conventions.coe.int/Treaty/EN/Treaties/Html/198.htm> (last visited July 18, 2005).

   [103] For the Ecuadorian declaration of June 3, 2003, see <http://www.oas.org/juridico/english/sigs/a-66.html> (last visited July 18, 2005).

   [104] A typo has crept into Professor Wedgwood's Declaration at para. 73: the Financing Convention is dated Dec. 9, 1999 (not: 1991).

of that Convention,

> any person commits an offence within the meaning of this Convention if that person unlawfully and intentionally delivers, places discharges or detonates an explosive or other lethal device in, into or against a place of public use, a State government facility, a public transportation system or an infrastructure facility
>> (a) With the intent to cause death or serious bodily injury; or
>> (b) With the intent to cause extensive destruction of such a place, facility or system, where such destruction results in or is likely to result in major economic loss.

71. Reading the two Conventions together, this means that any person commits an offense within the meaning of the Financing Convention if that person by any means, directly or indirectly, unlawfully and wilfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out bombings in the sense of Article 2(1) of the Bombings Convention or any of the acts mentioned in Article 2(1)(b) of the Financing Convention.

72. The Financing Convention is a treaty and, as such, is binding only on the parties to the Convention.[105] The Convention entered into force on April 10, 2002. As of July 18, 2005, the Convention had 138 parties. The table shows the development in the number of parties since the adoption of the Convention in December 1999:

| Year | Accessions or Ratifications | Total Number of Parties |
|---|---|---|
| 2000 | 2 | 2 |
| 2001 | 14 | 16 |
| 2002 | 48 | 64 |
| 2003 | 43 | 107 |
| 2004 | 25 | 132 |
| (July 18) 2005 | 6 | 138 |

Many Arab and Islamic countries such as Bangladesh, Indonesia, Iran, Iraq, Kuwait, Lebanon, Malaysia, Oman, Pakistan, Qatar, Saudi Arabia, the United Arab Emirates and Yemen are still

---

[105] See Article 34 of the Vienna Convention on the Law of Treaties, done on May 23, 1969: 1155 UNTS 331.

not parties to the Financing Convention. Other notable absentees include Argentina, Brazil, China, and the Czech Republic. Thus, a sizable segment of the international community of States representing some 2.6 billion people or 40% of the world population is still outside the convention regime.

73. Several State parties to the Financing Convention have made declarations under Article 2(2)(a) declaring that the Bombings Convention should be deemed not be included in the list of terrorist conventions to which the Convention applies. Such declarations cease to have effect as soon as the Bombings Convention enters into force for the party making the declaration. As of July 18, 2005, nine such declarations were still in force.[106] On July 18, 2005, the Bombings Convention had 139 parties; again many Arab and Islamic States not being parties.[107] This means that for 62 States, or roughly 30% of States, the financing of bombings within the meaning of the Bombing Convention is not yet a treaty offense.

74. It is thus grossly misleading when Professor Drumbl writes that "only four countries with populations larger than 13 million remain outside of both treaty regimes", i.e. outside the Financing and the Bombing Conventions (Drumbl Declaration, para. 19). First, one may ask why the – arbitrary – figure of "13 million" was chosen. The answer is that it allows Professor Drumbl to exclude a substantial number of smaller States which are not parties to the conventions from the picture of almost universal acceptance of the conventions which he attempts to paint. Secondly, one may ask what it means "to remain outside" of both treaty regimes. According to Professor Drumbl, States "outside" a treaty regime are States that "have not signed nor acceded to, approved, or accepted" the conventions. Those that have signed the conventions he terms "*participants* in the conventions" (Drumbl Declaration, para. 20 [emphasis added]). This leads him to state that "159 states are participants in the Financing Convention and 142 are participants in the Bombing Convention." The law of treaties, however, does not know of "participants" in conventions but only knows of "parties" to a convention. Article 2(1)(g) of the 1969 Vienna Convention on the Law of Treaties defines a "party" to a treaty as "a State which has consented to be bound by the treaty and for which the treaty is in force." States that have signed but have not ratified, accepted, approved, or acceded to a treaty are not bound by it. Such States are only under an obligation "to refrain from acts which would defeat the object and purpose" of the treaty.[108] The United States has signed

---

[106] The States in question are the Cook Islands, Egypt, Jordan, Moldova, Saint Vincent and the Grenadines, Singapore, Syria, Thailand and Viet Nam.

