

# OSEN & ASSOCIATE, LLC

ATTORNEYS AT LAW
700 KINDERKAMACK ROAD, ORADELL, NEW JERSEY 07649
TELEPHONE 201.265.6400  FACSIMILE 201.265.0303
WWW.OSEN.US

December 12, 2005

## BY ECF AND BY FEDERAL EXPRESS

Magistrate Judge Viktor V. Pohorelsky
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

> **Re:**   **Proposed Order Compelling Production of Documents**
>
> **Linde v. Arab Bank, plc, No. 04 Civ. 2799 (NG) (VVP)**
> **Litle v. Arab Bank, plc, No. 04 Civ. 5449 (NG) (VVP)**
> **Almog v. Arab Bank, plc, No. 04 Civ. 5564 (NG) (VVP)**
> **Coulter v. Arab Bank, plc, No. 05 Civ. 365 (NG) (VVP)**
> **Afriat-Kurtzer v. Arab Bank, plc, No. 05 Civ. 388 (NG) (VVP)**
> **Bennett v. Arab Bank, plc, No. 05 Civ. 3183 (NG) (VVP)**
> **Roth v. Arab Bank, plc, No. 05 Civ. 3738 (NG) (VVP)**

Dear Magistrate Judge Pohorelsky:

We write on behalf of the Plaintiffs in the above-captioned actions and enclose herein a Proposed Order marked as Exhibit A. We have attempted, in accordance with the Court's instructions, to reach agreement with the Defendant's counsel on the wording of a single Consent Order.  On November 4, 2005, Plaintiffs sent a detailed letter and proposed Consent Order to Defendant's counsel. On November 14, 2005, Plaintiffs' counsel wrote again to Defendant's counsel asking that the Defendant respond to the November 4th letter by November 18, 2005. On November 30, 2005 (26 days later),  the Defendant finally responded to Plaintiffs' letter and submitted a draft Consent Order of its own which did not comport with the Court's rulings on October 11, 2005. Counsel conferred by telephone on December 9, 2005, without resolving a single issue. Rather than burdening the Court further with a detailed characterization of the parties' positions - and in view of the fact that over two (2) months have passed since the Court made its rulings during the conference on October 11th - Plaintiffs' counsel have enclosed the Proposed Order herein in an effort to streamline the process.

For the Court's convenience, we are enclosing a copy of the transcript from the last conference before Your Honor as Exhibit B and have taken the liberty of cross-referencing the Proposed Order and the transcript so that Your Honor can confirm the accuracy and scope of the requests

Magistrate Judge Pohorelsky
December 12, 2005
Page 2

granted. Therefore, after identifying each paragraph of the Proposed Order, we have indicated the appropriate document request to which it refers. In addition, after the paragraph number of the Proposed Order and corresponding document request we have cited to the pages and line numbers of the transcript of the conference, noting the pages and lines wherein the Court ruled on the specific document requests.

Please note that the language of two (2) of the requests has been modified in the Proposed Order. Document Request No 6. is presently limited to the persons identified within the Saudi Committee website and the summary sheets that have been provided to the Defendant. Document Request No. 7 has been similarly limited to the Saudi Committee since the transcript is unclear as to the balance of that request. In addition, Document Request Nos. 28, 29 and 30 have not been addressed within the Proposed Order due to the fact that the transcript is unclear as to the Court's precise ruling. Plaintiffs propose to further address these at the next conference before the Court.

The following is a list of each of the paragraphs of the Proposed Order with the reference to Your Honor's rulings on October 11, 2005:

Paragraph 1 of the Proposed Production Order corresponds to Request No. 6. Request No. 6 was discussed on page 40, lines 21 through page 57, line 23. Your Honor granted this request on page 40, lines 24-25. This request was modified and is presently limited to persons identified within the Saudi Committee website and the summary sheets that have been provided to the Defendant.

Paragraph 2 of the Proposed Production Order corresponds to Request No. 7. Request No. 7 was discussed on page 57, lines 24 through page 72, line 19. Your Honor granted this request on page 66, lines 13-17, 20-21. This request was modified and is presently limited to documents related to the Saudi Committee.

Paragraph 3 of the Proposed Production Order corresponds to Request No. 8. Request No. 8 was discussed on page 41, lines 20 through page 57, line 23. Your Honor granted this request on page 48, lines 11-17.

Paragraph 4 of the Proposed Production Order corresponds to Request No. 10. Request No. 10 was discussed on page 73, lines 3 through page 83, line 25. Your Honor granted this request on page 79, lines 4-5.

Paragraph 5 of the Proposed Production Order corresponds to Request No. 11. Request No. 11 was discussed on page 84, lines 1-18. Your Honor granted this request on page 84, lines 1-2.

Paragraph 6 of the Proposed Production Order corresponds to Request No. 12. Request No. 12 was discussed on page 84, lines 19 through page 85 line 2. Your Honor granted this on page 84, line 25 through page 85, line 2.

Magistrate Judge Pohorelsky
December 12, 2005
Page 3

Paragraph 7 of the Proposed Production Order corresponds to Request No. 13. Request No. 13 was discussed on page 84, line 22 through page 85 line 2. Your Honor granted this request on page 85, line 2.

Paragraph 8 of the Proposed Production Order corresponds to Request No. 14. Request No. 14 was discussed on page 85, lines 3-18. Your Honor granted this request on page 85, lines 3-4 and 8-16.

Paragraph 9 of the Proposed Production Order corresponds to Request No. 15. Request No. 15 was discussed on page 85, lines 19 through page 86, line 8. Your Honor granted this request on page 86, line 8.

Paragraph 10 of the Proposed Production Order corresponds to Request No. 18. Request No. 18 was discussed on page 96, lines 11 through page 98 line 21. Your Honor granted this request on page 98, lines 10-19.

Paragraph 11 of the Proposed Production Order corresponds to Request No. 19. Request No. 19 was discussed on page 98, lines 22 through page 109, line 22. Your Honor granted this request on pages 108, lines 12-13, and on page 109, lines 9-13. This request was modified and is presently limited to the specific information which the court ordered produced.

Paragraph 12 of the Proposed Production Order corresponds to Request No. 20. Request No. 20 was discussed on page 109, lines 23 through page 111, line 17. Your Honor granted this request on page 111, lines 2-17. This request was modified and is presently limited to the specific information which the court ordered produced.

Paragraph 13 of the Proposed Production Order corresponds to Request No. 21. Request No. 21 was discussed on page 111, lines 18 through page 115, line 1. Your Honor granted this request on page 114, lines 10-18.

Paragraph 14 of the Proposed Production Order corresponds to Request No. 22. Request No. 22 was discussed on page 115, lines 2 through page 117, line 11. Your Honor granted this request on page 116, lines 9-10, and on page 117, lines 8-11.[1]

Paragraph 15 of the Proposed Production Order corresponds to Request No. 23. Request No. 23 was discussed on page 117, lines 12 through page 126, line 6. Your Honor granted this request on page 126, lines 4-6.

Paragraph 16 of the Proposed Production Order corresponds to Request No. 25. Request No. 25 was discussed on page 126, lines 15 through page 132, line 25. This Request

---

[1] The original document request contained a typographical error. It should have referenced Plaintiffs' First Document Request 19, but incorrectly referenced Request No. 18. The Proposed Order corrects the error.

Magistrate Judge Pohorelsky
December 12, 2005
Page 4

referenced the prior requests 17, 21 and 23. Your Honor granted Request No. 25 on page 132, lines 1-3.[2]

Paragraph 17 of the Proposed Production Order corresponds to Request No. 26. Request No. 26 was discussed on page 133, lines 1 through page 136, line 11. Your Honor granted this request on page 136, lines 7-11.

Paragraph 18 of the Proposed Production Order corresponds to Request No. 31. Request No. 31 was discussed on page 139, lines 20 through page 140, line 11. Defendant's counsel agreed to produce these documents on page 140, line 10.

Paragraph 19 of the Proposed Production Order corresponds to Request No. 32. Request No. 32 was discussed on page 140, line 12 through page 142, line 9. Your Honor granted this request on page 140, line 25 through page 141, lines 2 and 9-13.

Under separate cover, Plaintiffs have provided a second Proposed Order addressing transactional documents which Arab Bank provided to the U.S. Treasury Department Office of the Comptroller of the Currency ("OCC") and Financial Crimes Enforcement Network of the U.S Treasury Department ("FinCen"). Since Your Honor reserved judgment and did not definitively rule on this issue, we have separated this issue from the first (attached) Proposed Order which encompasses requests which the Court has already ruled upon.

Plaintiffs believe the enclosed Proposed Order accurately reflects the Court's rulings on October 11, 2005, and therefore respectfully request that Your Honor enter the Order. In addition, since more than two (2) months have elapsed since the last conference with Your Honor and Plaintiffs, as noted above, wish to obtain a further ruling on several of the Document Requests not addressed in the enclosed Proposed Order, we respectfully request that Your Honor schedule another discovery conference at the Court's earliest convenience.

Respectfully submitted,

Gary M. Osen

GMO/je

Encls.

cc: All Counsel on Service List

---

[2] Request No. 17 was granted. See Transcript on page 96, lines 8-10. Request Nos. 21 and 23 have also been addressed above. Your Honor limited the scope of the request to Specially Designated Global Terrorists (which are listed in the Proposed Order).

## SERVICE LIST

Kevin Walsh, Esq.
(kwalsh@llgm.com)
Randall M. Fox, Esq.
(rmfox@llgm.com)
LEBOUEF, LAMB, GREENE & MACRAE LLP
125 West 55th Street
New York, N.Y. 10019
Telephone:  (212) 424-8000
Facsimile:  (212) 424-8500

Counsel for Defendant Arab Bank
**By Electronic Mail**

Robert A. Swift, Esq.
(rswift&kohnswift.com)
Steven M. Steingard, Esq.
(ssteingard@kohnswift.com)
KOHN SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone:  (215) 238-1700
Facsimile:  (215) 238-1968

Counsel for Linde & Coulter Plaintiffs
**By Electronic Mail**

Andrew D. Friedman, Esq.
(afriedman@whesq.com)
Joshua Glatter, Esq.
(jglatter@whesq.com)
WECHSLER HARWOOD LLP
488 Madison Avenue
New York, New York 10022
(212) 935-7400

Counsel for Linde & Coulter Plaintiffs
**By Electronic Mail**

John M. Eubanks, Esq.
(jeubanks@motleyrice.com)
Michael Elsner, Esq.
(melsner@motleyrice.com)
Justin Kaplan, Esq.
(jkaplan@motleyrice.com)

MOTLEY RICE LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mt. Pleasant, SC 29465
Telephone  (843) 216-9000
Facsimile  (843) 216-9450

Counsel for Almog and Afriat-Kurtzer Plaintiffs
**By Electronic Mail**

Alan Gerson, Esq.
(gerson@gilgintl.org)
2131 S. Street
Washington, D.C. 20008
Telephone:  (202) 966-8557
Facsimile:  (202)

Counsel for Almog Plaintiffs
**By Electronic Mail**

Lee S. Shalov, Esq.
(lshalov@lawssb.com)
James P. Bonner, Esq.
(jbonner@lawssb.com)
SHALOV, STONE & BONNER LLP
485 Seventh Avenue
Suite 1000
New York, N.Y. 10018
Telephone:  (212) 239-4340
Facsimile:  (212) 239-4310

Counsel for Litle Plaintiffs
**By Electronic Mail**

Mark S. Werbner, Esq.
(mwerbner@swtriallaw.com)
SAYLES WERBNER P.C.
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
Telephone:  (214) 939-8711
Facsimile:  (214) 939-8787
Counsel for Litle Plaintiffs
**By Electronic Mail**

2

Steven R. Perles, Esq.
(sperles@perleslaw.com)
Edward MaCallister, Esq.
(emacallister@perleslaw.com)
PERLES LAW FIRM, P.C.
1615 New Hampshire Avenue, Suite 200
Washington, D.C. 20009
Telephone: (202) 745-1300
Facsimile: (202) 745-1858

Counsel for Litle Plaintiffs
**By Electronic Mail**

Richard D. Heideman, Esq.
(rheideman@hlnklaw.com)
Tracey Reichman Kalik, Esq.
(trkalik@hlnklaw.com)
Noel J. Nudelman, Esq.
(njnudelman@hlnklaw.com)
HEIDEMAN LEZELL NUDELMAN & KALIK, P.C.
1146 19th Street, NW
Fifth Floor
Washington, D.C. 20036
Telephone:    (202) 463-1818
Facsimile:    (202) 463-2999

Counsel for Litle Plaintiffs
**By Electronic Mail**

3

# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

COURTNEY LINDE, et al.                      :
                                            :          Case No. CV 04 2799 (NG/VVP)
                        Plaintiff,          :
                                            :
        -against-                           :
                                            :
ARAB BANK, PLC,                             :
                                            :
                        Defendant.          :

---

PHILIP LITLE, et al.                        :
                                            :          Case No. CV 04 5499 (NG/VVP)
                        Plaintiff,          :
                                            :
        -against-                           :
                                            :
ARAB BANK, PLC,                             :
                                            :
                        Defendant.          :

---

ORAN ALMOG, et al.                          :
                                            :          Case No. CV 04 5564 (NG/VVP)
                        Plaintiff,          :
                                            :
        -against-                           :
                                            :
ARAB BANK, PLC,                             :
                                            :
                        Defendant.          :

---

ROBERT L. COULTER, SR.                      :
FOR THE ESTATE OF JANIS                     :          Case No. CV 05 365 (NG/VVP)
RUTH COULTER, et al.                        :
                                            :
                        Plaintiff,          :
                                            :
        -against-                           :
                                            :
ARAB BANK, PLC,                             :
                                            :
                        Defendant.          :

---

GILA AFRIAT-KURTZER, et al.          :
                                     :          Case No. CV 05 388 (NG/VVP)
                    Plaintiff,       :
                                     :
      -against-                      :
                                     :
ARAB BANK, PLC,                      :
                                     :
                    Defendant.       :
_____
MICHAEL BENNETT, et al.              :
                                     :          Case No. CV 05 3183 (NG/VVP)
                    Plaintiff,       :
                                     :
      -against-                      :
                                     :
ARAB BANK, PLC,                      :
                                     :
                    Defendant.       :
_____
ARNOLD ROTH, et al.                  :
                                     :          Case No. CV 05 3738 (NG/VVP)
      Plaintiff,                     :
                                     :
      -against-                      :
                                     :
ARAB BANK, PLC,                      :
                                     :
                    Defendant.       :
_____

## PROPOSED DOCUMENT PRODUCTION ORDER

After fully reviewing Plaintiffs' First Request for the Production of Documents with both

Plaintiffs and Defendant on October 11, 2005, and in accordance with the rulings made on

October 11, 2005, IT IS HEREBY ORDERED THAT:

1.      Defendant shall produce all documents which refer or relate to payments made

through Arab Bank by or on behalf of the Saudi Committee for the Support of the Intifada Al

Quds ("Saudi Committee") -- or that were otherwise identified on the Saudi Committee website

2

or other lists or summary sheets provided by the Plaintiffs to the Defendant -- to the families or representatives of all persons, including Palestinians in Israeli custody, martyrs and suicide bombers, killed as a result of injuries sustained in any of the incidents that are alleged to have resulted in the injuries or deaths of plaintiffs described in the Linde (CV 04 2799), Litle (CV 04 5449), Almog (CV 04 5564), Coulter (CV 05 365) and Afriat-Kurtzer (CV 05 388) complaints, including, but not limited to, documents which identify account numbers for the accounts from which such funds were disbursed; account numbers for the accounts to which such funds were disbursed; the persons or entities that opened such accounts; the persons or entities in whose name such accounts were opened; the amounts which were disbursed and the dates of such disbursements; the wiring or other transfer of funds between such accounts; the identity of Arab Bank employees with knowledge of such disbursements; and with respect to the accounts which were the source of funds disbursed to such families, all documents which identify the manner in which such funds were deposited into the Arab Bank accounts prior to disbursement to such families, including but not limited to documents which describe or reflect account opening procedures or required documentation, identify the source of such funds, the depositor of such funds, the date of such deposits; the wiring of such funds; or the identity of Arab Bank employees with knowledge of such deposits. **(Plaintiffs' First Request No. 6)**

2. Defendant shall produce all documents which refer or relate to payments made by or on behalf of the Saudi Committee through Arab Bank to the families of or representatives of all persons, including so-called martyrs or Shuhada as defined in Plaintiffs' First Document Request, killed as a result of injuries sustained during the Second Intifada, including, but not limited to, documents which identify account numbers for the accounts from which such funds were disbursed; account numbers for the accounts to which such funds were disbursed; the

persons or entities that opened such accounts; the persons or entities in whose name such accounts were opened; the amounts which were disbursed and the dates of such disbursements; the wiring or other transfer of funds between such accounts; receipts or other confirmations of a payment; the identity of Arab Bank employees with knowledge of such disbursements; and with respect to the accounts which were the source of funds disbursed to such families, all documents which identify the manner in which such funds were deposited into such accounts prior to disbursement to such families, including but not limited to documents which identify the source of such funds; the depositor of such funds; the date of such deposits; the wiring of such funds; the amount to be disbursed or paid; or the identity of Arab Bank employees with knowledge of such deposits. **(Request No. 7)**

3.      All documents which refer or relate to accounts maintained at Arab Bank by the families of the persons set forth in Plaintiffs' First Document Request No. 8, including but not limited to any documents identifying any account that received disbursements, directly or indirectly, from the Saudi Committee, HAMAS, or PIJ; the source of such disbursements; the account numbers for the source of such disbursements; the date of such disbursements; the identity of Arab Bank employees with knowledge of such disbursements and all documents which refer or relate to the payment of said disbursements, including, but not limited to, receipts issued by Arab Bank to account holders, death certificates, photographic identification and certificates of martyrdom for the individuals indicated in Plaintiffs' First Document Request No. 8. **(Request No. 8)**

4.      Defendant shall produce all documents which refer or relate to accounts maintained at Arab Bank in the name of or for the benefit of the following organizations, including but not limited to documents identifying account numbers of such accounts,

4

individuals or entities that opened such accounts, and the deposit of funds into and disbursement

of funds out of such accounts; the source of funds deposited into such accounts and the recipients

of funds disbursed from such accounts; the identity of Arab Bank employees with knowledge of

such accounts; and all correspondence between Arab Bank and such organization:

    a.    Palestinian Islamic Jihad;

    b.    HAMAS;

    c.    Popular Front for the Liberation of Palestine;

    d.    Al Aqsa Martyrs Brigade

    e.    Fatah/Tanzim;

    f.    Force 17;

    g.    Popular Resistance Committees; and

    h.    Union of Good a/k/a Al-Tadhamun or I'tilaf al-Khayr, including but not
          limited to Arab Bank account #002850/811/9 at the Beirut, Lebanon
          branch

**(Request 10)**

    5.    Defendant shall produce all documents which refer or relate to the announcement

by Arab Bank on or about October 7, 2000, that it would make donations to Palestinians injured

in the Second Intifada. **(Request 11)**

    6.    Defendant shall produce all documents which refer or relate to accounts

maintained at Arab Bank in the name of or for the benefit of the Saudi Committee, including but

not limited to documents identifying account numbers of such accounts, individuals or entities

that opened such accounts, and the deposit of funds into and disbursement of funds out of such

accounts; the source of funds deposited into such accounts and the recipients of funds disbursed

from such accounts; all correspondence between Arab Bank and the Saudi Committee; all

5

transactions initiated with Arab Bank by Arab National Bank or the Islamic Development Bank or National Commercial Bank on behalf of the Saudi Committee; and the identity of Arab Bank employees with knowledge of such accounts and transactions. **(Request 12)**

    7.    Defendant shall produce all documents which refer or relate to efforts by Arab Bank to aid, implement or administer programs of the Saudi Committee designed to provide payments to the families of individuals, including Palestinians in Israeli custody, martyrs and suicide bombers, killed or injured during the Second Intifada and the identity of Arab Bank employees with knowledge of such efforts. **(Request 13)**

    8.    Defendant shall produce all documents which refer or relate to listings or databases provided to or maintained by Arab Bank containing the names of Palestinians in Israeli custody, martyrs, suicide bombers or other persons killed or injured during the Second Intifada, the dates and manner of death, payments made to the families of such persons and Arab Bank contacts with the Saudi Committee and/or HAMAS regarding such listings and databases, including, but not limited to documents which identify Arab Bank employees with knowledge of such listings and databases. **(Request 14)**

    9.    Defendant shall produce all documents which refer or relate to Arab Bank's receipt of certifications by the Palestinian Authority provided to families of Palestinians in Israeli custody, martyrs, suicide bombers and/or other persons killed or injured during the Second Intifada which make such families eligible to receive payments through Arab Bank and receipts issued to such families confirming such payments, including documents which identify Arab Bank employees with knowledge of such certifications and receipts. **(Request 15)**

    10.    With respect to the advertisements and the information contained therein previously produced to the Defendant and identified as Bates numbers L_C001906, L_C001907

6

and L_C001908, Defendant shall produce all documents which refer or relate to payments made through Arab Bank, including but not limited to, account numbers for accounts receiving such payments; the source of funds used in such payments; the identity of recipients of such payments; and the identity of Arab Bank employees with knowledge of such payments. **(Request 18)**

11.    Defendant shall produce all documents which constitute account opening records, documents relating to authority over the accounts, signature authority over the accounts, and documents identifying account numbers pertaining to the organizations identified in Plaintiffs' First Document Request No. 19.

12.    Defendant shall produce all documents which constitute account opening records, documents relating to authority over the accounts, documents indicating signature authority over the accounts, and documents identifying account numbers pertaining to the accounts identified in Plaintiffs' First Document Request No. 20.

13.    With respect to the organizations set forth below, Defendant shall produce all documents which refer or relate to accounts maintained at Arab Bank in the name of or for the benefit of such organizations, including but not limited to documents identifying account numbers of such accounts, individuals or entities that opened such accounts, and the deposit of funds into and disbursement of funds out of such accounts; the source of funds deposited into such accounts and the recipients of funds disbursed from such accounts; the identity of Arab Bank employees with knowledge of such accounts and correspondence between Arab Bank and such organizations:

> a.    Al-Ihsan Charitable Society;
> b.    Dar al-Huda Society; and
> c.    Islamic An-Naqqa Society for Women, Bethlehem

7

**(Request 21)**

14.     Defendant shall produce all documents which refer or relate to listings or databases provided to Arab Bank by the Al-Ansar Charitable Society or any other entity identified in Document Request 19 above or by the Saudi Committee containing the names of suicide bombers, martyrs, or other persons killed during the Second Intifada, the dates and manner of death, payments made to the families of such persons and Arab Bank contacts with the Al-Ansar Charitable Society or any other entity identified in Document Request 19 above regarding such listings and databases, including, but not limited to documents which identify Arab Bank employees with knowledge of such listings and database. **(Request 22)**

15.     With respect to the organizations set forth below, Defendant shall produce all documents which refer or relate to accounts maintained at Arab Bank in the name of or for the benefit of such organizations, including but not limited to documents identifying account numbers of such accounts, individuals or entities that opened such accounts, and the deposit of funds into and disbursement of funds out of such accounts; the source of funds deposited into such accounts and the recipients of funds disbursed from such accounts; the identity of Arab Bank employees with knowledge of such accounts; and correspondence between Arab Bank and such organizations and correspondence between the bank and these entities:

    a.    The Association de Secours Palestinien (ASP);
    b.    Commite de Bienfaisance et de Secours aux Palestiniens (CBSP);
    c.    Palestinian Association in Austria;
    d.    Holy Land Foundation For Relief and Development;
    e.    Palestinians Relief and Development Fund (Interpal);
    f.    Union of Good a/ka Coalition of Benevolence a/k/a *A'atalef Al-Khir*; and
    g.    Al-Aqsa Charitable Foundation (Germany, Belgium, Denmark, and the Netherlands)

**(Request 23)**

8

16.     Defendant shall produce all documents referring or relating to wire transfers to or

from accounts at the New York Branch of Arab Bank to or from foreign accounts of the

following Specially Designated Global Terrorists:

        a. .   The Association de Secours Palestinien (ASP);

        b.    Commite de Bienfaisance et de Secours aux Palestiniens (CBSP);

        c.    Palestinian Association in Austria;

        d.    Holy Land Foundation For Relief and Development;

        e.    Palestinians Relief and Development Fund (Interpal);

        f.    Al-Aqsa Charitable Foundation (Germany, Belgium, Denmark, and the Netherlands)

        g.    HAMAS via its alleged account at the Al-Mazra branch in Beirut, Lebanon, Account # 3-810-622473-0330

        h.    Al-Ahsan Charitable Organization (a.k.a. al-ihsan charitable society; a.k.a. elehssan society; a.k.a. ihsan charity).

**(Request 25)**

17.     Defendant shall produce all documents which refer or relate to the documents

attached as exhibits D-W to the Declaration of Rachel Ehrenfeld Ph.D. in support of the Order

to Show Cause and Motion for Preliminary Injunction executed October 4, 2004 and the Arab

Bank Accounts described and identified in the documents attached as Exhibits 1 and 2 to the

Supplemental Declaration of Rachel Ehrenfeld PhD in Support of Motion for a Preliminary

Injunction executed November 3, 2004 in the Linde action. **(Request 26)**

18.     Defendant shall produce all documents that refer or relate to any meetings

between officers, directors or employees of Arab Bank and officers, directors or employees of

the Saudi Committee. **(Request 31)**

19.     Defendant shall produce all documents concerning any formal or informal

document retention policy maintained by Arab Bank, any Arab Bank branch, or any Arab Bank

subsidiary or affiliate in any jurisdiction from which Arab Bank is obligated to produce

documents. **(Request 32)**

SO ORDERED:

_____
VIKTOR V. POHORLESKY
United States Magistrate Judge

Dated:

# Exhibit B

```
00001
  1   ---------------------------X    Docket#
      IN THE MATTER OF:          :    04-cv-2799(NG)(VVP)
  2                              :    04-cv-5449(NG)(VVP)
                                 :    04-cv-5564(NG)(VVP)
  3                              :    05-cv-365 (NG)(VVP)
      ARAB BANK, PLC.,           :
  4                              :    U.S. Courthouse
                                 :    Brooklyn, New York
  5                              :
                                 :    October 11, 2005
  6   ---------------------------X
            TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
  7        BEFORE THE HONORABLE VIKTOR V. POHORELSKY
              UNITED STATES MAGISTRATE JUDGE
  8   A    P    P    E    A    R    A    N    C    E    S:
      For Plaintiff Linde
  9   and Coulter:              Robert Swift, Esq.
                                Gary Osen, Esq.
 10                             Steven Steingard, Esq.
      For Plaintiff Litle:      Mark Werbner, Esq.
 11                             James Bonner, Esq.
                                Noah Nudelman, Esq.
 12   For Plaintiff Almog
      and Afriat-Kurtzer:       Michael Elsner, Esq.
 13                             Justin Kaplan, Esq.

 14   For the Defendant:        Steven Young, Esq.

 15                             Randall Fox, Esq.

 16                             Leah Campbell, Esq.

 17                             Kevin Walsh, Esq.

 18   Official Transcriber:     Rosalie Lombardi

 19                                   L.F.

 20   Transcription Service:    Transcription Plus II

 21                             823 Whittier Avenue

 22                             New Hyde Park, N.Y.  11040

 23                             (516) 358-7352

 24   Proceedings recorded by electronic sound-recording,

 25   transcript produced by transcription service
```

00002

 1           THE CLERK:  Civil Cause for a Status Conference

 2    in 04-cv-2799, Linde v. Arab Bank, 04-cv-5449, Litle v.

 3    Arab Bank, 04-cv-5564, Almog v. Arab Bank, 05-cv-365,

 4    Coulter v. Arab Bank and 05-cv-388, Afriat-Kurtzer.

 5           Magistrate Judge Viktor Pohorelsky provided.

 6           THE COURT:  Good morning, please be seated.  Do

 7    you have a sign in sheet?  We do have a sign in sheet.

