UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| COURTNEY LINDE, et al.,<br>                  Plaintiffs,<br>-against-<br>ARAB BANK, PLC,<br>                  Defendant. | Case No. CV 04 2799 (NG)(VVP) |
| PHILIP LITLE, et al.,<br>                  Plaintiffs,<br>-against-<br>ARAB BANK, PLC,<br>                  Defendant. | Case No CV 04 5449 (NG)(VVP) |
| ROBERT L. COULTER, SR.,<br>FOR THE ESTATE OF JANIS RUTH<br>COULTER, et al.,<br>                  Plaintiffs,<br>-against-<br>ARAB BANK, PLC,<br>                  Defendant. | Case No. CV 05 365 (NG)(VVP) |
| GILA AFRIAT-KURTZER, et al.,<br>                  Plaintiffs,<br>-against-<br>ARAB BANK, PLC,<br>                  Defendant. | Case No. CV 05 388(NG)(VVP) |
| ORAN ALMOG, et al.,<br>                  Plaintiffs,<br>-against-<br>ARAB BANK, PLC,<br>                  Defendant. | Case No. CV 04 5564 (NG)(VVP) |

**MEMORANDUM OF LAW OF ARAB BANK PLC IN OPPOSITION TO
PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF AND SANCTIONS**

Defendant Arab Bank plc ("Arab Bank" or the "Bank") respectfully submits this memorandum of law in opposition to the plaintiffs' Motion For Injunctive Relief and Sanctions.

## PRELIMINARY STATEMENT

The assertion that LeBoeuf Lamb has attempted to "obstruct justice" (Pl. Br. at 4) is baseless and scurrilous. The defamatory statements of the Center for Special Studies that are at issue in this motion are not "testimony," nor are the false translations of documents published by it "evidence." The contention that Arab Bank must stand mute as the Center libelously asserts, in this venue and elsewhere, that "Arab Bank is the Palestinian terrorist organizations' favorite bank" is legally insupportable and absurd on its face.

This motion has nothing to do with "threats" against witnesses or efforts "to obstruct the discovery of essential evidence," as plaintiffs irresponsibly contend. Rather, it concerns the issuance of a cautionary letter by Arab Bank's Israeli counsel to the operators of an Israeli Web site that is engaged in a defamatory campaign against Arab Bank. This campaign appears to be motivated by transparent bias and a plain intention to harm the Bank. It is entirely lawful for Arab Bank to exercise its rights to demand the cessation of such conduct.

Counsel for plaintiffs in these actions have regularly disseminated the defamatory content that appears on the Center's Web site to the media, among others. (The Wall Street Journal has reported, for instance, that one of plaintiffs' attorneys, Gary Osen, "shared information from the Web site with regulators from the Office of the Comptroller of the Currency," the Bank's principal federal regulator, "according to other

2

lawyers with knowledge of the matter."[1]  In fact, plaintiffs provided a copy of this very motion to the *New York Post* – and perhaps other publications – many months in advance of the time when it was to have been fully briefed before this Court, for the apparent purpose of generating highly adverse publicity against the Bank and its counsel in the jurisdiction where these cases will be tried.

The cautionary letter from Arab Bank's Israeli counsel represents an entirely legitimate response to a defamatory publication.  There is absolutely no evidence that either Arab Bank or its counsel has been motivated by any "improper purpose."  Indeed, the only "improper purpose" on display in this motion is that of the plaintiffs, who appear to view this motion, already disseminated by them to the New York media, as a fruitful opportunity to poison the jury pool and thereby deprive Arab Bank of its right to a fair trial.

## I.  THE CENTER FOR SPECIAL STUDIES DEFAMES ARAB BANK

The Center for Special Studies (hereafter, the "C.S.S.") identifies itself on its Web site as "a non-governmental organization" based in Israel.[2]  The Web site operated by the C.S.S. "intelligence.org.il," describes itself in the following fashion:

> An Internet site, which logs almost 100,000 visitors a month (as of May 2005) from all over the world, chiefly from the United States, Europe and Israel.  The site operates in Hebrew, English, French, Russian and Arabic (http://www.intelligence.org.il).  It is considered one of the world's leading sites in the field of terrorism.

