UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

COURTNEY LINDE, et al.

Plaintiffs,

-against-

ARAB BANK, PLC,

Defendant.

Case No. CV 04 2799(NG)(VVP)

ORAN ALMOG, et al.

Plaintiffs,

-against-

ARAB BANK, PLC,

Defendant.

Case No. CV 04 5564(NG)(VVP)

COULTER, et al.

Plaintiffs,

-against-

ARAB BANK, PLC,

Defendant.

Case No. CV 05 365(NG)(VVP)

GILA AFRIAT-KURTZER, et al.

Plaintiffs,

-against-

ARAB BANK, PLC,

Defendant.

Case No. CV 05 388(NG)(VVP)

**MEMORANDUM OF LAW OF DEFENDANT ARAB BANK, PLC IN OPPOSITION TO PLAINTIFFS' MOTION FOR AN ORDER OVERRULING OBJECTIONS, DEEMING FACTS AS ADMITTED AND COMPELLING FURTHER RESPONSES TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS AND RELATED INTERROGATORIES**

**LEBOEUF, LAMB, GREENE & MACRAE LLP**
125 West 55th Street
New York, New York 10019-5389
Tel: (212) 424-8000

Attorneys for Defendant Arab Bank plc

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 4

ARGUMENT ..... 12

I. FOREIGN BANK SECRECY LAWS PROHIBIT DISCLOSURE OF THE BANK DOCUMENTS AND ACCOUNT INFORMATION SOUGHT BY PLAINTIFFS. ..... 14

A. Express Bank Secrecy Statutes Of Three Sovereign Nations Prohibit Disclosure By Arab Bank. ..... 14

B. The Documents And Information Sought By Plaintiffs Fall Squarely Within These Foreign Bank Secrecy Laws. ..... 16

C. No Exceptions To Bank Secrecy Laws Apply To The Discovery Sought By Plaintiffs. ..... 19

1. Discovery Orders of a U.S. Court Are Not a Basis for Lawful Disclosure. ..... 19

2. There Is No Exception to Bank Secrecy Laws for Requests for Admissions of Authenticity. ..... 20

3. Bank Secrecy Applies to All Documents Withheld by Arab Bank. ..... 21

4. There Has Been No "Waiver" of Bank Secrecy. ..... 22

II. THE REQUISITE COMITY ANALYSIS WEIGHS AGAINST DISCLOSURE. ..... 24

A. Factors Favoring Preservation Of Bank Secrecy Predominate In The Case At Hand. ..... 24

1. Foreign Bank Secrecy Interests Outweigh the Interests Represented by These Private Litigants. ..... 25

2. Arab Bank Has Demonstrated the Substantial Hardship of Compliance. ..... 31

3. The Evidence Sought by Plaintiffs Is Available by Alternative Means. ..... 32

4. Other Factors Favor Protection from Disclosure. ..... 34

5. Arab Bank's Good Faith Efforts to Obtain Lawful Disclosure Mandate Denial of Plaintiffs' Motion. ..... 35

B. The Rejection Of Foreign Bank Secrecy Laws Urged By Plaintiffs Offends Basic Principles Of International Law. ..... 36

CONCLUSION ..... 42

## TABLE OF AUTHORITIES

**CASES** **Page(s)**

*Alfadda v. Fenn*,
149 F.R.D. 28 (S.D.N.Y. 1993) ........ 28, 30

*In re Bank One Securities Litig.*,
209 F.R.D. 418 (N.D. Ill. 2002) ........ 23

*Cicippio-Puleo v. Islamic Republic of Iran*,
353 F.3d 1024 (D.C. Cir. 2004) ........ 40

*Cochran Consulting, Inc. v. Uwatec USA, Inc.*,
102 F.3d 1224 (Fed. Cir. 1996) ........ 32

*Dellwood Farms, Inc. v. Cargill, Inc.*,
128 F.3d 1122 (7th Cir. 1997) ........ 22

*F. Hoffman-La Roche, Ltd. v. Empagran, S.A.*, (No. 03-724)
542 U.S. 155 (2004) ........ 38, 39

*First American Corp. v. Price Waterhouse LLP*,
154 F.3d 16 (2d Cir. 1998) ........ 24

*In re Grand Jury Subpoena dated August 9, 2000*,
218 F. Supp. 2d 544 (S.D.N.Y. 2002) ........ 29

*Hilton v. Guyot*,
159 U.S. 113 (1895) ........ 38

*Lamb v. Phillip Morris, Inc.*,
915 F.2d 1024 (6th Cir. 1990) ........ 40

*In re Lernout & Hauspie Sec. Litig.*,
218 F.R.D. 348 (D. Mass. 2003) ........ 21

*Madanes v. Madanes*,
186 F.R.D. 279 (S.D.N.Y. 1999) ........ 30

*Minpeco, S.A. v. Conticommodity Services, Inc.*,
116 F.R.D. 517 (S.D.N.Y 1987) ........ passim

*Murray v. Schooner Charming Betsy*,
6 U.S. (2 Cranch) 64 (1804) ........ 38

*Reinsurance Co. of America v. Administratia Asigurarilor de Stat*,
902 F.2d 1275 (7th Cir. 1990) ........ 25, 26

*Richmark Corp. v. Timber Falling Consultants*,
959 F.2d 1468 (9th Cir. 1992) ........ 30

*SEC v. Banca Della Svizzera Italiana*,
92 F.R.D. 111 (S.D.N.Y. 1981) ........ 13, 28, 30, 35

*SEC v. Renert, No. Civ. 3:01CV1027*,
2002 WL 32503671 (D. Conn. June 17, 2002) ........ 29

*Salomon Bros. Treasury Litig. v. Steinhardt Partners, L.P.*,
9 F.3d 230 (2d Cir. 1993) ........ 23

*In re Sealed Case*,
825 F.2d 494 (D.C. Cir. 1987) ........ 4, 42

*Société Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers*,
357 U.S. 197 (1958) ........ 12, 31, 32

*Société Nationale Industrielle Aerospatiale v. U.S. Dist. Court*,
482 U.S. 522 (1987) ........ 12, 13, 27

*Sosa v. Alvarez-Machain*,
542 U.S. 692, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004) ........ 29, 40

*Ssangyong Corp. v. Vida Shoes Int'l, Inc.*,
2004 WL 1125659 (S.D.N.Y. 2004) ........ 35

*The Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*,
268 F.3d 103 (2d Cir. 2001) ........ 38

*Trade Dev. Bank v. Cont'l Ins. Co.*,
469 F.2d 35 (2d Cir. 1972) ........ 12

*United States v. Castle*,
925 F.2d 831 (5th Cir. 1991) ........ 40

*United States v. Davis*,
767 F.2d 1025 (2d Cir. 1985) ........ 28

*United States v. First National Bank of Chicago*,
699 F.2d 341 (7th Cir. 1983) ........ 15, 19, 25

*United States v. First National City Bank*,
396 F.2d 897 (2d Cir. 1968) .......... 26, 28, 30

*In re Westinghouse Elec. Corp. Uranium Contracts Litig.*,
563 F.2d 992 (10th Cir. 1977) .......... 12, 32, 37

*White v. Kenneth Warren & Son, Ltd.*,
203 F.R.D. 369 (N.D. Ill. 2001) .......... 26, 27

**STATUTES AND TREATIES**

28 U.S.C. §1350 .......... 2

28 U.S.C. § 1603(d) .......... 38

28 U.S.C. § 1605(a)(2) .......... 38

15 U.S.C. § 6(a) .......... 39

European Union-United States Memorandum of Understanding Concerning the U.S. Helms-Burton Act and the U.S. Iran and Libya Sanctions Act, 36 I.L.M. 529 (1997) .......... 40

**FOREIGN STATUTES**

Lebanese Banking Law of September 3, 1956, Article 2 .......... 16

Lebanese Banking Law No. 318 of April 20, 2001 .......... 8

Lebanese Banking Law of September 3, 1956, Article 8 .......... 31

Jordanian Banking Law No. 28, Article 72 (2000) .......... 6, 14, 19

Jordanian Banking Law No. 28, Article 73 (2000) .......... 14

Jordanian Banking Law No. 28, Article 75 (2000) .......... 14

Palestinian Monetary Authority's Banking Law No. 2, Article 26 (2002) .......... 15, 16, 18, 20

Palestinian Monetary Authority's Banking Law No. 2, Article 52 (2002) .......... 15

Defendant Arab Bank, Plc ("Arab Bank") respectfully submits this memorandum of law in opposition to the joint motion of plaintiffs in the cases *Linde, et al.* (CV 04 2799), *Almog, et al.* (CV 04 5564), *Coulter, et al.* (CV 05 365), and *Afriat-Kurtzer, et al.* (CV 05 388) to compel discovery and order sanctions against Arab Bank. Together with this memorandum of law, pursuant to Fed. R. Civ. Pro. 44.1, Arab Bank also submits the expert opinions of Aiman Y. Odeh, Maher Misri and Chakib Cortbaoui on issues of Jordanian, Palestinian and Lebanese bank secrecy law, respectively, as well as official statements from regulatory authorities in those three sovereignties concerning applicability of their bank secrecy laws to the discovery sought by plaintiffs from Arab Bank.

**PRELIMINARY STATEMENT**

Plaintiffs have moved this Court to compel discovery from Arab Bank, overrule Arab Bank's objections based on bank secrecy, and impose sanctions against Arab Bank in the form of admissions and costs. Plaintiffs make this motion notwithstanding that (1) there is *no* discovery order of this Court with which Arab Bank has failed to comply, (2) the wholesale discovery of bank transactions in the Middle East sought by plaintiffs would constitute criminal violations of bank secrecy laws in three foreign nations, and (3) Arab Bank has been working diligently, as this Court itself has noted, to obtain permission from officials in Jordan, the Palestinian Authority and Lebanon to disclose lawfully the information and documents sought by plaintiffs. As Arab Bank has repeatedly stated – and states again unequivocally – it is Arab Bank's desire and intent to satisfy all legitimate discovery demands propounded by plaintiffs *within the bounds of its legal obligations in the foreign countries in which Arab Bank operates and in which the requested documents are located.* Indeed, it is in Arab Bank's interests in this litigation to produce its bank records, which will demonstrate *no* knowing support of terrorists or

terrorist acts. Arab Bank's efforts to obtain permission for lawful disclosure have already been successful in Lebanon, paving the way for discovery sufficient to render moot, in part, the instant motion. Plaintiffs, by contrast, have made no efforts to obtain the discovery they seek by alternative means. Plaintiffs' motion is a premature[1], and carefully calculated, attempt to force Arab Bank into the untenable position of choosing between criminal violations of foreign bank secrecy laws and potential punitive consequences in this litigation.

