UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| COURTNEY LINDE, et al. | Case No. CV 04 2799 (NG/VVP) |
| Plaintiff, | |
| -against- | Honorable Nina Gershon |
| ARAB BANK, PLC, | Magistrate Viktor V. Pohorelsky |
| Defendant. | |
| PHILIP LITLE, et al. | |
| Plaintiffs, | Case No. CV 04 5449 (NG/VVP) |
| -against- | |
| ARAB BANK, PLC, | |
| Defendant. | |
| ORAN ALMOG, et al. | |
| Plaintiffs, | Case No. CV 04 5564 (NG/VVP) |
| -against- | |
| ARAB BANK, PLC, | |
| Defendant. | |
| ROBERT L. COULTER, SR., FOR THE ESTATE OF JANIS RUTH COULTER, et al. | Case No. CV 05 365 (NG/VVP) |
| Plaintiff, | |
| -against- | |
| ARAB BANK, PLC, | |
| Defendant. | |

| | | |
|---|---|---|
| BENNETT, et al. | : | |
| Plaintiffs, | : | Case No. CV 05 3183 (NG/VVP) |
| -against- | : | |
| ARAB BANK, PLC, | : | |
| Defendant. | : | |
| ROTH, et al. | : | |
| Plaintiffs, | : | Case No. CV 05 3788 (NG/VVP) |
| -against- | : | |
| ARAB BANK, PLC, | : | |
| Defendant. | : | |
| GILA AFRIAT-KURTZER, et al. | : | |
| Plaintiffs, | : | Case No. CV 05 388 (NG/VVP) |
| -against- | : | |
| ARAB BANK, PLC, | : | |
| Defendant. | : | |

## DECLARATION OF ASHER SUSSER

1.  I was born in 1947 and graduated from Tel Aviv University in 1986 with a Ph.D. in the Modern History of the Middle East. For over twenty years I have taught courses in the Department of Middle Eastern History at Tel Aviv University focusing on Modern Middle Eastern History, Religion and State in the Middle East and Arab-Israeli issues, with special reference to Jordan and the Palestinians.

2. I was a Fulbright Fellow and a visiting professor at Cornell University, the University of Chicago and Brandeis University, and a visiting fellow at the Washington Institute for Near East Policy.

3. I have been the Director of the Moshe Dayan Center for Middle Eastern Studies at Tel Aviv University (TAU) since 2001 and from 1989 to 1995.

4. I have authored and edited seven books, the most recent of which are: *Jordan: Case Study of a Pivotal State* (2000) and *Six Days-Thirty Years, New Perspectives on the Six Day War* (Hebrew)(ed.1999). A copy of my *curriculum vitae*, including a complete listing of my publications is attached as Exhibit 1.

5. Over the course of my career, I have spent a considerable amount of time researching, writing and teaching courses on Jordan. As such, I am familiar with the modern history of Jordan and its relationship with Israel and with Palestine. I am also familiar with potential security threats to Israelis and their counsel, the legal system in Jordan and with the ability of Israelis to participate in the Jordanian legal system.

6. Israel has issued several travel warnings within the past nine months urging Israeli's to avoid travel to Jordan and neighboring Arab countries. *See*, Warnings Attached as Exhibit 2.

## Jordanian Bar Association

7. The Jordanian Bar Association has proclaimed a total boycott against representation of any Israeli citizen in any civil or criminal proceeding. The Supreme Court of Jordan has upheld the boycott. It is possible that the Jordanian Bar Association and Jordanian Courts may attempt to interfere with American and Israeli plaintiffs' efforts to conduct depositions of the Arab Bank employees in Jordan.

8. As a prerequisite to participating in a civil or criminal proceeding in Jordan, a party must be represented by a Jordanian lawyer. The Jordanian Bar Association (hereinafter JBA) was established by law admitted on September 16th 1950. According to this law, an association for the lawyers in the Jordanian Hashemite Kingdom is to be established. The association will include all the licensed attorneys. *See*, History of the Jordanian Lawyers Syndicate (April 16, 1951), downloaded from <http://www.jea.org.jo/aboutus/showcycles.aspx>. The 1950 JBA law was amended twice—in 1955 and 1970. These JBA laws were replaced by

3

the 1972 JBA law which was amended three times—1973, 1976 and 1985. A copy of the Code of the Jordanian Bar Association is attached as Exhibit 3.

