UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------X

ORAN ALMOG, et al.,

         Plaintiffs,  :  CV 04-5565 (NG)

     -against-

ARAB BANK, PLC,

         Defendant  :

------------------------------------------------X


------------------------------------------------X

GILA AFRIAT-KURTZER, et al.,

         Plaintiffs,  :  CV 05-388 (NG)

     -against-

ARAB BANK, PLC,

         Defendant.  :

------------------------------------------------X

## SUPPLEMENTAL DECLARATION OF RUTH WEDGWOOD

Ruth Wedgwood declares as follows:

1. Pursuant to the Court's Order of July 12, 2006, counsel for the plaintiffs, in the above-captioned matters, requested that I prepare this supplemental declaration.

2. Plaintiffs have made one fundamental claim to this court, with a significant legal consequence. They claim that the alleged campaign of suicide bombings, mounted against innocent civilians in Israel and the West Bank

        by militant groups, constitutes a violation of settled international law. They claim that private entities were proscribed from knowingly assisting that campaign through the provision of financial services.

3. Defendant is allegedly a private entity that knowingly provided financial services used to reward and "incentivize" suicide bombers, and thus allegedly assisted in the commission of malicious torts and crimes against civilians, through the modality of suicide bombing campaigns.

4. Hence, plaintiffs argue that there is a well-founded cause of action available under the Alien Tort Statute, 28 U.S.C. § 1350, that fully meets the cautious standards of *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).

5. The suicide bombings, according to the plaintiffs, amounted to crimes against humanity, genocide, and terrorism, including violating the law of armed conflict and the fundamental principle of distinction.

6. To inform the court's judgment on these matters, I will discuss several additional analytic distinctions and sources of law, and in the course of this, will comment briefly on the declarations submitted by Dr. Stefan Talmon and Professor Eric A. Posner.

### A. Tort vs. Crime

7. First, the declarations submitted by defendant offer the argument that a campaign of suicide bombings directed against civilians does not constitute an "international crime." See Second Declaration of Eric A. Posner, p. 2 et seq., and Second Declaration of Stefan Talmon, p. 1 et seq.

8. This is a problematic claim, at best. Indisputably, there have been international criminal prosecutions against governmental, militia, and military leaders, for the deliberate massacre of civilians—framed as crimes against humanity, genocide, and war crimes. Suicide bombings are merely one means of committing a massacre of civilians. The precedent for considering these to be a crime is founded on the broad body of case law punishing deliberate attacks on civilians.

9. Indeed, for this very reason, the attacks of September 11, 2001 were denounced around the world as a flagrant breach of international law, as well

as morality—for no one, whatever the reason, whether state or private party, is entitled to engage in a deliberate attack against civilians.

10. The Convention on Terrorist Bombings, ratified by the United States, precisely requires that any bombing attack aimed at civilians should be punishable as a crime. It is worthy of this court's especial attention that defendant Arab Bank long maintained a New York office. American treaty obligations would appear to apply directly to the work of any entity that acts on American territory to aid and abet terrorist bombings, even where the bombings took place abroad. Obligations under the Convention on Terrorist Bombing would also apply to activities in the territory of Israel.

11. As noted in my prior declaration, the Security Council's recent Chapter 7 resolutions (initiated by the United States) also require member states to prevent and to criminally punish the knowing financing of terrorism.

12. But equally importantly, the defendant's question about the status of these activities as "international crimes" is a *non sequitur*.

13. The Alien Tort Statute creates jurisdiction in the federal courts to hear actions "for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The statute does not require, either as a matter of jurisdiction, pleading or proof, that the tort also should qualify as an international crime.

### B. Congress' Delegation to the Courts

14. Defendant also claims that various international treaties, standards of customary law, and Security Council decisions have not been directly incorporated into United States law, and must await the further action of the Congress or the President.

15. But in the circumstances of this suit, this argument also may rank as a *non sequitur*. Congress has acted, through the Alien Tort Statute, to draw upon the standards of international law. One need not await the affirmative creation of a domestic cause of action through legislative means. Congress gave authority to the federal courts, albeit to be exercised cautiously, to imply a civil cause of action where it would vindicate a substantial violation of fundamental rules of international law. *See Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).

