IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHILIP LITLE, et al.<br>                Plaintiffs,<br>   v.<br>ARAB BANK, PLC,<br>                Defendants. | CASE NO.: cv-04 5449(NG)(VVP) |
| ORAN ALMOG, et al.<br>                Plaintiffs,<br>   v.<br>ARAB BANK, PLC,<br>                Defendants. | CASE NO.: cv-04 5564(NG)(VVP) |
| GILA AFRIAT-KURTZER, et al.<br>                Plaintiffs,<br>   v.<br>ARAB BANK, PLC,<br>                Defendants. | CASE NO.: cv-05 388(NG)(VVP) |
| MICHAEL BENNETT, et al.<br>                Plaintiffs,<br>   v.<br>ARAB BANK, PLC,<br>                Defendants. | CASE NO.: cv-05 3183(NG)(VVP) |
| ARNOLD ROTH, et al.<br>                Plaintiffs,<br>   v.<br>ARAB BANK, PLC,<br>                Defendants. | CASE NO.: cv-05 3738(NG)(VVP) |
| JOSEPH JESNER, et al.<br>                Plaintiffs,<br>   v.<br>ARAB BANK, PLC,<br>                Defendants. | CASE NO.: cv-06 3869(NG)(VVP) |

**DECLARATION OF GEORGE BERMANN IN SUPPORT OF
THE THIRD PARTY DEFENDANTS' MOTION TO DISMISS
<u>THE THIRD PARTY COMPLAINTS WITH PREJUDICE</u>**

1

GEORGE BERMANN hereby declares, pursuant to 28 U.S.C. § 1746, the following to be true and correct:

### Introduction

1. I have been asked to render an Opinion on the question of whether international law provides a basis for a requirement that the Alien Tort Claim Statute be understood as guaranteeing a right of contribution or indemnification in favor of a party who has been or may be found civilly liable under that statute.

2. In preparing this Opinion, I have reviewed the complaint in the present case as well as the prior ruling of the Court in this case on the motion to dismiss.[1] I have also reviewed the basic literature on the sources and content of international law, notably the law of treaties and customary international law.

3. By way of personal background, I am a member of the faculty of Columbia Law School, holding the Walter Gellhorn Professorship of Law and the Jean Monnet Chair of European Union law. I have been a member of that faculty since 1975. My principal subjects of research, writing and teaching are Transnational Litigation and Arbitration, Comparative Law and European Union Law. At Columbia, I direct the European Legal Studies Center and am chair of the executive editorial board of the *Columbia Journal of European Law*. I am also faculty board member of the *Columbia Journal of Transnational Law*.

4. Among my recently published books are "Transnational Litigation," "Party Autonomy: Constitutional and International Law Limits in Comparative Perspective," "Law and Governance in an Expanding European Union," and "Cases and Materials on European Union Law."

---

[1] 471 F. Supp. 2d 257 (E.D.N.Y. 2007).

5.      I am currently President of the International Academy of Comparative Law, based in Paris, France, and have previously served as President of the American Society of Comparative Law, of whose scholarly journal, *The American Journal of Comparative Law*, I am currently co-editor-in-chief.

6.      In addition to serving on the Columbia faculty, I am a member of the teaching faculty of the Universities of Paris I and II and the Institut des Sciences Politiques (France) and the College of Europe (Belgium).

7.      I have frequently served as expert witness on foreign law and issues of transnational litigation both to courts (U.S. and foreign) and to counsel appearing before those courts.  I commonly serve as arbitrator in international commercial arbitration under the auspices of the International Chamber of Commerce, the American Arbitration Association and other international arbitral institutions. I am currently beginning service on the American Law Institute's new Restatement of the Law of International Commercial Arbitration.

**Summary of Opinion**

8.      For the reasons set out below, I conclude that international law furnishes no basis for a requirement that the Alien Tort Claim Statute be construed to provide a right of contribution or indemnification in favor of a party who has been or may be held liable under the provisions of the Statute.  I base this conclusion on an examination of the principal sources of international law, notably treaty law and customary international law.

