UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

COURTNEY LINDE, et al.,

        Plaintiffs,

  - against -

ARAB BANK, PLC,

        Defendant,

----------------------------------------------------------------x

**OPINION AND ORDER**

04 CV 2799 (NG) (VVP)
and all related cases[1]

GERSHON, United States District Judge:

The issue presented here is what sanctions to impose for defendant's recalcitrance in meeting its discovery obligations. Defendant's objections to discovery on the basis of foreign bank secrecy were overruled in 2006. Since then, defendant has continued in its refusal to comply with its production obligations. In light of defendant's production failures, plaintiffs moved before Magistrate Judge Viktor V. Pohorelsky for sanctions pursuant to Rule 37(b)(2) of the Federal Rules of Civil Procedure. Judge Pohorelsky's Report & Recommendation ("R&R"), dated June 1, 2009, recommended a variety of sanctions, one of which was modified by Judge Pohorelsky by order dated June 18, 2009. Each side has filed objections to both the factual and the legal analysis performed by Judge Pohorelsky. Therefore, under Rule 72 of the Federal Rules of Civil Procedure, this court reviews *de novo* any portion the R&R to which there have been written objections. Fed. R. Civ. P. 72(b)(3); *see also, e.g., Lewis v. Zon*, 573 F. Supp. 2d 804, 811 (S.D.N.Y. 2008). I now grant plaintiffs' motion for sanctions to the extent indicated below.

---

[1] The following related cases have been consolidated with this case for the purposes of discovery and other pretrial proceedings: *Litle v. Arab Bank, PLC*, 04-CV-5449; *Almog v. Arab Bank, PLC*, 04-CV-5564; *Coulter v. Arab Bank, PLC*, 05-CV-365; *Afriat-Kurtzer v. Arab Bank, PLC*, 05-CV-388; *Bennett v. Arab Bank, PLC*, 05-CV-3183; *Roth v. Arab Bank, PLC*, 05-CV-0378; *Weiss v. Arab Bank, PLC*, 06-CV-1623; *Jesner v. Arab Bank, PLC*, 06-CV-3869; *Lev v. Arab Bank, PLC*, 08-CV-3251; and *Agurenko v. Arab Bank, PLC*, 10-CV-626.

# FACTUAL BACKGROUND

This court has detailed plaintiffs' claims in previous opinions, *see, e.g., Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005); *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257 (E.D.N.Y. 2007), but they warrant restating briefly here.  Thousands of plaintiffs, both United States nationals and foreign nationals, bring claims for damages against defendant Arab Bank, PLC ("the Bank" or defendant) for knowingly and purposefully aiding and abetting terrorists and terrorist organizations which sponsored suicide bombings and other murderous attacks on innocent civilians in Israel by providing banking and administrative services to various organizations identified by the United States government as terrorist organizations.  Each plaintiff alleges that he or she is a victim, or family member of a victim, of such attacks. Plaintiffs who are United States nationals seek recovery against Arab Bank pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. §§ 2332 *et seq.*, while foreign national plaintiffs, based upon similar factual allegations, allege violations of the law of nations and seek recovery against Arab Bank pursuant to the Alien Tort Claims Act ("ATS"), 28 U.S.C. § 1350.

Plaintiffs allege that Arab Bank knowingly and intentionally, both directly and indirectly, facilitated the attacks by the Islamic Resistance Movement ("HAMAS"), the Palestinian Islamic Jihad ("PIJ"), the Al Aqsa Martyrs' Brigade ("AAMB"), and the Popular Front for the Liberation of Palestine ("PFLP") by "soliciting, collecting, transmitting, disbursing and providing the financial resources that allowed those organizations to flourish and to engage in a campaign of terror, genocide, and crimes against humanity in an attempt to eradicate the Israeli presence from the Middle East landscape."  Plaintiffs allege that the Bank was part of a formalized system of financing that the above-referenced terrorist organizations—all designated by the United States government as Foreign Terrorist Organizations ("FTOs"), or Specially Designated Terrorist

Entities ("SDTs"), or Specially Designated Global Terrorist Entities ("SDGTs")—relied upon to plan, fund, and carry out the suicide bombings and other murderous attacks in support of their shared mission to "topple and eradicate the State of Israel, murder or throw out the Jews, and liberate the area by replacing it with an Islamic and/or Palestine state."

Specifically, plaintiffs allege that Arab Bank materially supported the efforts and goals of the terrorist organizations in two ways. First, the Bank provided banking services, including maintaining accounts, for HAMAS and other terrorist organizations. With respect to HAMAS, for example, plaintiffs allege that Arab Bank provided banking services to HAMAS directly by collecting funds into accounts maintained for the benefit of HAMAS in its Beirut, Lebanon, and Gaza Strip branches. Supporters knew to donate to HAMAS directly through Arab Bank because the HAMAS website directed supporters to make contributions to Arab Bank's Gaza Strip branch and because there were various advertisements publicized throughout the Middle East calling for donations to Arab Bank accounts. And Arab Bank knew that the donations were being collected to support terrorist attacks.

Plaintiffs also allege that Arab Bank maintained accounts and solicited and collected funds for various charitable organizations, or "zakats", which it knew were affiliated with the various terrorist organizations or were fronts for terrorist organizations. In addition, plaintiffs allege that Arab Bank maintained accounts for individual supporters of terrorist organizations, such as HAMAS. Arab Bank knew that the accounts of these various organizations and individuals were being used to fund the suicide bombings and other attacks sponsored by the terrorist organizations. Finally, Arab Bank laundered funds for the terrorist and front organizations, including the Holy Land Foundation for Relief and Development ("HLF"), which raised funds for HAMAS in the United States.

Plaintiffs additionally allege that Arab Bank administered the financial infrastructure by which the Saudi Committee for the Support of the Intifada Al Quds (the "Saudi Committee") distributed a comprehensive benefit of $5,316.06 to designated families of Palestinian "martyrs" and those wounded or imprisoned in perpetrating terrorist attacks.[2]  Despite its knowledge that the Saudi Committee was distributing this benefit to families of "martyrs," Arab Bank essentially served as a "paymaster" through its branch offices within the West Bank and the Gaza Strip. Plaintiffs allege that the Saudi Committee, as of November 2001, had paid millions of dollars to suicide bombers or their beneficiaries through Arab Bank.  Arab Bank also has transmitted millions of dollars to, among others, various individuals and institutions, whom plaintiffs allege to be terrorists or their fronts, on behalf of the Saudi Committee.

For purposes of determining the sanctions issue now before the court, it is important to recognize that plaintiffs must prove both that (1) Arab Bank actually engaged in the financial and administrative transactions alleged, and that (2) it did so knowingly and intentionally, *i.e.*, with the purpose of financing or incentivizing the terrorist acts alleged.  That is, plaintiffs must prove "that Arab Bank was not merely the indifferent provider of 'routine banking services' to terrorist organizations, but instead [knowingly and] purposefully aided their violations of international law."  *Lev v. Arab Bank*, No. 08-CV-3251, 2010 WL 623636, at *2 (E.D.N.Y. Jan. 29, 2010) (referencing ATA claims); *see also Almog v. Arab Bank*, 471 F. Supp. 2d 257, 268 (E.D.N.Y. 2007) (finding that plaintiffs had alleged sufficiently for Rule 12(b)(6) purposes, "Arab Bank's knowing and intentional participation in [the terrorist scheme's] illegal goals."); *id.* at 290.

