UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

|                          | : | 04 CV 02799 (BMC) |
| COURTNEY LINDE, et al.,   |   | And all related cases |
|             Plaintiffs,   | : | 04 CV 05449 (Litle) |
|                          |   | 04 CV 05564 (Almog) |
|                          | : | 04 CV 00365 (Coulter) |
|                          |   | 05 CV 00388 (Afrial-Kurtzer) |
|      - against--          | : | 05 CV 03183 (Bennett) |
|                          | : | 05 CV 03768 (Roth) |
|                          |   | 06 CV 01623 (Weiss) |
| ARAB BANK, PLC,           | : |                     |
|                          |   | United States Courthouse |
|             Defendant.    | : | Brooklyn, New York |
|                          | : | September 11, 2014 |
|                          |   | 9:20 o'clock p.m. |

- - - - - - - - - - - - - - - X

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

| For the Linde and Coulter Plaintiffs: | OSEN, LLC<br>By:  GARY M. OSEN, ESQ. |
| | TURNER & ASSOCIATES, PLLC<br>By:  CLYDE T. TURNER, ESQ. |
| For the Litle, Bennett and Roth Plaintiffs: | SAYLES WERBNER<br>By:  MARK S. WERBNER, ESQ. |
| For the Almog Plaintiffs: | STONE, BONNER & ROCCO, LLP<br>By:  JAMES P. BONNER, ESQ. |
| | MOTLEY RICE, LLC<br>By: MICHAEL E. ELSNER, ESQ.<br>JODI FLOWERS, ESQ. |

1 A P P E A R A N C E S (Continued)

2 For the Defendant:                    DLA PIPER US, LLP
                                        By:   SHAND STEPHENS, ESQ.
3                                             ANTHONY COLES, ESQ.
                                              BRETT INGERMAN, ESQ.
4                                             MARGARET CIVETTA, ESQ.

5

Court Reporter:                        Anthony M. Mancuso
6                                       225 Cadman Plaza East
                                        Brooklyn, New York 11201
7                                       (718) 613-2419

8

Proceedings recorded by mechanical stenography, transcript
9 produced by CAT.

10

11                (Trial resumed.)

12                In open court; jury not present.)

13                THE COURT:   Good morning.

14        We have some matters before the jury comes in.   They

15 are not all here yet.

16        The last letter I got was at 1:15 a.m.   Here are my

17 rulings on the exchange of letters that pertain to the

18 witnesses coming up today.   First, I'm going to allow

19 admission of Plaintiffs' Exhibit 1 and Plaintiffs' Exhibit 41.

20 Those are Plaintiffs' exhibits or Defendant's exhibits?

21                MR. STEPHENS:   Plaintiffs' Exhibit 1 is a

22 Defendant's exhibit.

23                THE COURT:   Those are general enough statements, the

24 defendant's compliance program, that they apply to the Hamdan

25 account, as to which the defendant is permitted to introduce

1  evidence.

2        As indicated, if the plaintiffs' counsel wants me

3  to, I'll give a limiting instruction to the jury that they can

4  only consider those documents with regard to the Hamdan

5  account, because that's the only account for which complete

6  records were produced.

7        However, I am drawing the line at compliance

8  evidence that is specific to defendant's branches, for which

9  the defendant did not produce account records; namely, the

10  Territories, Palestine.  Thus, all of Palestinian documents

11  are excluded.  If I didn't exclude them, I would have to

12  instruct the jury that they couldn't consider those exhibits

13  with regard to the accounts at the very branches from which

14  they were issued.  I think that would be nonsensical and

15  confusing, and would render the exhibits totally irrelevant.

16        Therefore, Defendant's Exhibits 76 through 8 are

17  excluded.

18        Similarly, testimony as to compliance procedures in

19  Palestine is not going to be permitted from witnesses.

20        The same is true of the PMA circulars.  Those could

21  only be relevant to show that defendant complied with foreign

22  law in its branches, for which, again, account records were

23  not produced, and it would violate both Judge Gershon's

24  Rule 37 ruling and her Rule 44.1 ruling

25        The plaintiffs never admitted the PMA circular

1  showing that certain accounts were frozen by the PLA.  So, my

2  ruling that the PMA circulars showing that those accounts WERE

3  unfrozen is inapplicable to Defendant's Exhibit 901.  Further

4  901 appears to be the only reference to the Muslim Womens

5  Association.

6          The testimony that plaintiffs elicited from

7  Mr. Spitzen argue the Al-Islah Society -- they didn't

8  reference this organization.  If defendants witnesses are

9  aware that relevant charities were unfrozen, they may testify

10 as to that, but only as to that.  The exhibit itself not going

11 to be admissible.

12         Now, as to questions to witnesses regarding

13 individuals who have been named as terrorists, I'm rejecting

14 the defendant's argument that there's a distinction between

15 asking its employees whether they knew an individual customer

16 to be a terrorist, and whether they had ever heard of that

17 individual at all.  Obviously, the latter subsumes the former,

18 and in my view, it's just a way of evading the preclusion

19 order.  So, I am not going to allow that questioning.

20         Judge Gershon could not, in her order, put in all

21 the permutations of how the questions might be asked as to

22 whether someone knew that someone else was a terrorist, but

23 this would clearly elicit an answer to the question that Judge

24 Gershon did not allow.

25         I also reject the defendant's contention that

1  plaintiff opened the door to these questions.  The plaintiff

2  still has the burden of proof to prove knowledge.  It can't

3  open the door.  It's not bound by the sanction and preclusion

4  orders the defendant is.

5         All right.  Those are all the rulings I'm going to

6  make this morning.

7         MR. COLES:  Just quickly on 901 is, 901 is a 2004

8  PMA circular saying that circular 113-203 is nullified.

9  Circular 113-203 -- which basically says that certain of the

10 banks in the Territories have to get preapproval before

11 allowing withdrawals from certain charity accounts -- is what

12 is referred to in the 2007 Al Salah designation

13        THE COURT:  It doesn't matter.  The fact of the

14 matter is, the plaintiffs have not been allowed to get to the

15 fundamental evidence which would show whether or not those

16 compliance statements were in fact adhered to.  So now, I'm

17 not allowing that.

18        All right.  Let's wait for the jury.

19        MR. OSEN:  Your Honor, I'm sorry.  One quick

20 question --

21        THE COURT:  Sure.

22        MR. OSEN:  -- with respect to your ruling on PX 1?

23        THE COURT:  Yes.

24        MR. OSEN:  We don't object to the use of that

25 document with a witness who has knowledge of the Hamdan

1   account.  I believe the defendant actually wants to offer it

2   for witnesses from the Palestinian Authority who have no

3   personal knowledge of the Hamdan account.

4         They do have witnesses on their list that address

5   the Hamdan account, and I think it would be appropriate for

6   them to use it in that context, but confusing for them to

7   offer a witness from Nablus or someplace else in the

8   Territories when it's only limited for that purpose.

9         THE COURT:  I agree.

10         MR. COLES:  Your order last week did say that we can

11   talk about our general policies in the Mid East.

12         THE COURT:  To put on somebody from the Territories

13   to talk about that when that person has not produced the

14   account information would suggest that those policies were in

15   fact applied by that person, and we just don't know.

16         MR. COLES:  Your order said we can talk about

17   general policies, and if appropriate, you would then give an

18   inference to the jury that it doesn't apply to any specific

19   account.

20         THE COURT:  That is still my position.  You may

21   still do that through the proper witness.

22         THE COURT:  Okay.  See you as soon as the jury

23   gets in.

24         (Recess.)

25         (In open court.)

1          THE COURT:  All right.  Let's bring in the jury,

2    please.

3          (Jury present.)

4    B E V E R L E Y    M I L T O N - E D W A R D S,

5          called as a witness, having been previously duly

6          sworn, was examined and testified as follows:

7          THE COURT:  Be seated, please.  Good morning, ladies

8    and gentlemen.

9          Continue with cross-examination, Mr. Osen.

10         MR. OSEN:  Thank you, your Honor.

11   CROSS-EXAMINATION (Continued)

12   BY MR. OSEN:

13   Q    Good morning, professor.

14   A    Good morning, Mr. Osen.

15   Q    Yesterday, you were asked by Mr. Ingerman about the

16   Ramallah Zakat Committee; do you remember that?

17   A    Yes, I do.

18   Q    And in that testimony, you were asked by Mr. Ingerman, at

19   transcript 2200, that's the page:

20         "QUESTION:  Professor Milton-Edwards, through your

21   work in this case and your review of the testimony, are you

22   aware that Matthew Levitt, one of the plaintiffs' experts in

23   this case, listed the Ramallah Zakat Committee as being

24   controlled by Hamas, but Mr. Spitzen, the other expert, did

25   not?  Are you aware of that?"

1          And then you answered:  "Right."

2          Do you remember that testimony?

3    A    Yes, I do.

4    Q    When you reviewed Mr. Spitzen's expert report in this

5    case, you knew, did you not, that Mr. Spitzen had in fact

6    listed the Ramallah Zakat Committee as being controlled by

7    Hamas; right?

8    A    Yes, that's correct.  He didn't mention it when he was

9    giving his testimony in court, but I do remember that he

10   included it in his expert report, and I responded to it.

11   Q    Right.  So, the statement -- and I'm not blaming you, but

12   you were asked a question which actually said that Mr. Spitzen

13   had not actually stated that the Ramallah Zakat Committee was

14   controlled by Hamas, and that statement wasn't true, was it?

15   A    No.  That's not correct.  I had to answer the question --

16   I thought it was relating to his direct testimony in court,

17   and he, as opposed to Dr. Levitt, hadn't mentioned the

18   Ramallah Zakat Committee in his direct testimony.  So, I don't

19   believe that's incorrect.

20   Q    Were you here when Mr. Spitzen discussed the Ramallah

21   Zakat Committee?

22   A    No.  I don't recall that I was here.  As I said to you

23   yesterday, there were parts of last week when, because I was

24   unwell, I wasn't in court.

25   Q    But you now agree that Mr. Spitzen in fact did assert in

1   his expert report that the Ramallah Zakat Committee was

2   controlled by Hamas; true?

3   A    Yes.  Had I been asked that question by Mr. Ingerman, I

4   would have agreed he covered it.  There were other societies

5   that the experts have talked about, again, that haven't been

6   included in the trial testimony.

7              THE COURT:  Mr. Osen, the question was:  Were you

8   aware that he listed?  I guess "listed" can be ambiguous.

9              All right.

10             MR. OSEN:  Fair enough, your Honor.

11  Q    Yesterday, Mr. Ingerman asked you about Mr. Spitzen's

12  slide 44, the brochure of Al Jam'iya Islamic center; do you

13  recall that?

14  A    Yes.  I need to see the slide again to recall it.  Yes.

15  Q    And then do you recall that he actually had you focus on

16  the second half of the document?

17  A    Yes, that's correct.

18  Q    And he asked you whether any of the names listed as the

19  administration council for Al Jam'iya, the Islamic Center,

20  from 2003 to 2006, were affiliates or members of Hamas in any

21  way.  Do you remember that question?

22  A    Yes.  He was asking me the question in relation to the

23  period of 2000 to 2004, yes.

24  Q    Actually, 2003 to 2006.  That's the document?

25  A    I don't recall that there was a specific issue of the

1  dates involved.

2  Q    You answered.  When asked whether you recognize any of

3  the names on the list as being affiliated or members of Hamas

4  in any way, this was your response:

5       "ANSWER:  Well, I mean, it's blurred here on the

6  screen.  Maybe it's easier to, but I don't recognize any

7  Hamas -- famous Hamas people from the list."

8       Do you recall that?

9       MR. INGERMAN:  Your Honor, may I present the witness

10  with the testimony?

11      THE COURT:  Well, if the witness feels she needs it,

12  yes.  I would like you to wait for her to ask, just to save

13  time.  He's reading it to her.  If she feels she needs to see

14  it, he will show it to her.

15  Q    I'll ask a different question.  Professor, when you look

16  at this list right now, do you recognize anyone on this list

17  who is associated with or a member of Hamas?

18  A    Yes.  I believe in 2006, Saqer Abu Heen, in 2006 stood in

19  the PLC elections.

20  Q    I'm sorry?  He stood in the PLC elections --

21  A    The Palestinian Legislative Council election, he did.

22  Q    On behalf of Hamas?

23  A    On the Change and Reform list.

24      Or it may have been he stood, in December 2005, in

25  the local elections.

1  Q    Do you know who --

2  A    Just one minute.  I'm looking at the list, please.

3  Q    Sure?

4         (Pause.)

5  A    Out of the twelve listed, I think, again, after 2006,

6  that Khalil El Haya, again, I think he also stood in the

7  Palestine Legislative Council of elections on the Hamas list,

8  as well.  So, that's two names that I recognize on that list

9  of twelve.

10  Q    If we can bring up the slide we had yesterday, the

11  promotional video of her book?

12         Do you recall our discussion of this yesterday.

13  A    Yes.

14  Q    I believe you identified yesterday Ahmed Bahar?

15  A    Yes.

16  Q    I'm frustrated, because my Teltrater isn't working.  It's

17  the gentlemen right there.  You recognize him as the Chairman

18  of the Islamic Society during the relevant time period;

19  correct?

20  A    Yes.  But this is an image from post-2006, not from the

21  relevant time period.

22  Q    I understand.  That's a fair point.

23  A    Yes.

24  Q    You recognize him as the Chairman of the Islamic Society

25  of Gaza during the time period relevant to this case?

1  A    No.  I recognize him as Ahmad Bahar.  I don't recall

2  meeting, in the 2000 to 2004 period, meeting with Ahmad Bahar

3  and the Islamic Society in my meetings.

4           MR. OSEN:  Move to strike.

5           THE COURT:  Sustained.

6  Q    My question was:  You testified yesterday, did you not,

7  that Ahmad Bahar was the Chairman of the Islamic Society of

8  Gaza during the relevant time period?

9  A    That's correct.

10 Q    Okay.  I believe you testified yesterday that you didn't

11 recognize Mr. Suhan next to Mr. Bahar in the center?

12 A    That's correct.

13 Q    And you didn't recognize Mr. Shama'a next to him?

14 A    No.  I mean, he's a gray-haired, gray bearded man like

15 hundred of thousands of others in the Palestinian Territories.

16 Q    Except for one thing, he's one of the founders of Hamas,

17 is he not?

18 A    But I've never met him.  I don't know him.

19 Q    Well, in order to know someone is a founder of Hamas, you

20 have to meet them?

21 A    Well, I have to be able to recognize them.  You're

22 telling me that that man, Muhammad Shama'a.  I'm telling you I

23 don't know if he's Muhammad Shama'a.

24 Q    How about the gentleman next to Mr. Shama'a?

25 A    That image is too blurred, and I can't tell you who that

1  individual is.

2  Q    For the witness only, can you show her the Izz al-Din

3  al-Qassam website?

4        MR. INGERMAN:  Your Honor, can we have an exhibit

5  number for something?

6        THE COURT:  It's from the website.

7        What's the exhibit number of the website?

8        MR. OSEN:  There are no exhibit numbers.  It's not

9  being offered, your Honor.

10        We can put it into evidence if they don't object.

11        MR. INGERMAN:  I don't even know what it is.

12        MR. OSEN:  It's coming up for the witness only.

13  A    Sorry.  It's too small.

14        THE COURT:  They are going to blow it up.

15  A    I need a much more proper look.  I need to look at the

16  entire document, not just parts of the document.

17  Q    One moment.

18        MR. OSEN:  Your Honor, if I may approach the

19  witness?

20        THE COURT:  You may.

21        MR. INGERMAN:  2010, is that the date on it?

22        MR. OSEN:  Yes.  I don't know.  It's certainly in

23  the last two or three years.  2010, correct.

24  A    Am I required to read the document?

25  Q    No.  You asked to see the whole document, but I just want

1   to ask you if that refreshes your recollection as to who

2   Dr. Khalil El Hay is

3   A    No, it doesn't.

4   Q    Let's go back to slide 44, please.

5        It's your sworn testimony here today that as of

6   2006, Saqer Abu Heen and Dr. Khalim Ismail El Haya, the

7   General Secretary and the Deputy General Secretary of the

8   Islamic Sector are Hamas leaders; true.

9   A    It's my sworn testimony that they were elected on the

10  Hamas election slate, and one of them is a member of the

11  Palestinian Legislative Council.

12       The other may be -- as I say, I think the other one

13  is like a local councillor.

14  Q    Isn't it a fact that Dr. Khalim El Haya is actually the

15  chairman of the Change and Reform Party?

16  A    No.  I thought that the Chair of the parliamentary bloc

17  of the Change and Reform Party in the PLC was somebody else,

18  not Khalil El Haya.

19       It's Aziz Dweik in the West Bank, and I believe it's

20  Mushir al-Masri.  Certainly on my meetings with the PLC, Gaza

21  from 2006 to the present, that's who I have been introduced to

22  as the leader of the bloc.  And Huda-somebody is a female, as

23  well.  I can't remember her name.  Certainly, it's not been

24  represented to me when I've made visits as to the PLC in Gaza.

25       I've been introduced to Mushir al-Masri, and the

1   leader of that bloc.  And in the West Bank, the PLC Building

2   is closed, but I've had meetings with Aziz El Dweik and he is,

3   as I understand it, he's the Deputy Leader.

4   Q    I would like to show slide 50 of Mr. Spitzen's

5   presentation, the bottom right.

6          Do you see Mushir al-Habi al-Masri.

7   A    Yes.

8   Q    Is that the gentleman you were talking about?

9   A    Yes.  I know Mushir al-Masri.  I've met.

10  Q    Did you have discussions with him of involvement in the

11  Al-Nur Prisoner Association?

12  A    No.  My knowledge about Al-Nur in the period 2000 to

13  2004, I don't believe he had any association with Al-Nur.

14  He's a very young man.  He would have been even younger during

15  that period.  And as I understand it, he was engaged in his

16  university studies, finishing his schooling and engaged in his

17  university studies.  He's somebody who, in the 2005 period, is

18  one of these bright stars, as they are called, that emerged

19  from the shadows, was encouraged to become involved in

20  politics.

21  Q    Let's talk about people who emerged from the shadows, to

22  use your phrase?

23          Do you recognize Salah Shehadeh in the bottom of

24  that picture, that slide.

25  A    Yes, I do.

1  Q     Is that the same Salah Shehadeh who appeared here in the
2  promotional video --
3  A     Yes.
4  Q     -- for your book in the billboard?
5  A     Yes, that's correct.  That's one of the images captured
6  for commercial video.
7  Q     The same person?
8  A     Yes.  I can't actually -- if it would be brought a little
9  closer?  This was the problem yesterday when I was being asked
10 to read from a distance, as well.  Yes, that's the same type
11 of image being used.  Again, that's an image taken from the
12 2006 -- post-2006 period.
13        I think actually that was taken after June 2007,
14 when Hamas took over Gaza.
15 Q     You're speaking of the image on the billboard?
16 A     That's correct.
17 Q     The image itself is from before 2002; correct?
18 A     One would assume so, yes, because he was killed by
19 Israel.  He was assassinated in 2002.
20 Q     Is Mr. Shehadeh someone who, during the relevant time
21 period, you would describe as in the shadows, not a public
22 figure?
23 A     Well, absolutely.  I mean, he was alleged to be and was
24 believed to be -- I think there's consensus on that -- the
25 head or one of the heads of the Izz al-Din al-Qassam Brigades.

1  As I already explained in my direct testimony, the Izz al-Din

2  al-Qassam Brigade, their leaders, operatives, their planners

3  and organizers, maintained a highly secret existence.  They

4  didn't take on much of a public persona.  They wouldn't have

5  been known as public figures by Palestinians, because of their

6  fear of persecution by Israel and by the Palestinian

7  Authority.

8  Q     And it was true in the period 2000 to 2002 and before

9  that?

10 A     I believe so.  I mean, there may have been instances

11 where statements may have been issued in his name or something

12 like that.  But, I mean, a famous individual -- I know there's

13 been some discussion of his notoriety when he was released by

14 Israel from prison.  Certainly, my experience during that

15 period and before that period was that, you know, he wasn't

16 widely known across the Palestinian Territories.  I mean, for

17 example in the West Bank, I don't believe he would have been a

18 famous individual.

19          MR. OSEN:  Your Honor, at this point, we would like

20 to offer a video clip for impeachment purposes.  It's not on

21 our exhibit list.  We wanted to show it both to the witness

22 and the jury.

23          THE COURT:  Any objection?

24          MR. INGERMAN:  Of course.  I don't know what it is.

25 It hasn't been authenticated.  It's not on the exhibit list.

1           THE COURT:  It's for impeachment.

2           MR. INGERMAN:  He can't show it to the jury unless

3    we know it's been authenticated and there's some foundation

4    made for it.

5           MR. OSEN:  I think, your Honor, the clip is

6    self-explanatory.

7           THE COURT:  Well, I have not seen it, so I don't

8    know that.

9           MR. OSEN:  Since sound is not an issue, we can play

10   it first for the witness and the Court.

11          THE COURT:  Let's try that, and see where it takes

12   us.

13          MR. INGERMAN:  Your Honor, may we have a brief

14   sidebar?

15          THE COURT:  Okay.

16          (Continued on next page.)

17

18

19

20

21

22

23

24

25

1          (Sidebar.)

2          MR. INGERMAN:  Your Honor, this is trial by ambush.

3    None of these exhibits are on their list.  The PTO required

4    them on their list.

5          THE COURT:  The PTO didn't require impeachment-only

6    exhibits to be on the list.  You don't know what a witness is

7    going to say.  She's taken the position that he's not a public

8    figure.  Now, I assume the video they want to show shows him

9    doing something very public.  I will look at that and see if

10   that's grounds for impeachment.

11         MR. INGERMAN:  We object to it on authenticity

12   grounds, foundation, hearsay --

13         THE COURT:  They are not offering it into evidence.

14   They are offering it for impeachment.

15         MR. INGERMAN:  -- if they wanted to show it to the

16   jury.

17         THE COURT:  I understand.  It doesn't mean it's

18   received in evidence.  If you want me to give a limiting

19   instruction to the jury they are only to consider it to the

20   extent they they'd to in weighing the witness's opinion, I

21   would give them such an instruction.

22         MR. INGERMAN:  I would rather you not have them show

23   it to the jury.

24         THE COURT:  What's your fallback?

25         MR. INGERMAN:  I don't know yet.  Let's look at the

1    video.

2              THE COURT:   Okay.

3              (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2          THE COURT:  When you say sound is not an issue, do

3    you mean you're turning the sound off?

4          MR. OSEN:  Yes, your Honor.

5          THE COURT:  Okay.  Let me see it.  Let the witness

6    see it.  Let counsel see it.

7          (Tape plays.)

8          (Tape stops.)

9          THE COURT:  Okay.  Now, put a question.

10   BY MR. OSEN:

11   Q    Do you recognize the speaker in that video as Salah

12   Shehadeh?

13         MR. INGERMAN:  Objection.

14         THE COURT:  Overruled.

15   A    It could be.  It could be somebody else.  I mean, I'm

16   sorry, but it's the whole big beard phenomenon and lots of

17   people looking like that.  It could be him.

18   Q    Would you like to see it again without freezing the

19   frame?  Is that necessary?

20         THE COURT:  I think so, if the witness is having

21   trouble recognizing who is in that video.  Go ahead and show

22   it to her again.

23         (Tape shown.)

24   Q    Stop it there.  Does that help you in determining it's

25   the same gentleman -- I use the term loosely -- as the one in

1    front of you, and who you saw on the slide a minute ago?

2    A    Yes, it looks like him.  I can't say definitively that's

3    him.  It looks very like him.

4              MR. OSEN:   Your Honor, we would like to play the

5    video.

6              THE COURT:   No.  You can ask her more questions

7    about it, but you can't play it.

8              MR. OSEN:   Sure.

9    Q    I suppose it wouldn't help you to play the sound, or

10   would it, for purposes of your analysis?  It's in Arabic.

11             MR. INGERMAN:   Objection.

12             THE COURT:   Sustained.

13   A    It doesn't make any difference to me.

14             MR. INGERMAN:   Professor Milton-Edwards, you don't

15   have to answer when the objection is sustained.

16             THE WITNESS:   Okay.

17   Q    Can you play the whole video again for the professor?

18             MR. INGERMAN:   Objection.

19             THE COURT:   Overruled.

20             (Tape plays.)

21             (Tape stops.)

22             MR. OSEN:   Stop it there.

23   Q    Professor, do you want to walk back the statement you

24   made earlier this morning, that Salah Shehadeh was not a

25   public figure, not well-known, didn't come out in public

1  during the relevant time period?

2          MR. INGERMAN:   Objection.

3          THE COURT:   Overruled.

4  A    No, I don't.

5  Q    And this video you just saw does not directly contradict

6  your prior sworn statement?

7  A    I'm considering that most of the video is just blurred.

8  Blurred crowd scenes, and then we see a partially blurred and

9  then partially clear individual of several seconds long.  No,

10  I don't know where it's from.

11  Q    But you know it's Salah Shehadeh speaking to a crowd; is

12  it not?

13  A    I said I think it looks like him, yes.

14          MR. OSEN:   Your Honor, we would like to play the

15  video for impeachment purposes.

16          THE COURT:   Let's talk at sidebar.

17          (Continued on next page.)

18

19

20

21

22

23

24

25

1              (Sidebar.)

2              THE COURT:  For some reason, I don't fully

3    understand.  The witness is saying things about this video

4    that really are inconsistent with the video.  It's clear it's

5    Salah Shehadeh.  We all see it.

6              Do you have any doubt about it?

7              MR. INGERMAN:  I have no idea.

8              THE COURT:  You're telling you don't know -- you've

9    seen a picture of him -- it's the same guy?

10             MR. INGERMAN:  I don't know that.

11             THE COURT:  Okay.  Then she won't say that he's

12   talking in front of a crowd when he clearly is talking in

13   front of a crowd.

14             MR. INGERMAN:  Your Honor, there's no authentication

15   for this video.

16             THE COURT:  It's not being offered into evidence.

17   The question is, is this witness credible when she says she

18   doesn't recognize this guy and she doesn't know if he's

19   talking to a crowd?  The video shows who it is, and he's

20   talking to a crowd.  It's for impeachment.

21             MR. INGERMAN:  The video is blurred, as she said.

22   It has a Hamas logo superimposed on it.  I don't know who put

23   that on there.

24             THE COURT:  Those would be relevant considerations

25   if it were being admitted into evidence, but they are not

1  being admitted into evidence.

2          MR. INGERMAN:  That's a clear 403 issue.  If you

3  superimpose a Hamas image on there, it says "It's Hamas, it's

4  not fear."

5          THE COURT:  I'm going to leave it out.  I don't

6  think you need it after this.

7          MR. OSEN:  Your Honor, the jury needs to be able to

8  assess the credibility of the witness.

9          THE COURT:  I think they are assessing fine the

10  credibility of this witness.  Let's go on.

11          (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2          MR. OSEN:  Sorry, your Honor.  If I could have just

3   a moment?

4          THE COURT:  Sure.

5          MR. OSEN:  I hear it, but I can't actually find the

6   microphone.

7          THE WITNESS:  Try your pocket.

8          MR. OSEN:  We're having a little comic relief here.

9          Problem solved.  At least one problem solved.

10  BY MR. OSEN:

11  Q    Can we go back to the slide with Mr. Shehadeh from the

12  Al-Nur Prisoner Society?

13         THE COURT:  All right.  I want another sidebar.

14         (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1          (Sidebar.)

2          THE COURT:  What she's doing is not fair.  It's

3    clearly Shehadeh, and it is clearly a crowd.  What I am going

4    to allow is this:  One frame showing a still of Shehadeh, and

5    you can ask her, Are you saying you don't know if that's

6    Shehadeh?, and you can show her one panoramic frame of the

7    crowd.

8          MR. OSEN:  Your Honor, there's one problem with that

9    technically.  As you know, it's a pan shot from the crowd back

10   to the podium that establishes the relationship between the

11   crowd and the speaker.

12         THE COURT:  Don't need it.  You're showing one

13   video.  You can show those two frames.

14         MR. INGERMAN:  Your Honor, we object for the same

15   reasons stated.

16         THE COURT:  That's fine.  You can object.  Next

17   time, don't get a witness to tell you untruths.

18         MR. INGERMAN:  Your Honor --

19         THE COURT:  Don't give me an unprincipled answer,

20   please.  It's very clearly Shehadeh.  There's no doubt about

21   it.