[107] For example, Egypt, Indonesia, Iran, Iraq, Jordan, Lebanon, Morocco, Oman, Qatar, Saudi Arabia, Syria.

[108] Vienna Convention on the Law of Treaties, Art. 18(a).

numerous treaties which it has never ratified.[109] Does the signing of these treaties mean that the United States has become a "participant" in these treaties and that by signing the treaties it wanted to be bound by them or to contribute to the creation of customary international law? Certainly not. This is shown by the fact that States that have signed a treaty are free to make their intention clear not to become a party to the treaty as was done by the United States on May 6, 2002, when it declared that it no longer wanted to become a party to the Rome Statute of the International Criminal Court which it had signed on December 31, 2000. Thus, to say that the United States for two years was a "participant" in the Rome Statute is not very helpful. Thirdly, Professor Drumbl's statement that among the non-parties of the two conventions "are a number of states with starkly dubious human rights records, rogue governments, and illegitimate regimes" (Drumbl Declaration, para. 19) is of no concern to the question of whether a treaty is reflective of or is crystalizing customary international law. One may consider outdated the "one-nation, one-vote principle", where every State has the same right to participate in the creation of rule of customary international law; it is nevertheless still a basic principle of international law. It must be put on record once again that, despite all creative scholarship on the part of Professor Drumbl, for roughly 30% of all States the financing of bombings within the meaning of the Bombing Convention is not yet a treaty offense; let alone an offense under customary international law.

75.   Three Arab States have made express declaration upon signing or ratifying the Financing Convention.[110] For example, Jordan made the following declaration upon signature of the Convention:

> The Government of the Hashemite Kingdom of Jordan does not consider acts of national armed struggle and fighting foreign occupation in the exercise of people's right to self-determination as terrorist acts within the context of paragraph 1(b) of article 2 of the Convention. [...].[111]

Similar declarations were made by Egypt[112] and Syria,[113] and in the context of the Bombing

---

[109] See e.g. the 1966 International Convention on Economic, Social and Cultural Rights (signed on Oct. 5, 1977), 1979 Convention on the Elimination of All Forms of Discrimination of Women (signed on July 17, 1980), 1989 Convention on the Rights of the Child (signed on Feb. 16, 1995), 1998 Rome Statute of the International Criminal Court (signed Dec. 31, 2000).

[110] According to Professor Drumbl "only two States, Jordan and Syria, contested the general definition of terrorism set out in art. 2(1)(b)" (Drumbl Declaration, para. 25). For Egypt's declaration see, *infra* n. 112.

[111] All declarations are available at <http://untreaty.un.org/>.

[112] The Egyptian reservation reads: "Without prejudice to the principles and norms of general international law and the relevant United Nations resolutions, the Arab Republic of Egypt does not consider acts of national resistance

Convention, by Pakistan.[114] In view of the above statements of Arab, Islamic and African States, it is to be assumed that these States have similar provisos, although not expressly declared.

76. While I would agree with Professor Wedgwood that these "declarations" are probably not admissible as "reservations" under the Financing Convention and they definitely cannot change the United States' obligations under the Convention (Wedgwood Declaration, paras. 78, 80), they are nevertheless a clear expression of *opinio juris* on the part of these States that acts of national armed struggle and fighting foreign occupation in the exercise of a people's right to self-determination are not regarded as "terrorist acts." The "declarations" make it clear that these States do not consider themselves obligated by international law to take action against such acts or the financing of such acts; a fact that is also reflected in the practice of these States.

77. At the time of its adoption, the Financing Convention neither codified existing customary international law nor did it have a crystalizing effect on nascent customary international law rules that could be found in the practice of States prior to the adoption of the Convention. This is demonstrated by the fact that until the terrorist attacks of September 11, 2001, almost two years after its adoption by the General Assembly, only four States had become parties to the Convention.