 8    Okay, good.  Thank you.

 9           So, Judge Gershon has decided some of the

10    issues here and so that assists, I think, now in working

11    on what the scope of discovery is.  Let me address just a

12    couple of housekeeping matters.

13           First of all, there's a motion to withdraw that

14    was made by Winston and Strawn and I take it there's not

15    any objection to that.  So, I am going to grant that

16    motion and LeBouf, Lamb has already entered a notice of

17    appearance and I don't think the lawyers changed, it's

18    just the firm changed; right?  Am I right bout that?

19           MR. WALSH:  That's correct, your Honor.

20           THE COURT:  Okay.  Then there was a stipulation

21    to adjourn defendant's time to answer complaints in, it

22    looks like two of the cases.  Yes, I guess I need to so

23    order this and I guess I'll do that.  It was adjourned

24    until September 30.  So, it's sort of nunc pro tunc;

25    right?

00003

1             I also note that Judge Gershon referred to a

2   couple of more cases that were filed; Bennett, I think

3   was one of them she refers to.

4             MR. WERBNER:     And Roth.

5             THE COURT:  And Roth; right.  I presume those

6   have been assigned to me; am I right about that, along

7   with Judge Gershon obviously.

8             MR. WERBNER:  That's a yes, your Honor.  That

9   they were (inaudible).

10            THE COURT:  Is anybody here on those cases?

11            MR. WERBNER:  I am, your Honor.  I am the

12  lawyer in those two cases.

13            THE COURT:  Oh, you are?

14            MR. WERBNER:    Yes, sir.

15            THE COURT:  Okay.

16            MR. WERBNER:    Those are just stand alone, one

17  family but they really for all practical purposes are

18  part of the Litle case.

19            THE COURT:  Okay.  And you are Mr. Werbner?

20            MR. BENNETT:  Mark Werbner.

21            THE COURT:  Mark Werbner.  Okay.

22            So, let me get to the main issues.  I have

23  three items on the agenda; one is the motion to

24  reconsider previous discovery rulings in light of

25  Judge Gershon's decision, one is a motion regarding the

00004

1   Litle plaintiff's recent -- I guess second round of

2   interrogatories and document requests and the third is a

3   motion to appoint lead counsel.

4            I haven't studied the complaints but

5   Judge Gershon's opinion does seem to suggest, at least,

6   that -- I don't remember the specific -- I don't have

7   them in front of me.  I don't know if maybe they were an

8   attachment, the first round of discovery requests made by

9   the plaintiffs.  Are they attached to one of your -- I

10  tend to throw away paper once I've -- you know, so

11           MR. SWIFT:  We'll try to locate one for you,

12  your Honor.

13           THE COURT:  But basically, the plaintiffs are

14  now taking the position that everything that they asked

15  for at the outset given Judge Gershon's ruling -- if you

16  have a copy of it.

17           MR. SWIFT:  Yes, sir.  That contains the

18  responses and objections, as well.

19           THE COURT:  Thank you -- is fair game.  I tend

20  to agree but I will hear what the defendants have to say

21  about that.  I mean, in essence, as I understand it,

22  you're basically saying you're entitled to everything

23  that the Saudi Committee -- you're entitled to see

24  everything that the Saudi Committee has done regardless

25  of whether it's tied to a specific act of terrorism.

00005

1          MR. SWIFT:  Well, I believe it's a little

2    broader than that, your Honor.

3          THE CLERK:  Counsel, I am sorry, can everybody

4    just briefly state their name for us before they start

5    speaking, just so we can get this transcribed, that we --

6    you know, for the court reporter.

7          MR. SWIFT:  My name is Bob Swift.  I'm with

8    Kohn, Swift & Graf.  Steve Steingard is with me and we're

9    counsel, together with some other lawyers in the room, in

10   the Linde and Coulter cases.  And other counsel will

11   introduce themselves when they speak.

12         Your Honor, I wanted to address Judge Gershon's

13   opinion because I believe that, you know, she eviscerates

14   the objections that are based on relevancy over threat

15   and ambiguity that had been made by the defendant in this

16   case.  And she made, I think very broad statements that

17   are just black and white case law with regard to the

18   sufficiency of the allegations we've made, the secondary

19   theories of aiding and abetting, conspiracy, the common

20   claim, and she even found relevance to the documents that

21   are part of the OCC probe.  That is, she found evidence

22   of failure to report due to --

23         THE COURT:  I thought she struck those claims.

24         MR. SWIFT:  She struck the claim but she's

25   found on page 13 of the West Law version, the bottom of

00006

1   the --

2               THE COURT:  As opposed to her own version, you

3   mean?  I mean, confused.  I have a copy of her opinion.

4               MR. SWIFT:  Right.

5               THE COURT:  Is there something different in the

6   version published out of West Law?

7               MR. SWIFT:  No, it's not --

8               THE COURT:  Oh, I see.  You just --

9               MR. SWIFT:  It's not different.

10              THE COURT:  It's page 13, using the -- okay.

11              MR. SWIFT:  I was just trying to draw your

12  attention.  And she says and I quote, "I note, however,

13  that plaintiffs claim that the bank provided material

14  support to a designated FTO found in Count Four of all

15  three complaints, which does constitute of international

16  terrorism may be shown to a variety of evidentiary means

17  which may include proof of violations of the requirements

18  regarding retention and reporting of FTO funds."

19              I believe what she is saying there is that

20  discovery as to that is highly relevant to foreign

21  terrorist organization.  It's a designation made by an

22  agency of the government which has very severe

23  consequences for organizations and banks, I might add.

24              So, but your Honor I believe in your earlier

25  rulings were quite careful.  In your August 23 ruling,

00007

1  you had said that you thought the first document requests

2  were over broad.  But you also said --

3          THE COURT:  I thought I said that even earlier

4  than August 23.

5          MR. SWIFT:  You may have.

6          MR. WERBNER:  The first time we were here.

7          THE COURT:  That's what I thought.

8          MR. SWIFT:  You may have but that was, you

9  know, specifically explicitly premised on the fact that

10  you hadn't gotten any guidance from the district court

11  judge with regard to whether or not linkage is necessary

12  or not and you thought that linkage was.  Hence, you

13  divided discovery.

14          THE COURT:  I do remember that.

15          MR. SWIFT:  And I think it's now time to use

16  your Honor's own words, to go back and revisit that

17  because we believe that first of all, our first document

18  set was a consolidated set on behalf of all counsel.  We

19  believe it's highly relevant and central to the issues in

20  this case.  And her ruling, in effect, deals with

21  objections that are based on relevance, over breath and

22  ambiguity.  And that does leave some objection, for

23  example, privilege, but we haven't received a privilege

24  log.

25          So, what I am going to suggest and I think it's

00008

1   good for your Honor to understand this is that we would

2   like an order today compelling production of the

3   documents that are requested in our first document

4   request.

5          THE COURT:  Okay.  I figured that was going to

6   be your -- that's what I took from your papers.  But

7   notwithstanding that the -- I tend to agree that

8   Judge Gershon's opinion answered at least some of the

9   questions about the breath of discovery.

10          I still have to go back to the individual

11   requests and make an assessment based on that -- based on

12   the language of the request, it seems to me.  So, I had

13   one question though before I get to that.  Judge Gershon

14   limited her ruling because this is one of the arguments

15   that the defendants make, Judge Gershon's decision is

16   limited to the ATA, I think, as opposed to the other

17   statutory basis.

18          Do all the plaintiffs have ATA claims?

19          MALE ATTORNEY:  Yes, they do, your Honor.

20          THE COURT:  Okay.  So, as a practical matter,

21   then it doesn't matter -- that distinction is not one

22   that would effect discovery, it seems to me, for any of

23   the plaintiffs.  All right.  So, right now I am going to

24   just deal with one plaintiff at a time.

25          As I recall, there was one set of -- I mean,

00009

1  there was at least one request among the first set that

2  was okay, I thought; wasn't there?

3          MR. SWIFT:  Well, that's where there was a

4  linkage, your Honor and you --

5          THE COURT:  Now you listed a whole bunch of

6  specific individuals, I thought, that were okay, that I

7  said were okay.

8          MR. SWIFT:  That's right. And that's what you

9  regarded as phase one discovery.

10          THE COURT:  Right.

11          MR. SWIFT:  And the sad part of it is it that

12  we have yet to receive any transactional documents.

13          THE COURT:  I know.  You haven't gotten

14  anything yet.  Right.  And we'll focus on that a little

15  bit later, although there is a process underway by which

16  at least the foreign transactional documents which are

17  hopefully we're going to see what the position will be

18  of, you know, foreign governments as to the application

19  of foreign law -- I say foreign, those country's law on

20  the documents that are within their jurisdiction.

21          MR. SWIFT:  If I can interrupt, there's a very

22  narrow group of documents that are now in front of two

23  foreign jurisdictions, Jordan and the Palestinian

24  National Authority.  It's sometimes referred to as PNA,

25  sometimes PMA, whether it's the monetary authority or the

00010

 1   national authority.  That's what --

 2            THE COURT:  You say narrow, why is that?

 3            MR. SWIFT:  Well, it only involves eight

 4   documents.  There was a Lebanese document which has not

 5   yet been presented to Lebanon.  But again, these are, you

 6   know, ten documents out of what we believe are will be

 7   tens of thousands of documents that relate to these

 8   transactions.

 9            THE COURT:  You've confused me.  I was under

10   the impression that the banks -- the transactional

11   documents were actually over in those countries.  The

12   transactional documents reflecting the transactions from

13   the Saudi Committee to the various families of martyrs.

14            MR. SWIFT:  The answer is there are documents

15   in New York that we have requested.  There are documents

16   in --

17            THE COURT:  Understood.  Understood.  But I

18   understood the main transactional documents in terms of

19   actually providing the monetary support to the families

20   putting aside where the funds came from but, you know,

21   those transactional documents would have been in those

22   areas.  But you're saying there is only eight documents.

23            MR. SWIFT:  No, no, no.  What your Honor did at

24   the last hearing was you signed an order in effect

25   compelling and it was a form of order that would make it

00011

1   easier for the defendant to then submit to the foreign

2   authorities.  And we now have two decisions from the two

3   jurisdictions, neither of which appear to be final.

4              THE COURT:  Oh, okay.  I didn't know that.  So,

5   there's been a response to the order that I issued and

6   then it was certified by the Secretary of State?

7              MR. SWIFT:  If I could just --

8              THE COURT:  Yes.

9              MR. SWIFT:  -- tell you briefly.  In Jordan,

10  there was authorization was given by the banking

11  authority but there was an appeal by an individual.  Now

12  that's as to one document.

13             As to eight or nine documents in the

14  Palestinian authority, permission was denied.  And we --

15             THE COURT:  Permission was denied to provide

16  the documents?

17             MR. SWIFT:  That's correct.  But I want to

18  point out, foreign blocking statute, secrecy statutes

19  aren't a basis for a privilege.  They are a simply a

20  concern that the Court has to deal with.  And I believe

21  that will go on a separate track.

22             What has to happen here, I believe, is that we

23  need an order compelling documents, so that --

24             THE COURT:  Yes, I understand.  So that you can

25  set up what kind of remedy you're entitled to when they

00012

1  don't produce them or if they don't produce them.

2          MR. SWIFT:  Right.  And these --

3          THE COURT:  But it's more of a win than an if,

4  it seems to me.

5          MR. SWIFT:  And Mr. Steingard mentioned to me

6  that really I should be speaking in terms of accounts as

7  opposed to documents.  Because these documents do concern

8  specific accounts.

9          THE COURT:  The ones that the order that I

10  signed which was presented to the authorities there.

11  Okay.  So, now you've cleared that up because at that

12  point, we only had the names of certain number of

13  accounts, I presume, or as I recall.

14          MR. SWIFT:  Well --

15          THE COURT:  And that was what the order was

16  directed to; am I right about that?

17          MR. SWIFT:  That's correct.

18          THE COURT:  Okay.  Well, let me get back -- we

19  digressed a little bit.  I still have to go back, it

20  seems to me, and look at the requests that were made

21  before to see how they are effected by Judge Gershon's

22  opinion.  You take the greatest -- it seems to me, your

23  argument centers primarily on the notion of how one

24  establishes the secondary liability of the bank and the

25  intent and of the -- and you don't have to.

00013

1          MR. SWIFT:  There's also a primary liability.

2   But those primary and secondary --

3          THE COURT:  And secondary; okay.  But that's

4   what opens up in your estimation, I think, a much broader

5   range of documents.

6          MR. SWIFT:  Yes.

7          THE COURT:  Whether it goes as far as to open

8   up all the documents though in your first request is a

9   separate issue because I don't agree with the notion.

10  I'll hear from Mr. -- is it Walsh?

11         MR. WALSH:  Mr. Walsh, your Honor.

12         THE COURT:  Mr. Walsh about why, perhaps

13  Judge Gershon's opinion shouldn't be read that way but I

14  have to go back, it seems to me, and look at these

15  individual requests again in light of the opinion it

16  seems to me.

17         I must also say that, you know, I just wanted

18  to know what this -- I had to know that at least some of

19  the claims were going to survive.  I know you were very

20  confident they were but now that I know that the claims,

21  at least some of the claims are going to survive --

22         MR. SWIFT:  We -- just going back to the

23  transcript and your Honor was quite clear that you were

24  wait -- you said you were looking for some guidance and

25  for the time being, you were going to just focus on

00014

1 linkage.

2          THE COURT:  Are those transcripts filed?  They

3 were.

4          MR. SWIFT:  I don't know if it's filed.  It's

5 certainly --

6          THE COURT:  Okay.  Good.  I ought to probably

7 consult my own transcripts at some point.  But -- okay.

8          Mr. Walsh, why -- it does seem to me that

9 Judge Gershon's opinion opens this up.  It opens up a lot

10 of activity, certainly I would say at a minimum it seems

11 to me like the Saudi Committee's entire transactional

12 activity is fair game --

13          MR. WALSH:  Well, your Honor, you eluded --

14          THE COURT:  -- wherever it may have occurred, I

15 am talking about.

16          MR. WALSH:  -- a moment ago -- it may indeed be

17 the case, your Honor, that some what broader discovery

18 regarding the Saudi Committee's activity -- this court

19 initially contemplated as appropriate.

20          However, the plaintiff's first document demand

21 which I happen to have before me is some 34 pages long

22 and I don't think any of the plaintiff's counsel would

23 dispute that it calls for many documents other than those

24 relating to the Saudi Committee.

25          THE COURT:  Yes, I understand and having looked

00015

1   at it -- so, I am going to revisit the issue.  So, maybe

2   -- I don't know what the best way to do that is.  Maybe

3   it will help me to go -- maybe even just go item by item,

4   even today perhaps.

5          But it does seem to me like having given -- I'm

6   told by the plaintiffs that there has been decision now

7   by foreign authorities.  The Jordanian decision was that

8   they let you see things except for some --

9          MR. WALSH:  Yes, indeed.  I --

10         THE COURT:  -- one individual who is appealing

11  it.  And I presume it's one of the individual whose

12  account is effected.

13         MR. WALSH:  That's exactly right. I'm happy to

14  comment briefly on this, your Honor, because you've heard

15  from a number of counsel that the sad fact is that no

16  transactional records have been produced.

17         There's essentially one operative order of this

18  court.  It concerns one account in Jordan and eight

19  accounts in the Palestinian territories.  We have already

20  informed the plaintiffs that there are no responsive

21  documents concerning transactions that touch New York.

22  And we have applied to these two jurisdictions for

23  permission to release documents.

24         As your Honor may recall, you initially

25  directed that application process to be a joint one with

00016

```
 1   plaintiffs.  They chose not to participate.  We've
 2   pursued this on our own and it is proceeding with great
 3   expedition.  The ruling in Jordan as your Honor noted,
 4   permits the bank to disclose these documents but an
 5   appeal has been filed.  We're advised that both our
 6   initial application as an emergent matter to the Court of
 7   first instance was by appropriate procedure there ex
 8   parte.  And the appeal is an ex parte appeal.
 9           So, we will have more information as to whether
10   the Court of Appeals in Jordan wishes the further
11   submission from Arab Bank in the immediate future.  But
12   that is proceeding quickly because it was presented to
13   the Court of first instance as an emergent matter.
14           In the Palestinian territories, we similarly
15   have obtained a ruling from the Palestinian courts.  And
16   as your Honor noted, and as Mr. Swift remarked, that
17   ruling prohibits Arab Bank at the moment from producing
18   the documents that were the subject of your Honor's
19   order.
20           It is our intention to appeal that order
21   because it is our desire, as we've told this court from
22   the beginning, to procure the consent and permission of
23   these governing authorities and to allow the forces of
24   comity to obtain, so that Arab Bank need not be placed in
25   a position where it has to consider violation of the
```

00017

1   laws, especially to the extent they contain criminal

2   provisions of its home regulators.

3           THE COURT:  Okay.

4           MR. WALSH:  But that's proceeding quickly,

5   your Honor.  And we submit with regard to documents

6   abroad --

7           THE COURT:  Yes.

8           MR. WALSH:  -- that are the subject of this

9   court's order, it makes perfect good sense to allow the

10  process to play itself out.

11          THE COURT:  Okay.  I did want to get reminded

12  about, it is your position then that at least to the

13  discovery that was allowed so far, that you've provided

14  all documents that are in New York, that were -- in other

15  words, all documents in New York that were in the custody

16  of the bank in New York regarding --

17          MR. WALSH:  Regarding the nine accounts that

18  are the subject of your order.

19          THE COURT:  Regarding the accounts; right.

20          MR. WALSH:  That's correct, your Honor, and

21  we've advised the plaintiffs of that.

22          THE COURT:  But that's because you have none.

23          MR. WALSH:  Exactly.

24          THE COURT:  But you've said that unequivocally.

25          MR. WALSH:  Yes, that's been said in this court

00018

1  during the last status conference.

2            THE COURT:  All right.

3            MR. WALSH:  And I repeat it, your Honor.

4            THE COURT:  All right.  So, I've got vigorous

5  objection from Mr. Werbner here.  What's the story,

6  Mr. Werbner?  Are you disputing that Mr. Walsh has made

7  that representation or --

8            MR. WERBNER:  No, maybe I misunderstand but in

9  a document and in a phone call, I was told and counsel

10 was told that they have 73 -- that they used their Swift

11 computer system in New York to search by the period we

12 described regarding anything for the Saudi Committee and

13 that they had 73 hits.  And they stated that they would

14 provide those 73 --

15           THE COURT:  Wait.  But I didn't think I had

16 given -- I thought that I had limited --

17           MR. WERBNER:  Let me clarify.

18           THE COURT:  Okay.

19           MR. WERBNER:  What your order was in Jordan was

20 10 accounts or nine accounts but your order --

21           THE COURT:  No, it was one account in Jordan,

22 eight in Palestine.

23           MR. WERBNER:  Exactly.  But we had asked for

24 irrespective of that process as it was going, what do you

25 have in New York that relates to the Saudi Committee.

00019

1          THE COURT:  I know.  But I had said that they

2  didn't have to do that.

3          MR. WERBNER:  No, you didn't.  No, you didn't.

4  They responded and said we have 73 documents and we will

5  produce them.

6          MR. WALSH:  Your Honor, I think there's some --

7          THE COURT:  Now, I am really --

8          MR. WALSH:  There's some --

9          THE COURT:  Maybe I have to go back and look --

10  I probably should go back and look at my rulings. I just

11  thought --

12          MR. WALSH:  Your --

13          THE COURT:  I didn't think that I had opened up

14  all transactions of the Saudi Committee.

15          MR. WALSH:  You didn't.  May I take a stab at

16  this, your Honor?

17          MR. WERBNER:  You had --

18          THE COURT:  Wait, wait.  Let Mr. Werbner

19  finish.

20          MR. WALSH:  I'm sorry.

21          MR. WERBNER:  What we're discussing is whether

22  they produced them and whether any exists.  All I am

23  saying --

24          THE COURT:  No, no.  I'm talking of the

25  documents that -- where discovery was permitted, did they

00020

1   have any documents here?  And you're saying that I said

2   it was okay for them to produce the Saudi Committee

3   documents.

4           MR. WERBNER:  I don't know if you said that

5   they could or they couldn't.  All I am rising to say is

6   is that they told us they have 73 and that they were

7   willing to produce them to us.  And --

8           THE COURT:  Produce 73 documents relating to --

9           MR. WALSH:  Your Honor?

10          MR. WERBNER:  Well, let Mr. Walsh tell us.

11          THE COURT:  Okay.

12          MR. WALSH:  There's no question in my mind that

13  this court's order did not contemplate or direct Arab

14  Bank to produce the Saudi Committee records we have

15  identified in New York.  Of the nine accounts, we have

16  told this court --

17          THE COURT:  Okay.

18          MR. WALSH:  -- and we have told Mr. Werbner --

19          THE COURT:  I guess I will have to go back.  I

20  mean, so it's a question of understanding what I may have

21  ruled on earlier.

22          MR. WALSH:  May I finish, Mr. Werbner?

23          THE COURT:  Yes.

24          MR. WALSH:  I can assure your Honor that you

25  did not rule earlier that Arab Bank produce what it has

00021

1   now identified as 73 Saudi Committee transactions that

2   reside in New York.  It appears that Mr. Werbner is

3   referring to subsequent document demands made of Arab

4   Bank which your Honor permitted to be --

5           THE COURT:  Made.

6           MR. WALSH:  -- filed --

7           THE COURT:  Right.

8           MR. WALSH:  -- filed and permitted Arab Bank to

9   state its objections and whether responsive documents

10  exist.  There were subsequently within the past two weeks

11  a meet and confer session by telephone and we informed

12  Mr. Werbner and his co-counsel that we had identified in

13  New York 73 records of financial transactions that

14  touched the New York office, that were made at the

15  initial originating instruction of the Saudi Committee.

16          We told Mr. Werbner and his co-counsel that

17  those transactions did not end at an Arab Bank branch in

18  the Palestinian territories and that they were not

19  executed for the benefit of any of the long list of names

20  that that have been provided to us in their previous

21  document demands.

22          In fact, we asked Mr. Werbner who the 121

23  individuals on the plaintiff's list were and we haven't

24  been able to elicit a response in that regard.

25          So, what we have now offered to do, your Honor,

00022

1   in the spirit of cooperation with regard to later

2   document demands that are not the subject of this court's

3   outstanding order, is to provide these 73 transactional

4   records even though they appear to have no connection and

5   no relevance whatsoever to the allegations of plaintiffs

6   in these actions and even though plaintiffs have refused

7   to tell us after we have described the transactions, how

8   they might be relevant.  But we are willing now and offer

9   today, your Honor, to produce those 73 records.

10           THE COURT:  Okay.  So we don't need to talk

11  about it anymore, do we?

12           MR. WERBNER:  And I stand -- I wasn't saying

13  that you had -- I misspoke.  I wasn't saying that you had

14  ruled that we get them.  I was trying to say they've

15  agreed to provide them.  I don't dispute that -- we're in

16  agreement.

17           THE COURT:  Then we've wasted our time; haven't

18  we?

19           MR. WERBNER:  Yes.

20           THE COURT:  We've completely wasted our time.

21  I don't know why you're even arguing about it.

22           MR. WERBNER:  Right.

23           THE COURT:  I mean --

24           MR. WERBNER:  I'm not.

25           THE COURT:  But you are.

00023

1          MR. WERBNER:  No, because they --

2          THE COURT:  You're the one that rose and said -

3  - why don't you sit down.

4          MR. WERBNER:  Okay.

5          THE COURT:  I mean, I don't seem to get -- you

6  confuse me more than you help me, Mr. Werbner.  I am

7  sorry.  This is not the first time I've been more

8  confused after you talked than I am before you get

9  started.

10          MR. WERBNER:  Well, we haven't heard --

11          THE COURT:  I don't need to hear anymore,

12  please.  We've got a lot of work to do and you're wasting

13  my time.

14          I don't know whether it makes sense to go to

15  the second issue; that is, the specific document request.

16  I think I really need to go back to the first requests

17  and talk about those globally and then we'll see what's

18  left with respect to the second round.  So, I am willing

19  really to go through the document requests now and see

20  how they relate, you know, on grounds of relevance to the

21  claims that are now made.

22          How do the -- let's start with request number

23  one.  Why is this request at all likely to lead to

24  admissible evidence?  Just for the record, that's all

25  documents generated by Arab Bank which refer or relate to

00024

1  the closing, consideration of the closing or possibility

2  of the closing of the Arab Bank's New York branch.  Why

3  is that relevant to anything?

4            MR. STEINGARD:  Your Honor, I am Steven

5  Steingard.

6            THE COURT:  Okay.  You don't need to stand by

7  the way, gentlemen.

8            MR. STEINGARD:  Thank you.

9            THE COURT:  You can stay seated.

10            MR. STEINGARD:  Basically, again referring back

11  to what Judge Gershon said regarding the retention --

12  documents regarding retentions of records or regarding

13  reporting of FTO funds, et cetera, et cetera.  Our

14  position is to the extent that the closing arose as we

15  believe -- there was a big factor in this, that the

16  closing arose form the failure to comply with those

17  requirements.

18            THE COURT:  The branch has closed.

19            MR. STEINGARD:  The bank's on a limited

20  operation which Mr. Walsh and I can discuss what the

21  status is but it's changed its method of operating and we

22  -- well --

23            THE COURT:  Okay.  Tell me why documents

24  generated which refer or relate to the closing or

25  consideration of closing of the Arab Bank is --

00025

1          MR. STEINGARD:  Because we believe the change

2    in the bank's status occurred in part because of its

3    failure to comply with certain document retention and

4    reporting requirements and we want the documents that

5    relate to that.

6          THE COURT:  Okay.  Well, why is that relevant?

7          MR. STEINGARD:  It's relevant because the judge

8    has said that if you have not complied with certain

9    document retention records and reporting requirements --

10         THE COURT:  Well, that may be relevant but why

11   about whether --

12         MR. STEINGARD:  Because the documents from both

13   FCEN (phonetic) and the OCC that discuss these matters

14   reference a failure to meet those requirements.  And

15   that's why they're tied up.

16         The change in the bank's status occurred as a

17   consequence of its failure to meet certain reporting and

18   retention requirements.  Therefore, the documents that

19   relate to that, we believe we're entitled to.

20         THE COURT:  Why is that going to lead to

21   admissible evidence?

22         MR. STEINGARD:  It's going to lead to

23   admissible evidence because the Court has suggested, we

24   can demonstrate that there is a violation of the ATA if

25   the bank did not meet its requirement --

00026

1           THE COURT:  Fine.  If they didn't meet the

2  reporting requirements, that's fine.

3           MR. STEINGARD:  But the ten --

4           THE COURT:  But why then are discussions

5  relating to them closing the branch because they didn't

6  meet reporting requirements or because they may think

7  they may have not -- I mean, why isn't it good enough

8  that you show that they didn't meet reporting

9  requirements?

10          MR. STEINGARD:  Well, but I am saying documents

11 relating to -- a way of getting at those documents is to

12 ask -- the branch has changed its status as a result of

13 this, what documents od you have relating to the failure

14 to meet those requirements led to the closing or led to

15 the change in status.

16          THE COURT:  Okay.

17          MR. STEINGARD:  And that's what this request

18 essentially asks for.

19          THE COURT:  Mr. Walsh?

20          MR. WALSH:  Your Honor, we have touched at

21 length on this type of request in this court before.  We

22 respectfully submit that this is a fishing expedition of

23 the most grotesque sort.  You know, the OCC has asserted

24 its examination privilege in this matter.  And has

25 refused to produce to these plaintiffs documents.

00027

1          Now, I should note, your Honor, that what these

2     plaintiffs are required to prove is that Arab bank with

3     knowledge and intention chose to either conduct as a

4     primary actor or to facilitate as the secondary actor,

5     terrorist conduct and terrorist activity.  And in fact,

6     in her opinion, Judge Gershon notes:

7          "To the extent that plaintiffs have pled

8     reckless conduct, not even negligent, reckless conduct,

9     as well as knowledge, the allegations of recklessness do

10    not defeat their allegations of knowledge.  There is,

11    however, no statutory basis for plaintiff's argument that

12    recklessness would be sufficient to meet the statutory

13    requirements."