---

[1]   Glenn R. Simpson, *Arab Bank's Link to Terrorism Poses Dilemma for U.S. Policy*, The Wall Street Journal, Apr. 20, 2005, attached as Exhibit 1 at 5.

[2]   *See* www.intelligence.org.il/eng/about_e/about_us_e.htm, attached as Exhibit 2 at 1.  The site also issues "Bulletins" in several languages, including Hebrew and English.  *Id.* at 2.

3

*Id.* The C.S.S. Web site also states that it provides "[a]n email service for the general public. Among the subscribers are senior policy-makers, leading media personalities and members of academic institutions and institutes which specialize in global terrorism." *Id.*

The C.S.S. Web site seeks to cloak itself in the legitimacy of the Israeli government by claiming to publish documents "captured by the Israeli army" from individuals and organizations resident in the Palestinian territories. *Id.* The C.S.S. typically appends to these documents disparaging and defamatory commentary and, on occasion, false translation.

Many pages of the C.S.S. Web site contain unsubstantiated statements of a highly defamatory character concerning Arab Bank. The C.S.S Web site states, for instance, that:

- "The Arab Bank is the Palestinian terrorist organizations' favorite bank because it has many branches throughout the PA-administered territories. It can be assumed that various bank officials are aware that the deposits originate with terrorist organizations and are used for terrorist activities or for the infrastructure supporting them…, but choose to turn a blind eye."

- "[The] identification [of charitable societies] with Hamas is, it is assumed, well-know [sic] to Arab Bank officials and employees."

- "It can be assumed that officials at Arab Bank are aware of the nature of the transactions involving Palestinian terrorist organizations because they have been carried out continuously for many years."

- "Palestinian terrorist organizations use the Arab Bank to channel money into Terrorism."

- "[Arab Bank] is the preferred channel of many Palestinian terrorist organizations, particularly Hamas and the Palestinian Islamic Jihad . . . ."

*See Palestinian Terrorist Organizations Use the Arab Bank to Channel Money into Terrorism*, available at http://www.intelligence.org.il/eng//finance/bank.htm, attached as Exhibit 3.

It is self-evident that these statements concern matters that lie at the heart of the actions before this Court. False statements concerning the knowledge possessed by the Bank in processing the transactions at issue in these actions, when broadly disseminated by the C.S.S. and subsequently republished by plaintiffs' counsel, gravely compromise the Bank's ability to obtain a fair trial in this Court.

In addition to defaming Arab Bank by the publication of such statements, the C.S.S. Web site has also published documents, purportedly created by Arab Bank, that have been falsely translated and falsely described. One such document, purportedly "captured" by Israeli Defense Forces, is described as "an Arab Bank *receipt for money* deposited in the account of Hussein Muhammad Farah al-Tawil, the father of Dhiyaa' Hussein Muhammad al-Tawil, a suicide bomber."[3] In fact, however, the purported "Arab Bank receipt for money" is nothing of the sort. Rather, it appears to be a photocopy of an Arab Bank account holder's card with an added handwritten Arabic notation indicating that the account holder's card belongs to "[t]he father of Dhiyaa Hussein Muhammad al-Tawil." *Id.*

The Arabic document that is published on the C.S.S. site contains no reference to a deposit, no date, and no indication on its face that either the recipient, or any family member of the recipient, in fact committed a terrorist act, as C.S.S. claims in

---

[3]   *See Palestinian terrorist organizations and 'charitable societies' identified with them make extensive use of the Arab Bank for transferring funds (Volume 2)*, Appendix J, *available at* http://www.intelligence.org.il/eng/finance/bank_2j.htm, attached with certified translation as Exhibit 4 (emphasis supplied).