As a substantive matter, plaintiffs' motion is grounded on the flawed premise that bank secrecy is a mere "privilege" that Arab Bank can easily waive and that this Court should casually reject with respect to all discovery. Indeed, although veiled in terms of purportedly seeking limited relief, plaintiffs' motion ultimately asks the Court to overrule all of Arab Bank's objections to discovery based on foreign bank secrecy laws: "this Court should comprehensively overrule [the foreign bank secrecy law] objection." (Pls.' Mem. at 38-39.) Plaintiffs thus seek a ruling that would mandate the wholesale disclosure of hundreds of thousands of banking transactions, in multiple foreign countries, and impose the threat of onerous sanctions against Arab Bank in this litigation to the extent the Bank complies with the foreign bank secrecy law of those countries. Contrary to plaintiffs' characterization, however, Arab Bank's objections rest not on a mere privilege, but on statutory obligations to preserve the confidentiality of its customers' private financial information. The *right*, not privilege, of privacy belongs to Arab Bank's many customers, and Arab Bank and its employees would be subject to criminal liability, and even imprisonment, for violating its customers' rights.

---

[1] The claims of 90% of plaintiffs who have brought the instant motion, namely those non-U.S. individuals relying on the Alien Tort Claims Act, 28 U.S.C. §1350, are the subject of a pending motion to dismiss by Arab Bank. These plaintiffs are asking the Court to reject the bank secrecy laws of three countries before even deciding whether the Court has jurisdiction to adjudicate the underlying claims of these plaintiffs.

As set forth in detail herein, and in the accompanying expert declarations on Jordanian, Palestinian and Lebanese bank secrecy laws, Arab Bank more than meets the legal standard for protection from disclosure of confidential information in violation of foreign law. Arab Bank's good faith efforts to procure permission for lawful disclosure – already recognized by the Court – further warrant denial of plaintiffs' motion, and in particular any sanctions for failure to produce documents or information covered by the foreign bank secrecy laws. Even more, any comity analysis in this case, we respectfully submit, must be resolved in favor of deference to foreign law. Plaintiffs have attempted to bias the requisite balancing of interests by invoking the U.S. national interest in combating terrorism. Yet that interest, although no doubt compelling, is one that has been asserted properly by the U.S. federal regulators that have already investigated Arab Bank. It is *not* an interest that is equally invoked by civil litigants, and not just any civil litigants, but mostly *non-U.S. citizens* who are asserting claims against a *foreign institution* over financial transactions that occurred in the *Middle East*, which transactions allegedly caused tortious acts in the *Middle East*, which acts caused injuries to individuals in the *Middle East*. By contrast, the very real interest of at least three nations in maintaining bank secrecy, as reflected in official statements of banking authorities from all three jurisdictions, should be given great weight.

These plaintiffs, who have elected to bring their claims in the United States, now want this Court to discount entirely the bank secrecy laws of Jordan, the Palestinian Authority and Lebanon and compel the production of thousands of bank documents in the Middle East without regard to the privacy of customers of an international banking institution, or the likely criminal liability for Arab Bank if it were to comply with such an order. Such a ruling would not only force Arab Bank to choose between criminal violations of foreign law and sanctions for

failure to comply with a U.S. court order, but it would contravene principles of international law by placing the interests of private plaintiffs in U.S. courts above the sovereignty rights of three foreign nations to regulate their banking industries, not to mention the privacy rights of the citizens of those three nations.[2] Judicial restraint in this circumstance is the more prudent course. *See In re Sealed Case*, 825 F.2d 494, 498 (D.C. Cir. 1987) ("we should say it causes us considerable discomfort to think that a court of law should order a violation of law, particularly on the territory of the sovereign whose law is in question"). Arab Bank should be permitted to pursue legal avenues for disclosure, and plaintiffs should be required to use means other than Court-sanctioned violations of foreign law to prove their case.

**STATEMENT OF FACTS**

The existence and significance of foreign law bank secrecy laws as they bear on plaintiffs' discovery requests have been the subject of discussion between the parties and with the Court since the summer of 2005. To the extent plaintiffs' myriad document requests and interrogatories seek documents and information relating to hundreds of Arab Bank customers throughout the Middle East, they invoke the bank secrecy laws of numerous sovereignties.[3] Even requests to admit the authenticity of purported Arab Bank transaction records obtained by plaintiffs from sources other than Arab Bank effectively would require Arab Bank to reveal confidential information by confirming the existence of private accounts and the accuracy of

---

2 Plaintiffs repeatedly refer to the recent election of HAMAS, a terrorist organization, as ruling party in the Palestinian Authority, as further reason for this Court to dismiss out of hand that jurisdiction's pre-election bank secrecy laws. (*See, e.g.*, Pls.' Mem. at 5: Inferiority of foreign law interest "is particularly true when the Bank is asserting bank secrecy laws enacted by the Palestinian Authority. . . . which is now controlled by HAMAS, a Foreign Terrorist Organization.") Plaintiffs cite no authority for resting the legitimacy of a foreign law on the nature of that nation's current political leadership, and they again are attempting improperly to convert this Court into an instrument of foreign policy. In the absence of such authority, plaintiffs further urge this Court to discount the laws of the Palestinian Authority on the basis of a decision in Rhode Island which questioned the Palestinian Authority's classification as a foreign "state". (Pls.' Mem. at 26) Plaintiffs may casually dismiss the foreign law interests of the Palestinian Authority, as well as Jordan and Lebanon, but a U.S. federal court should not.

3 One of the many Arab Bank accounts for which plaintiffs seek production is maintained in an Arab Bank branch in Morocco, which also has a criminal bank secrecy statute. Morocco Penal Code and Banking Law of 1999. Because of its limited application, Arab Bank does not focus on Morocco's bank secrecy law, *per se*, herein.

purported transactions. Arab Bank has objected appropriately to all such discovery requests, and on June 2, 2005, counsel for Arab Bank provided plaintiffs' counsel with copies of the relevant statutes from the three jurisdictions most directly affected by plaintiffs' discovery requests, Jordan, the Palestinian Authority and Lebanon. (Ex. A to the accompanying Declaration of Alan B. Howard ("Howard Decl.").)

At a conference before Magistrate Judge Pohorelsky held June 22, 2005, all parties recognized the import of bank secrecy, and the Court specifically noted: "You know, certainly I am going to have to address that bank secrecy act matter. But it's a lot easier to justify an order that deals with a specific account that you can in some way tie to this case rather than to say give me all information about all accounts of, I don't know, relating in any way to Hamas." (June 22, 2005 Conference Tr. at 61:17-21.) Consistent with this reasoning, *plaintiffs' counsel* proposed a process whereby they would identify individual bank accounts for purposes of addressing bank secrecy with specificity, and the Court agreed. (*Id.* at 62:10-15.) Accordingly, on June 27, 2005, plaintiffs submitted a Joint Modified Phase I Request for the Production of Documents to Defendant Arab Bank, Plc (Howard Decl., Ex. B); and, on July 27, 2005, the Court (Magistrate Judge Pohorelsky) ordered that "[t]he parties shall commence steps immediately to obtain the necessary permission from foreign regulatory authorities for the production of that information" for nine of the bank accounts identified by plaintiffs in their Joint Modified Phase I Request (July 27, 2005 Order, Howard Decl., Ex. C)[4]. While the Court expressly directed joint action by "the parties," plaintiffs nonetheless declined to assist in any way in the application process within the foreign jurisdictions, choosing instead to adopt the same position they take in the instant motion: foreign law secrecy obligations are the "Bank's

[4] Details concerning the categories of bank account records for which permission was to be sought was further elaborated in Orders of the Court issued on August 24, 2005. (Howard Decl., Ex. D).

problem." (Pls.' Mem. at 13 n. 33; *see also* August 5, 2005 letter from Osen to Fox, Howard Decl., Ex. E.) Arab Bank emphasizes this fact, not necessarily to suggest bad faith on the part of plaintiffs, but to point out that any criticism by plaintiffs of the procedural steps taken by Arab Bank in the foreign jurisdictions to obtain permission for lawful disclosure is baseless. In any event, Arab Bank, on its own, has fully complied with the Court's July 27, 2005 Order.

Jordan

The Court's July 27, 2005 Order covered a single Jordanian account, No. 600/21697-6, maintained at an Arab Bank branch in Al-Raseifa, Jordan. (Pls.' Joint Modified Phase I Request, Howard Decl., Ex. B, at Req. No. 2.) In compliance with the Court's directive to "commence steps to obtain the necessary permission from foreign regulatory authorities," and pursuant to Article 72 of the Jordanian Banking Law No. 28 of 2000, Arab Bank made an application to the Jordanian court of original jurisdiction for permission to disclose records relating to account no. 600/21697-6.

Arab Bank's application to the Jordanian court of original jurisdiction was granted on September 27, 2005. A prompt appeal of that decision, however, was brought *ex parte* by the account holder. On October 9, 2005, the Jordanian Appeals Court in Amman issued a ruling reversing the lower court and rejecting the request for permission to disclose. Arab Bank promptly provided this Court, on October 20, 2005, the Jordanian appellate court decision, in its original Arabic and in English, copies of which are annexed as Ex. F to the Howard Decl. Significantly, and as discussed further in the legal analysis herein, the Jordanian Appeals Court based its ruling on the fact that Arab Bank is bound by the bank secrecy provisions of Jordanian Banking Law No. 28 of 2000, and this Court's July 27, 2005 Order did not provide a basis for an exception to those bank secrecy provisions. Given that the account holder himself brought the

successful appeal, a direct request by Arab Bank to the account holder for consent to disclosure would be futile. Arab Bank therefore has no further steps it can take to achieve the lawful disclosure of records relating to account no. 600/21697-6 in Jordan.