9. The Code of the Jordanian Bar Association requires that "anyone practicing the legal profession has to have his/her name registered in the attorney's register." Exhibit 3, at Chapter 3, Article 7. The JBA maintains a listing of all members in the association and every lawyer must submit an application to be registered in the listing of attorneys. Exhibit 3, at Chapter 5, Articles 14 and 15. This listing is maintained in a register which is distributed by the JBA to the ministry of justice, public prosecutors, and courts. Exhibit 3, at Chapter 6, Article 19.

10. "Courts are forbidden from accepting attorneys who have not been registered in the register mentioned in Article 19 of this code." Exhibit 3, at Chapter 6, Article 21. Moreover, the JBA Code states that "the practice of the legal profession is an exclusive right limited to attorney's registered with the association…" and attorneys who are not registered have no right to practice law before any courts or tribunals or for the purpose of earning money. Exhibit 3, at Chapter 8, Article 38. In addition, a party may not appear before a Jordanian court without being represented by a lawyer. Exhibit 3, Chapter 41.

11. In March of 2005, the Jordanian government drafted new legislation concerning professional associations in Jordan. According to article 7 in the draft law, professionals (including lawyers) cannot practice their professions without obtaining the required license from the relevant association and before completing all the required admission procedures. Attached as Exhibit 4.

### JBA's Opposition to Normalization and Ban on Contacts With Israelis

12. While the Jordanian-Israeli peace negotiations were in process in 1994, the professional associations in Jordan adopted a firm position against the forthcoming peace treaty and against any kind of normalization with Israel. The JBA was very active in the anti-normalization campaign and, in August 1994, its executive council ordered its members to avoid all forms of contact with Israel. *See*, Rana Husseini, "Court Rejects Case of Lawyer/Politician Against JBA Ban After His Visit to Israel," *Jordan Times* (October 18, 1995), attached as Exhibit 5. Furthermore, on October 27th 1994, one day after the Jordanian-Israeli peace treaty was signed, the JBA, together with other professional associations, published a communiqué regarding the peace treaty. The communiqué declared that the day in which the treaty was signed was one of the darkest days in the history of the Arab nation. The associations further

agreed to boycott all forms of contacts with the "Zionist enemy," including partnerships, cooperation, meetings and conferences. The communiqué called for the commercial, industrial and agricultural sectors in Jordan and all citizens, to boycott the Zionists. It also called on all Jordanian parliament members to vote against the treaty. "In an Announcement by a Number of Professional Syndicates Calling the members of the House of Deputies not to Endorse the Peace Treaty" *Al Ray* (October 28, 1994). Attached as Exhibit 6.

13. The JBA's firm objection to normalization is also expressed in its website, which contains an article called "Struggling Against Normalization with the Zionist Enemy." The JBA stated due to its concern for the safety and stability of the Arab nation, it blatantly refused the attempts aiming at establishing normal relations with the Zionist enemy. The JBA has stood firmly against the enemy's attempts to penetrate the Jordanian society and to destroy it economically, politically and socially and hence, the JBA called its executive council to avoid any contacts with the "Zionist enemy." It is also mentioned, that in order to prevent normalization with Israel, several anti-normalization committees were founded in the years following the peace treaty. JBA, "Resisting Normalization with the Zionist Enemy," (2003) downloaded on January 30, 2005 at <http://www.jba.org.jo/Activities/TFighting.aspx>, and attached as Exhibit 7.

14. From 1994 onward, the JBA enforced upon its members its anti-normalization orders, the JBA imposed punitive actions on members who violated its 1994 boycott decision. In June 1995, a Jordanian attorney named Mohammad Zoubi, who was also the leader of the Jordanian Liberal Party, visited Israel and met there with Israeli senior politicians, including President Ezer Weitzman. After returning to Jordan he was disbarred by the JBA for violating its 1994 decision of boycotting Israel. After being disbarred, Mr. Zoubi filed a motion against the decision in a high court, but the case was dismissed by the court. Husseini, *Jordan Times*, attached as Exhibit 5.

15. The JBA's prohibition from permitting its members to represent Israeli citizens has left even Israeli criminal defendants without representation in Jordan. In October 1999, two Arab Israelis, Nash'at Fawzi Shabitah and Jarir Abdul Rahim, were arrested in Jordan and were charged with a fraud felony in connection with attempted land sales in Jerusalem. They were denied legal representation due to the JBA's prohibition from representing Israelis. *See*, Janine

Zacharia, "Israel, ADL Slam Jordanian Lawyers' Refusal to Represent" (November 30, 1999), attached as Exhibit 8.