16. The protection of civilians against deliberate armed attacks by private terror groups and other belligerents is such a fundamental standard. It is an axiom of law found throughout applicable treaties and customary law. Resolution 1373 was passed by the Security Council in a unanimous vote on September 28, 2001, and describes the attacks on the World Trade Center as a violation of this core standard, calling them "terrorist attacks" and "reaffirming" the Council's "determination to prevent all such acts." Thus, the murder of innocent civilians is recognized by Resolution 1373 as a terrorist act, and the resolution is aimed at preventing other instances. It makes no difference in the reach of this resolution that a suicide bomber travels on foot rather than through the air.

### C. The Defendant's Confusion between Jus ad Bellum, Jus in Bello, and Terrorism

17. The right of civilians to be protected against deliberate attacks is a foundational rule of international law. It is the foundation stone of the ban on genocide, crimes against humanity, and terrorism against civilians. The guarantee is also reflected in the law of armed conflict, sometimes called "jus in bello" and "international humanitarian law."

18. Defendant has derided the settled nature of that rule by asserting that there is no agreement on the definition of "terrorism."

19. This is a canard. To be sure, there are real and substantial debates about the *outer limits* of the idea of terrorism. Some governments have used the word to castigate any act of armed rebellion or insurgent attack against proper military objects, even where the tactics used by the insurgents otherwise comply with the laws of war.

20. But it remains undisputed that any premeditated attack upon civilians is a serious violation of international law. Indeed, the occasional attempt of some states to propose the idea of "state terrorism" is recognition of this very point.

21. Deliberate and systematic attacks upon civilians are simply forbidden, no matter who qualifies as the author of the attacks. These are war crimes, as well as crimes against humanity, and at least private actors who indulge in such atrocities also commit an act of terrorism.

22. Defendant also has attempted to deride the force of the prohibition by supposing that there are too few instances of prosecution or punishment of such acts.

23. But there does not need to be perfect enforcement for a norm to persist as a foundational rule of international law.

24. Indeed, what is quite remarkable in the four declarations on international law, as submitted by the defendant, is the clock that did not strike.

25. In particular, there is not a single instance where a state has dared to claim, in a direct and unambiguous way, that deliberate attacks upon civilians are permitted.

26. Defendant's proffered excerpts from diplomatic discussions concerning wars of "self-determination" – or wars to end a "foreign occupation" – do not change this result.

27. Some states, emerging from colonialism, have unsurprisingly offered the view that the use of force in seeking independence or secession is not prohibited by international law.

28. But the "Aim of a War" and "the Methods of a War" are two different matters. In international law, *jus ad bellum* has regulated the justification for resorting to war, at least in interstate conflict. These are causes that legally permit the use of force, commonly known as *casus belli*.

29. But there is a separate and independent set of rules on *how one can fight*. This is *jus in bello*. It limits the methods of attack, even for the best of causes, and even limits how a war can be fought by the victims of an aggression.

30. There is no modern state practice that has plainly and unequivocally sought to justify deliberate attacks upon civilians, in any type of war. The declarations submitted by the defendant do not and cannot claim otherwise.

31. To be sure, the defendant's declarations refer to a number of states belonging to the United Nations that have endorsed a right of rebellion or self-determination through armed resistance against existing governments,

as well as fights against "foreign occupation." Such claims are made in many disputed territories, including Kashmir, as well as the West Bank.

32. But no state party belonging to the United Nations has dared to openly suppose that deliberate attacks upon civilians are lawful, in the course of such martial campaigns.

33. Indeed, the defendant's confused attempt to conflate the <u>reason</u> for a fight and the <u>methods</u> used in a fight is rejected by a famous treaty convention that now has 165 state parties.

34. The 1977 First Additional Protocol to the Geneva Conventions was framed to apply modern rules of humanitarian law to ongoing struggles for "self-determination" and challenges to "colonial domination" or "alien occupation."[1]

35. Article 1(3) of the First Additional Protocol applies the protocol in standard international wars. Article 1(4) makes Protocol I applicable to non-state actors such as rebels and guerrilla organizations which are involved in internal conflicts where they are "fighting against colonial domination and alien occupation and against racist regimes in the exercise of their right of self-determination."