## International Treaty Law Does not Embrace a Principle of Contribution or Indemnification among Joint Debtors

9.     The principal source of international law within the U.S., as elsewhere, is of course international treaty law. I find, upon an examination of both general and specific international treaties, that there is no basis upon which a principle of contribution or indemnification may be considered an integral part of treaty-based international law.

10.    In the first place, the United States is not a party to any treaty that would obligate U.S. courts as a general matter to apply principles of contribution or indemnification in domestic litigation, even in international human rights litigation.[2] This should occasion no surprise.

11.    It might seem more likely that certain specific international treaties to which the U.S. is a party – notably treaties concerning international human rights or other treaties regulating liability in damages for injury to person or property – would contain provision specifically directed to the question of contribution or indemnification. These would include the various international treaties upon which Plaintiffs specifically rely in the present case, and to which the U.S. is a party, notably the Convention on the Prevention and Punishment of the Crime of Genocide,[3] the Convention against Torture and Other Cruel, Inhuman or Degrading

---

[2]   Nor is there any basis whatsoever in the Vienna Convention on the Law of Treaties, *opened for signature* May 23, 1969, 1155 U.N.T.S. 331 (entered into force Jan. 27, 1980) that remotely suggests that a requirement of contribution or indemnification should be read into a treaty that happens to establish or impose liability. The United States is not a party to this Convention, but has indicated that it will be guided by it.

[3]   Convention on the Prevention and Punishment of the Crime of Genocide, *opened for signature* Dec. 9, 1948, 102 Stat. 3045, 78 U.N.T.S. 277. The Convention contemplates criminal prosecution only, not civil prosecution. Contribution or indemnification does not therefore come into consideration.

Treatment or Punishment,[4] the International Convention for the Suppression of Terrorist Bombings,[5] and the International Convention for the Suppression of the Financing of Terrorism.[6] Yet, none of these conventions deals, even obliquely, with the question. Even where, as in the case of the Convention against Torture[7] and the Terrorism Financing Convention,[8] civil liability is in fact specifically contemplated, remedial questions such as contribution or indemnification are not even mentioned.

12. Other conventions governing liability arising out of international transactions, even while entering into considerable detail on remedies and damages in particular, similarly avoid such questions as contribution or indemnification.

---

[4] Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *opened for signature* Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85 [hereinafter Convention against Torture]. The Convention contemplates primarily criminal prosecution and extradition.

[5] International Convention for the Suppression of Terrorist Bombings, Jan. 12, 1998, S. Treaty Doc. No. 106-6, 37 I.L.M. 249. This Convention contemplates only criminal prosecution and extradition.

[6] International Convention for the Suppression of the Financing of Terrorism, Jan. 10, 2000, S. Treaty Doc. No. 106-49, 39 I.L.M. 270 [hereinafter Terrorism Financing Convention]. The Convention contemplates primarily criminal prosecution and extradition.

[7] Article 14 of the Convention against Torture provides:

1. Each State Party shall ensure in its legal system that the victim of an act of torture obtains redress and has an enforceable right to fair and adequate compensation, including the means for as full rehabilitation as possible. In the event of the death of the victim as a result of an act of torture, his dependants shall be entitled to compensation.
2. Nothing in this article shall affect any right of the victim or other persons to compensation which may exist under national law

[8] Article 5 of the Terrorism Financing Convention provides:

1. Each State Party, in accordance with its domestic legal principles, shall take the necessary measures to enable a legal entity located in its territory or organized under its laws to be held liable when a person responsible for the management or control of that legal entity has, in that capacity, committed an offence [within the meaning of the Convention]. Such liability may be criminal, civil or administrative.
…
3. Each party shall ensure, in particular, that legal entities liable in accordance with paragraph 1 above are subject to effective, proportionate and dissuasive criminal, civil or administrative sanctions. Such sanctions may include monetary sanctions.