---

[2] Plaintiffs allege that the term "martyr" describes "those who are killed or injured while carrying out suicide attacks in support of the second intifada." *Linde*, 384 F. Supp. 2d at 576 n.3. Although defendant asserts that the Saudi Committee uses the word "martyr" to refer to anyone killed in any manner as a result of the conflict between Israel and the Palestinian territories, *see* Def.'s Mem. of Law in Opp'n to Pls.' Rule 37(b)(2)(A) Motion at 18, 18 n.8 ("Defendant's Rule 37 Opposition"), the allegations of the complaints are taken as true at this stage of the proceedings.

## PROCEDURAL HISTORY

Discovery in these cases began five years ago, in mid-2005. From the beginning of discovery, defendant refused to produce certain documents, to respond to Requests for Admission ("RFAs"), to reveal bank account information, or to answer deposition questions on the ground that various foreign bank secrecy laws prevented such disclosure.[3] Upon learning that defendant had previously produced some such documentation to the Department of Justice ("DOJ") in connection with the DOJ's criminal prosecution in the Northern District of Texas of the Holy Land Foundation, and to the Office of the Comptroller of the Currency ("OCC") and the Financial Crimes Enforcement Network ("FinCEN"), plaintiffs moved before Judge Pohorelsky for an order compelling defendant to produce the previously-disclosed documentation in this case. Judge Pohorelsky denied the request, stating that he was "confident that any relevant documents that may be found within the production the plaintiffs seek are covered by their other requests and are therefore subject to production anyway." Decision and Order (March 24, 2006) at 4.[4] On December 13, 2006, I granted plaintiffs' Rule 72(a) appeal of Judge Pohorelsky's decision and ordered defendant to produce to plaintiffs the records it had produced to the OCC and FinCEN, stating that it was "simply not acceptable" for the Bank to "withhold the documents showing the funds transfers through New York which plaintiffs seek to

---

[3] The Bank asserted the Bank Secrecy laws of Jordan, Lebanon, and the Palestinian Monetary Authority—the U.S.-recognized entity that has jurisdiction over the financial system in the West Bank and Gaza. Violations of these laws may carry criminal penalties. *Linde*, 463 F. Supp. 2d 310, 313, 313 n.3 (E.D.N.Y. 2006) (describing the foreign bank secrecy statutes at issue). However, Jordan and Lebanon have both "adopted a policy not to rely on bank secrecy laws as a basis for protecting information relating to money laundering or terrorist financing." *Id.* at 315-16.

[4] This Order may be found at entry number 166 in docket number 04-CV-2799.

make their case." Order (Dec. 13, 2006) at 6.[5]  Defendant thereafter produced to plaintiffs the documents previously provided to the OCC and FinCEN.

Plaintiffs obtained the documents defendant had produced to the U.S. government in connection with the Holy Land Foundation prosecution from other sources.

Plaintiffs also moved to overrule defendant's foreign bank secrecy objections and asked Judge Pohorelsky to impose sanctions for defendant's refusal to produce.  On November 25, 2006, after consideration of the five factors set out in Section 442 of the Restatement (Third) of Foreign Relations Law ("the Restatement"), Judge Pohorelsky held that defendant's foreign bank secrecy concerns must yield to United States interests in combating terrorism, as expressed in the Anti-Terrorism Act, 18 U.S.C. §§ 2331 *et seq.* ("ATA").  *Linde v. Arab Bank*, 463 F. Supp. 2d 310, 315 (E.D.N.Y. 2006) ("November 25 Order").  Section 442 of the Restatement specifies five factors courts are to consider in "deciding whether to issue an order directing production of information located abroad, and in framing such an order."  Restatement § 442(1)(c).  The factors are: (1) "the importance to the investigation or litigation of the documents or other information requested;" (2) "the degree of specificity of the request;" (3) "whether the information originated in the United States;" (4) "the availability of alternative means of securing information;" and (5) "the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located."  Restatement § 442(1)(c). Judge Pohorelsky found that (1) "the discovery sought here is essential to the proof of plaintiffs' case"; (2) plaintiffs' RFAs and other discovery requests were "highly specific"; (3) "[r]easonable alternative means for obtaining the discovery sought ... is not available"; and (4) "important interests of the United States would be undermined by non-compliance with the

---

[5] This Order may be found at entry number 272 in docket number 04-CV-2799.

discovery orders issued by the court." *Linde*, 463 F. Supp. 2d at 315. Judge Pohorelsky noted that the only Restatement factor weighing in defendant's favor was that the vast majority of the discovery sought concerned information originating outside the United States. *Id.*

Rather than requiring defendant to immediately produce the previously-withheld documents, Judge Pohorelsky permitted the Bank to "make a good faith effort to secure permission from the foreign authorities to make the information available." *Id.* at 316 (quoting the Restatement (Third) of For. Rel. L. § 442(2)(a)). On March 14, 2007, I affirmed the November 25 Order and urged Judge Pohorelsky to set a prompt deadline by which the Bank would determine whether it could secure permission to turn over the documents. The parties conferred and agreed to a production order, which Judge Pohorelsky entered on May 7, 2007 ("May 7 Order").

In June 2007, defendant prepared and Judge Pohorelsky issued Letters of Request to Palestinian and Jordanian banking authorities. These letters sought waiver of foreign bank secrecy laws and permission to disclose documents responsive to plaintiffs' requests. *See* Joint Appendix ("JA") II, Howard Decl. Ex. K. By letters dated September 2007, these requests were denied. JA II, Howard Decl. Exs. L-O. Thereafter, the Bank's counsel informed plaintiffs' counsel that, given the Palestinian and Jordanian responses to the Letters of Request, the Bank would not be making further disclosures because it could not do so "without violating foreign bank secrecy laws, which the Bank is not prepared to do." JA I, Ungar Decl. Ex. 8.

As a result of defendant's continued refusals to produce materials called for by the production orders on the basis of foreign bank secrecy,[6] plaintiffs filed their motion under Rule

---

[6] Indeed, defendant continues to object to production requests based on assertions of foreign bank secrecy. *See, e.g.*, Pls.' April 21, 2010 letter (explaining that defendant refused to produce documents responsive to Request No. 12 of plaintiffs' Fourth Request for the Production of Documents, dated January 8, 2010, "to the extent it seeks production of documents that are

37(b)(2)(A) of the Federal Rules of Civil Procedure, seeking a range of sanctions against defendant for its failure to comply with the court's November 25 and May 7 orders. *See* JA I-III.