22         MR. INGERMAN:  You're accusing me of something I did

23   not do, your Honor.  It's not fair.

24         THE COURT:  All I'm accusing you of, telling me you

25   don't know who that is.  Put it in the record, so when the

1  Court of Appeals looks at it -- who you seem to be trying this

2  case for -- they can make their own judgment whether there's

3  any ambiguity.

4           (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  (continuing)

2  Q    While we're waiting for some technical assistance, do you

3  have a copy of your book up there?

4  A    Yes, I do.

5  Q    Great.  A moment ago you testified that this, the video

6  clip that we showed you only, you thought it might be Salah

7  Shehada but you weren't sure.

8         Do you recall that testimony?

9  A    That's correct, you were asking me.  I said I couldn't

10  say with certainty because it was only featured in a couple

11  of -- the chap that you're mentioning, I know you didn't want

12  to call him a gentleman -- the chap that you were mentioning

13  was only in that for a couple of seconds.

14         MR. OSEN:  Just so the jury understands, chap is

15  guy.

16         THE WITNESS:  It's not something cowboys would wear.

17  Didn't, is chaps, cowboys wear them here?

18         MR. OSEN:  That's beyond my expertise.

19         THE WITNESS:  I beg your pardon.

20         MR. OSEN:  Mr. Miller, are you able to show just

21  that image?

22         Your Honor, with the Court's permission, we would

23  like to show the stilled image from the video of the person

24  the witness identified as possibly being Mr. Shehada.

25         THE COURT:  All right, go ahead.

1      MR. OSEN:  Mr. Miller, could you bring up the

2   picture again from the slide that Mr. Spitzen -- excuse me, in

3   fact, it is a slide of the video.  No, I'm sorry, this one

4   here and then back to one that was in the video clip we just

5   showed a moment ago.

6              (Pause in the proceedings.)

7   Q    Do you have any doubt that that is Salah Shehada?

8   A    In the clip picture.

9   Q    Yes.

10  A    Again, as I've said, I mean, it could be him.  I'm not

11  saying, you know, it could be him.

12             MR. OSEN:  Mr. Miller, could you show the other

13  portion of it's, just the crowd scene.

14             With Your Honor's permission, this is a still clip

15  from the video you saw a moment ago.

16  Q    Do you recall that?

17  A    Yes.

18  Q    Do you have any doubt that Mr. Shehada was speaking in

19  front of a very large crowd?

20             MR. INGERMAN:  Objection.

21             THE COURT:  Overruled.

22  A    It could have been, I don't know where this clip is

23  coming from.  I don't know what this clip is about.

24             THE COURT:  What he's asking you is, in the clip, do

25  you agree that this is a picture of Shehada speaking to a

1    large crowd in the clip?

2              THE WITNESS:  Oh, I see.

3              THE COURT:  In the clip.

4              THE WITNESS:  In the clip.

5              THE COURT:  Yes.

6    A    Yes.

7    Q    And you testified a few minutes ago that Salah Shehada

8    was killed by Israel in 2002; correct?

9    A    That's correct, yes.

10   Q    And Mr. Shehada was in prison in Israel until 2000; isn't

11   that correct?

12   A    I believe so, yes.

13   Q    So, considering he spent ten years in prison before that,

14   this event had to take place sometime between 2000 and 2002,

15   after he was out of prison and before he died; is that fair?

16             MR. INGERMAN:  Objection.

17             THE COURT:  Sustained.

18             MR. OSEN:  I'll ask a new question.

19   Q    Do you still maintain that Salah Shehada was a secret,

20   shadowy individual who was unknown to the Palestinian public

21   during the relevant time period?

22   A    Yes, I still maintain that as a publicly recognized

23   figure across the Palestinian territories, Mr. Shehada was

24   maintaining a secret existence.  In my own experience he

25   maintained a secret existence.  According to those I worked

1    with he maintained a secret existence.

2    Q    What do you mean -- I'm sorry, go ahead.

3    A    And that included Palestinian Authority officials

4    including intelligence officials.  That included European

5    intelligence officials and that included others.

6    Q    What do you mean by secret existence?  You mean he moved

7    regularly to avoid being arrested or do you mean that people

8    didn't know who he was?

9    A    As I've said, it's still, I would still maintain that in

10   the Palestinian territories of the West Bank and the Gaza

11   strip he was not a publicly recognized figure and he

12   maintained a highly secret existence from the period of as you

13   said, I think you said, he was released in 2000 and he was

14   killed when Israel dropped a one-ton bomb on an apartment

15   building in 2002.

16   Q    Do you think the people in that crowd thought he was

17   secret?

18             MR. INGERMAN:  Objection.

19             THE COURT:  Sustained.

20             MR. OSEN:  Let's move back to Mr. Spitzen's slide, I

21   think it's 44, Mr. Miller.  Yes, right there.

22   Q    Do you remember a moment ago you were talking about

23   Mushir Al-Masri?

24   A    They, yes, that's correct.  I believe I met Mushir

25   Al-Masri for the first time in 2005.

1   Q    Right.  And you said that he was very young and that he

2   had no connection to the Al-Nour Prisoner Society; right?

3   A    No, I said in my conversations with him, as I said, I

4   think I believe I first met him in 2005 after he had been

5   elected a Counselor in the municipal -- so, actually, probably

6   I met him in 2006, maybe it was 2005.

7   Q    But your testimony --

8   A    Sorry, I'll finish.

9        And I met him after he'd been elected in the town of

10  Beit Lahiya in northern Gaza and he had been elected on the

11  Change and Reform list, the Hamas list.  I recall in

12  particular when I met him I had been to see his cousin, also

13  al-Masri, who had been on the Fatah list and had been defeated

14  in the vote.

15       In my conversations from that point onwards and

16  subsequently in the knowledge and information that I had about

17  him, I was never informed of him having any connection with

18  the Al-Nour Prisoner Society.  When I had met officers at the

19  Al-Nour Prisoner Society during the period in question and

20  subsequently, Mr. Al-Masri, there was never any -- nobody ever

21  told me that he was on that committee or had been a founder of

22  that committee.

23  Q    Would you turn please, to page 240 of your book.

24       I want to direct you to the last paragraph on the

25  page, I don't believe we'll be able to bring -- I believe

1   we'll be able to bring it up in a moment.

2            It reads, one such emerging leader is Mushir

3   Al-Masri.  Al-Masri, born in the north Gaza town of

4   Beit Lahiya in 1978 or wore a black leather bomber jacket.

5            Do you see that?

6   A    Yes, you know my book much, much better than I do.

7   Q    I have read it.  Well, it actually does say, does it

8   not --

9   A    Yes, it does.

10  Q    -- say that he was a deputy leader of the student council

11  and was involved as a Board member of the Gaza based charity

12  Al-Nour?

13  A    Yes.

14  Q    Do you see that?

15  A    Yes, that's correct, I had forgotten that.

16  Q    Go back to the slide.

17           I think we now all agree, do we not, that Mushir

18  Al-Masri, a rising star in Hamas was, in fact, involved with

19  the Al-Nour Prisoner Society, right?

20  A    Yes, as you've reminded me and I have forgotten I had

21  written this in the book with my co-author, yes, that is

22  correct.  He was, as we've said here, he was a Board member,

23  but I only learned that information after I met him and when

24  we wrote the book and so during the period in question,

25  because I hadn't met him and I didn't have that knowledge or

1    information.

2    Q    But you agree that he was on the Board of Al-Nour during

3    that time?

4               THE COURT:  She said yes.

5               Go on to something else.

6               THE WITNESS:  No, I don't agree and I didn't say.  I

7    said I had learnt that knowledge after I had met him.  I don't

8    know what period of time he was on the Board, but one would

9    assume and it would be correct because it was formed in 2000,

10   that it would have included the period in question.

11   Q    You mentioned a few minutes ago your discussions at

12   various points in time with different people that helped

13   inform your conclusions that you testified to in this trial,

14   right?

15   A    That's correct, it's informed part of my conclusions.

16   Q    You testified during the course of your work that you had

17   contacts with the Israeli military and intelligence community,

18   right?

19   A    That's correct.

20   Q    But during your contacts with those individuals, you

21   never raised the question of whether any Zakat committees or

22   charitable associations at issue in this case were affiliated

23   with Hamas, isn't that right?

24   A    That's correct.  Directly that issue was never raised

25   either by me or by the Israelis that I was talking to.  Whilst

1  we did discuss issues of combatting the Hamas threat, how it

2  could be combatted, what kinds of counter-terrorism measures,

3  political and other measures could be taken to relinquish

4  Hamas's control over parts of the Palestinian territories, I

5  never directly asked that question and they never directly

6  raised that issue with me.

7  Q    And you testified that you visited The Islamic Society of

8  Gaza during the 2000 and 2004 time period, right?

9  A    Yes, that's correct.

10 Q    And those visits form a part of your expert conclusion

11 that the Islamic Society of Gaza was not controlled by Hamas?

12 A    During that period in time, yes.

13 Q    And during your visit to the Islamic Society of Gaza, you

14 never discussed with anyone the issue of whether the Islamic

15 Society was a front organization for Hamas, did you?

16 A    No, during that period in time, those kinds of

17 discussions didn't take place.  When I was making those

18 visits, sometimes alone and sometimes with, as I've said,

19 British diplomatic officials or EU officials, the subject

20 matter, subject matter was quite different from -- sorry, I've

21 forgotten the question you asked me.  We never asked are you

22 Hamas.

23 Q    Okay.  You never raised that subject in your meetings at

24 the Islamic Society; correct?

25 A    No, not to my knowledge.  As far as I can recall, not

1  during that period, no.

2  Q    I can go through all of the committees with you, but can

3  we perhaps save everyone's time by having you acknowledge that

4  in all of your meetings, whether it was with the Israelis,

5  with the societies, with the general security services of the

6  PA during the time period, you never asked anyone whether the

7  committees and charitable associations at issue in this case

8  were controlled by or fronts for Hamas; true?

9  A    That's correct.  As I've said, I mean, we had many

10 discussions about Hamas, about the threat it presented, about

11 how to diminish and even eliminate its control, its spheres of

12 influence over parts of Gaza and the West Bank and the issue

13 of the Zakat committees was never raised by my colleagues and

14 never raised by myself.  Correct.

15 Q    Let's move on to another subject.  Sheikh Ahmed Yassin.

16       Yesterday on direct examination you stated -- the

17 transcript is page 2210 -- you were discussing Sheikh Yassin

18 during the relevant time period of 2000 to 2004.  And you

19 described his physical limitations and health, do you recall

20 that testimony?

21 A    Yes.  I think I do.  May I see the testimony?

22 Q    Sure.

23       MR. OSEN:  Mr. Miller, can you bring up page 2210 of

24 yesterday's transcript.

25       MR. INGERMAN:  Your Honor, may I give her a hardcopy

1    of the transcript?

2            THE COURT:  Would you like a hardcopy of the

3    transcript?

4            THE WITNESS:  Yes, I always prefer it.

5            THE COURT:  You may.

6            THE WITNESS:  The screen is quite blurred.

7    Actually, it's probably my eyesight that's probably quite

8    blurred.

9            (Pause in the proceedings.)

10   A    That's correct I see that.

11   Q    Right.  And so you also said that, and this is the part I

12   want you to focus on, you said I think I would know, I would

13   cast significant doubt on whether he -- that's Sheikh

14   Yassin -- even had control of Hamas.

15           Do you see that?

16   A    Yes, I do.

17   Q    So, in the time period between 2000 and 2004, you have or

18   your phrase is would cast significant doubt on whether he even

19   had control of Hamas; is that right?

20   A    That's correct.

21           MR. OSEN:  I'd like, Your Honor, if we may publish

22   to the jury PX 1248, which is already in evidence.

23           THE COURT:  All right.

24           MR. OSEN:  May I approach the witness, Your Honor?

25           THE COURT:  You may.

1    Q    Professor, this is the United States designation of

2    various Hamas leaders and Hamas affiliated fund-raising

3    societies that took place on August 22nd, 2003.

4         You've seen this document before, have you not?

5    A    Yes, I've seen this document before.

6         MR. OSEN:   Mr. Miller, could you turn to page three.

7    Q    One of the individuals who was designated in this

8    designation in August of 2003 was Ahmed Yassin, he had been

9    previously designated in 1995, but was redesignated again

10   under a different executive order in 2003.  I'd like to read

11   the US Government's assessment of Ahmed Yassin in 2003.

12        You see where it says Yassin is the head of Hamas in

13   Gaza, he maintains a direct line of communication with other

14   Hamas leaders and coordination of Hamas's military activities

15   and openly admits that there is no distinguishing the

16   political and military wings of Hamas.  Yassin also conveys

17   messages about operational planning to other Palestinian

18   terrorist organizations.

19   A    Yes, I see that.

20   Q    Do I understand your testimony correctly that your

21   opinion differs from that of the United States Government at

22   this time in terms of Mr. Yassin's direction of and leadership

23   of Hamas?

24   A    No.  I mean, I can certainly agree that, you know, as I

25   acknowledged yesterday because he is able to speak, I can

1   certainly I know that he was able to speak.  I've witnessed

2   that myself and I know that he was able, if somebody held a

3   phone up to his ear, that he would be able to communicate.

4   So, I don't, I don't really see any disagreement in that

5   respect.

6           What I was reflecting on was the issue of wide

7   control, actual control of the Hamas organization.  I think

8   there was agreement he was seen as a spiritual head of the

9   organization or spiritual figurehead of the organization.  I

10  don't disagree with this assessment.

11          Where I'm casting doubt is and the reason why I'm

12  casting doubt is that firstly, when Israel released Mr. Sheikh

13  Yassin from prison in 1999 they were aware of his disabilities

14  and physical limitations and as I say, I'm aware myself of

15  that.  So in terms of controlling on a day-to-day basis this

16  entire organization, that was where I was coming from in terms

17  of that explanation.  I was, you know, the real physical

18  limitations in doing that.

19  Q    Mr. Yassin was actually released from prison in 1997, was

20  he not?

21  A    Yes, my belief -- we've had this discussion before and

22  again, you're much better at remembering the history of

23  certain events than I am.  Yes, that's right, it was in 1997.

24  Q    Let's turn to a different subject from yesterday.  We

25  talked about the FBI's assessment of certain of the Zakat

1   committees and the Islamic Charitable Society of Hebron that

2   are the subject of this case.

3            Do you recall that testimony?

4   A    Yes, I remember our discussion about the FBI.

5   Q    Do you still have the transcript, the full transcript

6   from yesterday in front of you?

7   A    I presume this is the full transcript.

8   Q    Well, do you have page 2280?

9   A    22... yes, I do have 2280.

10  Q    You testified yesterday that you disagreed with my

11  statement that the FBI concluded that the organizations listed

12  on the slide we showed yesterday were controlled by Hamas.

13           Do you recall that now that you have it in front of

14  you?

15  A    Yes, I can see that, but I don't know what slide we were

16  referring to.

17           MR. OSEN:  Mr. Miller, could you bring up the slide

18  from yesterday, thank you.

19           THE WITNESS:  Sorry, the box, is that the text?  The

20  box has an arrow into this introduction.

21  Q    Yes, that's just the, that's Mr. Miller's talented

22  design.  This is the Watson memorandum.

23  A    Right, what page?

24  Q    It's actually, the entire document runs, that is the memo

25  itself is 49 pages.

1   A    Okay, so can I see the -- excerpt.

2   Q    So, we're going to talk --

3   A    Excuse me.

4   Q    Sorry?

5   A    Could I see the memorandum, please.

6   Q    Oh, you don't have a copy.  I thought you did.  Hold on.

7            MR. OSEN:  We're going to focus on page 27 to 28.

8            Mr. Miller, can you bring up the slide of the bottom

9   of 27 and 28.

10  Q    I apologize to everyone, it's been copied so many times

11  that is loses some of its clarity.

12           The language which is on the screen, Professor,

13  states as follows:  It is the FBI's analysis that the Zakat

14  committees received Holy Land Foundation for Relief and

15  Development financial support are controlled by Hamas.

16  Government of Israel analysis has already determined that

17  Hamas activities have been elected or appointed -- I'm sorry,

18  Hamas activists have been elected or appointed to senior

19  leadership positions on the Zakat committees.  Government of

20  Israel analysis, as well as open-source reporting, has

21  identified that the civilian population is aware that the

22  services being provided by the Zakat committees, whether it's

23  the distribution of food, medical services or other social

24  services, are being provided by Hamas.

25           Then it cites to Exhibits to the memorandum and goes

1   on to say the Holy Land Foundation For Relief and

2   Development's finding of the Islamic Charitable Association

3   (ICA) is one example of the role that the Zakat committees

4   play in the overall goal of building Hamas grassroots support

5   through charitable projects.

6           My question, Professor, is whether you still have

7   any doubt that the FBI concluded in 2001 that several of the

8   committees at issue in this case were controlled by Hamas and

9   were using social services in order to further the aims of

10  Hamas?

11  A    Well, as I said yesterday, when I read the conclusion on

12  page 49 it made no mention of any of the Zakat committees --

13  the document itself makes no mention of any of the committees

14  in Gaza.  It talks about some of the committees in the

15  West Bank.

16          This was an action memorandum that wasn't actioned

17  in relation to any of the conclusions that the FBI had reached

18  in that period.  None of the committees were designated and as

19  I understand, Mr. Watson left in some ignominy and disrepute a

20  month or so later because he claimed that Osama bin Laden was

21  dead when it was ten years later that he was killed.

22          I'm looking at the conclusions on page 49.

23  Q    Right.

24  A    And the FBI made conclusions about the Holy Land

25  Foundation and this interference in the national security

1  foreign policy or economy.  This wasn't a public document in

2  2000 to 2004.  As far as I know, it went up to the Treasury,

3  Treasury took no action to designate any of the committees

4  that the FBI had their suspicions about.

5  Q    Well, first of all, what's your basis for the assertion

6  that the Watson memorandum wasn't a public document?

7  A    In the 2000 to 2004 period.

8  Q    Well, not 2000, it was issued in November of 2001.  But

9  in the 2002 to 2004 period, what is the basis for that factual

10  assertion?

11  A    Well, to my knowledge it was a classified document.  And

12  to my knowledge it wasn't declassified until after 2004.

13  Q    And what is the basis for your knowledge?

14  A    The basis of my knowledge is learning about this

15  memorandum when I was hired to become involved in this case in

16  2010.

17  Q    What does that mean?  What is the actual basis of your

18  statement?

19  A    I've just explained the basis of my statement.

20  Q    You said you learned this when you became involved in

21  this case.

22          My question is what is the actual factual basis for

23  your claim that this document was not public between 2002 and

24  2004?

25  A    That it was, it was an internal memorandum from the FBI

1   to United States Treasury.  An internal memorandum leads me to

2   believe that it was not a public document.

3   Q    Do you see the front page of the Watson memorandum?  Can

4   you turn to the front cover?

5   A    Yes, I do.

6   Q    Do you see a handwritten portion on the top corner,

7   public 12/3/01?

8   A    Well, it looks like public, yes.  But I don't know, I

9   mean, unfortunately, as you've acknowledged yourself, it's so

10  indistinct.

11  Q    Let's switch topics again and I want to return to your

12  book, page 176.

13            MR. OSEN:  And Your Honor, if I may, I'd like to

14  display the page.

15            THE COURT:  Go ahead.

16  Q    We discussed this in your deposition.

17  A    Sorry, just let me turn.

18  Q    Sure.  I'm not sure I'm helping.

19            I want to focus on one paragraph.  The paragraph

20  that reads but the work of the Islamic Society and the rest of

21  Hamas's network in the decades up to, during and after the

22  second intifada, when families needed it most, represented not

23  so much a donation as an investment by Hamas, one that reached

24  a lucrative political dividend in the 2006 election.

25            You see that passage, right?

1    A    Yes, I do.

2    Q    And you wrote in your book that the Islamic Society of

3    Gaza, the one that you've testified under oath in this

4    courtroom was not controlled by Hamas, you wrote in your book,

5    did you not, that in the decades up to, during and after the

6    second intifada, The Islamic Society was part of Hamas's

7    network and that donations to it were an investment; that is,

8    there were actually, was an investment by Hamas, right?

9    A    Yes, that's correct, and as we went on, further on in the

10   book and in that chapter in the interviews that we had with

11   society officers and beneficiaries, they then were disavowing

12   any direct link.  So, we were talking generally when we were

13   writing this in 2009 about the network.

14            And yes, we wrote that, that's correct.  With

15   hindsight we were writing that.  We weren't, at the time when

16   we wrote this book, we weren't writing about control, which is

17   what I've been asked about in this case, but yes, we wrote

18   that.

19

20            (Continued on following page.)

21

22

23

24

25

                    VB      OCR      CRR

 1  BY MR. OSEN:

 2  Q    So, you're making a distinction now, if I understand,

 3  between being part of Hamas's network in the decade up to,

 4  during and after the Second Intifada, with the idea of control

 5  of the Islamic Charitable Society by Hamas?  That's your

 6  testimony?

 7  A    Hold on a minute, because I actually want to read the --

 8       (Pause.)

 9  A    What's your question, again?

10  Q    I'll ask a new question.

11  A    Okay.

12  Q    In your deposition in this case in 2011, you were asked

13  about this statement in your book?

14  A    Right.

15  Q    You were asked whether it was your sworn testimony that

16  this statement that the Islamic Society of Gaza was part of

17  Hamas's network before, during and after the Second Intifada,

18  and you stated, did you not, that you stood by the statement

19  made in your book?

20            MR. INGERMAN:   Objection.

21            THE COURT:   Read her the questions and answers from

22  her deposition, if that's what you want to do.

23            MR. OSEN:   With the Court's permission, we would

24  actually like to play the clip.

25            THE COURT:   Fine.

1          MR. INGERMAN:  Can we have the page and line, your

2   Honor?

3          THE COURT:  Please.

4          MR. INGERMAN:  Your Honor, may I give a hard copy to

5   the witness?

6          THE COURT:  Sure.

7          (Pause.)

8          MR. OSEN:  Can we have the lights?

9          (Tape plays.)

10         (Tape stops.)

11  Q    The question, professor, is, which is it?  Are we to take

12  your opinion from your book and from your deposition under

13  oath that the Islamic Society of Gaza was part of Hamas's

14  network during the relevant period, or your testimony on

15  Monday and yesterday that it was not?

16         MR. INGERMAN:  Objection.

17         THE COURT:  Overruled.

18  A    As I've said and I'll carry on maintaining, I'm prepared

19  to stand by the statements that we published in the book and

20  that we made in the deposition.

21         We talk about a network.  We didn't write the book

22  with the intention of talking about control.  I don't believe

23  we refer in the book to control.  That wasn't the intention of

24  our book, to look at issues of control.  And I don't see a

25  contradiction in those assertions.  I took in a considerable

1   number of other factors when I was looking at the Islamic

2   Society and all the other societies in this case in

3   determining criterias of control, and there's been an awful

4   lot of debate about control.

5   Q    But what about public perception?  To hear the question I

6   asked, how could Hamas reap a lucrative political dividend in

7   2006 if no one knew that the Islamic Society of Gaza was part

8   of Hamas's network?

9              MR. INGERMAN:  Objection.

10             THE COURT:  Overruled.

11  A    That's a very good question.  As I've already pointed

12  out, everybody involved in this case has scrutinized me and my

13  coauthor's work and is looking for implications there that I

14  can honestly say were not there when we were writing -- when

15  we were writing the book in 2010 and 2009.

16             For the purposes of this case, I was being asked to

17  reflect on the period of 2000 to 2004, reflect on my

18  experiences of public perception during that period, and that

19  was the conclusion that I reached for the purposes of this

20  case.

21  Q    But it's not the conclusion you reached in your book, and

22  it's not the conclusion you reached in your sworn deposition

23  in 2011, is it?

24  A    That's not a conclusion on that page.  That's part of a

25  written narrative and analysis.  And as I've already said,

1   there are other parts of the book on forwarding pages where

2   managers of the Society and beneficiaries of the Society say,

3   We're not Hamas, and we're not part of Hamas.

4   Q    But you thought -- these are your words -- that the

5   public in the Palestinian Territories actually did associate

6   the Islamic Society of Gaza with Hamas; otherwise, Hamas could

7   not have reaped a lucrative political dividend from the work

8   of the Islamic Society of Gaza; isn't that true?

9   A    No.  It's not true.  We here are talking about

10  represented by Hamas.  We're not talking about what the public

11  thought.  There are any number of reasons why the Palestinian

12  public voted for Hamas in 2006.  Many reasons.  Most of them

13  weren't actually connected with being Hamas-hugging people.

14  They were to do with the disappointment and failure and

15  progress in the peace process.  They were to do with the ways

16  in which other campaigns were run.  They were to do with the

17  ways in which other political factions had disappointed.

18         We're talking about Hamas representing things.  I'm

19  not talking about the Palestinian public there, nor is my

20  coauthor.  If you wish to make that interpretation, you may.

21  Q    Let's read it again, so that everyone is on the same

22  page:  "The work of the Islamic Society and the rest of

23  Hamas's network" -- that's a statement of fact; correct?

24  A    A statement of fact?

25  Q    Yes.

1  A    No.

2  Q    That's your assertion?

3  A    This is analysis.

4  Q    That's your analysis?

5         MR. INGERMAN:  Objection, your Honor.

6         THE COURT:  You're objecting that he's not letting

7  him finish her answer?

8         MR. INGERMAN:  I am.

9         THE COURT:  Let her finish her answer.

10        MR. OSEN:  Absolutely, your Honor.

11 A    This is not an encyclopedia.  This is a book.

12 Q    Your book?

13 A    It's a co-authored book.  Yes, as I keep saying, I'm more

14 than happy to stand by the contents of this, of this book.

15 And we're representing a variety of perspectives,

16 historically, politically.  We're representing the views of a

17 variety of individuals, of groups, communities, and

18 constituencies from the Palestinian Territories, from Israel

19 and from abroad.

20 Q    You're not representing it here, though?  This is your

21 analysis?  You're not describing somebody else's analysis, are

22 you?  This is your statement and your coauthor's statement as

23 to what you assessed, your analysis of the fact that the

24 Islamic Society was part of Hamas's network in the decades up

25 to, during and after the Second Intifada; true?

1    A    Yes.  I've already said that, I think three times now.

2              MR. OSEN:  I have no further questions, your Honor.

3              THE COURT:  All right.  Let's take our morning

4    break, ladies and gentlemen.  We'll reconvene at 11:10.

5    Please don't talk about the case.  See you in a few minutes.

6              (Jury excused.)

7              THE COURT:  We're in recess until 11:10.

8              (Recess.)

9              (In open court; jury not present.)

10             THE COURT:  Bring in the jury, please.

11             (Jury present.)

12             THE COURT:  Be seated.

13             Redirect examination.  Please proceed, Mr. Ingerman.

14             MR. INGERMAN:  Thank you, your Honor.

15   REDIRECT EXAMINATION

16   BY MR. INGERMAN:

17   Q    Professor Milton-Edwards, you're almost done.

18   A    Thank you.

19   Q    Let me start with where we ended, with the Islamic

20   Society --

21   A    Yes.

22   Q    -- and the statement from your book.

23   A    Yes.

24   Q    And Mr. Osen showed you an excerpt or played an excerpt

25   from your deposition, where he asked about the statement in

1    the book, and then asked you whether you stood by that

2    statement today.  But he didn't play the entire excerpt for

3    you.  I would like to pull up -- let's actually start at page

4    3676, at line 24, where Mr. Osen -- and he did play this part

5    to you, and he said:

6                "QUESTION:  And do you stand by that today?"

7                Your answer was at the bottom of 366:  "In terms of

8    the general descriptive as in this book, yes, I do.  But this

9    was a different task to the task that I was undertaking, in

10   terms of the preparing for the expert report, which required

11   much more significant scrutiny.  But yes, I still do stand by

12   that statement today."  And that's where the clip ended.

13               I would like to show you what comes right after that

14   at line 8 on page 367.  You were asked the following question:

15               "Is it your testimony that you undertook greater

16   research and scrutinized materials more for your expert report

17   than you did for your book?"

18               "ANSWER:  No, not really.

19               "QUESTION:  The same?

20               "ANSWER:  Could be the same.  Could have been

21   different.  It's a different set of tasks."

22               Let me ask you this question, professor:  What is

23   the difference in the set of tasks and what is the difference

24   between your statement in the book in 2010 that the Islamic

25   Society was part of the Hamas network and the conclusion you

1   reached here in court before the jury, that it was not

2   controlled by or perceived to be controlled by Hamas during

3   the relevant time period of 2000 to 2004.