78. The Convention or its Article 2(1) also has not developed into customary international law since its adoption. As the International Court of Justice pointed out: "There is no doubt that this process is a perfectly possible one and does from time to time occur" but "this result is not lightly to be regarded as having been attained."[115] For this result to be attained, the Court required the conventional rule in question to be of a "fundamentally norm-creating character such as could be regarded as forming the basis of a general rule of law."[116] This must be open

---

in all its forms, including armed resistance against foreign occupation and aggression with a view to liberation and self-determination, as terrorist acts within the meaning of article 2, subparagraph (b), of the Convention."

[113] The Syrian reservation reads: "A reservation concerning the provisions of its article 2, paragraph 1 (b), inasmuch as the Syrian Arab Republic considers that acts of resistance to foreign occupation are not included under acts of terrorism."

[114] The Pakistani declaration reads: "The Government of the Islamic Republic of Pakistan declares that nothing in this Convention shall be applicable to struggles, including armed struggle, for the realization of right of self-determination launched against any alien or foreign occupation or domination, in accordance with the rules of international law. This interpretation is consistent with Article 53 of the Vienna Convention on the Law of Treaties 1969 which provides that an agreement or treaty concluded in conflict with an existing *jus cogens* or peremptory norm of international law is void and, the right of self-determination is universally recognized as *a jus cogens*."

[115] *North Sea Continental Shelf*, ICJ Reports (1969), 3 at 41, para. 71.

[116] Ibid., 42, para. 72.

to some considerable doubt in the present case. Article 2(1)(a) refers to offenses established under a number of treaties which can be amended by the parties to the Financing Convention. This is an unusual element in what is supposed to be a potential general rule of international law. The content of customary rule would in effect depend on the parties to the Financing Convention. In addition, Article 2(2)(a) allows State parties to the Convention to exclude some or all of the offenses referred to in Article 2(1)(a). Article 2 also requires that the funds have been provided "unlawfully" without specifying how to determine the unlawfulness of the conduct in question. It should be noted that during the discussions of the Working Group preparing the Convention delegates pointed to "the distinction between terrorist acts and the lawful acts of national liberation movements."[117] It has been pointed out that the unlawfulness of the conduct would have to be determined in accordance with national law,[118] an element which again makes it difficult to regard the rule as a general one.

79. In addition, the Court required a "very widespread and representative participation in the convention" of States whose interests are affected by the subject matter of the convention. With regard to terrorism the interests of all States are affected. Of the 191 member States of the United Nations, as of July 18, 2005, only 138 are parties to the Financing Convention.

80. Even more important, the Court considered it an "indispensable requirement" that

> State practice [especially the practice of *States that were not parties to the convention*] should have been both extensive and virtually uniform in the sense of the provision invoked; and should moreover have occurred in such a way as to show a general recognition that a rule of law or general obligation is involved.

There is no evidence in the present case that there is "extensive and virtually uniform" practice of *non-parties* to the Financing Convention establishing the offenses set forth in Article 2(1) of the Convention (including violent acts in the struggle for self-determination or against foreign or alien occupation) as criminal offenses under their domestic law and that this practice is based on their belief that States are required to do so by international law.

81. Both the Financing Convention and the Bombings Convention have been included by the United Nations Secretary-General in this year's annual treaty event, *Focus 2005: Responding*

---

[117] Measures to eliminate international terrorism. Report of the Working Group, UN Doc. A/C.6/54/L.2, 26 October 1999, 61, para. 81.

[118] Roberto Lavalle, The International Convention for the Suppression of the Financing of Terrorism, *Zeitschrift für ausländisches öffentliches Recht und Völkerrecht* 60 (2000), 491-510 at 500-501.

*to Global Challenges*.[119] It is thus to be expected that the number of State parties to these Conventions will increase further in the months to come. The question we are concerned with in the present case is, however, not one of mere numbers of parties to a treaty but of the content of the treaty in question and of the interpretation of the provisions of the treaty adopted by States. The declarations of States set out above show that many parties to the Conventions expressly exclude the struggle for self-determination from terrorism and thus from the application of the Conventions.