14          What these plaintiffs must prove is that Arab

15    Bank knowingly chose to provide material support to

16    terrorist.  What it did in the conduct of its regulatory

17    affairs has nothing whatsoever to do with the allegations

18    in these pleadings.  Moreover, the regulators with

19    responsibility for Arab Bank have asserted their

20    privilege, their examination privilege and have refused

21    to disclose such documents because it would be contrary

22    to the spirit of bank regulation.

23          THE COURT:  I --

24          MR. STEINGARD:  May I respond to that?

25          THE COURT:  Yes, I will let you respond to that

00028

1 because that is -- I found that somewhat significant that

2 the O --

3           MR. WALSH:  CC.

4           THE COURT:  -- CC refused your request.

5           MR. STEINGARD:  Well, actually that the OCC

6 said was much of what you want you can get from the bank

7 in discovery.  And we've limited, we've stayed away from

8 the privileged type of document in our request.  It's

9 made clear in the request that relate to that.  So, the

10 -- and again, when Mr. Walsh raises recklessness --

11           THE COURT:  When you say privilege, what do you

12 mean by privilege?

13           MR. STEINGARD:  Well, the bank examination

14 privilege is the one where there's some deliberative

15 process.  We've stayed clear of that stuff.  We've asked

16 for the underlying documents and --

17           THE COURT:  I guess I'll get to it.  Does --

18 you know, one of the concerns I have is if you say give

19 us everything that you gave the OCC, well then you are,

20 in essence, doing your -- you're doing what the OCC

21 doesn't want you to do.

22           MR. STEINGARD:  Well, that's --

23           THE COURT:  Because the OCC doesn't want to

24 give you those documents.  You can get those documents

25 perhaps by requests -- they don't ask for it that way but

00029

1  you can get them probably if you ask for them some other

2  way.

3          MR. STEINGARD:  The OCC has said that as to

4  privileged documents it was not going to produce them.

5  It said as to the others to go to the bank.  The bank has

6  produced nothing.

7          THE COURT:  Right.

8          MR. STEINGARD:  Because their documents --

9          THE COURT:  I understand the bank has produced

10 nothing.

11         MR. STEINGARD:  There are documents --

12         THE COURT:  You don't have to keep telling me

13 that.

14         MR. STEINGARD:  Well, the documents --

15         THE COURT:  I understand that.

16         MR. STEINGARD:  The documents underlie some of

17 the conclusions that the OCC may have reached but they're

18 the factual predicate upon whatever action they took.

19 And although Mr. Walsh wants to point us towards

20 recklessness, et cetera, he keeps ignoring what the judge

21 said which said that the bank -- proving that the bank

22 provided material support to a designated FTO may be

23 shown through a variety of evidentiary means which may

24 include proof of violations of the requirements regarding

25 retention and reporting of FTO funds.  And that's what

00030

1  we're seeking here.

2          THE COURT:  A violation of reporting

3  requirements; right.

4          MR. STEINGARD:  And that's what we're seeking

5  here.

6          MR. WALSH:  Your Honor?

7          THE COURT:  But wait a minute.  I mean, is

8  there a finding by the OCC that that happened?

9          MR. STEINGARD:  We have attached, I believe in

10  our letter -- I believe it's our letter of September 15

11  to your Honor.

12          THE COURT:  Is that the Kohn Swift?

13          MR. STEINGARD:  Yes.

14          THE COURT:  Okay.

15          MR. STEINGARD:  And there is the FCEN

16  assessment is one of the exhibits to that letter and it

17  outlines what the findings were.

18          THE COURT:  This is the -- you're going to have

19  to help me out by using the -- don't use your -- I know

20  that you're familiar with all of these things but I am

21  just not.

22          MR. STEINGARD:  Financial --

23          THE COURT:   FCEN, is that the Financial Crimes

24  Enforcement Network?

25          MR. STEINGARD:  Yes, that's right.

00031

1              THE COURT:  Okay.  Got it.  I have that here.

2      It's Exhibit C.

3              MR. STEINGARD:  Yes, and if you go through that

4      attachment --

5              THE COURT:  Okay.

6              MR. STEINGARD:  -- there are some

7      determinations that appear in it.  And it talks about

8      failure to meet the reporting and retention requirements.

9      It talks about the failure of internal controls, the

10     violations of the requirement to report suspicious

11     transactions.  And these are all the things that led to

12     the $24 million fine that was imposed and the change in

13     the status of Arab Bank's branch in New York City and we

14     think they're directly relevant to our case.

15             THE COURT:  The change in the status because

16     the Arab Bank chose to do something and alter its method

17     of operations because of it.

18             MR. STEINGARD:  By consent with the government.

19             MR. WALSH:  By consent, your Honor.

20             MR. STEINGARD:  By consent.  There was a

21     consent order.

22             MR. WALSH:  Your Honor, may I comment?

23             THE COURT:  Just a moment.  Let me just --

24             MR. STEINGARD:  May I just add one additional

25     note.  We had made it clear and although it appears in

00032

1    connection with request number five, that what we're

2    seeking is to exclude direct correspondence between the

3    OCC and Arab Bank which contains legal opinions or other

4    non-factual deliberative contents.  So, we've tried to

5    step outside any bank examination privilege concerns

6    here.

7              THE COURT:  Well, what explains OCC's desire

8    not to give you the information?

9              MR. STEINGARD:  Well, I believe that to the

10   extent it felt the privilege applied to certain things,

11   it declined to produce that documentation.

12             THE COURT:  But you're saying --

13             MR. STEINGARD:  But it told us to go

14   (inaudible).

15             THE COURT:  But put aside the privilege stuff.

16   I mean, let's say -- why don't they give you the others?

17   I mean, why -- what explains their mindset?

18             MR. WALSH:  May I --

19             THE COURT:  It seems to me, let's -- just so

20   that -- it seems to me that one of their concerns is that

21   the way they do business, the way they conduct their

22   investigations is something that they don't want to

23   disclose if they don't want -- you know, because then

24   that -- how they go about conducting their business then

25   to the extent that gets known by people out in the

00033

1   banking community is something that others can figure out

2   how to get around, let's put it that way.

3           MR. STEINGARD:  If I may, your Honor?

4           THE COURT:  So, it's a little bit like a work

5   product privilege, if you want to call it that.  Or it's

6   a law enforcement privilege, you know, to keep their

7   processes --

8           MR. STEINGARD:  Your Honor?

9           THE COURT:  -- their investigative processes

10  from --

11          MR. STEINGARD:  May I --

12          THE COURT:  -- general understanding.

13          MR. STEINGARD:  Mr. Elsner has dealt with that

14  issue on our behalf.

15          MR. ELSNER:  The documents can fall into two

16  categories; the work product -- the privileges that you

17  described.

18          THE COURT:  Just so for the record, can you

19  tell us who you are.

20          MR. ELSNER:  Michael Elsner --

21          THE COURT:  Thank you.

22          MR. ELSNER:  -- from Motley Rice --

23          THE COURT:  Yes, go ahead.

24          MR. ELSNER:  -- on behalf of the Almog

25  plaintiffs.

00034

1            The documents fairly fall within two

2  categories; those which are the deliberative process of

3  the OCC that notes their impressions.  We requested those

4  documents and they chose not to waive the privilege and

5  produce those documents.

6            THE COURT:  OCC?

7            MR. ELSNER:  Yes.

8            We also made requests for the factual

9  predicates, not the notes and impressions of the OCC but

10  the underlying factual documents --

11            THE COURT:  No, I understand.  You mean the

12  transactional documents for want of a better word.

13  Whatever they did submit in terms of reporting and what

14  kinds of transactional records there are that --

15            MR. ELSNER:  Right, and the OCC's --

16            THE COURT:  -- might fall into the categories

17  that the -- well, the ones that OCC asked to see.

18            MR. ELSNER:  And the OCC's factual

19  determinations based on those documents, not their notes

20  and impressions on how they came to those conclusions or

21  how whether they should come to this conclusion or not --

22            THE COURT:  The factual determinations.

23            MR. ELSNER:  Well, they issue reports.

24            THE COURT:  They issue reports.

25            MR. ELSNER:  They issue reports.

00035

 1              THE COURT:  And they didn't give you those

 2   reports.

 3              MR. ELSNER:  Correct.

 4              THE COURT:  This is their final report.

 5   Anything along the way, you want as well, though, because

 6   -- are you saying that's not covered by the privilege?

 7              MR. ELSNER:  And what the OCC said was is for

 8   those documents that don't fall within our deliberative

 9   process, the bank has admitted that they would produce

10   those documents in the regular course of discovery.  And

11   for that reason, you have an alternative means by which

12   to collect the documents.  And you don't need to acquire

13   them from us.

14              THE COURT:  You don't need to bother us for

15   them; is that what the deal is?

16              MR. ELSNER:  The bank said that it would

17   produce those documents and so you have a mechanism to

18   obtain the factual predicate documents.

19              THE COURT:  When you said the bank said or the

20   bank told them specifically?

21              MR. ELSNER:  The bank and it's -- well, in its

22   letters to the Court, and also in the letters to the OCC

23   stated that they would not object to the production of

24   documents on the basis of the OCC privilege to the extent

25   it relates specifically to the factual --

00036

```
 1              THE COURT:  Right.  Right.  But I don't --
 2              MR. WALSH:  Your Honor?
 3              THE COURT:  At the risk of -- I don't -- yes,
 4    Mr. Walsh?  All right, I get it.
 5              MR. WALSH:  I fear that there is confusion
 6    again being --
 7              THE COURT:  No, I think I understand what your
 8    position is.
 9              MR. WALSH:  Yes.
10              THE COURT:  And your position is look, if they
11    make other document requests that happen to ask for
12    documents that we happen to produce to the OCC, we're not
13    going to say, oh, well we produced them to the OCC.
14              MR. WALSH:  Exactly, your Honor.
15              THE COURT:  So, we're not going to produce them
16    to you.
17              MR. WALSH:  Exactly.
18              THE COURT:  But you don't want to, you know, go
19    and pick up whatever -- wherever that pile of documents
20    is, you just take that pile of -- the OCC documents and
21    now turn them over to these guys.
22              MR. WALSH:  Exactly.
23              THE COURT:  And I guess I've got to figure out
24    why that's not likely -- you know, I guess I have to
25    familiarize myself with these findings here.
```

00037

1           MR. WALSH:  Your Honor, would it be helpful if

2    the parties make -- there are obviously 34 pages of this.

3    Would it be helpful if the parties made a written

4    submission to you in light of the Gershon opinion?

5           THE COURT:  I don't know.  Let me spend some

6    time right now.  Maybe I will get tired and get to the

7    point where I can't take any more information in and then

8    I'll say yes, you're going to have to write to me. But --

9           MR. ELSNER:  Your Honor, would it help for me

10   to describe what the OCC process was and what they were

11   examining?

12          THE COURT:  If you could do it in about two

13   minutes but my guess is they asked for documents.

14          MR. ELSNER:  Well, OCC --

15          THE COURT:  They looked at documents and said -

16   -

17          MR. ELSNER:  The Acting Controller of the

18   Currency testified before Congress that --

19          THE COURT:  As to Arab Bank?

20          MR. ELSNER:  As to Arab Bank.  That "Related to

21   its examination of the bank, we determined that the

22   branch did not have adequate systems and controls in

23   place to monitor international wire transactions despite

24   the high risk nature of that activity."

25          She goes on to state that, "During the course

00038

1  of our work, in order to test the branch's system, the

2  OCC compiled a list of individuals and entities with the

3  same or similar names as reputed terrorists or terrorists

4  organizations using publicly available information from

5  sources such as criminal indictments, testimony before

6  congressional committees and media reports.  And then the

7  OCC ran that list against the bank's system and they

8  described the process as extraordinarily challenging

9  giving the huge number of wire transfer transactions

10 processed in the branch on a daily basis -- this is the

11 New York branch -- and significant language barriers.

12 Nevertheless, our review disclosed that the bank had

13 handled hundreds of suspicious wire transactions

14 involving individuals and entities with the same or

15 similar names as suspected terrorists and terrorists

16 organizations and that many of these individuals and

17 entities were customers of Arab Bank or its affiliates."

18            THE COURT:  And did they disclose that list --

19            MR. ELSNER:  No.

20            THE COURT:  -- to Congress?

21            MR. ELSNER:  They did not.  They did not.

22            MR. WALSH:  Your Honor, the official position

23 of the OCC is before this court and it is unequivocal.

24 We have submitted it to your Honor.

25            THE COURT:  Where is it?

00039

1          MR. WALSH:  It has been submitted at about the

2    time it was received some months ago and we're happy to

3    provide it again.  But notwithstanding comments that may

4    have been made in congressional testimony, there's no

5    question that the OCC's lawyers do not want this process

6    to be invaded.  And they're quite explicit about that in

7    their official response.

8          It is attached, your Honor, to our letter to

9    the Court, Mr. Fox's, dated September 23.  And we

10   respectfully submit, your Honor, that rather than hearing

11   Mr. Elsner's characterization of all of this, with which

12   we strenuously disagree --

13         THE COURT:  I ought to go to the source; right?

14   I think you're right.

15         MR. ELSNER:  I was just reading from the

16   testimony of the OCC.

17         MR. WALSH:  Well, I suggest you read the

18   letter, Mr. --

19         THE COURT:  Okay, gentlemen; please.  I know

20   where -- you've pointed out where to look.  I will look

21   at that.

22         Let's look at request number two.  All

23   documents that identify Arab Bank assets and equity in

24   the United States from a certain point, I guess

25   commensurate with the action to the present.

00040

1            MR. WALSH:  Your Honor?

2            MR. STEINGARD:  We haven't particularly pressed

3   that one at this time.

4            THE COURT:  All right.  So, that's --

5            MR. STEINGARD:  We're not conceding anything.

6            THE COURT:  You're not going to say it's never

7   going to be relevant.

8            MR. STEINGARD:  Yes, sir.

9            THE COURT:  But right now, that seems to be --

10  all right.

11           MR. STEINGARD:  And that would also be true of

12  number three and number four.

13           THE COURT:  Now we're getting somewhere; okay.

14  Number five, just give me a second.

15           MR. STEINGARD:  It's pretty much just the same

16  issue --

17           THE COURT:  This is the same issue --

18           MR. STEINGARD:  Yes.

19           THE COURT:  -- as before?  I don't need to go

20  over that one again.

21           Number six?

22           MR. STEINGARD:  Number six, your Honor, let me

23  take a second and read it.

24           THE COURT:  This one, it seems to me, is fair

25  game now.

00041

1           MR. WALSH:  May I comment, your Honor?

2           THE COURT:  Yes, but I am just telling you

3    where my position is.

4           MR. WALSH:  I understand, your Honor.  To the

5    extent that this request imposes a burden upon Arab Bank

6    to assess what Palestinians are in Israeli custody, what

7    designated beneficiaries are martyrs and what are suicide

8    bombers --

9           THE COURT:  Okay.

10          MR. WALSH:  -- is plainly unreasonable.

11          THE COURT:  All right.

12          MR. WALSH:  To the extent they tell us what to

13   look for --

14          THE COURT:  Let's put that aside.  Let's assume

15   they can start identifying people, can you do that?  I

16   mean, it's certainly -- I think that's a fair comment.  I

17   mean,you know --

18          MR. STEINGARD:  Although I won't concede what

19   Mr. Walsh has stated, however, I will point out that in

20   number eight, for example, there is a --

21          THE COURT:  Number eight?

22          MR. STEINGARD:  Eight.

23          THE COURT:  Why are we going to number eight?

24          MR. STEINGARD:  Well, we're going to number

25   eight because --

00042

1           THE COURT:  I'm on number six.

2           MR. STEINGARD:  -- for that reason -- because

3     number eight --

4           THE COURT:  You've already done some of that.

5           MR. STEINGARD:  We've given them a fairly

6     extensive list.

7           THE COURT:  Fine.  Okay.  But is that -- I

8     mean, to the extent that you want to identify eight as a

9     starting point --

10          MR. STEINGARD:  Yes, we will identify eight as

11    a starting point.

12          THE COURT:  And that are those --

13          MR. STEINGARD:  And that we are glad to submit

14    more.

15          THE COURT:  Those are all -- excuse me for

16    interrupting you.

17          MR. STEINGARD:  I'm sorry.

18          THE COURT:  But are those all martyrs?

19          MR. STEINGARD:  To the best of our information.

20          THE COURT:  To the best -- okay.  So, eight --

21          MR. WALSH:  That's helpful to us, sir.

22          THE COURT:  Do eight and six overlap then

23    essentially?

24          MR. STEINGARD:  Well, to a certain degree; yes.

25    However, we would state first if your Honor is going to

00043

1   ask us to provide anymore -- even more names, we'll

2   provide more to the extent it's --

3          THE COURT:  Well, I think it's fair.  I mean --

4          MR. STEINGARD:  But at the end of the day, if

5   Arab Bank has specific records that help it very easily

6   identify this type of activity, I don't think they're --

7   they should still produce that information --

8          THE COURT:  But they are --

9          MR. STEINGARD:  -- irrespective of whether

10  we've given them list or not.

11         THE COURT:  Well, to the extent that -- am I

12  right that it's your position that the Saudi Committee's

13  reason for being is to take in money to disburse -- to

14  take in money and to disburse money to those who are

15  martyrs in the second intifaddah?

16         MR. STEINGARD:  And wounded and prisoners, et

17  cetera.  But yes, that's our position.

18         THE COURT:  I mean, I guess the Saudi

19  Committee's -- I mean, central purpose is that activity

20  as opposed to other kinds of potential humanitarian

21  activities.  I mean, not to classify this as a

22  humanitarian activity but that this is something -- am I

23  right about that or -- yes, okay, Mr. Werbner, I won't

24  land on you again.

25         MR. WERBNER:  I'm sorry, your Honor. but if I

00044

1  could give a little background, I hope it will be

2  helpful.

3          THE COURT:  It may be.

4          MR. WERBNER:  Okay.  We contend that the Saudi

5  Committee was formed in October 2000 specifically at the

6  time of the intifaddah and it stated its purpose was to

7  provide support to the Palestinians engaged in the

8  violent struggle and that they would pay a scale to three

9  categories; 20,000 riels (phonetic) to those that got

10 killed, 15,000 to those that were in the --

11         THE COURT:  So, that's right.  I guess I had

12 forgotten but it was formed at the time right at the --

13         MR. WERBNER:  October 16.

14         THE COURT:  Essentially at the same time that

15 that second intifaddah got underway.

16         MR. WERBNER:  Yes, sir.

17         THE COURT:  All right.  So, to the extent that

18 you get documents relating to the Saudi Committee, maybe

19 you don't get but we'll deal with that whenever, but to

20 the extent that those documents reflect, you know, the

21 same kinds of transactions that you're seeking in six and

22 eight, that's going to be the source of names, if you

23 want, for want of a better word or --

24         MR. WERBNER:  Indeed, your Honor, and I would

25 also like to point out that your Honor may recall we've

00045

1    had some discussion about so-called summary sheets.

2              THE COURT:  I remember the summary sheets.  And

3    those are --

4              MR. WERBNER:  And those --

5              THE COURT:  Those are documents that are

6    specifically -- aren't they specifically before the --

7              MR. WALSH:  They are indeed, your Honor.

8              THE COURT:  -- Palestinian and Jordanian

9    authorities --

10             MR. WALSH:  They are indeed.

11             THE COURT:  -- as well because they --

12             MR. WALSH:  They are indeed.

13             MR. STEINGARD:  They only point out --

14             THE COURT:  Among other things, they have --

15             MR. WALSH:  Account and customer information.

16             THE COURT:  Of the eight accounts and others.

17             MR. WALSH:  That's correct, your Honor.

18             MR. STEINGARD:  And the point -- the only point

19    I wish to make regarding that is those are examples of

20    lists of names that fall within this particular document

21    request.

22             THE COURT:  Okay.  And they aren't otherwise --

23    because you haven't seen those, you've seen only the one

24    that you have.

25             MR. STEINGARD:  Right, exactly.

00046

1          THE COURT:  You don't know -- but it was --

2    based on your review of the one summary sheet -- I have

3    it.  Did you show me that summary sheet?  You may have.

4          MR. STEINGARD:  I don't --

5          THE COURT:  But that summary sheet is a summary

6    sheet that you contend is solely -- is limited to martyrs

7    or those injured.

8          MR. STEINGARD:  Yes, correct.

9          THE COURT:  Okay.

10          MR. STEINGARD:  And it was used --

11          THE COURT:  I guess you gotten -- I understand

12   it was an exemplar.

13          MR. STEINGARD:  -- it was used as an example.

14   We have produced others in document productions.

15          THE COURT:  Oh, you've gotten other summary

16   sheets, as well?

17          MR. STEINGARD:  We have produced other sheets

18   to them.

19          THE COURT:  And that's where you got these

20   names that are in number eight, in part?

21          MR. STEINGARD:  From among other sources.

22          THE COURT:  Okay.

23          MR. STEINGARD:  And, for example, the Saudi

24   Committee website has an extensive list which we invite

25   them to take a look at.

00047

1          MR. WERBNER:  Your Honor, if I can add to --

2          THE COURT:  You mean they post the names --

3          MR. STEINGARD:  Yes.

4          THE COURT:  -- of the martyrs?

5          MR. STEINGARD:  Yes.

6          MR. WERBNER:  Your Honor, may I add there very

7    briefly.  In December of '04, the congressional research

8    arm of the US Congress wrote a report and I cited it

9    where they said at one time the Saudi Committee had on

10   its website the actual list of some 40,000 transactions

11   identifying who they paid money for and the amounts.  And

12   that sometimes they even showed Al Malia Ish Dish a Dia

13   (phonetic), which was suicide operation.  And these

14   congressional researchers said with these published

15   40,000 transactions, we've matched up that the Saudi

16   Committee paid to at least five suicide bombers and over

17   60 terrorists.  That's a US Congressional research.

18          I mention that for one -- for two points; one,

19   I think it shows that these were not being treated as

20   confidential by the Saudi Committee because they've taken

21   it off the internet, your Honor.  And we can't get it

22   now.  But at point before the lawsuit, it showed that --

23          THE COURT:  Did you have the foresight to print

24   it out?

25          MR. WERBNER:  Well, we have acquired what's

00048

1  called fact to time machine.  You know, it's a way that

2  archives off the internet.

3           THE COURT:  Okay.

4           MR. WERBNER:  But it's not totally complete.

5           THE COURT:  Okay.  Well, in any event --

6           MR. WERBNER:  Okay.

7           THE COURT:  -- I get your point and -- yes, all

8  right.  So, six and eight --

9           I haven't heard you, Mr. Walsh.

10          MR. WALSH:  May I just comment very briefly?

11          THE COURT:  Yes, you can comment on six and

12  eight any further but it seems to me, six and eight are

13  fair game now and to the extent that -- certainly, to the

14  extent that they identify martyrs, you know, and to the

15  extent that you have access to information that

16  identifies martyrs, then it ought to be produced.  But I

17  will hear you.

18          MR. WALSH:  We've made great progress this

19  morning, your Honor, because this is the first time after

20  many months that the plaintiffs have told us that the

21  individuals identified in request number eight are

22  martyrs.  And we've asked many times.  So, that's

23  helpful.

24          It's very helpful for them to give us names and

25  for them to state why they believe discovery as to those

00049

1    names is relevant and material to their claims.

2         Now, I should note as a caution, your Honor,

3    that to the extent there are not transactional records in

4    New York any transactional documents that reside in

5    Jordan or in the Palestinian territories are going to be

6    subject to the very same bank secrecy issues that we're

7    now visiting in connection with the nine accounts --

8         THE COURT:  Well, I understand.

9         MR. WALSH:  So --

10        THE COURT:  I understand that.  But I mean,

11   look, if the Palestinian authority has already denied the

12   seven or eight, I mean, we can guess what their response

13   is going to be to the rest.

14        MR. WALSH:  Well, your Honor, we haven't --

15        THE COURT:  We have an appeal.

16        MR. WALSH:  -- exhausted the process.

17        THE COURT:  All right.  By all means, take your

18   appeal.  I mean, you know where this is going to end up

19   if you deny the recovery -- not you, but if the bank

20   chooses not to provide the discovery, well, you know,

21   then certain things happen from an evidentiary stand

22   point.  So, I am sure you're telling them this is what's

23   going to happen if you don't produce the documents.

24        MR. WALSH:  And that --

25        THE COURT:  And so that's why you're pursuing

00050

1   the appeal.

2           MR. WALSH:  That's exactly what why we're doing

3   it, your Honor.

4           THE COURT:  I understand.

5           MR. WALSH:  But --

6           THE COURT:  To the extent that you can pursue

7   the appeal and then show me you've done everything you

8   could, well then I guess I will have to take that into

9   account when recommending what the right sanction ought

10  to be; right?

11          MR. WALSH:  But, your Honor, we do urge --

12          THE COURT:  Okay.

13          MR. WALSH:  -- urge the Court not to impose

14  upon Arab Bank the obligation to conduct research as to

15  what Palestinians are in Israeli custody or who qualifies

16  as a martyr.

17          You know, as your Honor may recall, you

18  directed these plaintiffs to produce liability related

19  documents to us.  That process is going very slowly.

20  It's a source of great frustration to us.  And we would

21  like to see much more and would hope that your Honor can

22  revisit that issue today.  But --

23          THE COURT:  That wasn't among the letters, I

24  got, was it?

25          MR. WALSH:  It was not, your Honor, but to the

00051

1  extent that --

2            THE COURT:  Well, we'll touch on it.

3            MR. WALSH:  -- what comes out of this is a next

4  phase of discovery --

5            THE COURT:  Okay.  We'll touch on that.

6  We'll touch on that.   I will hear what you have to say

7  about that and we'll see what their response is.

8            MR. WALSH:  You know, I should also --

9            THE COURT:  But let me just make this

10  observations, well first of all, I am -- is there a

11  request in here that asks for all transactions involving

12  the Saudi Committee?

13            MR. STEINGARD:  Yes.

14            THE COURT:  Basically, all of the transactions

15  in -- all transactions into and out of their account

16  basically; right?   That's what you want you want to

17  know.

18            MR. STEINGARD:  Yes, sir.

19            THE COURT:  And that, it seems to me, is now an

20  appropriate scope of discovery.

21            MR. WALSH:  Just to correct a point the Court

22  made, your Honor, the Saudi Committee, as we have said

23  before in this court, was not an account holder of Arab

24  Bank.

25            THE COURT:  Okay.

00052

1              MR. WALSH:  So, we are not looking at the

2    account statements of the Saudi Committee.

3              THE COURT:  Okay.

4              MR. WALSH:  This would entail looking at --

5              THE COURT:  You have stated that -- you have

6    made that statement.

7              MR. WALSH:  Yes.

8              THE COURT:  I mean, I'm talking about in

9    writing, so it's a -- I mean, in terms of establishing a

10   record.

11             MR. WALSH:  Yes.

12             THE COURT:  Okay.

13             MR. WALSH:  It's been made on the record.

14   We're happy to confirm it in writing, your Honor.

15             THE COURT:  Yes.  No, but I think you do need

16   to, although, you know, transcripts are good, too.

17             Mr. Werbner?

18             MR. WERBNER:  Just I think it's helpful, a

19   point of information and I had these charts last time and

20   you wanted it to be later, you said, but here's the whole

21   story.  The account -- the bank that handled for the

22   Saudi Committee is the Arab National Bank, 40 percent of

23   which is owned by Arab Bank.  It's its largest affiliate

24   and, your Honor, the two board members -- there's

25   interlapping members of the board of directors.  So, I

00053

1  welcome the letter where counsel says we never had an

2  account but it's their affiliate that they own 40 percent

3  of that two of the ten members of the board --

4          THE COURT:  Well can you sue the affiliate?

5          MR. WERBNER:  No, no.

6          THE COURT:  Why not?

7          MR. WERBNER:  Well, maybe we can but I don't

8  want to.

9          THE COURT:  Why not?

10          MR. WERBNER:  Well, because they're --

11          THE COURT:  Because that makes it easy for me

12  to order discovery.