5

its published commentary concerning the document. Nor has C.S.S. accurately translated the contents of the document. The site's purported translation of the account holder's card, for instance, includes the words "Pay to the order of Hussein Muhammad Farah al-Tawil." In fact, however, as illustrated by the certified translation of the document provided herewith for the reference of the Court, the Arabic content of the document contains no such statement. *Id.*

Another C.S.S. report, purporting to expose the unlawful practices of the Al-Tadhamun Charitable Society, features what are described as "Arab Bank" documents seized from the Nablus Charity Committee by the Israeli Defense Force.[4] False translations of these documents appear on the C.S.S. site, which, among other things, invent references to the Arabic word for "martyr."[5]

## II. EPSTEIN CHOMSKY PROPERLY DEMANDED THAT THE C.S.S. DESIST FROM ITS IMPROPER CONDUCT

By letter dated May 25, 2005, Eytan Epstein, a senior partner in the Tel Aviv law firm of Epstein, Chomsky & Co., Arab Bank's Israeli counsel, wrote to the C.S.S. to demand that it cease its publication of content concerning Arab Bank (the "Epstein Letter"). Mr. Epstein further demanded that the C.S.S. issue:

> a written clarification, according to which it is not about facts only assessments and solely assessments of the research editors and their opinion, and that the assessments do not reflect or point to an official stand of the State of Israel.

---

[4]   See "Charity" and Palestinian terrorism – spotlight on the Hamas-run Islamic Al-Tadhamun 'charitable society' in Nablus: a case study of the workings of the Palestinian terrorism support-system infrastructure and the organizations abroad which finance it," Appendices B-B(3), *available at* http://www.intelligence.org.il/eng/sib/3_05/charity_2b.htm, attached as Exhibit 5 at 41, 42, 51, 63.

[5]   For example, a photocopy of an alleged Arab Bank receipt of deposit is shown under the heading "Deposit of 100 [Jordanian] dinars [about $140] to the account of the father of shaheed al-Shouli at the Nablus branch of the Arab Bank." Yet, the Arabic document contains no reference to the word "shaheed" and no evidence that the Bank knew that the payment was for an illicit purpose, as suggested by C.S.S.'s added caption. *See id.* at Appendix B(1), p. 42, attached with certified translation as Exhibit 6.

6

Pl. Ex. 1 ¶ 9. In seeking this clarification and demanding that the C.S.S. cease and desist from publishing libelous content regarding Arab Bank, the Epstein Letter noted that the defamatory falsehoods published on the C.S.S. Web site were likely to cause particular harm to Arab Bank because of the pendency of the actions before this Court.

The C.S.S. responded to the Epstein Letter by letter dated July 26, 2005.[6] The plaintiffs are in possession of this response, but they have neglected to provide it to this Court. Their failure to do so is worthy of censure, as the C.S.S.'s response contains facts that expressly refute plaintiffs' contentions in this motion.

Notably, the C.S.S. was neither "intimidated" nor "coerced" by the Epstein Letter, as plaintiffs claim. In fact, the C.S.S. refused to remove any content concerning Arab Bank from its Web site. In doing so, the C.S.S. expressly disavowed any "involvement in," or "relationship with," these proceedings: "[i]nsofar as C.S.S. does not have any relationship with or involvement in these proceedings, C.S.S. will, in any event, be unable to address this matter, nor does it intend to comment on them or to take a position with respect thereto." Exhibit 7 ¶ 3. The C.S.S. statement that it does not "intend to comment . . . or take a position with respect [to this litigation]" could not be more unequivocal: no one – especially the C.S.S. itself – ever contemplated that the C.S.S. would be a witness in this proceeding. *Id.*

In its reply to the Epstein Letter, the C.S.S also stated that its commentary was nothing other than "the interpretation and the assessments that have been attributed to the collection of documents by the researcher, the fact is that this refers to the research opinion of the author, and this has found further, explicit expression in the terms that he

---

[6] *See* Letter from Yehuda Tunik to Mr. Epstein, dated July 26, 2005, attached with certified translation as Exhibit 7.

7

has chosen in order to portray the issues in the collection." *Id.* ¶ 5. Although this argument appears to be entirely unsupported by the Israeli law of defamation, the C.S.S. deemed it to be of particular exculpatory value; indeed, it noted that this Court would have little difficulty in disregarding its commentary as a protected expression of opinion, rather than "factual evidence:"

> [W]e shall note that it is presumed that the Courts know very well how to differentiate between factual evidence and an assessment, and they certainly do not require our guidance in this respect.

*Id.* ¶ 7.