Palestinian Authority

Plaintiffs' Joint Modified Phase I Request identified eight accounts at Arab Bank branches in the Palestinian territories. In compliance with this Court's July 27, 2005 Order, and pursuant to the Palestinian Monetary Authority's ("PMA") Banking Law No. 2 of 2002, Arab Bank applied to the Supreme Judiciary Council, Ramallah First Instance Court, for permission to disclose the account records and information relating to those eight accounts. On October 2, 2005, in an opinion annexed as Ex. G to the Howard Decl., the Palestinian Court denied Arab Bank's application. Like the Jordanian Appeals Court, the Palestinian Court ruled that this Court's discovery order did not satisfy the judicial order exception to Palestinian bank secrecy law, which therefore prohibits disclosure of the requested records. Arab Bank has appealed the First Instance Court's decision, and that appeal is scheduled to be heard by the Ramallah Court of Appeals this month. An English translation of Arab Bank's appeal is annexed as Exhibit H to the Howard Decl.

As a separate avenue for release from its bank secrecy obligations, on October 5, 2005, Arab Bank sought permission directly from the PMA to authorize disclosure of the records for the seven accounts identified in this Court's July 27, 2005 Order. The PMA denied that request on the basis that it does not have the power under Banking Law No. 2 to authorize disclosure, which therefore must be honored. Arab Bank's request to the PMA, and its denial, are annexed as Ex. I.

Lebanon

The Court's July 27, 2005 Order expressly excluded the one Lebanese account, No. 3-810-0622473-0330, in Arab Bank's Al-Mazra branch, identified in Plaintiffs' Joint Modified Phase I Request. (Howard Decl., Ex. B, at Req. No. 1.) However, at an October 11, 2005 status conference, the Court revisited the issue and requested a proposed order directing production of records relating to this account for the parties then to submit to the appropriate regulatory authorities in Lebanon. A Stipulated Production Order was submitted by the parties and signed by Magistrate Judge Pohorelsky on November 8, 2006. (Howard Decl., Ex. J.) In compliance with that November 8, 2005 Stipulated Production Order, and pursuant to Lebanese Law No. 318 of April 20, 2001, Arab Bank promptly applied to the Lebanese Special Investigation Commission for permission to disclose information relating to account number 3-810-622473-0330 at Arab Bank's Al-Mazra branch. On January 25, 2006, the Special Investigation Commission granted Arab Bank's application. An English translation of Arab Bank's application and the Special Investigation Commission's decision are annexed hereto as Exhibit K. Records relating to this Lebanese account have now been produced to plaintiffs.

* * *

In sum, as of February 20, 2006, when plaintiffs filed the instant motion, Arab Bank had complied with all discovery orders issued by this Court. Plaintiffs make reference in their memorandum of law to a purported "Order" dated October 11, 2005 with which they contend Arab Bank has not complied, but in support of this contention plaintiffs offer only a status conference transcript cite (Oct. 11, 2005 Tr. at 136:5-11, Pls.' Mem. at 8 fn. 18) which does not direct Arab Bank to produce anything at all. To the extent plaintiffs seek sanctions for "Defendant's failure to comply with discovery or this Court's previous order" (Pls.' Mem. at 39),

Arab Bank unequivocally denies the suggestion that it has failed to comply with any order of this Court.

To the contrary, Arab Bank has taken all reasonable steps in timely fashion to obtain the requisite approval for disclosure of the foreign bank records sought by plaintiffs but covered by multiple bank secrecy laws. While plaintiffs dismiss the efforts of Arab Bank as "dilatory applications" (Pls.' Mem. at 5), this Court has already noted that "[w]e can't say that the bank has dragged its feet in pursuing the issue of getting approval from the authorities there." (Tr. of Feb. 28, 2006 Conference at 82:7-9.) Arab Bank's efforts in this regard are even more noteworthy when contrasted with plaintiffs' efforts to go through proper legal channels to obtain discovery outside the U.S. – which is *none*. Not only have plaintiffs declined to participate in the process seeking appropriate approval from the foreign jurisdictions (despite this Court's directive that it do so), they have not sought discovery by means of letters rogatory of any Arab Bank account holders, the Saudi Committee or any other parties plaintiffs contend were supporters of terrorism. Plaintiffs instead are relying on this Court to impose the discovery burden entirely on Arab Bank – at the risk of criminal prosecution – or better yet get the benefit of sanctions in the form of deemed facts or adverse inferences so as to avoid altogether their evidentiary burden. The Court should reject plaintiffs' transparent strategy.

March 3, 2006 Production Order

On March 3, 2006, two weeks after plaintiffs filed the instant motion, the Court (Magistrate Judge Pohorelsky) issued a Document Production Order ("Production Order"), annexed as Ex. L to the Howard Decl. This Production Order defines specific categories of information, for specific alleged Arab Bank customers (among others), as discoverable. The Production Order (at ¶ 12) expressly states that it is not a ruling concerning bank secrecy, and (at ¶ 13) directs Arab Bank to identify those categories of documents identified in the Production

Order that are subject to any bank secrecy laws. Arab Bank has complied with that directive. (March 24, 2006 Statement of Def. Arab Bank plc Regarding Application of Foreign Bank Secrecy Laws to the Court's March 3, 2006 Document Production Order and March 31, 2006 Further Statement of Def. Arab Bank plc Regarding Application of Specific Foreign Bank Secrecy Laws to the Court's March 3, 2006 Document Production Order, Howard Decl., Ex. M.)

With the March 3, 2006 Production Order in hand, Arab Bank has commenced the process of seeking appropriate permission for the release of documents called for by the Production Order but protected by bank secrecy laws. First and foremost, as contemplated by the Production Order (at ¶ 14), Arab Bank is working to obtain appropriate authorization for the release of the instructions of Arab National Bank to Arab Bank for payments originating with the Saudi Committee. As of the date of this filing, Arab Bank is very close to obtaining the requisite consent and is optimistic that it will be able to report to the Court positive news within a matter of a few weeks, if not days. Upon receipt of the requisite consent, Arab Bank will begin the process for producing to plaintiffs all of the instructions for payments to be made by Arab Bank in the Palestinian territories that originated from the Saudi Committee.

With respect to any accounts covered by the Production Order and maintained in any Arab Bank branch in Jordan, Arab Bank is seeking advice of local counsel to determine whether applications may be made to the Jordanian court of original jurisdiction for permission to disclose the requested records in light of the October 9, 2005 decision of the Jordanian Court of Appeals. To the extent that appellate decision is binding upon the lower courts, and its reasoning applicable to any application based on a U.S. court discovery order, judicial relief from Jordanian bank secrecy law may not be an option. Arab Bank, therefore, is also taking steps to solicit directly from holders of accounts in Jordan covered by the Protective Order, the requisite

consent for disclosure. Similarly, for any accounts in Arab Bank branches in Lebanon covered by the Production Order, Arab Bank will prepare applications to the Special Investigation Commission for permission to disclose, and, alternatively, will seek consent for disclosure from the account holders.

In the Palestinian territories, Arab Bank is awaiting the outcome of its appeal before filing any additional applications to the Palestinian First Instance Court. Given the reasoning of that Court's October 2, 2005 opinion on Arab Bank's first application (in which the Palestinian Court declined to recognize a discovery order from this Court as a basis upon which to allow the disclosure of confidential bank records), any further applications would be pointless while the appeal is pending. In the meantime, however, and as a contingency to an unsuccessful result on the pending appeal, Arab Bank is seeking the consent for disclosure directly from individual owners of accounts in Arab Bank branches in the Palestinian territories.

In light of Arab Bank's record of compliance with all discovery motions, and its intention going forward to pursue all available means to permit the lawful disclosure of materials covered by the Court's March 3, 2006 Production Order (which Arab Bank itself wants to present at trial), plaintiffs' motion is premature. To the extent the Court decides to engage in a substantive legal analysis now, however, Arab Bank respectfully submits that the Court should honor the bank secrecy laws at issue and deny the requested relief.

## ARGUMENT

The legal framework for a substantive decision by this Court on the issue of foreign bank secrecy is not truly in dispute. Arab Bank acknowledges the authority of this Court to order discovery from Arab Bank notwithstanding foreign bank secrecy concerns. The point of dispute is whether it should: "It is not disputed that a district court 'has the *power* to impose discovery under the Federal Rules of Civil Procedure when it has personal jurisdiction over the foreign party,' . . . [t]he critical question is whether the court should, as a matter of discretion, issue such an order in view of the [foreign law] secrecy objections raised by [Defendant Bank]." *Minpeco, S.A. v. Conticommodity Services, Inc.*, 116 F.R.D. 517, 520 (S.D.N.Y 1987) (*"Minpeco"*), quoting *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court* (*"Société Nationale"*), 482 U.S. 522, 553 n. 4 (1987) (Blackmun, J., concurring in part and dissenting in part) (emphasis in original). It is Arab Bank's position that the Court should decline to compel discovery in violation of bank secrecy law in the first instance (*Minpeco*, 116 F.R.D. at 521, 530; *Trade Dev. Bank v. Cont'l Ins. Co.*, 469 F.2d 35, 39-42 (2d Cir. 1972)); and, even if discovery is ordered, the Court should not impose sanctions against Arab Bank for complying with foreign legal obligations after good faith efforts to enable lawful disclosure have been exhausted (*Société Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 211 (1958) (reversing sanction of dismissal of claims, finding "petitioner's failure to satisfy fully the requirements of this production order was due to inability fostered neither by its own conduct nor by circumstances within its control"); *In re Westinghouse Elec. Corp. Uranium Contracts Litig*, 563 F.2d 992, 994 (10th Cir. 1977) ("the fact of foreign illegality may prevent the

imposition of sanctions for subsequent disobedience to the discovery order")).[5] Indeed, Arab Bank is aware of no case in which evidentiary or other severe sanctions have been imposed against a party bound by foreign law in the absence of bad faith.

The factors the Court should consider in making its decision are not truly in dispute either, only the outcome mandated by consideration of all the relevant factors. Arab Bank submits that the requisite balancing test, applying factors set forth in *Minpeco* and other apposite case law, as well as Restatement (Third) of Foreign Relations Law § 442, weighs against disclosure. As in *Minpeco*, this Court should deny plaintiffs' motion in the face of foreign bank secrecy concerns raised not just by Arab Bank, but by officials of Jordan, the Palestinian Authority and Lebanon as well. *See also Société Nationale*, 482 U.S. at 546 ("American courts should therefore take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state.") As set forth herein, (I) the bank secrecy laws of three foreign nations apply, without exception, to the documents and information as to which Arab Bank has asserted a bank secrecy objection; and (II) a comity analysis, as well as principles of international law, mandate denial of plaintiffs' motion.