16.   Following this case, the President of the American Bar Association, William Paul, sent a letter to the JBA's chairman, Saleh al-Armouti. In his letter, Paul protested against "reports that the Jordanian Bar Association prevents its members from representing Israeli citizens before Jordanian Courts." Letter from William Paul, President of the American Bar Association (January 12, 2000), downloaded in Arabic from the JBA website on March 28, 2005, <*http://www.jba.org.jo/Activities/TFightingLink.aspx*>, attached as Exhibit 9. Paul wrote that the prohibition contradicted international principals of human rights and violated Jordan's international obligations. In addition, Paul claimed that the prohibition violated article 14 of the International Covenant for Civil and Political rights that Jordan is a signatory to.

17.   Al-Armouti responded to Paul's letter by saying that he considered Paul's accusations an intervention in Jordan's internal affairs and an attempt to promote political goals not related in any case to the issue of the rule of law or to the independent status of the attorneys. *See*, Letter from Saleh Abdul Karim Al-Armouti, Head of the Jordanain Bar Association to William Paul, President of the American Bar Association (date), downloaded from the JBA website on January 30, 2005, at http://www.jba.org.jo/Activities/Note.aspx, attached as Exhibit 10. Al-Armouti states that "Jordanian lawyers have taken a collective stand…not to defend the Zionist defendants…." *Id.* "We are not ashamed of not offering legal counsel to these people." *Id.* Al-Armouti also claimed that Israel, in its actions against the Palestinians, and the U.S., in its actions against the Arabs, including against Iraq, are the ones who had violated international law. *Id.*

18.   In October of 2005, the President of the JBA led an Anti-Normalization rally in Amman, Jordan where protestors burnt US and Israeli flags. The President stated at the rally:

> The peace treaty is null and void. It does not exist and we should not abide by it. **The only path we should take is armed struggle against the enemy and the occupation (Israel).**

*See*, Exhibit 11, "Ten Years On, Jordan Urged to Tear Up Israel Peace Treaty," Turkish Press, (October 26, 2005).

19.   Based on my experience, my expertise in the Middle East and the documents cited herein, it is my opinion that depositions of Arab Bank employees in Amman, Jordan by lawyers

6

representing American and Israeli citizens may be disrupted by members of the Jordanian Bar Association or Jordanian courts because of the JBA's prohibition on the representation of Israelis and the general public atmosphere that may be created by publicity surrounding these depositions.

## Conclusion

20.   In my opinion, given the Anti-Israeli bias within the Jordanian legal system, efforts may be undertaken by the Jordanian Bar Association to interfere with depositions in the above captioned cases. Any Jordanian court would be subject to intense pressure if a motion were filed by a member of the Jordanian Bar Association to interfere in the conduct of depositions in Jordan. If such a motion were filed, it is likely that the Jordanian Bar Association may exert tremendous influence over Jordanian courts and interfere with civil depositions taking place in Jordan. The Arab Bank is the largest bank in Jordan and plaintiffs are Israeli victims and U.S. victims killed or injured in attacks in Israel. Given the extensive prohibition of conducting business with or representing Israelis, asserted by numerous professional organizations including the JBA, I believe that, in the present circumstances, these professional organizations would unduly influence any decision issued by a Jordanian Court. In prior cases, the Jordanian judiciary has upheld the JBA's decision to disbar lawyers who represent Israelis.

I the undersigned Asher Susser, Identity Card number 069509404 declare, after being warned that I am required to state the truth otherwise I will be subject to penalties established by the law, including penalty of perjury under the laws of the United States of America that, to the best of my knowledge, the foregoing is true and correct.

Executed on 22 May 2006      _____
                             Asher Susser

I hereby certify that on the 22nd of May 2006 Asher Susser appeared before me, Gavriel Mairone Adv., in my office at 12 Ha-Chilazon Street, Ramat Gan Israel, and identified himself by presenting his Identification Card number 069509404, and, after being warned that it is incumbent upon him to state the truth otherwise he will be subject to penalties imposed by the law, including the penalty of perjury under the laws of the United States of America, he affirmed that to the best of his knowledge his foregoing affidavit is true and correct and he executed this affidavit before me.

_____
Gavriel Mairone, attorney

7