36. Protocol I also imposes several mandatory rules. First, the non-state actors, though out of uniform, must comply with the requirement of bearing arms openly on the way to an attack, and must have a structure of command to assure compliance with the laws of war. See Articles 43(1) and 44(3)(a) and (b).

37. In addition, Protocol I embraces and renews the long-standing norm of Hague treaty law, customary law, and common Article 3 of the 1949 Geneva Conventions, all of which prohibit any deliberate attack upon civilians. Protocol I reiterates that the rule of "distinction" to protect civilians must be followed even in the course of a struggle for "self-determination." *See* Articles 48, 51(2), and 52(1).

---

[1] See Article 1(3) and 1(4), First Protocol Additional to the Geneva Conventions of 1949, and relating to the Protection of Victims of International Armed Conflicts (Geneva Protocol I).

38. Jordan and Lebanon have ratified Protocol I without any reservation, on January 5, 1979 and July 23, 1997 respectively. Syria ratified Protocol I without any reservation concerning the use of force.

39. It is incoherent to argue that a state party could claim the right to attack civilians as a protected modality of "terrorism" when there is already a binding treaty instrument that bans the same tactic as part of armed conflict.

40. Article 51(2) of the First Additional Protocol states in clarion language:

   **"The civilian population as such, as well as individual civilians, shall not be the object of attack. Acts or threats of violence the primary purpose of which is to spread terror among the civilian population are prohibited."**

41. Article 48 also reads plainly:

   "In order to ensure respect for and protection of the civilian population and civilian objects, **the Parties to the conflict shall at all times distinguish between the civilian population and combatants** and between civilian objects and military objectives **and accordingly shall direct their operations only against military objectives."**

42. The United States has signed, but not ratified, Protocol I. But the United States accepts many of the rules of Protocol I as a restatement of customary law. *See* Wedgwood declaration at paragraph 34 and note 19. Protocol I supports the basic rule of distinction that protects civilians against deliberate attack. The United States has also signed, but not ratified Protocol II.[2]

43. This core distinction between purpose and means helps to explain many of the sources quoted by Dr. Stefan Talmon in his first declaration submitted to this court on behalf of the defendant Arab Bank.

---

[2] The United States signed Additional Geneva Protocol II on December 12, 1977, and the treaty is still pending in the Senate. (The assumption has been that Protocols I and II would have to be considered together.) Additional Protocol II currently has 160 state parties. Protocol II also recognizes the "principle of distinction." See Second Additional Protocol on Victims of Non-International Armed Conflicts, Article 13(2)("The civilian population as such, as well as individual civilians, shall not be the object of attack. Acts or threats of violence the primary purpose of which is to spread terror among the civilian population are prohibited.")

It may be of interest that the customary law of treaties, as reflected in the Vienna Convention on the Law of Treaties, recognizes that there is a duty of good faith on the part of a treaty signatory to avoid action that would frustrate the object or purpose of the treaty, until and unless the state has made clear its intention not to become a party to the treaty.

44. For example, Dr. Talmon quotes the April 6, 2005, statement of Malawi, on behalf of the group of 53 member states of the Group of African States. Malawi states that "In line with the Algiers Convention on the Prevention and Combating of Terrorism, terrorism cannot be justified under any circumstances. Political, philosophical, ideological, racial, ethnic, religious or other motives cannot be a justifiable defense for a terrorist act."

45. Malawi also suggests that a struggle for self-determination must avoid the illegality of means, and only use methods consistent with international law. "[T]here is a difference between terrorism and legitimate struggle waged by people for their liberation or self-determination *in accordance with the principles of international law.*"

46. Malawi is a state party to Geneva Additional Protocol I. Thus, it would make no sense to read its statement in a sense that contradicts that protocol. Malawi may well hold the view that an armed struggle to achieve "liberation" or "self-determination" should not be labeled *per se* as terrorism. But such a rebellion must use legitimate means of warfare. Insurgents cannot attack civilians as deliberately chosen victims.