Clearly, the imposition of civil liability is not a requirement of the Convention. By the Convention's terms, States may choose among criminal, civil and administrative sanctions.

5

13. A good example is the Warsaw Convention[9] which, while dealing with such particularized matters as ceilings on damages, exoneration for contributory negligence, and joint and several liability, is nevertheless silent on contribution or indemnification. Indeed, the drafters of the Convention went out of their way to leave that matter expressly to the otherwise applicable national law. "Nothing in this Convention shall prejudice the question whether a person liable for damage in accordance with its provisions has a right of recourse against any other person."[10] The successor Montreal Convention,[11] even while contemplating joint and several liability in very particular circumstances,[12] similarly leaves open the question of recourse against third parties.[13]

---

[9] Convention for the Unification of Certain Rules Relating to International Transportation by Air (Warsaw Convention), Oct. 12, 1929, 49 Stat. 3000, 137 L.N.T.S. 11. The U.S. is a party to this Convention.

[10] Id., art. 30A.

[11] Convention for the Unification of Certain Rules for International Carriage by Air (Montreal Convention), May 28, 1999, S. Treaty Doc. No. 106-45, 1999 WL 33292734 (entered into force Nov. 4, 2003). The U.S. is a party to this Convention.

[12] Article 36 provides that, with regard to loss of or injury to baggage or cargo in the course of successive transports, the passenger may take action against both the first and last carriers, as well as the carrier that performed the transport during which the loss occurred. (Likewise, the consignor and consignee may take action, respectively, not only against the first and last carrier, but also against the carrier that performed the transport during which the loss occurred.) In these circumstances, the relevant carriers are considered jointly and severally liable.

[13] Id. art. 37 ("Nothing in this Convention shall prejudice the question whether a person liable for damage in accordance with its provisions has a right of recourse against any other person.").

Only in the very narrow situation where actual transport was actually provided by a carrier other than the one that was a party to the transport contract does the Convention contemplate something along the lines of impleader. Id. art. 45. But, even here, the Convention takes care to ensure that while a second carrier may procedurally be joined in the proceedings, the "effects" (i.e. the liability consequences) are explicitly left to be governed by the law of the competent court, not by any provision of the treaty. Id.

Similarly, the Convention on Third Party Liability in the Field of Nuclear Energy, July 29, 1960, 956 U.N.T.S. 251, U.K.T.S. 69 (1968), to which the U.S. however is not a party, provides in Article 5 for joint and several liability in the event that more than one nuclear facility operator is liable pursuant to the Convention, but contribution and indemnification pass unmentioned. Article 6(f) gives the operator a right of recourse, but only in two specific circumstances, viz. (a) where the damage resulted from an act or omission done with intent to cause damage (in which case recourse may be had against the person so acting) or (b) where contract expressly so provides. Note, further, that Article 11 provides that "[t][he nature, form and extent of the compensation, within the limits of this Convention, as well as the equitable distribution thereof, shall be governed by national

14. Indeed, this is the prevailing pattern among treaties that address injury or losses arising out of international transactions. Conventions of this sort typically deal extensively with remedies (in some situations even contemplating joint and several liability). Even so, however, they not only omit any provision on the existence or non-existence of a right of contribution or indemnification, but again expressly leave that matter to national law. Such treaties include, for example, the Convention on the Carriage of Goods by Sea,[14] the Protocol on Transboundary Effects of Industrial Accidents on Transboundary Waters,[15] the Convention on Environmentally Dangerous Activities,[16] and the Environmental Protocol to the Antarctica Treaty.[17]

---

law." It is telling that even a treaty like this one, which exceptionally deals specifically with "third party liability," provides for the *"equitable distribution"* of liability to be governed by "national law" (emphasis added).