On June 1, 2009, Judge Pohorelsky issued his R&R, recommending that the court impose the following sanctions on defendant: (1) a direction that it be deemed established that between 2000 and 20004, defendant provided financial services on behalf of the Saudi Committee to "numerous terrorists, or to the relatives or representatives of terrorists" either unaffiliated or affiliated with various named terrorist organizations; (2) a jury instruction permitting, but not requiring, the jury to infer that defendant provided financial services between 1994 and 2004, "either directly or indirectly, to foreign terrorist organizations … and to individuals affiliated with foreign terrorist organizations"; (3) a direction deeming admitted certain requests for admissions as to the admissibility of documents which defendant had refused to answer on foreign bank secrecy grounds, and permitting to be entered into evidence at trial any documents referred to in those requests for which plaintiffs sought authentication as business records; and (4) an order precluding defendant from offering into evidence at trial "any documents or other information withheld from discovery on bank secrecy law grounds." R&R at 22. Judge Pohorelsky's R&R did not include any sanction relating to defendant's knowledge or intent.

Defendant moved before Judge Pohorelsky for reconsideration of the R&R, arguing, *inter alia*, against a deemed finding regarding the bank's provision of financial services to terrorists on behalf of the Saudi Committee. On June 18, 2009, Judge Pohorelsky modified his R&R to recommend that, in place of the originally-recommended deemed finding, the court advise the trial jury that it can, but is not required to, infer that withheld documents would prove that

---

subject to bank secrecy laws of foreign jurisdictions in which Arab Bank operates."). The court considers that the November 25, 2006 Order, affirmed on March 14, 2007, overruled *all* of the Bank's foreign bank secrecy objections. Defendant therefore is under a continuing obligation to produce documents that are responsive to plaintiffs' requests and cannot rely on foreign bank secrecy objections.

defendant had provided financial services between 2000 and 2004, on behalf of the Saudi Committee, to terrorists, including those affiliated with HAMAS or several other named organizations, or their relatives or representatives. He also deleted the reference to "numerous" terrorists.

Both parties filed Rule 72(b) objections to Judge Pohorelsky's modified R&R. Plaintiffs ask this court to grant sanctions that: (1) deem found that, between 2000 and 2004, defendant "processed and distributed payments on behalf of the Saudi Committee to numerous terrorists," including those affiliated with named terrorist organizations and those who are unaffiliated, or their relatives or representatives; (2) deem found that, between 1994 and 2004, defendant directly or indirectly provided financial services to organizations designated by the United States as FTOs; (3) instruct the jury that it may infer that the withheld documents and testimony would have demonstrated that the Bank knowingly and intentionally provided the financial services referenced in (1) and (2); (4) prohibit defendant from offering into evidence any discovery withheld on foreign bank secrecy grounds and from "offering any evidence, including expert or fact witness testimony, regarding its then-current state of mind, or any other issue for which [d]efendant's production failures" affect plaintiffs' ability to cross-examine witnesses; and (5) award plaintiffs reasonable attorneys' fees and costs incurred as a result of defendant's noncompliance with discovery orders issued by this court and by Judge Pohorelsky. Pls.' Mem. of Law in Support of Their Objections to the Report and Recommendation at 2-3 ("Plaintiffs' Objections").

Defendant, in its "limited" objections, does not object to a sanction directing that plaintiffs' first RFAs are deemed admitted and that any documents referred to in those requests are deemed authenticated. Nor does defendant object to a sanction permitting a jury to infer that

the Bank provided financial services indirectly (though not directly) to terrorist organizations. Def.'s Mem. of Law in Support of Its Objections to the Report and Recommendation at 22 ("Defendant's Objections").   However, defendant argues that, even a permissive adverse inference regarding defendant's provision of financial services on behalf of the Saudi Committee would be improper, since, defendant argues, there is no evidence that Bank records would show Saudi Committee beneficiaries to be terrorists.  Defendant also argues that any instruction that would allow a jury to infer that the bank provided *direct* support to terrorists would be over-inclusive, as there was "no production by Arab Bank of any such direct accounts or transactions." *Id.* at 29.  Finally, defendant argues that, because none of the produced documents substantiate plaintiffs' allegations on the issue of defendant's intent, an inference on the Bank's knowledge and intent would be improper.

## ANALYSIS

### A. Legal Framework

Rule 37 of the Federal Rules of Civil Procedure permits the court to impose sanctions for a party's failure to obey a discovery order. Fed. R. Civ. P. 37(b).  Rule 37(b) affords the court "broad discretion in fashioning an appropriate sanction." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 101 (2d Cir. 2002).  Such sanctions may include—but are not limited to—orders deeming certain facts established; permitting an adverse inference instruction; striking pleadings; prohibiting the "disobedient" party from making specific claims or introducing certain matters into evidence; dismissing a claim or the entire action or granting default judgment against the disobedient party; or entering an order of contempt. *Id.*; Fed. R. Civ. P. 37(b).  Rule 37 does not identify the factors courts should weigh in considering whether

to sanction a party for noncompliance with the court's discovery orders, but the Rule instructs that the sanctions must be "just", Fed. R. Civ. P. 37(b)(2)(A), meaning that "the severity of the sanction must be commensurate with the non-compliance." *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007).   Ultimately, discovery sanctions should, "insofar as possible, ... restor[e] the prejudiced party to the same position [it] would have been in absent the wrongful [withholding] of evidence by the opposing party." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).

Whether a sanction strikes this balance requires consideration of two factors:  the intent of the disobedient party, and the probable content of the non-produced evidence. *Id.*  As the Second Circuit recognized in *Kronisch*, this "task is unavoidably imperfect, inasmuch as, in the absence of the [withheld] evidence, [a court] can only venture guesses with varying degrees of confidence as to what the missing evidence may have revealed." *Id.* at 127.   Nevertheless, a "prejudiced party" will be permitted sanctions—particularly, as discussed in *Kronisch*, the sanction of an inference in its favor—"so long as [it] has produced *some* evidence *suggesting* that a document or documents relevant to substantiating [its] claim would have been included among the [withheld or destroyed] files." *Id.* at 128 (emphasis added); *see also* 2 Wigmore, Evidence in Trials at Common Law § 291, at 228.  While "[j]ust how much evidence is enough to support an inference about the content" of non-produced evidence "will necessarily vary from case to case," courts should "remain mindful of Wigmore's admonition that 'care should be taken' not to require too specific a level of proof" lest withholding parties profit from their disobedience and "innocent parties meant to benefit from the adverse inference ... receive no benefit at all, having been deprived of evidence that may be crucial to their case." *Kronisch*, 150

F.3d at 128. Whatever level of proof a court requires, it "must be less than the amount that would suffice to survive summary judgment" on the issue for which the inference is sought. *Id.*[7]

As discussed *supra*, where the disobedient party has invoked foreign bank secrecy laws as a justification for its noncompliance, courts look to the factors contained in Section 442 of the Restatement for guidance in determining whether to compel production of documents located in foreign jurisdictions. Courts again consider these factors when deciding what sanctions to impose if parties fail to comply. *See, e.g., Société Aérospatiale v. U.S. Dist. Ct.*, 482 U.S. 522, 541-46 (1987); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 529-30 (S.D.N.Y. 1987).