4   A    The difference is, in my expert report as ordered by the

5   court, in particular as it related to the issue of whether

6   these Societies and the Islamic Society in particular was

7   controlled by Hamas or perceived to be controlled by Hamas, I

8   relied on -- and I think that Mr. Osen pointed out to me that

9   I relied on -- up to 18 distinct criteria.  I think it

10  was 18, and these were the criteria by which I determined my

11  opinion that during the 2000 to 2004 period, the Islamic

12  Society was not controlled by Hamas.

13        And, of course, that criteria was inclusive of or

14  included leadership.  It included whether it was designated by

15  the U.S. Government at the time.  It included whether the UK

16  had designated it.  Whether the EU had designated it.  Whether

17  the UN had designated it.  Did it have U.S. Government-cleared

18  partners?  Which it did.  I relied on my meetings.  All of the

19  things that I spoke about in my direct testimony, that

20  extensive criteria, I relied on to reach that conclusion.

21  Q    Now, if we could have slide 7.  This is slide 7 from your

22  direct testimony.

23        This is the list of the eleven Zakats at issue in

24  this case.  I'm focused on the right side, which are the

25  Zakats that were in the Gaza Strip.  The Charitable Societies

1    in the Gaza Strip.  Al Jam'iya Al-Islamiya was the Islamic

2    Society we were just talking about.  With respect to the Gaza

3    Strip Zakats and Charitable Societies, was there a particular

4    event in 2005, 2006 that changed how those Zakats were run and

5    controlled with respect to Hamas.

6    A    Yes.  As I explained in my direct testimony, I mean, I

7    never at any point said that the situation in the Palestinian

8    Territories during the period 2000 to 2004 was static, and I

9    certainly wasn't saying that it was static after that period.

10   In fact, I tried to go to a great deal of trouble to explain

11   that in 2005, Israel withdrew from Gaza.  Withdrew its

12   military forces.  It withdrew its settlers.  It left the

13   Fatah-controlled Palestinian Authority in charge, but it left

14   it powerless to police its own society, to deal with the

15   threats that it faced and that Israel faced, and that common

16   threat, of course, was Hamas.  And that's because Israel,

17   during the period of 2000 to 2004, had actually destroyed the

18   security services, had bombed their prisons, their police

19   stations, had left a society that was in chaos -- what was the

20   term that was used? -- fawda, in chaos.

21             And into that vacuum, Hamas, along with other

22   militant groups, took advantage and took control, culminating,

23   in June 2007, with Hamas taking complete control of the Gaza

24   Strip.

25   Q    And was Hamas in control of the Gaza Strip prior to 2005?

1  A    No, it was not.  The Palestinian Authority, headed and

2  led by Fatah, which were the enemies and rivals of Hamas, they

3  were the ones in control --

4  Q    Now --

5  A    -- and Israel.

6  Q    Thank you?

7         Mr. Osen started out this morning, I think, pointing

8  out to you that you had said yesterday that Mr. Spitzen did

9  not identify the Ramallah Zakat Committee as one of the

10  committees that he was discussing here in his testimony.

11         And I would like to show you, if we could, Spitzen

12  slides 40 and 41, which were the two summary slides that he

13  put up in his discussion of the Zakats that he discussed here

14  in front of the ladies and gentlemen of the jury.  He's got

15  one for the Gaza Strip and one for the West Bank.

16         Do you see that.

17  A    Yes, I do.

18  Q    And do you see the Ramallah Zakat Committee on either of

19  those lists?

20  A    No, I don't.

21  Q    Now, let me ask you a little bit -- you can take that

22  down?

23         Let me ask a little bit about the Israeli list.

24  A    Yes.

25  Q    We've heard a lot about the Israeli designations of some

1   of these Zakat Committees.  First of all, I think your

2   testimony was that you were not aware of the Israeli list in

3   the 2000-2004 time frame; that is correct?  Is that right?

4   A    Yes.

5   Q    During your time actually in the Palestinian Territories,

6   during that time period and during your visit to these many

7   Zakats, did you ever see any evidence of the enforcement of

8   the Israeli designation list?

9   A    No.  I didn't see any evidence whatsoever.  If they had

10  been closed by Israel, which is what you would expect if

11  something had been declared unlawful, obviously, I would have

12  reported that.  But on my visits throughout that period, these

13  Societies were open and operating.

14          I recall that Mr. Spitzen himself, who was the head

15  of the Civil Administration, acknowledged that they were

16  monitoring the committees on a weekly basis, that they were

17  still approving financial transfers to the committees from

18  abroad, and, again, you know, if they were unlawful, we would

19  have expected them to have closed it down.

20          And in fact, as I recall from my own direct

21  testimony, I know that during that period, there were

22  occasions when the IDF, the Israeli Defense Forces, were even

23  coordinating their work with these committees to provide

24  humanitarian relief and help to the needy.

25          The international community, in terms of USAID -- in

1   other words, the U.S. Government -- they were working in

2   partnership with these committees, as well.  So, in terms of

3   Israeli designation list, to my knowledge, it was not public

4   in the Palestinian Territories.

5   Q    Let me move from the Israeli list to the Al-Islah

6   designation that Mr. Osen showed you.

7              If we could have PX 1293.

8              Al-Islah was designated in 2007; is that right,

9   professor?

10  A    Yes, that's correct.

11  Q    And the part that Mr. Osen did not show you is in the

12  first -- second paragraph, where the U.S. Government says

13  "Today's action alerts the world to the true nature of

14  Al-Islah and cuts it off from the U.S. financial system."  And

15  that's, as you see, in the upper left-hand corner,

16  August 7, 2007

17             What relevance did that statement have to you in

18  connection with your assessment of Al-Islah

19  A    As I stated before, during the period of 2000 to 2004,

20  Al-Islah was not designated by the U.S. Government.  That

21  says "today."  It doesn't say, Well, now that we realize, you

22  know, well, we've been thinking about it and we've decided.

23  It says from today.  It says "Today's action alerts the

24  world."

25             I'm sure that if in 2000 to 2004, the U.S.

1    Government had had that information and they had wanted to

2    designate it as a Hamas front, then they would have done it.

3    But they didn't.  They didn't do that during the period

4    concerned.

5    Q    Now, another thing you mentioned on cross-examination

6    that was of interest to me was that -- and Mr. Osen showed you

7    a series of what I'll call or mentioned a series of Western

8    press stories.  I think he even mentioned NPR, National Public

9    Radio.  During the 2000 to 2004 time period, was the Western

10   press making its way into the Palestinian Territories?

11   A    No.  It may come as some surprise here, but residents of

12   Ramallah and Nablus, even if the curfew was lifted, and again,

13   these were periods where in Gaza and in the West Bank people

14   were often under curfew, were in closed military areas, were

15   prevented from even leaving their houses, and I'm certain with

16   99.9 percent certainty the Palestinian residents of the

17   Territories were not going and buying the Daily Mail, they

18   were not buying the Washington Post.  These newspapers were

19   not for sale.  Distribution of newspapers was controlled

20   during that period by the Israeli Government and military

21   censor, because these were occupied territories.  And also the

22   Palestinian Authority and they enforced strict control over

23   the circulation even of the Palestinian press titles and other

24   Arabic press titles, and I don't believe that these newspapers

25   were -- these press reports were available in the Palestinian

1   Territories at the time.

2   Q    Were people in the Palestinian Territories in the

3   2000-2004 time period, did they regularly use the Internet?

4   A    No.

5   Q    Why is that?

6   A    Internet usage at that point was very low.  People didn't

7   have -- I mean, I know most of us, we tend to use the Internet

8   at home and we use our iPads.  During that period, personal

9   usage or home usage, again, because the Palestinian Authority

10  ran the cables out, there were no land lines, there were very

11  few land lines for Internet usage, there were some Internet

12  cafes, I recall, in Gaza and in the West Bank, not many, and I

13  know from having been in those Internet cafes, they were

14  frequented by young men, and those young men were usually

15  gaming or accessing pornography.

16  Q    Let's not go there in this trial.  Okay?

17  A    Okay.

18  Q    Save that for another day?

19       Let me switch gears for a minute, and talk about

20  Al-Islah, one of the other Zakat Committee Charitable

21  Committees in this case.  Mr. Osen showed you Plaintiffs'

22  Exhibit 871, and that was the Palestinian National Authority

23  indicating that Al-Islah was shut down on 12-15-2001.

24       Do you recall the questions about that?

25  A    Yes, I do.

1  Q    Mr. Osen didn't ask you what happened to Al-Islah after

2  this memo?  Do you know what happened to it after this memo?

3  A    Yes.  Al-Islah continued to operate and continued to be

4  licensed by the Palestinian Authority, and its board members

5  continued to be approved in terms of them discharging their

6  activities for this charity.  I believe that later it then

7  changed its name, and again, the Palestinian Authority

8  approved the name change, and they continued to give the

9  charitable support to the needy and those who had been victims

10 of the conflict during that period.

11 Q    Mr. Osen spent a lot of time with you yesterday on the

12 Holy Land Foundation litigation?

13 A    Yes.

14 Q    And my question for you is, are you aware of, as a result

15 of that litigation, are you aware of the United States

16 Department of Justice ever bringing charges against any of the

17 eleven Zakats that are at issue in this case?

18 A    As far as I'm aware, there were no charges ever brought

19 by the United States Department of Justice against any of

20 those charities.

21 Q    A few last things here.  If we could see -- one of the

22 other things Mr. Osen showed you was PX 1248, which was of the

23 designation of Sheikh Yassin.  Do you recall that discussion?

24 A    Yes.

25 Q    And in the top left-hand corner, it shows a date of

1    August 22, 2003.  Do you see that?

2    A    Yes, I do.

3    Q    And it talks about designating five charities who were

4    funding Hamas and six senior Hamas leaders as terrorist

5    entities; do you see that?

6    A    Yes, I do.  But I only saw the names of the individuals,

7    not the charities.

8    Q    Okay.  You remember that the Watson memo, the infamous

9    Watson memo, was dated November 2001?

10   A    Yes.

11   Q    Even though Mr. Watson made his views known to the

12   Treasury Department in November of 2001, when the United

13   States Government designation Yassin in August of 2003, does

14   it designate any of the eleven charities at issue in this

15   case?

16   A    No.

17   Q    Now, Israel had some of the Zakats on its designation

18   list; right?

19   A    Yes.

20   Q    Germany listed some of the Zakats in one of its

21   intelligence memoranda; correct?

22   A    Yes, some of it.  Not all.

23   Q    And Dale Watson did what he did in his memo; right?

24   A    Yes.  He didn't even mention any of the Gaza charities.

25   Q    Notwithstanding what was available to Israel, Germany and

1   the FBI, prior to 2007, did the United States, the UK, the UN

2   or the EU designate any of these eleven Zakats as

3   Hamas-affiliated or terrorist organizations?

4   A   No.  They didn't designate them, and therefore I see that

5   my conclusions about the control and the perception of the

6   Palestinian public during that period in time about control is

7   completely aligned with all of those governments:  The U.S.

8   Government, the UK Government, all the member states of the

9   United Nations, and all twenty-eight member states of the

10   European Union.

11          MR. INGERMAN:  I have no further questions, your

12   Honor.

13          THE COURT:  All right.  You may step down.

14          Thank you very much.

15          (Witness excused.)

16          THE COURT:  The defendant may call its next witness.

17          MR. STEPHENS:  The defense calls Mr. Shukry Bishara.

18          THE CLERK:  Would the interpreter raise your right

19   hand.

20          (Interpreter sworn.)

21          THE CLERK:  State your name for the record.

22          THE INTERPRETER:  Muhammad, M U H A M M A D,

23   Fawaz, F A W A Z, Azem, A Z E M

24          THE COURT:  All we need is a witness.

25          MR. STEPHENS:  He was out in the hallway just a

1    minute ago.

2           THE CLERK:  Sir, please raise your right hand.

3    S H U K R Y     B I S H A R A,

4           having been duly sworn, was examined and

5                  testified as follows:

6           THE CLERK:  State your name for the reporter.

7           THE WITNESS:  Shukry Bishara, S H U K R Y,

8    Bishara, B I S H A R A

9           THE CLERK:  Thank you.  You may be seated.

10          THE WITNESS:  Thank you.

11          THE COURT:  He's going to testify in English?

12          MR. STEPHENS:  Yes.

13   DIRECT EXAMINATION

14   BY MR. STEPHENS:

15   Q    Good morning, Mr. Bishara.  How are you?

16   A    Good morning.  I'm fine, thank you.

17   Q    Maybe we can move that just a little closer to you.

18   A    Yes.  It's working.

19   Q    There we go.  Okay?

20          My first question to you, what languages do you

21   speak?

22   A    I speak fluently English, Arabic and French, and a bit of

23   Italian and a bit of Hebrew these days.

24   Q    What is your current employment, please?

25   A    I'm a Minister of Finance.

1  Q    Where?

2  A    In the Palestinian Government.

3  Q    Is that called the Palestinian Authority?

4  A    Yes.

5  Q    Could you tell the jury, please, what the Palestinian

6  Authority is?

7  A    The Palestinian Authority is the authority that signed

8  the peace treaty back with Israel in 1993.  It's the

9  recognized government for Palestine.  It's the government that

10  is recognized by the international community, and it's the

11  government that deals on a daily basis with the global

12  community.

13  Q    What do you do as Minister of Finance of the Palestinian

14  Authority?

15  A    A Minister of Finance's job is like in any other country.

16  We manage a country's finances.  A country's finances involves

17  revenues on one side, expenses on the other, and management of

18  the treasury.  Revenues are basically the taxes we collect.

19  The expenses are the budgets we allocate for various other

20  ministries, agencies of the government, development programs,

21  etcetera.

22         In a country such as ours, which is very poor, it's

23  an emerging country, we depend a lot on international aid.  In

24  my function, I coordinate a lot of the international aid with

25  countries such as the United States, the European Union.

1       Also, we are very much dependent on trade flows from

2   Israel, the return of taxes that Israel remits back to us.

3   They collect taxes on our behalf on borders, and on a monthly

4   basis, I act very closely with my counterpart, the Minister of

5   Finance of Israel.

6           (Continued on next page.)

1   (CONTINUING)

2   Q     How long have you been in your position as the minister

3   of finance?

4   A     Year-and-a-half.

5   Q     And prior to that, you worked at Arab Bank; did you not?

6   A     Yes, sir.

7   Q     And could you tell the jury, please, when was it actually

8   that you worked at Arab Bank?

9   A     I started working for Arab Bank in 1979.  In Paris.

10  Q     And then, how long did you work for the bank?

11  A     14 years, Mr. Shand, in Paris.

12  Q     And then, after that?

13  A     1993, when word of the Oslo Agreement was coming out, I

14  offered to take charge of resuming the bank's operations in

15  Palestine.

16  Q     So you worked in the West Bank in Gaza from 1993 until

17  when?

18  A     West Bank in Gaza, '93 effectively to end of 2001,

19  beginning 2002.

20  Q     And then after 2002, where did you work at Arab Bank?

21  A     I moved to the headquarters of the bank in Amman, Jordan,

22  yes.  And I became the chief banking officer of the bank.  I

23  was, in fact, in charge of the lending side and corporate side

24  of the bank.

25  Q     Okay.  Now, where do you currently live, Mr. Bishara?

1  A    I live in Jerusalem.

2  Q    Okay.  And where are your offices as minister of finance?

3  A    In Ramallah.

4        MR. STEPHENS:  Do we have the map?  Yes?

5  Q    Can you point out for the jury, actually where you live

6  and where your office is?

7  A    Do you mind if I move, Mr. Shand?

8        MR. STEPHENS:  Let me put this up here.

9        THE WITNESS:  Thank you.

10  A    Well, Jerusalem is here, this is Jerusalem.  Ramallah is

11  here.  On a typical day it would take 15 minutes to drive, but

12  sometime with road blocks, et cetera, it could take up to two

13  hours.  It's barely 18 kilometers, 18 kilometers would be 22,

14  23 miles.

15        MR. STEPHENS:  Okay.  Thank you, you can take the

16  stand again.

17        THE WITNESS:  All right.

18  Q    Of what countries are you a citizen?

19  A    I am citizen of both France and Jordan and I also hold a

20  residency card in Jerusalem, a residence card in Jerusalem.

21        MR. WERBNER:  Your Honor, may I take this down?

22        THE COURT:  Yes.

23        MR. WERBNER:  Thank you.

24        MR. STEPHENS:  Sure.

25  Q    Do you have a family?

1    A    Yes, sir.

2    Q    And could you tell the jury please about your family.

3    A    I have two boys and one girl.

4    Q    And where were they born?

5    A    The three of them were born in quick succession in 1990,

6    1991, '92, in Paris, France.

7    Q    Where did you grow up?

8    A    I grew up in Jerusalem.

9    Q    And what year were you born, please?

10   A    1948.

11   Q    And where did you attend school before you went to

12   college?

13   A    I went to school in Jerusalem, a school called Christian

14   Brothers School and finished.  From there I went to study, I

15   did a one-year, one-year-and-a-half stint of studying medicine

16   at the Jesuit university in Lebanon.  I decided within a year,

17   year-and-a-half that medicine was not for me, I couldn't stand

18   the sight of blood.

19        I move to the American University of Beirut.  I

20   switched to economics.  And I graduated with a bachelor degree

21   in economics and then, went on to England and I studied for a

22   masters degree at the University of London.  I graduated there

23   with a master in economics.

24   Q    Could you tell the jury about your family in Jerusalem

25   when you were growing up, please.

1   A    My father passed away in 1990.  He was surgeon, medical

2   doctor.  In his latter years he was a director of hospital,

3   famous hospital called Augusta Victoria Hospital in Jerusalem.

4   And my mom was a painter, quite well-known painter and

5   sculpturing.

6   Q    Was your father in the military?

7   A    He was a medical doctor in the military during the

8   British mandate, but that's in 1948.  He held the rank of

9   major in medical services, yes.

10  Q    In which Army?

11  A    British Army.

12  Q    After you graduated from London University with your

13  masters degree in economics, what did you do next?

14  A    I was placed on a training program with the British bank,

15  at that time it was called Midland Bank, but since then it has

16  been acquired by the Hong Kong Shanghai Banking Corporation,

17  for short HSBC.

18       I spent six months of training with the bank and

19  then I moved on to an American bank called Fidelity Bank.

20  Q    Where was Fidelity, where was Fidelity Bank located with

21  when you worked there?

22  A    Actually, I first met officers from Fidelity Bank in

23  London and they encouraged me to apply for a job at the bank.

24  I flew to Philadelphia, the headquarters of the bank is in

25  Philly, Philadelphia.  I started working Philadelphia, then I

1  was moved to New York and from New York, back to London

2  because I became deputy head of African Middle East division,

3  which was based in London.

4  Q    You mentioned earlier in the testimony that you started

5  with Arab Bank in 1979?

6  A    Yes.

7  Q    Can you tell the jury please, how that came about and

8  what your first position was in Arab Bank?

9  A    All right.  I was as working for Fidelity Bank.  I did a

10  lot of traveling, drumming up business for the bank and even I

11  was in charge basically of the Middle East and Africa division

12  of the bank.  I used to call on Jordan regularly and in one of

13  my trips I was told by Arab Bank that they had plans to

14  establish operations in France.  And they were aware that I

15  speak quite well French and they said they were having

16  difficulty identifying someone to take charge of that

17  responsibility.  The idea appealed to me a lot and that's how

18  it started.

19  Q    So, what was your first position at Arab Bank?

20  A    In France, you mean?

21  Q    Yes.

22  A    Yeah, country director.

23  Q    And what actually did you do for Arab Bank as France's

24  country director?

25  A    Well, first responsibility is to apply for a banking

1  license.  The process is legal, it's bureaucratic.  It starts

2  with the steps, first of all, the bank's Board, Arab Bank's

3  Board decide to open in France.  Then there are protocols,

4  agreements governing when a foreign bank opens a banking

5  operation in another country, there are reciprocal

6  arrangements between the central banks, so we needed also

7  approval of the central bank of Jordan to open in France.

8         And then, I submitted applications.  We had to

9  confirm to the bank of France that we had the capital

10  requirements, every bank has to have a minimum capital and it

11  has to be transferred effectively, has to be deposited at the

12  bank account.  Any way, people, policies, procedures, systems,

13  software, premises, training.

14  Q    That was all your responsibility?

15  A    Yes.

16  Q    And when you left France in 1993, '94, how large was the

17  Arab Bank operation in that country?

18  A    It was, it was quite significant.  Its deposit base, if I

19  remember correctly, was in excess of $1 billion.

20  Q    And how many branches did Arab Bank have in France at the

21  time?

22  A    In France we ended up opening two branches.  The main

23  branch was in Paris and then we opened another branch in a

24  resort town city called Cannes in the south of France, Cannes

25  Festival where the festivals are.

1    Q     And while you worked for Arab Bank in France, did you

2    have any responsibilities for the bank's operations in other

3    parts of the world?

4    A     Yes, sir.

5    Q     What were those please, if you could tell the jury?

6    A     Eventually, I became responsible to open, I opened

7    branches in Italy, in Spain, in Austria, in Australia, in

8    South Korea and in Singapore.

9    Q     I think you alluded to a moment ago that you got married

10   while you were in France; is that right?

11   A     That's correct, yes.

12   Q     And you had, all your children are born there?

13   A     That's correct.

14   Q     All right.  And could you tell the jury please, why you

15   left your position with Arab Bank in France in 1993 to go to

16   Palestine?

17   A     Well, I've been raised in Jerusalem.  As a child I had a

18   wonderful childhood.  The Arab-Israeli conflict existed for as

19   long as I remember.  Today it's very hard to describe the

20   feeling I had when I heard about peace.  It was a very

21   exciting moment.  Usually, the word war broke out, but in this

22   case something miraculous happened, peace broke out.  It was

23   really an intoxicating moment and the opportunities this peace

24   process would open for Arab Bank, for the whole region,

25   transacts -- transacting -- the opportunities it would open

1   for transactions, for commerce in the area, I actually refer

2   to it personally in my own words as the axis of prosperity.

3   Can you imagine peace Jordan, Israel and Palestine?  It was a

4   wonderful opportunity for me personally on a professional

5   level and it was a wonderful opportunity for the bank and

6   really, really end of the day, I wanted in a way to be part of

7   the peace process.  It was very exciting.

8   Q    When you say the peace process, are you speaking of the

9   Oslo Accords and the implementation of those accords?

10  A    Yes, indeed.

11  Q    And would you tell the jury please, your understanding of

12  the Oslo Accords that caused you to move your family from

13  France where you had lived for 14 years back to the West Bank

14  of Gaza?

15  A    I'll try to sum it up.

16        Actually, efforts at peace-making have been ongoing

17  all along.  Sometime in the early '93, 1993 behind-the-scenes

18  negotiations were taking place in Oslo, capital of Norway.

19  That's why it's called Oslo agreement.

20        Eventually, a deal was reached.  It was consummated

21  here in the United States at the White House.  That agreement

22  stipulated a transitional five-year period during which the

23  Israelis would hand over power and sell food to the

24  Palestinians, but by the end of the five-year period the

25  agreement should culminate in a two-state solution; a

1  Palestinian state and the Israel, both states living in

2  neighborly and peaceful relations together.

3  Q    And how was this plan, this five-year plan to create

4  these two separate states, an advantage to Arab Bank which

5  would cause it to want to re-open business in the West Bank in

6  Gaza?

7  A    It created tremendous business opportunities.  We had a

8  competitive edge.  We were an international bank.  We were

9  the -- actually, Arab Bank is the oldest bank and it had the

10  largest international network of branches worldwide.  For us,

11  this would have been a significant market and it proved itself

12  to be a significant market.  We simply cannot -- other banks

13  had beat us to it.  There were a couple of banks opened in

14  Palestine earlier than us.  We were first established

15  Palestine and it was vital for us to resume operations there.

16          But keep in mind one thing.  Both the Israeli

17  Government and the Jordanian Government specifically asked us

18  to open because they felt we are the bank with the know-how,

19  the capabilities, the capital resources actually to help in

20  building the economy of the new state.

21  Q    What position did you take at Arab Bank in the West Bank

22  and Gaza when you started there?

23  A    I was the country chief executive officer.

24  Q    You were the same position basically you had in France?

25  A    In France, yes.

 1   Q    Yes.   And what were your responsibilities as the country

 2   manager of Arab Bank in the West Bank in Gaza?

 3   A    Not too different from how we started in operation from

 4   virtually zero in France, same was in the West Bank because

 5   there was no banking system between '67 literally and 1993.

 6   Our main challenge was to find the right people, recruit the

 7   right people, train the right people, teach them banking.  So,

 8   the first thing I did really, Mr. Shand, is to set up a

 9   backing scenario.   But again, the authorizations for licensing

10   from central bank of Jordan.

11        At the beginning, we had to get authorization from

12   Israeli central bank for a period of two to three years, they

13   were our supervisor regulatory agency.   The same thing;

14   systems, people, policies, procedures, training.   As a CEO of

15   a country, my main responsibility is to set strategy to

16   determine the business direction of the bank, where are we

17   going, which are the market segments we would focus on, which

18   are the market segments we would not touch and what we would

19   be doing to make it a vibrant, successful operation.

20   Q    You actually started working in the West Bank in Gaza

21   when; 1994?

22   A    My first fact-finding trip to West Bank in Gaza was in

23   February 1994.

24   Q    And in the first six months after you became country

25   manager --

1    A      Yes.

2    Q      -- how many branches did Arab Bank open in the West Bank

3    in Gaza?

4    A      In first six months I do not remember, but we opened

5    during the period I was there from 1994 through 2002, 22

6    branches and we were opening basically at the pace of a branch

7    each five to six months.

8    Q      And by the year 2000 or when you went to Amman in 2002 if

9    that's easier for you, approximately how many employees did

10   Arab Bank have in the West Bank in Gaza?

11   A      If my memory doesn't fail me, approximately 600

12   employees.

13   Q      All of whom had been hired since you started as country

14   manager; is that right?

15   A      That's correct, yes.

16   Q      And approximately how much did Arab Bank invest and spend

17   on opening those 22 branches, finding the space to put the

18   branches in, acquiring the equipment and hiring the employees?

19   A      Yes.  If I remember correctly the capital expenditures

20   were in excess of hundred million dollars.  The operating

21   expenditures between software, wages and recurring expenses,

22   repetitive expenses was probably in excess of $70 million by

23   my time.

24   Q      Now, you mentioned that when Arab Bank started in the

25   West Bank in Gaza, that its regulator was the Israel --

1  Central Bank of Israel and then later on, the regulator became
2  who?
3  A    The Palestinian Monetary Authority, which is the Central
4  Bank of Palestine.
5  Q    Could you tell the jury briefly what it is that a
6  regulator does with respect to a bank?
7           MR. WERBNER:  Objection, Your Honor.
8           THE COURT:  Sustained.
9           Just so the witness knows, if I say sustained, that
10 means you can't answer the question.  If I say overruled that
11 means you can answer the question.
12          THE WITNESS:  Okay, thank you, sir.  Thank you.
13 Q    Could you tell the jury, please how the Palestine
14 monetary authority was formed?
15          MR. WERBNER:  Your Honor, irrelevant.
16          THE COURT:  Sustained.
17 Q    Could you describe please for the jury, Mr. Bishara, Arab
18 Bank's business in the West Bank in Gaza.  In other words,
19 what was it actually that Arab Bank was doing to conduct its
20 banking business there?
21 A    At the risk of boring them, but I will answer.
22          Anyway, banking is in my functions as chief country
23 executive of the country, I have to set the strategy and
24 decide where we are heading with the operation.  Arab Bank had
25 a competitive advantage, as I said, because we have the

1    international operations.  So, number one thing we focused on

2    is to position ourselves as the bank of choice for foreign

3    Government, the Americans, U.S.A., the Japanese for aid and

4    support to the Palestinian economy.

5            The second thing we focused on is the credit

6    corporate commercial business because we had the know-how and

7    the capability and the branches network and the resources.

8            The third thing which, in my opinion, was the best

9    thing we did, I determined that the economy in Palestine was

10   dependant on growth, economy growth how shall I say, bottom

11   up.  So, we focused, we created specialized products,

12   dedicated to the small businesses and small micro enterprises

13   to help them grow.  So, we had a whole division set up that

14   would be lending to these new small entities.