## B. CONTENT OF THE CONVENTION

82.   Even if the Financing Convention had developed into customary international law since its adoption in December 1999, neither Article 2 nor any other provision prescribes the financing of terrorist acts as a crime under international law. The Financing Convention provides that any person who commits one of the acts set out in Article 2 commits *an offense "within the meaning of the Convention"* and in Article 4 imposes an obligation upon State Parties to establish as criminal offenses under their *"domestic law"* the offenses set forth in Article 2.

83.   Crimes under international law may be prosecuted and punished by any State which obtains custody of the perpetrator, regardless of a territorial or nationality link with the perpetrator or his victims.[120] Article 7 of the Convention, however, limits the jurisdiction of State Parties to offenses which have some kind of linkage with them. When prosecuting or punishing the offenses under the Financing Convention States exercise their national, not international jurisdiction, as they would do in case of international crimes.[121]

84.   In addition, Article 7(2) of the Convention *allows, but does not oblige*, State Parties to establish jurisdiction over the offenses set forth in Article 2 in a number of circumstances where there is a (less direct) connection between the offense, or the offender, and the State Party concerned. Leaving it to individual States whether or not to take action against the financing of terrorism evidences that it is not a crime under customary international law.

85.   Article 21 of the Convention provides that "nothing in this Convention shall affect other rights, obligations and responsibilities of States and individuals under international law, in particular the purposes of the Charter of the United Nations, international humanitarian law and other

---

[119] See United Nations, *Multilateral Treaty Framework: An Invitation to Universal Participation. Focus 2005: Responding to Global Challenges* (2005), 63 and 67.

[120] See Antonio Cassese, *International Law* (2nd edn., 2005), 436.

[121] See Ian Brownlie, *Principles of Public International Law* (6th edn., 2003), 303-305.

relevant conventions." This savings clause allows Arab, Islamic and African States to argue that the Convention leaves untouched the right of individuals to resist foreign occupation, as "international law and the Charter of the United Nations have guaranteed the legitimate right of all peoples under foreign occupation and control to liberate their land."[122]

## CONCLUSION

86.   I am of the opinion that while there is widespread condemnation of international terrorism and the financing of terrorism, "terrorism" and the "financing of terrorism" have not yet been established as crimes under customary international law for the following reasons:

(1)    the above survey of State practice shows that all States condemn terrorism and the financing of terrorism, but that consensus is at a very high level of generality;

(2)    there is no generally accepted definition of terrorism in international law;

(3)    a substantial number of Arab, Islamic and African States continues to exclude groups fighting foreign occupation or alien domination, and especially Palestinians groups "fighting for self-determination and national liberation", from the definition of terrorists;

(4)    there is no evidence of an established, widespread and consistent practice on the part of States coupled with the necessary *opinio juris* that financing of terrorism is prohibited by customary international law and entails the direct criminal responsibility under international law; and

(5)    financing of terrorism does not have a clear and defined content under customary international law and is therefore insufficiently precise to support individual criminal responsibility.


Respectfully submitted

Stefan Talmon
University Lecturer in Public International Law, Oxford University
Fellow of St. Anne's College, Oxford


July 18, 2005

---

[122] See e.g. the declaration of Qatar of 3 October 2001, above para. 19.

I declare, under penalty of perjury and the laws of the United States of America, to the best of my knowledge and belief, that the statements made in this Declaration are true and correct.

Executed on July 18, 2005, at St. Anne's College Oxford, United Kingdom.


Stefan Talmon

# Stefan Talmon

Born 22 January 1965, Pforzheim

St Anne's College, Oxford, OX2 6HS, UK
Telephone ++ 44 (0) 1865 284530 │ Fax ++ 44 (0) 1865 271899
Email stefan.talmon@law.ox.ac.uk
http://users.ox.ac.uk/~sann2029/

## Current Position
- University Lecturer in Public International Law, Oxford University, and Tutorial Fellow in Law, St Anne's College, Oxford (2003-)
- Course Director, Public International Law, Oxford Foreign Service Programme (2003-)

## Previous Professional Appointments
- Associate Professor, Tübingen University (2002-2003)
- Assistant Professor, Tübingen University (1998-2002)
- Member of the academic staff at the chair of Professor Dr. Dr. h.c. Wolfgang Graf Vitzthum, Tübingen University (1997-1998)