13          MR. WERBNER:  Yes, but I am trying to make it,

14  with all due respect to the Court, for our clients, there

15  are going to be huge jurisdictional issues.

16          We have the 40 percent --

17          THE COURT:  Do you mean the Arab National Bank;

18  is that what you called it?

19          MR. WERBNER:  Yes, sir.

20          THE COURT:  That's the subsidiary?  It's not

21  the --

22          MR. WERBNER:  Yes, sir.

23          THE COURT:  It does not operate in the United

24  States?

25          MR. WERBNER:  No, sir.

00054

1          THE COURT:  So you have no personal --

2          MR. WERBNER:  It has 140 --

3          MR. WALSH:  It's not a subsidiary.

4          THE COURT:  No, no, no.

5          MR. WALSH:  I'm sorry.

6          THE COURT:  Affiliate.  I understand.  It's

7   not a wholly owned subsidiary.

8          MR. WERBNER:  They have a --

9          THE COURT:  It's a 40 percent owned affiliate.

10         MR. WERBNER:  They have a 100 -- it used to be

11  before the '80s owned wholly by the Arab Bank and then

12  there was a Saudi law but the important point is that --

13         THE COURT:  I think I get it.  I mean, I get

14  it.  You don't have to -- I understand what --

15         MR. WERBNER:  And the directors and the

16  control --

17         THE COURT:  Yes, I mean, you know, even if they

18  didn't have common directors, they got 40 percent

19  ownership.  But the directors aren't on trial.  I mean,

20  the directors aren't sued, neither are the -- so, it

21  makes it a little difficult for me to order discovery

22  from an affiliate.

23         MR. WERBNER:  I am not asking for Arab National

24  Bank records.

25         THE COURT:  I understand.

00055

1          MR. WERBNER:  I was just --

2          THE COURT:  Trying to let me know that there is

3   something out there, as far as you understand it, that is

4   providing the banking services.

5          MR. WERBNER:  And do you remember, you had

6   permitted me the 30(b)(6) deposition of Arab Bank, New

7   York.

8          THE COURT:  Yes.

9          MR. WERBNER:  And I took it -- and I was going

10  to tell you last time and you said wait, and I am just

11  going to say one sentence --

12         THE COURT:  You've been saving this up.

13         MR. WERBNER:  Yes, sir.  That's why I am so

14  bouncy all of the time because I have been held to this

15  big moment.

16         All I want to say, your Honor, about that

17  deposition is that the chief of operations of Arab Bank,

18  New York, who has worked there 20 years, who I deposed,

19  he said that I keep a file in Microsoft Outlook and I

20  have a folder for the Arab National Bank.  And all of

21  these transactions, he said that in New York, 90 --

22         THE COURT:  All of these transactions.

23         MR. WERBNER:  All the --

24         THE COURT:  All of the transactions of Arab

25  National Bank?

00056

```
 1            MR. WERBNER:  He says 90 percent of what we do

 2  in New York is transactions for our worldwide branches

 3  and affiliates.  We basically just have 22 customers here

 4  in New York.

 5            THE COURT:  Okay.

 6            MR. WERBNER:  And they're not those people.

 7  Our customer is the Ramallah (phonetic) Bank in

 8  Palestine.

 9            THE COURT:  Okay.  But I don't know why you're

10  telling me all of this except that -- I mean, I --

11            MR. WERBNER:  I will tell you why.

12            THE COURT:  Okay.

13            MR. WERBNER:  Because I am concerned that if

14  you don't know that that's the depth of our position and

15  that they had these documents at their fingertips kept by

16  that, you won't -- you will think that it's a huge burden

17  for them to give us records when they are actually

18  sitting right here.

19            THE COURT:  Well, but -- look, to the extent

20  that they have records sitting here relating to

21  transactions conducted on behalf of or for the benefit of

22  the Saudi Committee, I think that those -- if you've

23  asked for those, they're fair game then.

24            MR. STEINGARD:  And, your Honor, may I just

25  point out that it's request number 12.
```

00057

1          THE COURT:  Okay.  Well, we're going to get

2   there.

3          MR. STEINGARD:  Right.

4          THE COURT:  We're on number seven right now.

5          MR. WERBNER:  Thank you.  I'm done.

6          THE COURT:  Number six -- let me put it this

7   way.  I think that to the extent that the Arab Bank has

8   lists of martyrs that have been supplied, I don't think

9   you have the obligation to go research and determine who

10  the martyrs are, to the extent that you have those --

11  that kind of information readily at your disposal because

12  somebody provided it to you.  Then that's information

13  that you have to consider when deciding to --

14          MR. WALSH:  We understand, your Honor.

15          THE COURT:  Okay.

16          MR. WALSH:  We just didn't want to --

17          THE COURT:  I'm not saying you -- but I am not

18  implying -- okay.  And it is useful for the plaintiffs to

19  identify every time you see somebody that you think falls

20  in that category, you know, make it a matter of record.

21  You know, here's somebody else.  And --

22          MR. WALSH:  That would be very helpful to us.

23          THE COURT:  I understand.  I understand.  Okay.

24  Number seven.

25          MR. STEINGARD:  Number seven is essentially

00058

1  number six but broadened out beyond the scope of the case

2  -- the five cases.  In other words, if you look at six,

3  it relates to the plaintiffs described in the five cases,

4  number seven simply says that there are other instances

5  of the same type although it may not involve a plaintiff

6  in one of the five cases.  We still want the information.

7          And effectively --

8          THE COURT:  Well, how are they going to know?

9          MR. STEINGARD:  Well, it relates --

10         THE COURT:  I mean, I shouldn't say how are

11  they going to know.  Maybe they have somebody there that

12  knows.  But --

13         MR. STEINGARD:  The short answer, your Honor,

14  is I was about to say, the list that we've been talking

15  about cover that issue --

16         THE COURT:  Yes.

17         MR. STEINGARD:  -- because we will be -- to the

18  extent we've identified what is already in our document

19  requests and any other information we provide to him, it

20  may be outside the limits of the five complaints but

21  there will be martyrs involved in the same activities and

22  will be --

23         THE COURT:  Now, let me make sure I understand.

24  Martyrs aren't limited to suicide bombers.

25         MR. STEINGARD:  Correct.

00059

1            THE COURT:  Martyrs could be people who engage

2    in other kinds of violent activity even with the Israeli

3    army, for instance; is that right?

4            MR. WALSH:  Or --

5            MR. STEINGARD:  In particular, we also allege

6    in our complaints, for example, people who were shooting

7    victims on buses, that wasn't a suicide bomber.  Somebody

8    pulled up and started shooting at them.  And so, it's a

9    different --

10           THE COURT:  Right, okay.  But you have those

11   plaintiffs in your -- are all of your plaintiffs injured

12   as a result of suicide bombers?

13           MR. STEINGARD:  No.

14           MR. ELSNER:  No.

15           THE COURT:  Some of them are injured as a

16   result of the kinds of terrorism?

17           MR. STEINGARD:  Correct.

18           THE COURT:  Okay.  And seven goes to anybody

19   who is --

20           MR. STEINGARD:  That's correct.

21           THE COURT:  Regardless of whether they had any

22   relation to your specific plaintiffs.

23           MR. STEINGARD:  Plaintiffs; that's correct.

24           THE COURT:  And again, I think that that's -- I

25   think that's opened up by what Judge -- by Judge

00060

1 Gershon's opinion.

2        MR. WALSH:  Let me only say this, your Honor,

3 and first a point of clarification.  My understanding of

4 how the term martyr is used is that it refers to one who

5 has died as a result of this conflict.  It could include

6 an eight year old child.

7        THE COURT:  Yes, martyr -- I think that's the

8 general definition of a martyr, is somebody who has died.

9        MR. WALSH:  Yes, it's not a terrorist who has

10 died but someone who has died as a result of the conflict

11 which may in some cases involve the --

12        THE COURT:  I see, terrorist activity.  In

13 other words, somebody could be a martyr but how else -- I

14 mean, maybe they're a martyr --

15        MR. WALSH:  An eight year old child who happens

16 to be on the street corner --

17        THE COURT:  Yes.

18        MR. WALSH:  -- caught in hostile cross fire and

19 who dies is a martyr, your Honor.

20        THE COURT:  But it's kind of hard -- but

21 basically since -- well --

22        MR. WALSH:  But we would only state --

23        MR. STEINGARD:  May I --

24        THE COURT:  Let Mr. Walsh finish --

25        MR. WALSH:  May I speak for a moment,

00061

 1  Mr. Steingard?

 2            MR. STEINGARD:  I'm sorry, Mr. Walsh.  Go

 3  ahead.

 4            THE COURT:  He is making a --

 5            MR. WALSH:  You know, again, your Honor, to the

 6  extent that number seven imposes upon the bank the

 7  obligation to determine which martyrs were killed as a

 8  result of injuries sustained during the -- if they

 9  provide lists to us and they establish that the

10  individuals named in those lists have some relevant

11  connection to their allegations, that's a much more

12  manageable task to discharge than to respond to requests

13  as they're framed in this fashion.

14            THE COURT:  Well, let me -- since it seems to

15  me that way this is pleaded and certainly the way

16  Judge Gershon's opinion reads, the actions or the

17  activities of the Saudi Committee, all activities of the

18  Saudi Committee are basically at issue.  It's almost like

19  -- well, I don't want to make any analogies but it seems

20  like any transactions that the Saudi Committee engaged

21  in, either in taking in funds or disbursing funds are now

22  open to discovery.

23            Now, so much of what's asked for in request

24  number seven would be producible on that basis.  Now,

25  request number seven is broader, it seems to me, because

00062

1   it would also seek any documents that reflect, if for

2   instance, a transaction meant that funds were transferred

3   from one Arab Bank account to another Arab Bank held by

4   an individual somewhere, as opposed to just being

5   disbursed to another bank somewhere.  Then they would

6   have -- then you would want those transactional records,

7   as well.

8           MR. STEINGARD:  Absolutely, your Honor.

9   Absolutely.

10          THE COURT:  Am I right about that?

11          MR. STEINGARD:  You're right about that.

12          THE COURT:  Okay.  Now is there another

13  component that I am not following?

14          MR. STEINGARD:  Well, the only thing I would

15  point out again is the prior request was limited to

16  incidents that were described in the five complaints.

17  This one is not limited to just those incidents.

18          THE COURT:  I understand that.

19          MR. STEINGARD:  And that's the --

20          THE COURT:  But what I am saying is, I'm saying

21  that to the extent that the Saudi Committee is at the

22  center of this, then all disbursement by the Saudi

23  Committee, if you get that, you're going to be getting at

24  least the first outflow of funds to wherever they want;

25  martyr, as a result of -- I mean, martyr involving yours

00063

1     -- in the plaintiff's injuries and deaths and any others.

2            MR. STEINGARD:  Correct.

3            THE COURT:  All right.  But what you're also

4     interested in in request number seven, is to the extent

5     that Arab Bank has further transactional records of where

6     the -- of what happened to the funds, that is if it

7     landed in an account holder who has an account at Arab

8     Bank, you want those records, as well and the records of

9     that account holder; am I right?

10           MR. STEINGARD:  That's correct.

11           THE COURT:  All right.  So, I mean --

12           MR. WERBNER:  If I could add just one gloss, I

13    think it would be helpful, what you said is exactly right

14    but we believe and our complaint alleges that they were

15    administering the disbursement, that they actually issued

16    -- they required at the bank, your Honor, to receive a

17    certificate of --

18           THE COURT:  I understand.

19           MR. WERBNER:  -- so that we believe in addition

20    to just the bank account money movement transfers, which

21    is vitally important, that there will be other documents

22    that show their analysis of the payment because the Saudi

23    Committee entrusted the bank to administer the plan.

24           THE COURT:  But wouldn't those records be

25    records of transactions involving the Saudi Committee?

00064

1                MR. WERBNER:  I say yes but what -- all I am

2    saying is not just the wire transfer record.

3                THE COURT:  I understand that.

4                MR. WERBNER:  That's all I was --

5                THE COURT:  Not just the transactional records.

6                MR. WERBNER:  Exactly.

7                THE COURT:  But I thought --

8                MR. WERBNER:  So you're right.  That would be

9    encompassed within the Saudi Committee.  All I was trying

10   to clarify is there will be not just wire transfers that

11   relate to the implementation of those funds for the Saudi

12   Committee, there should be a qualification folder, for

13   example.

14               THE COURT:  Right, but you're --

15               MR. WERBNER:  Over complicating it?

16               THE COURT:  Well, no, but request number seven,

17   all documents which refer or relate to payments made to

18   Arab Bank to the families of or representatives of all

19   persons.  I mean, how would the certificates that you're

20   talking -- the certification process not --

21               MR. WERBNER:  Well --

22               THE COURT:  The documents that would constitute

23   the certification process not be encompassed within that

24   request?

25               MR. WERBNER:  It would -- but with all due

00065

1   respect, your Honor, to my counsel behind us, I just

2   wanted to make clear that that was the Court's intention

3   and the reading of our request.  I mean, we haven't --

4          THE COURT:  Look, you guys -- all right.  I

5   mean, yes, that's a fair reading of that request.

6          Mr. Walsh, do you want to --

7          MR. WALSH:  Just so I understand, your Honor,

8   and I think I do, because the Saudi Committee was not an

9   account holder at Arab Bank, Arab Bank accepted payment

10  instructions from other banks --

11         THE COURT:  Arab National Bank.

12         MR. WALSH:  Arab National Bank, among them and

13  there are transactional records in the Palestinian

14  territories that reflect that.  In some cases, monies

15  were paid to account holders of Arab Bank.  In other

16  cases, to account holders of other banks.

17         THE COURT:  Understood.

18         MR. WALSH:  To the extent that those

19  transactional records reside within Arab Bank, assuming

20  that the bank secrecy issues are resolved, we understand

21  the Court's sentiment regarding the production of those.

22         THE COURT:  Well, the Court --

23         MR. WALSH:  But there may be --

24         THE COURT:  The Court's sentiment is really

25  irrespective of whether -- what the bank secrecy

00066

1  requirements are.

2          MR. WALSH:  I understand, your Honor.

3          THE COURT:  I mean, in other words -- okay.  I

4  think you understand the distinction I am trying to make.

5          MR. WALSH:  But there may be, your Honor, Saudi

6  Committee transactions that did not touch Arab Bank.

7          THE COURT:  Well, then I understand that.

8          MR. WALSH:  Of course, the bank cannot produce

9  those documents.  Now --

10         THE COURT:  We're only asking you to produce

11 what you have.

12         MR. WALSH:  Now, let me just --

13         THE COURT:  But I do want to -- doesn't it seem

14 like we could short circuit the whole process by just

15 saying that whatever you have regarding transactions

16 conducted for and on behalf of the Saudi Committee are

17 producible?

18         MR. WALSH:  The transactional records involving

19 the Saudi Committee.

20         THE COURT:  All records.  Whatever documents

21 you have relating to whatever transactions you conducted.

22         MR. WALSH:  Well, you know --

23         THE COURT:  I mean, that's --

24         MR. WALSH:  Let me only say, your Honor, that

25 it may well be a very significant burden to produce

00067

1  those.

2          THE COURT:  I am sure it will be.

3          MR. WALSH:  And --

4          THE COURT:  I mean, you're talking about

5  500,000 transactions.

6          MR. WALSH:  Yes.

7          THE COURT:  But I mean, that's --

8          MR. WALSH:  It will be a very, very, very

9  burdensome exercise.

10          THE COURT:  Well, I am not -- the

11  burdensomeness is something you take into account but it

12  seems to me like these are all highly relevant records

13  now.

14          MR. WALSH:  If that is --

15          THE COURT:  So, burdensome as it may be, I

16  don't -- I mean, if these were marginal records, then I

17  would take into account the burdensomeness and say okay,

18  well, you know, maybe we are going to have to find some

19  way to cut it back.  But, now, this is -- well --

20          MR. WALSH:  If that's the pleasure of the

21  Court, your Honor, and we understand that you're not

22  considering the bank secrecy issues at the moment, we

23  would only ask that we have the opportunity to assess

24  what collection of these records will entail and to have

25  some orderly mechanism.  It may involve, to the extent

00068

1  we're talking about ascertaining whether documentation

2  exists at the final end of the transaction, that may

3  involve the hand retrieval of paper documents,

4  your Honor.  And that is going to be a very, very

5  burdensome process.

6           THE COURT:  But how else do the plaintiffs make

7  their case?  I mean, don't they have to -- isn't the

8  heart of their case that Arab Bank paid out funds to all

9  of these various families of martyrs and they have to

10  show that paper trail, unless you're willing to stipulate

11  to it.  I mean, that's another option.

12           MR. WALSH:  Your Honor?

13           THE COURT:  You can give up the discovery, if

14  you will, to stipulate that it seems to me.  I mean,

15  that's another way to avoid the burdensomeness of

16  producing each --

17           MR. WALSH:  We --

18           THE COURT:  -- and every document because I bet

19  you they don't want to have to sift through all of those

20  and put together miles of -- I mean, you know, tons of

21  charts to show a jury.

22           MR. WALSH:  We don't dispute the transactional

23  records regarding the Saudi Committee are relevant to

24  this cation.  And we've told Mr. Swift and others from

25  the inception that it is more likely than not that Arab

00069

1   Bank itself will want access to those documents for use

2   in this court to conduct its defense.  And that's why

3   we're attempting to obtain permission to produce the

4   first phase of documents.

5        THE COURT:  Okay.  But that's different from

6   the burdensomeness question.  We're talking

7   burdensomeness right now.

8        MR. WALSH:  Yes, your Honor.

9        THE COURT:  And it seems to me that what's at

10  the heart of the plaintiff's case here is how extensive

11  the Saudi Committee was and how extensively involved the

12  Arab Bank was in the Saudi Committee's work.  I mean, the

13  more they show that, the more they show intent and

14  material aid and support.

15       MR. WALSH:  We understand that, your Honor.

16       THE COURT:  And so, half a million transactions

17  is a powerful statement about how -- or I don't know how

18  many there are but I am just --

19       MR. WALSH:  There are many hundreds of

20  thousands, your Honor.

21       THE COURT:  So, I don't think the -- I guess

22  what I am saying is the burdensomeness argument is not

23  going to travel very far with me because I think it's

24  almost essential.  You can certainly go back and do

25  whatever research you want on how burdensome it would be

00070

1   and then try to explain -- and explain to me, you know,

2   the problems and then if you want to propose some

3   alternatives at that point, then I guess I will have to

4   consider it but --

5           MR. WALSH:  We would only like, your Honor, the

6   opportunity to propose -- again putting aside the bank

7   secrecy issues, a timetable --

8           THE COURT:  I'm not talking about the bank

9   secrecy issues.

10          MR. WALSH:  -- that is achievable in light of

11  the part of the world where this document gathering is to

12  be conducted.

13          THE COURT:  I can't believe there aren't

14  computers.  I can't believe there aren't significant

15  technological advances that are available to our bank of

16  this size and with these means.  I mean, they're not -- I

17  understand that much of that part of the world is not yet

18  sophisticated in banking transactions but the bank

19  itself, I've got to believe, has got plenty of those

20  kinds of resources available.

21          MR. WALSH:  Your Honor, there are indeed, I

22  believe, electronic transaction records and but I

23  mentioned earlier that Mr. Werbner and Mr. Steingard are

24  also referring to other types of documentation that if it

25  exists --

00071

1              THE COURT:  The certification things, you're

2   talking about.

3              MR. WALSH:  -- is not electronic.  And

4   physically retrieving that is probably going to be a

5   matter of, you know, visiting archives and looking for

6   documents that may or may not exist that --

7              THE COURT:  It's only four or five years worth;

8   right?  It only goes back to October of 2000.  I mean, I

9   know there's been a number of -- well, I don't know what

10  the scope of the number of martyrs is, you know?  But

11  you're talking about the certification records for the

12  martyrs.  Is that what you're talking about, Mr. --

13             MR. WERBNER:  164.

14             THE COURT:  I don't know what Mr. Walsh is

15  talking about.  Maybe I am misunderstanding.

16             MR. WALSH:  Well, you know --

17             THE COURT:  But that certification process, at

18  least to the extent that that is -- you know, there

19  aren't that -- how many there are, I don't know.

20             MR. WALSH:  Now, your Honor, we've been

21  speaking of hundreds of thousands of Saudi transactions.

22  I don't know if Mr. Werbner --

23             THE COURT:  Yes, but that's going to be largely

24  in the deposit -- those organizations that were

25  depositing money, forwarding money to the Saudi

00072

1    Committee, on behalf of whoever the donors are, all of

2    which is going to be -- a lot of which is going to be

3    electronic --

4              MR. WALSH:  All --

5              THE COURT:  -- at least available in electronic

6    format, it seems to me.

7              MR. WALSH:  All that Arab Bank knows,

8    your Honor, is what it is instructed to pay --

9              THE COURT:  I guess you're right.

10             MR. WALSH:  -- it's correspondent bank.

11             THE COURT:  You're right.  I mean, well, I

12   don't know what the half million transactions are then.

13   I mean, you're talking about the half million

14   transactions relating to the Saudi Committee.  I mean, if

15   they're -- maybe I am making myself more confused.

16             Look, you're going to have to do the inquiry

17   and then tell me what we're talking about.

18             MR. WALSH:  We will do that, your Honor.

19             THE COURT:  All right.  So --

20             MR. STEINGARD:  We're on to number nine --

21             THE COURT:  Number nine.

22             MR. STEINGARD:  -- which documents have been

23   produced --

24             THE COURT:  Okay.

25             MR. STEINGARD:  -- relating to number nine.

00073

```
 1              THE COURT:  I would think it should be; right?
 2              MR. STEINGARD:  Yes.
 3              THE COURT:  Number ten?
 4              MR. STEINGARD:  Number ten is a listing --
 5              THE COURT:  Are these the FTOs?
 6              MR. STEINGARD:  Yes.  Here it is.  Number ten
 7  is the listing of certain FTOs; correct.  And in
 8  particular, I just want to point out that in H, it
 9  mentions a specific bank account in Lebanon, other than
10  the one that's been the subject of our earlier
11  discussions.
12              THE COURT:  That these are -- what did you say,
13  FTO?  Excuse me.
14              MR. WERBNER:  Terror organizations.
15              THE COURT:  Is that a designation that --
16              MR. WERBNER:  Terror organizations.
17              THE COURT:  I understand.  But is that a
18  designation that was given to these organizations by some
19  agency of the American government or is that just
20  whatever -- I mean, I could imagine that Hammas, for
21  instance, has already been designated.
22              MR. WERBNER:  A has been designated.  B has
23  been designated.  C has been designated.
24              THE COURT:  By whom?
25              MR. WERBNER:  By the US; either the Treasury or
```

00074

1    the State Department or both or the President.  There's

2    three STDG, FTO, there's an executive order by the

3    President, there's one by the State Department and one by

4    the Treasury.

5            THE COURT:  Okay.

6            MR. WERBNER:  But one or the other has

7    designated A, B, C, D, I think H, but I am not sure.  The

8    others may not be designated by the United States but as

9    Judge Gershon's ruling makes clear, there's two ways

10   under the ATA that someone is prohibited from helping and

11   supporting either with a designated one or someone that

12   they know to be engaged in such activity.  You do not

13   have to be designated.

14           In other words, it's not a safe harbor that you

15   can knowingly do business with terror groups even if they

16   weren't designated.  That's clearly her ruling and the

17   statute. Therefore, the fact that --

18           THE COURT:  Yes, but who decides whether

19   they're a terror group or not?  In other words --

20           MR. WERBNER:  Well, ultimately the jury will --

21   there's a definition and the jury will be. So, if you

22   have an -- if it's designated, it's per se.

23           THE COURT:  Right.

24           MR. WERBNER:  But if it's undesignated --

25           THE COURT:  Okay.

00075

1           MR. WERBNER:  -- then we will have to prove --

2           THE COURT:  You have to present evidence to the

3    jury --

4           MR. WERBNER:  Yes.

5           THE COURT:  -- about the activities --

6           MR. WERBNER:  Yes, sir.

7           THE COURT:  -- of the organization.

8           MR. WERBNER:  Yes, sir.

9           THE COURT:  And then the jury decides if it was

10   a --

11          MR. WERBNER:  And whether they had the required

12   scienter when they supported that entity.

13          THE COURT:  They being --

14          MR. WERBNER:  The bank.

15          THE COURT:  -- the bank.

16          MR. WERBNER:  In other words, we have to prove

17   to the jury's satisfaction both that the entity they were

18   assisting was this type of entity, namely engaged in

19   terrorism and that the bank knew that when they

20   substantially assisted or at least was truly aware of.

21          THE COURT:  Mr. Walsh?

22          MR. WALSH:  May I first, as an aside,

23   your Honor, note that one of the reasons noted by

24   Judge Gershon in her opinion for ruling as she did was

25   that there are extensive allegations of knowledge on the

00076

1   part of the bank by these plaintiffs.  And for that

2   reason, we continue to await with great expectancy

3   production from these plaintiffs of documents that

4   reflect the bank's alleged knowledge.

5            And to the extent that these --

6            THE COURT:  Of the activities of --

7            MR. WALSH:  Of the organizations that are

8   alleged to be terrorists organizations.  We think it's

9   vital, your Honor, that that be --

10           THE COURT:  When you say alleged to be as

11  you --

12           MR. WALSH:  Well, I mean, Mr. Werbner had said

13  --

14           THE COURT:  -- include those that listed A

15  through H?

16           MR. WALSH:  -- that some of these are

17  designated organizations, others are not.  The burdens of

18  proof that fall upon the plaintiffs with regard to those

19  that have not been officially designated are obviously

20  different.  But the plaintiffs are alleging that Arab

21  Bank knew that these organizations both designated and

22  not, and in most cases, these are front -- alleged front

23  organizations that have never been designated were known

24  --

25           THE COURT:  Well, the first four are well

00077

1  known, aren't they?

2          MR. WALSH:  Yes, they are, your Honor.

3          THE COURT:  I mean, as per -- E is, too.  I

4  don't recognize the last three as -- well, anyway, all

5  right.  So, what is your point?

6          MR. WALSH:  The point is really --

7          THE COURT:  Are you saying you don't --

8          MR. WALSH:  -- your Honor --

9          THE COURT:  You haven't gotten discovery about

10  whether -- of the documents that show that you knew or

11  your client knew.

12          MR. WALSH:  Yes, that form the basis for these

13  extensive allegations.

14          THE COURT:  Okay.  But why does that obviate

15  the need for you to provide the discovery they're asking?

16          MR. WALSH:  I offered it only as an aside,

17  your Honor.

18          THE COURT:  Okay.

19          MR. WALSH:  But, you know, again --

20          THE COURT:  All right.  Well --

21          MR. WALSH:  -- there is a --

22          MR. WERBNER:  So now we're one and one.

23          THE COURT:  Yes, I was going to say --

24          MR. WERBNER:  Okay.

25          THE COURT:  -- maybe I owe Mr. Werbner one

00078

1  here.

2          MR. WALSH:  There is a Lebanese account noted

3  here at the very bottom of the list, your Honor.  Again,

4  we have not pursuant to the orderly process that this

5  court has instituted, made any formal application to the

6  Lebanese courts and in the case of Lebanon as in the case

7  of Jordan and the Palestinian territories, we very much

8  would like to be acting with the blessing of the local

9  regulators rather than being put to the hard choice

10 otherwise.

11         THE COURT:  You mean -- all right.  Well, you

12 know, we just know where that's going to end up.  I mean,

13 for goodness sake.  But I am not going to deny you the

14 opportunity --

15         MR. WALSH:  Your Honor, we do have permission

16 in Jordan --

17         THE COURT:  I'm not going to deny you the

18 opportunity to do it but --

19         MR. WALSH:  We do have permission in Jordan,

20 your Honor.

21         THE COURT:  I guess we started out by saying --

22 I mean, Mr. --

23         MR. SWIFT:  Swift.

24         THE COURT:  -- Mr. Swift said he wanted an

25 order today and, you know, we may be at a point where I

00079

1   need to do that.  All right.  I think I've already given

2   an order to a certain extent like the one that you

3   presented.  Now, if I need to get a new one -- anyway,

4   but it seems to me again though that nine or ten does

5   fall within the scope of documents that are -- you know,

6   here I have --

7          MR. WALSH:  If you look at the full text of

8   paragraph 10, your Honor, it's exceedingly broad.