Notwithstanding its refusal to remove content regarding Arab Bank from its Web site, the C.S.S appears to have undertaken at least one corrective action. Following its receipt of the Epstein Letter, the C.S.S. added a disclaimer to its Web site that stated that:

> The material found in the information bulletins posted on this site represent the opinions and assessments of the bulletin's author[s], exclusively. The Center for Special Studies takes no responsibility for their contents and they do not in any way reflect the Center's positions or opinions.

*See* C.S.S. Web site, "Terms of Use," attached as <u>Exhibit 8</u>; *see also* Internet Archive (illustrating absence of disclaimer on preserved versions of C.S.S. Web site prior to date of Epstein Letter), *id.*

In light of the C.S.S.'s refusal to cease its defamatory practices, it may become necessary for Arab Bank to institute libel proceedings against it either in Israel or other jurisdictions. Arab Bank plainly has the legal right to do so, and to rely upon the legal advice of Israeli counsel in making such a decision, just as it was acting lawfully in engaging Israeli counsel to seek to resolve its dispute with the C.S.S. by means short of formal litigation.

8

## III. THE IMPROPER DISSEMINATION OF THIS MOTION TO THE NEW YORK POST

The plaintiffs' true motivation in filing this motion was fortuitously revealed by the disclosure to Arab Bank of an e-mail from a reporter on the staff of the New York Post to Lee Wolosky, a partner of the law firm of Boies, Schiller & Flexner, LLP. Mr. Wolosky has been identified in a Motley Rice press release as part of a team of attorneys representing certain plaintiffs in these actions.[7] This e-mail revealed that plaintiffs had provided their moving papers to the *New York Post* immediately after serving them upon the Bank, and long before this motion was fully briefed and filed with the Court. They appear to have done so for the purpose of procuring immediate press coverage of their scurrilous and false allegation that LeBoeuf Lamb was attempting to suppress evidence, before Arab Bank had the opportunity in this Court to rebut these claims.

Arab Bank learned of this conduct only because the reporter in question, Roddy Boyd, copied a spokesman for Arab Bank on his reply to Mr. Wolosky. (Arab Bank is not in possession of Mr. Wolosky's e-mails to Mr. Boyd, but these communications would undoubtedly shed additional light on the plaintiffs' motives.) In his reply, which is familiar, if not jocular, in tone and which bears the caption "that motion is wild," Mr. Boyd assured Mr. Wolosky that he "will try to write something Tuesday for Wednesday."

The e-mail from Boyd to Wolosky, a copy of which is appended as Exhibit 10, reads in its entirety:

---

[7] *Almog v. Arab Bank*, Motley Rice Web site at http://www.motleyrice.com/terrorism/Arab BankSuitMain.asp, attached as Exhibit 9.

9

>**From**: Boyd, Roddy
>**Sent**: Monday, November 7, 2005 3:30 PM
>**To**: Lee Wolosky
>**Cc**: Bob Chlopak
>
>**Subject**: that motion is wild
>
>hilarious even. i will try and write something Tuesday for Wednesday. Really, what the hell were they thinking? I just think you sent me this to hear about the comment made by the spokesperson for Arab Bank.

Mr. Boyd has written a number of articles concerning the actions against Arab Bank; it appears likely that these too were written at the urging of Mr. Wolosky. *See, e.g.*, Roddy Boyd, "*Sick 'Martyr' Kits*," N.Y. Post, Jul. 5, 2005 (referring throughout to Arab Bank and quoting Mr. Wolosky as saying "New Yorkers would be outraged if a bank on Madison Avenue was alleged to have provided financial support to the families of al Qaeda terrorists. These allegations are no different."); *see also,* Roddy Boyd, "*Bomb Victims Blast Back . . .*," N.Y. Post, Jul. 5, 2005 (plaintiffs "seek[ ] an undetermined amount in financial damages plus assurances that the bank will stop facilitating terror"); Roddy Boyd, "*Terror Fine,*" N.Y. Post, Aug. 18, 2005 (again quoting Mr. Wolosky, and also Mr. Osen, stating that "lawsuits on behalf of the victims of these attacks *turned up evidence* that groups such as Hamas and Palestinian Islamic Jihad *openly used the bank* to pay the families of suicide bombers) (emphasis supplied); Roddy Boyd, "*Arab Bank's Terror Trial Hit,*" N.Y. Post, Sept. 3, 2005 (referring to this Court's ruling on the first motions for dismissal and stating that "in July, The Post broke the story that the bank required intricate and official so-called Martyr's Kits . . . concrete proof that the bank knew where its payments were destined."), compiled and attached as Exhibit 11.