[5] The Second Circuit, unlike some other circuits, generally applies the same analysis to the decision whether or not to compel discovery and the decision whether or not to impose sanctions, and as stated by Judge Pollack in *SEC v. Banca Della Svizzera Italiana*, 92 F.R.D. 111, 117 n. 3 (S.D.N.Y. 1981), "[s]uch a distinction in analysis makes little, if any, practical difference."

# I. FOREIGN BANK SECRECY LAWS PROHIBIT DISCLOSURE OF THE BANK DOCUMENTS AND ACCOUNT INFORMATION SOUGHT BY PLAINTIFFS.

## A. Express Bank Secrecy Statutes Of Three Sovereign Nations Prohibit Disclosure By Arab Bank.

As a threshold matter, it is indisputable that foreign bank secrecy laws apply to the discovery sought by plaintiffs. Statutes from the principal jurisdictions involved provide as follows:

Jordan

According to Jordanian Banking Law No. 28 of 2000:

> A bank shall observe full confidentiality regarding all accounts, deposits, trusts, and safe-deposit boxes of its customers. . . . This prohibition shall remain in effect even if the relationship between the bank and the client has terminated for any reason whatsoever. (Article 72)
>
> * * *
>
> All present and former administrators of the bank shall be prohibited from providing any information or data on the clients or the accounts, deposits, trusts, safe-deposit boxes, or any of their transactions, or disclosing or enabling others to have access to such information and data in situations other than those permitted under this law. (Article 73)
>
> * * *
>
> A person who has violated the provisions of Article 72 or Article 73 of this law shall be punished with imprisonment for a period not less than six months, a fine not less than ten thousand Dinars and not more than fifty thousand Dinars, or with both penalties. (Article 75)

(Declaration of Aiman Y. Odeh, dated March 30, 2006 ("Odeh Decl.") at ¶¶ 12-13, 15; *see also* Howard Decl., Ex. A.) As explained by a Jordanian attorney who assisted in the drafting of Jordan's Banking Law No. 28 of 2000, this "comprehensive law, with criminal penalties" not only "codifies the longstanding interest in the Jordanian culture of preserving individual privacy," but is an important component of Jordan's banking system that "honors the privacy of

bank customers." (Odeh Decl. at ¶ 10.) As in *United States v. First National Bank of Chicago*, 699 F.2d 341, 344-45 (7th Cir. 1983), in which the Seventh Circuit Court of Appeals reversed enforcement of an IRS summons which sought records protected by a Greek bank secrecy statute, the language of the Jordanian bank secrecy provisions is "clear and unambiguous" and "certain in its tenor."

Palestinian Authority

In 2002, the PMA codified long-standing bank secrecy principles in the Palestinian territories by enacting Banking Law No. 2 of 2002:

> All present and former directors and employees of the banks shall keep confidential all information, and documents regarding their customers. The directors and employees of the banks are prohibited from informing third parties of any information or permitting these third parties to have access to it unless: (A) the customer waives the bank secrecy in writing, or (B) a judicial decision has been rendered. Any person who violates the provisions of this article will be punished pursuant to the sections mentioned in this law. (Article 26)

(*See* Declaration of Maher Masri, dated April 1, 2006 ("Masri Decl."), at ¶ 5 *see also* Howard Decl., Ex. A.) Thus, bank secrecy is preserved in the Palestinian territories as well, by equally unambiguous statutory language and the threat of a criminal penalty of imprisonment of up to one year and/or a fine of up to 100,000 Jordanian Dinars. (Banking Law No. 2 of 2002, at Article 52; Masri Decl. at ¶ 6.) Palestinian banking expert and former PMA Board member, Maher Masri, further notes that "[b]y codifying bank secrecy principles into the Banking Law No. 2, the PMA wanted to give a definitive statement of the importance of bank secrecy and give assurance to customers of Palestinian banks that their right to privacy in their financial transactions would be honored." (Masri Decl. at ¶ 8.)

Lebanon

Lebanon, too, has a "clear and unambiguous" statutory basis for bank secrecy, in effect for the past 50 years. A September 3, 1956 Law provides at Article 2:

> Managers and employees of the banking establishments referred to in article 1 as well as all persons who, through their position or function, by one means or another, have knowledge of the bank's books, operations and correspondence, are bound to *absolute secrecy* in favor of the bank's clients and may not disclose to *anyone whatsoever*, whether a private individual or an administrative, military or judicial authority, the names of clients, their assets and facts of which they are aware, except with the written authorization of the client or his heirs or legatees, or in the case he is declared bankrupt, or in the event of a dispute between the client and the bank resulting from banking relations.

(*See* Declaration of Lebanese Bank Secrecy Expert Chakib Cortbaoui, dated March 29, 2006 ("Cortbaoui Decl."), at ¶ 4 (emphasis added).) Indeed, Lebanese law is so strict as to forbid disclosure of account information even from the Lebanese government. (Cortbaoui Decl., at ¶ 4.) The penalties for violations of bank secrecy include imprisonment of up to one year. (*Id.* at ¶ 9.) "Thus, for fifty years, the Law has imposed on banks strict obligations of bank secrecy, and provided to bank customers the assurance of privacy in their financial affairs. These principles are embedded in Lebanese culture, which places significant value on personal privacy . . . [and] [t]he assurance of privacy has also made Lebanon a destination of choice for many foreign investors, and has helped build a strong international banking industry." (*Id.* at ¶¶ 7-8.)

**B. The Documents And Information Sought By Plaintiffs Fall Squarely Within These Foreign Bank Secrecy Laws.**

In direct contravention of these unequivocal foreign law criminal restrictions, Plaintiffs' First Request for the Production of Documents to Defendant Arab Bank, plc, seeks, *inter alia,* broad categories of bank records maintained by Arab Bank at its branches throughout the Middle East. These include "[a]ll documents which refer or relate to payments made through

Arab Bank . . ." (Pls.' First Req. Produc. Docs. to Def. Arab Bank, Plc, Howard Decl., Ex. N, at Req. Nos. 6-7, 18), and "[a]ll documents which refer or relate to accounts maintained at Arab Bank . . . " (Howard Decl., Ex. N, at Req. Nos. 8, 10, 12, 19, 21, 23.) More specifically, plaintiffs are seeking, *inter alia*, "account numbers," "persons or entities that opened such accounts," "the deposit of funds into and disbursement of funds out of such accounts," "the source of funds deposited into such accounts and the recipients of funds disbursed from such accounts," "amounts which were disbursed and the dates of such disbursements," and "any accounts that received disbursements." (Howard Decl., Ex. N, at, *e.g.,* Req. Nos. 6, 8, and 10.) These are the very definition of confidential bank records, which are subject to the bank secrecy laws of the jurisdictions in which they are maintained, and appropriately the subject of Arab Bank's bank secrecy objections.

Even as limited by the Court's March 3, 2006 Production Order, several categories of documents identified in that order are subject to foreign bank secrecy laws. (Statement of Arab Bank plc Regarding Application of Foreign Bank Secrecy Laws to the Court's March 3, 2006 Doc. Production Order, Howard Decl., Ex. M.) For example, the Production Order calls for the disclosure of "[a]ll documents concerning payments made through Arab Bank by or on behalf of the Saudi Committee," and account opening and electronic transaction records relating "to each account maintained at Arab Bank in the name of, or for the benefit of" hundreds of organizations identified by plaintiffs. (March 3, 2006 Production Order, Howard Decl., Ex. L, at ¶¶ 2, 3, and 4.) Again, these categories of bank records fall squarely within restrictions of the foreign bank secrecy laws, and Arab Bank would be subject to criminal prosecution and civil suits in Jordan, the Palestinian Authority and Lebanon were it to produce

them unlawfully. (*See* Odeh Decl., at ¶ 12-16; Masri Decl., at ¶¶ 5-6, 17; Cortbaoui Decl., at ¶¶ 9-11.)

As part of the relief sought by the instant motion, plaintiffs also request that this Court overrule Arab Bank's bank secrecy objections to Plaintiffs' First Set of Requests for Admissions and Related Interrogatories, seeking authentication of 40 documents obtained by plaintiffs from sources other than Arab Bank. (*See* Exs. E and F to Pls.' Mot.) Authentication in this case, however, would be tantamount to unlawful disclosure. Indeed, plaintiffs do not have – and therefore are seeking with these requests for admission – reliable and admissible evidence of banking transactions that are covered by foreign bank secrecy laws. If Arab Bank were to authenticate the documents in plaintiffs' possession, they would effectively be transformed into something they are not now: confirmed, protected bank records:

> Confidentiality under Jordanian law also extends to information that I understand is being sought by plaintiffs from Arab Bank in order to authenticate materials obtained from some source other than the bank itself. Any authentication of bank client records by Arab Bank would be effectively the same thing as disclosure of the confidential records in the first place, and would subject Arab Bank and its employees to criminal liability.

(Odeh Decl., at ¶ 17.)

* * *

> In their Motion, plaintiffs argue that the Bank's confidentiality obligations do not apply to documents which have otherwise been made available to the public, including by means of a website called www.intellilgence.org.il. Under Palestinian law, however, Arab Bank's obligation to maintain the confidentiality of its customers' information is not lifted by the public dissemination of these documents by a third party. First of all, such disclosure is not specified as an exception to a bank's obligations under Article 26 of the Banking Law No. 2. Additionally, *information available publicly, believed to be sourced from a given bank, cannot be confirmed or authenticated by the bank because the confirmation itself would be tantamount to a breach of the secrecy provisions of the Banking Law.*

(Masri Decl., at ¶ 12) (emphasis added.)

### C. **No Exceptions To Bank Secrecy Laws Apply To The Discovery Sought By Plaintiffs.**

Absent customer consent, which Arab Bank is proactively soliciting, Arab Bank is unequivocally bound by the "clear and unambiguous" language of the criminal bank secrecy statutes of at least these three sovereignties. *United States v. First Nat'l Bank of Chicago*, 699 F.2d at 344. None of the limited statutory exceptions, nor any of the factual distinctions suggested by plaintiffs, apply.