47. So, too, Dr. Talmon quotes author Patrick Robinson, who writes that "international law excludes from the concept of terrorism the struggle for self-determination and independence." But Robinson goes on to note that "*some acts perpetrated in that struggle may themselves be terrorist and unlawful.*" See Declaration of Stefan Talmon, July 18, 2005, at paragraph 62.

48. Only a world of Orwellian doublespeak could read these statements in any other sense. Quite apart from their obligations under customary law and the Geneva Additional Protocols, there is the clarion standard of Security Council resolution 1566 (2004), which condemns all acts of deliberate violence against civilians.

49. Security Council Resolution 1566 demands, under the authority of Chapter 7 of the UN Charter, that

> "criminal acts, including against civilians, committed with the intent to cause death or serious bodily injury, ... with the purpose to provoke a state of terror in the general public ... **are under no circumstances**

> **justifiable by considerations of a political, philosophical, ideological, racial, ethnic, religious, or other nature."**

50. One must read the law with some coherence. It would make no sense to suppose that the signatories of the Additional Protocols intended, through gnostic mysteries and crossed fingers, to preserve a claim of right to attack civilians, in direct contravention of their pledge under these treaties. This prevarication would not be what qualifies in international law as a "persistent objection" or variant state practice.

### D. The High-Level Panel and the September 2005 Heads of State Summit

51. The clear voice of the "High-Level Panel" appointed by Secretary-General Kofi Annan was noted in a prior submission to this court. See Declaration of Ruth Wedgwood, June 15, 2005, at paras. 82-89.

52. Defendant has subsequently derided the significance of this panel as "recommending reform, not stating existing law." See Declaration of Eric Posner, July 19, 2005, at para. 25.

53. But defendant's claim is contradicted by the panel report itself.

54. The secretary-general of the League of Arab States, sitting with the former secretary-general of the African Union, and 14 other distinguished diplomats, lawyers and world leaders, issued a statement on behalf of the High-Level Panel concerning **what the law already holds.**

55. Thus, the panel stated, "virtually all forms of terrorism **are prohibited** by one of 12 international counter-terrorism conventions, international customary law, the Geneva Conventions or the Rome Statute. **Legal scholars know this.**" High-Level Panel Report, para. 159 *(emphasis added.)*

56. The concern of the High-Level panel was to afford greater visibility to the law, so that it is **"understood by all."** High-Level Panel Report, para. 159 *(emphasis added).*

57. The defendant's implicit suggestion that terrorist bombings are accepted as legal in some quarters is additionally challenged by the signal event of the Heads of State Summit.

58. This was a summit meeting held at the opening of the General Assembly in New York, in September 2005. President Bush attended, along with more than 150 other heads of state. In the Outcome Document of the Summit, the assembled Heads of State declared as follows, with unequivocal language:

    "We strongly condemn terrorism *in all its forms and manifestations, committed by whomever, wherever and for whatever purposes,* as it constitutes one of the most serious threats to international peace and security."[3]

    This same standard was passed as a resolution by the General Assembly of the United Nations.

59. To be sure, lawyers are professional skeptics. But even a casuist would have trouble reading any equivocation into these statements. They have direct legal significance in determining what is already required by customary law, and in deciding whether any state has in fact taken steps to remain outside that regime as a "persistent objector."[4]

### E. Other Points

60. There are two other matters that deserve the attention of the court.

61. The first is the somber subject of genocide. Defendant suggests that the issue of genocide has no possible application to this case, because "internal violence motivated by the goal of national liberation, even when tinged by racial or ethnic animus, [is not] tantamount to the international crime of genocide." *See* Reply Memorandum of Law of Defendant Arab Bank PLC in Further Support of Its Motions to Dismiss the Amended Complaints, quoting Second Declaration of Eric A. Posner, at para. 41.

---

[3] See 2005 World Summit Outcome, Doc. A/60/1.1*, at para. 81.

[4] Dr. Talmon has noted that a prior draft of the Outcome Document contained additional language concerning the nature of terrorism, but his characterization of why various drafts were shortened or changed has no evident support in published materials. As noted above, the treaty commitment of 165 states parties under the First Additional Geneva Protocol of 1977 rebuts any suggestion that states were 'reserving their right' to bomb civilians in "legitimate national liberation struggles." See Supplementary Wedgwood Declaration, paragraphs 62-74 supra. One explanation for the succinct language may have been the belief that its meaning was plain. For access to the various drafts, a useful source is the Global Policy Forum, at <www.globalpolicy.org/msummit/millenni/m5outcomedocindex.htm>.