[14] United Nations Convention on the Carriage of Goods by Sea (Hamburg Rules), Mar. 31, 1978, 1695 U.N.T.S. 3, 17 I.L.M. 608. Like the Montreal Convention, this treaty contemplates special circumstances in which there may be joint and several liability (namely, where performance of transport services has been entrusted by the contracting carrier to another carrier that actually performs the service). Id. art. 10(4). But even here, the Convention has nothing to say about contribution or indemnification, except that the Convention is without prejudice to any right of recourse between the contracting and actual carrier that may otherwise exist. Id. art. 10(6). The U.S. has signed but not ratified this Convention.

[15] Protocol on Civil Liability and Compensation for the Damage Caused by Transboundary Effects of Industrial Accidents on Transboundary Waters, May 21, 2003, United Nations Economic Commission for Europe, http://www.unece.org/env/civil-liability/protocol.html. The U.S. is not a party.

If two or more operators are liable under the Protocol, the claimant may seek full compensation from any of them (unless an operator is able to prove that it was responsible for only a part of the damage). Id. art. 4(4). But again, a person who is liable under the Protocol has a right of recourse only insofar as such a right is provided for either by contractual arrangement among the parties or by the domestic procedural law of the competent court. Id. art. 7.

[16] Convention on Civil Liability for Damage Resulting from Activities Dangerous to the Environment, June 21, 1993, E.T.S. 150. The U.S. is not a party to this Convention.

Article 7 of the Convention again provides that "[n]othing in this Convention shall prejudice any right of recourse of the operator against any third party."

[17] Annex VI to the Protocol on Environmental Protection to the Antarctica Treaty, Oct. 4, 1991, 30 I.L.M. 1455. Article 6(4) provides for joint and several liability when an environmental emergency arises from the activities of two or more operators (though not where an operator is able to establish that it caused only a part of the emergency, in which case its liability extends only to that part). There is no mention whatsoever of the possibility of contribution or indemnification. The U.S. is party to the Antarctic Treaty and has enacted legislation implementing this protocol.

15. A good many other treaties governing damage arising out of international transactions, though replete with provisions on remedies, do not make any allusion at all to joint and several liability, not to mention contribution or indemnification among joint debtors.[18] Even a convention such as the Unidroit Convention on International Financial Leasing,[19] which specifically and designedly addresses a distinctively "triangular" relationship,[20] is completely silent on the joint and several liability question, not to mention on the question of contribution or indemnification.

16. My survey of international conventions to which the U.S. is a party reveals a single treaty – the Convention on International Liability for Damage Caused by Space Objects[21] – that, while contemplating civil liability, goes on to address the question of contribution or indemnity.[22] The rarity of any such provision in international treaties in force is striking. It

---

[18] *See, e.g.*, Convention Relating to a Uniform Law on the International Sale of Goods, July 1, 1964, with Annex, Uniform Law on the International Sale of Goods (1972), 834 U.N.T.S. 107, 12. Articles 82-89 deal extensively with damages, without reference either to joint and several liability or to contribution and indemnification. The U.S. signed but did not ratify this Convention, although it did ratify the later United Nations Convention on Contracts for the International Sale of Goods, Apr. 11, 1980, S. Treaty Doc. 98-9 (1983), 1489 U.N.T.S. 3.

Contribution or indemnification should not in any event be confused with subrogation. On rare occasion, a treaty may provide that when a person is held liable to an injured person fully on the basis of wrongdoing on the part of a third party, he or she has the right to full recovery from the third party of the moneys paid in compensation. *See, e.g.*, International Convention on Travel Contracts, Apr. 23, 1970, 1275 U.N.T.S. 531, art. 15(3) (U.S. has signed but not ratified). However, other conventions remit the question of the existence or non-existence of aright of subrogation to the otherwise applicable national law. *See, e.g.*, Convention on International Interests in Mobile Equipment, Nov. 16, 2001, UN Doc. No. A/AC.105/C.2/2002/CRP.3**,** art. 38 ("nothing in this Convention affects the acquisition of associated rights … by legal or contractual subrogation *under the applicable law*") (emphasis added). The U.S. is a party to the Convention on International Interests in Mobile Equipment.