Like Rule 37, the Restatement provides for the imposition of sanctions for "[f]ailure to comply with an order to produce." While the Restatement does not identify the method by which courts should determine whether and what sanctions are proper, the United States Court of Appeals for the Second Circuit and district courts in the circuit "employ[] the same analysis to decide whether to compel discovery and whether to impose sanctions for noncompliance." *In re Grand Jury Subpoena dated August 9, 2000*, 218 F. Supp. 2d 544, 554 (S.D.N.Y. 2002); *see also Minpeco*, 116 F.R.D. at 521. Thus, courts in this circuit weigh the five factors listed above both when setting sanctions and when deciding whether to issue production orders for information located in foreign states. Courts also consider the hardship imposed on the party ordered to produce at the compulsion stage, *Minpeco*, 116 F.R.D. at 522-23, but are not required to consider it anew in reviewing a request for sanctions based on noncompliance. *Weiss v. Nat'l Westminster Bank, PLC*, 242 F.R.D. 33, 55 (E.D.N.Y. 2007).

---

[7] In its briefing, the Bank argues that *Kronisch* requires more than this. Its interpretation of *Kronisch* ignores the Second Circuit's explicit warnings that the standard for adverse inferences should not be construed to place stringent requirements on parties seeking sanctions for non-production or destruction of evidence.

In addition, while courts in the Second Circuit consider at the sanctions stage whether the party resisting discovery has acted in good faith, *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 438-39 (E.D.N.Y. 2008), a court may impose sanctions—including findings of fact adverse to the noncompliant party—even if it does not find bad faith or willful conduct.[8]   Restatement § 442(2)(c).   The harshest sanctions, including dismissal, contempt, or default, are reserved for cases in which the court makes a determination that the non-producing party has acted willfully or in bad faith.   Restatement § 442(2)(b).   But sanctions are available even absent such a finding, since failure to comply with court-ordered discovery "occur[s] along a continuum of fault— ranging from innocence through the degrees of negligence to intentionality."   *Residential Funding Corp.*, 306 F.3d at 101, 108 (internal quotation marks and citation omitted).   In instances where no bad faith is found, the party seeking sanctions must demonstrate that the evidence sought is of "specific relevance," *i.e.*, that it "would have been of the nature alleged by the party affected by its [unavailability]."   *Kronisch*, 150 F.3d at 127; *Residential Funding Corp.*, 306 F.3d at 108-09.

**B.   Sanctions**

Defendant continues to assert that foreign bank secrecy laws require it to refrain from producing a range of documents plaintiffs seek to prove their case.   This court has already rejected defendant's rationale for withholding the documents.   Thus, as Judge Pohorelsky recognized, "some sanction must be imposed if for no other reason than to restore the evidentiary balance that has been disturbed by the non-production of important evidence."   R&R at 2-3 (internal quotation and citation omitted).   As described above, this court has broad discretion in

---

[8] Although the court in *Minpeco* relied on an older version of the Restatement—Section 40 of the Restatement (Second) of Foreign Relations Law, which has since been replaced by Section 442 of the Restatement (Third)—courts continue to consider the resisting party's good faith when contemplating appropriate discovery sanctions.   *See Strauss*, 249 F.R.D. at 439; *Nat'l Westminster Bank*, 242 F.R.D. at 56.

crafting the sanctions.   In this case, where defendant has intentionally failed to meet its production obligations, where plaintiffs have made specific requests and shown that the withheld evidence is not only relevant but also essential to proof of their claims, where plaintiffs have no alternative means of securing the information they seek from defendant, and where defendant has articulated no reason for its recalcitrance other than the bank secrecy grounds already rejected, significant sanctions are both "just" and "commensurate" with defendant's non-compliance. *See Scherbakovskiy*, 490 F.3d at 140.   Defendant's "weighty excuse" of fear of criminal prosecution, *see Societe Internationale*, 357 U.S. at 211, is not, alone, sufficient justification for defendant's production failures.   On the contrary, there is nothing in the record indicating that defendant faces a real risk of prosecution; nor does the record show that defendant or its employees have been prosecuted for the Bank's *voluntary* productions in other cases.

### 1.  Production to Date

In its papers, defendant argues that its production has been "extensive" and has included "full production of records and deposition testimony on matters not covered by foreign bank secrecy, as well as a production of extensive additional records and testimony after obtaining governmental authorization or private party consent, or based on other exceptions to bank secrecy." Defendant's Objections at 6.   The Bank also stresses that it "pursued foreign judicial remedies and official requests for further governmental authorizations." *Id.*

With regard to defendant's alleged provision of financial services to various terrorists and terrorist organizations, defendant asserts that it has made complete production, including, after successful application to the Lebanese Special Investigation Committee to waive bank secrecy, "all account records and transactional documents relating to an account formerly maintained at Arab Bank's Al-Mazra branch in Beirut, Lebanon (the "Beirut Account") that plaintiffs have

alleged was opened and maintained directly for the benefit of the terrorist organization Hamas." *Id.* at 12-13. This production includes transactional records, Know Your Customer documentation, and internal bank communication related to this account. The documents—which defendant previously produced to the Office of the Comptroller of the Currency ("OCC") without seeking the consent of the Lebanese government but refused to produce to plaintiffs here without such permission—show that in 1998, Osama Hamdan,[9] an [alleged] HAMAS leader and an SDGT since his designation in 2003, opened a bank account at defendant's El-Mazra branch in Beirut, that he maintained the account until it was closed in 2004, and that transfers were made to and from his account in the intervening years.[10] *See* JA II, Howard Decl. Ex. A-7.

The Beirut Account is only one of eleven accounts that defendant admits it maintained for FTOs, SDGTs, or SDTs. Defendant has refused to provide any documents for the other ten accounts.

Defendant also produced to plaintiffs the same incomplete account information for seven charitable organizations alleged to be terrorist fronts that it had previously produced pursuant to an order of the U.S. District Court for the Northern District of Texas in connection with the Department of Justice's prosecution of the Holy Land Foundation. In addition, the Bank asserts that it made "voluminous production" of documents "not subject to foreign bank secrecy laws," including documents from Arab Bank New York ("ABNY") of over 600 transaction records, including 73 records reflecting Saudi Committee transactions. Def.'s Obj. at 14-15.

With regard to the Saudi Committee, defendant states that it voluntarily obtained the Saudi Committee's consent to produce "more than 180,000 records relating to the payments it processed" for the Saudi Committee, including, for each record, "the name of every individual or

---

[9] Hamdan is also known as Usama Hamdan or Usama Hamdan Abd el-Latif Hamdan. *See* JAI, Ungar Decl. Ex. 33.

[10] The United States designated HAMAS a Foreign Terrorist Organization in 1997.

entity that received money from the Saudi Committee through Arab Bank, and the amount of money received by such recipient." *Id.* at 8, 10.  Defendant provided lists of Saudi Committee beneficiaries, some of which include the martyr's name, place, date, cause of death, and desired beneficiary, as well as one 1,485-page spreadsheet prepared by the Bank that lists all payments by the Bank at the request of the Saudi Committee.  Defendant also states that it produced "all correspondence between Arab Bank and Arab National Bank relating to the Saudi Committee payments," as well as a witness for a Rule 30(b)(6) deposition regarding the services defendant provided to the Saudi Committee.  *Id.* at 8-9.  Defendant acknowledges that it did not produce account and other transaction records for the recipients of payments from the Saudi Committee, because, defendant claims, the Saudi Committee could not provide consent for the production of these documents.