15           Indeed, we partnered with a lot of international

16   organizations to pass through such products.  The one bank,

17   the Japanese Government, British Government, et cetera.  We

18   had on any one day at least 20, 30 products dedicated to that

19   market segment.

20   Q    And when you say grow the economy from the bottom up,

21   could you describe for the jury what that means and how it's

22   different in growing it from the top down?

23   A    Yeah, well, bottom up is the grassroots economy.  It's

24   the small businesses, the artisanals, the shops, the bakeries,

25   the small workshops, the small traders.  This is, this segment

1   in banking is called the SME segment, small medium sized

2   enterprises.  Smaller than that, it's called micro enterprises

3   and this is where the broad base of the economy exists.  In a

4   country like Palestine, this is the core of the economy.  You

5   know, you would have typically maybe at the top ten, twenty

6   large corporate, but this is where the future of the economy

7   is and this is where jobs are created.

8   Q     How many accounts did Arab Bank have in the West Bank in

9   Gaza when you left there in 2002 to go to Jordan?

10  A     When I left, Mr. Shand, I think 350,000.

11  Q     Accounts?

12  A     Yes, because I was always comparing with Jordan.

13  Q     In the commercial lending, area which you mentioned as

14  one of the three main focuses that you had, who were the

15  bank's main clientele?

16            MR. STEPHENS:  Your Honor, I'll object to that.

17            THE COURT:  Yes, Mr. Stephens, let me think about

18  that a second.

19            (Pause in the proceedings.)

20            THE COURT:  I will allow that question.

21  A     The main investment companies we invested ourselves into

22  companies to jump start the economy.  There was, for instance,

23  Sabih Al-Masri, the Chairman of the Bank, he and us started an

24  investment called Palestine Investment and Development

25  Corporation.  It went into various businesses.  Hotels,

1  telecommunications, power, industrial zones and estates,

2  et cetera, this would have been a typical client.

3       We also, also worked very closely with the

4  Palestinian Authority.  We were the principal banker, the fund

5  flows through the Palestinian Authority whether it is aid,

6  donor aid, grants from abroad or the taxes rebated from Israel

7  would flow through our accounts at Arab Bank so occasionally,

8  we gave what you call bridge loans.  Advances until the monies

9  arrive.  We had virtually most of the large corporate accounts

10 at Arab Bank.

11 Q    Now, I want to talk to you now switching subjects about

12 the second intifada and you have described the opening of the

13 Arab Bank branches in the 1990s.

14      What happened in the period 2000 to 2002 with

15 respect to where you were living in the West Bank in Gaza and

16 what that did to the bank?

17 A    The period 2000-2002 violence broke out and it's commonly

18 referred to as the second intifada.

19      As I mentioned earlier, the Oslo process stipulated

20 a five-year transitional period until the and final agreement,

21 final piece agreement between Israel and Palestine.  It was

22 clear efforts at promoting the peace were failing and

23 resentment was rising and --

24      MR. STEPHENS:  Your Honor, I'm going to object to

25 the narrative.

1      THE COURT:   Well, the witness can probably answer

2  this question for about two days, but I will let him give a

3  short answer to the question.

4      THE WITNESS:   May I continue, Your Honor?

5      THE COURT:   You may.

6      THE WITNESS:   Thank you.

7  A    Anyway, one thing led to another and the cycle of

8  violence took place.   Violence, counter-violence, it was a

9  horrible period of time.   Hundreds of people wounded,

10 thousands wounded, hundreds dead on both sides.   As usual,

11 Mr. Shand, it's the --

12     MR. STEPHENS:   Your Honor, I think --

13     THE COURT:   This is a little beyond.

14     Let's put another question.

15     MR. STEPHENS:   All right.

16 Q    Where were you living and working with when the second

17 intifada started?

18 A    In Jerusalem.

19 Q    In Jerusalem.   And where you were on the day the second

20 intifada started?

21 A    As I said earlier, there was not a specific day, but

22 there is a specific day when the intifada turned really

23 violent.   It was on a Friday, about 18 people got killed, 18

24 Palestinians got killed.   I was having lunch with my family,

25 my kids and my wife at The American Colony.   It's a hotel in

1    east Jerusalem very close to my house actually, three minutes

2    drive from my house.  It took me on that day four, five hours

3    to get to my house as a result of the riots in the street,

4    burning tires, stone throwing, violence, havoc in the streets.

5    Q    So, your family was with you in Jerusalem when the second

6    intifada became violent?

7    A    Yes.

8    Q    And how old were your children at the time?

9    A    They were probably nine, ten and eleven.

10        MR. STEPHENS:  Could we see the map of Jerusalem,

11   please.

12   Q    This is a map of Jerusalem that you and I have worked on,

13   is it not, Mr. Bishara?

14   A    Yes, sir.

15   Q    Okay.  All right.  And it shows -- why don't you just

16   tell the jury what it shows.

17   A    It shows a poor rendition of my house.  Shows the Lycée

18   Français and shows The American Colony.

19   Q    So, you were with your family when the second intifada

20   became violent at The American Colony hotel, which as you say

21   how far away from your house?

22   A    Three minutes drive.

23   Q    Three minutes drive.  And the Lycée Français is what?

24   A    That would be five minutes drive.

25        MR. WERBNER:  Your Honor, I'm going to object to

1    this.

2              THE COURT:   Overruled.

3    Q    And did your children attend school at the Lycée

4    Français?

5    A    Yes, sir.

6    Q    During the second intifada terrorism touched your life

7    and the life of your family, did it not?

8    A    Yes.

9    Q    And what was the first incident where terrorism touches

10   your family?

11   A    We were actually living in complete fear and panic and

12   then the closest incident to me personally was sometime in

13   2001.   First day of school back, September 1st.   A suicide

14   bomber actually blew himself off right at the gate of the

15   school where my children were going.   I had deposited them to

16   the school three minutes earlier.   That was the closest.

17             I see you also have Sbarro Pizzeria.   That's a place

18   where my children would eat typically, regularly there.

19   Q    The stars on the map represent attacks that are in this

20   case.

21             MR. WERBNER:   Your Honor, may I approach.

22             THE COURT:   Yes.

23             (Side-bar conference held on the record out of the

24   hearing of the jury.)

25

1              (Side-bar.)

2              THE COURT:   Yes.

3              MR. OSEN:   Your Honor, this is just a back door of

4    character evidence offered for the fact or the assertion that

5    Mr. Bishara has no motive to support terrorism, et cetera,

6    et cetera.   The only thing that's relevant in this case is his

7    knowledge of the actual material support or lack thereof to

8    Hamas.

9              THE COURT:   Well, I did rule that I would let him

10   talk about the Sbarro bombing as part of his personal

11   background.

12             If you're about to take him into other bombings --

13             MR. STEPHENS:   No, I'm not.

14             THE COURT:   It sounded like you did, that is why I

15   got the objection.   If you are not, we do not have a problem.

16             MR. STEPHENS:   I'm not, just pointing them out on

17   the map.

18             THE COURT:   Don't do that, that doesn't have

19   anything to do with this particular witness unless he was

20   there or proximate to them.

21             MR. STEPHENS:   Okay.

22             (Side-bar end.)

23

24

25

1         (In open court.)

2   Q    Do you remember, Mr. Bishara, that the bombing of the

3   Sbarro pizzeria was shortly before the suicide bombing in

4   front of your children's school?

5              MR. WERBNER:   Your Honor, I object.

6              THE COURT:   Overruled.

7   A    Yes, I do, actually, yes.

8   Q    And the evidence in this case is that the Sbarro bombing

9   was in August of 2001?

10  A    Yes.

11  Q    And you mentioned to the jury a moment ago that the

12  suicide bombing in front of your children's school happened --

13  A    Second or first, yes.

14  Q    So, they were within two or three weeks of one another?

15  A    That's right, yes.

16  Q    And what did you do personally after the suicide bombing

17  occurred in front of your kids' school?

18  A    That's the point, Mr. Shand, where I really reached the

19  conclusion that I've had enough.  I took my children out of

20  the school and I took them next day to Amman and brought them

21  in the equivalent school in Amman, all Lycée Français in

22  Amman.  And my wife, of course, left and lived with them.  I

23  used to commute once a month to Amman back to Jerusalem and

24  the West Bank.

25  Q    Can you describe, please, for the jury, what the effect

1  of the cycles of violence in the second intifada was on the

2  operations of the bank in the West Bank in Gaza?

3  A    All right.  Let me start by saying, you know, I'm

4  thinking as a banker again.  For a bank the worst thing that

5  can happen is war, violence, lack of stability -- instability.

6  It's called worse case scenario for a bank.

7         The second intifada, whatever it's cause was beyond

8  the worse case scenario, commerce froze.  Unemployment, which

9  was to begin with very high around 25 percent shot to

10  60 percent within weeks.  Nonpayment of loans multiplied.

11  There was risk for the life of our own employees of being in

12  harm's way.  All our operations were at risk.  The whole area,

13  the whole economy was tanked and we were truly within very

14  close to having systemic meltdown in the banking system.  It

15  was the worst possible outcome that could happen.  It was a

16  calamity to the economy.

17  Q    Was there anything about the violence during the second

18  intifada that was an advantage to the bank in any way?

19  A    Of course not, Mr. Shand.

20  Q    I'm going to turn to another subject now and could you

21  briefly tell the jury what anti-money laundering or AML is,

22  please?

23  A    Anti-money laundering is the policy that the banks began

24  to adopt in the mid-'90s to prevent the bank systems being --

25  to be used for fraudulent transactions, drug money, gun

1   smuggling and terrorism.  Anti-money laundering, the

2   understanding and the business and process of anti-money

3   laundering are evolving as we speak, they're being advanced,

4   they are being fine-tuned.

5   Q    When you were country manager in the West Bank in Gaza,

6   were you involved in putting policies and practices in place

7   with respect to anti-money laundering?

8   A    Yes, sir.

9            MR. STEPHENS:  I'd like to show you, please, what's

10  been marked as Plaintiff's Exhibit 1 or I'd like to show it to

11  the witness because I don't think it's in evidence yet.

12           MR. OSEN:  Your Honor, may we have a side-bar?

13           THE COURT:  Get him to identify it at least and then

14  we'll talk about it if he tries to admit it.

15           MR. OSEN:  Actually, if we may for a moment,

16  Your Honor?

17           THE COURT:  Okay.

18           (Side-bar conference held on the record out of the

19  hearing of the jury.)

20

21           (Continued on following page.)

22

23

24

25

1          (Side-bar.)

2          THE COURT:  Yes.

3          MR. OSEN:  Okay.  The issue, Your Honor, is that the

4   banking instruction, Plaintiff's Exhibit 1, Mr. Bishara could

5   testify to it according to Your Honor's ruling with respect to

6   his knowledge of Lebanon and the Hamdan account.  But our

7   concern is that Mr. Stephens may ask him general questions

8   about it as it applies to his work in the Palestinian

9   territories and we just want to make sure that the cat doesn't

10  get out of the bag when he addresses it in his capacity.  So,

11  far he's testified solely about his role in the Palestinian

12  Authority.

13         THE COURT:  Look, cats can't get out of the bag

14  until a question is asked.  There is nothing objectionable

15  yet.  If a question is asked and the witness gives a rogue

16  answer, you can move to strike the answer.

17         But since it is being raised and we are standing

18  here, I thought what I had ruled this morning was that a Gaza

19  or West Bank witness could not be the one to get this in and

20  he is a Gaza or West Bank witness; right?

21         MR. STEPHENS:  Then he moved and became the chief

22  banking officer, Your Honor, in 2002.

23         THE COURT:  And was living in Amman?

24         MR. STEPHENS:  Yes.  Yes.  And running --

25         THE COURT:  Okay.  Then I see no reason why he can't

1    be the foundational witness to get in 1 and 41.

2           MR. OSEN:  He can be as it relates to the Hamdan

3    account.

4           THE COURT:  No, that is not what I ruled.  That is

5    not what I ruled.  What I ruled is I will let in 1 and 41 and

6    let a non-West Bank or Gazan witness testify generally about

7    those procedures.  And I will give a limiting instruction to

8    the jury that they may only consider those procedures in

9    reference to the Hamdan account.

10          MR. OSEN:  That's fine Your Honor.

11          MR. STEPHENS:  Thank you, Your Honor.

12          (Side-bar end.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2          THE COURT:  All right you may proceed.

3          MR. STEPHENS:  Thank you.

4     Q    Mr. Bishara, you have in front of you a document that's

5     marked as PX 1 and you can see it.  It's dated April 20th,

6     2000?

7     A    Is this...

8          THE COURT:  I'm sorry, I erased that, you wanted

9     that mark there?

10         MR. STEPHENS:  No, I didn't, I was trying to erase

11    it.  I think Mr. Bishara is making markings on the screen.

12         THE WITNESS:  I can't see the document.

13         THE COURT:  Don't touch unless you're told to.

14         THE WITNESS:  Yes, sir.  I thought actually it was

15    touch screen, I was scrolling it up.

16         THE COURT:  I see.

17         He will expand the screen for you as you need to see

18    different pieces.

19         THE WITNESS:  Yes, sir.  Thank you.

20    Q    Back to Plaintiff's Exhibit 1.  The date on this is

21    April 20, 2000?

22         Do you see that?

23    A    April 20th, 2000, yes.

24    Q    Right.  And could you describe actually what this

25    document is?

1          THE COURT:  Now you need me to show him more.

2          MR. STEPHENS:  Yes.  In fact, let me do it this way.

3    Q    This is a memo to all branches in Arab countries subject

4    general banking instructions.

5          Do you see that?

6    A    Yes, sir.

7    Q    And is this a memorandum that you received when you were

8    country manager in the west pang in Gaza in 2000?

9    A    Yes.

10          MR. STEPHENS:  Move its admission.

11          THE COURT:  Any objection?

12          MR. STEPHENS:  Nothing different than we've stated,

13   Your Honor.

14          THE COURT:  I'm not sure what that is, I'm sorry.  I

15   need another side-bar.

16          MR. STEPHENS:  Well, I can just say from here.

17          THE COURT:  No, you can't say from there.  Let's

18   have a side-bar.

19          (Side-bar conference held on the record out of the

20   hearing of the jury.)

21

22

23

24

25

1        (Side-bar.)

2        THE COURT:  Say it again.

3        MR. WERBNER:  Well, it's the objection that we

4   lodged this morning and that you ruled upon.  We think this is

5   a violation of the sanction order by allowing him to talk

6   about compliance.

7        THE COURT:  Okay.  Then the objection is overruled.

8        MR. COLES:  Your Honor, may I hand the witness a

9   copy of the Exhibit?

10        THE COURT:  Yes.

11        MR. STEPHENS:  And Your Honor.

12        THE COURT:  Yes, something else?

13        MR. WERBNER:  While we're here, that will be our

14   same position on the Defense Exhibit they're about to

15   introduce.

16        THE COURT:  Right.  Got it.

17        (Side-bar end.)

18

19        (In open court.)

20        MR. STEPHENS:  Mr. Bishara, I'm going to hand you a

21   written copy of, a paper copy of Exhibit, Plaintiff's

22   Exhibit 1 so you can refer to that if you'd like.

23        THE WITNESS:  Thank you.

24   Q    Can we display to the jury, please?

25   A    I'm sorry, Mr. Shand, what was the question?

1          THE COURT:  Wait, he's asking me.

2          And the answer is yes, you may.

3   A    This is a directive from the head office regarding

4   anti-money laundering instructions.  It's quite articulated

5   well-developed directive.  It's all together several pages.

6   It spells out the details what needs to be done, how to

7   recognize, how to report and it emphasizes the importance of

8   applying these instructions across the institution.

9

10          (Continued on following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. STEPHENS:

2  Q    Could we look, please, at the third page of the

3  instructions, and they are marked at the bottom 1080?

4           THE COURT:   Hang on.   If you are going to go into

5  the document now, are the plaintiffs requesting the limiting

6  instruction as to this document?

7           MR. WERBNER:   Yes, your Honor.

8           THE COURT:   All right.

9           Ladies and gentlemen, you are about to hear evidence

10  concerning the defendant's compliance programs.   I instruct

11  you that you may only consider this evidence as relevant to

12  defendant's mental state with regard to the Usama Hamdan

13  account, because that's the only account for which the

14  defendant has produced full account records.   It does not

15  apply to any other account except that one.

16           All right.   Please continue.

17           MR. STEPHENS:   Thank you, your Honor.

18  BY MR. STEPHENS:

19  Q    As you can see, the definitions section defines money

20  laundering and talks about the reasons for the instructions

21  from the headquarters.   Could you please read the first

22  paragraph, and then describe to the jury exactly what that

23  meant to you as country manager in the West Bank of Gaza?

24  A    I'm sorry.   I lost you there, Mr. Stephens.   I have the

25  Arabic version.

1   Q    It's the English version, actually at the end of that.

2   A    Yes.

3   Q    I'm on the page that has a stamp at the bottom of

4   it, 100.

5   A    Yes.

6   Q    Okay.  The first paragraph reads, under "Definitions":

7   "With the increase in the problem of money laundering as a

8   result of criminal activity, financial institutions have

9   become more susceptible to unknowingly and unwittingly getting

10  involved in this operation.  Hence, we should work in

11  coordination and cooperation with local authorities to

12  stop/prevent any such operations, and to follow local

13  instructions and laws issued in this regard according to the

14  regions."

15  A    Yes.

16  Q    When you read that, did you understand what it was that

17  this document was trying to -- this set of instruction was

18  trying to accomplish?

19  A    Yes.

20  Q    What was that?

21  A    To institute -- we already had, by 2000, we already had

22  money-laundering and anti-money-laundering processes and

23  audits and controls.  This is just one step further.

24          As I said earlier, the entire anti-money-laundering

25  business is evolving.  It's a process.  And the understanding

1    of it in the mid-'90s was something.  It developed into

2    another in 2000, and the tools available to the banks became

3    much more sophisticated and more effective.

4            Now, money laundering at Arab Bank --

5    anti-money-laundering at Arab Bank had always been a serious

6    and principal concern for the bank.

7            MR. WERBNER:  We object at this point.

8            THE COURT:  Sustained.  Stop.

9            Another question, please.

10   Q    If you'd look at "Money-laundering operations,"

11   paragraph number one.  It says that:  "These" -- meaning

12   money-laundering operations --  "are the process of hiding the

13   real origin and ownership of funds resulting from illegitimate

14   criminal activities and the provision of a legal cover for

15   these funds and their inclusion in legitimate activities."

16           You understood that's what money-laundering

17   operations were, did you not.

18   A    Yes.

19   Q    And then the criminal activities are defined in the next

20   paragraph, and could you tell the jury what those are?

21   A    These criminal activities include all kinds of illicit

22   trade, including drug smuggling, terrorist activity, theft and

23   fraud, including tax fraud, burglary, forgery, fake

24   governments, blackmail and theft.

25   Q    I take it the purpose of this anti-money-laundering set

1  of instructions is to address the possibility of the bank

2  unknowingly and unwittingly getting involved in these sorts of

3  operations?

4           MR. WERBNER:   Objection.

5  A    That's right.   Yes.

6           THE COURT:   Sustained.

7           The answer is stricken.

8  Q    If you turn the page to 1082, the one stamped 1082.

9  A    All right.  I got it.

10  Q    If you go down to the middle of the page there, it has a

11  section on training.

12  A    Yes.

13  Q    And it describes training that would be necessary in

14  order to implement these money laundering --

15  anti-money-laundering instructions?

16  A    Yes, correct.  It says "Training" and continuos training.

17  Q    In the Arab Bank, when you arrived in Amman in 2002, the

18  local compliance officer was Mohammed Dabbour; is that right?

19  A    Yes.

20  Q    And he's going to testify here.  So, I won't go any

21  further into this with you, since he's actually in charge of

22  the compliance programs per se?

23           What I would like to do is go on to another document

24  with you, which is Defendant's Exhibit 41.

25           Can you show that to the witness only, please, in

1    the English version.

2    A    You said I have the document with me?

3    Q    No.

4              THE COURT:  It's on your screen.

5              MR. STEPHENS:  If we can get a paper copy and give

6    it to the witness, please.

7              THE WITNESS:  Thank you, sir.

8    Q    Defendant's Exhibit 41 is a memo dated April 20, 2000, as

9    well, like the others, with an indication that it was actually

10   distributed on April 24, 2000; is that right?

11   A    Yes.

12   Q    And it is from the headquarters in Amman to regional

13   management in Egypt, Lebanon, Morocco, Palestine, Yemen, Qatar

14   and Bahrain?

15   A    Yes.

16   Q    Is this a document that you received in your capacity as

17   country manager of the West Bank in Gaza in 2000?

18   A    Yes.

19             MR. STEPHENS:  We move admission, please, of

20   Defendant's Exhibit 41.

21             THE COURT:  Any objection other than what was

22   previously stated?

23             MR. WERBNER:  No, your Honor.  Nothing further.

24             THE COURT:  All right.  It is admitted over

25   objection.

1      (So marked.)

2          MR. STEPHENS:  If we can display it to the jury,

3  your Honor.

4          THE COURT:  Yes.

5          MR. WERBNER:  Can we have the limiting instruction

6  as to this document, as well?

7          THE COURT:  Yes.  This document, ladies and

8  gentlemen, like the last one, is only to be considered in

9  connection with the Usama Hamdan account, because that is the

10 only account for which the bank produced full records.

11 Q    Now, the subject of the memo is money-laundering

12 reporting officer.  Do you see that?

13 A    Yes.

14 Q    Could you please tell the jury what the money-laundering

15 reporting officer's position was in 2000?

16 A    I believe the bank was taking a step further, appointing

17 a designated anti-money-laundering official officer in each

18 branch of the bank, reporting to a head of the headquarters

19 for anti-money-laundering.  This is the designated person

20 whose job it is to do nothing else except to examine

21 suspicious transactions.

22 Q    If you look at the third paragraph of Exhibit 41, you'll

23 see the primary responsibilities of the money-laundering

24 reporting officer were:  "1.  Receives all cases suspected of

25 involving money-laundering activities from the heads of the

1  sections at the branch and affiliate offices, recorded on a

2  special form documenting that the cases have been reported,

3  and receives daily reports from about the detail of movements

4  that exceed certain sums."

5           Do you see that.

6  A    Yes, sir.

7  Q    Is that your understanding of what the primary

8  responsibilities were, among others, of the money-laundering

9  reporting officer?

10 A    Yes, indeed, yes.

11 Q    I want to ask you now, turning to a different subject,

12 about the Saudi Committee for a moment?

13          And could you tell me, when did you first hear about

14 the Saudi Committee.

15 A    I think it was towards the latter part of the year 2000.

16 A specific date, I don't have in mind now.

17 Q    Sure.  And what did you learn about the Saudi Committee

18 at that time?

19 A    I learned that this was an effort by Arab governments to

20 put together a humanitarian assistance package to the

21 Palestinian people, and I learned that they designated the

22 Government of Saudi Arabia to administer that initiative.

23 Q    What, if anything, did you learn about the benefits being

24 offered by the Saudi Committee?

25 A    Yes.  The package was basically to offer immediate relief

1  assistance, humanitarian assistance to those who were wounded,

2  to the families of those who were killed during the events.

3  Also, to repair, quickly, damaged infrastructure.

4          MR. WERBNER:  Excuse me, sir.

5          THE COURT:  You can't do that.  If he has said

6  something that's not responsive to the question, then just

7  move to strike it, and I'll either do it or not do it, or hear

8  you at sidebar.  Is there something he said not responsive?

9          MR. WERBNER:  I think it was being a narrative, and

10  I couldn't object earlier.

11          THE COURT:  All right.  I will sustain the objection

12  on the ground that it's a narrative.

13          Let's have another question, please.

14  Q    What did you learn at that same time in late 2000, early

15  2001, about the programs being offered and the benefits being

16  offered by the Saudi Committee?

17          MR. WERBNER:  I would object and request a sidebar

18  to explain.

19          THE COURT:  Okay.

20          (Continued on next page.)

21

22

23

24

25

VB        OCR        CRR

1                (Sidebar.)

2                MR. WERBNER:  Sorry.  It's complicated.

3                THE COURT:  That's all right.

4                MR. WERBNER:  It's hearsay until we find out.  But

5    additionally, I think Mr. Osen has concerns about it going

6    into state-of-mind aspects that we haven't been able to

7    challenge, because we don't have certain material.

8                THE COURT:  If it's state of mind, then it's not

9    hearsay.

10               The question is, is his state of mind relevant and

11   admissible, both on its own and in light of the sanctions

12   order?  Let me hear on that.

13               MR. OSEN:  Maybe I can phrase it this way, your

14   Honor:  Judge Gershon's ruling would allow Mr. Bishara to

15   testify about a document that's been produced and his

16   understanding of the contents of that document.

17               But the question as posed, and I suspect others like

18   it which elicit his general state of mind or opinions about

19   the program, etcetera which don't have a foundation in a

20   document, are things that we cannot probe on

21   cross-examination, because they withheld the account records.

22   So, that's the basis for the objection.

23               THE COURT:  Let me hear from the defendant.

24               MR. STEPHENS:  In your orders, your Honor, you have

25   said that you're harmonizing Judge Gershon's rulings by

1    rejecting plaintiffs' suggestion that the defendant cannot

2    mention the Needy Families Program of the Saudi Committee.  As

3    the Court has previously expressed, it will not allow the jury

4    to get a partial view of the Saudi Committee.  I'm trying to

5    get him to say what he learned and what he thought the program

6    was while he was there in 2000.

7              THE COURT:  Okay.  He's already said that.  He's

8    already said it was a -- he's read -- he didn't read.  He last

9    said it was a program to help those who were injured, those

10   who were killed, victims of terrorism, I think he said.  He's

11   answered that.

12             I don't think the question as to his particular

13   state of mind is admissible under the sanctions order, because

14   that could only be offered to show that in fact they wouldn't

15   fund terrorist accounts at the bank.  That's the only thing it

16   would be relevant to, and that's precluded, because the

17   plaintiffs can't show him all the documents from the account

18   and say, What about this and what about that?

19             So, I'm going to sustain the objection to this

20   question.

21             MR. STEPHENS:  Your Honor, I think that's a little

22   more broad, actually, than the preclusion.  The preclusion, as

23   I understand it, is that state-of-mind evidence is not

24   disallowed when it comes from sources, in particular that have

25   been fully disclosed.  This is -- 176,000 documents got

1    produced on the Saudi Committee.

2           THE COURT:  Right.  We have gotten into the record

3    his understanding of what the Saudi Committee did.  We got

4    that.

5           MR. STEPHENS:  Yes.

6           THE COURT:  I don't think you get more.  What more

7    is there, other than what he thinks about all that and what he

8    thinks it was?

9           MR. STEPHENS:  I'm asking him to be a little more

10   specific, is what I am doing.

11          MR. OSEN:  Where there's a document with

12   Mr. Bishara's name on it and he received it and he wrote it

13   and he has personal knowledge of the contents of that

14   document, to the extent that he testifies about what he knew

15   when he wrote it or what he thought when he received it,

16   that's a different issue for us than broad statements in the

17   abstract about his subjective state of mind.

18          THE COURT:  All right.  I want to think of it over

19   lunch.  I'll break now.

20          MR. STEPHENS:  Okay.

21          (Continued on next page.)

22

23

24

25

1          (In open court.)

2          THE COURT:  All right.  Ladies and gentlemen, we'll

3   take your lunch break.  Be back here, please, at 1:40.  Don't

4   talk about the case.  Have a good lunch.  Don't talk about the

5   case.  See you in an hour and ten minutes.

6          (Jury excused.)

7          THE COURT:  All right.  Let's recess until 1:35, and

8   I'll give you my ruling based on our discussion at the bar.

9          (Lunch recess.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    A F T E R N O O N    S E S S I O N

2         (In open court; jury not present.)

3    SHUKRY BISHARA, resumed

4         THE COURT:  Be seated, please.

5         Okay.  Like so many of the rulings in this case, the

6    lawyers have been quite adept, both sides, at pushing right up

7    to the line of where the sanctions order limits what the

8    defendant can do.  In this particular instance, with regard to

9    the pending question, I believe the defendant is on the right

10   side of the line and can elicit from the witness what his

11   understanding of the Saudi program was.  So, I'm going to

12   allow that question.  I may not allow much more.  I have a

13   feeling I will be asked to allow more, but we'll take them one

14   at a time as they come up.