## Visiting and Adjunct Professorships
- Adjunct Professor, Ohio State University (2005-)
- Adjunct Professor, University of Georgia (2005-)
- Visiting Professor, Yeditiepe University, Istanbul (occasional arrangement since 2003)
- Visiting Professor, University Aix-Marseille III (2002, 2003)
- Visiting Professor, Jaroslaw-Mudryi Academy, Charkow (2001)

## Professional Work
- Legal opinions on questions of international environmental law, law of the sea, human rights, terrorism, international criminal law, and European law (2004-)
- Legal opinion for the Government of Nigeria in the Case Land and Maritime Boundary Between Cameroon and Nigeria (Cameroon v. Nigeria) before the International Court of Justice (2000)
- Legal opinion on US Congress Resolution 562 H (1999)
- Legal opinion on the status of archaeological objects found in the Adriatic Sea (1998)
- Legal opinion for the German Army Medical Corps (1997)
- Counsel and Advocate for the Government of Botswana in the Case Concerning Kasikili/Sedudu Island (Botswana/Namibia) before the International Court of Justice (1996-1999)

## Academic Activities
- Evaluation of Research Proposals for the German-Israeli Foundation for Scientific Research & Development (2005-)
- Referee for Hart Publishing (2004-)
- Referee for Cambridge University Press (2004-)
- Provide legal training for Royal Navy Officers (2003-)
- Referee for the Oxford Journal of Legal Studies (2003-)
- Taught Summer Course on New Models of Transnational Governance for the German National Scholarship Foundation (2002)
- Co-Editor of the Chinese Journal of International Law (2001-)

- Referee for the Journal Social Science History (2001)
- Referee for Oxford University Press (1998-)
- Specialist training in international humanitarian law (1996)


## Education
- Professional training as a lawyer, including four months with 2 Hare Court, London (1995-1997)
- Doctoral studies at the University of Oxford (St Antony's College) (1992-1995)
- Law studies at the Universities of Tübingen, Munich, Cambridge (Wolfson College) (1985-1992)
- Military service (lieutenant) (1984-1985)
- Neuenbürg Grammar School (1981-1984)

## Academic and Professional Qualifications
- Master of Arts (M.A.), Oxford University (2003)
- Barrister, member of the German bar (called 21 April 2003)
- Habilitation, Tübingen University (2002)
- Second State Examination in Law, Higher Regional Court of Appeal, Stuttgart (1997)
- Doctor of Philosophy (D.Phil.), Oxford University (1995)
- First State Examination in Law, Tübingen University (1992)
- Master of Law (LL.M.), Cambridge University (1989)

## Scholarships and Academic Prizes
- Award of the German Research Foundation for habilitation thesis (2003)
- Award of the German Foreign Office for habilitation thesis (2002)
- Teacher of the Year Award, Federal State of Baden-Württemberg (2000)
- Conference Scholarship of the German-British Jurists' Association (1996)
- Scholarship for the Summer Course of the Hague Academy of International Law (1995)
- Rhodes Scholarship (1991)
- Scholarship of the German National Scholarship Foundation (1987)
- Scholarship of the Konrad-Adenauer-Foundation (1986)

## Committee and Administrative Work
- Assessor for the OSI/FCO Chevening Scholarship Scheme (2003-2004)
- Examiner for the Certificate and for the Postgraduate Diploma in Diplomatic Studies (2003-)
- Serve on Teaching Committee of the Oxford Foreign Service Programme (2003-)
- Internal and external examiner of numerous doctoral and master theses in law (2003-)
- Serve on Graduate Studies Committee of Oxford Law Faculty (2003-)
- Serve on Estates, JRF Appointments and Academic Adjudication Committee of St Anne's College (2003-)
- Examiner on the First State Legal Exam (2002-2004)

## Research Funding
- Research Support Fund Grant, Oxford University, Faculty of Law (2004, 2005)
- Ministry of Education Funding for the Law Library, Tübingen University (2001)
- Funding for the Philip C. Jessup Moot Court Competition (1999-2001)