9          THE COURT:  It is broad.

10         MR. WALSH:  It is --

11         THE COURT:  It is broad.

12         MR. WALSH:  It is --

13         THE COURT:  I think that somehow there has to

14  be a connection to the case.  I mean, basically to the

15  extent of -- I am not sure that ordering every document

16  is -- the Saudi Committee is one thing, it seems to me.

17  That one is easier to justify saying every document that

18  you're entitled to.  This is a little bit harder to

19  justify, every document relating to every activity that

20  these organizations are engaged in, regardless of what

21  impact -- what connection they had to your clients or

22  even to terrorist activities.  I guess you could say

23  because they're a terrorist organization, everything they

24  do -- every financial transaction they're engaged in is a

25  terrorist transaction.

00080

1           MR. WEBNER:  For sure as to the designated

2  ones for sure because that one --

3           THE COURT:  Is that what the government has

4  said?

5           MR. WEBNER:  Well, Judge Gershon has said and

6  the statute -- yes, and the government.

7           THE COURT:  But I mean let's say --

8           MR. WEBNER:  Because money is funded --

9           THE COURT:  Look, Hammas is running elections,

10  is putting up candidates for elections in --

11           MR. WEBNER:  You cannot support -- under US

12  law, even if they're giving it to orphans because the --

13           THE COURT:  But why is that relevant -- forget

14  about that.

15           MR. WEBNER:  It is relevant to the

16  violation --

17           THE COURT:  Forget about that.  Why is that --

18           MR. WEBNER:  It's a violation.

19           THE COURT:  -- relevant to the case here?

20           MR. WEBNER:  Because it's a violation.  You

21  cannot -- the Congress said because money is fungible and

22  you would be freeing up dollars, even if they used the

23  monies and the other things for non-terrorist things by

24  giving a designated terror group money, the money is

25  fungible.  You are helping them -- go ahead.

00081

1            MR. STEINGARD:  I just want to read --

2            THE COURT:  Well, but wait a minute.

3            MR. STEINGARD:  Can I?

4            THE COURT:  Wait a minute.  The theory is that

5    if Arab Bank is engaged in transactions involving these

6    organizations --

7            MR. WERBNER:  Or (inaudible).

8            THE COURT:  -- it is providing material aid in

9    support.

10            MR. WERBNER:  Correct.

11            THE COURT:  Right?  So that -- and --

12            MR. WERBNER:  And that would be a primary

13    violation.

14            MR. STEINGARD:  Your Honor, could I just read

15    you one short --

16            THE COURT:  Yes, but you know, I --

17            MR. STEINGARD:  -- thing from Judge Gershon?

18            THE COURT:  I'm sorry?

19            MR. STEINGARD:  Judge Gershon in her opinion

20    addresses this exact issue citing from the Humanitarian

21    Law Project case, she says, "The Court noted that

22    material support given to a terrorist organization can be

23    used to promote the organization's unlawful activities

24    regardless of donor intent.  Once the support is given,

25    the donor has no control over how it is used."

00082

```
 1            THE COURT:  Well --

 2            MR. STEINGARD:  And that's the bottom --

 3            THE COURT:  I understand that theory.  I

 4   understand.  But that's a little bit -- it's separate

 5   from the notion of providing every document relating to

 6   that organization's activity.  It's just as a discovery

 7   matter.

 8            MR. STEINGARD:  Well, but they should --

 9            THE COURT:  I mean, you know, here the

10   burdensomeness starts to kick in a little bit, you know,

11   where the activities are not specifically related to your

12   -- I understand you're saying they've done all sorts of -

13   - the bank conducts all of these transactions for them;

14   right?  In a sense, that alone is enough; isn't it?

15            MR. WERBNER:  Well, they shouldn't have any.

16   They shouldn't have any records for Hammas.  They said

17   they don't.

18            THE COURT:  Well, if they don't, they find --

19            MR. WERBNER:  In other words, it shouldn't be a

20   burden.  I mean --

21            THE COURT:  Well, if they're saying it's not a

22   burden, that's fine.  But the order is as to the -- if I

23   issue that order, I've got to give them a chance to say

24   it's burdensome to produce it and to show why it's

25   burdensome.  So, on the one hand I am saying a moment ago
```

00083

1   the burdensomeness is much less of a concern for me when

2   I am talking about the Saudi Committee.

3           When I order them to produce every document

4   relating to these other organizations, I am -- the

5   burdensomeness argument has a little more -- it gives me

6   a little more pause, let me put it that way.

7           But I understand your theory for relevance in

8   terms of, you know, the broader picture of establishing

9   aid in support.  I you administer the financial

10  transactions for a designated terrorist organization, and

11  those transactions number in the millions of

12  transactions, then that is a significant fact in

13  establishing material aid in support.

14          Is that your --

15          MR. STEINGARD:  Well, that's --

16          THE COURT:  See, but you don't necessarily need

17  every document --

18          MR. STEINGARD:  Well --

19          THE COURT:  -- to establish that notion, is

20  what I am saying.  All right.  Look, I think I've given

21  you some guidance on what I am thinking there.  All

22  right.  I can see the theory of relevance but I will

23  certainly consider the burdensomeness argument with

24  respect to that.

25          Number ten, what's that?  That was the one we

00084

1  just dealt with.  Number 11 sounds like a pretty good

2  one, a good request.

3           MR. STEINGARD:  That's our opinion.

4           MR. WALSH:  Your Honor?

5           THE COURT:  I think that one goes without -- I

6  am surprised that I -- no, I think that that's definitely

7  -- do you have any argument on that one, Mr. Walsh?

8           MR. WALSH:  Your Honor, we'd only note that the

9  request as framed obviously encompasses activity that

10  could be entirely legitimate and have nothing to do with

11  the allegations of wrongdoing in this complaint.

12           Surely, there's nothing wrong with making

13  donations to hospitals, to schools, to, you know, food

14  baskets for children who can't eat and why this needs to

15  be placed in contention, as an alleged act of wrongdoing

16  by the bank is something that really escapes us.

17           THE COURT:  Well, I think it would go to the

18  intent enough to order the discovery.

19           Number 12 -- okay, here we've already dealt

20  with 12, essentially, haven't we?

21           MR. STEINGARD:  That's correct.

22           THE COURT:  13 --

23           MR. STEINGARD:  13 is another variation of 12

24  essentially.

25           THE COURT:  That's right.  Yes, again I

00085

1  consider the documents that are requested there are

2  relevant and therefore, should be produced; 12 and 13.

3            14, as well.  I will hear you on that,

4  Mr. Walsh, because I think 14 is --

5            MR. WALSH:  Again only, your Honor, my concern

6  is one I've already stated which is that it would be

7  unreasonable to impose the duty --

8            THE COURT:  I'm not putting on you to do

9  research to find out who falls within that but to the

10  extent that you have documents that are, for instance,

11  created for the specific purpose or databases created for

12  the specific purpose of naming or maintaining information

13  about martyr, suicide bombers, well then that's -- you

14  have that obligation.  You don't have to go out and

15  conduct research to determine who people are who might be

16  within your databases that also --

17            MR. WALSH:  That was my concern, your Honor.

18            THE COURT:  You know, but -- okay.

19            15 is encompassed already.  I think we've dealt

20  with that one; right?  I hope so.

21            MR. WALSH:  I believe so, your Honor.  And

22  that's with regard to the Saudi Committee transactions,

23  your Honor.

24            THE COURT:  Well, it was my understanding that

25  the Saudi Committee was the organization through which --

00086

1   I don't know of any other organization through which

2   these payments that's conducting the certification

3   requirement.  But look, if there's something that you

4   know that we don't, then I think that you're obligated to

5   make -- they didn't limit it that way and I don't think

6   that the case requires it that I limit it that way.

7           MR. WALSH:  I understand.

8           THE COURT:  15; okay.  16, what's that?  Tell

9   me what the relationship is to this case, plaintiffs.

10          MR. WERBNER:  Well, it goes to their state of

11  mind because --

12          THE COURT:  What is the Fund for the Support of

13  the Persistence of the Palestinian people?  Is that a

14  designated terrorist organization?

15          MR. WERBNER:  No, sir.  They may claim that it

16  was purely humanitarian.  Our evidence will be that that

17  was also paying money to people who were engaged in the

18  violent intifaddah and it reflects, at least for whatever

19  weight the jury wants to give it, whether the bank was

20  intentionally aiding that cause and it gives them

21  motivation or not.  It doesn't mean that it's conclusive

22  on the subject but in the newspapers, it was declared.

23  We want to examine what their papers are that show why

24  they are supporting that.

25          And if -- that's why it would be pertinent.

00087

1  It bears on their state of mind as to whether they would

2  help violence of this kind of not.

3          THE COURT:  Well, but you're going to end up

4  showing that this fund, the funded terrorist activities?

5          MR. WERBNER:  Yes, that --

6          THE COURT:  How are you going to do that?

7          MR. WERBNER:  Well, we're going to show what

8  they -- how they advertised for the funds.  In fact,

9  we're going to show that they were explicit in saying

10  this, you know, intifaddah, that the intifaddah was

11  characterized by attacks against civilians.  Nobody at

12  that point in time could donate money and not see that

13  supporting the intifaddah and providing money to the

14  ongoing was included -- included that violence.

15          THE COURT:  This is -- what you're saying is

16  tantamount to saying that anybody who donated to any

17  Palestinian organization was thereby engaging in a

18  terrorist --

19          MR. WERBNER:  No.

20          THE COURT:  -- support.

21          MR. WERBNER:  I'm saying they might.  They

22  could have been innocent donors or they might not have

23  been.  I'm not saying that per se because they donated $2

24  million, I'm just saying that it has a tendency which is

25  the relevance test, and the discovery, if they did

00088

1   depending on the other circumstances, the jury could

2   infer that they were willing -- that may be why they were

3   willing to do the other things that they've done.

4           THE COURT:  No, what you're saying is that you

5   can draw an inference from the fact that somebody made a

6   donation to some Palestinian organization, that they were

7   making that donation with the intent of supporting

8   terrorism.

9           MR. WERBNER:  That you might be able to.  I'm

10  not saying every --

11          THE COURT:  No, I mean you --

12          MR. WERBNER:  It depends on the --

13          THE COURT:  No, I mean, you're saying -- and

14  I'm not wiling to buy that.  The theory of relevance here

15  is because -- I need to know what the Fund for the

16  Support of the Persistence of the Palestinian People

17  does --

18          MR. WERBNER:  Right.

19          THE COURT:  -- before I am willing to say that

20  -- it seems to me, I mean --

21          MR. WERBNER:  No, because I agree.  Let's see

22  what we can amplify.

23          MR. OSEN:  Your Honor, if I may, I apologize,

24  Gary Osen for the Linde and Coulter plaintiffs.  Since I

25  actually drafted that request, I am probably better

00089

1  suited to addressing it.

2      The plaintiffs do not contend that the Saudi

3  Committee is the only mechanism in the Middle East for

4  supporting the families of the martyrs.  There are, in

5  fact, numerous committees; a Jordanian committee, Kuwaiti

6  committee and so forth.  The focus of our allegations

7  you're correct, deal with the Saudi Committee.  However,

8  the committee referenced in that discovery request is one

9  of several in the Arab world that have publicly pledged

10  to support the intifaddah and to support the families of

11  the martyrs.

12      We don't know as Mr. Werbner has indicated,

13  whether it's of the same scope and nature as the Saudi

14  Committee and, therefore, what we're trying to ascertain

15  is, in fact, what the Arab Bank's knowledge of the

16  aforementioned committee is and to determine because it's

17  a specific instance where Arab Bank is publicly pledged

18  its own money, not transferring other people's money but

19  it's own funds for the support of the intifaddah.

20      Now, Mr. Walsh may come back and say that the

21  support of the intifaddah in this case is non-violent, it

22  has nothing to do with terrorism and so forth, that's

23  something that only the documents themselves would

24  reveal.  But we want to determine whether or not that $2

25  million contribution was, in fact, in the same vein and

00090

1  in keeping with the kind of monies the Saudi Committee

2  itself has pledged.

3          MR. STEINGARD:  May I --

4          MR. WALSH:  Your Honor?

5          MR. SWIFT:  And to that end, I believe,

6  your Honor, that -- Bob Swift speaking, that that

7  organization has been identified in one or more of the

8  complaints.  So, it's directly relevant to allegations --

9

10          MR. OSEN:  And that donation.

11          MR. SWIFT:  Your Honor, it --

12          THE COURT:  So it was named in the complaint.

13          MR. SWIFT:  Yes.

14          THE COURT:  As what?

15          MR. SWIFT:  As the kind of organization that

16  Mr. Osen described.

17          THE COURT:  Okay.

18          MR. OSEN:  It is not, your Honor, a designated

19  terrorist organization, nor I believe do these complaints

20  allege that it conducts terrorist activity.  We've heard

21  from Mr. Osen, a candid admission that he really doesn't

22  know precisely what this organization does and the

23  plaintiffs for that reason, would like to --

24          THE COURT:  I'm going to need some more --

25  you're going to have to supply me with some more

00091

1   information, not just -- I mean, look, it seems to me

2   that you have to establish that -- I mean, if you're not

3   even making an allegation that they were engaged in

4   terrorist activity.  Are you making that allegation in

5   the complaint?

6        MR. OSEN:  Well, your Honor, it's part of the

7   terrorist activity we're talking about is incentives and

8   rewards given to the families of martyrs.  So, to the

9   extent that they do provide those kinds of services, yes,

10  it would constitute support for terrorism.

11       THE COURT:  Is that the allegation in the

12  complaint?

13       MR. OSEN:  Correct.

14       THE COURT:  That this fund specifically

15  provided --

16       MR. OSEN:  It's not -- your Honor, to be --

17       THE COURT:  -- financial support?

18       MR. OSEN:  To be perfectly fair, the complaint

19  does not allege in the kind of detail that it does

20  concerning the Saudi Committee, the full extent of the

21  activities they have undertaken.  That may be a function

22  of the fact that they don't have a website detailing all

23  of the killers that they've paid.

24       However, that doesn't mean we're not entitled

25  to discovery to ascertain whether, in fact, they do in

00092

1    fact do that kind of activity and secondly, since the

2    bank has publicly --

3              THE COURT:  Well, no, but you see the theory on

4    which this was suggested was that this went to the

5    intent --

6              MR. OSEN:  Correct.

7              THE COURT:  -- of the bank because they decided

8    to gather money, apparently, from its employees and to

9    make its own contribution to this particular fund.

10             Now the theory is moving a little bit to

11   another realm and now you're saying that you need to find

12   out what this fund did with the money, I guess; right?

13             MR. OSEN:  Well, the first thing we want to

14   ascertain --

15             THE COURT:  But this is not what you're asking.

16   You're asking what -- who pledged.

17             MR. OSEN:  Right.  We're trying to ascertain

18   whether the bank has made direct contributions to a fund

19   comparable to the Saudi Committee in its purposes and its

20   intent.

21             THE COURT:  But --

22             MR. OSEN:  I.e., has personally pledged, that

23   is the bank itself has donated money for the support of

24   the martyrs in the same way that it has provided

25   financial services for other organizations doing the same

00093

1    thing.

2            THE COURT:  But I don't -- now you're just

3    saying -- but you are just saying you want to find out

4    whether they have actually -- whether the fund has

5    actually done that.

6            MR. OSEN:  Well, first and foremost, we want to

7    find out whether they've actually donated the money

8    that's been publicly described in the newspapers.

9    They've claimed at least in newspaper accounts that

10   they've donated such money.

11           THE COURT:  But that's just it.  Somehow, I am

12   just not -- Mr. Walsh, do you want to address this?  Do

13   you know anything about this fund?

14           MR. WALSH:  I don't, your Honor, but I think

15   Mr. Osen appears to be putting the cart before the horse.

16   There are no allegations in these complaints that this is

17   a terrorist organization.  If the argument we're now

18   hearing, your Honor, is that any monies that went for any

19   purpose for the relief of the Palestinian people are fair

20   game as a discovery proposition because at some point an

21   argument may be cobbled together, that that is the

22   support of terrorism, we think that's not what fair and

23   relevant discovery encompasses, your Honor.

24           THE COURT:  You see, there has to be some kind

25   of limits here.  I mean, just as a matter of case

00094

1   management, I've got to put some kind of limits on this.

2   And I am just not satisfied, based on what I have been

3   told so far about this fund, that any of this is

4   relevant.  Maybe you can -- I am not going to foreclose

5   you from making that showing.

6           MR. OSEN:  Your Honor, would it --

7           THE COURT:  At this time, I am not satisfied.

8   All right.

9           MR. OSEN:  Would it assist the Court if we

10  provided translations and so forth, of the relevant

11  articles describing the fund?

12          THE COURT:  I don't know what will assist the

13  Court.

14          MR. OSEN:  Okay.

15          THE COURT:  But right now, I don't have enough.

16          MR. OSEN:  Okay.

17          THE COURT:  So, I am not going to -- you're

18  free to do whatever you want.  Right now, I am not going

19  to -- I ma not opening this yet.

20          Okay.  What's number 17?

21          MR. STEINGARD:  17.  17 is the Lebanese bank

22  account that was also the subject of the phase one --

23          THE COURT:  Okay.  So, I've already dealt with

24  this.

25          MR. STEINGARD:  -- (inaudible) approved at the

00095

1  time.

2          THE COURT:  That's already been dealt with.

3          MR. WERBNER:  At the time you denied it.

4          MR. WALSH:  Well, your Honor, we have requested

5  the opportunity --

6          THE COURT:  I denied it?

7          MR. WERBNER:   -- at the time; yes.

8          MR. STEINGARD:  Yes.

9          MR. WERBNER:  Because it wasn't connected

10  specifically to a specific attack of the plaintiff.

11          THE COURT:  I see.  And what is it connected

12  to?

13          MR. WERBNER:  Well, we claim it is a Hammas --

14  Hammas on their website said send money to this account

15  and therefore, that was at Arab Bank.  And Arab Bank --

16          THE COURT:  Send money to this account for what

17  purpose?

18          MR. WERBNER:  For supporting Hammas.

19          THE COURT:  Okay.

20          MR. WERBNER:  And the bank, this is important,

21  the bank told Judge Gershon that they closed that account

22  after the lawsuit was filed and they saw our allegation.

23          THE COURT:  Okay.

24          MR. WERBNER:  Because it was --

25          THE COURT:  And Mr. Walsh?

00096

    1            MR. WALSH:  Your Honor, we would simply like

    2    the opportunity to seek permission of the Lebanese

    3    regulators.  It's something we don't have underway

    4    already only because --

    5            THE COURT:  I know.  But the first step is

    6    asking me to issue an order essentially; isn't it?

    7            MR. WALSH:  Yes.

    8            THE COURT:  Then you have an order and the you

    9    can go seek the regular -- but yes, 17 is a proper

   10    request.

   11            18?

   12            MR. STEINGARD:  Yes, your Honor, these are two

   13    advertisements.  The underlying claims here, these are

   14    two advertisements that were placed in Palestinian

   15    newspapers; one which listed more than 1,000 individuals

   16    who had been injured in the second intifaddah and invited

   17    their families to go to the Arab Bank to receive their

   18    allocations donated by the Saudi Committee.

   19            The second one requested that families of

   20    martyrs whose names were listed in it, go to a branch of

   21    Arab Bank to get their payment.

   22            MR. WERBNER:  But these are both subsumed under

   23    the Saudi material.

   24            MR. STEINGARD:  Yes, and also under effectively

   25    they are lists of martyrs, as well or lists of martyrs

00097

1 families.

2          THE COURT:  In other words, these are

3 advertisements placed --

4          MR. WERBNER:  In Palestinian appears.

5          THE COURT:  No, but on behalf of or for the

6 benefit of the Saudi Committee.

7          MR. STEINGARD:  Correct.

8          MR. WERBNER:  And they're saying go to the Arab

9 Bank branch to get your money.

10          THE COURT:  Okay.  Just let me read it again.

11 Okay.  So, this is a listing of martyrs, so-to-speak;

12 right?  Or not martyrs, martyrs and other injured people.

13          MR. WERBNER:  Three categories; martyrs,

14 prisoners and wounded that Saudi was paying money to and

15 said you people haven't collected, go to your local Arab

16 Bank branch manager --

17          THE COURT:  Right.

18          MR. WERBNER:  -- and collect your money.

19          THE COURT:  But what I am saying is this is an

20 identification.  This is a useful identification of the

21 names of people --

22          MR. WERBNER:  Yes.

23          THE COURT:  -- as to whom --

24          MR. WERBNER:  Yes.

25          THE COURT:  Okay.  So, Mr. Walsh?

00098

1            MR. WALSH:  Your Honor, many months ago I think

2   at our first meet and confer session, we asked the

3   plaintiffs for copies of these newspaper articles.  As

4   you've heard from both Mr. Werbner and Mr. Steingard, the

5   ads are not alleged to have been placed by Arab Bank.  We

6   would like the ads.  If they have them, it shouldn't be a

7   difficult proposition for them to provide them to us.

8            THE COURT:  I mean, have they asked for them?

9            MR. WERBNER:  They have been produced.

10            THE COURT:  Well, guys, some of you guys got to

11   get together and figure out -- somebody's got to -- this

12   is the ado r something, because they say they produced

13   it, you say they haven't.  But anything else?

14            MR. WALSH:  I mean, it would appear,

15   your Honor, that this request is subsumed in your earlier

16   Saudi --

17            THE COURT:  It does.

18            MR. WALSH:  -- Committee ruling.

19            THE COURT:  Right.  Exactly.

20            MR. WALSH:  So, there's no dispute as to what's

21   at issue here.

22            THE COURT:  19?  Okay.  This is a huge one.

23   What is this?

24            MR. WERBNER:  Can I give you a little

25   background on this one, your Honor, because we really

00099

1    haven't talked about it.

2          THE COURT:  Yes.

3          MR. WERBNER:  And Judge Gershon does and I

4    think that's very important, talk about what these

5    charitable committees that we claim and the United States

6    government has claimed are fronts for Hammas and

7    Judge Gershon specifically in her opinion discussed that

8    and has laid out that if the bank dealt with Hammas

9    directly or indirectly and knew that this was an agent of

10   Hammas.  And we have pled that this list of charity

11   entities are really Hammas controlled, thus they're run

12   by Hammas, their operatives are from Hammas, that these

13   are just fronts which the bank knew.

14         Consequently, it's important -- and I believe

15   many, many of the Saudi Committee transfers went not only

16   directly to the families of the suicide bombers but

17   through many of these Hammas fronts because the way this

18   worked is in each of these cities, Ramallah, Tulkarn,

19   Hebrone, Bethlehem (phonetic), Hammas had a supposed

20   charity that compiled the names of the martyrs.

21         In fact, we've produced, they put together what

22   they called a shocked (sic) or a martyr file with their

23   death certificate, their birth certificate, but I didn't

24   --

25         THE COURT:  You mean the various individual

00100

1   agencies?

2           MR. WERBNER:  Yes, and it was these

3   charities --

4           THE COURT:  All right; charities.

5           MR. WERBNER:  -- that did that and then took it

6   to the bank and then qualified the people in their

7   community that were Hammas numbers for receipt of the

8   funds.  And I can give you the page from Judge Gershon's

9   opinion where she talked about that.

10          The reason I say that not only have we alleged

11  they were Hammas fronts but there is a pending indictment

12  by the United States government against the Holy Land

13  Foundation where six of these have been specifically

14  singled out to be Hammas fronts.

15          Additionally, one of them has recently been

16  designated and the union of goods.  So, that's the reason

17  these are relevant.  Because these represent support to

18  Hammas indirectly through dealing with the Hammas agents

19  and we will be able to show that.

20          THE COURT:  So, how are you going to show that?

21  Where did you get this list of names of organizations?

22          MR. WERBNER:  Well, one we saw it in the

23  indictment that the United States brought.  Two, there is

24  Israel declared under seven criteria, these Hammas

25  fronts, not every Palestinian charity organization but

00101

1  they applied seven factors.  Number one has the --

2            THE COURT:  All right.

3            MR. WERBNER:  Can I just give you one example?

4            THE COURT:  No.

5            MR. WERBNER:  No, okay.

6            THE COURT:  I just needed to know what the

7  source is.  One is some of them came from an indictment

8  that the United States brought against --

9            MR. WERBNER:  Against the Holy Land Foundation

10  which is a Hammas --

11            THE COURT:  Okay. So, that's about six of them,

12  you say?

13            MR. WERBNER:  Yes.

14            THE COURT:  And then others were declared by

15  the Israelis --

16            MR. WERBNER:  The Israeli government.

17            THE COURT:  Israeli government.  And that's the

18  two sources?

19            MR. WERBNER:  Yes.

20            THE COURT:  But the overwhelming majority, it

21  sounds like, were declared by the Israeli government.

22            MR. WERBNER:  Yes.  And we will be prepared to

23  show that the Israeli government applied a criteria, a

24  seven criteria, I won't go in that if it's not helpful to

25  the Court, but it wasn't.  They just picked some.  They

00102

1   analyzed who were the leaders, who were the committees.

2   Had the PA ever closed them down?  Had the PA, the

3   Palestinian organization themselves treated them as

4   Hammas?  Did the people on the street consider them to be

5   Hammas?  And that's what led to the Israeli government's

6   legal action.  It was published in their legal gazette

7   and that's the basis on which we've named those entities.

8            MR. WALSH:  Your Honor?

9            THE COURT:  Yes.

10           MR. WALSH:  If Mr. Werbner plans to seek the

11  admission of these Israeli lists at some point in time,

12  perhaps he could provide them to us first.

13           MR. WERBNER:  It has been produced in English.

14           MR. WALSH:  I don't believe that's so.

15           MR. WERBNER:  I will give you the list.

16           MR. WALSH:  But will you let me finish?

17           THE COURT:  Okay.

18           MR. WERBNER:  Yes, sir.

19           THE COURT:  I hope you guys are using bates

20  numbers, by the way.

21           MR. WERBNER:  Yes.

22           MR. WALSH:  Yes.

23           MR. WERBNER:  And I can give him the bates

24  number.

25           MR. WALSH:  But, your Honor --

00103

1            THE COURT:  Okay.  Fine.  Do that.  You don't

2  have to do it now, do it at some point.

3            MR. OSEN:  Your Honor?

4            MR. WALSH:  May I finish please, your Honor?

5            THE COURT:  Well, wait, Mr. Osen, let

6  Mr. Walsh -- he's got the floor.

7            MR. WALSH:  Your Honor, there are 72 entities

8  that are listed here and with the exception of six that

9  Mr. Werbner claims were identified but presumably

10  unindicted in an indictment --

11           THE COURT:  No, well they were --

12           MR. WALSH:  -- these are drawn from a laundry

13  list that appeared in one of the complaints with nothing

14  other than the most boiler plate allegations as to front.

15           Now, this is a hugely invasive request with

16  regard to account holder.

17           THE COURT:  Well, it --

18           MR. WALSH:  It essentially, your Honor --

19           THE COURT:  I get it.

20           MR. WALSH:  -- designates every charity in the

21  Palestinian territories and says --

22           THE COURT:  Well, I don't know about that.

23           MR. WALSH:  -- give us the account records.

24           THE COURT:  But it certainly is a lot and it's

25  asking for a lot of documents relating to all of these

00104

 1  committees.

 2          MR. WERBNER:  If I could make a proposal

 3  subject to the co-counsel, I would propose without

 4  waiving it fully that for the time being, we limit it to

 5  those that are listed in either the United States

 6  indictment or the list which I will give the bates number

 7  declared by Israeli, at least as an initial production.

 8          THE COURT:  Oh, some of the rest of these are

 9  even beyond that, you're saying?