10

It should be a matter of particular concern to this Court that Mr. Wolosky appears to have acted, as assisting counsel to the Motley Rice firm, to procure publication of articles that falsely assert that Arab Bank "knew where its payments were destined." These extrajudicial statements to publications with broad circulation among potential jurors in this action might certainly be understood by a reasonable person to have "a substantial likelihood of materially prejudicing" this proceeding, and they are accordingly prohibited by Disciplinary Rule 7-107.

Nor is this the first time that plaintiffs' counsel have provided copies of their pleadings to the press before filing them with the Court. Gary Osen, counsel for the *Linde* and *Coulter* plaintiffs, for example, immediately informed the *Forward*, a weekly New York newspaper published in English, Russian and Yiddish, of the "Motion for Preliminary Injunction" that plaintiffs filed, under seal, on November 4, 2004. Although the filing itself was not available to the public because plaintiffs had expressly requested its confidential treatment, Mr. Osen nonetheless freely commented upon it to the media who reported that it was "based on federal rules."[8] Mr. Osen, who is admitted to practice *pro hac vice* in this District, made his statements to the media before Arab Bank was afforded the opportunity to respond and before this Court had the opportunity to conclude, as it ultimately did, that the relief sought by plaintiffs was in fact contrary to "[t]he plain language of the statute." *Linde v. Arab Bank plc*, 353 F. Supp. 2d 327, 331 (E.D.N.Y. Nov. 29, 2004) (NG).

---

[8]  *See* Marc Perelman, *Banks Eyed In Lawsuits On Funding For Terror,* Forward, Oct. 15, 2004, *available at* http://www.forward.com/main/printer-friendly.php?ref=perelman20041013928, attached as Exhibit 12. In this same article, Allan Gerson, counsel for the *Almog* and *Afriat-Kurtzer* plaintiffs, reported that similar claims were being prepared against Citigroup and a number of large European institutions, but that the decision to file "partly hinges on the outcome" of the suit against Arab Bank. *Id.* at 1.

It is an unhappy fact of this litigation that plaintiffs have made a concerted effort to procure regular commentary in the New York media that is hostile to Arab Bank.[9] This Court may wish to consider whether they have done so for the purpose of improperly influencing the potential jurors in these actions and whether such conduct contravenes the provisions of Disciplinary Rule 7-107. The repeated comments of plaintiffs' counsel to the media, some of which are quoted in the footnote below, constitute extrajudicial statements that a lawyer must refrain from making if "they will have a substantial likelihood of materially prejudicing an adjudicative proceeding." In