#### 1. **Discovery Orders of a U.S. Court Are Not a Basis for Lawful Disclosure.**

As pointed out in plaintiff's motion, two of the three bank secrecy statutes at issue (Jordanian Banking Law No. 28 of 2000 and Palestinian Banking Law No. 2 of 2002) include an exception for judicial orders. (Pls.' Mem. at 25.) Plaintiffs' implication, however, that a discovery order of this Court might be sufficient to mandate production of the foreign documents at issue, and protect Arab Bank from prosecution from their disclosure in Jordan and the Palestinian Authority, is without merit.[6] Unfortunately for all parties, there is no such simple, or effective solution.

Jordanian Banking Law No. 28 of 2000, at Article 72, provides that disclosure of a customer's bank records may be made "upon a decision issued by a competent judicial authority in a current litigation." As explained in the expert Declaration of Aiman Y. Odeh, interim rulings of foreign courts prior to issuance of a judgment on the merits "are not enforceable under the Foreign Judgment Enforcement law of 1952 since they are not judgments on the merits for the payment of an amount of money or concerning a moveable asset." (Odeh

---

[6] Plaintiffs' memorandum of law argues that the judicial decree exception to bank secrecy diminishes the state interest in bank record confidentiality. The compelling state interest of Jordan and the Palestinian Authority in bank secrecy is addressed in the next section, II A. 1., but because plaintiffs have suggested in other papers and in Court that an order of this Court would suffice to invoke the foreign law judicial exception, Arab Bank addresses that suggestion herein.

Decl., at ¶ 29.) This conclusion was corroborated by the Decision of the Jordanian Appeal's Court reversing the Court of original jurisdiction's approval of disclosure of account records upon the application by Arab Bank. (Howard Decl., Ex. F.)

The Decision of the Palestinian Court of Final Instance in this matter, similarly on an application by Arab Bank to permit disclosure of account records as directed by this Court, confirms the same result in the Palestinian territories. Article 26 of the PMA's Banking Law No. 2 of 2002 provides that bank secrecy is lifted when "a judicial decision is rendered." However, as stated by the Palestinian Court, relying on the Jordanian Enforcement of Foreign Judgment Law No. 8 of 1952 (applicable in the Palestinian Authority as well):

> There are specific conditions of inclusive nature required to execute a foreign judgment including having a final judgment that is not subject to further appeal in the jurisdiction where the suit was filed. These conditions should be applied to the [the U.S. discovery order] and upon examination, we determine that they do not apply to [the U.S. discovery order] which is a preparatory (preliminary) order and does not determine any matter nor is it a judgment.

(Howard Decl., Ex. G.)

In Lebanon, there is no judicial order exception to bank secrecy, other than in an action for unjust enrichment brought pursuant to Decree No. 154, dated December 27, 1999 and against officials of the Lebanese government. (Cortbaoui Decl., at ¶ 12.) That situation is clearly not applicable here.

**2. There Is No Exception to Bank Secrecy Laws for Requests for Admissions of Authenticity.**

Plaintiffs also argue for exceptions to bank secrecy that are not codified in any of the relevant statutes. As noted above, plaintiffs contend that bank secrecy does not "prevent the requesting party from obtaining admissions concerning the authenticity and admissibility of documents that the requesting party already has in its possession in the United States." (Pls.'

Mem. at 13-14.) This contention is meritless, and understandably unsupported in plaintiffs' papers. Plaintiffs have, to date, failed to identify the source of the documents for which they seek authentication, but the fact of the requests for admission necessarily means the source of the documents is not Arab Bank itself. This fact distinguishes the one authority cited in support of plaintiffs' position, *In re Lernout & Hauspie Sec. Litig.*, 218 F.R.D. 348 (D. Mass. 2003). In that case, the issue was confidentiality not authenticity, and plaintiff sought copies of documents that it had already viewed in defendant's own files. It was not a situation in which plaintiff was looking to establish the authenticity of records in its possession but obtained from some (questionable) source other than defendant.

Plaintiffs complain that denial of the requested relief would "extend a problematic foreign limitation to full merits discovery to block a party from using documents already in the public domain – the only effective alternative means of obtaining transactional documents that the Bank itself refuses to produce on bank secrecy ground." (Pls.' Mem. at 14.) This circular and flawed reasoning assumes plaintiffs have a right to use unauthenticated records from the public domain in the first place, which they do not, and that plaintiffs are without recourse, for example by means of letters rogatory, to obtain transactional records directly from Arab Bank customers and others, which they are not.

**3. <u>Bank Secrecy Applies to All Documents Withheld by Arab Bank.</u>**

Plaintiffs' next argument, that "bank secrecy does not apply to prevent discovery of documents and information located in the United States" (Pls.' Mem. at 15) is a red herring. Contrary to plaintiffs' assertions, Arab Bank has never contended that foreign bank secrecy laws apply to records maintained by Arab Bank, New York ("ABNY"). To the contrary, Arab Bank has already produced to plaintiffs over 70 ABNY transaction records called for by their discovery requests. Documents, such as transaction records, that are created in Jordan, the Palestinian

territories, or Lebanon, for accounts maintained there, are subject to the respective bank secrecy laws of those jurisdictions. (*See* Masri Decl., at ¶ 13.) To the extent plaintiffs have included discussion of this additional "exception" to weaken Arab Bank's bank secrecy objections, the Court should ignore it.

**4. <u>There Has Been No "Waiver" of Bank Secrecy.</u>**

Finally, plaintiffs argue that Arab Bank has "waived" bank secrecy on account of disclosure of certain bank records to the U.S. Office of the Comptroller of the Currency ("OCC"). (Pls.' Mem. at 16.) Plaintiffs' waiver argument, however, is grounded on the unsupported, and unsupportable, presumption that the foreign bank secrecy laws at issue create a "privilege" that can be waived by Arab Bank. Not only have Plaintiffs repeatedly mischaracterized bank secrecy in this matter as "privilege" (*see, e.g.*, Pls.' Mem. at 1), but they have also suggested that Bank secrecy is unavailable as a recognized privilege under Fed. R. Evid. 501 (*id.* at 3), and that Arab Bank is in breach of Local Rule 26.2 of the U.S. District Court for the Eastern District because Arab Bank has not provided a "privilege log" of documents covered by bank secrecy (*id.* at 2.) The Court has already rejected this last suggestion by expressly excluding bank secrecy materials from Arab Bank's privilege log obligation. (*See* March 24, 2006 Scheduling Order, Howard Decl., Ex. O at ¶ 6.) The Court should similarly reject completely plaintiffs' characterization of bank secrecy as a mere "privilege", and the waiver argument that follows.

The foreign bank secrecy laws of Jordan, the Palestinian Authority and Lebanon convey not a privilege to Arab Bank, but rather a *right* belonging to Arab Bank's customers, that is the right to be protected from the crime of disclosure by their bank of their account records. The right does not belong to Arab Bank, which therefore may not waive it. (Cortbaoui Decl., at ¶ 6) ("Bank secrecy obligations under the Law . . . may not be 'waived' in any way by the bank,

since the right to privacy belongs to the bank customer.") *See also Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1127 (7th Cir. 1997) (Waiver is the "deliberate relinquishment of a right."). While the customers themselves may relinquish this right by written consent, nothing the bank does unilaterally – even a prior unauthorized disclosure – can deprive its customers of the right to protection, including from future violations. As stated by the foreign bank secrecy law expert from Jordan:

> A bank client's right to privacy may be relinquished *by consent of the client*. . . . Since such waiver is an exception *per se,* it should be interpreted narrowly under the general principles of interpretation under Jordanian law. It follows that if the waiver is given in relation to a specific document to be disclosed to a specific party, this means that the bank is prohibited from future disclosure of such document to other parties and also from disclosures of other documents to that party.

(Odeh Decl., at ¶ 32 (emphasis added).)

No authority cited by plaintiffs supports the proposition that foreign bank secrecy law is a "privilege" that may be waived by Arab Bank. To the contrary, plaintiffs again rely on the flawed equation of bank secrecy with lesser privileges. In *Salomon Bros. Treasury Litig. v. Steinhardt Partners, L.P.*, 9 F.3d 230, 234 (2d Cir. 1993), the Second Circuit Court of Appeals ruled that the voluntary disclosure of a legal memorandum to the SEC waived the attorney work product protection of that memorandum for purposes of a subsequent civil suit. Similarly, in *In re Bank One Sec. Litig., First Chicago Shareholder Claims,* 209 F.R.D. 418 (N.D. Ill. 2002), documents provided to bank regulators could not thereafter be withheld on the basis of attorney work product. Arab Bank's objection to disclosure is based on criminal bank secrecy statutes, not the attorney work product doctrine. As such, it is deserving of far greater deference than plaintiffs are willing to pay.

## II. THE REQUISITE COMITY ANALYSIS WEIGHS AGAINST DISCLOSURE.

Arab Bank having established the applicability of multiple foreign bank secrecy laws to the discovery sought by plaintiffs, and no exception having been established, the Court must now balance the interests in preserving bank secrecy against any factors favoring disclosure. The scales in this balancing analysis tip decidedly in the direction of upholding bank secrecy.

### A. Factors Favoring Preservation Of Bank Secrecy Predominate In The Case At Hand.

A framework for a comity analysis in the event of conflicts between discovery demands in U.S. litigation and foreign law interests is set forth in *Minpeco*. In *Minpeco*, the Court focused on four principal factors:

> (1) the competing interests of the nations whose laws are in conflict,
>
> (2) the hardship of compliance on the party or witness from whom discovery is sought,
>
> (3) the importance to the litigation of the information and documents requested, and
>
> (4) the good faith of the party resisting discovery.

116 F.R.D. at 523. This framework has been cited with approval by the Second Circuit Court of Appeals in *First American Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 22 (2d Cir. 1998), and we submit it is appropriate for this case. Applying all of these factors, the result should be denial of plaintiffs' motion.

Even if the Court were to take into consideration the additional factors set forth in Restatement (Third) of Foreign Relations Law § 442, as suggested by plaintiffs, the result should be the same. Restatement (Third) of Foreign Relations Law § 442, which addresses a comity analysis in the discovery context, also focuses on competing national interests and the resisting

party's good faith, as well as additional factors such as the specificity of discovery requests, the origin of the materials sought and the availability of alternative means to the information. The balancing of these factors again weighs against disclosure.