62. One may quarrel with the defendant's characterization of the provable facts. Blowing up an opposing set of civilians because of their ethnic or national identity might seem to warrant a more sober description than violence "tinged" by ethnic animus. The events alleged in this case are not a set of random street encounters or barroom brawls, but rather a concerted campaign to use terror to force the withdrawal of a particular ethnic or religious group from a particular land.

63. In the jurisprudence of the International Criminal Tribunal for the former Yugoslavia, such use of terror and violence has indeed been characterized as genocide. The definition of genocide does not require an ambition to destroy an entire ethnic or religious group worldwide. Both the ad hoc tribunals for the former Yugoslavia and Rwanda have characterized widespread violence used in an ethnic cleansing campaign as genocide.[5]

64. Defendant has noted that the case law of these ad hoc international tribunals is not directly binding on the United States, and that is true.

65. But its jurisprudence has at least persuasive power. One source of law under the Alien Tort Statute is the "law of nations" and these tribunals have been central in the exposition of modern international criminal law. The Security Council resolutions creating the tribunals were passed by U.S. initiative, and three distinguished American judges have served on the Yugoslav tribunal, namely, Judge Patricia Wald, as a trial judge, and Judges Gabrielle Kirk McDonald and Theodor Meron, each as tribunal president.[6]

66. The defendant has also suggested that the law of "aiding and abetting" is insufficiently developed in international law, as to be pleaded under the Alien Tort Statute. See Reply Memorandum of Law of Arab Bank PLC in Further Support of Its Motions to Dismiss the First Amended Complaint, at p. 3.

---

[5] A useful guide to the jurisprudence of the ad hoc tribunals has been provided by Human Rights Watch, in *Genocide, War Crimes and Crimes Against Humanity: Topical Digests of the International Criminal Tribunal for Rwanda and International Criminal Tribunal for the former Yugoslavia*, New York, Human Rights Watch, 2004. The case law of the two tribunals is reported on the UN web site, at <www.un.org>, under the heading for "international law." See also R. Wedgwood, *The Development of International Criminal Law*, The Hague, Netherlands, Hague Academy of International Law (forthcoming 2006).

[6] Judge Meron also served as a judge in the appellate chamber for both the Rwanda and Yugoslav tribunals, and is one of the best known scholars in the fields of war crimes and human rights.,

67. This is not a well-founded conclusion. Aiding and abetting has been incorporated as a theory of liability in the statutes of the International Criminal Tribunal for the former Yugoslavia and the International Criminal Tribunal for Rwanda.[7] Other ideas used to charge complicity in international criminal tribunals include doctrines of accomplice, common purpose, joint or co-perpetration, joint criminal enterprise, and conspiracy.[8] One assumes that defendant's wish is not a different theory of complicity, but no theory at all.

68. In any event, this is a civil suit for damages, not a criminal case. Thus, there is no parallel to the strictures on the recognition of federal common law crimes seen in *United States v. Hudson v. Goodwin*, 7 U.S. 32 (1812). Compare *United States v. Coolidge*, 14 U.S. 415 (1816).[9]

Respectfully submitted,

Ruth Wedgwood
Edward B. Burling Professor of International Law and Diplomacy
Director of the Program in International Law and Organizations
School of Advanced International Studies
Johns Hopkins University
July 25, 2006

I declare under penalty of perjury and the laws of the United States of America, to the best of my knowledge and belief, that the statements made in this Declaration are true and correct.

Executed on July 25, 2006, in Geneva, Switzerland

_____
**Ruth Wedgwood**

---

[7] See articles 6 and 7(1) of the respective statutes.
[8] See generally E. van Sliedregt, *The Criminal Responsibility of Individuals for Violations of International Humanitarian Law*, T.M.C. Asser Press, The Hague 2003.
[9] See also Henry J. Friendly, *In Praise of Erie – and the New Federal Common Law*, 39 NYU Law Review 383 (1964).