[19] Convention on International Financial Leasing, May 28, 1988, 27 I.L.M 931. The U.S. has signed but not ratified this Convention.

[20] The preamble states that the signatory States were "conscious of the fact that the rules of law governing the traditional contract of hire need to be adapted to the distinctive triangular relationship created by the financial leasing transaction."

[21] Convention on International Liability for Damage Caused by Space Objects, *opened for signature* March 29, 1972, 24 U.S.T. 2389, 961 U.N.T.S. 187. The U.S. is a party to this Convention.

[22] According to Article IV of the Convention:

strongly suggests that the question whether, in the event of a treaty-based liability, any imposition of liability is subject to contribution or indemnification among joint debtors is a matter *not* addressed by international law. Rather, it is to be left to the internal law of the States that are party to the treaty in question.

17.  The scarcity of examples of treaties containing provisions of this sort is not surprising.  It is customary for international treaties to leave to the signatory States a great deal of discretion in determining (consistent of course with the underlying policies of the treaty) the precise modalities through which the treaty's purpose are to be implemented.  The Supreme Court emphatically took that view in its recent decision in *Sanchez-Llamas v. Oregon*,[23] where the Court refused to read the Vienna Convention on Consular Relations,[24] though admittedly a self-executing treaty, as requiring an exclusionary rule for evidence obtained in violation of the

---

1. In the event of damage being caused elsewhere than on the surface of the earth to a space object of one launching State or to persons or property on board such a space object by a space object of another launching State, and of damage thereby being caused to a third State or to its natural or juridical persons, the first two States shall be jointly and severally liable to the third State, to the extent indicated by the following:

    (a) If the damage has been caused to the third State on the surface of the earth or to aircraft in flight, their liability to the third State shall be absolute;

    (b) If the damage has been caused to a space object of the third State or to persons or property on board that space object elsewhere than on the surface of the earth, their liability to the third State shall be based on the fault of either of the first two States or on the fault of persons for whom either is responsible.

2. In all cases of joint and several liability referred to in paragraph 1 of this Article, the burden of compensation for the damage shall be apportioned between the first two States in accordance with the extent to which they were at fault; if the extent of the fault of each of these States cannot be established, the burden of compensation shall be apportioned equally between them.  Such apportionment shall be without prejudice to the right of the third State to seek the entire compensation due under this Convention from any or all of the launching States which are jointly and severally liable.

[23] 126 S.Ct. 2669, 165 L.Ed.2d 557, 2006 U.S. Lexis 5177 (2006).

[24] Vienna Convention on Consular Relations, Apr. 24, 1963, 21 UST 77, 596 U.N.T.S. 261.

Convention or as precluding application of the ordinary domestic law principle of waiver or foreclosure.

18. In sum, there is nothing whatsoever in U.S. treaty law to suggest that U.S. courts must or even should read into the Alien Tort Claim Statute a requirement of contribution or indemnification in the event that multiple parties are or may be liable under that statute.

**There is no Basis in Customary International Law for Imposing a Requirement of Contribution or Indemnification under the Alien Tort Claim Statute**

19. As pointed out in the opinion of the Court at an earlier stage of this dispute, international law binding on the U.S. has its sources not only in the law of treaties to which the U.S. is a party, but also in customary international law. It is therefore appropriate also to consider whether there is any basis for concluding that customary international law imposes an obligation on U.S. courts to enforce principles of contribution or indemnification in the case of a liability under the Alien Tort Claim Statute.

20. I would point out, preliminarily, that considerable uncertainty reigns over the question of the nature and quantity of evidence that is required to establish customary international law. Certainly, unlike in the case of treaty law, where a single relevant treaty provision may by itself operate as binding international law, the existence of customary international law on any particular matter presupposes a very substantial quantum of evidence drawn from myriad sources.[25]

---

[25] According to the Second Circuit in the case of *Flores v. Southern Peru Copper Corporation*, 414 F.3d 233 (2d Cir. 2003):

> The determination of what offenses violate customary international law … is no simple task. Customary international law is discerned from myriad decisions made in numerous and varied international and domestic arenas. Furthermore, the relevant evidence of customary international law is widely dispersed.