Defendant's characterization overstates both the breadth of its production and the efforts it has made to meet its production obligations.  Defendant gets little credit for its grudging production of the ABNY documents, which were produced only after this court rejected the Bank's attempt to obfuscate the production obligations of its local branch, or for its production of records for HAMAS-affiliated charities, which were already physically located in the United States, and regarding which the Bank's witnesses have refused to answer substantive deposition questions.  While defendant has produced hundreds of thousands of pages of records relating to its provision of services to the Saudi Committee, it has neither produced a privilege log-like accounting of its withholding nor indicated how many pages of documents responsive to plaintiffs' requests have been withheld.  The production lacks account statements; unredacted Know Your Customer material that the Bank is required to collect under international and local anti-terrorism laws; reports created by terrorism detection software that the Bank says it uses and

that it acknowledges is required to use to comply with anti-terrorism laws; internal correspondence regarding Bank work for the Saudi Committee; unredacted minutes of Bank meetings at which the Saudi Committee was discussed; or any other documents that "might confirm an accountholder or payment beneficiary's identity or circumstantially evidence the Bank's knowledge of identity." Pls.' Objections at 4. Defendant argues in its opposition to plaintiffs' objections that its production has been more fulsome than plaintiffs claim, but cites only irrelevant deposition testimony to support its claim. Moreover, defendant's deposition witnesses consistently have refused to answer questions seeking information for accounts held by the Bank, asserting the same foreign bank secrecy objection that this court has already overruled, even when confronted with documents the Bank itself has already produced. *See, e.g.*, Osen Decl. Ex. B (Deposition of Tayseer Sadeq at 192:13-21; 71:11-16).

The court has carefully reviewed plaintiffs' representations of the record and finds them to accurately reflect the state of production. The record establishes that defendant has withheld materials falling into the following categories: (1) account records for ten of eleven accounts defendant admits it maintained for FTOs, Specially Designated Global Terrorists ("SDGTs"), or Specially Designated Terrorists; (2) account records for over 90 percent of the other entities listed in the parties' agreed May 7, 2007 production order, to which defendant stipulated, for whom defendant was obligated to produce relevant records; (3) internal Bank communications relating to the Saudi Committee; and (4) all Saudi Committee documents, including Know Your Customer documentation for thousands of Saudi Committee beneficiaries.

As shown in detail below, plaintiffs have provided ample evidence from which the court can infer that the withheld evidence would be of the character asserted and would substantiate plaintiffs' claims. Plaintiffs' showing is a sufficient basis for sanctions. Plaintiffs are not

required to do the impossible, *i.e.*, provide direct evidence of the contents of the non-produced documents.

## 2. Good Faith

Because, as described below, the court is not imposing the most severe sanctions available, no finding of bad faith is necessary here.[11]   Nevertheless, the court notes that defendant's argument that it has acted in the utmost good faith and that it has "sought every possible means for lawful disclosure" is not supported by the record.   Def.'s Mem. of Law in Opp'n to Pls.' Objections at 6 ("Defendant's Rule 72 Opposition").   Defendant's letters requesting permission from foreign banking authorities to disclose information protected by bank secrecy laws are not reflective of an "extensive effort" to obtain waivers.   *See, e.g.*, Ungar Decl. Ex. 40 (letter dated September 25, 2006, from Arab Bank, PLC – Lebanon, to the Lebanese Special Investigation Commission ("LSIC")).   Instead, the letters were calculated to fail.   Despite the fact that this court had already denied defendant's motion to dismiss at least one of plaintiffs' complaints, defendant represented to LSIC that plaintiffs' allegations have "no basis in reality or in the law." *Id.* at 1.   Defendant's letter further stated that the court had "provided for respecting confidentiality laws in the countries of these accounts," even though Judge Pohorelsky was at that time considering the merits of the Bank's foreign bank secrecy objections—which he ultimately overruled.   Defendant was permitted to deny plaintiffs' allegations, but it was not permitted to mischaracterize the status of the lawsuit.   Its false or exaggerated assertions hardly

---

[11] In its papers, defendant repeatedly refers to adverse inferences and deemed findings as "severe" sanctions, but the case law is clear that these sanctions are not properly considered "severe".   In this context, the term "severe" refers to sanctions of dismissal and contempt, not to the more limited sanctions imposed here. *See, e.g.*, *Scherbakovskiy*, 490 F.3d at 140.

support a finding of good faith. *See Remington Prods., Inc. v. North Am. Phillips Corp.*, 107 F.R.D. 642, 653 (D. Conn. 1985).[12]

In addition, defendant claims credit for its production of Arab Bank New York documents. Defendant forgets that it produced documents touching its New York branch only after I ordered it to do so, noting that defendant's actions thus far had not inspired "confidence that reliance on other [production] requests [would] be effective," given that the Bank had "failed to produce New York documentation … admittedly called for by plaintiffs' requests." Dec. 13, 2006 Order. The Bank had refused to produce despite its earlier production of many of the very same documents to the OCC, FinCen, and the DOJ. These prior disclosures were made to governmental authorities, whose requests are thought to embody a "strong" national interest, especially in the context of criminal prosecutions. *See In re Grand Jury Subpoena*, 218 F. Supp. 2d at 562. But the fact that this is a lawsuit between private parties cannot excuse defendant's refusal to match its prior production here. As far as this court knows, the Bank has not faced any repercussions as a result of its prior disclosures. *See Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 30 (S.D.N.Y. 1984). Yet it emphasizes its fear of such reprisals as a reason for its noncompliance here. Moreover, defendant stresses throughout its papers that it has produced hundreds of thousands of pages of documents. But defendant's assertion is devoid of context—defendant nowhere indicates how many pages it has withheld—and, as plaintiffs argue, many of the documents defendant did produce were either publicly available, had previously been produced in connection with other investigations, or are incomplete. "[I]t is the content not the quantity of the discovered material

---

[12] Judge Pohorelsky viewed defendant's letter more generously, *see* R&R at 8-9, but I respectfully disagree.

that may indicate the existence or absence of good faith." *Compagnie Francaise*, 105 F.R.D. at 31.

Finally, the years of delay caused by defendant's refusals to produce weigh against a finding of good faith. *Weiss v. Nat'l Westminster Bank*, 242 F.R.D. at 56. It is now apparent that the delay was for no purpose at all; defendant never intended to produce certain documents, regardless of this court's rulings on the Bank's foreign bank secrecy objections. Defendant's objections were overruled in 2006, but it continues to assert these same rejected objections as grounds for its withholding.

What is more, in making its limited production, defendant "has decided when it will be cooperative, and when it will not be cooperative," which it has no right to do. *Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1065 (2d Cir. 1979). Its selective compliance with foreign bank secrecy laws, as described above, highlights the limits of its supposed good faith and casts doubt on its claims of hardship.