15        All right.  Let's have the jury back, please.

16        MR. OSEN:  Your Honor, while we're waiting, I

17   believe this is a new interpreter.

18        THE COURT:  We swore him -- no.  He's a totally new

19   interpreter.  We swore a new one this morning, and now we have

20   another one and we'll swear him, too.

21        THE INTERPRETER:  He was sworn in for Mr. Al-Masri.

22        THE COURT:  He was.  That's fine.

23        (Jury present.)

24        THE COURT:  Be seated, please.

25        I'll note for the record that we have a new

1  interpreter.  He's new for now, but he has been here before

2  and was previously sworn.

3          All right.  You may continue, Mr. Stephens.

4          MR. STEPHENS:  Thank you, your Honor.

5  DIRECT EXAMINATION (Continued)

6  BY MR. STEPHENS:

7  Q    When we left off, Mr. Bishara, we were talking about the

8  Saudi, Committee and my question to you on that is:  During

9  2000-2001, what did you learn about the programs and benefits

10 that were being offered by the Saudi Committee?

11 A    Okay.  First, three components in general.

12         First one was humanitarian aid to the population for

13 those who got wounded, died, the parents -- the families of

14 those who died.

15         And then the other component was quick repair for

16 construction:  Hospitals, schools, water systems, sewage,

17 etcetera.

18         The third component, which actually attracted my

19 attention, was unemployment benefits directly.  Remember, I

20 said at the very beginning one of the sequences of the

21 Intifada was ratcheting of unemployment from roughly

22 twenty-five percent, it skyrocketed to almost sixty.  With the

23 program they put in place, a framework to pay directly to the

24 unemployed monthly unemployment benefits, this was a feature

25 that actually drew my attention.

1    Q    Could you describe to the jury what Arab Bank's role was

2    with respect to the Saudi Committee transfers to the

3    beneficiaries that got payments?

4    A    Well, we were the bank in the Territories.  But our rule

5    was to provide that service on behalf of our correspondent

6    bank, the Arab National Bank, which in turn actually offered

7    -- provided services on behalf of the Saudi Committee.

8    Q    So, the Saudi Committee was a customer of Arab National

9    Bank, and Arab Bank was, in the banking lingo, the

10   correspondent bank?

11   A    That's correct, yes.

12   Q    Why does a bank need a correspondent bank?

13   A    If a bank doesn't have an operation or presence in a

14   second country, in another country, then it would have to use

15   the services of the correspondent bank.

16   Q    In order to do what?

17   A    In order to render services on their behalf like

18   transfers, issuing letters of credit, guarantees, on their

19   behalf in a different jurisdiction.

20   Q    Did Arab Bank have any role in choosing the beneficiaries

21   of the Saudi Committee?

22   A    No.

23   Q    Did Arab Bank have any role in determining the size of

24   any benefits offered by the Saudi Committee?

25   A    No.

1  Q    To your knowledge, was the Saudi Committee on any

2  black-list during the time you were country manager?

3  A    Again, no.

4  Q    So, I would like now to turn to the Hamdan account.   And

5  when did you first hear of the name Usama Hamdan?

6  A    Through the lawsuit.

7  Q    This lawsuit?

8  A    Yes.

9  Q    How did that come about?

10 A    If I remember correctly, we heard about the lawsuit

11 through media.   Then we received the hard copy of the lawsuit

12 to our offices in Amman.   I looked at it together with our

13 legal counsel, internal legal counsel in the bank.   It

14 contained the -- the accusation was on two key elements:   The

15 Saudi Committee, and an account without the name in Lebanon,

16 which is supposed to be, according to the accusation, a

17 funding account for Hamas.   So, I --

18 Q    What did you do then?

19 A    I did a preliminary inquiry with our people in Lebanon.

20 They came back to me and told me indeed the account belonged

21 to someone who had opened the account under -- he reported

22 himself to be a merchant in spare parts, in car spare parts.

23 We discovered that he had been, through a website, raising

24 money on the account.   And most importantly, the account had

25 been classified by our people in Lebanon as dormant.   Dormant

1  in banking lingo means --

2          MR. WERBNER:  Excuse me.  I'm sorry.

3          THE COURT:  Give me one word, Mr. Werbner.

4          MR. WERBNER:  Legal about Lebanon.

5          THE COURT:  Overruled.

6  A    Dormant in banking language is from French, the

7  word "dormir."  That is classified, you cannot withdraw funds

8  from it, because that account had not experienced any

9  withdrawals for three years, consecutive years.  It was

10 classified as dormant.

11         My immediate reaction is to tell the people, Look.

12 This account has to be closed.  It has to be reported to the

13 bank regulators and confirmed that this is what you are doing.

14 Q    Why did you think the account needed to be closed after

15 you learned that information?

16 A    Mr. Stephens, my immediate reaction, the guy Mr. Hamdan

17 was using the account not properly.  He was raising funds on

18 the account.  He was a merchant.  Yes, he was raising funds.

19 Later on in our inquiry process, we did discover that he had

20 his name on the U.S. OFAC list in 2003 or 2004.  I don't

21 remember the exact date.

22 Q    After the bank closed the account, then what did it do?

23 A    It reported it to the Central Bank of Lebanon, a special

24 investigation unit, SIC.  They checked for instructions.  They

25 waited for a period of six, seven months, and they had no

1   choice but, in order to close the account, to remit the

2   funds --

3        MR. WERBNER:  Your Honor, Lebanese law, I am going

4   to object.

5        THE COURT:  He hasn't said anything about Lebanese

6   law.  He was not asked anything about Lebanese law.  You are

7   not allowed to testify about Lebanese law.  The objection is

8   overruled.

9   A    They had to choice but to return the funds to the guy, in

10  order to close the account.

11  Q    How much money was there in the account when you took a

12  look at it in 2004?

13  A    I think $8,000, plus or minus.

14  Q    When the bank closed the account and reported it to the

15  SIC, what happened to that money?  Where did it go, to begin

16  with?

17  A    We issued to Hamdan a check drawn on Central Bank of

18  Lebanon, and we closed the account.

19  Q    Before that, that happened, in the months between closing

20  the account and reporting it to the SIC and then waiting for a

21  response from the SIC, where did the money go?

22  A    I see.  We put it in a separate frozen account, into an

23  escrow account.

24  Q    When the SIC did not respond to the bank, the money was

25  returned to Mr. Hamdan?

1  A    Correct, yes.

2  Q    You joined your bank in 1979?  That's thirty-five years

3  ago?

4  A    Yes, sir.

5  Q    During the time you worked for the bank, to your

6  knowledge, did the bank ever support terrorism in any way?

7           MR. WERBNER:  Your Honor, I'm going to object.

8           THE COURT:  Sustained.

9  Q    Is it in the Arab Bank's interest --

10 A    No.

11          THE COURT:  There's no question pending.

12 Q    I have to finish the question?

13          What do you think of terrorism?

14          MR. WERBNER:  Your Honor, objection.

15          THE COURT:  Sustained.

16 Q    Can you think of any reason why deliberately supporting

17 terrorism would somehow be in the interest of a bank?

18          MR. WERBNER:  Objection.

19          THE COURT:  Sustained.

20          MR. STEPHENS:  I have nothing further.

21          THE COURT:  All right.  Cross-examination.

22 CROSS-EXAMINATION

23 BY MR. WERBNER:

24 Q    Good afternoon.

25 A    Good afternoon, sir.

1  Q    The Intifada began in September of 2000; correct?

2  A    On or around that time.  I cannot put a specific date on

3  it.

4  Q    It was violent from the beginning, wasn't it?

5  A    It turned violent at one point, yes.

6  Q    It was violent from day one, wasn't it?

7  A    That's not quite right.

8  Q    I thought you said on direct that you remembered

9  specifically where you were having lunch that day, and that 18

10  people were killed that day.  Did I misunderstand?

11  A    I said it turned violent on that day, was the day

12  probably where it turned to turn violent.

13  Q    So, you would agree that this Intifada that broke out

14  around September of 2000 was a violent one?

15  A    Yes.

16  Q    A violent uprising; correct?

17  A    A violent episode in the history of the countries, yes.

18  Q    And violent from day one that got worse and worse;

19  correct?

20  A    That's not quite right.

21  Q    It was an Intifada that began with violence, that came to

22  be characterized by suicide bombings and other acts of

23  terrorism; correct?

24  A    Not exactly true.

25  Q    All right?

1          Let me try it this way:  There were many, many
2   suicide bombings during the Intifada; correct?
3   A    Yes, there were.
4   Q    And there was an onslaught of many of these suicide
5   bombings and terror attacks; correct?
6   A    Correct, yes.
7   Q    And we can agree that Hamas was committing scores of
8   these suicide bombings during this almost four-year period of
9   the Intifada; correct?
10  A    I would have to agree with you to some extent.
11  Q    Don't you agree that Hamas was responsible for many,
12  many, many of these suicide bombings during the Intifada?
13  A    Yes.
14  Q    When Hamas committed these atrocious suicide bombings
15  throughout this four-year period, that was widely reported in
16  the news media, wasn't it?
17  A    I believe it was, yes.
18  Q    It was typical that on the day of such events, CNN had
19  breaking news, these suicide bombings by Hamas were on the
20  front page of the papers.  Would you agree with that?
21  A    It's not as simple as that.
22  Q    Do you agree that these suicide bombings committed by
23  Hamas during the Intifada were widely reported in the news
24  media?
25  A    I would think that would be right, yes.

1   Q    On the television?

2   A    Possibly, yes.

3   Q    Well, possibly.  Is there any doubt in your mind that

4   during the Intifada, these horrible suicide bombings were

5   being reported in the television?

6   A    I can only say, sir, I imagine what you are saying is

7   true now.  You are talking about events fourteen years earlier

8   or ten years earlier.

9   Q    Mr. Usama Hamdan, that you just talked about, are you

10  aware that on the day in March of '02 at a Passover seder when

11  people were slaughtered by Hamas suicide bombers, your

12  customer was on CNN gloating about it?

13  A    No, I'm not aware.

14  Q    Do you dispute that these Hamas suicide bombings got

15  worldwide attention?

16  A    No, I don't dispute that.

17  Q    Now, in the context of this violent Intifada, Arab Bank

18  became involved in something called the Saudi Committee for

19  the support of the Intifada; right?

20  A    No, that is not quite right, sir.

21  Q    Well, just after this violent Intifada that we just

22  talked about began, Arab Bank became involved in a project

23  that involved the Saudi Committee for the support of the

24  Intifada; right?

25  A    I've testified a few minutes earlier that the Saudi

1  Project, as we call it, was purely humanitarian nature.  It

2  was a package that provided humanitarian assistance to the

3  Palestinian people and not to be violent.

4          MR. WERBNER:  Objection, nonresponsive.

5          THE COURT:  Hang on one second.

6          That's sustained.

7          The testimony is stricken.

8          Ask another question.

9  Q    My question simply, Mr. Bishara, is that in the context

10 of this violent Intifada, within months of that beginning --

11 that was violent from day one -- Arab Bank got involved in a

12 project concerning the Saudi Committee for the support of the

13 Intifada; right?

14 A    That is not right at all.  You are trying to put words in

15 my mouth, sir.

16 Q    I'm trying to find out if when you wrote a letter about

17 the Saudi Committee for the support of the Intifada.  The

18 context was "In the midst of this violence that we just talked

19 about."  Let's look at the letter, Plaintiffs' Exhibit 441.

20 It's not yet in evidence, so let's look at it to counsel and

21 the witness only?

22          Do you remember a January 2001 letter that you

23 signed and mailed that concerned the Saudi Committee for the

24 support of the Intifada?

25 A    Yes, I remember the letter, yes.  In front of me.

1   Q     And Plaintiffs' Exhibit 44 is the one you signed and sent

2   regarding it?

3   A     Yes.

4              MR. WERBNER:  We offer Plaintiffs' Exhibit 441.

5              MR. STEPHENS:  It's pre-admitted.

6              THE COURT:  All right.  Go ahead.

7              MR. WERBNER:  Can we show it, then, to all?

8   Q     The subject line in that letter is, correct me if I'm

9   wrong:  "Payment of incoming transfers for the benefit of the

10  families of the martyrs and the injured of the Al-Aqsa

11  Intifada."

12             Do you see that?

13             MR. STEPHENS:  Your Honor, may I give the witness a

14  copy of the exhibit?

15             COURT:  Do you need a copy?

16             THE WITNESS:  No, sir.  I have it in front of me in

17  English.

18             Can you give me the Arabic version, please?

19             MR. STEPHENS:  Sure.

20             May I approach, your Honor?

21             THE COURT:  Sure.

22             THE WITNESS:  Thank you.

23  Q     In the Arabic -- why don't we show the Arabic as you look

24  at it?

25             In Arabic, it will come up in a minute.  We'll see

1   there's some actual handwriting.  You can see that it was

2   noted in the English handwritten and the Arabic we see at the

3   top left of that, indeed, there's some handwriting on it.  Do

4   you see that.

5   A    Yes.

6   Q    Do the words "very important" show up there in that

7   handwriting on your letter?

8   A    Yes.

9   Q    And you sent this letter -- let me back up, because I

10  think you didn't quite answer when you were wanting to have

11  that before you, and I'm glad you do have it before you?

12        The subject was "Payment of incoming transfers for

13  the benefit of the families of the martyrs and the injured of

14  the Al-Aqsa Intifada"; correct.

15  A    Yes.

16  Q    What is the Arabic word for "bereaved"?

17  A    "Families of bereaved."

18  Q    I'm asking a language question.  What is the word in

19  Arabic for "bereaved"?

20  A    I'm trying to think of the right answer.  I don't have it

21  in mind, "bereaved."

22  Q    I don't know.

23  A    I don't know, either.  We have a translator.

24        THE INTERPRETER:  "Bereaved"?

25  A    "Osar" is families.

1          THE INTERPRETER:  Families.  (Foreign Language

2     Spoken)  "the dead" if you are talking about people who are

3     dead.  There is no word single word in Arabic for "bereaved."

4     It would be rendered in two words, "Families of the dead."

5          MR. WERBNER:  Excuse me.

6          "Families of shaheed" is not "Families of bereaved,"

7     is it?

8          MR. STEPHENS:  Your Honor, is he questioning the

9     translator?

10         THE COURT:  Is that an objection?

11         MR. STEPHENS:  Yes.

12         THE COURT:  It's overruled.

13         THE INTERPRETER:  Shall I answer?  Yes, it could be.

14         THE COURT:  I'm sorry.  I thought that was a

15    question for the witness.

16         MR. WERBNER:  That's what I thought.

17         Let me pose it this way.

18    Q    In the Arabic, read in the Arabic of this exhibit, the

19    subject line, and then I would like to have it translated.

20    A    I have to take a few minutes to answer your question, if

21    you don't mind.

22    Q    I'm asking you to read out loud in Arabic the subject

23    line of your letter.

24    A    The subject is "Settlement of transfers, incoming, in

25    favor, families of dead/bereaved."

1    Q    That sounds like English to me.

2    A    Because the word "shaheed" could imply many things.

3          THE COURT:   What he is asking you to do is, read it

4    in Arabic, and then the translator will interpret it.   He

5    wants you to read it out loud in Arabic.

6          THE WITNESS:   Okay, sir.

7          THE INTERPRETER:   Subject is "Payment of incoming

8    wire transfers for the benefit of the families of the

9    killed" -- dead, martyrs, any number of words could be

10   used" --  "and the injured of the Intifada."

11          MR. WERBNER:   We'll go with the certified

12   translation that's part of Exhibit 44.

13   Q    You sent this letter, didn't you, to all the Palestinian

14   branches; correct?  Is that correct?

15   A    Yes.

16   Q    To all the Palestinian branches?  That would be West

17   Bank, Gaza, the twenty-plus different branches; right?

18   A    Correct, yes.

19   Q    And in the second paragraph, you said "To all the

20   branches, as we strive for the success of this party's

21   project," and then it went on.   Let's look at that again in

22   English.   Do you see where I'm talking?

23          Blow that out, the second paragraph.

24          "As we strive for the success of this party's

25   project."  Do you see that?

1    A    Yes.

2    Q    So, is it the fact that in the early days of the

3    Intifada, on this document that said "important" that you sent

4    to all the branch managers, that you were telling them, as the

5    country manager, that this Saudi Committee for the support of

6    the Intifada was something that Arab Bank was striving for the

7    success of?

8    A    That's not correct.  You are, sir, with all due respect,

9    reading one paragraph --

10            MR. WERBNER:  I object, nonresponsive.

11   A    Give me a chance to answer, and then I'll be responsive.

12            THE COURT:  Sir, the rules are that he gets to ask

13   you just what he wants to hear.  Then if there's more that you

14   want to tell, then the bank lawyers will get up and ask you on

15   redirect examination.

16            THE WITNESS:  Sir, I understand.  Thank you.

17            THE COURT:  So, I'll strike everything after "That's

18   not correct."

19            Next question.

20   Q    You were the number one person over the Palestinian

21   branches at the time you sent all the branch managers this

22   letter, weren't you?

23   A    Yes.

24   Q    And if these branch managers got a letter from you, they

25   knew it was very important to comply with it, didn't they?

1       MR. STEPHENS:  Objection, your Honor.

2       THE COURT:  Overruled.

3   A    I hope so.

4   Q    And so, just like was noted here, when you said "We are

5   striving for the success of the Saudi Committee for the

6   support of the Intifada," they knew that they should follow

7   those directions; correct?

8   A    It could imply this, yes.

9   Q    And you could tell from this letter that not only were

10  families of -- was it "shaheed" in Arabic?  Was the

11  word "Families of the shaheeds"?

12  A     "Families of the shaheeds and the wounded."

13  Q    And you knew, also -- I don't know if you mentioned it

14  during the direct examination, you knew that this committee

15  you were working with was sending money to prisoners, as well;

16  right?

17  A    I'm not sure I remember that.  I'm not sure about the

18  prisoners.  I've already described what the program was about.

19  Q    I want the whole truth.

20      MR. STEPHENS:  Objection, your Honor.

21      THE COURT:  Sustained as to the question.

22  Q    Was this project that Arab Bank wanted to be successful,

23  did it include sending money to prisoners, prisoners that had

24  been convicted as terrorists?

25  A    Today, my recollections are very simple about the

1    program.  It was a humanitarian program.

2              MR. WERBNER:  Objection, non-responsive.

3              THE WITNESS:  Can I explain?

4              THE COURT:  I'm afraid not.

5    A    It may have.  I do not recall.

6    Q    Then, I appreciate that.  We know that you want to say

7    that it's humanitarian.  I'm sure the jury listened carefully,

8    and you said that.

9              THE COURT:  Mr. Werbner, just ask questions.

10             MR. WERBNER:  Yes, sir.

11   Q    My job is to get through all of this.

12             THE COURT:  Just ask questions.

13             MR. WERBNER:  Yes, sir.

14   Q    Will you accept the fact that many, many dollars went

15   through your bank for the Saudi Committee for the support of

16   Intifada to prisoners?

17   A    I have to say, I can't accept that fact, because I don't

18   know.

19             (Continued on next page.)

20

21

22

23

24

25

1   (CONTINUING)

2   Q    Even though this lawsuit's been pending ten years, you

3   gave a deposition, you signed an affidavit, you don't know

4   that this Saudi Committee for the support of the intifada was

5   making payments through Arab Bank to prisoners who were

6   convicted of terrorism?  Is that your testimony?

7   A    My testimony stands as I've just said it.  Again, I knew

8   the program was humanitarian assistance.

9            MR. WERBNER:  Objection; nonresponsive.

10           THE COURT:  Well, you are asking him twice, so he's

11  answering twice.

12           I will strike the answer but I'm going strike the

13  last question, too.  So if there is another question, go

14  ahead.  His answer is he didn't know.

15  Q    You talked with Mr. Stephens about, at the end of your

16  testimony just now, that Arab Bank was -- maybe you didn't say

17  merely, but basically we were just the correspondent bank for

18  Arab National Bank, is that essentially what you said?

19  A    Yes.

20  Q    But that's not the whole truth either, is it?  Because

21  there was a very close relationship between Arab Bank and Arab

22  National Bank, isn't that true?

23           MR. STEPHENS:  Objection, Your Honor.

24           THE COURT:  Sustained as to form.

25  Q    Isn't it true that there was a very close relationship

1  between Arab National Bank, the Saudi banks and Arab Bank in

2  Amman, Jordan?

3  A    No, that's not quite true.

4  Q    So, you're saying that it's not true that those banks

5  were close?

6  A    I'm saying it's not quite true.  I, for instance, never

7  set foot in Saudi Arabia and I never visited Arab National

8  Bank.  Depends on your definition of closeness.

9  Q    How about the fact that Arab Bank own 40 percent of Arab

10  National Bank?  Is that something that you would consider

11  makes it close?

12            MR. STEPHENS:  Objection, Your Honor.

13            THE COURT:  Overruled.

14  A    I'll have to answer your question as to the history of

15  the 40 percent, if you don't mind.

16            THE WITNESS:  Can I, Judge, answer?

17            THE COURT:  If Mr. Werbner wants that answer.

18  A    We were nationalized --

19  Q    Excuse me?

20  A    -- at least to have branches and we were nationalized --

21            THE COURT:  Let me stop the witness.

22            The only question pending is if there is 40 percent

23  owned by one institution, does that make them close?  It

24  really calls for a yes or no.

25            THE WITNESS:  The answer is not necessarily, Judge.

1        THE COURT:  Okay, that's fine.

2   Q    What, if anything, Arab Bank has called it an affiliate

3   or a subsidiary.  Would you agree that in business that a

4   company that is an affiliate or a subsidiary is a close

5   business relationship by nature?

6   A    Again, under normal circumstances, yes, but in

7   Saudi Arabia, no.

8   Q    It's true that Arab Bank has a Board of Directors;

9   correct?

10  A    Arab Bank does have a Board of Directors.

11  Q    And Arab National Bank in Saudi, it has a Board of

12  Directors; right?

13  A    Yes.

14  Q    And there's commonality between those Board of Directors,

15  isn't there?

16  A    Depends on what you mean by commonality.

17  Q    Well, Mr. Shoman was the chairman of Arab Bank, right?

18  A    Yes.

19  Q    And he sat both on the Board of Arab Bank and on the

20  Board of Arab National Bank?

21  A    Yes.

22  Q    And Arab National Bank has ten directors, four of whom

23  are appointed by Arab Bank, correct?

24  A    Not correct, no.

25  Q    Three?

1  A    I don't know.

2  Q    Does Arab Bank have the power and, in fact, exercise it

3  to appoint Board members of Arab National Bank, if you could

4  say yes or no or you can't answer yes or no?

5  A    No, I can answer but I have to give you the correct

6  banking answer.

7          The percentage of ownership is to the extent you

8  have influence on an institution.  You influence its policies,

9  you influence its decision-making.  In our case 40 or ten or

10 zero is the same way very little influence on Arab National

11 Bank.

12 Q    I think I was asking about the Board of Directors.  So,

13 maybe we can go there now.

14         Is it true that Arab Bank appoints directors on the

15 Arab National Bank Board?

16 A    Nominates directors.  Nominates directors.  Arab National

17 Bank has to approve it them.

18 Q    Okay.  But that's pretty influential where Arab Bank

19 nominates members to the Board of Arab National Bank, wouldn't

20 you agree?

21 A    I don't agree at all, actually.

22 Q    On Arab Bank's Board, there's Mr. Al-Masri, right?

23 A    Sabih, yes.

24 Q    And there's also the Saudi Arabia finance minister;

25 correct?

1  A    Yes.

2  Q    In other words, just like you're the finance minister for

3  the Palestinian Authority?

4  A    Yes.

5  Q    The finance minister for Saudi Arabia sits on the Board

6  of Directors of Arab Bank in Jordan, right?

7  A    Yes.

8  Q    So, there's a close relationship between Arab Bank and

9  the Saudis; right?

10  A    Actually, you've jumped from Arab National Bank to the

11  Saudi Government.  The Saudi Government has ten percent in

12  Arab Bank that's why they have a Board representative.

13  Q    Oh, okay.  Okay.  So, ten percent is a huge interest in

14  Arab Bank, isn't it?

15  A    Actually, I'm not sure if it's ten now.  Maybe it is

16  seven or six.

17  Q    Well, it was ten a second ago, wasn't it?

18  A    They have maybe up to ten percent.  I'm not sure.  I'm no

19  longer work for the bank.

20  Q    But that's a huge amount of shares, isn't it?

21  A    Ten percent, no.

22  Q    How much is that in dollars, roughly?

23  A    I have no idea.

24  Q    It's millions and millions and millions of dollars, isn't

25  it?

1    A    I have no idea, Mr. Werbner.

2    Q    You don't know that ten percent of Arab Bank is in the

3    millions of dollars, if not much larger?

4    A    It is a significant amount, but I cannot put a dollar

5    figure on it.

6    Q    So, would the kingdom of Saudi Arabia be one of the

7    largest shareholders in Arab Bank?

8    A    It is not the largest shareholder.

9    Q    Would it be one of the largest?

10   A    It is probably a significant shareholder but not the

11   largest.

12   Q    Would it be one of the largest?

13   A    No.

14   Q    Okay.   Who were the largest?

15   A    The Rafik Hariri family, the Jordanian Government through

16   the pension fund.  I believe the remaining shareholder are

17   floating shareholding, the commoners.

18   Q    Well, between the commoners as you call them and the

19   Hariri family of Lebanon and the Jordanian social security or

20   whatever you said?

21   A    Yes.

22   Q    Between those is the Saudi Arabia; right?

23   A    Saudi Arabian Government.

24   Q    The Saudi Arabian Government.

25        So, if Mr. Al-Masri told the jury a few days ago

1    that the Board of Directors of Arab Bank didn't know about the

2    Saudi committee for the support of the intifada, surely the

3    Board member that's the finance minister from Saudi Arabia

4    knew about the Saudi committee for the support of the

5    intifada; right?

6    A    Of course not right.  You're asking me about my knowledge

7    about the third-party.  I don't know what he knew or what he

8    did not know.  I never met him on my life.  I have not been to

9    Saudi Arabia except once in my life on behalf an American bank

10   and I have no clue what he knew or what he did not know.

11   Q    You do know Mr. Shoman, though, that was the head of the

12   bank.  Actually, the Shoman family founded the bank back in

13   the 1930s; isn't that true?

14   A    That is true, yes.

15   Q    And either the Mr. Shoman the grandfather and then the

16   son and then the grandson, they were chairmen of Arab Bank

17   from 1930 through up until very recently; correct?

18   A    That's correct, yes.

19   Q    And the jury saw on videotape deposition a Mr. Shoman

20   from recent time.  You know that during the intifada

21   Mr. Shoman had come into the headquarters of Arab Bank

22   committees to support the intifada.  You're aware of that,

23   aren't you?

24   A    No, I'm not aware of that and that is not true.

25   Q    Well, you know that Mr. Shoman contributed money of the

1   employees into the welfare association for the support of the

2   intifada right there at Arab Bank when it began in the fall of

3   2000; correct?

4   A    Like every other corporate institution in Jordan, yes.

5   Q    And all the employees of Arab Bank were asked to put in

6   money to support the intifada, those early days; correct?

7   A    No.

8   Q    In New York Arab Bank was asked to do that, weren't they?

9   A    Voluntary.

10  Q    Okay?

11  A    Some branches did not.

12  Q    Okay.  But did all of your branches?

13  A    No.

14  Q    Did the New York branch?

15  A    I don't know.  I don't remember.  Perhaps.

16  Q    You don't remember seeing in your deposition the evidence

17  indicating the contributions of the New York employees for the

18  welfare association for the intifada?

19       MR. STEPHENS:  Objection, Your Honor.

20  A    Surely --

21       THE COURT:  Hang on.

22       Overruled.  Go ahead.

23  Q    Do you recall that?

24  A    Can you repeat your question, please.

25  Q    Do you recall seeing the contributions of some of the

1  Arab Bank employees made into a welfare association?  You

2  didn't want to say welfare association in support of the

3  intifada and there was a little argument about that.  Do you

4  remember?

5  A    No, I don't recall now.

6  Q    You were speaking of the deposition.  Have you reviewed

7  it lately?

8  A    Yes.

9  Q    With within the last week?

10  A    Yes.

11  Q    Read the whole 500 pages of it?

12  A    Read the whole 4, 5 pages it was.

13  Q    And that was a deposition that was taken in Amman, Jordan

14  in November of 2010 about four years ago; correct?