-3-

**Membership of Professional Societies**
• Society of Legal Scholars (since 2004)
• German Society of the United Nations (since 2003)
• German Society of Constitutional Law Teachers (since 2002)
• German Society of International Law (since 2002)
• International Law Association (first German, later British Branch) (since 2000)
• International Society for Military Law and the Law of War (since 1998)
• British Institute of International and Comparative Law (since 1994)
• American Society of International Law (since 1993)

# List of Academic Publications
### Dr. Stefan Talmon

## Books

- *Kollektive Nichtanerkennung illegaler Staaten. Grundlagen und Folgen einer international koordinierten Sanktion dargestellt am Beispiel der Türkischen Republik Nord-Zypern [Collective Non-recognition of Illegal States. Legal Foundations and Consequences of an Internationally Co-ordinated Sanction Exemplified by the Case of the Turkish Republic of Northern Cyprus]* (Tübingen: Mohr Siebeck (in print)). 796 pp. (Series: Jus Publicum).
- *Recognition in International Law. A Bibliography* (The Hague: Martinus Nijhoff Publishers, 2000). 437 pp.

  Reviews: Peter Macalister-Smith (2002) 71 *Nordic Journal of International Law* 587-589; Iganz Seidl-Hohenveldern (2004) 59 *Austrian Journal of Public and International Law* 105; Colin Warbrick (2001) 72 *British Year Book of International Law* 409; ASIL UN 21 Interest Group, No. 22 (January 2001).

- *The Reality of International Law. Essays in Honour of Ian Brownlie.* Foreword by Sir Robert Jennings (Oxford: Clarendon Press, 1999). 643 pp. (edited with Guy S. Goodwin-Gill).

  Reviews: Emily Haslam (2000) 4 *International Journal of Human Rights* 126-7; Colin Warbrick (2000) 116 *Law Quarterly Review* 690-2; Daniel Warner (2000) 12 *International Journal of Refugee Law* 695-6; Arthur Watts (2003) 52 *International and Comparative Law Quarterly* 269-70.

- *Alles fließt. Kulturgüterschutz und innere Gewässer im Neuen Seerecht [Everything is in a state of flux. The protection of cultural objects and internal waters in the new law of the sea]* (Baden-Baden: Nomos, 1998). 203 pp. (with Wolfgang Graf Vitzthum).

  Reviews: Wolff Heintschel von Heinegg (1999) 32 *Verfassung und Recht in Übersee* 391-5; Karsten Nowrot (1998) 41 *German Yearbook of International Law* 602-4; Lyndel V. Prott (1999) 8 *International Journal of Cultural Property* 599-604.

- *Recognition of Governments in International Law: With Particular Reference to Governments in Exile* (Oxford: Clarendon Press, 1998 [hardcover edition]); 2001 [paperback edition]). 465 pp. (Series: Oxford Monographs in International Law).

  Reviews: J. Craig Barker (1999) 48 *International and Comparative Law Quarterly* 237; Britta Buchenau (1998) 41 *German Yearbook of International Law* 600-2; Pierre Michel Eisemann (1998) 44 Annuaire Français de Droit International 840; Ulrich Fastenrath, 'Praktisch bedeutsam [Of practical importance]', *Frankfurter Allgemeine Zeitung*, 21 July 1998, 6; Maurice Flory (1998) 102 *Revue générale de droit international public* 1063-5; Jan Klabbers (1999) 68 Nordic Journal of International Law 105-7; Edward G. Lee (1999) 93 *American Journal of International Law* 261-3; Vaughan Lowe (1999) 58 *Cambridge Law Journal* 232-4; Siegfried Magiera (2002) 40 *Archiv des Völkerrechts* 378-379; Rafał Tarnogórski (2002) 2/5 (9) *Polski Przeglad Dyplomatyczny [Polish Diplomatic Review]* 180-182; Colin Warbrick (1999) 70 *British Year Book of International Law* 274-5; Jill McC. Watson (1999) 27 *International Journal of Legal Information* 276-7; Wendy T. Wylegala (1999) 31 *New York University Journal of International Law and Politics* 675-8; Yoo Hyuck-Soo/Apkhanzava Nikoloz (2001) 9/3 *Yokohama kokusai keizai hogaku [Yokohama Law Review]* 401-10; Ineta Ziemele (1999) 10 European Journal of International Law 640-3;

-2-

ASIL UN 21 Interest Group, No. 21 (July 2000); (1997-1998) 31 *George Washington Journal of International Law and Economics* 519-20; (2001) 10/3 *The Commonwealth Lawyer* 47.