10          MR. WERBNER:  There may be.  I don't --

11          THE COURT:  But still -- again, this is -- I

12  mean, I think I understand the theory of relevance now a

13  little bit.  To the extent that the bank was involved in

14  transactions with these committees, that is another way -

15  - once you link up these committees with Hammas of

16  showing aid to a terrorist organization --

17          MR. WERBNER:  Right.

18          THE COURT:  -- some of which aid went to pay,

19  you allege and you hope to be able to prove it, went to

20  pay out the funds to --

21          MR. WERBNER:  Yes.

22          THE COURT:  -- plaintiffs -- to the martyrs who

23  are the other people who injured your plaintiffs.

24          MR. WERBNER:  Yes.

25          THE COURT:  But aren't you going to get, to the

00105

1    extent that you've asked for it, you're going to get the

2    documents that reflect payments on behalf of the various

3    martyrs to at least some of these organizations?

4              MR. WERBNER:  Yes.

5              THE COURT:  So, the scope of the discovery

6    you're asking for is something I am not sure you're going

7    to need.

8              MR. WERBNER:  Let me say what I would like that

9    -- why we would.  For example, first let me note that the

10   first four are the same entity, Topar (phonetic) charity

11   is --

12             MR. STEINGARD:  Wait, wait.  That's

13   (inaudible).

14             MR. WERBNER:  Okay.  But anyhow, here's what we

15   need more.  I believe that these had accounts at the Arab

16   Bank.  Let's say the Ramallah Charity Committee had an

17   account.  During the intifaddah if they ever said towards

18   the know your customer, if they ever investigated who is

19   the Ramallah Charity Committee, why did the PA in the --

20   shut them down because they were a Hammas front?

21             We need to investigate.  If they have any

22   records that reflect who they are and whether or not they

23   are engaged in humanitarian versus terrorism, if they

24   have documents like that, that's what we would like to

25   see.  They may not have any.

00106

```
 1            THE COURT:  Well, but the point I -- I mean,
 2  yes, when the request starts getting narrowed in that
 3  way, it makes it a lot easier for me to order -- you see,
 4  I don't -- Mr. Walsh, I hear you.  I mean, I already hear
 5  you.
 6            MR. WALSH:  Your Honor?
 7            THE COURT:  I think I've already heard you;
 8  haven't I?
 9            MR. WALSH:  Yes, you have, your Honor.
10            THE COURT:  Yes.
11            MR. WALSH:  It seems to us that what you
12  proposed in terms of staging is a far more orderly and
13  fair way of approaching what otherwise would be a hugely
14  invasive and burdensome process merely because there's a
15  conclusory allegation that the some 70 charity committees
16  are front organizations.
17            THE COURT:  But they are entitled to
18  investigate.  They are entitled to investigate and I am
19  hoping that I can -- let me say this.  I am not prepared
20  at this point to order the production of every document
21  relating to these accounts, every disbursement, every
22  source of funds deposited into it.
23            Documents relating to who signs on the
24  accounts, who is -- you know, who opened the account, who
25  signed the accounts, those sorts of documents, however,
```

00107

1  which -- I mean, I don't -- it's still going to be

2  somewhat of a burden but there's only 72 of them, so I

3  don't think that that's not -- I don't find that

4  particularly burdensome.  Let me put it that way.

5          To the extent that there is a flow of funds

6  that can be traced to any martyr event or martyr payment

7  or prisoner payment or whatever, that would be

8  discoverable.  But --

9          MR. WALSH:  But, your Honor, how can Arab Bank

10  possibly conduct that inquiry?

11          THE COURT:  What I am saying is I'm talking

12  about in the long run.

13          MR. WALSH:  I understand that.

14          THE COURT:  I'm not talking about right this

15  minute because I don't know that anybody's in a position

16  to give you that kind of information right this minute.

17  But again, this is more of a burdensomeness issue to me.

18  I understand the connection.  And I understand why

19  there's a need to get some of this information.

20          But it does seem to me to be burdensome to

21  require the Arab Bank gather every document relating to

22  everything that any of these accounts ever did.

23          MR. WERBNER:  Well, I would say on the record

24  subject to co-counsel, I would be willing to orally

25  narrow it just in the way that the Court has just stated

00108

1    on the record because I believe that if they produced

2    that, that's all we really need.  If that's agreeable to

3    counsel, we can move on.  Just make a note, I was being

4    agreeable, so --

5              MR. OSEN:  I think -- if I may, your Honor, I

6    think that for the time being, we should work with what

7    you proposed.  However --

8              THE COURT:  I'm not even sure I remember what I

9    proposed.

10             MR. OSEN:  Account opening records as to the 72

11   accounts.

12             THE COURT:  Account opening records, signature

13   authority; that sort of thing.

14             MR. OSEN:  And we will furnish your Honor with

15   additional information and come back on this.  But I

16   don't want to be --

17             THE COURT:  Well, you may not even have to

18   furnish it to me.  To the extent that you are able to

19   show the rough -- even indirectly through -- I mean, I

20   don't know how things are going to -- how the discovery

21   is going to -- who knows, you may never get any

22   documents.  So, this is -- but, you know, if you're able

23   to show that there's a transaction that went from Arab

24   Bank to any of these charities for the purpose of -- even

25   by timing makes it looks like it's for the purpose of

00109

1   making a payment to survivors, then you would be entitled

2   to follow that trail of money and follow that transaction

3   record.  That's what I am --

4              MR. OSEN:  We just don't want to be foreclosed

5   on this.

6              THE COURT:  I'm not foreclosing you.

7              MR. OSEN:  But we understand your Honor's

8   ruling.

9              THE COURT:  I'm not foreclosing you.  But at

10  this point, I am not going to require anymore than the

11  production of the account opening records and records

12  relating to authority over the account.  And obviously,

13  account numbers.

14             By the way, have you worked out any kind of

15  confidentiality --

16             MR. STEINGARD:  Yes.

17             MR. WALSH:  We have, your Honor.

18             MR. STEINGARD:  And your Honor signed it for

19  us.

20             THE COURT:  And I signed it.

21             MR. STEINGARD:  Yes.

22             THE COURT:  All right.

23             MR. STEINGARD:  Number 20 is really some

24  additional charitable committees that weren't included in

25  19 -- one of the reasons was there's some name issues at

00110

  1  times.  So, we want to make sure we had everything listed

  2  correctly.

  3          THE COURT:  I'm not sure I understand what

  4  you're saying.

  5          MR. STEINGARD:  Well, because of the conversion

  6  from Arabic to English and English transliterations, some

  7  of the names get listed a bunch of different ways.  I

  8  just want to make sure we have --

  9          MR. WERBNER:   19 and 20 go together.

10          MR. STEINGARD:  Exactly.

11          THE COURT:  And you're saying that 20 are

12  different ways of saying or of translating names that

13  appear in 19?

14          MR. WERBNER:  Some of them --

15          MR. STEINGARD:  Yes.

16          MR. WERBNER:  And some had account numbers.

17          MR. STEINGARD:  And some had different account

18  numbers, so we wanted to make sure we had it all covered.

19          MR. OSEN:  Your Honor, the one other

20  distinction in number 20 is that in those cases, we

21  believe that Arab Bank is actually the bank that holds

22  the account for the Hammas front, as opposed to 19 where

23  there may only be transactional records that flow through

24  the bank.

25          THE COURT:  I see.  Well, all the more reason

00111

1  why -- Mr. Walsh, do you want to be heard on this?

2              MR. WALSH:  Your Honor, we're willing to apply

3  the same --

4              THE COURT:  Okay.

5              MR. WALSH:  -- principles to 20 and obviously,

6  in light of Mr. Osen's clarification, if the entities

7  identified in 19 were not Arab Bank account holders, then

8  there shouldn't be any account holder --

9              THE COURT:  Right.  So, it's that much less

10  burdensome.

11              MR. WALSH:  -- opening documents or

12  signatories.

13              THE COURT:  But then there may be -- and well -

14  -

15              MR. WALSH:  But it seems fair to apply the same

16  principle.

17              THE COURT:  Right; okay.

18              21, what's that?

19              MR. WERBNER:  21-A has been designated as a

20  PIJ, a Palestinian Islamic Jihad terror organization.

21  So, it's just --

22              THE COURT:  Is that one of the FTOs?  Is that

23  it?

24              MR. WERBNER:  Yes.

25              THE COURT:  Okay.

00112

1            MR. WERBNER:  Yes, sir.

2            THE COURT:  Okay.

3            MR. WERBNER:  B and C, I don't know offhand

4    that they've been designated but we had information that

5    suggested that they were PIJ fronts.  Hammas had a lot

6    more.  This one is the Islamic Jihad which is a smaller

7    -- I know A has been designated.

8            THE COURT:  Are these allegations in the

9    complaint?

10           MR. WERBNER:  Yes, sir.

11           THE COURT:  You allege that --

12           MR. WERBNER:  Ali Shon (sic) and we have

13   produced documents --

14           THE COURT:  No, you've already said Ali Shon is

15   a -- it's already been designated as an FTO.  The other

16   two --

17           MR. WERBNER:  I don't know that we named those

18   other two in the complaint, if that's your --

19           THE COURT:  Okay.  Yes, that's my question.

20           MR. WERBNER:  No, I cannot say that we have.

21           MR. OSEN:  Your Honor, they were named in the

22   complaints but they're not -- they're alleged to be PIJ

23   front organizations but they --

24           THE COURT:  I' sorry, they were named in the

25   complaint.

00113

1          MR. OSEN:  Sorry.  And alleged to be front

2    organizations for the Islamic Jihad and Palestine.

3    They're -- all three of them are named in the complaint.

4    Mr. Werbner's point is that the first one has been

5    officially designated by the United States Treasury as an

6    Islamic Jihad front.

7          THE COURT:  But all three were named -- were

8    alleged in the complaint to be involved in terrorist

9    activity.

10          MR. OSEN:  Yes, to the degree that they are

11    fronts for Islamic Jihad, a designated terrorist

12    organization.

13          THE COURT:  Oh, that they are fronts for --

14    when you say front, that means they are --

15          MR. WERBNER:  Alter ego.

16          THE COURT:   -- just another name under which

17    they operate.

18          MR. WERBNER:  Agents of.

19          MR. OSEN:  Correct.

20          THE COURT:  Okay.

21          Mr. Walsh?

22          MR. WALSH:  Well, your Honor, the logic

23    underlying this request seems analogous to that

24    underlying request number ten.  And, you know, we

25    respectfully suggest that whatever guidelines your Honor

00114

1    offered with respect to ten should obtain here.

2              THE COURT:  I must tell you I forget what I had

3    said with respect to number ten.

4              MR. WERBNER:  You said produce it but you

5    cautioned us that if there was too great a burden, then

6    you would want them to show you what burden --

7              THE COURT:  Yes.

8              MR. WALSH:  There was an issue of over breath;

9    that's correct.

10             THE COURT:  Okay.  Now I remember.  Yes, okay.

11   They're subject to production -- let me put it this way

12   or phrase it this way.  They're subject to production

13   unless the court finds production to be too burdensome,

14   in which case I would certainly entertain any

15   alternatives or ways to make it less burdensome, but yet

16   provide the information that -- provide information that

17   is useful to the -- or that is useful to the plaintiff's

18   position. I don't know how else to phrase it.

19             MR. WALSH:  We understand, your Honor.

20             MR. WERBNER:  I think this is just a repeat of

21   Saudi Committee stated another way, so I think --

22             THE COURT:  Wait.  What are we talking about?

23             MR. WERBNER:  22.

24             THE COURT:  I haven't gotten there yet.  Just

25   give me a second.

00115

```
 1            MR. WERBNER:  Oh, I am sorry.  Okay.

 2            THE COURT:  Okay.  Number 22 is what?  What did

 3  you say?

 4            MR. WERBNER:  22 is a little different

 5  phrasing.  It mentions El Ansar (phonetic), which is a

 6  Hammas front that we've specifically stated in our

 7  complaint to be a Hammas front.  But it should be

 8  subsumed under the prior request.  It's just a little

 9  different phrasing where we think there's a database of

10  -- so, I --

11            MR. OSEN:  Your --

12            MR. STEINGARD:  It's -- go ahead.

13            MR. OSEN:  Sorry.  Your Honor, the allegations

14  that are specific to El Ansar in the complaint derive

15  from the fact that El Ansar's own website not only

16  describes payments to the martyrs and the usual aphorisms

17  regarding avenging the blood of the martyrs and so forth,

18  but specifically, El Ansar's website references

19  consulting with the branch manager of Arab Bank to

20  facilitate the payments to the families.  So, we regard

21  this one as sort of a special stand alone because there's

22  direct relevance from the website content which is fully

23  outlined in the complaints.

24            THE COURT:  Okay.  Well, number 22, Mr. Walsh,

25  anything?  It doesn't --
```

00116

```
 1              MR. WALSH:  Your Honor, it would appear as

 2   Mr. Werbner noted to be subsumed in the larger Saudi

 3   Committee directions you've provided.

 4              THE COURT:  It may or may not but --

 5              MR. WALSH:  But if there are such --

 6              THE COURT:  It may or may not.

 7              MR. WALSH:  -- lists or databases, we

 8   understand them to be encompassed in your ruling.

 9              THE COURT:  Yes, fine.  22 is okay then.  I

10   mean it's a request to be honored.

11              23?

12              MR. OSEN:  I'm sorry, your Honor, just a point

13   of clarification on 22.  Are you saying that the

14   defendants only have to produce the account signatory

15   information?

16              THE COURT:  No.

17              MR. OSEN:  No.  They have to produce

18   everything.

19              THE COURT:  No.

20              MR. OSEN:  No, they have to produce everything.

21              THE COURT:  No, that's not what request number

22   22 asks for.

23              MR. OSEN:  Correct.

24              THE COURT:  You asked for all documents which

25   refer or relate to listings or databases provided to Arab
```

00117

1   Bank by the El Ansar charitable society or any other

2   entity identified in document request 18 or by the Saudi

3   Committee, et cetera, et cetera.  I mean, I don't need to

4   read it all in the record but the request is all

5   documents which refer to databases and payments made to

6   people listed in the databases; right?

7           MR. OSEN:  Correct.

8           THE COURT:  It's a relatively narrow request by

9   comparison to most of the others or to many of the

10  others.  Let me put it that way.  And I think it is

11  clearly relevant.

12          So, 23?

13          MR. WERBNER:  A through G have all been

14  designated.  These are counterparts to the Saudi

15  Committee in other parts of the world; France, Austria,

16  Germany, the United States, and Belgium and --

17          THE COURT:  These are counterparts to what?

18          MR. WERBNER:  They're just like the Saudi

19  Committee.  They've all been designated by the United

20  States government.

21          MR. OSEN:  Excuse me.  I think counsel

22  misspoke.  The Saudi Committee hasn't been designated as

23  DGT.  But A through E and G have all been designated,

24  specially designated global terrorists by the United

25  States Treasury Department.

00118

1           I'm sorry, your Honor, A, B, and C were done in

2    August of 2003,  D in 2001, E in August of 2003 and G, I

3    believe in April or May of 2005.

4           THE COURT:  And F?

5           MR. OSEN:  And 3; sorry.  F is an umbrella

6    organization which is the, if you will, the parent

7    company of most of these European SDGTs.  It's not been

8    designated itself but it is explicitly the parent

9    organization or umbrella organization for Interpal and

10   the other SDGTs.

11          THE COURT:  And you said it is -- how is it

12   generally known or held out to be that?

13          MR. OSEN:  Right, well, the Union of Good

14   itself are you referring to?

15          THE COURT:  Yes.

16          MR. OSEN:  Yes.

17          THE COURT:  You said F is the parent to some of

18   the other organizations listed her.

19          MR. OSEN:  The Union of Good is an organization

20   outlawed by Israel.  It purports itself to be an umbrella

21   organization for 52 Islamic organizations worldwide

22   including the SDGTs listed in A through C.

23          THE COURT:  You say it holds itself out that

24   way?

25          MR. OSEN:  Correct.

00119

1               THE COURT:  Where, on its website or whatever?

2               MR. OSEN:  Yes, it has a website at

3       www.100days.org.

4               THE COURT:  Okay.

5               So, Mr. Walsh?

6               MR. WALSH:  Your Honor, it's not clear to me

7       that, as I sit here, that there are allegations in the

8       complaint with respect to each of these entities.

9       Perhaps Mr. Osen could shed a bit of light on that.

10              MR. WERBNER:  We produced a 34 page report on

11      the Union of Good and I can give you the bates number

12      right now.

13              MR. WALSH:  I'm only --

14              THE COURT:  No, he's only asking --

15              MR. WALSH:  -- asking about the allegations of

16      the complaint.

17              THE COURT:  The question was what are the

18      allegations in the complaint relating to these

19      organizations?

20              MR. OSEN:  Well, we allege that, at least I

21      speak for Linde and Coulter but it's certainly true for

22      the other complaints, that numerous plaintiffs in our

23      collective actions have been killed, injured or maimed by

24      Hammas to the extent that SDGTs, especially A, B and C,

25      for example, as well as Holy Land Foundation were so

00120

1  designated precisely because they are viewed as agencies

2  of Hammas and Hammas fund raising, providing financial

3  services to a Hammas organization or an alter ego is per

4  se a violation of US law and of the Antiterrorism Act.

5          THE COURT:  And you have evidence that will

6  establish that these organizations are related to Hammas?

7          MR. OSEN:  Not only do we have evidence but the

8  United States government has so designated them.  The

9  President of the United States on August 22, 2003 --

10         THE COURT:  When you say SDGTs?

11         MR. OSEN:  Special Designated Global

12 Terrorists.

13         THE COURT:  And that means that they are

14 connected to Hammas?

15         MR. OSEN:  The President formally connected him

16 in his statement designating those entities.

17         THE COURT:  Okay.

18         MR. WALSH:  Your Honor, I think the fact

19 remains that there are no allegations in the complaints

20 about these entities.

21         MR. WERBNER:  No, there are.

22         THE COURT:  But there are about Hammas.

23         MR. WERBNER:  There are.

24         MR. WALSH:  About Hammas but not these

25 entities.

00121

1                THE COURT:  Wait, one at a time.

2                MR. WERBNER:  Sorry.

3                THE COURT:  Mr. Walsh has the floor.

4                MR. WERBNER:  Sorry.

5                MR. WALSH:  Your Honor, we understand that

6    there are allegations about Hammas.  That's quite plain

7    to all of us.  But if the significance of these entities

8    as Mr. Osen notes is their alleged connection to Hammas,

9    it would be of value to us to read those allegations in

10   the complaints.

11               And as I understand Mr. Osen's remarks, there

12   are not presently any such allegations.  It seems

13   reasonable before discovery of this sort is contemplated

14   that at the very least, the complaint offered the

15   template for what should be fair discovery here.

16               THE COURT:  Do you mean the template in the

17   sense of what the scope --

18               MR. WALSH:  Yes, your Honor.

19               THE COURT:  -- of the discovery ought to be

20   allowed to be --

21               MR. WALSH:  I mean, if we are to get laundry

22   lists of all of these many, many, many hundreds of

23   organizations, at the very least, there should be some

24   allegation in the complaint that illustrates their

25   ostensible relevance to the matters in dispute.

00122

```
 1            THE COURT:  Okay.  Who wants -- one or both of

 2   you can respond, since you both -- you represent

 3   different parties.

 4            MR. WERBNER:  Paragraph 464 of the Litle live

 5   pleadings states, "Arab Bank also knowingly laundered

 6   funds for Interpal, a London based 'charity' that has

 7   raised funds in Europe for Hammas for more than a

 8   decade."  And it goes on, and I can just do another words

 9   search here on Holy Land.  So, it has been specifically,

10   at least to the extent that Interpal and Holy Land

11   Foundation.

12            MR. OSEN:  We in the Coulter complaint

13   identified certainly A, B, C and D and E.  I don't

14   believe that we specifically identified F or G but from

15   our perspective, that's hardly relevant since the can

16   agreed in is that they're Hammas fronts.

17            THE COURT:  But so why is -- if just because

18   they happen to be Hammas fronts, why does that make it

19   relevant?

20            MR. OSEN:  Because knowingly providing material

21   support to an agent of Hammas is per se liability for any

22   plaintiff who has been injured by reason of an attack of

23   Hammas.

24            THE COURT:  Mr. Walsh?

25            MR. WALSH:  Your Honor, if indeed the complaint
```

00123

1  alleges --

2          THE COURT:  Well, no, put aside whether it does

3  or not.  The theory of relevance is that if the bank

4  provides aid to Hammas --

5          MR. WALSH:  Yes.

6          THE COURT:  -- and then --

7          MR. WALSH:  Knowingly.

8          THE COURT:  -- knowingly provides --

9          MR. WALSH:  Or organizations known by it to be

10  Hammas in other words --

11          THE COURT:  Right, then you're liable for the

12  injuries to their clients.

13          MR. WALSH:  And my only point, your Honor --

14          THE COURT:  Caused by Hammas.

15          MR. WALSH:  Yes, we understand that those are

16  the allegations of the complaint.  But my only point is

17  that absent such identification in the complaint of

18  alleged front organizations, there doesn't appear to be a

19  basis for your Honor to conclude that this is relevant

20  discovery.

21          THE COURT:  Well, what if it's short of putting

22  it in the complaint, they establish it some other way?

23          MR. OSEN:  But, your Honor, most of them are in

24  the complaint.

25          THE COURT:  I'm talking to Mr. Walsh right now.

00124

```
 1              MR. OSEN:  I'm sorry.
 2              THE COURT:  In other words, do they have to say
 3  in the complaint that -- I mean, I don't know that that's
 4  ever been a rule of --
 5              MR. WALSH:  Your Honor, we would only submit
 6  that it would be grossly unfair and intrusive for these
 7  plaintiffs to provide a list of, let's say 500 charitable
 8  organizations to Arab Bank, request complete disclosure
 9  as to all account details for those organizations in the
10  contemplation of at some point attempting to prove that
11  some or all of them were front organizations.
12              THE COURT:  For Hammas.
13              MR. WALSH:  There needs to be some --
14              THE COURT:  I'm sorry to interrupt you.  But
15  let's say they can satisfy me because the government of
16  the United States has said the ASP -- whatever, that each
17  of these eight are SGDTs connected to Hammas, if they
18  produce a document that reflects that, isn't that enough?
19              MR. WALSH:  Well --
20              THE COURT:  Because that's -- I mean, they're
21  making the -- do they have to put into the complaint an
22  allegation that the government has designated these as
23  agents of Hammas?  I don't think they need to make them
24  do that.  I will certainly give them leave to do that.  I
25  mean, you know, but do we need to go through that
```

00125

1  exercise?  I think it's a fair statement that they have

2  to make -- that they have to at least go on record as

3  saying as lawyers that we are -- this is our allegation

4  and, you know, our -- we have done sufficient

5  investigation to make us believe in the truth of these

6  allegations.

7         MR. WALSH:  That's what we're asking for.

8         THE COURT:  And then -- but once they've done

9  that, and I think that they're prepared to do that, then

10  I think that this is fair game.  So, I will ask you to go

11  on the record and show me why each of these -- that each

12  of these are, in fact, what you say they are.  And once

13  you do that, then you know, you don't need to make an

14  allegation in the complaint.  But --

15         MR. ELSNER:  Your Honor, I'm sorry to interrupt

16  but this point may apparently be moot.

17         THE CLERK:  If you could just state your name

18  again please.

19         MR. ELSNER:  Michael Elsner for the Almog

20  plaintiffs.

21         In the Almog and Afriat-Kurtzer complaints in

22  paragraph 53 and 54, we specifically identify each of

23  these organizations as Hammas funds and with their

24  designations.  So --

25         THE COURT:  Oh, okay.  Got you.  It's there

00126

1  already.  So, I guess we're --

2          MR. OSEN:  It's in the Coulter complaints as

3  well, your Honor.

4          THE COURT:  Okay.  If they've made the

5  allegations, then I think they're fair areas of discovery

6  then.  Okay.

7          24?

8          MR. STEINGARD:  We will pass --

9          THE COURT:  Were we on 24?

10         MR. STEINGARD:  No, we're about to start 24 and

11 we will -- because that's a financial assets type

12 request, we'll pass it.

13         THE COURT:  It's withdrawn for the time being.

14         MR. STEINGARD:  Yes.

15         THE COURT:  25?

16         MR. STEINGARD:  25 essentially relates to wire

17 transfer documents from the accounts -- the charitable

18 committee accounts that are in previous document requests

19 that pass through the New York branch of Arab Bank.

20 That's what we're asking.

21         THE COURT:  Well, you know, those include some

22 of those that aren't even designated.

23         MR. STEINGARD:  These are the charitable

24 committees.  These are --

25         THE COURT:  Charitable committees.  They're not

00127

1  designated as fronts for any organizations; right?

2          MR. STEINGARD:  Some of them are.  I have --

3  some of them indeed are but most of them are the

4  charitable ones.

5          MR. WALSH:  Your Honor, these are the some 72

6  organizations as to which you've already stated a

7  beginning point.

8          THE COURT:  Right.

9          MR. WALSH:  We respectfully submit that that's

10 the proper place to begin rather than trolling through

11 all of the transactional history.

12         THE COURT:  I think that's right, as well.

13 Let's

14         MR. ELSNER:  Your Honor?

15         THE COURT:  Let's -- yes?

16         MR. ELSNER:  I am sorry.  Mr. Elsner for the

17 Almog plaintiffs.

18         If I could just make one caveat.  Arab Bank is

19 as a creditor, as a branch in the United States is

20 required by law to monitor the transactions involving any

21 designated organizations.  So, to the extent that it has

22 records relating to the designated organizations, I don't

23 think we need to phase it in steps, as Mr. Walsh

24 suggests.

25         MR. OSEN:  You know --

00128

1          MR. ELSNER:  It's a violation of United States

2    law to provide material support or financial services to

3    a designated organization.  In fact, you have the --

4          THE COURT:  I thought this by designation --

5    well, I thought we were talking about the charitable

6    committees here, not -- these aren't limited to

7    charitable committees.

8          MR. ELSNER:  Some charitable committees have

9    been designated, your Honor, as (inaudible) those

10   organizations.

11         THE COURT:  Well, why don't you -- Mr. Walsh,

12   do you want to respond to that?

13         MR. WALSH:  You know, it appears, your Honor,

14   that these three, four requests that are referenced

15   encompass more than 100 entities.

16         THE COURT:  Yes, but --

17         MR. WALSH:  Most are not designated.

18         THE COURT:  Okay.

19         MR. WALSH:  Now to the extent Mr. --

20         THE COURT:  But to the extent that they are

21   designated --

22         MR. WALSH:  -- Elsner is referring to

23   prohibited transfers of entities after their designation,

24   those are an ascertainable universe of transactions if

25   they exist at all.

00129

1            THE COURT:  Is that what you're talking about?

2            MR. ELSNER:  No.  What I am talking about are

3    any transactions by a designated charitable organization

4    or a designated individual that's identified in these

5    prior requests regardless of the time period in which

6    they were designated.

7            MR. WALSH:  Well, this is a different kettle of

8    fish.

9            THE COURT:  Okay. Wait a minute.  Wait.  I am

10   trying to figure out what -- not everybody that's listed

11   in 17, 18, 19 and 21 is a designated--

12           MR. ELSNER:  Right.

13           THE COURT:  Right?  So you're saying to the

14   extent that any of them are designated what, SDGTs, is

15   that what you call them; SDGTs, then there's no need --

16   and regardless of when they were designated, right?

17           MR. ELSNER:  Yes.

18           THE COURT:  But you are interested in a time

19   frame; right?

20           MR. ELSNER:  Yes.

21           THE COURT:  Which is what, 2000 -- from the end

22   of the second intifaddah to today.

23           MR. ELSNER:  We propose 1995 but at present,

24   other plaintiff's counsel prefer the date of 2000.  But

25   we have claims that predate 2000.