---

[9]   *See, e.g.*, Ex. 13 (compiling articles referenced herein); Joshua Mitnick, *Taking On Arab Bank*, The Jewish Week, Feb. 18, 2005 (Mr. Osen, stating that Arab Bank "cares how they are perceived in the capitols of Europe and the U.S., and that makes . . . [it] vulnerable and amenable to change"); Adam Dickter, *New Suit Against Arab Bank*, The Jewish Week, Dec. 24, 2004 (Mr. Osen, stating that Arab Bank "acknowledge[s] that the account may be controlled by Hamas and therefore ha[s] frozen it and notified the authorities."); Elliot Blair Smith, *Officials Tell Arab Bank to Stop Wire Transfers*, USA Today, Feb. 28, 2005 (Mr. Werbner, stating that the regulators should have acted "before so many lives were lost"); Elliot Blair Smith, *Arab Bank Retreats From U.S. Market*, USA Today, Feb. 9, 2005 (Mr. Osen, stating "We're going to do everything we can to prevent [Arab Bank] from destroying evidence or withdrawing assets" and that the Bank's contribution to terrorist attacks "was public and brazen"); *Jordan Dismisses Claim Against Arab Bank*, AP, Jul. 9, 2004 (Mr. Werbner, stating "We have a mountain of evidence that will prove that the bank not only knows about the terror financing, but is actively involved and using its New York branch to launder money"). Nor have plaintiffs communications with the press been confined to local media. *See, e.g.*, Avi Krawitz, *Arab Bank Fined $24 Million For Funding Palestinian Terrorism*, Jerusalem Post, Aug. 19, 2005 (Gavriel Mairone [counsel for the *Almog* and *Afriat-Kurtzer* plaintiffs]: "No one pays such a high sum if it does not understand that it did something wrong."); Sam Ser, *Victims' Lawyer: Arab Bank 'Knows' It Financed Terror*, Jerusalem Post, Feb. 18, 2005 (Richard Heideman [counsel for the *Litle, Bennett* and *Roth* plaintiffs]: "[Arab Bank] know[s] they're guilty; they know what they've done."); Dan Izenberg, *Terrorist Victims Act To Keep Arab Bank Banch's Assets In U.S.*, Jerusalem Post, Feb. 10, 2005 (Nitzana Darshan-Leitner [counsel for the *Linde* and *Coulter* plaintiffs]: "We are preparing to file requests for temporary restraining orders and temporary seizures against [Arab Bank] and its assets before it closes down and smuggles them out of the country."); Tovah Lazaroff, *Suit On Behalf Of Israeli Terror Victims Targets Arab Bank*, Jerusalem Post, Dec. 21, 2004 (Steven R. Perles [counsel for the *Litle, Bennett* and *Roth* plaintiffs]: "The suit is not about restitution, it's about deterrence"); Melissa Radler, *More Families Join Arab Bank Suit*, Jerusalem Post, Aug. 12, 2004 (Mr. Werbner: "America can't allow a New York banking institution to launder money for terrorists."); Melissa Radler, *Victims Of Palestinian Terror Sue Arab Bank In New York for $875 Million*, Jerusalem Post, Jul. 7, 2004 (Mr. Werbner: "Governments and armies need additional tools and this civil litigation can be the smart bomb in the war against terrorism."); *Terror Victims' Families Vow To Pursue Arab Bank*, AFP, Feb. 9, 2005 (Mr. Motley: "[Arab Bank] can run, but they can't hide."); Toni Heinzl, *2nd Lawsuit Filed Against Bank, Alleging Terrorist Ties*, Fort Worth Star Telegraph, Aug. 11, 2004 (Mr. Werbner: "Our investigation has accumulated transactions, specific documents showing Arab Bank's active rendering of banking services to Hamas and to Hamas' charitable front organizations."). *Id.* It is inconceivable that these statements collectively, including such outrageous statements as Mr. Heideman's assertion that the Bank "knows of its guilt," are not intended to subvert any chance of "an impartial trial." DR 7-107(b)(5).

considering this issue, this Court may also wish to note that all of the attorneys of record in this action who are regularly quoted in the media in connection with this litigation have been admitted *pro hac vice* and thus appear pursuant to the discretion of this Court.

IV.    **PLAINTIFFS' MOTION PROVIDES NO BASIS FOR IMPOSITION OF SANCTIONS**

Putting aside for the moment plaintiffs' apparent motivation in serving and publicizing their motion, as a matter of law it must fail for the simple reason that the Epstein Letter is not a discovery abuse. It is an attorney's letter that seeks to end the publication of defamatory material concerning a client. Such conduct is entirely proper, and sanctions are plainly not warranted.

Plaintiffs have failed to entirely address the governing legal standards, perhaps because this motion was intended for the readership of the *New York Post* rather than this Court. In this Circuit, the imposition of sanctions against counsel requires an express determination by the court that the challenged action was "entirely without color" *and* was taken "for reasons of harassment or delay or for other improper purpose." Neither standard is satisfied here.

The Supreme Court has held that "because of the 'very potency' of a court's inherent power [to assert sanctions], it should be exercised 'with restraint and discretion.'" *United States v. Int'l Brotherhood of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991) (quoting *Chambers v. NASCO, Inc.*, 111 S. Ct. 2123, 2132 (1991)). Here, of course, it is absurd to argue that the Epstein Letter was written for the purpose of harassment, or, indeed, for any other improper purpose. Nor is there any evidence of bad faith, which is also a necessary predicate to the assessment of sanctions. *United States v. Seltzer*, 227 F.3d 36, 41-42 (2d Cir. 2000) (requiring factual findings of bad faith and

meritlessness with a "high degree of specificity"); *Sierra Club v. Unites States Army Corps of Eng'rs*, 776 F.2d 383, 390 (2d Cir. 1985) (test for imposition of sanctions requires finding of both improper purpose *and* legal meritlessness).