**1. Foreign Bank Secrecy Interests Outweigh the Interests Represented by These Private Litigants.**

In *Minpeco*, the Court noted that the competing interests of the countries involved and the hardship imposed by compliance are the most important factors to consider. 116 F.R.D. at 522. Weighing those factors in particular, the Court denied a motion to compel production of documents and information protected from disclosure by a Swiss bank secrecy law. The same result is warranted here.

Just as in *Minpeco*, the laws that preclude disclosure by Arab Bank are criminal in nature, which alone demonstrates a compelling foreign interest in bank secrecy:

> the prohibition on disclosure of customer information is specifically expressed in at least one criminal statute that would apply to the disclosure of documents and information sought on this motion. In contrast to the situation presented here, courts in this circuit have considered the foreign nation's interest in prohibiting disclosure weaker where bank secrecy doctrine is embodied in a non-statutory "privilege" whose enforcement is left to the vagaries of private litigation and where the consequence of disclosure is at most civil liability.

116 F.R.D. at 524 (internal quotation marks omitted). Arab Bank is subject to the criminal bank secrecy laws of at least three sovereignties, which impose not only fines but prison sentences for unauthorized disclosures of bank records. In *United States v. First National Bank of Chicago*, 699 F.2d at 344-45, the Seventh Circuit Court of Appeals refused to enforce an IRS summons where compliance would subject bank and bank employees to criminal penalties pursuant to a Greek bank secrecy statute. Similarly, in *Reinsurance Co. of America v. Administratia Asigurarilor de Stat*, 902 F.2d 1275, 1280 (7th Cir. 1990), the same court refused to compel

discovery responses in potential violation of a Romanian criminal statute: "Given the scope of its protective laws and the strict penalties it imposes for any violation, Romania places a high price on this secrecy." *See also White v. Kenneth Warren & Son, Ltd.*, 203 F.R.D. 369, 375 (N.D. Ill. 2001) (deference paid to English criminal law prohibiting disclosure of witness statements).

By contrast, in order to suggest a diminished foreign interest in bank secrecy, plaintiffs rely on precisely the precedent distinguished by the Court in *Minpeco* as invoking exclusively a non-statutory, civil bank secrecy privilege. Plaintiffs cite *United States v. First National City Bank*, 396 F.2d 897 (2d Cir. 1968) (Pls.' Mem. at 24-25), but neglect to point out the many findings of the Court in *First National City Bank* that not only make that case completely distinguishable, but support Arab Bank's position by comparison:

> Citibank concedes, as it must, that compliance with the subpoena does not require the violation of the criminal law of a foreign power . . . or risk the imposition of sanctions that are the substantial equivalent of criminal penalties . . . or even conflict with the public policy of a foreign state as expressed in legislation . . . . [I]t is surely of considerable significance that Germany considers bank secrecy simply a privilege that can be waived by the customer and is content to leave the matter of enforcement to the vagaries of private litigation. Indeed, bank secrecy is not even required by statute.

396 F.2d at 901, 903. The Second Circuit further relied on the District Court's finding that even a civil lawsuit against Citibank was unlikely in the event of disclosure. *Id.* at 905.

It is also significant that the bank secrecy statutes of Jordan, the PMA and Lebanon are not only criminal in nature, but are designed to protect the confidentiality of banking customers in those three jurisdictions. Thus, these laws further national interest in strong banking industries, as well as cultural interests in personal privacy. (Odeh Decl., at ¶¶ 9-10; Masri Decl., at ¶ 8; Cortbaoui Decl., at ¶¶ 7-8.) These exclusively national purposes distinguish these bank secrecy laws from the type of "blocking statutes" enacted by several

countries in order to impede discovery of foreign parties in U.S. litigation, which statutes are afforded less weight in a U.S. court comity analysis. *See, e.g., Société Nationale*, 482 U.S. at 544 n. 29; *Reinsurance Co. of Am.*, 902 F.2d at 1280 ("Unlike a blocking statute, Romania's law appears to be directed at domestic affairs rather than merely protecting Romanian corporations from foreign discovery requests."); *White*, 203 F.R.D. at 375 ("English interests in confidentiality seem quite compelling considering the penalties involved and to the extent their law appears aimed toward domestic affairs."). As the Court stated in *Minpeco*,

> the bank secrecy laws involved here have the legitimate purpose of protecting commercial privacy inside and outside Switzerland. In this respect, article 47 is to be distinguished from a number of other foreign anti-disclosure laws whose purposes courts have determined do not warrant deference.

116 F.R.D. at 524. While it is true, as plaintiffs have emphasized, that the foreign bank secrecy laws at issue have some limited exceptions (which, as previously discussed, do not apply here), that fact does not preclude a finding of compelling national interest. *Minpeco*, 116 F.R.D. at 525 (Swiss bank secrecy exceptions including customer consent, a consideration against national interest, but ultimately not dispositive).

Consistent with the important privacy interests being protected by their criminal statutes, each of the three sovereignties have taken an official position against disclosure by Arab Bank of the materials sought by plaintiffs. The Chairman and Governor of the Central Bank of Jordan, Dr. Umayya Toukan, having been informed of the instant motion to compel, has provided the official position of the Jordanian government on this matter: "the Central Bank of Jordan would strongly urge the New York Court not take a position that would place the Arab Bank in violation of the Banking Law." (March 26, 2006 Statement of Dr. Umayya Toukan, Howard Decl., Ex. P.) Similarly, Dr. George T. Abed, the Chairman and Governor of the PMA, has stated on the issue of disclosure of Palestinian banking records by Arab Bank, "[i]n conformity with

these provisions of law, as I understand them, I submit that the Arab Bank may disclose confidential bank records only with the express written consent of the customer, or where directed to do so by a Palestinian Court or a judicial decision recognized as enforceable in the Palestinian Territories." (Statement of Dr. George T. Abed, Howard Decl., Ex. Q.) With respect to Lebanon, the government has not issued a statement expressly addressed to the instant motion, but the Governor of the Bank of Lebanon has already rejected a general request by Arab Bank to disclose information relating to bank accounts maintained in Arab Bank's Lebanese branch. (October 23, 2004 Request by Arab Bank for permission to disclose; November 3, 2004 Response of Riad Toufie Salame, Governor of the Bank of Lebanon, Howard Decl., Ex. R.)

Thus, as in *Minpeco*, these official statements objecting to the disclosure of bank records at issue, "evince a strong [state] interest in bank secrecy," and distinguish several of the decisions upon which plaintiffs rely in which no statement of foreign interest was provided. 116 F.R.D. at 525 distinguishing *United States v. Davis*, 767 F.2d 1025, 1035 (2d Cir. 1985) ("The absence of any objection by the Cayman government to the subpoena and subsequent order. . . . is significant."); *United States v. First Nat. City Bank*, 396 F.2d 897; *SEC v. Banca Della Svizzera Italiana*, 92 F.R.D. 111 (S.D.N.Y. 1981) ("The Swiss government. . . . has expressed no opposition"); *see also Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993) ("Switzerland, despite an opportunity to do so, has not expressed any view nor attempted to intervene in any manner to prevent disclosure of the information plaintiffs seek.")

In competition with the compelling bank secrecy interests of Jordan, the Palestinian Authority and Lebanon, as reflected in criminal statutes and in official statements to this Court, is the interest of the United States represented by these private plaintiffs. This interest is *not*, however, the fight against terrorism, as claimed by plaintiffs. That fight is being pursued

by the U.S. government. As plaintiffs themselves point out, the OCC, as well as the Financial Crimes Enforcement Network (FinCEN), already have conducted extensive investigations of Arab Bank and taken the remedial steps they deemed necessary. (Pls.' Mem. at 23-24.)

Plaintiffs, on the other hand, are not the U.S. government and not a proxy for the U.S. government. They rely primarily on a civil statute, the Alien Tort Statute ("ATS"), to seek money damages. The real interest they represent is the access to U.S. courts to assert tort claims - which is not only less compelling than foreign bank secrecy, but in the case of the 90% of plaintiffs asserting ATS claims, of questionable and unresolved viability. Moreover, the ATS was enacted in large part to give redress to foreign nationals who are victims of torts committed by Americans, thereby "threatening serious consequences in international affairs." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 715 (2004) ("*Sosa*"). Aside from the question of whether the ATS even applies to the alleged conduct of Arab Bank, which is addressed by Arab Bank's pending motion to dismiss the *Almog* and *Afriat-Kurtzer* complaints, this eighteenth century statute does not reflect current U.S. interests in fighting terrorism. Finally, "[p]rivate litigants cannot be expected to have comparable concern for the national interest or for abiding by international undertakings." Reporters' Note No. 9 to the Restatement (Third) on Foreign Relations Law § 442. Thus, discovery requests of private plaintiffs are generally accorded less weight than grand jury subpoenas and government enforcement actions and the like. Compare *Minpeco* with *In re Grand Jury Subpoena dated August 9, 2000*, 218 F. Supp. 2d 544 (S.D.N.Y. 2002) and *SEC v. Renert*, No. Civ. 3:01CV1027, 2002 WL 32503671 (D. Conn. June 17, 2002). So should plaintiffs' requests here be accorded less weight than if this were a government action.

A common theme in virtually all of the judicial decisions compelling disclosure in the face of bank secrecy has also been the reluctance of U.S. courts to permit foreign laws to

shield disclosure by parties accused of misconduct *in the United States*. Thus, in *Alfadda v. Fenn*, 149 F.R.D. 28, a motion for a protective order on account of a Swiss trade secret law was denied where plaintiffs' claims arose from a stock offering in the U.S.; in *SEC v. Banco Della Svizzera Italiana*, 92 F.R.D. 111, disclosure was compelled in a case involving transactions on the U.S. securities exchanges; and in *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992), a motion to compel discovery was granted against a Chinese company that had contracted for the purchase of timber in the United States. Judge Pollack, in *SEC v. Banco Della Svizzera Italiana,* perhaps best captured the reasoning for holding U.S. interests paramount over foreign laws when the alleged misconduct takes place in the United States:

> It would be a travesty of justice to permit a foreign company to invade American markets, violation American laws if they were indeed violated, withdraw profits and resist accountability for itself and its principal for the illegality by claiming their anonymity under foreign law.