10

21.     According to Section 102 of the Restatement (Third) of Foreign Relations Law of the United States, "[c]ustomary international law results from a general and consistent practice of states followed by them from a sense of legal obligation." It is accordingly not enough for a principle to be general and widespread[26] in order for it to be considered a part of customary international law. Rather, the practice or principle must be followed out of a sense of legal obligation.[27] As comment *(c)* to Section 102 explains:

22.     For a practice of States to become a rule of customary international law, it must appear that the States follow the practice from a sense of legal obligation (*opinio juris sive*

---

Id. at 247. In *Flores*, Judge Cabranes, writing for the Court, set a high standard for proof of customary international law, particularly in the Alien Tort Claim Statute setting. Regarding treaties as sources of customary international law, Judge Cabranes writes:

> [A] treaty will only constitute *sufficient proof* of a norm of customary international law if an overwhelming majority of States have ratified the treaty, and those States uniformly *and* consistently act in accordance with its principles. The evidentiary weight to be afforded to a given treaty varies greatly depending on (i) how many, and which, States have ratified the treaty, and (ii) the degree to which those States actually implement and abide by the principles set forth in the treaty.

Id. at 256-57 (emphasis in original). He is equally severe as to multinational declarations of principle, decisions of multinational tribunals, and scholarly writing. Speaking of declarations in particular, he states: "In undertaking the difficult task of determining the contours of customary international law, a court is not granted a roving commission to pick and choose among declarations of public and private international organizations that have articulated a view on the matter at hand." Id. at 262.

[26]  Comment *(b)* to Section 102 remarks that, while a practice need not be universally followed in order to constitute customary international law, "[the f]ailure of a significant number of important states to adopt a practice can prevent a principle from becoming general customary law."

[27]  "[C]ustomary international law is composed only of those rules that States universally abide by, or accede to, *out of a sense of legal obligation* and mutual concern." *Flores v. Southern Peru Copper Corporation, supra* note 25, at 248 (emphasis added), citing *Chubb & Son, Inc. v. Asiana Airlines*, 214 F.3d 301, 307-08 (2d Cir. 2000). "[W]here the customs and practices of States demonstrate that they do not universally follow a particular practice out of a sense of legal obligation and mutual concern, that practice cannot give rise to a rule of customary international law." Id. at 252.

To the same effect, see generally Clive Parry, The Sources and Evidences of International Law (1965).

This definition of customary international law is borne out by rulings of the International Court of Justice. See the Court's ruling in *Rights of United States Nationals in Morocco*, ICJ Reports 1952, pp. 176, 200, according to which an element of customary international law must be "established in such a manner that it is binding on the other Party … in accordance with a constant and uniform usage practiced by the States in question."

11

*necessitatis*); a practice that is generally followed but which States feel legally free to disregard does not contribute to customary law. A practice initially followed by States as a matter of courtesy or habit may become law when states generally come to believe that they are under a legal obligation to comply with it.

23. It is simply not tenable to suppose that States feel a sense of obligation to provide for contribution or indemnification in the event of litigation, even litigation under a statute such as the Alien Tort Claims Statute. It is not even obvious that States have a sense of obligation under international law to provide a cause of action for damages to private parties for violations of international law in the first place, even though many States do provide such a cause of action. But it is certainly not the case that those States that do provide such a cause of action feel an international law obligation to afford a remedy that conforms to any particular international law remedial model, much less according to specific modalities such as contribution and indemnification. Absent a specific treaty obligation, States are free to fashion the private causes of action they choose, and to provide the accompanying remedial mechanisms they deem best. The U.S. Supreme Court's ruling in the case of *Sanchez-Llamas v. Oregon*[28] is particularly instructive in this regard.