In sum, I cannot accept that the Bank has undertaken its discovery obligations with the utmost good faith. Instead, defendant's conduct places it at a location approaching willfulness on the "continuum of fault". *Residential Funding Corp.*, 306 F.2d at 108. Even absent bad faith, adverse inference sanctions are appropriate here. *Id.* "The inference is *adverse* to the [nonproducing party] not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its [nonproduction]." *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 75 (S.D.N.Y. 1991).

### 3. Acts

#### a.  Various Terrorists and Terrorist Organizations

Plaintiffs have presented evidence that between 1994 and 2004, defendant provided financial services to several Foreign Terrorist Organizations, including the Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine, and HAMAS.  This evidence includes the Beirut Account records discussed *supra*, as well as documentation of transfers by other HAMAS leaders, such as a 2002 transfer by Mousa Mohammed Abu Marzook, a designated SDGT since 1995, and Salah Mostafa Mohamed Shehadad, a founder of HAMAS and, plaintiffs allege, the "supreme leader" of the Izz al-Din al-Qassam Brigades—HAMAS's military wing. *See* Pls.' Rule 72 Opp'n at 20; JA I, Pls.' Rule 37 Br. at 39; JA I, Ungar Decl. Exs. 35, 36. Defendant also processed a payment to Ismail Haniyah, the "prime minister" of HAMAS in Gaza.  *See* Pls.' Rule 72 Opp'n, Schlanger Decl. Ex. F. (Deposition of Tayseer Sadeq at 191:7-193:4); JA I, Ungar Decl. Ex. 37.

Furthermore, plaintiffs have provided proof that defendant processed transfers from or to "zakat" committees and other charitable organizations that plaintiffs allege are fronts for HAMAS.  For example, plaintiffs have offered records of at least one 2004 wire transfer to the Al-Salah Society, a charitable organization affiliated with HAMAS that the United States designated as an SDGT in August 2007, and whose funds the Palestinian Monetary Authority froze in August 2003.  *See* Pls.' Obj., Schlanger Decl. Exs. G, H.  In another instance, Hamid Sulaiman Khdeir, a.k.a. Hamid Sulaiman Jabar Khudeir al-Bitwai, who plaintiffs allege to be among HAMAS's senior leaders, was a signatory for the Nablus Zakat Committee's Arab Bank account.  *See* JA III, Pls.' Rule 37 Reply Br., Schlanger Decl. Ex. D.  Another zakat, the Ramallah Zakat Committee, an Arab Bank accountholder, received a transfer from Interpal in

2004—the year after Interpal was designated as an SDGT. *See* Pls.' Rule 72 Opp'n, Osen Decl. Ex. B. The transfer was not stopped by the Bank's programs for detecting transactions linked to terrorism, and it appears to have been approved by an Arab Bank employee. *Id.*

These documents are sufficient to show that the withheld evidence would likely substantiate plaintiffs' claims. For example, defendant admits that it maintained accounts for eleven people or organizations that had already been designated as Terrorists. Pls.' Rule 72 Opp'n, Osen Decl. Ex. A at 1 (Def.'s Resp. to Pls.' First Amended Interrogatory) ("Bank's Interrogatory Response").[13] But defendant has produced only the account information for one of these eleven—the Beirut Account discussed at length above. This production, which represents the only set of complete account records provided to plaintiffs, included, among other things, Know Your Customer information, picture identification, and wire transfer records. Plaintiffs reasonably expect that the Bank has similar information for the other ten accounts it has admitted belonged to terrorists, and plaintiffs were entitled to receive that information. In its absence, plaintiffs are entitled to an inference that the withheld documents would support their claim. In addition, defendant, in RFAs, interrogatories, and depositions, refused to confirm that certain people—including alleged and designated terrorists—were its customers. The withheld documents would confirm or disprove the identities of defendant's customers whom plaintiffs allege to be terrorists, including Haniyah, Marzook, and al-Bitawiand—particularly important clarification in light of defendant's refusal to confirm its customers' identities at depositions and its already-expressed mistaken identity defense.

---

[13] Defendant states that it no longer maintains accounts for any presently or formerly designated Terrorists. *See* Pls.' Opp'n to Def.'s Obj., Osen Decl. Ex. A at 2. However, the record contains no information regarding what it did with the funds contained in those accounts when they were closed, and no documentation of the account closings.

### b. Saudi Committee

Plaintiffs have offered evidence to support their claim that between 2000 and 2004, the Bank facilitated the Saudi Committee's "martyr" payment program. Included in plaintiffs' exhibits is a Saudi Committee spreadsheet listing, among other things, the names of martyrs and their beneficiaries, as well as the martyrs' causes of death.  *See* JA I, Ungar Decl. Ex. 14.[14] Among the martyrs listed are at least eight identified as people who died in the commission of various "martyrdom operations," including Yatem Yaqin al-Shweiki, who was killed in the execution of the so-called "French Hill operation," named for the Jerusalem neighborhood in which he opened fire with an M-16 machine gun while riding a bus, killing two, including Shoshana Ben-Yishai, whose survivors are plaintiffs in this litigation.[15]  JA I, Ungar Decl. Ex. 12; *see also, e.g.*, JA I, Ungar Decl. Ex. 14 at 11 (martyr Ahmed Abdel Monem Ahmed and martyr Ashraf Muhammad Sobhi Mahmoud); JA II, Howard Decl. Ex. A-3.  The listed causes of death for other martyrs are ambiguous.   Numerous martyrs are listed as dying by "assassination"—the same cause of death listed on the Saudi Committee webpage documenting the Bank's transfer to the beneficiaries of Izz Ad-Din Shuhail Ahmad al-Masri, the person who carried out the *suicide bombing* at the Sbarro pizzeria in Jerusalem on August 9, 2001, in which 130 people, including plaintiffs in this case, were injured or killed.[16]  *See* JA I, Ungar Decl. Exs. 15, 16 at 2 (reporting on Hamas's acceptance of responsibility for the bombing and identification of al-Masri as the suicide bomber).

---

[14] The document is entitled "List of Names of Martyrs to Substitute the Existing Transfers at the Bank Substituting the Name of One Beneficiary with Another."

[15] Ben-Yishai's survivors are American citizen plaintiffs in *Coulter, et al. v. Arab Bank, PLC*, 05-CV-365.  *See* Coulter Complaint at 21-23.  Al-Shweiki was shot dead by police while fleeing the scene of the massacre.

[16] Plaintiffs are either the injured victims themselves or the surviving family members of those killed in the Sbarro attack.

Plaintiffs also have offered records of wire transfers by the Bank on behalf of the Saudi Committee to recipients not featured in any Saudi Committee list, including documentation of a transfer to the father of al-Masri, the Sbarro bomber discussed above; and evidence of a transfer to Ibrahim Sa'id Ibrahim Ramadan, allegedly the father of Sa'id Ibrahim Ramadan, a suicide attacker who opened fire on a Jerusalem bus with an M-16 on January 22, 2002, killing two people and wounding forty, including three plaintiffs, before being shot and killed.[17]  *See* JA I, Ungar Decl. Ex. 20, 21.  Plaintiffs allege that these wire transfer payments—and many others—were made to the relatives of terrorists.  If plaintiffs can so prove, the documents are direct evidence of the Bank's facilitation of terrorist activity.