15  A    I believe that is correct, yes.

16  Q    Do you remember that you didn't -- you weren't

17  comfortable referring to in the documents the families of the

18  martyrs.  You wanted to call that something else?

19  A    I don't remember that at all.

20  Q    That letter that we looked at where the subject said

21  families of the martyrs and the wounded, do you remember that

22  you kind of refused to say family of the martyrs?

23           MR. STEPHENS:  Objection.

24           THE COURT:  Sustained.

25  Q    Let's look at plaintiff's 327.  It's in evidence, may I

1  show it, Your Honor?

2          THE COURT:   You may.

3  Q    This is an April 11, 2001, document.  It's not to you or

4  from you, but it shows that you were copied on this document.

5          You're aware that was; correct?

6  A    Can I see the Arabic version of this document, please.

7          MR. WERBNER:   Sure.

8          MR. STEPHENS:   May I approach the witness

9  Your Honor.

10          THE COURT:   Sure.

11 Q    If we can look, while you look at that, highlight please

12 on this front page where it shows copy to Shukry Bishara down

13 at the bottom there.  Maybe blow it out a little bit.

14          You let me know when you're ready.

15 A    I'm ready.

16 Q    Okay.  So, this was discussed in your deposition in

17 November of 2010, wasn't it?

18 A    I don't think so, not in my deposition -- in my

19 deposition?  Yes.

20 Q    Okay.  And that's the one that you reviewed in the last

21 week so you're probably not surprised to be seeing this

22 document; is that right?

23 A    I'm sorry.  You asked me if I viewed my deposition or my

24 affidavit?

25 Q    Well, we're going to talk about both.  What I was saying

1  in this last question was that letter that shows you getting a

2  copy of was something discussed in your deposition, wasn't it?

3  A    Yes.

4  Q    And what's the date of it?

5  A    11th April, 2001.

6  Q    So, the intifada by April of 2001, it was becoming more

7  and more bloody, wasn't it?

8  A    Perhaps, yes.

9  Q    Well, not perhaps.  For sure, wasn't it?

10 A    No, there were moments of calm.

11 Q    Okay.  How was it in April of '01?

12 A    I cannot remember.

13 Q    It wasn't calm, was it?

14 A    I cannot remember.  That's what I said.

15 Q    The title of this letter is outward transfers as per

16 request of the Saudi Committee for the support of the intifada

17 Al Quds.

18        Do you see that?

19 A    Pardon me?

20 Q    Do you see the subject line of the letter?

21 A    Yes.

22 Q    Okay.  And it's talking about the Saudi Committee for the

23 support of the intifada?

24 A    Yes.

25 Q    The program that you told all the branch managers you

1  were striving for the success of the project; correct?

2  A    Incorrect.

3  Q    So, let's look at the two pages that are attached.  To

4  look at them quickly, there's one of the charts attached and

5  the next page is a different one.  Let's go back to the first

6  one.  The first one, if we can blow out the title.

7          Lists of martyrs' names in the West Bank sixth

8  installment.

9          Do you see that?

10  A    Yes.

11  Q    Let's go to the second chart, and look at the title of

12  it.  It shows the title is, lists of martyrs' names in Gaza

13  fifth installment.

14          Do you see that?

15  A    I have the document, sir, that says lists of martyrs'

16  name in West Bank sixth installment.

17  Q    And another chart, yes, sir, go ahead.

18  A    Another chart is in Arabic.  It says yes, martyrs'

19  intifada in Gaza fifth installment.

20  Q    Okay.  So, it looks like Arab Bank and you in particular

21  are getting lists for both martyrs in the West Bank and

22  martyrs in Gaza concerning transfers that are to be made,

23  isn't that what it seems?

24  A    No, that is incorrect, actually.

25  Q    Well, let's start back from the beginning.  This letter

1    was provided by Arab Bank, I'll represent that to you.   This

2    letter was produced in the lawsuit from Arab Bank.

3            Do you dispute that this document was received by

4    Arab Bank?

5    A    I dispute the fact that this is a letter of Arab Bank.

6    This is a letter of Arab National Bank.

7    Q    Okay.  I didn't mean to say that and if I did I

8    apologize.

9            What I'm asking is whether Arab Bank is getting a

10   document, whether it's from a charity, whether it's from Arab

11   National Bank as the case here or whether it's from the

12   Saudi Committee.  Arab Bank, by virtue of this Exhibit, is

13   clearly getting a document that gives Arab Bank lists of

14   martyrs; right?

15   A    Mr. Werbner, this is a document sent to us, I believe,

16   from Arab National Bank on behalf of the Saudi Committee.

17   That's what I believe it is.

18   Q    Okay.  That's fine.  And Arab Bank employees read what

19   they're sent, don't they?

20   A    I have to believe that they do.

21   Q    Especially when you've told all the branches that you

22   were striving for the success of a project and it was very

23   important?

24   A    I don't think we do that.  Because you did not give me a

25   chance to say what I told actually in the letter, in the

1   letter I said --
2           MR. WERBNER:  Excuse me, I object.
3   A    -- I do not permit mistakes.
4           THE COURT:  I know you are anxious to give the whole
5   story but you have to wait for the bank's lawyers to ask you
6   that question.
7           THE WITNESS:  I'm sorry, Judge.
8           THE COURT:  It's all right, I know you don't do this
9   for a living.
10          THE WITNESS:  I wish I did.
11  Q    By the way, these big words highly confidential that's
12  stamped on there by your bank's lawyers, do you know that?
13  That's not something I put on there.  Or do you not know?
14  A    Is that a question?  I didn't hear it.
15  Q    Do you know who put this highly confidential on these
16  documents that show suicide bombings that are in the files of
17  Arab Bank?
18  A    I don't know who put highly confidential.  I have to
19  assume it's our lawyers.  I don't know.
20  Q    Okay.  Let's look at the first chart, the one on the
21  West Bank.  And you might want to have the Arabic, but this
22  document from Arab Bank's files that they've marked highly
23  confidential, it's listing people to get money.  If I look
24  down the item 14, assassination, assassination, bullets to the
25  head and then I see four from the bottom martyrdom operation

1   and the Arabic it says amaliyyah istisyhadiyyah, doesn't it?

2   A    Yes, it does.

3   Q    And you know what that means?

4   A    Yes.

5   Q    In your deposition you weren't so quick to say yes,

6   though, were you?  You danced around, didn't you?

7             MR. STEPHENS:  Objection, Your Honor.

8             THE COURT:  Sustained.

9             The objection is sustained as to the form of the

10  question.

11            THE WITNESS:  Your Honor, he put words in my mouth.

12            THE COURT:  Wait, wait.  That is why I sustained the

13  objection.  Okay?

14            Ask another question.

15  Q    Does the word amaliyyah istisyhadiyyah appear in this

16  document that came from the bank's file?

17  A    Yes, it does.

18  Q    And you know it means suicide operation; correct?

19  A    Absolutely false.  Absolutely categorically false.

20  Amaliyyah istisyhadiyyah could be a combat operation.

21            MR. WERBNER:  Excuse me.

22            Your Honor, I object; nonresponsive beyond false.

23            THE COURT:  After absolutely false, I will strike

24  the answer.

25            Ask another question.

1  Q    Let me be sure that I'm clear you are saying that

2  amaliyyah istisyhadiyyah does not mean suicide operation?

3  A    That's exactly what I'm saying.

4  Q    Do you know why -- you know Mr. Mazen Abu Hamdan, the man

5  who became the country manager one or two people after you?

6  Do you know him?

7  A    Yes.

8  Q    Good personal friend?

9  A    I know him.

10 Q    So, if he testifies that amaliyyah istisyhadiyyah

11 definitely means suicide bombing, like about five other

12 witnesses have, you disagree?

13 A    Definitely.

14 Q    Okay.  You remember being asked about that in your

15 deposition?

16 A    I don't think I remember actually.

17      MR. WERBNER:  Let me refresh your recollection with

18 page 92, line 7, give Counsel a moment to get to that spot if

19 they wish.  I think we've produced it.

20      And Your Honor, we would like to refresh his

21 recollection on the subject with the video deposition at page

22 92?

23      THE COURT:  If you're refreshing his recollection,

24 you're just showing it to him; right?

25      MR. WERBNER:  Well, and it's for impeachment as

1  well.

2          THE COURT:  Then you can show it to everybody.

3          MR. WERBNER:  All right.

4          Please play the clip number four.  Dim the light,

5  please.

6          (Video played for jury.)

7  Q    Weren't suicide bombers or their activities or their

8  conduct during the intifada referred to frequently in the

9  press and among the public as martyrdom operations?

10         MR. STEPHENS:  Objection, Your Honor.

11 A    No.

12         THE COURT:  Overruled.

13 A    They were --

14         MR. WERBNER:  Objection after no, Your Honor.

15         THE COURT:  Okay.

16         Another question.

17         THE WITNESS:  Can I explain?

18         THE COURT:  I'm afraid not.  I'm afraid you can't.

19         Let's move on.  Ask another question.

20         MR. WERBNER:  Yes, I would ask Your Honor for

21 amaliyyah istisyhadiyyah to be translated by our sworn

22 translator.

23         THE COURT:  Well, no.  I'm not going allow that.

24         MR. STEPHENS:  Objection.

25         THE COURT:  Go ahead.

1    MR. WERBNER:  Okay.

2    Q    So, regarding this chart, was that something typical

3    while the intifada was going on that you'd have the fifth

4    installment, the sixth installment, that these transfers of

5    people that were martyrdom operation?

6    A    Your question is what, please?

7    Q    Is what we looked at typical of what the bank was

8    involved with during this violent intifada?

9         MR. STEPHENS:  Objection, Your Honor.

10        THE COURT:  Sustained.

11   Q    Let's move to -- just before we leave that.

12        You don't dispute that Arab Bank employees who were

13   dealing with that matter read the material, you don't dispute

14   that, do you?

15   A    Which material, sir?

16   Q    The one that we are just looking at.  The letter with the

17   two charts?

18   A    I can only answer I have to assume that they did, but I

19   don't know today.

20   Q    All right.  Do you know Mr. Blackmore who was an Arab

21   Bank employee in London?

22   A    No.

23   Q    Are you aware that when he was shown this he said if they

24   had seen that at Arab Bank in London they would called the

25   police and filed suspicious activity reports?

1    MR. STEPHENS:  Objection, Your Honor.

2    THE COURT:  Overruled.

3  A    I don't know Mr. Blackmore and I don't know what he may

4  have or may not have said.  I don't know him.

5  Q    Well, if you saw this or one of these people came to you

6  and said hey, we're being asked questions about transferring

7  money and it's showing people that have died in martyrdom

8  operations, would you have called the police?  Would you have

9  taken steps?  It's what should have happened; right?

10  A    That's not quite right.  I cannot agree with you there.

11  Q    Okay.  You mentioned in a question from Mr. Stephens that

12  he was asking you at the end about the Saudi Committee, was it

13  ever on any blacklist, do you remember that question?

14  A    Yes.

15  Q    And you answered that in the negative, right?

16  A    Yes, correct.

17  Q    Well, isn't it the case that if the bank -- and this is a

18  hypothetical -- if the bank knows that they have a customer

19  who is engaged in terrorism, the bank's not to do business

20  with that person whether they're designated or not; isn't that

21  true?

22    MR. STEPHENS:  Objection, Your Honor.

23    THE COURT:  Sustained.

24  Q    Well, let's take a specific example of Salah Shehada and

25  assume he is a customer at your bank branch, but he was never

1   designated.  Is it your position that the bank can go ahead

2   and provide financial services to him, the head of a terror

3   brigade, just if he's not designated?

4            MR. STEPHENS:  Objection, Your Honor.

5            THE COURT:  Sustained.

6   Q    You said you didn't know if the Saudi Committee was on a

7   blacklist.  Did you know that they were part of an entity that

8   was blacklisted by the United States?

9   A    Actually, I know the opposite of what you're saying.  I

10  know that they were not on the U.S. blacklist.

11  Q    I'm asking you about if you've been told that they are

12  part of an organization; that is, that the Saudi Committee is

13  part of an organization that is a designated by the

14  United States.  Do you know that?

15  A    No, I don't know that and it can't be true.  If it were

16  the case --

17           MR. WERBNER:  I'm going to object to everything

18  after I don't know that.

19           THE COURT:  I don't know what he said.

20           THE WITNESS:  I will repeat it.

21           THE COURT:  No, that's all right.

22           Let's go on to another question, please.

23  Q    Let's talk about that affidavit.  When the lawsuit was

24  filed and I actually am confused here, at the end of the

25  questions did you mention the affidavit?  I know that you

1  mentioned that you investigated this particular account of

2  Osama Hamdan and you found certain things and you closed.   But

3  did you tell the ladies and gentlemen that you signed a sworn

4  statement to the Court about that?

5              MR. STEPHENS:  Objection, Your Honor.

6              THE COURT:  Sustained as to form.

7  Q    Anyhow, let's talk about it, whether it's new or not.

8  But it is true, isn't it, that this lawsuit was filed in

9  July of '04 and you filed a sworn statement in the court in

10 November of '04, four or five months later; correct?

11 A    Yes.

12 Q    And you've reviewed that affidavit, it's called a

13 declaration in this instance, but it's a sworn statement;

14 right?

15 A    I, I believe it is.

16 Q    And you've reviewed it in the last week?

17 A    Yes.

18 Q    And you stand behind every word of that sworn statement?

19 A    Yes, I do.

20 Q    Okay.  And do you think it was misleading?

21 A    No.

22

23              (Continued on following page.)

24

25

1    BY MR. WERBNER:   (Continued)

2    Q    Well let's examine that.

3         The lawsuit when it was filed in April was if we --

4    A    You just said July.

5    Q    July.  You're right.  Something else happened in April

6    but you're right.  It was July.  Thank you.

7         (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q    Let's look at the chart that -- well, I'll come to that

2  in a minute, but the, the lawsuit was referenced in your

3  affidavit.  Let's look at that.  It would be slide one.

4         You stated in your declaration, there's only about

5  three paragraphs in it about the Beirut account, but in

6  paragraph 41, you said, The amended complaint falsely claims,

7  and then it quotes, Arab Bank knowingly provides banking

8  services to Hamas directly through its Al Masra branch account

9  and it gives the number in Beirut and it cites the amended

10 complaint paragraph 345.

11        Do you see that?

12        MR. STEPHENS:  Objection, Your Honor.

13        THE COURT:  Sustained.  Let's have a side bar.

14        (The following occurred at side bar.)

15        THE COURT:  If you are impeaching him on that, he

16 has to say something to which it could be inconsistent.  Now,

17 of course it is a statement by someone who I think is deemed a

18 party so it is probably admissible in its own right, if it is

19 at all relevant, which it obviously is.  So, if you want to

20 admit it, you can admit it and ask him about it, but the way

21 you're doing it now when it is not in evidence is impeachment

22 without an inconsistent statement to impeach him with.

23        MR. WERBNER:  Let me, if I may, tell you where I'm

24 going.  I don't want to introduce the whole 21 pages.  I don't

25 mind introducing these three paragraphs but where I'm going --

1          MR. OSEN:  You are going to admit the document and

2     then ask him about the three --

3          MR. WERBNER:  Well, either way, but where I'm going

4     is that he is very misleading, I contend, when the jury sees

5     these paragraphs about what he failed to disclose, that the

6     fact that it was a designated terrorist, he doesn't disclose

7     that.

8          THE COURT:  I can't rule on that.  I can only rule

9     on questions that are pending.

10          MR. WERBNER:  Well, we'll offer it.

11          THE COURT:  Okay.

12          (The following occurred in open court.)

13          THE COURT:  Your Honor, Plaintiffs will offer that

14     declaration marked Plaintiffs' 4721.

15          THE COURT:  Any objection?

16          MR. STEPHENS:  No, Your Honor.

17          THE COURT:  All right.  It is received.

18          (So marked.)

19          (Continued on next page.)

20

21

22

23

24

25

1    BY MR. WERBNER:    (Continuing)

2    Q    So going back to the paragraph 41 of your declaration, so

3    correct me if I'm wrong, but the situation, so that the ladies

4    and gentlemen of the jury understand, the lawsuit is brought

5    saying here's a specific account number that Hamas is getting

6    money from at Arab Bank in Beirut.  It doesn't mention the

7    name.  I mean, it doesn't know.  It's taken it off of a

8    website and wanting to know about that account.

9                Is that a fair statement of what you understood the

10   contention to be?

11   A    Actually, I don't see -- you're asking me a question

12   actually?  What is it, please?

13   Q    The fact is that you knew that the lawsuit was filed and

14   it was saying here's a specific account number at Arab Bank in

15   Beirut associated with Hamas, but it didn't have the name of

16   who it was?

17   A    We checked.  The answer is we checked the account number

18   and I was told it belonged to an individual called Osama

19   Hamdan.

20   Q    But you didn't put that in the affidavit.  In your

21   affidavit, you said it's a normal account for an individual.

22   You didn't say in the affidavit that it's a designated global

23   terrorist named Osama Hamdan, did you?

24                MR. STEPHENS:  Objection, Your Honor.

25                THE COURT:  Sustained.

1  Q    You filed the affidavit in November as part of an effort

2  to get this lawsuit dismissed, didn't you?

3  A    Actually, as an effort to tell the truth.  I did not know

4  if you need to dismiss it.

5  Q    Well, you say in the first paragraph of the declaration

6  that you're filing your declaration in support of a motion to

7  dismiss.

8       Isn't it correct that your sworn declaration here

9  was an effort to get the case dismissed?

10 A    My sworn declaration was principally to tell the truth.

11      THE COURT:  Okay.  Is there a recital in the first

12 paragraph?  I've got to move this along a little.  Is there a

13 recital in the first paragraph of the affidavit?

14      MR. WERBNER:  Yes.

15      THE COURT:  Read that to him and ask him if it's

16 correct.

17 Q    In the very first paragraph numbered number 1, it says, I

18 am the chief banking officer of Arab Bank, PLC, the defendant

19 in the above-captioned case, and I am resident at the Bank's

20 headquarters in Amman, Jordan.  I submit this declaration in

21 support of the Bank's motion to dismiss the first amended

22 complaint.  And it goes on for the legal grounds.

23      Do you dispute that this sworn declaration you gave

24 just a few months after the lawsuit was filed was part of an

25 effort to get the case dismissed?

1   A    I do not dispute the fact that I intended to tell the

2   truth and I told the truth and I would love that the case be

3   dismissed.

4              MR. WERBNER:  Your Honor, I'd ask that the Court ask

5   the witness to be responsive.

6   A    Yes.  I answered.  I would like the lawsuit to be

7   dismissed.

8              THE COURT:  Okay.  He's now answered you.  Go ahead.

9   Q    You filed the affidavit in an effort to have it

10  dismissed, didn't you?

11  A    I filed the affidavit in defense of my bank against

12  untruthful accusations.

13             MR. WERBNER:  Your Honor, I move to strike.

14             THE COURT:  It's granted.

15             Look, it says in the first paragraph that you are

16  submitting the affidavit in support of the Bank's motion to

17  dismiss.  Is that correct?  Is that why you submitted it?

18             THE WITNESS:  That's correct, Your Honor.

19             THE COURT:  Okay.  Let's have another question,

20  please.

21  Q    Now, after your you were approached and said there's a

22  lawsuit and you looked into it, you said, We have investigated

23  this account.  Do you see that in paragraph 42?

24             We have investigated this account and our findings

25  was that this account which had a balance of U.S. $8,000 had

1    been opened by an individual and has been dormant for the past

2    three years.

3              Do you see that?

4    A    Yes.

5    Q    Did you disclose the name of that accountholder?  Yes or

6    no.

7    A    It can't be answered in a yes or no format, sir.  4.

8    Q    I --

9    A    You accused this account by Hamas is opened --

10   Q    Well --

11             THE COURT:  Wait.  Wait.  Both of you, stop.

12             He's just asking is the name of the individual in

13   your affidavit.

14             THE WITNESS:  No.

15             THE COURT:  Okay.  Next question.

16   Q    Was the fact that that individual was a designated U.S.

17   global terrorist disclosed in that affidavit?

18   A    No.

19   Q    But Arab Bank and its lawyers who had done this

20   investigation knew those two things when you signed this

21   affidavit, right?

22   A    I suppose by that time, yes.

23   Q    And this person -- well, before we look more at the

24   person, when you say the account had been dormant for three

25   years, was it intended to give the impression in your efforts

1    to get the lawsuit dismissed that this account really was

2    totally inactive for three years?

3            Was that the intent of your language that it was

4    dormant for three years?

5            MR. STEPHENS:  Objection, Your Honor.

6            THE COURT:  Sustained.

7    Q    Was it your intent with the word "dormant" to convey that

8    there was no activity in the account?

9    A    My intent was to tell the truth.  The fact that it was

10   dormant for three years is a fact that cannot be denied.

11   Q    Well, let's look at the graphic that shows the five

12   transactions in that account that did occur in the three

13   years.

14           (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1          MR. STEPHENS:  I have an objection to this line,

2     Your Honor.

3          THE COURT:  Let's talk about that.

4          (The following occurred at side bar.)

5          MR. WERBNER:  It's exactly what the five -- this is

6     an exact summary of the bank records.

7          MR. STEPHENS:  What it doesn't say is that they're

8     deposits.  What he testified to is dormancy where he works and

9     lives --

10         THE COURT:  That's for redirect.  You can

11    rehabilitate him on that if Mr. Werbner is switching the

12    field --

13         MR. WERBNER:  I'm going to bring out what you're

14    saying.

15         THE COURT:  Stop.  We have to all stop talking at

16    the same time.  I get to go first.  Okay?

17         There's no dispute about the data in that chart

18    being in evidence.  Your dispute is to the mischaracterization

19    of the question, right?

20         MR. STEPHENS:  It's actually -- I believe that in

21    order for this not to be misleading, he needs to say they're

22    deposits because he's trying to get to something else.

23         THE COURT:  I can only go on what I hear.  All

24    right?  Right now, I've got an accurate summary of underlying

25    documents.  I'm going to permit him to ask the witness about

1   that.  Let's take those questions one at a time.  You can show

2   him the chart.

3                (Continued on next page.)

1          (The following occurred in open court.)

2          MR. WERBNER:  May we show the chart, Your Honor?

3          THE COURT:  Yes.

4          (Published.)

5   Q    First, let's establish a few helpful facts.  The

6   affidavit was November 11th of '04, correct?

7   A    Yes.

8   Q    So as we examine your statement that it had been dormant

9   for the prior three years, that three-year period would go

10  back to November 11th of '01.  Do you see -- do you

11  understand?  November 11th, '01 is three years from your

12  affidavit, earlier than your affidavit.

13  A    Yes.

14  Q    Okay.  The fact is that, and the exhibit numbers are

15  here, during that period, March 28th of '02, $53 came in

16  addressed to the Palestinian Media Center.  Do you see that?

17  A    Came in or went out, you mean?

18  Q    Came in.  This was a funding account where monies were

19  being received by the guy who raised money for Hamas.

20          MR. STEPHENS:  Objection, Your Honor.

21          MR. WERBNER:  I'll rephrase, Your Honor.

22          THE COURT:  Do that.  It will save us the side bar.

23  Q    Do you understand -- and we can look at the designation

24  of Osama Hamdan, that he was a fundraiser for Hamas.  So that

25  monies would be coming in, that's what the website said.  Send

1    monies to this account.  That's what the website said.  Do you

2    follow me?

3    A    I, I have to explain the concept "dormant."

4    Q    Well, we're going to get to that.

5    A    Yes, please.

6    Q    Because this affidavit was sent to American lawyers and

7    to an American court in an effort to dismiss the lawsuit and

8    it said "dormant," but if you look here, would you agree, tell

9    me if I've got this wrong, that in March of '02, April of '02,

10   May of '02, June of '02, November of '02, June of '03, monies

11   were still actively coming in to his account.

12            Do you agree with that?

13   A    No, that's not quite right.  I have to explain, please.

14   You have to allow me to explain what the concept "dormant"

15   means.

16            THE COURT:  You are going to get a chance to do

17   that.  In fact, I have a feeling we can all anticipate that.

18   But for now, he's just asking you is it correct that money

19   came into the account.

20            THE WITNESS:  With your forbearance, I don't know if

21   this came in or not.

22            THE COURT:  That's fine.

23            THE WITNESS:  It doesn't say debit or credit.

24            THE COURT:  That's fine.  You can say that.

25   Q    What you want to say is that in Lebanon, "dormant" means

1  only about outgoing.  Isn't that what you want to say?

2  A    Not just Lebanon.  Across most countries of the world.

3  Q    But in plain English, the plain meaning of the word

4  "dormant" is giving the impression that the account had been

5  inactive for three years.

6           Do you not see that that would be an impression that

7  would be presented by saying that the account was dormant for

8  three years?

9           MR. STEPHENS:  Objection, Your Honor.

10          THE COURT:  All right.  I'm going to sustain the

11  objection and ask you to move on, Mr. Werbner, because the

12  point has been covered.

13          MR. WERBNER:  All right.

14 Q    As part of the investigation that you say occurred, I

15 presume that included the lawyers of the bank, right?

16          MR. STEPHENS:  Objection, Your Honor.

17          MR. WERBNER:  Not what they said to you, but just --

18          THE COURT:  I'm going to overrule that.

19 Q    This investigation -- you said it in your deposition --

20 from the moment the lawsuit was first filed, this was in the

21 hands of the lawyers.  Do you remember that?

22 A    Yes.

23 Q    And so this investigation wasn't just you individually;

24 it was other people at the bank and it was lawyers as well,

25 right?

1   A    And auditors.

2   Q    And so before you filed the declaration, that group of

3   people, they knew that it was Osama Hamdan's account, didn't

4   they?

5   A    Yes.

6   Q    And they knew that he was a designated global terrorist,

7   didn't they?

8   A    After the investigation, yes.

9   Q    And when we look at that declaration as they did, we

10  would know that he's not just a global terrorist, but one who

11  has been involved in fundraising to move weapons, explosives,

12  and personnel as part of Hamas military operations.  Did your

13  bank know that before you signed the declaration?

14       MR. STEPHENS:  Objection, Your Honor.  One question

15  at a time.

16       THE COURT:  The form is objectionable.  Rephrase the

17  question.

18       MR. WERBNER:  Yes, Your Honor.

19  Q    You have no doubt that this group from Arab Bank, the

20  lawyers, the audit, I think you said, the, your staff, that

21  they learned that it was Osama Hamdan and that he had been

22  designated; certainly they read the designation, don't you

23  think?

24  A    You're asking a long question.  I have to answer you with

25  a long answer.

1    Q    Well, let me give you a shorter question.

2    A    Good.

3    Q    If that group of people, when they learned it was Osama

4    Hamdan's account and that he was a designated terrorist, read

5    the Treasury statement, they would have learned that his role

6    in Hamas included moving weapons, explosives and personnel to

7    Hamas fighters to conduct Hamas military operations in Israel.

8    Do you dispute that?

9             MR. STEPHENS:  Objection, Your Honor.

10            THE COURT:  Sustained.

11   Q    But after your declaration, you gave this terrorist

12   $8,000, the man who moves weapons and explosives.  Your bank

13   had no other choice but to call him in and give him $8,000, is

14   that your testimony?

15            MR. STEPHENS:  Objection, Your Honor.

16            THE COURT:  Sustained as to the form.

17   Q    Do you contend that you had no other choice than to give

18   this designated terrorist the $8,000?

19   A    I have to answer the question that you're asking in the

20   simplest and the most truthful possible way.  My concern was

21   to get rid of the account and, yes, the only way to get rid of

22   the account in the absence of a court ruling, a writ, a legal

23   order, we had to give him the money first off.

24   Q    Was that too much trouble to have a legal proceeding or

25   get a writ so that you didn't have to give this man who's

1  moving weapons and explosives thousands of dollars?

2  A    I believe, sir, we tried.  We issued him a check drawn on

3  the Central Bank of Lebanon to make the point.  There was

4  simply no way.  There is no sequestration order on the

5  account, there is no writ freezing the money from anybody and

6  I believe until today, the guy is not designated in Lebanon.

7  So can you imagine the position the Bank was in?

8  Q    Oh, you're wanting to say here he wasn't designated in

9  Lebanon and, I mean, is that why y'all gave him the money?

10  A    That is not what I said.  I said our main concern was to

11  get rid of the account, close the account.  These were the

12  instructions we gave our people in Lebanon.  We notified the

13  Central Bank of Lebanon about the problem with this account

14  and after waiting six or five months, this was the only course

15  of action we can take.