## Articles and Chapters in Books

- Diplomacy under Occupation, *Anuario Mexicano de Derecho Internacional* 6 (2005) (manuscript, 15 pp., in print).
- The Duty Not to 'Recognize as Lawful' a Situation Created by the Illegal Use of Force or Other Serious Breaches of a *Jus Cogens* Obligation: An Obligation Without Real Substance?, in: Christian Tomuschat (ed.), *The Fundamental Rules of the International Legal Order and the Sovereignty of States* (The Hague: Kluwer, 2005) (manuscript, 20 pp., in print).
- The Security Council as World Legislature, *American Journal of International Law*, 99 (2005), pp. 175-193.
- Changing Views on the Use of Force: The German Position, *Baltic Yearbook of International Law*, 5 (2005), pp. 41-76.
- Luftverkehr mit nicht anerkannten Staaten: Der Fall Nordzypern [Air Traffic with Non-Recognized States: The Case of Northern Cyprus], *Archiv des Völkerrechts [Public International Law Archive]*, 43 (2005), pp. 1-42.
- The Constitutive versus the Declaratory Doctrine of Recognition: Tertium Non Datur?, *British Year Book of International Law* 75 (2004) (manuscript, 77 pp., in print).
- Responsibility of International Organizations: Does the European Community Require Special Treatment?, in: Maurizio Ragazzi (ed.), *International Responsibility Today. Essays in Memory of Oscar Schachter* (Leiden: Martinus Nijhoff, 2005), pp. 405-421.
- Article 23, in: Karin Oellers-Frahm/Christian Tomuschat/Andreas Zimmermann (eds.), *Commentary on the Statute of the International Court of Justice* (Oxford: Oxford University Press, 2005) (manuscript, 15 pp., in print).
- Article 43 in: Karin Oellers-Frahm/Christian Tomuschat/Andreas Zimmermann (eds.), *Commentary on the Statute of the International Court of Justice* (Oxford: Oxford University Press, 2005) (manuscript, 60 pp., in print).
- Impediments to Peacekeeping: The Case of Cyprus, *International Peacekeeping: The Yearbook of International Peace Operations* 8 (2004), pp. 33-63.
- The Legal Character of Statements by the President of the Security Council, *Chinese Journal of International Law*, 2 (2003), pp. 419-467.
- Grenzen der 'Grenzenlosen Gerechtigkeit'. Die völkerrechtlichen Grenzen der Bekämpfung des internationalen Terrorismus nach dem 11. September 2001 [How Infinite Is 'Infinite Justice'. Legal Limits of the Fight Against International Terrorism after September 11, 2001], in: Wolfgang März (ed.), *An den Grenzen des Rechts [Law at Its Limits]* (Berlin: Duncker & Humblot, 2003), pp. 101-183.
- Ende des Föderalismus. Gleichschaltung und Entstaatlichung der deutschen Länder von der nationalsozialistischen Machtergreifung bis zur Auflösung des Reichsrats [End of Federalism. The Bringing Into Line and Liquidation of the German Federal States from the National Socialist Seizure of Power to the Abolition of the Reichsrat], *Zeitschrift für Neuere Rechtsgeschichte [Journal of Contemporary Legal History]*, 24 (2002), pp. 112-155.
- Das deutsche Kolonialverfassungsrecht vor dem Internationalen Gerichtshof [The Constitutional Law of the German Colonies Before the International Court of Justice], *Archiv des Völkerrechts [Public International Law Archive]*, 40/1 (2002), pp. 17-53.