00130

1          THE COURT:  OH, that's right.  Okay.

2          MR. WALSH:  Your Honor?

3          MR. ELSNER:  But regardless, what I wanted to

4  suggest was that I don't mind and we'll agree to this two

5  tier approach for the undesignated but with respect to

6  someone who is already designated, the bank is required

7  by law to seize those records and to report on those

8  transactions where there's designated individuals.  So,

9  with respect to --

10         THE COURT:  Designated organizations.

11         MR. OSEN:  But, your Honor --

12         MR. ELSNER:  -- organizations are (inaudible).

13         MR. WALSH:  There is a necessary clarification

14  here that I am compelled to offer.  It is unlawful for a

15  bank to process a financial transaction on behalf of an

16  organization after its designation.  It is obviously not

17  unlawful for such an institution to do so before its

18  designation.

19         THE COURT:  Understood.  But the illegality or

20  not --

21         MR. WALSH:  So, if Mr. Elsner is referring --

22         THE COURT:  But the illegality or not of that

23  transfer is not necessarily the significant fact.  It's

24  the fact that the Arab Bank did conduct a transaction and

25  if it conducted a transaction before it became illegal

00131

1  but nevertheless it was a transaction for an organization

2  that was thereafter designated as a terrorist

3  organization, it does reflect a connection between the

4  bank and the terrorist organization.

5           MR. WALSH:  Only, your Honor, to the extent

6  that as these plaintiffs allege, there was information in

7  the air sufficient to inform the bank that the

8  entities --

9           THE COURT:  Right, but this is just discovery.

10  This is discovery.  At some point, they're going to have

11  to establish that connection for you to be liable.  I

12  understand that.

13          MR. WALSH:  And as your Honor notes, there

14  needs to be a time frame established --

15          THE COURT:  Well, 2000 to the present for any

16  -- the --

17          MR. WALSH:  For designated entities?

18          THE COURT:  For designated entities.

19          MR. WALSH:  May we have from them, your Honor,

20  a list of designated entities?

21          THE COURT:  Yes, yes, why don't you do that?

22  Why don't you help him out and tell him which of the ones

23  from 17 through 21 are designated and provide him with

24  whatever information supports the assertion that they're

25  designated, so I don't have to decide that issue.

00132

1           So, 25 is limited to documents related -- for

2    the time being, limited to documents related to

3    designated entities.

4                MR. WALSH:  From 2000 on.

5                THE COURT:  From 2000 to the present.  Now,

6    when did this designation process start?

7                MR. ELSNER:  In 1995, Hammas was designated.

8                THE COURT:  And then periodically --

9                MR. ELSNER:  Over time.

10               THE COURT:  Is SGDTs is that related solely to

11   Hammas?

12               MR. ELSNER:  No.

13               THE COURT:  Any terrorist organization but

14   Hammas --

15               MR. WERBNER:  Before a designation, they tell

16   you which --

17               MR. ELSNER:  Tell you why.

18               THE COURT:  As a front for, you're connected

19   to --

20               MR. WERBNER:  El Qaida or Hammas or --

21               THE COURT:  Okay.

22               Mr. Osen, you were stepping up.  Is there

23   something --

24               MR. OSEN:  Only for the next --

25               THE COURT:  -- you're anticipating?

00133

1          MR. OSEN:  I've been asked to respond to number

2  26.

3          THE COURT:  Okay.  Which one are we on?  We're

4  on 26?  Okay.  All documents refer or relate.  Oh, okay.

5  Tell me what this is about.

6          MR. OSEN:  In roughly October 2004, your Honor,

7  we submitted to Judge Gershon in connection with an

8  injunctive relief motion, an affidavit of

9  Dr. Rachel Aaronfeld (phonetic) and attached to that

10  affidavit or declaration were a number of transactional

11  documents including a number of documents from the SDGT

12  Holy Land Foundation and other organizations listed in

13  previous document requests.

14          In other words, we provided or produced records

15  indicating that the New York branch had been used by Holy

16  Land Foundation and other questionable entities through

17  the New York branch of Arab Bank.  And this request seeks

18  the bank to produce the materials related to those

19  transactions and transaction holders, if you will.  It

20  relates back but with greater specificity to what we just

21  discussed a moment ago with Holy Land Foundation and the

22  other Hammas fronts.

23          THE COURT:  Let me -- there were specific

24  transactions between Arab Bank and Holy Land Foundation

25  that are evidenced in these attachments to Rachel

00134

1    Aaronfeld's declaration.

2            MR. OSEN:  Right.

3            THE COURT:  And you want the other documents

4    relating to those transactions.

5            MR. OSEN:  Right.  Those documents included

6    wire transfers for the benefit of the Tolkarim (phonetic)

7    Committee and other Hammas front organizations identified

8    in the Holy Land Foundation indictment, Holy Land

9    transactions initiated by Holy Land itself, et cetera, et

10   cetera.  The precise number is D through W of that list

11   and that includes, you know, a bevy of about 15 or 20

12   transactions.

13           Those are the kinds of documents that the

14   defendant has presumably in its custody in New York

15   because they're New York/US based transactions.  And

16   they're the kind of documents that we believe the OCC and

17   FCEN previously flagged.

18           MR. WALSH:  Your Honor?

19           THE COURT:  Okay.

20           MR. WALSH:  The Holy Land Foundation, as others

21   have noted, is a designated entity.  It was designated in

22   July 2004.  As --

23           THE COURT:  July what?

24           MR. WALSH:  I'm sorry, it was -- it is a

25   designated entity and it has been indicted, as well.

00135

1           THE COURT:  Here?

2           MR. WALSH:  To the extent, your Honor, that --

3           THE COURT:  In this district?

4           MR. OSEN:  Texas.

5           THE COURT:  Texas.

6           MR. WALSH:  To the extent that in our

7    discussions of request number 25, your Honor has directed

8    the bank to produce transactional documents involving

9    designated entities like the Holy Land Foundation, on the

10   assumption that that will be on the list, that is

11   subsumed in request number 25.

12          THE COURT:  Okay.

13          MR. WALSH:  Now, I should note that motion for

14   preliminary injunction which Mr. Osen spoke of was denied

15   by Judge Gershon.

16          THE COURT:  I understand.  But that was a

17   different --

18          MR. WALSH:  And this is a rather ungainly way

19   to frame a document request.  It's been done elsewhere in

20   a better way and the Court's already dealt with it.

21          THE COURT:  Okay.  But then there's no

22   objections.  I mean, there's objections.

23          MR. WALSH:  Your Honor, the --

24          THE COURT:  But --

25          MR. WALSH:  Our objection is that to the extent

00136

1  that what is being sought are evidence of transactions

2  after 2000 with designated entities that these plaintiffs

3  named.  The Court has dealt with that.

4  THE COURT:  Okay.  Understood.

5  MR. WALSH:  And it's a far more manageable way

6  for Arab Bank to deal with it than request number 26.

7  THE COURT:  But I must note that at least this

8  was more specific and so, whereas the prior requests were

9  a good deal -- well, anyway, I was critical of the

10  requests earlier as being over broad but this one

11  definitely didn't fall in that category.  Okay.

12  27, what's that?

13  MR. STEINGARD:  Your Honor, I will address

14  that.  But I think it might help to address 27 in the

15  context of 33 because is a much more specific request

16  related -- these are --

17  THE COURT:  Didn't you already get 33?

18  MR. STEINGARD:  They have produced some

19  documents responsive to that request.

20  THE COURT:  Some but not all?

21  MR. WALSH:  We've produced thousands of pages

22  of documents, your Honor.

23  THE COURT:  Okay.  So, is 27 within 33?

24  MR. ELSNER:  It is.  It's more of a catch-all

25  provision.

00137

1            THE COURT:  Have you produced the documents

2    requested in 27?

3            MR. WALSH:  We have produced procedural

4    documents and manuals that are called for in 27,

5    your Honor.

6            THE COURT:  That's what's asked for, isn't it?

7            MR. WALSH:  Yes, it is.

8            THE COURT:  Okay.  So, is there anything else I

9    need to do on that one?

10           MR. STEINGARD:  No.

11           THE COURT:  Okay.

12           28?

13           MR. STEINGARD:  I think we pretty much covered

14   28 one way or the other.

15           MR. WERBNER:  It's just a rephrasing of some of

16   the stuff, so we can say --

17           MR. STEINGARD:  It's subsumed; yes.

18           THE COURT:  Subsumed; okay.  Already -- okay.

19           29?

20           MR. STEINGARD:  I believe 29 also is subsumed.

21           MR. WALSH:  Your Honor, you know, we would only

22   note -- I am not certain what that remark of

23   Mr. Steingard means but --

24           THE COURT:  Do you mean subsumed?

25           MR. WALSH:  -- 29 calls for every communication

00138

1  between employees of Arab Bank and --

2           THE COURT:  Concerning anything listed in 28?

3           MR. WALSH:  On anything listed in 28.  I mean,

4  it's wildly over broad, your Honor.

5           MR. WERBNER:  That's why we're giving him a

6  break.  We're saying that as you've already ordered, it's

7  going to be adequate.  There's nothing in that that goes

8  beyond what he already should be obligated to produce.

9           THE COURT:  In other words, they're satisfied

10  with what my rulings require on other requests --

11           MR. WERBNER:  Yes.

12           THE COURT:  -- such that to the extent that

13  this goes beyond that, you're not pressing it right now.

14           MR. WALSH:  I understand now, your Honor.

15           THE COURT:  Okay.

16           MR. WALSH:  Thank you.

17           THE COURT:  I'm glad you -- he helped me

18  clarify it.  I mean, it's worth getting clarification;

19  okay.

20           MR. WERBNER:  And likewise on 30, we can -- I

21  mean, it does go beyond but for today's purposes, we'll

22  treat it as subsumed.

23           THE COURT:  You're not pressing it beyond what

24  --

25           MR. WERBNER:  Correct.

00139

```
 1              THE COURT:  All right.
 2              MR. WALSH:  Your Honor, may I just digress or
 3  not digress, but if we look at the entities in 30, we're
 4  now talking about different entities all together.  These
 5  are entities of the Palestinian Authority.  The
 6  Palestinian Authority, Ministry of Religious Matters,
 7  Palestinian Ministry of Welfare.  We haven't talked about
 8  this type of thing before, your Honor.
 9              MR. WERBNER:  Well, that's why we were not
10  pressing it.
11              MR. WALSH:  And I think it's important that --
12              THE COURT:  Okay.  So, he's not pressing it.
13  And at this point, if there's not a motion to compel, I
14  am not going to make a ruling.
15              MR. WALSH:  Okay.
16              MR. WERBNER:  I mean the fact is, she was the
17  one -- the woman Jihad who ran that ministry issued the
18  martyr certificate but we won't press it today.
19              THE COURT:  Okay.
20              31?
21              MR. WERBNER:  We think that you've already
22  ordered that.  It's just a more narrow statement.  These
23  other transactions that they have, other documents, non-
24  transactional that describe and relate to the Saudi
25  Committee is what 31 asked for.
```

00140

1          THE COURT:  Well, but on the other -- yes, but

2  --

3          MR. WERBNER:  Meetings, in particular.

4          THE COURT:  Well, that can include things like

5  memorandum, et cetera.

6          MR. WERBNER:  Yes, meetings.

7          THE COURT:  So, I mean, I am prepared to order

8  31.  Maybe it's already subsumed in some ways otherwise,

9  but I might as well make it clear that --

10          MR. WALSH:  If they exist, we'll produce them.

11          THE COURT:  Okay.

12          32 -- I mean, we've done 32.  We did that

13  before, didn't we?

14          MR. STEINGARD:  Well, my only issue with 32,

15  your Honor, is the nature of the objection that purported

16  to limit what they were going to produce to countries in

17  which the alleged transactions in -- that caused the

18  damages to plaintiff, certain place occurred -- so, in

19  other words, they give us policies perhaps for obvious --

20  you know, in the Palestinian territories, for example.

21  Our only point is there may be document retention

22  policies at issues in some of their other branches which

23  they should produce because they can't limit it to this

24  per incident linkage type of approach.

25          THE COURT:  Yes, but it's only relevant -- this

00141

1   is relevant to document retention with respect to places

2   where you're going to obtain documents from; right?   And

3   then --

4          MR. STEINGARD:   Correct, but we may wind up --

5   I guess my issue is we may wind up in some other areas

6   where they have branches not at issue.

7          THE COURT:   Right.

8          MR. STEINGARD:   So we won't --

9          THE COURT:   Just to make it clear, any branch

10   in any country form which documents end up being

11   produced, the document retention policy for that branch

12   is fair game.   I mean, is appropriate -- that's an

13   appropriate request.

14          MR. WALSH:   We understand, your Honor, but this

15   is a global institution with --

16          THE COURT:   I understand.

17          MR. WALSH:   -- facilities in Australia and

18   Singapore.

19          THE COURT:   That's why I am not asking you to

20   go find the ones in wherever, Bahrain or wherever.

21          MR. WALSH:   China.

22          THE COURT:   China or whatever; exactly.

23          MR. OSEN:   I think your Honor is correct.   We

24   would just note that Interpal is in London, CBSP is in

25   France.   So, as you say, whatever is germane to --

00142

```
 1              THE COURT:  Whatever is germane to documents
 2  related to -- yes, to any office from which documents are
 3  produced, that ought to be produced.
 4              All right.  What's the best way to proceed on
 5  this now?  Should I ask the plaintiffs to --
 6              MR. STEINGARD:  Your Honor, you're not quite
 7  done --
 8              THE COURT:  Oh.
 9              MR. STEINGARD:  -- we're sorry to report but --
10              THE COURT:  33 was done, wasn't it?
11              MR. STEINGARD:  No, we haven't done 33.
12              THE COURT:  You haven't done 33.  I thought
13  that was done before.
14              MR. STEINGARD:  We did?
15              MR. OSEN:  We did.
16              MR. STEINGARD:  Okay.
17              MR. WERBNER:  And 34 is subsumed --
18              MR. STEINGARD:  I'm sorry, my apologies,
19  your Honor.
20              THE COURT:  I missed 34 though, you're right.
21  I hadn't gone to that.
22              MR. WERBNER:  It's subsumed.
23              THE COURT:  It's subsumed; right?  Okay.
24              MR. STEINGARD:  I'm sorry.
25              THE COURT:  Now, do you want to settle -- now,
```

00143

1  where does this place the rest of the requests that were

2  recently made by Mr. Werbner?  I mean, weren't they more

3  -- aren't they going to be largely covered by the rulings

4  today?

5          MR. WERBNER:  I would be happy to pass today,

6  review and see if there's anything with one exception.

7  That's the interrogatories.  I bet 99 or maybe even 100

8  percent of the document requests are now moot by your

9  ruling today.  If we could spend five minutes on our ten

10  interrogatories, then I would be --

11          THE COURT:  They were answered; is that right?

12          MR. WERBNER:  They are responded --

13          THE COURT:  They were responded to --

14          MR. WERBNER:  -- with objections.

15          THE COURT:  -- is the rest --

16          MR. WERBNER:  No answers were provided.  And I

17  have my copy here.

18          THE COURT:  Okay.  I did review them.  Give me

19  a second to remind myself of that.

20          MR. WERBNER:  Attached to the September 28

21  letter.

22          THE COURT:  That's right.  You had two

23  September 28 letters.

24          MR. WERBNER:  Yes, sir, one deals with the

25  interrogatories and one --

00144

1           THE COURT:  And one with the document requests.

2           MR. WERBNER:  Yes.  And if we'll just focus on

3  the interrogatories, please.

4           THE COURT:  All right.  Let's -- Mr. Walsh, you

5  objected to all of them, as I recall.

6           MR. WALSH:  Your Honor, there is a point of

7  order that we would respectfully request the Court visit

8  first.

9           THE COURT:  Okay.

10           MR. WALSH:  Mr. Werbner represents, I believe,

11  164 plaintiffs.  Those at plaintiffs counsel table, such

12  as Mr. Elsner represent in excess of 1,000 plaintiffs --

13  in excess of 2,000 plaintiffs.

14           THE COURT:  So you want to know how many

15  interrogatories do they get to propound?

16           MR. WALSH:  Exactly, your Honor.  These

17  interrogatories are not unique to the Litle family and

18  presumably the next set of interrogatories propounded by

19  Mr. Werbner on behalf of another family will not be

20  unique to that family.

21           There needs to be some order in this process,

22  your Honor, that doesn't contemplate tens of thousands of

23  interrogatories, all pertaining to bank practices and not

24  unique to individual plaintiffs being dropped in the

25  bank's lap.

00145

1          And in addition to the fact that these purport

2   to be asserted on behalf of a subuniverse of

3   Mr. Werbner's clients, it's our understanding that --

4          THE COURT:   Subuniverse being the Litle as

5   opposed to the other --

6          MR. WALSH:   Exactly, the Litle family alone.

7          THE COURT:   -- the other two --

8          MR. WALSH:   There are six plaintiffs

9   encompassed in the Litle family --

10         THE COURT:   I see.

11         MR. WALSH:   -- and some 164 plaintiffs

12  represented by Mr. Werbner at large.

13         In addition, your Honor, it was our

14  understanding that this court in initially deciding not

15  appoint lead counsel or liaison counsel, was planning to

16  expect coordination among the plaintiffs.  And certainly

17  with respect to discovery of the bank's practices in the

18  case of these interrogatories, this is discovery also

19  captured in plaintiff's request number two.

20         We don't understand, your Honor, why they're --

21         THE COURT:   I'm sorry, in request number --

22  their document request number two?

23         MR. WALSH:   There was a joint second request

24  that was also propounded.

25         THE COURT:   Right.

00146

1            MR. WALSH:  We fail to understand, your Honor,

2    why there can't be coordination among the plaintiffs in

3    that regard.

4            THE COURT:  Well, this is goes into the form of

5    lead counsel sort of argument; doesn't it?

6            MR. WALSH:  It does indeed, your Honor.

7            THE COURT:  And the problem I have, first of

8    all, I don't think that so far there's been such a -- I

9    understand your frustration.  You've got a lot of --

10   you've got several different groups of plaintiffs here

11   and different attorneys but so far, I don't think that it

12   has been out of control, the different sets of requests

13   and interrogatories so far.

14           So, to give you the short decision on the

15   appointment of lead counsel, that's denied.  I'm not

16   going to require that at this point.

17           I think that having rendered rulings on the

18   joint request for documents will hopefully limit the

19   kinds of multiple document requests for the future.  I

20   think that there's now -- and I may be wrong, we'll find

21   out what happens, but there's sort of a -- I have a

22   framework in my mind of where the overall scope of

23   discovery ought to be and they're all interested in much

24   the same sort of universe of documents, some of them --

25   but since the discovery is braid enough now that it's

00147

1   going to encompass all of their different parochial

2   concerns, I don't see that they're going to be showering

3   you with a whole bunch of individual requests for

4   documents.

5           I do think that the interrogatory question is a

6   fair one.  How do we go about limiting the kinds of

7   interrogatories that are sent?  And --

8           MR. WERBNER:  If I could say a few things,

9   your Honor, I --

10          THE COURT:  I will hear -- let me just finish.

11          MR. WERBNER:  Okay.

12          THE COURT:  So, then I will give you a chance

13  to speak in a moment. I am interested in hearing what the

14  proposals are.  I am not -- I think most judges are not

15  that found of interrogatories as a discovery device.  And

16  I mean, they're useful in some kind of circumstances but

17  they tend to generate a lot more satellite litigation

18  without getting a lot of information across when people

19  try to use them too much.

20          So, with that said, I am certainly willing to

21  listen to what people think the proper scope of

22  interrogatories are (a) in terms of number and then also

23  in terms of what kind of subject matter they ought to be

24  propounded on, you know, in the most -- to achieve

25  efficiency.

00148

1          Okay.  So, Mr. Werbner, you get to speak first.

2          MR. WERBNER:  Thank you, Judge.  I'm sorry to

3    always be trying to jump the gun but I would rather be

4    judge don what I do than what their fears are.  You can

5    see, I put ten interrogatories.  I'm not a big fan of

6    interrogatories.  I have no intention of propounding

7    massive interrogatories or playing some game of -- the

8    local rules say you get 25 and I am not going to even ask

9    that every one of the families get 25.

10          I don't have any intention right now

11   specifically to do many more.  After we look at some of

12   these documents, I may.  I think every one of my

13   colleagues at the plaintiff's table will be happy to see

14   these answers and I think they wrote that.

15          It was just at the time, I was anxious to ask

16   some questions looking to the next stage before we got

17   the documents.  I think, you know, what we see is Arab

18   Bank took ten interrogatories.  Let's measure by what

19   they did.  They objected to every single one claiming

20   that one day I might send too many.  They should answer

21   the ten and if I go beyond 25, I can either ask for leave

22   and demonstrate.

23          I took into account --

24          THE COURT:  Well, okay, but that assumes that

25   you're willing to live with the 25 for your --

00149

1            MR. WERBNER:  I would rather --

2            THE COURT:  -- group and I don't know if the

3    other plaintiffs -- right now, I've got three sets of

4    counsel, the way I see it.  You represent all the

5    plaintiffs in one of the cases.

6            MR. WERBNER:  And Roth and the Davis

7    (phonetic) --

8            THE COURT:  And now you've gotten the

9    individuals --

10           MR. WERBNER:  The Roth and --

11           THE COURT:  -- each of them are just one --

12           MR. WERBNER:  But here's --

13           THE COURT:  But wait, wait a minute.

14           MR. WERBNER:  Yes, sir.

15           THE COURT:  Let me finish.

16           MR. WERBNER:  Go ahead.  I know --

17           THE COURT:  I don't know if the others --

18   there's a firm -- there's a couple of -- the other two

19   sets of attorneys each represent two parties in two

20   cases, as I recall.

21           MR. SWIFT:  That's right, your Honor.

22           THE COURT:  You know, do they want 25 for each

23   of the cases?  Do they want 25 for each plaintiff?

24   That's not going to happen.  I can promise you that.  But

25   you know what --

00150

1           MR. WERBNER:  Judge --

2           THE COURT:  Let me finish.  Because  it's

3    better to know now what your limits on interrogatories

4    are because when you get to the --

5           MR. WERBNER:  The last one.

6           THE COURT:  -- when you hit your limit, if you

7    don't have a limit way and they say well, let's set a

8    limit now, you're going to say but Judge, here's all this

9    very important information I need and meanwhile they've

10   gone running around getting all this less important

11   information.  And now here's the crucial information that

12   you need.  Judge, you've got to let me have these extra

13   interrogatories.

14          So, I would rather set the ground rules now and

15   then you get all the information you've got to get with

16   those crucial interrogatories, you know, an parcel out

17   your interrogatories in that way.

18          MR. WERBNER:  Well, I would like 100 for all of

19   my -- I would propose for each of the three teams.  I

20   mean, I would rather look at the documents first.  I may

21   never get past 20.  But if I was taking the Court's

22   suggestion that let's know at the front end how many

23   you're going to have, I think 100 for my group of three

24   cases where, in fact, interrogatory two, I would ask

25   about one particular or describe witnesses.  I would say

00151

1   100 for my -- all of my clients.

2          THE COURT:  What do the other plaintiffs think?

3          MR. STEINGARD:  That would certainly probably

4   more than we would need or use.  I think that in terms of

5   the Linde and Coulter plaintiffs, that we would like your

6   Honor to set a reasonable number but with an opportunity

7   to come back to you should we need some more.

8          THE COURT:  And who wants to be heard on behalf

9   of Almog and Afriat-Kurtzer?

10          MR. ELSNER:  This is Michael Elsner again.  I

11   think that 100 would be more than enough for us.

12          THE COURT:  So that right now you've got a

13   total of 300.

14          Mr. Walsh?

15          MR. WALSH:  Your Honor, the local rules

16   contemplate 25.  It's likely that each of these

17   interrogatories will not be unique in any way to the

18   particular circumstances of every plaintiff.  These cases

19   are being handled as related cases before this court and

20   are at least informally being coordinated for discovery

21   matters.

22          We see no reason why there should be a 12-fold

23   expansion of what the rules contemplate if, in fact,

24   these interrogatories are all going to seek the same

25   universe of information.

00152

1          THE COURT:  Well, if they do, they're easy to

2     answer.  The 300 become 100.

3          MR. WALSH:  Well --

4          THE COURT:  Then you just copy and paste.

5          MR. WALSH:  They're all going to seek

6     information regarding what is in the bank's possession,

7     your Honor, that can be, you know, sort of readily used

8     by any plaintiff and no plaintiff here, your Honor, in

9     light of the allegations needs to tailor its discovery

10    to, you know, to its unique circumstances.

11         There's no reason why the Litle family rather

12    than all of Mr. Werbner's clients had to submit these ten

13    interrogatories.

14         THE COURT:  All right.  Well, I will have to --

15    let me do this.  Let me consider how many total

16    interrogatories.

17         MR. WALSH:  By comparison, your Honor, may I

18    note that the bank does indeed need to inquire as to the

19    unique and individual circumstances of each plaintiff.

20    And we now have some 2,800 of them.

21         THE COURT:  2,800 plaintiffs?  2,800?

22         MR. WERBNER:  So they want us to get 25 and

23    they get 2,800.

24         MR. WALSH:  I haven't said that, your Honor.

25         THE COURT:  Yes, that's what they're saying.

00153

1          MR. WALSH:  I've only said that as the Court

2     entertains what is a fair mechanism here, it seems

3     reasonable for that fact to be before the Court, as well.

4          THE COURT:  Well, granted, the discovery issues

5     are, you know, substantially different with respect to

6     the defendants from the plaintiffs.  And I don't see how

7     -- somehow they're going to have to get the information

8     that they -- some set of information about each of the

9     plaintiffs and we're going to have to establish perhaps a

10    criteria for a set of --

11         MR. WALSH:  And, your Honor, may I --

12         THE COURT:  -- information that each plaintiff

13    has to provide.  We haven't addressed that yet.

14         You were concerned about the discovery you've

15    gotten so far which you think is minuscule.

16         MR. WALSH:  Exactly, your Honor.  May we --

17         THE COURT:  But that's not the issue right

18    before me.  I am glad you raised that because --

19         MR. WALSH:  Like Mr. Werbner, I jumped ahead.

20         THE COURT:  Yes, but no, I am glad you pointed

21    out that you have some discovery concerns of your own.

22    And that what's sauce for the goose in terms of

23    interrogatories may not be sauce for the gander.

24         Well, what occurs to me as perhaps as to

25    interrogatories, it would be useful to set a certain

00154

1   number for all s plaintiffs to propound together and then

2   grant each group of plaintiffs another, you know, set

3   that they can use for their own individual purposes.

4   That way, we can get some coordination at the outset, it

5   seems to me, on the big picture items that you're seeking

6   information on that are discover -- that an interrogatory

7   may be a useful device to get information on.  And then

8   they can give you an additional opportunity, to the

9   extent that you need something that's more -- that you

10  want to follow up on with respect to your clients.

11  Although I can suspect that perhaps what will happen --

12  well, I don't know.  I don't know.

13          I mean, what do you think about that as an

14  option?

15          MR. WALSH:  That seems like a good way of

16  taking a first --

17          MR. WERBNER:  I like that also.

18          MR. WALSH:  -- stab at it.

19          MR. OSEN:  So, long as there's leave to come

20  back to your Honor if there's needs.

21          THE COURT:  Yes, there is always going to be

22  leave on any side to revisit a discovery ruling, as long

23  as you come with some new piece of information.  I don't

24  like to get argument on issues I've already decided.  I

25  mean, just to reargue it.

00155

1            But one of the factors that will be taken into
2       account when you do come back to revisit, let's say, a
3       limitation on interrogatories, is you know, what did you
4       use your other interrogatories to do -- to get?  And did
5       you use those well or did you sort of fritter them away
6       and if you did, well, then I will have to -- that will be
7       taken into account.
8            But all right, that's it.  I just don't know
9       where to set the -- you know, it may -- it strike me that
10      some of these requests, Mr. Werbner, were made in
11      response to my ruling last time that -- you know, because
12      we were still dealing in the preopinion universe or
13      preopinion environment.  And I remember saying the last
14      time, I said well, you -- I didn't mean you couldn't ask
15      for some specific things and so you -- I think -- is that
16      what promoted you to send out your document request and
17      interrogatories?
18           MR. WERBNER:  It's what prompted it but yes --
19      but, I mean, these are the sort of things that I am
20      looking at at trial and I would like to see what they say
21      when, "Describe all steps you took to prevent the
22      rendering of financial services to people who are engaged
23      in terrorism," I mean, I want to see what they say.  If
24      they say look, we did this, we did that.  We couldn't
25      know.  We did our best.  Then that's fine.  I mean, they

00156

1   have plenty of time.  But that's a fair question.