To the contrary, the Epstein Letter was an entirely appropriate attempt to prevent the publication of defamatory material. The text of the letter itself clearly requests that the C.S.S cease its publication of such material on its Web site – a Web site which boasts that it enjoys a large readership in the United States, and provides English content for the convenience of that readership.

This is obviously not the occasion for Arab Bank to argue that the content of the C.S.S. Web site is defamatory. Such matters are for separate litigations, if and when Arab Bank decides to commence them. It is nonetheless beyond dispute that the material posted on the C.S.S. Web site is defamatory of Arab Bank – whether the applicable law is that of Israel, England or the United States.

Statements accusing an international bank of knowingly assisting terrorism – an accusation that Arab Bank vehemently denies – are defamatory on their face. *See, e.g., Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 359-60, 399 (S.D.N.Y. 1998) (assertion that plaintiff was responsible for major act of terrorism is defamatory); *Al Rajhi Banking and Invest. Corp. v. Wall Street Journal Europe SPRL*, 2003 EWHC 1776 (QB), All ER (D) ¶ 3 (Jul) (Queen's Bench Div. July 21, 2003) (assertion of involvement in terrorist funding is a "defamatory imputation which could hardly be more serious"); *Bin Mahfouz v. Ehrenfeld*, 2005 EWHC 1156 (QB), All ER (D) 361 (Jul) (Queen's Bench Div. May 3, 2005).[10]

---

[10] Rachel Ehrenfeld, the defendant in the *Bin Mahfouz* action, was found to have published libelous statements that a Saudi Arabian business was involved in financing terrorism. Ms. Ehrenfeld is no stranger

14

Indeed, under New York law, the assertions on the C.S.S. Web site are libelous *per se* because they tend to injure Arab Bank in its trade or business. *Championship Sports, Inc. v. Time, Inc.*, 40 Misc. 2d 407, 408, 234 N.Y.S.2d 28, 29 (N.Y. Sup. Ct. 1963) (citations omitted) ("A corporation is the victim of libel per se if the publication tends to impugn 'management, credit or business, or holds it up to ridicule contempt or disgrace' . . . or 'if the publication disparages some aspect of its business in such a manner as directly to prejudice the successful conduct or to imperil the very continuation of that business.'"); *Penn Warranty Corp. v. DiGiovanni*, Civ. No. 600659/04, 2005 WL 2741947, at *3 (N.Y. Sup. Ct. Oct. 24, 2005); *Jack Braunstein, Inc. v. Oleg Cassini, Inc.*, 20 Misc. 2d 291, 195 N.Y.S.2d 671 (N.Y. Sup. Ct. 1959).

It is self-evident that it is lawful and appropriate for counsel to write to the publisher of defamatory statements, including those, such as counsel, that have republished such statements, to demand that such publication cease. *See Davis v. Costa-Gavras*, 595 F. Supp. 982, 987 (S.D.N.Y. 1984) (issue concerning whether counsel's letter to book publisher constituted notice of defamatory material in book); *Barricade Books, Inc. v. Langberg*, Civ. No. 8906/95, 2000 U.S. Dist. LEXIS 18279 (S.D.N.Y Dec. 19, 2000) (counsel's letter to halt republication of defamatory material is privileged litigation conduct and not actionable under tortious interference theory). The Epstein Letter does precisely this. Moreover, regardless of plaintiffs' contrived claims of obstruction and tampering, C.S.S. clearly viewed the position asserted in the Epstein Letter as having sufficient merit that C.S.S. decided to add a disclaimer to its Web site

---

to this Court; she has submitted an affidavit in support of the "motion for preliminary injunction" that plaintiffs filed on November 4, 2004; this motion was denied by order and opinion dated November 29, 2004. As noted above (*supra* at 11), that motion was also the subject of extensive commentary to the press by plaintiffs' counsel, notwithstanding the fact that they elected to file it under seal.