92 F.R.D. at 119.

By contrast, neither the acts that injured plaintiffs, nor the conduct of Arab Bank alleged to have contributed to those acts, took place in the United States. The integrity of the U.S. securities markets or commercial marketplace is not at issue, and while America has a substantial interest in fighting terrorism, it is no greater than that of any other sovereignty. Moreover, it is a fight that should be waged with financial aid to foreign governments, provision of military training, information sharing and other resources, *not* an extraterritorial stretch of our civil judicial system. As stated by the Court in *Madanes v. Madanes*, 186 F.R.D. 279, 286 (S.D.N.Y. 1999), U.S. interests in the underlying claims "diminish the less closely a case is related to the United States." The claims of these plaintiffs, especially the more than 90% who are non-U.S. citizens, have no particular ties to this country, and their attempt to cloak

themselves in, and advance their civil claims by, the American interest in fighting terrorism should be rejected.

**2. Arab Bank Has Demonstrated the Substantial Hardship of Compliance.**

The second important factor under *Minpeco*, and one entirely ignored by plaintiffs, is "the potential hardship which would be imposed on [Defendant] by an order compelling the requested discovery." 116 F.R.D. at 525. Hardship in the instant case takes the form of potential criminal prosecution in three jurisdictions. Government officials from both Jordan and the Palestinian Authority have expressly advised Arab Bank that unauthorized disclosure of the bank records and information sought by plaintiffs will "subject Arab Bank to criminal prosecution and other sanctions as well." (March 26, 2006 Statement of Jordanian Central Bank Governor Dr. Umayya Toukan, Howard Decl., Ex. P; *see also* Declaration of PMA Governor George Abed, Howard Decl., Ex. Q: "any such disclosure would constitute a criminal violation and subject Arab Bank and Bank employees to possible imprisonment, fines, or both.") In the case of Lebanon, Arab Bank has already been forbidden from making an unauthorized disclosure of bank records from its Lebanese branch (Howard Decl., Ex. R), and Article 8 of the Lebanese Banking Law of September 3, 1956 imposes criminal penalties for violations, and even attempted violations of bank secrecy. (Cortbaoui Decl., at ¶ 9.) In the case of the Lebanese bank secrecy law, which as been in existence for a significantly longer period of time than Jordanian and Palestinian bank secrecy laws, there exists precedent for its application, imposing criminal penalties against bank employees. (Cortbaoui Decl., at ¶ 11.)

The Supreme Court has stated that *"[i]t is hardly debatable that fear of criminal prosecution constitutes a weighty excuse for non-production, and this excuse is not weakened because the laws preventing compliance are those of a foreign sovereign."* *Société*

*Internationale pour Participations Industrielles et Commerciales, S.A.*, 357 U.S. at 211 (emphasis added). *See also Cochran Consulting, Inc. v. Uwatec USA, Inc.*, 102 F.3d 1224, 1231 (Fed. Cir. 1996) (reversing imposition of sanctions against defendant which could not comply with discovery order because it was bound by Swiss secrecy law: "The threat of Swiss sanctions was explicit, and must, according to *Société International*, be given great weight"). That fear in the case of Arab Bank is more than justified given that plaintiffs seek wholesale disclosure of thousands of bank records, involving hundreds of Arab Bank customers, in violation of the laws of three countries. Individual Arab Bank professionals could go to jail. Arab Bank's compliance with such discovery demands would indeed pose a substantial hardship that Arab Bank cannot risk to bear.

Plaintiffs' suggest that this hardship is warranted because Arab Bank chose to conduct business in the United States, and therefore must bear the consequences. (Pls.' Mem. at 35-36.) This argument is misleading. Arab Bank has not asserted bank secrecy with respect to its U.S. (New York) based transactions, and has produced its records of those transactions. The documents and information covered by foreign bank secrecy laws have nothing to do with the U.S., and it is the impact of disclosure in those foreign jurisdictions that must be considered. *See In re Westinghouse Elec. Corp. Uranium Contracts Litig.*, 563 F.2d at 999 (district court erred by focusing on fact that did business in Utah, while records at issue were located in Canada and protected by a Canada law prohibiting disclosure.)

**3. <u>The Evidence Sought by Plaintiffs Is Available by Alternative Means.</u>**

Arab Bank does not dispute, as a general matter, the potential relevance of the discovery covered by the March 3, 2006 Production Order. Three facts, however, mitigate

against the importance of those documents as a justification for compelling disclosure in violation of foreign law.

First and foremost, plaintiffs will receive a substantial portion of the information they seek through lawful disclosure. In addition to the production of Arab Bank's New York branch records and other materials not covered by bank secrecy, plaintiffs have received or (very likely) will receive:

- The records of the one Arab Bank account, Lebanese account no. 3-810-0622473-0330, that plaintiffs allege belonged directly to HAMAS, the organization that claimed responsibility for the terrorist acts that injured plaintiffs;
- Records of any other Arab Bank accounts in Lebanon covered by the Production Order, assuming further successful applications to the Lebanese Special Investigation Commission;
- Records of Arab Bank accounts in Jordan covered by the Production Order, either by means of successful applications to the Court of original jurisdiction with no objections by account holders, or by means of the direct consent of account holders;
- Records of Arab Bank accounts in the Palestinian territories covered by the Production Order for which Arab Bank receives customer consent to disclosure; and, in particular,
- Records of all Saudi Committee payments made through Arab Bank in the Palestinian territories.

Second, to the extent Arab Bank is unsuccessful in establishing a basis for lawful disclosure of any particular account records, their value, if any, to plaintiffs' claims is questionable. Plaintiffs seek these bank records primarily to try and satisfy an element of their claims as to which they have conceded, in open court that they admittedly have no proof - namely evidence that Arab Bank had knowledge that the charitable organizations for which Arab Bank processed financial transactions had ties to terrorists. Despite alleging such knowledge in their complaints, plaintiffs have conceded to this Court that they currently "can't speak to" this

issue without the benefit of discovery. (Tr. of Feb. 28, 2006 Conference at 10:10-14.) Yet, while plaintiffs make the conclusory statement that the bank records they seek will provide "important evidence in establishing the Bank's knowledge that it was providing material support to families of terrorists and fronts for terrorist organizations" (Pls.' Mem. at 29), they provide no support for this statement. As in *Minpeco*, it is much more likely that plaintiffs' discovery demands would "yield much material that plaintiffs will not find useful in this litigation." 116 F.R.D. at 528.

Third, the importance to plaintiffs of the records they seek is diminished by the failure of plaintiffs to take any alternative steps, such as letters rogatory, to obtain evidence directly from the entities plaintiffs contend are terrorist front organizations. Such steps should be required before Arab Bank is compelled to violate foreign law.

**4. <u>Other Factors Favor Protection from Disclosure.</u>**

The additional factors for a comity analysis which plaintiffs cite, in reliance on Restatement (Third) of Foreign Relations Law § 442, in fact weigh against disclosure. First, plaintiffs assert that "the specificity of Plaintiffs' requests clearly favors discovery." (Pls.' Mem. at 30.) This assertion is based entirely on the notion that plaintiffs seek only responses to their requests for admission and interrogatories *(id.)*, and plaintiffs' requests might, indeed, be considered specific if their motion were so limited. Plaintiffs', however, conveniently ignore that their motion goes on to request the outright rejection of bank secrecy as it applies to all of their decidedly non-specific discovery requests. *(Id.* at 39: "This Court should comprehensively overrule this [bank secrecy] objection in Defendants' discovery responses.")

Next plaintiffs contend that the origin of the documents at issue mandate disclosure because "the Bank clearly transferred some funds through its New York branch, it is likely that much of the information documenting those transfers originated in New York." *(Id.* at

31.) This is incorrect. As previously stated, Arab Bank has not asserted bank secrecy as to transactions that originated in New York, and records relating to such transactions, as well as transactions processed in New York, have been produced. The issue at hand concerns exclusively records originating and terminating in foreign jurisdictions, which are subject to bank secrecy.

Third, plaintiffs claim to "have no alternative means of obtaining transactions evidence created by the Bank." (*Id.* at 31.) This is also incorrect. Plaintiffs may seek, by means of letters rogatory, transaction records directly from Arab Bank customers.

**5. Arab Bank's Good Faith Efforts to Obtain Lawful Disclosure Mandate Denial of Plaintiffs' Motion.**

A final, but by no means insignificant consideration, which plaintiffs nonetheless ignore, is Arab Bank's exercise of good faith in a prompt and reasonable manner. Indeed, a common denominator of virtually all cases imposing sanctions against a party unable to comply with discovery demands because of foreign law restrictions is evidence of bad faith, which is entirely lacking here. *See, e.g., SEC v. Banca Della Svizzera Italiana*, 92 F.R.D. at 114, 117 ("A noncomplying party's good or bad faith is a vital factor to consider . . . BCI acted in bad faith. It made deliberate use of Swiss nondisclosure law to evade in a commercial transaction for profit to it, the strictures of American securities law against insider trading."); *Ssangyong Corp. v. Vida Shoes Int'l, Inc.*, No. 03 Civ. 5014, 2004 WL 1125659, at *13 (S.D.N.Y. May 20, 2004) ("Plaintiff has made a strong *prima facie* showing of bad faith on the part of the accountholder and the defendants.")

Arab Bank's diligent efforts to obtain approval for lawful disclosure of its records in Jordan, the Palestinian territories and Lebanon have already been commended by this Court. (Tr. of Feb. 28, 2006 Conference at 82:7-9.) Arab Bank is committed to continue these efforts,

and expects to build on the success already achieved with the Lebanese Special Investigation Commission, as well as strong indications of forthcoming consent to disclosure from the Saudi Committee. In fact, with respect to the Saudi Committee, Arab Bank is going the extra mile. Arab Bank has not simply requested consent from the entity that instructed Arab Bank to make the subject payments, Arab National Bank. Rather, cognizant that it is the Saudi Committee that initiated the payments and is the party with the true privacy interest, Arab Bank's counsel have approached the Saudi Committee directly, asking them to authorize Arab National Bank to consent to disclosure.

In addition to its record of efforts toward lawful disclosure, the nature of the bank secrecy statutes themselves support a showing of good faith. As in *Minpeco,*

> this is not a situation in which the party resisting discovery has relied on a sham law such as a blocking statute to refuse disclosure (citation omitted), nor a situation in which the resisting party has not made reasonable efforts to apply to the appropriate government authority for an exemption to such a statute.