24. In order for a requirement of contribution or indemnification to be deemed a part of customary international law, there would need to be credible evidence that when States make such a mechanism available in private claims under international law, they do so because they feel they are bound to do so. Sometimes, a sense of obligation is inferred from what States say or do through international organizations.[29] Yet there is no resolution, declaration or other

---

[28] *See supra* note 23.

[29] Reporters Note 2 to Restatement (Third) of Foreign Relations Law, Section 102.

statement of principle of the United Nations General Assembly, for example, that suggests that it is mandatory for States to provide mechanisms of contribution or indemnification for private claims under international law.[30] Even if there were, the Restatement informs us that we would have to ask further questions, such as whether the resolution purports to reflect legal principles, whether it commanded a large majority, whether numerous or important States dissented, whether the resolution is widely supported, and whether it is later confirmed by practice.[31]

25.  Similarly, international conferences, especially those engaged in codifying customary law, may provide occasions for an expression by States of a sense of obligation as to a particular matter.[32] I have found no evidence of this sort to suggest that States acknowledge an obligation to attach contribution or indemnification rights to claims before their courts, including claims arising out of international law violations.

26.  The Restatement further informs us that, in determining whether a rule has become part of international law, weight should be given, among other things, to (a) judgments and opinions of international judicial and arbitral tribunals, (b) judgments and opinions of national judicial tribunals, (c) the writings of scholars, and "(d) pronouncements by states that undertake to state a rule of international law."[33] Reference is also made to declaratory resolutions of international organizations.[34] Upon examining all of these categories of potential

---

[30] As noted below, *infra* note 34, the International Law Commission's report to the U.N. General assembly on state responsibility embraces a general notion of joint and several liability, but expressly refrains from embracing any notion of contribution or indemnification.

[31] Id.

[32] Id.

[33] Restatement (Third) of Foreign Relations Law, sec. 103.

[34] Id., comment *(c)*. Reporters Note 1 to Section 103 suggests that the views set forth by the International Law Commission of the United Nations are considered particularly authoritative. A look at the Report of the International Law Commission on the Responsibility of States for Internationally Wrongful Acts demonstrates

sources, I again find in none of them statements or indications to the effect that a principle of contribution or indemnification has become a part of customary international law.[35]

---

that the Commission has not endorsed a principle of contribution or indemnification as a principle of international law. G.A. Res. 56/83, Annex, U.N. Doc. A/Res/56/83/Annex (Jan. 28, 2002).

Addressing the question of States' own liability for their internationally wrongful acts, Article 47 of the Report embraces a principle of joint and several liability ("1. Where several States are responsible for the same internationally wrongful act, the responsibility of each State may be invoked in relation to that act.").

However, the Report goes on to specifically leave over the question of contribution or indemnity ("2. Paragraph 1 … [i]s without prejudice to any right of recourse against the other responsible States."). The Commentary to Article 47 specifically observes that "there may be cases where recourse by one responsible State against another *should not be allowed*." International Law Commission, *Commentaries to the Draft Articles on Responsibility of States for Internationally Wrongful Acts*, Report of the International Law Commission on the Work of its Fifty-third Session, U.N. GAOR, 56th Sess., Supp. No. 10, U.N. Doc. A/56/10 (2001) (emphasis added).

[35] Significantly, even if we were to look, as a subsidiary source of international law, to the notion of "general principles of law recognized by civilized nations" (as per Article 38 of the statute of the International Court of Justice), we would find no support whatsoever for the notion that private claims for internationally wrongful acts must be accompanied by contribution or indemnification rights.

According to a leading and comprehensive study of the matter, while there seems to have emerged a general principle of responsibility of States for international law violation, no general principles of law have emerged on questions of remedy, even as basic a remedial question as how damages are to be assessed:

> The question of judicial remedies has generally been regarded as peripheral to the main study of international law; attention has been centred on the substantive rules with little consideration of the consequences of their violation in general or judicial remedies in particular.