In addition, plaintiffs' proffer includes documentation of transfers by the Bank on behalf of the Saudi Committee directly to six individual terrorists.  At least one of these was an over-the-counter payment to a person named Ibrahim Ahmad Khaled al-Muqadama—the name of a founder of HAMAS—who received a payment from the Saudi Committee at the Bank's Al Rimal Branch in May 2001.  *See* JA I, Pls.' Rule 37 Br. at 26; Pls.' Rule 72 Opp'n, Osen Decl. Ex. C.  Defendant processed Saudi Committee payments to Ahmad Sa'id Khalil al-Ja'bari, the leader in the Gaza Strip of HAMAS's military wing, and an "invalid" payment to Jamal Ataya Zayed Abu Samhadana, a founder of the Popular Resistance Committees in Gaza.  *See* JA I, Pls.' Rule 37 Br. at 26.

---

[17] Defendant produced the wire transfer record, which evidences payment of $5,316.06 to a person named Shuhail Ahmad Isma'il al-Masri, who identified himself as the bomber's father and acknowledged in a 2005 *NBC News* report that he had received money from Arab Bank as a "salary" and compensation for his son's "sacrifice".  *See* JA I, Pls.' Rule 37 Br. at 23-24 (citing NBC report: Lisa Myers, *Terror Ties at Middle Eastern Bank?* (May 11, 2005), available at www.msnbc.msn.com/id/7806333/ (last accessed July 8, 2010)).  The Saudi Committee website memorializing the Committee's payment to al-Masri's survivors lists al-Masri's cause of death as "assassination".  *See* JA I, Ungar Decl. Ex. 15.

Defendant maintains that "there is no basis to infer that [the withheld] records would establish" that the Bank knew the Saudi Committee sponsored terrorism and that the Bank supported the Saudi Committee's efforts.  But the content of the Saudi Committee records that have been produced suggests otherwise.  Plaintiffs argue, and I agree, that the withheld records would include documentation (including photographic identification) for the approximately 3,000 beneficiaries of "martyr" payments who did not hold accounts at the Bank and received their payments (which together totaled $20 million) over the counter.  This group includes Mr. Muqadama, for whom the Bank has refused to provide the identification that he must have provided to the Bank in order to receive the payment—documentation essential to plaintiffs' ability to prove that the Muqadama who was the Bank's customer was the same person leading HAMAS's militia and who was arrested by the Palestinian Authority.  Full production also would include account and other transaction records of the recipients of Saudi Committee payments who *did* maintain accounts at the Bank, including Know Your Customer information and photo identification—documents defendant admits exist and acknowledges it did not produce.  As discussed above, this material will be particularly important given defendant's intent to pursue a mistaken identity defense.

### c.  Adverse Inferences

For the above reasons, I impose adverse inference sanctions on the issue of defendant's acts.  At trial, the jury will be instructed, in sum and substance, (1) that it may infer that defendant provided financial services to organizations designated by the United States as Foreign Terrorist Organizations, and to individuals affiliated with the FTOs; and (2) that it may infer that defendant processed and distributed payments on behalf of the Saudi Committee to terrorists,

including those affiliated with named terrorist organizations and those who are unaffiliated, their relatives, or representatives.

### 4. State of Mind

Plaintiffs seek a jury instruction permitting the jury to infer that the withheld documents and testimony would have demonstrated that defendant acted with a culpable state of mind— here, knowledge and purposeful intent. *See Lev*, 2010 WL 623636, at *1-*2. As set forth above, in order to receive such an inference, plaintiffs must introduce evidence "tending to show that the document[s] actually … withheld [are] the one[s] as to whose contents it is desired to draw an inference." *Kronisch*, 150 F.3d at 127-28 (quoting 2 Wigmore, Evidence in Trials at Common Law § 291, at 228).

Plaintiffs have demonstrated that the withheld evidence is essential, not only to proving both that defendant provided financial services to terrorists, but also that it did so knowingly and purposefully. For example, the Saudi Committee spreadsheets listing hundreds of martyrs and the dates and causes of their deaths indicate that defendant knew—or should have known—that some of the "martyrs" died while engaged in terrorist activities. Plaintiffs also have offered evidence supporting the Bank's knowledge that one of its accountholders was inextricably linked to HAMAS. Wire transfer records from the Beirut Account demonstrate that, on at least three occasions in 2000, Arab Bank officials approved the transfer of funds into that account despite the fact that the transfers listed Harakat al-Mukawama al-Islamiya, HAMAS, or the "Islamic Resistance" as the beneficiary. *See* JA I, Ungar Decl. Ex. 34.[18]   The Bank argues that these three transfers are an aberration—in essence, that they slipped through the cracks and therefore provide no proof of defendant's knowledge or intent—or, in the alternative, that Bank employees

---

[18] These transfers were made after HAMAS was designated an FTO but before Hamdan was listed as an SDGT in 2003. Each transfer was reviewed and initialed by a senior Bank official.

26

did not realize that their customer Osama Hamdan was in fact the same person known to be a leader of HAMAS, *i.e.*, a defense of mistaken identity.[19]   In the absence of records from other accounts, especially those of the ten Palestinian FTOs, SDGTs, or SDTs that defendant admits were its customers but whose account records it has not produced, *see* Bank's Interrogatory Response at 1-2, plaintiffs face tremendous obstacles in proving the identities of the Bank's customers and will have difficulty challenging the Bank's stated defenses.  They will be hard-pressed to show that the Beirut Account transfers were not approved by mistake, but instead are representative of numerous other transfers to terrorists.  Without an inference, plaintiffs would be prejudiced by defendant's incomplete production.

In light of the record, an inference regarding defendant's knowledge and intent is both appropriate and necessary to restore the evidentiary balance.  *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009), demonstrates both the difficulties ATS (and ATA) plaintiffs face in proving intent, and the importance of full document production in allowing plaintiffs to make their case.  There, the Second Circuit upheld the district court's grant of summary judgment to defendant because plaintiffs had not provided sufficient support for an inference that the defendant had knowingly and intentionally aided in violations of the law of nations. *Talisman*, 582 F.3d 244, 261-64 (2d Cir. 2009).  The Court in *Talisman* acknowledged that "intent must often be demonstrated by the circumstances," but found that "in this case, there were insufficient facts or circumstances suggesting that Talisman acted with the purpose to advance violations of international humanitarian law."  *Id.* at 264.  The quantity of evidence

---

[19] Defendant's papers also suggest that the Bank will argue at trial that evidence external to Bank records "is not evidence of what the Bank knew." Def.'s Rule 72 Opp'n at 42.  This argument, too, puts into stark relief the necessity of full production of Bank documentation. Absent complete production, plaintiffs will be unable to respond to defendant's claim, giving defendant—by virtue of its own disobedience of discovery orders—a distinct, and unfair, advantage.

plaintiffs can offer from which a jury could infer intent therefore is crucial to their ability to prove their claim. Simply put, if the withheld documents support plaintiffs' claims—and I am satisfied that plaintiffs have shown the high likelihood that the withheld documents would show repeated transfers by the Bank to terrorists, terrorist organizations, or their fronts, or on their behalf—the documents are powerful additional direct evidence of defendant's knowledge and circumstantial evidence of defendant's intent.