16  Q    Are you aware that Arab Bank transferred over

17  $2.5 million to terrorists after they had been designated by

18  the United States?

19  A    No, I'm not aware.

20  Q    Are you aware that the Bank, Arab Bank provided financial

21  services to 11 designated terrorists?

22  A    No, I'm not aware.

23  Q    Was Sheik Yassin a customer of Arab Bank?

24  A    I don't know.

25  Q    Now, when the Dolphinarium bombing occurred, a suicide

1    bombing, and the name of the bombers were in the paper, did

2    Arab Bank attempt to look at that to be sure they weren't

3    providing monies to those terrorists?

4    A    I'm not familiar with the Dolphinarium.  If you can

5    perhaps explain.

6    Q    But Arab Bank did strive for the success of the Saudi

7    Committee's support of Intifada, didn't it?

8    A    Arab Bank did strive to operate properly in accordance

9    with laws and regulations because the Saudi Committee was a

10   purely humanitarian effort.

11           THE COURT:  You can't do that.  You can't change the

12   question like that to give the answer.  All right?  You have

13   to answer his question.  The Bank lawyers will ask you for

14   more details to get your point across.

15           MR. WERBNER:  Move to strike.

16           THE COURT:  All right.  Stricken.

17           MR. WERBNER:  And ask that the jury be instructed to

18   disregard it.

19           THE COURT:  The jury understands if I order

20   something to be stricken or I sustain a objection they are not

21   to consider it.  I told them that at the beginning of the

22   case.

23   Q    You made it clear to the Arab Bank, all the branch

24   managers, that it was important that this Saudi project be

25   successful, didn't you?

1   A    I made it clear to all Arab Bank -- you're referring to

2   my letter, yes?

3   Q    Let me repeat.  Nothing tricky about it.

4        Do you agree that you made it clear to all the

5   branch people throughout the territory that you wanted the

6   Saudi Committee's support for the Intifada program, project,

7   to be successful?

8              MR. STEPHENS:  Objection, Your Honor.

9              THE COURT:  Overruled.

10  A    I made it clear in my letter, sir, that we must not

11  commit mistakes.  That was the gist of my letter and good

12  banking service is about not making mistakes.  That's what I

13  made clear to our people.

14  Q    And you emphasized that you wanted the project to be

15  successful, correct?

16  A    I emphasized that we wanted the service --

17             MR. WERBNER:  Objection, Your Honor.

18  A    -- to be successful, yes --

19             THE COURT:  I don't know if he's nonresponsive.  He

20  didn't finish.

21  Q    Is it true that you wanted this project, you wanted

22  people to strive for the success of the Saudi Committee

23  support for the Intifada project, isn't that what you wrote?

24  A    I wrote in the first paragraph what you just said, but

25  the memo is made of three paragraphs.

1      MR. WERBNER:   Your Honor --

2   Q    Right.  I'm not saying it's the only thing you said in

3   the letter, but isn't it just the plain fact we can see in the

4   letter, you directed everyone that this was important that

5   this project be successful?

6   A    Yes, it's humanitarian project.

7          MR. WERBNER:   I'll pass the witness.

8          THE COURT:   All right.   Redirect.

9   REDIRECT EXAMINATION

10  BY MR. STEPHENS:

11  Q    All right.  Mr. Bishara --

12  A    Mr. Stephens, why weren't you closer like Mr. Werbner?

13  Q    All right.  You want me -- I was going to move up here.

14  You want me to come up here?

15  A    That's all right.

16          THE COURT:   Let's proceed with a question, please.

17  Q    First of all, could you explain, please, to the jury what

18  "dormant" means as you used it in your affidavit?

19  A    Dormant accounts, I don't know why they use the French

20  term, "dormant."  Dormant is from "dormir," sleepy.

21          Dormant accounts are typically the accounts that are

22  most hit by bank employees.  They detect accounts that have

23  not been subject to withdrawals and they make them.  That's

24  why an account that has not experienced recent withdrawals by

25  the client, the Bank classifies them as dormant.  So the

1  standard is more towards withdrawal than credits.  If all

2  saving accounts receive, they may not be subject to

3  withdrawals, receive interest.  So you cannot block the

4  income.  You can block the outgoing.

5  Q    During your cross-examination, Mr. Werbner showed you

6  number 4.

7         Sean, do you have that?  No?  I'm going to have to

8  go over here for that.

9  A    Okay.

10        (Exhibit published.)

11        THE COURT:  Clockwise.

12        MR. STEPHENS:  Can you do that for me, Sean?

13        THE COURT:  All right.  We're going to give you some

14  help here.  There you go.

15        MR. STEPHENS:  That's close enough.  Great.  Thank

16  you.

17  Q    This is what Mr. Werbner showed you during your

18  cross-examination.  Do you remember that?

19  A    Yes.

20  Q    And these are deposits.  In fact, he told you that,

21  didn't he?

22  A    No, he did not.

23  Q    Well?

24  A    I asked if they were in, inwards or outwards.

25  Q    Right.  If those are deposits, it wouldn't make the

1  account nondormant, would it?

2  A    No.

3  Q    Right.

4  A    If they were inwards, into the account, no.

5  Q    He also asked you about the Saudi Committee and in your

6  affidavit, you discussed the Saudi Committee, did you not?

7  A    Yes.

8  Q    And in November 2004, when you signed this document, you

9  swore that payments were made by the Saudi Committee to

10 thousands of unemployed Palestinians, persons in hospitals,

11 Palestinians that were wounded or injured during the violence,

12 persons whose houses were destroyed as well as payments to

13 Palestinian schools, hospitals and infrastructure in general?

14 A    That's correct.

15 Q    And that's the truth, isn't it?

16 A    Yes.

17 Q    Mr. Werbner also showed you Exhibit 441.  Could we see

18 that, please?

19        (Exhibit published.)

20 Q    And you have that in front of you there, don't you, the

21 written copy?  Because if you don't, I'll get one.

22 A    Yes, I actually have --

23 Q    The translation should be right there.

24 A    Yes.  Yes, I have it.

25 Q    Exhibit 441 is the letter that you wrote to the Palestine

1  branches, is it not?

2  A    May I -- it is, but may I make one, just one

3  qualification?

4  Q    I'll ask you some questions.

5  A    Okay.

6          THE COURT:  None of the lawyers will let you talk.

7          Go ahead, put a question, please.

8  Q    I get paid to ask the questions.

9          If you look at the second -- if you look at the

10  first paragraph, actually, it says, We would like to inform

11  you -- that means the branches -- that due to an error made by

12  a sender party, the Saudi Committee, several transfers have

13  been sent more than once to the same beneficiary.

14          Do you see that?

15  A    Yes.

16  Q    And so what you're telling the branches is that there was

17  some mistakes made, right?

18  A    That's correct, yes.

19  Q    And then here in the second paragraph, you say, As we

20  strive for the success of this party's project --

21          That means the Saudi Committee, yes?

22  A    Yes.

23  Q    -- and since we don't want to issue more than one

24  transfer to the same beneficiary and so there will not occur

25  further problems with beneficiaries in the future --

1          Then you tell the branches what you want them to do,

2     right?

3     A    That's correct, yes.

4     Q    So when you wrote, As we strive for the success of this

5     party's project, what did you mean?

6     A    I meant do not make operational errors.  Be precise in

7     your work.  That's what I meant.  Somebody had complained to

8     me and this is a memo cosigned by me and the chief financial

9     controller because as you see, there's a signature, if you

10    scroll down, by someone else.  And I remember, vividly, the

11    incident.  He came up and he said, We're making errors, errors

12    in payments, Mohammed Ahmed, Mohammed Ali, mistakes, and he

13    told me these are repeated mistakes.  Please make sure to the

14    branches that they should not keep repetitive operational

15    errors.  That's all.

16    Q    Okay.  One last thing and then I'll have nothing further

17    which is would you please tell the jury about the relationship

18    between Arab National Bank and Arab Bank and the

19    nationalization of the interest Arab Bank used to have and

20    that whole history?

21    A    Yes.  Back -- we used to have branches like everybody,

22    like most of the major banks.  Citibank had branches in Saudi

23    Arabia.  The government decided to nationalize the banks,

24    basically.

25    Q    Which government?

1   A     The Saudi government.   They called it Saudization

2   process.   They forced us -- they forced all the banks to sell

3   60 percent of the shares, turn it into a domestic entity and

4   kept us 40 percent but with minimum decision-making role.   The

5   Saudization process, they reviewed, they set policies.   We do

6   have one or two members sitting on the board, but our

7   influence on this is virtually nil.

8          Saudi Bank now in Saudi Arabia was called Saudi

9   American Bank.   I think they closed two years ago.   British

10  bank, it was called Saudi British Bank.   The French Credit

11  Agricole is called Saudi French Bank and our bank is called

12  Arab National Bank.   But as far as I'm concerned, our

13  influence on them is literally nil.

14          MR. STEPHENS:   I have nothing further, Your Honor.

15          THE COURT:   All right.   You may step down.   Thank

16  you very much.

17          THE WITNESS:   Thank you, sir.   Thank you for your

18  patience with me.

19          (Witness excused.)

20          (Continued on next page.)

21

22

23

24

25

CMH        OCR        RMR        CRR        FCRR

1          THE COURT:  Ladies and gentlemen, we'll take our

2    afternoon break.  We'll reconvene at 3:20, don't talk about

3    the case, the lawyers or anything else.  We'll see you in a

4    few minutes.

5          (Jury excused.)

6          Okay, 3:20.

7          (Recess.)

8          (In open court; jury not present.)

9          THE COURT:  All right.  Let's have the jury, please.

10         (Jury present.)

11         THE COURT:  All right.  Be seated.

12         The defendant's next witness.

13         MR. COLES:  The defendants call Jamal Hurani to the

14   stand, your Honor.

15         THE COURT:  All right.

16         Please stand, sir.

17         THE CLERK:  Stand and raise your right hand.

18   J A M A L   S I D Q I   S A D E Q   H U R A N I,

19         having been duly sworn, was examined and

20               testified as follows:

21         THE CLERK:  State your name for the record.

22         THE WITNESS:  My name is Jamal Sidqi Hurani.

23         THE CLERK:  Spell it.

24         THE WITNESS:  Jamal, J A M A L, S I D Q I,

25   S A D E Q, Hurani, H U R A N I.

1    THE COURT:  You may inquire.

2    MR. COLES:  Thank you, your Honor.

3  DIRECT EXAMINATION

4  BY MR. COLES:

5  Q    Good afternoon, Mr. Hurani.

6  A    Good afternoon, sir.

7  Q    At your deposition in this case, you testified in Arabic;

8  right?

9  A    That's right, sir.

10  Q    And today, you're going to try and testify for the jury

11  in English?

12  A    I'll do my best.

13  Q    If you need clarification, we have a translator sitting

14  right next to you.

15  A    That will be great.  Thank you.

16  Q    Now, the jury has heard that you have four names.  Is it

17  common for Palestinians to have four names?

18  A    Yes, sir.  It's common for us to the Palestinian

19  Territories to have four names, because mostly we use the same

20  names for naming people, and we have large families.  So,

21  using two names will bring in hundreds having the same name.

22  So, we use four names, so that we are able to identify each

23  other.

24  Q    Are four names also used on official identification

25  cards?

1    A    Yes, sir.  That's right.  It is also in the formal system

2    for the same reason.

3    Q    Where do you work, Mr. Hurani?

4    A    I work for Arab Bank.

5    Q    What is your current position?

6    A    I am the country manager in the Palestinian Territories.

7    Q    Does that mean you're the top man in the Palestinian

8    Territories?

9    A    Yes.  I'm the CEO for the Palestinian Territories.

10   Q    Where do you live?

11   A    I live in Nablus and Ramallah.  I have two houses, one in

12   Nablus and one in Ramallah.

13            MR. COLES:  If I can have him point out the two

14   cities on the map, your Honor?

15            THE COURT:  Yes, sir.

16   Q    With the judge's permission, can you come down?

17   A    Yes.

18   Q    Maybe you can show Nablus and Ramallah.

19   A    Yes, sir.  This is the map of the Middle East, actually.

20   This is the Mediterranean, Egypt, and this is Jordan.  In

21   yellow, Israel.  And this in green is West Bank.

22            So, Nablus is here to the north in the West Bank,

23   and Ramallah here.  I live in Nablus and Ramallah and my

24   office is in Ramallah.

25   Q    How would you describe Nablus and Ramallah?

1  A    Nablus and Ramallah are big cities in Palestine.  Nablus

2  has at least 250,000 people living it, and Ramallah may have

3  the same number.

4           THE COURT:  Mr. Coles, let's take down the board.

5  Q    Mr. Hurani, where did you grow up?

6  A    I grow up in a village called Ajja, between it's Nablus

7  and Jenin districts.

8  Q    Can you tell us a little bit about your family, if you

9  have a wife and kids?

10 A    Yes, I'm married to my wife.  She was an employee at Arab

11 Bank.  She holds an MBA degree.  She used to work at Arab

12 Bank.  That she is running her own business with her brother.

13 They are working with bridal gowns.  I have four kids, three

14 boys and one little lady.  They go to private schools in

15 Nablus.  I lived in Nablus right after I married, and they go

16 to private schools in Nablus.  I travel every day between

17 Nablus and Ramallah, where I work.

18 Q    And as far as your education, did you go to college?

19 A    Yes, sir.  I went to university.  It's called Mutah

20 University in Jordan, in the south of Jordan, in a city called

21 Karak.

22 Q    What kind of degree did you get?

23 A    I got there bachelor's degree in computer science.

24 Q    In computer science?

25 A    Yes.

1  Q    Do you have any other degrees in addition to your degree

2  in computer science?

3  A    Yes.  I have a master of business administration, an MBA.

4  Q    When did you get that?

5  A    Between 2005 and 2008 in Najah University in Nablus.

6  Q    So, you were taking night classes at the time you got

7  your MBA?

8  A    Yes, sir, I took night classes to get my MBA.

9  Q    After you graduated from Mutah University in 1993, what

10 was your first full-time job?

11 A    I worked for a year in a company in Amman in Jordan

12 called Computer Applications and Technical Services.  I was a

13 programmer there for one year before joining Arab Bank.

14 Q    We'll go through your positions in Arab Bank in a second.

15 First, I want you to provide a snapshot for the jury of Arab

16 Bank today.  How many branches does the bank have in the

17 Palestinian Territories?

18 A    We have now twenty-seven branches working, and we have

19 two in the pipeline coming.

20 Q    How many customers do you have in the Palestinian

21 Territories?

22 A    We have around 300,050.

23 Q    Where is your work office?

24 A    My main office is in Ramallah.

25 Q    And the bank's main office?

1    A    The bank's main office is in Ramallah, which is the main

2    office for the bank in the Palestinian Territories.  But the

3    bank's headquarters are in Amman, because it's a Jordanian

4    bank.

5    Q    And about how many people live in the Palestinian

6    Territories?

7    A    Around 4.5 million people.

8    Q    And you said you started working at Arab Bank in the

9    Territories in 1994?

10   A    Yes, sir.

11   Q    Did Arab Bank have any branches in 1994, when you started

12   there?

13   A    No.  The bank was planning to open branches before when I

14   joined.

15   Q    What brought you to work for the bank in the Palestinian

16   Territories at that time?

17   A    After I graduated from the university, I was looking for

18   a job.  So, I worked in a company in Amman, because there were

19   actually no jobs in the Palestinian Territories.

20         And at that time, there was the signatures for the

21   Oslo Accords between the Israeli Government and the

22   Palestinian Liberation Organization, PLO, and that was showing

23   that there was an atmosphere of peace and the economy coming

24   to the Territories, so that made me an excellent opportunity

25   to look for a job there.  I knew that Arab Bank was planning

1   to open branches in the Palestinian Territories, and that made

2   me apply for the job.  I was examined, I was interviewed, and

3   I was accepted.  So, I joined Arab Bank at that time.

4   Q    What was your first position at Arab Bank when you joined

5   in 1994?

6   A    My first position was in the computer center as a

7   programmer analyst.

8   Q    At some point, did you move in Amman to the Palestinian

9   Territories after you were hired?

10  A    Yes, sir.  I worked around two months in Amman, and then

11  the branch was to be opened -- the first branch was really to

12  be opened in the Palestinian Territories, so we moved from

13  Amman to Nablus.

14  Q    From your position as a computer programmer, what was it

15  like to open a branch of the bank in the Palestinian

16  Territories just after the Oslo Accords?

17  A    It was a huge challenge, sir.  It was a huge challenge,

18  because we were moving -- I was new to the bank, and then we

19  were moving to a new country that has its own requirements,

20  that has its own regulations, that has its own way of doing

21  banking, and we were to do that in a new market that needs

22  also accelerated expansion for the bank.  So, it was a huge

23  challenge.

24  Q    Why didn't you take the computer programs that Arab Bank

25  had in Jordan and move them over to the Palestinian

1  Territories?

2  A    That would have been the dream to do that, sir, but that

3  was not possible, because it's a different environment in

4  Palestine than in Jordan.  At least, we can think of Jordan

5  only banking with the Jordan dinar.

6          But going back to the Palestinian Territories, we

7  have to work in multi currencies, mainly the Israel shekel.

8  We have to have a new regulator.  We have to work with the

9  Israel banks for clearing the shekels and everything with

10 them, and we have to respond to the market needs that are

11 different in a banking perspective than the market needs in

12 Jordan.

13 Q    Do the Palestinian Territories have their own currency,

14 like the United States has the dollar or England has the

15 pound?

16 A    No, sir.  We don't have a national currency.  We work

17 with Jordanian dinar, the U.S. dollar, with the Israeli shekel

18 as the main currency in the Palestinian Territories.

19 Q    If you go to the grocery store and want to buy something,

20 what typically is the currency?

21 A    The Israeli shekel.

22 Q    What was it like when the first branch was opened up in

23 Nablus in 1994?

24 A    For me, this is a day I can never forget, because it had

25 a story.  So after everything was set up and there was the

1  ceremony, they were cutting the ropes, everyone is there,

2  speeches, and many, many people just coming to see what this

3  Arab Bank that is opening in Nablus, and we have customers

4  joining the bank and coming to the bank opening accounts,

5  doing transactions.

6         And after all of that has happened and the branch

7  doors were closed, so we were doing what is called in the IT

8  the end-of-day process.  At that time, the electricity went

9  down, cut off, and all of the transaction files on the

10 computers were damaged.  So, we have to call back the

11 employees to come through the night and re-key all the

12 transactions again.

13 Q    What kind of access to electricity did the bank have in

14 the Palestinian Territories in the 2000 time frame?

15 A    It was different between city and city and area and area.

16 So, in some branches, we would have twenty-four by seven

17 hours, which is the best case.  In other areas, we would have

18 the electricity coming on and off, with all the time the power

19 going down.  That was something that was usual.

20 Q    Did there come a time when you were promoted from your

21 job as a programmer analyst?

22 A    Yes, sir.  Joining Arab Bank at that time was such a

23 challenging environment, and working day and night, that would

24 be giving me the opportunity to be promoted.  So, I was

25 promoted to be a team head for development.  One of the

1    development teams, I was heading that team, and after that, I

2    became the development team's head.  So, I was responsible for

3    all the development in the bank, and I was the deputy for the

4    IT center by 2000.

5    Q    By 2000, you were given that promotion?

6    A    No.  I got that -- promotions '95, '96, and in 2000, I

7    was at that time the IT head deputy.

8    Q    Now, at that period of time in the 2000 period of time,

9    were the branches connected to one another electronically?

10   A    That would have been another dream at that time.  Every

11   branch was working on its own as a full bank.  We had a little

12   connectivity between the branches and the head office, so that

13   we can produce the global reports about the whole bank.  But

14   at that time, each branch was working on its own, and we were

15   using floppy disks to send data between the branches.

16   Q    Didn't the branches have Internet access in the 2000-2004

17   time frame?

18   A    Between 2000 and 2004, Internet was not available in

19   Palestine.  It was, I think, so minimal number was there,

20   because the technology was not there, and, no, there was no

21   Internet access in the branches.

22   Q    What was the reason you didn't have Internet access?

23   A    To have Internet access or anything, you would need an

24   investor and you would need the technology.  But in Palestine,

25   we are in the third world.  You would need occupier

1  permission.  For that, I think the communication company, we

2  were working on getting the permissions from the Israeli side,

3  and it was not public, having Internet.

4  Q    If an employee on in a branch wanted to go on Google in

5  the 2004 time frame --

6            MR. TURNER:  Your Honor, may we stop for a minute?

7            THE COURT:  Is there an objection to the question?

8            MR. TURNER:  I object.

9            THE COURT:  Sustained.

10 Q    You mentioned that when you first opened branches in the

11 Palestinian Territories in 1994, you were regulated by the

12 Central Bank of Israel?

13 A    That's right.

14 Q    As a computer programmer at that time, did you have to

15 have contact with the Central Bank of Israel to prepare

16 systems to communicate with them?

17 A    Yes, sir, that's correct.

18 Q    What did you have to do?

19 A    I was representing the IT team with our teams that were

20 meeting with the Central Bank of Israel, and we met them so

21 that the bank get from them what is needed, what reports are

22 needed, what should be ready.

23            And from my side, I was there so that I was to agree

24 with them on how to communicate, what are the communication

25 programs that are to be used between us and them, and what

1  type and format should the data be sent to them.  So, I was

2  there with them all the time.  And they were also visiting the

3  bank at that time frame to make sure that everything was okay

4  before opening the branch.

5  Q    Did there come a time when your regulator changed?

6  A    Yes.

7            MR. TURNER:  Objection, your Honor.

8            THE COURT:  Overruled.

9  Q    And who became your regulator after the Central Bank of

10 Israel?

11 A    It was the PMA, the Palestinian Monetary Authority.

12 Q    And can you just explain what the PMA is?

13           MR. TURNER:  Your Honor, I object.

14           THE COURT:  Overruled.

15 A    The PMA is the central bank, was being the central bank

16 rule in the Palestinian Territories.  I think it was

17 established after what is called the Paris Accords, which was

18 an economic agreement between the Palestinian Authority and

19 Israel, so that the PMA would take the role of the military

20 for the banks in the Palestinian Territories.  And so, the PMA

21 is the central bank.  They issue the license for the bank to

22 work, and they issue circulars and regulations, and they

23 oversee all the bank's activity in Palestine.

24 Q    After the PMA became your regulator, did you have to set

25 up new systems again to communicate with the PMA the same way

1  you had with the Central Bank of Israel?

2  A    Yes.   And for more, too, because the PMA was established

3  and they have experts and they have support from the World

4  Bank, from everywhere, and they were setting up a central

5  bank.   So, we have to work all the time to change the reports

6  that they were sending, to send them the reports that they

7  wanted, to meet with them, to get what they want from

8  statistics from all types of activities that happens in the

9  bank, and also to be with them for some projects they wanted

10  to do to expand the banking system.

11  Q    Without Internet, how were you able to communicate with

12  the PMA and send them information that they needed?

13           MR. TURNER:   The same objection.

14           THE COURT:   Well, we are getting a little deeper

15  than I anticipated.   I'll let him answer this question.   You

16  are going to have to move on from compliance issues.

17           MR. COLES:   Thank you.

18  A    Thank you, sir.   We were sending the data to the

19  regulator using the floppy disks.   So, we would prepare the

20  data, and if -- we would put it on a floppy disk, and we would

21  use a card.   We were using the regulator at that time to reach

22  him.

23  Q    I want to change the subject to a question of a

24  black-list.   Are you familiar with black-lists used by banks?

25  A    That's right, sir.

1    Q    Can you explain what a black-list is?

2    A    Black-list is the list that contains the names of the

3    people and the entities that the bank should not bank with.

4    Q    Now, did Arab Bank have a policy concerning black-lists

5    in the Palestinian Territories?

6              MR. TURNER:   Objection.

7              THE COURT:   Let's have a sidebar.

8              (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Sidebar.)

2       THE COURT:  I'll hear from defendant, but I'm

3  inclined to sustain the objection, because the plaintiffs have

4  no ability to cross-examine into the degree of adherence to

5  the black-list that was actually followed, because you have

6  not given them the documents.  I think that runs into the

7  preclusion order.

8       MR. COLES:  I have two responses.  First, I'm really

9  going to talk about the systems that he put in place in order

10 to create a black-list.  I'm not going to talk about specific

11 accounts or whether or not accounts were screened against the

12 black-list.

13      Secondly, under your Honor's order is general

14 questions about what programs existed.  Should be okay, so

15 long as I don't tie them to any specific account, and I'm not

16 going to do that.  This will be more -- I'm certainly aware of

17 the issue, and this is more about systems and what he did to

18 puts the systems in place.

19      THE COURT:  All right.  I'm not sure what your last

20 question was.  I frankly don't remember it.  Let's keep it

21 within that parameter.  It's got to be very general and cannot

22 be leaving the plaintiffs open to an inability to

23 cross-examine this witness, because they don't have the key

24 documents that might undermine some of the things he's saying.

25 You can describe in general the system they maintained, in

1    general.  But if you get very specific, I'm going to have to

2    stop it, because the plaintiffs have one hand tied behind

3    their backs here.

4              MR. COLES:  I totally understand that.  I'm going to

5    ask him what black-lists were used and how did you create

6    programs.

7              MR. TURNER:  That goes into the very problem we

8    have.

9              THE COURT:  I disagree.  The question is, Did you

10   follow the black-list?

11             MR. COLES:  I'm not going to go there.

12             THE COURT:  You are going there.  When you say, What

13   black-list did you use?, he's going to say, We used this, this

14   and this, and they don't know.

15             MR. COLES:  Fair enough.  I understand your Honor's

16   objection.  We have had a lot of discussions about that.  I

17   will stick to the systems that were put into place, and I'll

18   be as careful as I can.

19             (Continued on next page.)

20

21

22

23

24

25

1           (In open court.)

2    BY MR. COLES:

3    Q    Mr. Hurani, when you were involved as the development

4    director for IT, did you have a role in putting black-list

5    systems for black-lists in place at the bank branches in the

6    Palestinian Territories?

7    A    Yes, sir.  Black-lists are one of the core issues that

8    the banks rely on.  So, black-lists were used in the

9    Palestinian Territories since the bank opened.  They were used

10   with the branches on the paper.

11               MR. TURNER:  Excuse me, your Honor.  I object.

12               THE COURT:  The answer is stricken after "Yes, sir."

13               Go ahead.

14   Q    From a programming computer perspective, what did you do

15   to put the black-lists in place in the branches in the

16   territory?

17   A    So, from the programmer perspective, we were to help our

18   branches do their job.  So, helping them meant that we created

19   a system where the documents, the papers that are holding the

20   black-list, would be keyed into the computer system so that

21   they can use them.  They can use that system to inquire and

22   check about the names they want to check that went branch by

23   branch.

24               And then over time, there was additional

25   development, so it could be done once in the regional

1    management, and then exported into floppy disks.  Those floppy

2    disks would be circulated to branches, the branches would put

3    those lists on the systems and continue using them.  After

4    that, there was development, also, so that we were reflecting

5    of the development of our regulator, which is the PMA.  The

6    PMA started to send those lists --

7              MR. TURNER:  Excuse me, your Honor.  I object again.

8              THE COURT:  I agree.  I will strike that portion of

9    the answer where the first reference is made to floppy disks.

10             Next question, please.

11   BY MR. COLES:

12   Q    We've been talking about your role at Arab Bank,

13   Mr. Hurani, after 2000, when you were appointed as deputy head

14   of IT.  How long did you stay in that position

15   A    I stayed until 2004.

16   Q    You said earlier that the period starting in 1994, when

17   you came back to the Palestinian Territories after Oslo, was a

18   time of growth for the bank.  Was that true of the years 2000

19   to 2004, as well?

20   A    No.  It was the opposite between 2000 and 2004.

21   Q    And what happened in the Palestinian Territories in the

22   years 2000 to 2004?

23   A    Between 2000 and 2004, the Second Intifada was there, and

24   there was violence everywhere, and it was a very, very tough

25   period for the bank and for me and for everybody.  There were

curfews, there were operations for the Israeli army, there
were suicide bombings in the Israeli cities.  Everything was
very bad.  There were roadblocks.  It was like living in a
war.

          (Continued on next page.)

1    (CONTINUING)

2    Q    And where were you living during the second intifada?

3    A    I was still living in Nablus at that time.

4    Q    And where were you working?

5    A    I was working in Ramallah.

6    Q    And were you traveling between Nablus and Ramallah for

7    work every day?