-3-

- ITLOS - International Tribunal for the Law of the Sea, in: Helmut Volger (ed.), *A Concise Encyclopedia of the United Nations* (The Hague: Kluwer, 2002), pp. 340-349.
- ITLOS - Internationaler Seegerichtshof, in: Helmut Volger (ed.), *Lexikon der Vereinten Nationen* (Munich: Oldenbourg Verlag, 1999), pp. 285-294.
- Membership and Representation of States, in: Helmut Volger (ed.), *A Concise Encyclopedia of the United Nations* (The Hague: Kluwer, 2002), pp. 369-373.
- Mitgliedschaft/Repräsentation von Staaten, in: Helmut Volger (ed.), *Lexikon der Vereinten Nationen* (Munich: Oldenbourg Verlag, 1999), pp. 393-397.
- Law of the Sea, in: Helmut Volger (ed.), *A Concise Encyclopedia of the United Nations* (The Hague: Kluwer, 2002), pp. 356-366.
- Seerecht, in: Helmut Volger (ed.), *Lexikon der Vereinten Nationen* (Munich: Oldenbourg Verlag, 1999), pp. 455-466.
- Der Internationale Seegerichtshof in Hamburg als Mittel der friedlichen Beilegung seerechtlicher Streitigkeiten [The International Tribunal for the Law of the Sea as a Means for the Pacific Settlement of Law of the Sea Disputes], *Juristische Schulung [Legal Training]*, 41 (2001) pp. 550-556.
- The Cyprus Question Before the European Court of Justice, in: Ismail Bozkurt (ed.). *Proceedings of the Third International Congress for Cyprus Studies. 13-17 November 2000*, Vol. 3: *Cyprus Issue & Tourism* (Gazimağusa: Eastern Mediterranean University Printinghouse, 2000), pp. 205-239.
- The Cyprus Question Before the European Court of Justice, *European Journal of International Law*, 12 (2001), pp. 727-750.
- Who is a Legitimate Government in Exile? Towards Normative Criteria for Governmental Legitimacy in International Law, in: Guy S. Goodwin-Gill/Stefan Talmon (eds.), *The Reality of International Law. Essays in Honour of Ian Brownlie* (Oxford: Clarendon Press, 1999), pp. 499-537.
- Die Geltung deutscher Rechtsvorschriften bei Auslandseinsätzen der Bundeswehr mit Zustimmung des Aufenthaltsstaates [The Applicability of German Laws to German Troops Stationed Abroad with the Consent of the Host State], *Neue Zeitschrift für Wehrrecht [New Journal of Military Law]*, 39 (1997), pp. 221-236.
- The Legal Effects of (Non) Recognition: The Case of the Turkish Republic of Northern Cyprus, in: Malcolm Evans (ed.), *Aspects of Statehood and Institutionalism in Contemporary Europe* (Aldershot: Dartmouth, 1997), pp. 57-81.
- War Booty of 'Separate Entity' Protected by Sovereign Immunity, *Oxford Journal of Legal Studies*, 15 (1995), pp. 295-307.
- Recognition of Governments: An Analysis of the New British Policy and Practice, *British Year Book of International Law*, 63 (1992), pp. 231-297.
- The Radbruch Formula: Legal Injustice and Supra-legal Justice, *ELSA Law Review*, 2 (1991), pp. 17-30.
- LL.M. Studium an der University of Cambridge (Wolfson College) nicht nur für Referendare [LL.M. Studies at Cambridge University (Wolfson College) not only for Graduates], *Juristische Schulung [Legal Training]*, 31 (1991), pp. 522-524.


**Reviews and Notes**

- Review of Kovalev, A.A., Contemporary Issues of the La of the Sea. Modern Russian Approaches, in: *International and Comparative Law Quarterly* 55 (2006) (forthcoming).
- Review of Marston, G. (ed.), United Kingdom Materials on International Law 1975-2001, Version 1.0 on CD-ROM, in: *Law Quarterly Review* 121 (2005) (in print).

-4-

- Review of Verwey, D., The European Community, the European Union and the International Law of Treaties, in: *European Law Review* (forthcoming).
- Review of Mani, V.S., Basic Principles of Modern International Law, New Delhi: Lancers Books, 1993, in: *International and Comparative Law Quarterly* 44 (1995), pp. 241-242.