2          Two is not so important because the document --

3   the only thing new, "Did you get a fee?"  I mean, the

4   Litle family would like to know if the person that

5   murdered their child, if this bank made a transfer to

6   those people and if so, did they get a fee.  If they

7   didn't, they didn't.

8          In number three, I took their initial

9   disclosure where they said here's six people around the

10  world at Arab Bank that have knowledge of the facts.  I

11  simply want to know before I go to Aman (phonetic) and

12  Ramallah, you know, tell me a little bit more about what

13  these people know.

14         THE COURT:  Well, that's supposed to be

15  encompassed in your initial disclosures.

16         MR. WERBNER:  It wasn't.

17         THE COURT:  Well, then you don't need an

18  interrogatory to get that information.

19         MR. WERBNER:  Well, if you'll order them to

20  say, I --

21         THE COURT:  I didn't know that the -- I think

22  that the automatic disclosures say you've got to provide

23  a brief statement of the subject, so that the person has

24  information about it.

25         MR. WALSH:  And we did, your Honor.

00157

1          MR. WERBNER:  Well, then I want to --

2          THE COURT:  So, the sufficiency of that may be

3  in issue but --

4          MR. WERBNER:  Well, we can look at that.  But

5  three is not -- all it's just saying is, you know, tell

6  me -- I mean, because he says that we have approximately

7  12 employees who have knowledge.  List the people.

8          THE COURT:  What's the -- the Barshara

9  (phonetic) declaration?

10          MR. WERBNER:  Yes, sir.

11          THE COURT:  What is that?

12          MR. WERBNER:  He filed on November 11, 2004,

13  he's the number three guy in Aman.

14          THE COURT:  Oh, I see.  Okay.

15          MR. WERBNER:  He's the one who said --

16          THE COURT:  You know, I thought that was some -

17  - I guess I should --

18          MR. WERBNER:  He's the number three guy at the

19  bank.

20          THE COURT:  Okay.  It's just somebody who filed

21  the declaration in this case.

22          MR. WERBNER:  Yes.

23          MR. WALSH:  That's correct, your Honor.

24          THE COURT:  I thought it was like, you know,

25  the Oslo Accords, the Barshara declaration or something.

00158

1           MR. WERBNER:  Yes, look at interrogatory four.
2    During the second intifaddah, did Arab Bank seek to
3    determine the identity of any suicide bombers who had
4    committed an attack?  If so, why did you do it?  If not,
5    why didn't you?
6           I simply, without going to Aman to depose 20
7    people want to say look, all around you these suicide
8    bombers --
9           THE COURT:  What occurs to me is, you know, why
10   don't I set limits and then you figure which of these you
11   want to press either as part of your group of
12   interrogatories and which you want to reserve to your own
13   -- you know, your own special set if you want to because
14   I think that's the way I will do it is I'll -- has
15   anybody else served interrogatories?
16          MR. WERBNER:  No.
17          MR. STEINGARD:  Yes.
18          MR. WERBNER:  Oh, you have?  I'm sorry.
19          MR. STEINGARD:  Yes, we served a request for
20   admissions that contain about ten or 15 interrogatories
21   that are covered with -- that follow the request.  They
22   basically say, if you admit it, please answer the
23   following.  If you haven't, please answer the following.
24          So, there's about ten interrogatories that's
25   combined from both of our -- both the Afriat-Kurtzer and

00159

 1   the Linde Coulter plaintiffs combined in that document.

 2           THE COURT:  So you've served something -- okay.

 3   And I haven't -- that hasn't been responded to.

 4           MR. STEINGARD:  No, the response I think is due

 5   next week.

 6           MR. WERBNER:  My only position here is I will

 7   adopt all ten at no matter what number you set.  I

 8   submitted these probably two months ago.  I simply --

 9           THE COURT:  I thought that was -- August 28?

10   Yes, I guess it's a month and a half.

11           MR. WERBNER:  So, I simply, you know, want some

12   answers in the next, you know, 15 days or whatever.  It's

13   not fair that they won't answer these because I might be

14   asking too many.  I mean, I would like to leave today

15   saying okay, Werbner, you've used your ten but bank you

16   need to answer these.

17           MR. WALSH:  Your Honor, as we have noted in our

18   correspondence to the Court, the bank has proceeded under

19   this court's directive that discovery be staged.  When we

20   were last before you, there was a phase one discovery.

21   All we are asking now and have asked, your Honor, that

22   whatever is done by the parties be done pursuant to the

23   oversight and direction of this court and not in a

24   freelance fashion.

25           And if the Court is willing to allow the

00160

1   parties to exchange interrogatories and document demands,

2   Arab Bank would like to engage in that process itself

3   because it, too, has great frustration about those

4   documents it has not yet received.

5           THE COURT:  All right.  Well, what documents

6   have you not yet received?

7           MR. WALSH:  Well, you know, as we've talked at

8   great length, your Honor, about the Gershon opinion;

9   Judge Gershon's opinion and the significance to these

10  plaintiffs of establishing the bank's knowledge that the

11  many organizations that we've spoken of today were

12  terrorist organizations.

13          On the assumption that we're not going to

14  proceed with trial by ambush here, to the extent that

15  these plaintiffs are in possession of documents or other

16  information which they plan to rely upon to establish

17  that these alleged front organizations are in fact

18  terrorist organizations, we submit, your Honor, that it's

19  vital that we begin getting these documents.  It's

20  subsumed within this court's initial production order.

21          THE COURT:  Well, did you make requests?  What

22  did you make request for?

23          MR. WALSH:  We made request, your Honor, for

24  some seven categories of documents that essentially

25  substantiated the plaintiff's allegations as to the

00161

 1    bank's liability, a liability premised on knowledge.

 2            THE COURT:  And did you get objections to those

 3    requests?

 4            MR. WALSH:  Your Honor, those requests are the

 5    operative requests which you've ordered there be

 6    production.  There were objections.  This was fully

 7    adjudicated in this courtroom.

 8            THE COURT:  Okay.

 9            MR. WALSH:  Your Honor said whether it's in the

10    possession of the plaintiffs' attorneys or in the

11    possession of the plaintiffs, that's not an operative

12    distinction to me and the plaintiffs' attorneys should

13    produce it.  We just don't have this yet, your Honor.

14            THE COURT:  Okay.  So have you talked to them

15    about why they haven't produced the documents?  Do they

16    say they produced everything they've got?

17            MR. WALSH:  Well, you know, we hear that

18    they're coming and that if we don't have them now,

19    they'll be coming and that there are more on the way.

20    But as a matter of what is in our possession, we don't

21    have documents reflecting that these some 150

22    organizations are going to be at the time of trial proven

23    to be terrorists organizations.

24            THE COURT:  Okay.

25            MR. WALSH:  And we would like that that,

00162

1  your Honor.  And that's essential.

2          THE COURT:  Why don't you ask for them and they

3  haven't produced them, I mean -- do you know what

4  Mr. Walsh is talking about?

5          MR. WERBNER:  Well, I would say this.  We have

6  produced a lot of things that I believe that if we have a

7  met and confer on a motion that he will better

8  understand.  But --

9          THE COURT:  Okay.  Well that's what I want you

10 to do.

11         MR. WERBNER:  We are not holding back

12 documents.

13         THE COURT:  I mean, are you not -- have you

14 produced everything that you have?

15         MR. STEINGARD:  We filed --

16         THE COURT:  Do you think you have produced

17 everything you were supposed to produce?

18         MR. WERBNER:  I do.  I do.

19         MR. STEINGARD:  We have produced over 1,900

20 pages of liability (inaudible).

21         THE COURT:  It didn't matter how many.

22         MR. STEINGARD:  I am not finished yet.

23         THE COURT:  I don't care if you produced a

24 million pages.

25         MR. STEINGARD:  I see.

00163

1          THE COURT:  The question is did you produce

2   everything that you have?

3          MR. STEINGARD:  We haven't finished going

4   through everything we have.

5          THE COURT:  Okay.  And what's the hold up then?

6          MR. STEINGARD:  It's a lot of information and a

7   lot of it has to be translated.  It's mostly in Arabic.

8   And it's going slowly but we've given them 37 -- 37 of

9   our clients we've produced documents for.  We've produced

10  over 3,500 pages of documents.  We've given them 1,900

11  pages of liability documents.

12         We're giving it to him as we go through it and

13  I'm, frankly -- when I compare it to what they've given

14  us, I don't understand what the problem is.

15         We've been trying to honor what your Honor

16  instructed us to do.  And we were --

17         THE COURT:  Well, they're talking more about

18  the documents relating to establishing -- I don't know

19  that they're -- I don't hear anyone complaining about the

20  damages documents right now.  We're talking about the

21  liability documents.

22         MR. STEINGARD:  To be specific, we, that is the

23  Litle and Coulter -- I'm sorry, the Linde and Coulter

24  plaintiffs have produced about 1,900 pages of liability

25  documents not related to the specific plaintiffs.

00164

1           THE COURT:  And have you been translating those

2 and are you providing translations, too?

3           MR. STEINGARD:  Well, no, we are not providing

4 translations.

5           THE COURT:  So, then --

6           MR. WERBNER:  Many of them are in English.

7 Many of them are in English.  Many are in Hebrew.  Many

8 are in Arabic.  We, on my team, have produced over 2,500

9 and almost all of them are in English.  They are

10 summarized reports that go through and do have

11 translations built into them.  We've produced

12 congressional reports.  Israeli government reports.

13          THE COURT:  Okay.

14          MR. WERBNER:  Ministry of Defense reports,

15 State Department reports, the Counter Terrorism Bureau.

16 What counsel said is the bank's knowledge.  Well, we may

17 not -- there may not be a roomful of documents that show

18 the bank's knowledge.

19          First of all, what was in their mind in 2000

20 may be coming in these documents that they're about to

21 produce.  What's in their mind -- we've been producing

22 liability.  He keeps saying where is your documents that

23 show that we knew it.  I mean, that may be something that

24 will be circumstantial evidence based on what these

25 documents --

00165

1            THE COURT:  Okay.  I am just asking.

2            MR. WERBNER:  Yes, I am not --

3            THE COURT:  I understand that there's various

4    things that --

5            MR. WALSH:  Your Honor, may I propose this?

6    Just as the Court has permitted the plaintiffs to provide

7    lists to Arab Bank and require that Arab Bank provide

8    transactional detail regarding this list, may we use the

9    very same list, for instance, the list of 72 charity

10   societies and to flesh out the production of liability

11   information that we thought would be forthcoming in

12   accordance with our earlier request, may we submit the

13   very same list that plaintiffs provided to us and say --

14           THE COURT:  You can make any kind of requests

15   you want.

16           MR. WALSH:  -- give us all information you have

17   regarding the Al Hooda (phonetic) society.

18           THE COURT:  You can make any requests you want.

19   I will have to rule on the objections to the requests

20   once they come to me.  I don't want to tell you what -- I

21   don't want to decide that until you've made a request and

22   they get a chance to respond.

23           MR. WALSH:  We --

24           THE COURT:  And I hear what you have to say.

25           MR. WALSH:  WE're --

00166

1           THE COURT:  I mean, there's nothing to prevent

2      you from serving requests.

3           MR. WALSH:  We'll do that, your Honor, because

4      it may be an aid to move this process forward to actually

5      seek documents regarding the very same entities that have

6      been named by these plaintiffs.

7           THE COURT:  Or it may be that they just don't

8      -- maybe they just don't -- they're not --

9           MR. WALSH:  If they don't have anything, we

10     would like to know that.

11          THE COURT:  They're saying they still are

12     reviewing documents.  I am not sure I understand. You

13     have a pile of documents in your office that people

14     provided to you and you're looking through them to see if

15     they have any relevance if the case.  If they do and

16     they're not privileged, as probably most of them aren't,

17     you pass them on.  Is that what the process is?

18          MR. STEINGARD:  Your Honor, we are in the

19     process of acquiring documents from non-parties in a

20     foreign country or foreign countries plural.  When the

21     documents come in, we have people that review them and we

22     make a determination, number, does it have any bearing on

23     this case, is this relevant.  And does it relate to

24     either the claims or defenses in the case?

25          THE COURT:  Do you make an assessment of

00167

1   whether it's a request -- of whether it falls within

2   their request?

3           MR. STEINGARD:  Yes, we do.

4           THE COURT:  Okay.

5           MR. STEINGARD:  And as we do this because

6   recognizing that for a researcher who might read Arabic,

7   that still then has to be then communicated to a lawyer

8   and some documents must be translated in English for us

9   to just understand them.  And then if it is a document

10  that is called for, we do produce them.

11          Because remember, this is part of our

12  investigation.  I recognize your Honor has ordered us to

13  do it.  But it is different and distinct from asking

14  clients to give us documents and then we produce those

15  documents to the other side.  That process is ongoing and

16  we have produced and I can speak for everybody, many,

17  many documents in that respect.

18          THE COURT:  What proportion of your client --

19  so you divide your discovery into two categories;

20  documents from whatever sources that they may come from

21  which you review for the evidentiary significance and

22  then documents you received from your clients mostly

23  relating to, I guess their damages; right?

24          MR. STEINGARD:  Principally, but --

25          THE COURT:  There are some liability documents

00168

1  in there, too.

2          MR. WERBNER:  They have newspapers and --

3          MR. STEINGARD:  Well, we have --

4          THE COURT:  Right, I see what you're saying.

5          MR. STEINGARD:  -- the burden of establishing a

6  terrorist incident.  So, frequently there are newspaper

7  articles or even sometimes videotape dealing with the

8  particular terrorist incident.

9          MR. WERBNER:  Or a police report or --

10          THE COURT:  And as to that pile, how far are

11  you along, you know, percentage wise?

12          MR. STEINGARD:  I can't speak to that for this

13  reason.  We are still in the process of collecting but

14  (inaudible) have to be reviewed.

15          THE COURT:  But you get more later.  So now,

16  the pile that you now have, where are you?  That's the

17  question.

18          MR. OSEN:  As far as --

19          MR. STEINGARD:  Yes, please.

20          MR. OSEN:  As far as the client's documents go?

21          THE COURT:  No, I am talking about the non-

22  client document.

23          MR. OSEN:  Everything we've gotten that's been

24  reviewed, we've been turning over to them as we get them.

25  I am expecting in the next week or so to give them

00169

1   another CD's worth of documents because we're coming to

2   the end of that.

3          THE COURT:  But are you still reviewing more

4   that you've received but haven't had a chance yet to

5   review?

6          MR. STEINGARD:  There is still more review

7   going on; yes.

8          THE COURT:  And what percentage of the total

9   that you produced so far do you have?  That's the

10  question.

11         MR. OSEN:  Your Honor, as Mr. Steingard

12  indicated, it's somewhat difficult to quantify because

13  for example, our next production is about 100 documents,

14  video, audio clips, et cetera, it's taken us about two

15  weeks and four associates just to compile it and put it

16  in a list form, and so on.

17         When we compile the list and it's final and

18  we've reviewed it, we produce the entire amount.  And

19  then when we get additional documents, we repeat the

20  process. So, that's truly rolling discovery.

21         THE COURT:  And then focusing on the client

22  documents, have you communicated with all of your

23  clients?

24         MR. STEINGARD:  Yes, absolutely.

25         THE COURT:  Have you gotten everything from

00170

1 them?

2          MR. STEINGARD:  It's still ongoing as to some.

3          THE COURT:  And what is the hold up there

4 because --

5          MR. STEINGARD:  Well --

6          THE COURT:  -- you have been at it for a while?

7          MR. STEINGARD:  Well, for example, medical

8 records have been a problem in certain respects trying to

9 retrieve them from wherever they're located in Israel,

10 for example, but we're working on it.  And as we get

11 them, we produce for -- we must have about 15, some

12 clients we produce were about 37 and we're still on the

13 people --

14          THE COURT:  But where's the 2,800 then?  You've

15 got only --

16          MR. STEINGARD:  Your Honor, that's --

17          MR. WALSH:  Your Honor, Mr. Elsner might be

18 able to shed some light on this.

19          THE COURT:  Okay.

20          MR. WALSH:  He represents 2,300 of them.

21          THE COURT:  2,300.

22          MR. WALSH:  And there, we feel a crying need

23 for speedier production.

24          THE COURT:  Okay.  Yes.

25          MR. ELSNER:  Well, we have obviously many more

00171

1   clients in the universe and --

2           THE COURT:  What kind of resources are you

3   putting on it?

4           MR. ELSNER:  We have informed all of our

5   clients.

6           THE COURT:  No, what kind of lawyer and

7   paralegal resources do you have for those clients?

8           MR. ELSNER:  We have -- I believe we have five

9   or six paralegals in the United States with four

10  translators in the United States.  We have six lawyers in

11  Israel with their support staff and I couldn't tell you

12  exactly how many paralegals they have.

13          Let me tell you what we have done.  As we said

14  early on, we were going to stage our discovery process.

15  We have produced standing information and that is

16  information that this individual is who they say they are

17  for 90 percent of the client base, we think.

18          A vast majority of these clients filed their

19  claims in July of -- from July of this year forward.  So,

20  some of these claims are quite new as opposed to others

21  who have filed in the December/January.  After the

22  standing information, we produced liability information.

23  We've gone through all of the liability documents that we

24  had obtained in our office as of about mid to the end of

25  August and those have all been produced.

00172

1                    As production continues and as it comes in

2      since August, we'll review those documents now and we

3      plan to make a second production of liability documents.

4      The next step is the production of damage information

5      plus a consent to hospitals, request of the consent of

6      our clients to collect that information.  We've produced

7      already roughly -- over 2,000 pages of -- I'm sorry, over

8      1,500 pages of damage information.

9                    THE COURT:  That's less than a page per

10     plaintiff.

11                   MR. ELSNER:  It is.  But we have been told that

12     our Israeli counterparts have collected roughly 7,000

13     pages of materials which have been sent to the United

14     States and will be produced in the next three to four

15     weeks, as soon as they can be bates stamped, you know,

16     and --

17                   THE COURT:  Did you find everybody who was

18     injured in some way?

19                   MR. ELSNER:  No.

20                   THE COURT:  I mean, that's an amazing number.

21                   MR. ELSNER:  No, this is frankly about a third

22     of those that have been injured.

23                   THE COURT:  Wow.  Or family members, I guess,

24     maybe --

25                   MR. ELSNER:  These are --

00173

1           THE COURT:  There is also derivative claims

2  here.  It's not just the actual physical injuries.

3           MR. ELSNER:  Yes.

4           THE COURT:  I see.

5           MR. ELSNER:  That's correct.

6           MR. WERBNER:  One person may have six kids.

7           THE COURT:  Understood.  Now I get it.  Okay.

8  So, all right.

9           MR. WERBNER:  And the only problem my team is

10  having is with police reports and we have just broken

11  through to where the police are putting some people

12  gathering all of these things.  They were tied up with

13  this disengagement and all of the resources were being

14  put there.

15           But I feel like 90 percent -- I mean, I've

16  produced 100 percent of what I have and what we're

17  missing are mainly police reports and some litigation

18  files in Israel where some of these terrorists were

19  actually confessed and tried and we're getting certified

20  judgments and the like.

21           THE COURT:  Well, all right.  So, it sounds at

22  least like between Mr. Elsner and Mr. Werbner, that

23  you've got just about all of the liability document they

24  have.  Am I overstating it?  As of the end of August --

25           MR. WALSH:  I don't believe we have

00174

1    Mr. Elsner's liability documents, your Honor.  I --

2           MR. ELSNER:  You have received over 2,100

3    documents.

4           MR. WALSH:  We've received some documents as

5    we've noted.

6           THE COURT:  Well, what I heard Mr. Elsner to

7    say was that as of the end of August everything he had at

8    that point had been turned over.

9           MR. ELSNER:  Maybe in the middle of August;

10   it's either the middle or to the end, somewhere in

11   that --

12          MR. WALSH:  Well, this is the first time I've

13   heard that, your Honor.

14          THE COURT:  Okay.  Well, you are expecting more

15   liability document from your clients?

16          MR. ELSNER:  Well, the liability documents

17   don't just come from my clients.  They come from our own

18   investigation into this matter.

19          THE COURT:  Okay.  I understand.  But I was

20   asking about from your clients.

21          MR. ELSNER:  We are expecting more.

22          THE COURT:  And then you're just continuing to

23   do your own investigation by whatever, I mean --

24          MR. ELSNER:  Yes.

25          THE COURT:  -- reading newspapers, tracking

00175

1  government sources, et cetera.

2          MR. ELSNER:  Yes.

3          THE COURT:  What do you want me to do?

4          MR. WALSH:  You know, we would like --

5          THE COURT:  I can't set a deadline for -- I

6  mean, in other words, as I understand the rules, they're

7  not -- they have an obligation to continue providing

8  discovery as they get it.

9          MR. WALSH:  Yes, your Honor.

10          THE COURT:  And --

11          MR. WALSH:  All the --

12          THE COURT:  I mean, I suppose at some point a

13  deadline can be set and if you haven't produced it by

14  this point, you're going to have to do without it but

15  we're not there yet.

16          MR. WALSH:  No, all that we request,

17  your Honor, is that the Court underscore the importance

18  of reciprocal discharge of discovery obligations.

19          THE COURT:  Well, they're going to say well

20  what have we got from you.

21          MR. WALSH:  Yes.

22          MR. WERBNER:  We don't want that kind of

23  recidivism.

24          THE COURT:  No, I am not going to tread on that

25  territory just yet.  I am still toying over how to deal

00176

1   with these interrogatories.  I guess I am going to rule

2   on the interrogatories that -- Mr. Werbner, you want me

3   to rule on the ten.

4            MR. WERBNER:  Yes, sir.

5            THE COURT:  Now, some of the -- are you

6   standing on the objections in the interrogatories,

7   Mr. --

8            MR. WALSH:  Your Honor, we would only note that

9   to the extent that those are all submitted by

10  Mr. Werbner in their present form, they are duplicative

11  of other requests that have been made by other counsel

12  and reflect a lack of coordination which we understand

13  this court wishes to be had.

14           THE COURT:  Well, but isn't that -- I made a

15  proposal and that's what I am going to file.  I just have

16  to settle on a number as to how many joint requests and

17  each of them get individual requests.  And that's going

18  to -- right now, you've got a set of ten from roughly

19  from Mr. Steingard and you've got ten from Mr. Werbner.

20  So, that's counting against their individual numbers.

21           And, you know, I am not going to give you that

22  today.  I am going to go back and think it through and

23  figure out what I ought to do on that.  And it would be

24  -- it's useful for me to know as to each of you how many

25  -- I'm not talking about derivative claims, injured party

00177

1   -- actual physical injury, either deaths or injuries each

2   of you represent.

3              MR. WERBNER:  That's 55 plus or minus, you

4   know, either death or injury.

5              THE COURT:  Okay.  Mr. Steingard, you and

6   Mr. Swift are together?

7              MR. STEINGARD:  Yes.

8              THE COURT:  On your various cases?

9              MR. STEINGARD:  Approximately 50.

10             THE COURT:  Approximately 50 actually injured

11  parties.  Mr. Elsner?

12             MR. ELSNER:  We have roughly I believe it's 20

13  or so families that are American citizens and roughly

14  500 to 600 foreign national plaintiffs.

15             THE COURT:  You mean one person in each family

16  at least?

17             MR. ELSNER:  Yes.

18             THE COURT:  So you've got a total of about 520

19  families.

20             MR. ELSNER:  Between 500 and 600.  I can get

21  you the exact number.

22             THE COURT:  Okay.  I say 550.

23             MR. ELSNER:  Okay.

24             THE COURT:  Now, the foreign, you all have

25  United States --

00178

1           MR. WERBNER:  Only Americans.

2           THE COURT:  Only Americans.  And the foreign

3    are -- how did they get here, under the alien --

4           MR. ELSNER:  The alien tort claims, your Honor.

5           THE COURT:  Alien tort claims which you're not

6    using that.

7           MR. ELSNER:  That's correct.

8           THE COURT:  You're using the alien tort claims

9    -- and that's the one that's still --

10          MR. WERBNER:  Unresolved.

11          THE COURT:  But is there any --

12          MR. ELSNER:  We do have some American citizens.

13          THE COURT:  Understood.  You said 20.

14          MR. ELSNER:  20.

15          THE COURT:  You have 20.  I understood you had

16   some of the others, too.

17          What is Judge Gershon -- were those motions

18   submitted at the same time?

19          MR. WALSH:  No, your Honor, they were submitted

20   later and they're presently pending.

21          THE COURT:  They're pending.  They're fully

22   briefed.

23          MR. WALSH:  Yes.

24          THE COURT:  Is there anything about that

25   decision that's -- I mean, about the previous decision

00179

 1   that sheds any light on what Judge Gershon is going to do

 2   on this one?  No.  They're really different issues.  I

 3   don't know the issues at all, frankly.

 4              MR. ELSNER:  As to their ATA claims, we have a

 5   pretty good idea.

 6              THE COURT:  Well, no, I am talking about the

 7   ATC --

 8              MR. WERBNER:  I think we expect something

 9   pretty soon.

10              THE COURT:  You do expect something but -- all

11   right.  But you don't now.

12              MR. WERBNER:  How about 50 a team and 100

13   jointly, just to throw out a number?

14              THE COURT:  I have --

15              MR. WERBNER:  You have it; okay.

16              THE COURT:  I know what his objection -- I've

17   got to think this through.

18              MR. WERBNER:  Okay.

19              THE COURT:  And --

20              MR. WERBNER:  Okay.

21              THE COURT:  All right?

22              MR. WERBNER:  Well, meanwhile on the

23   interrogatories --

24              THE COURT:  I've got one set of ten I am going

25   to have to rule on them.

00180

        1            MR. WERBNER:  You'll rule.

        2            THE COURT:  Individually.  I'm going to look at

        3   the objections --

        4            MR. WERBNER:  And just see --

        5            THE COURT:  -- and issue rulings.

        6            MR. WERBNER:  Okay.  Thank you.

        7            THE COURT:  And those ten are going to be --

        8            MR. WERBNER:  On the papers.

        9            THE COURT:  -- from your group.

       10            MR. WERBNER:  Thank you, sir.

       11            MR. ELSNER:  I want to thank your Honor for

       12   your diligence in going throughout these and I wondered

       13   if we may submit to you what I hope will be a consent

       14   order.

       15            THE COURT:  That's what I was going to -- I'm

       16   glad you raised that because I had gone -- yes, submit a

       17   consent order so that, you know, whatever they need they

       18   can submit and we'll see what their -- frankly, I have a

       19   feeling how it's all going end up but I am going to

       20   permit them the opportunity to pursue that process

       21   because it will make a difference -- I think it may make

       22   a difference on how we decide what kind of remedies, if

       23   any, are going to be necessary.

       24            So, yes, submit the consent orders on

       25   consultation with Mr. -- and if you have any questions

00181

```
 1   about it, I guess you could consult the transcript and --

 2              MR. WALSH:  We will, your Honor.

 3              THE COURT:  Thank you very much.

 4              MR. ELSNER:  Thank you.

 5              MR. WERBNER:  Thank you.

 6                 (Matter concluded)

 7                     -oOo-

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          C   E   R   T   I   F   I   C   A   T   E

25
```

00182

1              I, ROSALIE LOMBARDI, hereby certify that the

2    foregoing transcript of the said proceedings is a true

3    and accurate transcript from the electronic sound-

4    recording of the proceedings reduced to typewriting in

5    the above-entitled matter.

6

7              I FURTHER CERTIFY that I am not a relative or

8    employee or attorney or counsel of any of the parties,

9    nor a relative or employee of such attorney or counsel,

10   or financially interested directly or indirectly in this

11   action.

12

13             IN WITNESS WHEREOF, I hereunto set my hand this

14   13th   day of   October   , 2005.

15

16

17

18

19             ------------------------

20

21                  Rosalie Lombardi

22                  Transcription Plus II

23

24

25