that the materials posted were merely matters of personal opinion and not statements of fact. In light of the fact that the Epstein Letter constituted a legitimate legal strategy which put the C.S.S. on notice of the defamatory content of its postings, and the fact that it elicited a response that the C.S.S. appears to have believed, *albeit* mistakenly, to have been curative, the plaintiffs simply cannot establish that Arab Bank's attempts to protect its reputation are "entirely without color," and their motion for sanctions must therefore fail. *See, e.g., Sussman v. Bank of Israel*, 56 F.3d 450, 459-60 (2d Cir. 1995) (court cannot use inherent powers to sanction partially meritorious legal strategy); *Milltex Indus. Corp. v. Jacquard Lace Co.*, 55 F.3d 34, 41 (2d Cir. 1995) (sanctions inappropriate where action of counsel was colorable).

Plaintiffs have also entirely failed to establish that either Epstein Chomsky or LeBoeuf Lamb was motivated by an improper purpose; again, they have chosen to ignore entirely the governing legal standard. The purpose of the Epstein Letter is self-evidently not improper. Nothing in the Epstein Letter can remotely be construed, as plaintiffs irresponsibly claim, as seeking the destruction of evidence or the coercion of witnesses. To the contrary, the Epstein Letter demands that the C.S.S. cease and desist from publication and issue a clarification.

Plaintiffs have, moreover, improperly failed to inform this Court that the C.S.S. has stated that it will not be a witness in this case. Indeed, the plaintiffs themselves have failed to designate the C.S.S. as a witness. The parties have exchanged Rule 26 disclosures, and the plaintiffs have identified thousands of witnesses; the C.S.S. is not, however, among them.[11] There is no reason, moreover, for this Court to conclude,

---

[11] *See Linde, Coulter, Litle, Almog* and *Afriat-Kurtzer* Plaintiffs' Rule 26 Disclosures, attached as Exhibit 14.

16

nor have the plaintiffs stated any such reason, that C.S.S. has any personal knowledge of any of the matters at issue in this litigation. To the contrary, C.S.S. has expressly disclaimed such knowledge in its letter reply to Mr. Epstein: "it is presumed that the Courts know very well how to differentiate between factual evidence and an assessment." Ex. 7 ¶ 7.

In short, the Epstein Letter reflects neither improper purpose nor a meritless legal position, so the imposition of sanctions would be an abuse of discretion. *Sussman*, 56 F.3d at 459-60. But the real issue here is not what the C.S.S. asserts about Arab Bank. The real issue is plaintiffs' attempt to suggest to this Court and to the public at large that this law firm and Arab Bank are suppressing evidence or threatening witnesses. It is beyond dispute that the C.S.S. is not a witness and its views are not evidence. Indeed, everyone, including the C.S.S., agrees on this point, although plaintiffs failed to make this known to the Court in their initial motion. In light of this, the plaintiffs' charges of witness tampering and obstruction are despicable, incredible, and legally unsupportable. Their motion is a transparent and unprofessional attempt to procure scandalous media coverage in the New York media so as to diminish the reputation of this law firm and Arab Bank in the estimation of those who will be the ultimate finders of fact in these actions.

Mr. Wolosky's actions in disseminating the plaintiffs' motion to the press long before Arab Bank had been afforded the opportunity to respond makes plaintiffs' true motivation manifest. Should this Court carefully consider the conduct of Mr. Wolosky and his co-counsel, it will surely conclude that this is the only professional misconduct worthy of this Court's attention.

## CONCLUSION

For the reasons set forth herein, Arab Bank respectfully urges the Court to deny plaintiffs' motion, to award Arab Bank the costs and fees incurred by it in the defense of this motion, and to order such other and further relief as the Court may deem appropriate to discourage attorney conduct that is likely to materially prejudice these proceedings.

Date: December 20, 2005

Respectfully submitted,

_____
Kevin Walsh (KW 6256)
LEBOEUF, LAMB, GREENE & MACRAE LLP
125 West 55th Street
New York, New York 10019-5389
Tel.: (212) 424-8000

Attorneys for Arab Bank plc