116 F.R.D. at 528. At issue here, as well, are legitimate, pre-existing criminal statutes to which Arab Bank is bound to comply absent appropriate authorization, which Arab Bank is actively seeking.

In sum, Arab Bank has "made diligent efforts to produce materials not subject to [bank secrecy]," has "sought a waiver" from all the appropriate regulatory authorities, and is now going directly to hundreds of bank customers for consent to disclosure. *In re Westinghouse Elec. Corp. Uranium Contracts Litig.*, 563 F.2d at 998. This is the very definition of good faith.

### B. The Rejection Of Foreign Bank Secrecy Laws Urged By Plaintiffs Offends Basic Principles Of International Law.

While conflicts between discovery of foreign documents in U.S. litigation and foreign law interests are not entirely uncommon – and, indeed, the developing case law and

Restatement (Third) on Foreign Relations Law have provided a framework to resolve such conflicts – the context of the instant conflict makes its resolution significant and potentially unsettling to the equilibrium among nations that is the foundation of international law. With the same biases that have driven plaintiffs' claims from the start of this litigation, plaintiffs now ask this to reject out of hand "feather-weight" bank secrecy interests of three Arab nations (Pls.' Mem. at 28), and go so far to say that "it would be absurd" to defer to the laws of the Palestinian Authority at all (*id.*). This, we respectfully submit, would be a dangerous precedent.

International law is based on cooperation among nations and mutual respect for national interest. National governments – the executive branch and Congress in the U.S. – have responsibility for negotiating international law and addressing foreign policy issues. The judiciary, when called upon to consider international law in the application of domestic law, generally strives for harmony and respect for the interests of foreign states. Indeed, it is vital for the judiciary to be sensitive to the interest of foreign states and not discount them on the ground that the courts are, themselves, American institutions. This precept is an important theme in American legal history, reflected in statutes as well as judicial doctrines, and recent examples in which we have departed from this precept have not served America well.

The very concept of comity, on which this Court will rely to decide the instant motion, has its origin in the notion of mutual respect among nations:

> 'Comity', in the legal senses, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows with its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws. . . . [I]t contributes so largely to promote justice between individuals, and to produce a friendly intercourse between the sovereignties to

> which they belong, that courts of justice have continually acted upon it as a part of the voluntary law of nations.

*Hilton v. Guyot*, 159 U.S. 113, 163-65 (1895) (internal quotation marks omitted.) This same principal lies at the heart of such doctrines as foreign sovereign immunity (Restatement of Foreign Relations Law § 451; Foreign Sovereign Immunity Act of 1976, 28 U.S.C. §§ 1605(a)(2), 1603(d) (foreign governments, acting in their sovereign capacity, are immune from suit in the U.S.)); the "Act of State" doctrine (Restatement of Foreign Relations Law § 443(1) (Courts "will generally refrain from examining the validity of a taking by a foreign state of property within its own territory, or from sitting in judgment on other acts of a governmental character done by a foreign state within its own territory and applicable there.")); the "revenue rule," by which courts will not enforce tax judgments issued by courts of foreign states, thereby allowing domestic courts "to avoid entanglement with questions about the underlying validity of a foreign sovereign's laws" (*The Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 111 (2d Cir. 2001)); and the "Charming Betsy" canon, which provides that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804); Restatement of Foreign Relations Law § 114 and Reporters Note 1.

Just recently, the Supreme Court had the opportunity to underscore the need for judicial respect of foreign interests in the modern era. In *F. Hoffman-La Roche, Ltd. v. Empagran, S.A.*, 542 U.S. 155, 164 (2004) ("*Empagran*") the Supreme Court held that the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6(a), should not be interpreted to have extraterritorial reach when the anticompetitive conduct in question is predominantly foreign in origin and effect. That interpretation had provoked an angry response from numerous foreign states, many of which filed amicus brief in the litigation. Canada, for example, pointed out:

> Extending jurisdiction in this case without consideration of the reasonableness of exercising the courts' powers. . . . would elevate the courts of the United States to an unwarranted and unintended position of preeminence in international antitrust regulation and enforcement, and to a position of appearing indifferent to the impact of the exercise of their powers on other countries. The United States should not, and the Government of Canada would not, welcome such a result.

Brief of Amicus Curiae Government of Canada, at *21, *F. Hoffman-La Roche, Ltd. v. Empagran, S.A.*, No. 03-724, 2004 WL 226389 (Feb. 3, 2004). Recognizing this threat to international law, the Supreme Court restricted the statute's scope:

> this Court ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations. (citations omitted). . . . This rule of statutory construction cautions courts to assure that legislators take account of the legitimate sovereign interests of other nations when they write American laws. It thereby helps the potentially conflicting laws of different nations work together in harmony – a harmony particularly needed in today's highly interdependent commercial world.

*Empagran*, 542 U.S. at 164.

By the same token, international disharmony and discord is the result when American actions extend beyond acceptable boundaries in disrespect of foreign interests, resulting in protests by foreign nations and responsive action. Extraterritorial application of American antitrust laws has been but one example. Foreign nations have also objected to intrusive American legislation such as the Foreign Corrupt Practices Act of 1977 and the Helms-Burton Act of 1996, ultimately leading to restrictive applications of those statutes. *See, e.g.*, *U.S. v. Castle*, 925 F.2d 831, 836 (5th Cir. 1991) (refusing to apply FCPA to foreign officials); *Lamb v. Philip Morris, Inc.*, 915 F.2d 1024, 1030 (6th Cir. 1990) (refusing to imply a private right of action in FCPA); European Union-United States Memorandum of Understanding Concerning the

U.S. Helms-Burton Act and the U.S. Iran and Libya Sanctions Act, 36 I.L.M. 529 (1997) (suspension of private right of action under Helms-Burton Act).

Moreover, in the interest of international harmony, the Supreme Court has urged a restrictive application of the very statute upon which most plaintiffs in this case rest their claims. In *Sosa*, the Court declined to extend the Alien Tort Statute to allegations of illegal detention on foreign soil:

> A series of reasons argue for judicial caution when considering the kinds of individual claims that might implement the jurisdiction conferred by the [ATS] ... Since many attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences, they should be undertaken, if at all, with great caution.

542 U.S. at 728. Justice Breyer, in his concurring opinion in *Sosa* further warned against applying the ATS to conduct that occurs outside the U.S. by invoking "notions of comity that lead each nation to respect the sovereign rights of other nations by limiting the reach of its laws and enforcement." *Id.* at 761. Similarly, in *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004), the D.C. Circuit Court of Appeals interpreted narrowly the language of the 1996 Antiterrorism and Effective Death Penalty Act so as to exclude a private cause of action against foreign states for alleged sponsorship of terrorism. The Court noted that a more expansive reading of the statute might further interests of anti-terrorism, but that was a step for Congress to take, not the courts. *Id.* at 1033.

On the very subject of discovery in U.S. litigation of documents and persons overseas, foreign states have demonstrated their objection to over-reaching American practices which are viewed to compromise individual rights to privacy and confidentiality. Numerous countries, including, among others, Canada, Great Britain, Australia, France, South Africa, and the Netherlands, have enacted "blocking statutes" forbidding their citizens from complying with

discovery orders originating abroad (*i.e.*, the United States). These blocking statutes reflect the very real concerns provoked by American discovery orders that impose on foreign privacy interests – precisely the interests at stake here.

Justice O'Connor recently said that "when U.S. courts are seen to be cognizant of other judicial systems, our ability to act as a rule-of-law model for other nations will be enhanced." Justice Sandra Day O'Connor, Remarks to the Southern Center for International Studies" (Oct. 28, 2003), available at http://www.southerncenter.org/OConnor_transcript.pdf. Of course, the opposite is true as well, and that is a real risk here. Plaintiffs urge this Court to take a decidedly one-sided approach to the bank secrecy concerns of Arab Bank:

> It is ultimately insulting to argue that the feather-weight and purely personal privacy interest advanced by the exception-ridden and waivable foreign bank secrecy laws on which the Bank relies tips the scales against the clearly expressed U.S. interest in preventing the provision of financial services for terrorists to kill and maim American nationals and other civilians like the Plaintiff.

(Pls.' Mem. at 28.) Arab Bank does *not* trivialize the importance of preventing terrorism – preventing terrorism is a cause Arab Bank actively supports. Nor does Arab Bank want to trivialize in any way the tragedy suffered by plaintiffs. Yet this case is not about governments or institutions fighting terrorism: it is about private plaintiffs, most of whom have never set foot in the United States, taking advantage of a civil tort system to try to obtain compensation from an available and politically unpopular defendant. Moreover, these mostly non-U.S. citizens – whose jurisdictional basis before this Court is highly questionable and not yet confirmed in any event – and smaller number of U.S. citizens are suing a Middle Eastern bank, over financial transactions in the Middle East, that allegedly contributed to torts in the Middle East, which injured plaintiffs in the Middle East.

Plaintiffs have it backwards: it would be insulting to the laws, the governments and the people of three foreign nations, as well as to principles of international law, for this Court to rule now that the interests of these private litigants whose claims have little connection to this Court or country, outweigh the sovereign right of three foreign nations to regulate their domestic banking systems, as well as the privacy interests of thousands of foreign citizens. At the very least, plaintiffs' motion is an invitation for an extension of U.S. extraterritorial powers that have provoked such negative international reaction, and is an invitation this Court should decline.

## CONCLUSION

When faced with a situation in which a grand jury subpoena was issued to a foreign bank compelling disclosure of records in violation of foreign law, the D.C. Circuit Court of Appeals stated: "We have little doubt, for example, that our government and our people would be affronted if a foreign court tried to compel someone to violate our laws within our borders." *In re Sealed Case*, 825 F.2d 494, 498-99 (D.C. Cir. 1987). From the perspective of the governments of Jordan, the Palestinian Authority and Lebanon, and its citizens, this is precisely the outcome urged by plaintiffs.

For all of the foregoing reasons, Defendant Arab Bank plc respectfully submits that plaintiffs' motion should be denied in all respects.

Dated: New York, New York
April 3, 2006

Respectfully submitted,

LeBOEUF, LAMB, GREENE & MacRAE LLP

By:______________________________
Kevin Walsh (KW – 6256)
Alan B. Howard (AH – 7544)

125 West 55th Street
New York, New York 10019
Phone: 212-424-8000
Facsimile: 212-424-8500

Attorneys for Defendant
Arab Bank plc