Christine D. Gray, Judicial Remedies in International Law (1987).

*See also* Christine Gray, Is There an International Law of Remedies?, 56 Brit. Y.B. Int'l L. 25, 26, 35, 41-47 (1986) (describing the international law of remedies as subject to "fundamental uncertainties" and "extreme disparities among States"). Professor Gray finds:

> [T]he jurisprudence of the World Court is some way from creating an international law of remedies. The Court treats each case in isolation, it does not refer back (or only briefly and partially) to previous arbitral practice or to its own decisions. There is little general discussion of basic rules and what there is … is controversial. … In theory it would be possible for the Court, and helpful to potential litigants, to clear up some of the uncertainty left by arbitral practice. But the decisions of the Court that did deal with these questions are unfortunately less than authoritative because they are brief, generally not fully reasoned, and made without reference to international arbitral practice.

Id. at 107. Among various remedial issues on which Professor Gray finds that no general principles, as a source of international law, can be discerned are the availability of provisional relief, a requirement of production of documents, and a requirement of exhaustion of remedies. Id. at 64, 70, 95-96, 98.

Among Professor Gray's other conclusions are that differences on remedies among decisions of various international claims commissions "highlight dramatically the uncertainties of international law on remedies." Id., at 194. Regarding specialized international tribunals, "any explanation of their decisions [on damages] as based on general principles cannot be more than an ex post facto rationalization, a convenient fiction to explain

27. There is an additional reason why a rule of contribution or indemnification cannot possibly constitute a rule of customary international law. As underscored by Judge Cabranes in the Alien Tort Claim Statute case of *Flores v. Southern Peru Copper Corporation*,[36] a rule must be based on "mutual" and not merely "several" concern to the States of the world in order to constitute customary international law. Practices are of "mutual" concern when they affect the relations between States and serve their common good,[37] whereas they are of merely "several" concern if they are ones in which States are "separately and independently interested."[38] Even if all the other indicia of customary international law were present, which they are not, it seems clear that when States adopt mechanisms like contribution and indemnification in the event of joint and several liabilities, they do so altogether "separately and independently."

28. The fact of the matter is that I have been unable to identify in customary international law any principle that has the remedial specificity of a right of contribution or indemnification. Within the remedial sphere, customary international law has of course been understood to embrace a very general principle to the effect that States are themselves responsible for the violations of international law obligations that they commit or the obvious principle that international tribunals are themselves bound by fundamental tenets of due process, such as the maxims of *nemo judex debet esse in propio sua causa* (no one shall be judge in his own cause) or *audi alteram partem* (the right to be heard).[39] But nothing on the order of a

---

the absence of any express choice of legal system rather than an accurate description of a conscious choice of general principles." Id. at 167.

[36] *Flores v. Southern Peru Copper Corporation*, supra note 25, at 249, citing *Filartiga v. Pena-Irala*, 630 F.2d 876, 888 (2d Cir. 1980).

[37] See *IIT v. Vencap Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975).

[38] *Flores*, supra note 25, at 249.

[39] See Clive Parry, The Sources and Evidences of International Law 84-85 (1965):

15

specific requirement of contribution or indemnification has made its way into customary international law.

29. In sum, customary international law is simply incapable of furnishing a basis for a requirement of a right of contribution or indemnification in connection with the Alien Tort Claim Statute.

## Conclusion

30. It can only be concluded, upon examining the principal sources of international law – namely, international treaty law and customary international law – that this body of law does not speak to the question of whether a right of contribution or indemnification may or must be read into the Alien Tort Claim Statute. There is certainly no basis in either treaty law or customary international law for any such requirement that the statute be so read. If such a reading of the Alien Tort Claim Statute is to be maintained, the requirement would need to find its basis, if at all, in domestic law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 29 August, 2007, in New York, New York.

*George Bermann*

George Bermann