### 5. **Other Sanctions**

In addition to the above-described sanctions, plaintiffs request an order precluding defendant "from offering any evidence, including expert or fact witness testimony, regarding its then-current state of mind, or any other issue for which [d]efendant's production failures impact [p]laintiffs' ability to effectively cross-examine witnesses." Judge Pohorelsky rejected plaintiffs' requested sanction without explanation.

Plaintiffs argue that such a sanction is necessary and appropriate to prevent defendant from "affirmatively profiting from gaps in the evidentiary chain that it is solely responsible for creating," *e.g.*, presenting "third-party fact witnesses" that plaintiffs would be "unable to probe, test or impeach ... with reference to the Bank's [unproduced] internal documents, memos, or emails." Pls.' Obj. at 48. Plaintiffs argue that, absent this sanction, Bank witnesses would "continue to offer sworn testimony that [d]efendant would never knowingly transact business with HAMAS ... yet provide [p]laintiffs with no means of effectively cross-examining whether that representation is credible." Defendant counters that plaintiffs' requested preclusion sanction would "prevent the Bank from proffering any meaningful defense at all" and therefore would violate the Bank's due process rights. The Bank also invokes its status as a foreign corporation and the fact that the terrorist acts at issue took place in the Middle East as proof that its

withholding based on foreign bank secrecy reflects circumstances not within the Bank's control, thus mitigating its culpability and the need for the preclusion sanction.

Plaintiffs are entitled to the sanction requested. While it is not possible to identify every question that might require application of a preclusion sanction, the parties' papers provide illustrations. For example, I agree with plaintiffs that defendant should be barred from asserting, through evidence and/or argument, that it did not have a culpable state of mind because certain people or organizations were not "generally known" to be terrorists. General knowledge is irrelevant; what matters is whether *the Bank* knew that a customer or beneficiary was a terrorist, and whether it intended to support or enable that person's or organization's terrorist activities. The Bank must be precluded from making any argument about its state of mind that would find proof or refutation in the withheld documents. Defendant is entitled to rely on the documents it did produce to make its case that it did not have the required state of mind. In addition, defendant can argue to the jury that it had no knowledge that certain accountholders, whose records have been produced, were terrorists. But it cannot argue that it had no knowledge a certain Bank customer was a terrorist if it did not produce that person's complete account records. To permit the Bank to make such an argument would allow it to profit from evidentiary gaps that it chose to create. A preclusion sanction therefore is necessary to restore the evidentiary balance.

Finally, I adopt Judge Pohorelsky's recommended sanctions (1) providing for the authentication of Bank records obtained by sources other than defendant, and (2) prohibiting defendant from introducing in pre-trial motions or at trial any evidence withheld on foreign bank secrecy grounds. No written objections were filed to either sanction, and I find no clear error. *See Zon*, 573 F. Supp. 2d at 811.

## ATTORNEYS' FEES AND COSTS

Plaintiffs request that the court order defendant to pay an award of reasonable attorneys' fees and costs.  Under Rule 37 of the Federal Rules of Civil Procedure, when a party fails to produce in spite of a court order, a "court must order the disobedient party … to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances might make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).  While the Second Circuit has never held that expenses are a mandatory sanction, the Court has acknowledged that the Rule's language "certainly suggests that an award of expenses is mandatory" absent one of the enumerated exceptions.  *Novak v. Wolpoff & Abramson LLP*, 536 F.3d 175, 178 (2d Cir. 2008).[20]  Given this, the disobedient party bears the burden to show that one of the exceptions has been met; otherwise, fees and costs will be awarded.  *Id.* (citing the Advisory Committee Note to the 1970 Amendments to the Rule).

Here, defendant has demonstrated neither that its recalcitrance was substantially justified nor that an award of fees and costs would be unjust.  I have already rejected defendant's argument that the potential for criminal prosecution, which can be "a weighty excuse for non-production," provided sufficient excuse for noncompliance with the May 7 production order. Plaintiffs spent "massive" amounts of time and large sums of money flying to Jordan, to depose witnesses who, as defendant admits, did not answer plaintiffs' questions on the grounds of foreign bank secrecy—an excuse this court has already rejected.  Defendant's refusal to produce

---

[20] The Second Circuit in *Novak* cited the version of Rule 37(b)(2)(C) in effect in 2006, which stated that "the court *shall* require the party failing to obey the order ... to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." *Novak*, 536 F.3d at 177 (quoting the 2006 version of Rule 37(b)(2)).  In 2007, the Rule was "amended as part of the general restyling of the Civil Rules to make them more easily understood and to make the terminology consistent throughout the rules.  These changes are intended to be stylistic only."  Fed. R. Civ. P. 37 (Advisory Committee Note, 2007 Amendment). Thus the change in wording from "shall" to "must" does not affect the analysis in the text.

has caused plaintiffs "extensive delays and waste of resources," *Gutman v. Klein*, No. 03-CV-1570, 2008 WL 4682208, at *13 (E.D.N.Y. Oct. 15, 2008), *adopted by* 2008 WL 5084182 (E.D.N.Y. Dec. 2, 2008), for which plaintiffs should not have to bear the costs.  I therefore grant plaintiffs' request and direct plaintiffs to submit an application for their fees and expenses by September 17, 2010.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for sanctions is GRANTED. At trial, the jury will be instructed that, based on defendant's failure to produce documents, it may, but is not required to, infer: (1) that defendant provided financial services to organizations designated by the United States as Foreign Terrorist Organizations, and to individuals affiliated with the FTOs; (2) that defendant processed and distributed payments on behalf of the Saudi Committee to terrorists, including those affiliated with named terrorist organizations and those who are unaffiliated, their relatives, or representatives; and (3) that defendant did these acts knowingly and purposefully.  In addition, (4) defendant is precluded from making any argument or offering any evidence regarding its state of mind or any other issue that would find proof or refutation in withheld documents; (5) all requests for admissions in plaintiffs' First Set of Requests for Admissions which defendant refused to answer on foreign bank secrecy grounds are deemed admitted, and any documents referred to in those requests, which plaintiffs obtained from sources other than defendant, are deemed authentic and are admissible as such at trial; and (6) defendant is prohibited from introducing in pre-trial motions or at trial any evidence withheld on foreign bank secrecy grounds.  Finally, plaintiffs are awarded attorneys' fees and costs incurred as a result of defendant's production failures and the resulting sanctions litigation.

SO ORDERED.

_/s/ Nina Gershon_____
**NINA GERSHON**
**United States District Judge**

Dated:  July 12, 2010
       Brooklyn, New York