8    A    At the start, I continued to travel every day as I was

9    doing all the time.  But then things started to complicate and

10   I have to spend four, five days and then the week in Ramallah

11   all the time and back by the weekend to see my family in

12   Nablus.

13        And then things complicated more, became more

14   dangerous and the work needs were high, so I have to stay

15   three, four weeks before being -- if I am even to go back to

16   see my family for one day and then come back to work.

17   Q    From your perspective as a computer expert, how did the

18   second intifada affect the ability of the bank's branches to

19   communicate with each other?

20   A    It was huge effort because first of all, by the second

21   intifada there was closure for the branches.  In many times,

22   in many occasions, so we would awake in the morning and count

23   how many branches are working because we don't know what's

24   going on in the cities and we don't know what branch will be

25   working and what branch will not be working and our branches

1   are disconnected, so there is a tiny connection that you can

2   never judge it will work because you don't know any operation,

3   anything that's happening will cut communication.  So, for the

4   communication-wise, we continued use the floppy disks to view

5   whatever we wanted from the regional management to the

6   branches so that we were able to send to them.  If we were

7   lucky that would arrive in the same day or may not arrive in

8   the same day even depending on the place we are sending the

9   data to.

10          Also, personal, humans, people who are working with

11  IT center and other branches, you cannot judge who's going to

12  be there in the morning because of the situation of the

13  grounds.  So, I started to count my team in the morning even

14  if I'm there and I think each branch manager was doing the

15  same so that you know who's there and what jobs to be done

16  today so that we will do it.  And at that time, I think we

17  moved from executing our plans, doing our plans to try to fire

18  fight what's going on and helping the business to continue

19  even with the weekend.

20  Q    With the road closures an the fights, how were you able

21  to deliver the floppy disks between branches and deliver other

22  material between branches?

23  A    Sometime we use donkeys.

24  Q    Donkeys?

25  A    Yes, sir.

1  Q    Can you explain?

2         THE COURT:  It's a small horse.

3  A    Yes, sir, because West Bank it's cities, it's mountains

4  and if the block, if the Cities are closed and the army is not

5  allowing one to enter, then you have to walk the mountain and

6  walking the mountains holding a PC with you, you cannot do

7  that.

8         So, some business happen and some people started to

9  have ten or fifteen donkeys in a point.  They will rent that

10 to you and you will get that donkey 20, 25 minutes and you

11 deliver it at the ending point when you reach where you can

12 get.  So, that we use that, that way in many cases.

13 Q    Did the second intifada have an effect on your family?

14 A    Of course.

15         MR. TURNER:  Objection, Your Honor.

16         THE COURT:  Well, I will allow that question and

17 that answer.

18         Are you going to go into detail.

19         MR. COLES:  I just want to ask him how.

20         THE COURT:  That's detail, let's have a side-bar,

21 please.

22         (Side-bar conference held on the record out of the

23 hearing of the jury.)

24

25

1          (Side-bar.)

2          THE COURT:   What happened to him?

3          MR. COLES:   Just the difficulty of communicating

4     with his family.   There's no specific incident.

5          THE COURT:   No terrorist activities?

6          MR. COLES:   I'm not going to talk about any

7     terrorist activities.

8          THE COURT:   Okay, let's go.

9          (Side-bar end.)

10

11         (In open court.)

12    Q    Mr. Hurani, why don't you tell the jury how the second

13    intifada affected your family.

14    A    Yes, my wife was working with the bank at that time and

15    she, at that time I had two kids, my boy and my girl, and they

16    were to be taken to the kindergartens and I was spending all

17    the time in Ramallah away from them and it was danger.   There

18    were things that happening on the ground.   There were

19    operation that happening in the cities.   And all the time I

20    was just calling them every hour.

21         I have to spend all that time one week, two weeks,

22    three weeks away from them just calling to make sure that

23    everything is okay.   If I hear that something is happening in

24    Nablus or things, I would call my wife.   When I drive, when I

25    spend -- I go at home I used to travel by 4:00 o'clock in the

1  morning, 4:00 a.m., so I would be able be in my work.  So my

2  wife keeps calling me to make sure that I reach my work.  More

3  than one time I would not be there on time, so she'd go crazy

4  checking, calling everybody to make sure that I was there.

5  Q    Now, Mr. Hurani, are you aware that there were terror

6  attacks perpetrated during the second intifada?

7  A    That's right.

8  Q    Including terror attacks in Israel?

9  A    Yes, sir, I'm aware.

10 Q    And what was your reaction to those?

11           MR. TURNER:  Objection.

12           THE COURT:  Sustained.

13 Q    How long did you remain deputy head of the computer

14 center?

15 A    I remained between 2000 and 2004.

16 Q    And what did you do then?

17 A    I then was promoted to be the Nablus branch manager.

18 Q    Okay.  And why did you decide to move to the business

19 side of the bank and away from computer operations?

20 A    Actually, to be what I am today.  Because computer man

21 can never be a CEO for a bank, so I decided to move from the

22 computer system to the business.  I thought I was ready at

23 that time and to have a different career line and I worked

24 hard and thanks God, I've done what I wanted.

25 Q    What was the Nablus branch like in 2004?

1   A    It was a large branch.  It is a large branch, Nablus is a

2   large city and Nablus branch is a larger branch.  At that time

3   it has at least 25,000 customers, is located in the center of

4   the city, so there is a lot of work to be done on daily basis.

5   You will have around 1,000 to 1,500 customer visiting the

6   branch each day and we have a lot of work to do there.

7   Q    Okay.  I'd like to display a photo just to the witness

8   only.

9        Do you recognize this photograph, Mr. Hurani?

10  A    I don't see anything so far.

11  Q    It will come up in a second.

12       THE COURT:  Maybe not.  Do you see it?

13       THE WITNESS:  Yes.

14  A    This is the Nablus branch picture.

15  Q    Okay.  And were you present when that photograph was

16  taken?

17  A    Yes, sir, I was there.

18  Q    When was that photograph taken?

19  A    January 2014.

20  Q    And it's, can you tell us whether the outside of the

21  branch looked like this in 2004 at the time that you became

22  the branch manager?

23  A    Yes, I think it's the same.  It's the same from outside,

24  it's different from inside.  It's the same from outside with

25  the exception of the ad you can see here for the lady, it's a

1  promotion campaign that we're doing these days.

2          MR. COLES:  May I display this to the jury?

3          THE COURT:  Are you moving it into evidence.

4          MR. COLES:  Sure, I'll move it into evidence.

5          THE COURT:  What Exhibit number do you want to give

6  it?

7          MR. COLES:  The next consecutive Exhibit Number is

8  DX 1623.

9          THE COURT:  Any objection?

10         MR. TURNER:  No, sir.

11         THE COURT:  All right.

12         (Defendant's Exhibit DX 1623 was received in

13 evidence.)

14         THE COURT:  Show it.

15         Anything else, Mr. Coles?

16 Q    When you became a branch manager in 2004, did Arab Bank

17 have a program to combat money laundering and terror

18 financing?

19         MR. TURNER:  Objection.

20         THE COURT:  Sustained.

21         No, I'm going to allow that question to be answered.

22 It's a yes or no question.  You can answer the question.

23 Q    When you became branch manager in 2004, did Arab Bank

24 have a program to combat money laundering and terror financing

25 in the Palestinian territories?

1      MR. TURNER:  Same objection.

2      THE COURT:  Overruled.

3  A    Of course, yes.

4  Q    Okay.  And at your branch, whose responsibility is it to

5  put that program into place under the bank's policies?

6  A    It was the branch manager and everyone else in the branch

7  was responsible to execute that program.

8  Q    And did Arab Bank at that time have a policy against

9  doing business with terrorists?

10     MR. TURNER:  Objection.

11     THE COURT:  Sustained.

12 Q    Was there a policy to have someone at the branch who was

13 specifically assigned the job of checking to prevent terror

14 financing and money laundering?

15     MR. TURNER:  Objection.

16     THE COURT:  Sustained.

17 Q    How long did you stay the manager of the Nablus branch?

18 A    I stayed for around three years.

19 Q    And so, you left in 2007, approximately?

20 A    2007 I resigned from Arab Bank.  I was recruited by

21 another bank in Palestinian territories as assistant general

22 manager.  But after ten months, the bank really set me and

23 asked me to come back as the head of all the branches in

24 Palestinian territories.

25 Q    And was the second intifada over by the time that you

1   came back to Arab Bank?

2   A    It was over in operations but the road blocks and

3   everything was still there, so it is until today there are

4   road blocks there that do exist.  The life is easier, it's

5   better, but the consequences of the intifada as measures on

6   the ground.

7           MR. COLES:  I have no more questions for this

8   witness at this time.

9           THE COURT:  Cross-examination.

10          MR. TURNER:  Very briefly.

11          THE COURT:  Okay.

12  CROSS EXAMINATION

13  BY MR. TURNER:

14  Q    Mr. Hurani, as I understand it, you were born and raised

15  in the Nablus area?

16  A    It's, you can consider it as the Nablus area.  It's a

17  village between Nablus and Jenin.

18  Q    And then you got an education and then sometime in the

19  early to mid-1990s you went to work for Arab Bank?

20  A    That's correct, sir if 12994.

21  Q    And your focus was in the computer sciences area?

22  A    It was the computer science serving the bank, so I was

23  working the computer science and I was helping all the

24  departments collecting their needs and know how they work.

25  That's what help me to move from the IT to the business.

1  Q    Right.  And you worked in the IT area, that's the

2  computer-type area; is that right?

3  A    That's right.

4  Q    And you did that all the way up until 2004 and then after

5  that is when you ended up moving over on the business side of

6  the bank?

7  A    That's correct, as a job, sir.

8  Q    Right.  And I believe you've told us because your

9  deposition you gave sworn testimony once before; is that

10 correct?

11 A    That's correct, sir.

12 Q    I think there's four volumes of it; is that correct?

13 A    Again, sir?

14 Q    Four or five volumes?

15      THE COURT:  Volumes, like books.

16 Q    Volumes like different books?

17 A    I don't know, it was like three, four days.

18 Q    And I believe you told us during this period of time that

19 there were a lot of posters that were up virtually everywhere.

20      Do you remember telling us words to that effect?

21 A    That's right, sir.

22 Q    And I think in all fairness you told us there were so

23 many you didn't pay much attention to the details of those

24 posters, did you tell us that?

25 A    That's correct.

1  Q    And I think you told us that you got newspapers at your

2  bank every day and you named two of the newspapers that you

3  got?

4  A    That was after 2008, but while in the computer center,

5  no.

6  Q    So, you didn't get any newspapers?

7  A    No.

8  Q    During that period of time?

9  A    No, sir.

10 Q    You also told us, I believe, and correct me if I'm wrong,

11 that during the second intifada you don't recall your bank in

12 Ramallah ever being closed during that period of time because

13 of the activities that were going on, do you recall that?

14 A    No.  Of course.

15 Q    You don't recall that?

16 A    No.

17 Q    Mr. Miller, let's show the witness only volume two, page

18 127 and it's highlighted for you there.  Can you read it okay,

19 Mr. Hurani?

20 A    Let me read it, please.  Were there periods of time

21 between --

22            THE COURT:  Just read it to yourself.

23            THE WITNESS:  Oh, thank you.

24            (Pause in the proceedings.)

25 A    Yes, sir.

1    Q    All right.  Isn't it true that you were asked the

2    following question during your sworn testimony.

3            Were there periods of time between 2000 and 2004

4    that you're aware of that Arab Bank branches simply could not

5    open during that period?

6            And your answer at that point in time was.

7            I can't remember exactly, but that's possible.  It

8    may have happened.

9            Did I read that correctly?

10   A    That's right, sir.

11   Q    Okay.  During the period of time that you were working in

12   the computer area, the IT area, during that period of time,

13   you didn't have any responsibility whatsoever for opening

14   people's accounts, did you?

15   A    That's correct, sir.

16           MR. TURNER:  All right, that's all the question, I

17   have, Your Honor.

18           THE COURT:  Any redirect?

19           MR. COLES:  No redirect, Your Honor.

20           THE COURT:  All right, you may step down, thank you

21   very much.

22           THE WITNESS:  Thank you, sir.

23           (Witness exits the courtroom.)

24           THE COURT:  Defendant may call its next witness.

25           MR. COLES:  We call Brian Billard to the stand.

1          (Witness enters and takes stand.)

2          THE COURTROOM DEPUTY:  Please, raise your right

3   hand.

4   B R I A N    D A V I D    B I L L A R D,

5               called by The Defense, having been

6               first duly sworn, was examined and testified

7               as follows:

8          THE COURTROOM DEPUTY:  Please, state and spell your

9   name for the reporter.

10         THE WITNESS:  My name is Brian David Billard.

11  B-R-I-A-N, D-A-V-I-D, B-I-L-L-A-R-D.

12         THE COURTROOM DEPUTY:  Thank you, you may be seated.

13         THE WITNESS:  Thank you.

14         THE COURT:  Mr. Coles, do we need the interpreters?

15         MR. COLES:  I don't think we'll need the

16  interpreters for Mr. Billard.

17         THE COURT:  You are excused.

18         THE INTERPRETERS:  Thank you.

19         THE COURT:  Please, proceed.

20         MR. COLES:  Thank you.

21  DIRECT EXAMINATION

22  BY MR. COLES:

23  Q    Where do you live, Mr. Billard?

24  A    I currently reside in New Windsor, New York.

25  Q    What do you do for a living?

1  A    I'm currently the deputy manager and comptroller for Arab

2  Bank in New York.

3  Q    How long has that been your position at Arab Bank

4  New York?

5  A    For the last four years.

6  Q    Okay.  And how long have you worked for Arab Bank

7  overall?

8  A    I joined Arab Bank in September 1999 so it's my 15th year

9  anniversary.

10 Q    And happy anniversary?

11 A    Thank you.

12 Q    What positions have you held at Arab Bank between

13 September 1999 and your current?

14 A    When I first joined the bank I joined as comptroller.

15 When I joined I realized that I also had responsibility for

16 compliance so I was named the compliance officer.  In 2004 we

17 had a separate compliance officer and in 2009 I got the

18 additional title of deputy manager.

19 Q    Okay.  So from 1999 to 2004 you were both the comptroller

20 an the compliance officer?

21 A    That is correct.

22 Q    Okay.  Where did you grow up, Mr. Billard?

23 A    I grew up in a small town called Blackpool in England.

24 Q    Okay.  When did you come to the United States?

25 A    December of 1977.

1   Q     And where did you move to?

2   A     We moved to Atlantic Beach which is right next to

3   Long Beach on Long Island.

4   Q     And is that where you grew up?

5   A     Well, I was 17 when I moved over there.  I attended

6   school in Long Beach for six months and then went on to

7   college.

8   Q     And where did you attend college?

9   A     Graduated from Penn State university.

10  Q     And what degree?

11  A     In accounting.

12  Q     Okay.  And did you go into banking after graduating from

13  Penn State?

14  A     I did.  Yes.  Shortly after leaving Penn State I joined

15  Hong Kong Shanghai bank, which is better known today as HSBC.

16  Q     Okay, what was your position there?

17  A     When I joined, I was a Grade 2 clerk in the accounting

18  department.

19  Q     And what is HSBC?

20  A     HSBC nowadays actually is the second largest bank in the

21  world, I believe.  It started out as a small trading bank.

22  That facility would trade between Hong Kong Shanghai and

23  Scotland.

24  Q     And how long were you employed at HSBC?

25  A     I left HSBC in September of 1999 and three days later I

1  joined Arab Bank.

2  Q     Why did you decide to join Arab Bank?

3  A     Well, when I joined HSBC, as I said before, it was

4  Hong Kong Shanghai bank, it was a foreign branch much like our

5  branch is a foreign branch of Arab Bank.  Over the years, as

6  HSBC grew, they took over a bank in New York State called

7  Marine Midland Bank.

8        Once they did that, they folded the foreign business

9  into the domestic bank so it became a domestic banking entity.

10 At that point my forte was really foreign banking.  So I

11 decided to go look for another job.

12 Q     So, when you came to Arab Bank in 1999, as comptroller

13 would you describe for the jury your responsibilities?

14 A     Sure.  When I joined the bank as comptroller, I'm

15 responsible for making sure that the general ledger the

16 operations of the bank's finances and certain thing are okay

17 on a daily basis.  I was responsible for all the reporting to

18 all the regulators and to our head office for the financials.

19 As I said, I also had responsibilities for compliance.

20 Q     Okay.  How did you go about performing your job as

21 compliance officer?

22 A     Well, compliance in Arab Bank, I was very impressed with

23 it because everybody was involved in compliance function.  The

24 heads of the departments of each department was responsible

25 for their own section in compliance and those heads of

1    departments had many years of knowledge in those areas.  So I

2    was very comfortable.

3         My role was to make sure that those heads of

4    departments complied with the rules and regulations

5    responsible for their departments, that any new laws or

6    regulations that came into place were communicated properly

7    and put into place properly.

8    Q    Okay.  And who did you report to in your position as

9    comptroller and compliance officer?

10   A    I reported to a gentleman by the name of Nofal Barbar.

11   Q    And who did Mr. Barbar report to?

12   A    He reported directly to head office in Amman, Jordan.

13   Q    Okay.  And at that time, what were the branches main

14   areas of business?

15   A    Back then, we had four main areas of business.  We had

16   lending.  We had trade finance.  We had a private banking and

17   we had a money transfer wire business.

18        The credit department, the credit and straight

19   finance, we provided facilities for the large fortune 1000

20   companies, companies such as GE, or Mobil, Chevron, those

21   companies that did business with the Middle East and required

22   financing to conduct that business.

23        The private banking business we only had a couple

24   hundred customers, maybe 300 as compared with Chase that has

25   millions.  And what we did for them is we had both checking

1  accounts and savings accounts.

2          The wire transfer business, we facilitated the U.S.

3  dollar clearing for our branch network.  You know we had

4  branches throughout the world.  When they have to do business

5  in U.S. dollars and clear dollars, they would come to our

6  branch for us to clear those dollar for them.

7  Q    So, what was Arab Bank New York's role as it related to

8  the rest of Arab Bank's operations around the world?

9  A    Well, first we were a liaison for the Fortune 1000 to

10 sell our products to the Fortune 1000 group letting them know

11 what the branch network for the group could do for them.  And

12 as I said before, we cleared the U.S. dollar wire transfers

13 for the bank.

14 Q    Does every dollar that Arab Bank processes around the

15 world get cleared through the United States?

16 A    It's U.S. dollars, yes, it does.

17

18          (Continued on following page.)

19

20

21

22

23

24

25

1   BY MR. COLES:   (Continuing)

2   Q     Okay.   And why is that and how does it happen?

3   A     Well, I mean, you know, U.S. dollars is the currency of

4   choice throughout the globe, essentially, so a lot of business

5   and trade is done in U.S. dollars.   Those U.S. dollars have to

6   go to U.S. shores because, after all, they're U.S. dollars.

7   You can't go to the UK that uses British pounds and clear

8   dollars there.   They have to come to U.S. shores eventually.

9   Q     Can you give an example of a clearing transaction to the

10  jury?

11  A     Sure.   Let's say you have one of our, our customers in

12  Amman, Jordan, for argument's sake, and he has a son that goes

13  to Penn State University where I went.   He pays tuition every

14  six months.   Penn State bills tuition in U.S. dollars and our

15  client goes to the local branch and says, look, I've got to

16  pay my son's bill, otherwise, he'll be kicked out of school,

17  you know, can you help me.   What would happen is the branch

18  officer would send a wire to us and they say can you forward

19  this to Penn State University for the credit of my son's

20  tuition.   We would, in turn, if we have a direct relationship

21  which we don't, we would go to a third-party bank, the

22  correspondent bank, and say could you please do this for us

23  and that's how it would be cleared.

24  Q     The term "correspondent bank" has come up earlier in this

25  case.   Can you also explain what that is?

1  A    Sure.  A correspondent bank -- you know, banks don't have

2  branches in every country in the globe so they need somebody

3  to help them conduct business for their customers.

4       If a customer comes in in the U.S. and says, look, I

5  need to send money to somebody in China, for argument's sake,

6  okay, they don't have a branch in China.  They would go to

7  another bank who does have a branch in China and say I have

8  this customer that needs some help and he's got funds over

9  there, can you do it.  The Bank would say sure and that's

10 basically a correspondent relationship.

11 Q    So it's really a relationship for a bank in places where

12 that bank doesn't have branches?

13 A    Absolutely, yes.

14 Q    Do all correspondent banks have relationships?

15 A    All -- no bank has branches in every country in the

16 globe.

17 Q    Now, I want to change to another subject.

18      Are you familiar with something called the OFAC

19 list?

20 A    I am, yes.

21 Q    Okay.  Can you explain what the OFAC list is?

22 A    Sure.  OFAC is an acronym for Office of Foreign Asset

23 Control.  It's a department within the United States Treasury

24 within the government that puts out a list of individuals

25 including terrorists and companies and other entities and

1  sometimes countries that people in the United States cannot do
2  business with.  And it's put out to banks.  It's put out to
3  insurance companies.  Essentially every company in the United
4  States is required to file with OFAC.
5  Q    And does the Treasury Department tell you why somebody is
6  on the OFAC list or give you information about them?
7  A    No, they don't.  You know, who goes on to OFAC, we, we
8  get the edict, in fact, I get it on my phone nowadays.  It
9  says, hey, have these people on OFAC, please.
10 Q    Is what a bank supposed or why did you look, Arab Bank
11 New York branch look to the government to tell you who to deal
12 with and not to deal with?
13 A    Well, you know, determining who's a criminal, who's not a
14 criminal, who should be doing business with somebody in the
15 United States, who shouldn't, that's really law enforcement
16 and government responsibility.  A bank can't do that.  Law
17 enforcement -- you know, putting somebody on OFAC is a very,
18 very serious matter.  Law enforcement, government has the
19 resources.  They have the intelligence throughout the world to
20 make those examinations.  Banks don't have that sort of
21 resource and intelligence.  In fact, I don't think anybody
22 would want somebody taking it as a light thing.  If bank A
23 says, hey, this person should be on OFAC and Bank B said no,
24 and vice versa, you know, you need uniformity.  Without
25 uniformity, it won't work.

1   Q    Is OFAC binding on all banks in the United States?

2   A    It absolutely is, yes.

3   Q    And it has to be applied uniformly by all the banks?

4   A    Yes.

5   Q    What is a bank in the U.S. required to do with respect to

6   the OFAC list?

7   A    Well, in the wire transfer business or any financial

8   transaction that comes through the bank, not just a wire

9   transfer but any financial transaction, you are required to

10  take the information of that financial transaction and look at

11  the OFAC list and say does any of this information appear to

12  be or is somebody that is on that list.  And if it is, you are

13  required to stop that financial transaction and look into it

14  further.

15  Q    Okay.  How did Arab Bank New York go about doing that in

16  the 2000-2004 time frame?

17  A    We had an automated system which ran off our, our

18  computer system.

19  Q    And why was -- why was the OFAC filter integrated into

20  the Bank's systems?

21  A    Well, you know, in comparison, we're a small bank.  We

22  have 3,500 transactions a day, let's say.  A bank like Chase

23  or Citi will have, like, millions.  There's thousands of

24  entities on the OFAC list.  So if you have a typical wire that

25  comes through, you may have five, six pieces of information

1   that have to be checked against OFAC.  For us, 3,500 is

2   difficult.  For another bank, millions would be difficult.  So

3   it's, it's pretty much impossible to manually check each and

4   every transaction that goes through and go against thousands

5   of names that are on OFAC.

6   Q    What type of transactions did Arab Bank New York filter

7   against the OFAC list?

8   A    Every transaction that went through the branch.

9   Q    Were there any transactions that went through the branch

10  that were not filtered against the OFAC list?

11  A    Not that I'm aware of, no.

12  Q    Do you know how long the branch had a filter system by

13  which the transactions were screened against the OFAC list?

14  A    Well, I joined in 1999 and it was in place when I joined.

15  Q    Okay.  And can you explain the process of, of whether or

16  not sometimes the Bank's filter would identify a transfer as a

17  potential OFAC hit?

18  A    Oh, sure.

19  Q    And what the Bank would do under those circumstances?

20  A    Sure.  So a wire comes through or multiple wires come

21  through, you know, and they process automatically.  Okay?  So

22  as the wires get checked against OFAC, if OFAC, if the match

23  thinks it's a possible hit, it would stop and it would wait in

24  a queue for somebody to physically get on and look at that

25  transaction.  Okay?  So, you know, during the course of the

1    day, you would have multiple items in the queue.  By virtue of

2    the way OFAC worked, we, we had a lot of items to look at.  So

3    you'd open up the wire or the transaction and you would look

4    as to the reasons why.

5           If it was felt that it was false positive -- now,

6    what a false positive is is -- and banks get a lot of false

7    positives just by the way it works.  If the wire said, let's

8    say, John Smith and OFAC said Brian Smith, the filter would

9    stop it because it has Smith in it so you actually have to

10   look at that piece of information.  And as a, as an

11   individual, an operator looking at those, you can see that

12   clearly John Smith and Brian Smith are not the same.  You can

13   say, okay, I can let this payment go and release it from the

14   stop queue.  If it was a little less easy to make that

15   determination, if the wire said John Smith and/or J. Smith and

16   the OFAC said John Smith, then you can't clearly say, hey,

17   definitely not a match so what would happen then is that the

18   operator would automatically bump it up to a higher level, a

19   supervisor or assistant vice president.

20   Q    What would the supervisor do or the person at that higher

21   level that this was bumped to?

22   A    Well, they would look at it and, again, if there was

23   other pieces of information that they could make a clear

24   determination, they would make that, but Arab Bank, in it's

25   very nature, was very conservative so a lot of times we would

1  call OFAC directly and give them information for their

2  guidance because we didn't want to make that decision.

3  Q    How would you contact OFAC?

4  A    Well, they have a hotline.  It's 1-800 -- it's been a

5  long time -- I think it's 540-OFAC.  Direct line to them.

6  Q    And what would happen when you call?

7  A    Well, whoever called them would, would talk to somebody

8  at the other end and they would give them the information that

9  they have and the gentleman or lady at the other end would

10  say, okay, I want you to put together all the information for

11  me, don't let the payment go through yet, put together all the

12  information for us and fax it to us in Washington so we can

13  make the determination for you.

14  Q    And what involvement in this process would you typically

15  have?

16  A    Well, whenever anything got to a level where it was being

17  reviewed by somebody senior, myself and the head of operations

18  would take a look at the information also and help guide the

19  process along the way.

20  Q    Okay.  Now, was this OFAC hotline something that was

21  available for all banks in the United States?

22  A    Yes, it is.

23  Q    I'd like to show you, for the witness only, what's been

24  marked as DX 469.

25               THE COURT:  Mr. Coles, how much longer do you

1  anticipate with this witness?

2         MR. COLES:  We can take a break now because I'll

3  probably be another hour or so.

4         THE COURT:  Okay.  Let's end for the day then if

5  this is convenient for you.  Yes?

6         MR. COLES:  Sure.  I think this is fine.

7         THE COURT:  Ladies and gentlemen, don't talk about

8  the case.  Don't do any research on the internet.  Don't look

9  at any newspaper or listen to any TV coverage of the case.

10 Keep your mind open and we'll see you tomorrow at 9:30.  Have

11 a great evening.

12        (Jury exits.)

13        THE COURT:  All right.  Anything before we adjourn

14 for the day?

15        MR. STEPHENS:  No, Your Honor.

16        THE COURT:  See you at 9:30.  Thank you.

17        THE WITNESS:  Thank you, Your Honor.

18        (Matter adjourned to September 12, 2014 at

19 9:30 a.m.)

20

21

22

23

24

25

B E V E R L E Y    M I L T O N - E D W A R D S

CROSS-EXAMINATION (Continued)

REDIRECT EXAMINATION

S H U K R Y    B I S H A R A

DIRECT EXAMINATION

SHUKRY BISHARA, resumed

DIRECT EXAMINATION (Continued)

CROSS-EXAMINATION

REDIRECT EXAMINATION

J A M A L    S I D Q I    S A D E Q    H U R A N

I

DIRECT EXAMINATION

CROSS EXAMINATION

BY MR. TURNER

B R I A N    D A V I D    B I L L A R D

DIRECT EXAMINATION

BY MR. COLES

4721

Defendant's Exhibit DX 1623

41